IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ILLINOIS, EAST ST. LOUIS DIVISION

| | | |
|---|---|---|
| DEMETRIUS ROSS, on behalf of himself and all others similarly situated, | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 15 C 0309 |
| | ) | |
| GREG GOSSETT, et al., | ) | |
| | ) | |
| Defendants. | ) | Judge Staci M. Yandle |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTIONS TO DISMISS (Doc. Nos. 46 & 51)**

## INTRODUCTION

Demetrius Ross brought this class-action lawsuit against members of the

"Orange Crush" Special Operations Response Team, as well as prison

administrators responsible for supervising and directing the actions of the team,

over the abusive and humiliating strip-searches and shakedowns conducted by

them from 2014 to the present at four Illinois Department of Corrections (IDOC)

prisons: Illinois River Correctional Center (Illinois River), Menard Correctional

Center (Menard), Big Muddy River Correctional Center (Big Muddy), and Lawrence

Correctional Center (Lawrence). Mr. Ross filed this suit on behalf of himself and all

individuals housed at these four prisons who were subjected to the 2014

shakedowns, and all prisoners presently confined to those facilities or who may be

confined to them in the future.

As described in more detail below, Defendants physically and sexually abused

Plaintiffs throughout the shakedowns at these four prisons, and gratuitously

inflicted punishment on them solely to cause them humiliation and unnecessary pain. Defendants' misconduct violated Plaintiffs' Eighth Amendment rights, and gave rise to the federal and state-law claims at issue in this case. For the reasons described below, there is no basis to dismiss any of Plaintiffs' claims against Defendants at the pleadings stage.

## BACKGROUND

In early April 2014, members of the Orange Crush team began conducting abusive shakedowns at four prisons in Southern Illinois: Illinois River, Menard, Big Muddy, and Lawrence. Doc. No. 1 (Pls.' Compl.) ¶ 19, 36. During these shakedowns, Orange Crush team members wore riot gear to conceal their faces, their name badges, and their identities from the prisoners whom they encountered.

At each prison, Defendant Orange Crush Officers—the Defendants who personally participated in the shakedowns—started each shakedown by entering the housing units *en masse*, making loud "whooping" noises, and hitting their batons against the walls, tables, doors, and railings of the housing unit. *Id.* ¶ 20. This was done to cause the prisoners fear and distress. Each one of the Defendant Orange Crush Officers, including several female officers, then lined up in front of a specified cell and ordered the prisoners to "get asshole naked!" *Id.* ¶ 21. Once naked, Defendant Orange Crush Officers ordered the prisoners to spread their buttocks and lift their genitals, and then use their hands to open their mouths with their fingers. *Id.* ¶¶ 21–22. They were not given any opportunity to wash their hands. *Id.* ¶ 22. Defendant Orange Crush Officers then ordered the men to get dressed, but

2

told the prisoners that they could not put on any underwear. *Id.* ¶ 23. If any prisoner voiced any opposition or questioned the officers' conduct, they were told to "shut the fuck up!" and threatened with segregation. *Id.* ¶ 22.

After the strip searches were all completed, Defendant Orange Crush Officers ordered the men in the cell to which they had been assigned to face the wall. *Id.* ¶ 24. Each prisoner was then handcuffed in the same way: with the palms of his hands facing outwards and his thumbs pointed up to the sky. *Id.* The men were then told to line up, and as they did so, each Defendant Crush Officer lined up beside them, hitting his baton in his hands and chanting "punish the inmate" softly. *Id.* ¶ 25.

Once the chanting stopped, Defendant Orange Crush Officers simultaneously grabbed the back of each prisoner's head and slammed it violently into the back of the prisoner ahead of him in line. The prisoners were ordered to stand in such a way that one man's genitals were in direct contact with the buttocks of the man ahead of him in line—a procedure Defendants called "Nuts to Butts." *Id.* ¶ 26. Defendant Orange Crush Officers shoved their batons in between each prisoner's legs and jerked upwards, forcing the prisoner to straighten his legs while keeping his back bent over onto the prisoner in front of him. *Id.* ¶ 27. Any requests for medical attention or complaints of pain were ignored and complaining prisoners were told to "shut the fuck up!" and threatened with segregation. *Id.* ¶ 24.

Defendant Orange Crush Officers ordered the men to march in this bent-over formation from the housing unit of their prison to a common area in the facility. *Id.*

3

¶ 27. The march was long and painful, because every time that a prisoner's head came off of the back of the prisoner in front of him (an inevitable consequence of marching in a line without being able to look forward), Defendants responded with violence by slamming the prisoner's head in the back of the prisoner in front of him, or being pulled to the ground in a chokehold. *Id.* ¶ 28.

Once in the common area of the prison, a few select officers, who appeared to be supervisors, were left in charge. *Id.* ¶ 29. These supervisors told the men that "This is punishment for all your sins!" *Id.* ¶ 30. Prisoners were told not to ask for medical attention, water, or to use the bathroom, because all of these requests would be denied. *Id.* ¶ 30. And indeed, they were.

After several hours, the mass of Defendant Orange Crush Officers returned to the common area, and again slammed the prisoners' heads into the backs of the prisoners in front of them. *Id.* ¶ 31. Defendant Orange Crush Officers again ordered the men to march back to their housing unit—and reacted with the same violence whenever a prisoner broke the line by (accidentally or otherwise) lifting his head off the back of the person ahead of him in line. *Id.* ¶ 31. Throughout the entire march, Defendant Orange Crush Officers laughed at and taunted the men. *Id.* ¶ 32.

Upon return to their housing unit, prisoners found that their cells had been "tossed" and that non-contraband items had been taken. *Id.* ¶ 33. Rather than providing the proper paperwork to allow prisoners to challenge these improper confiscations, however, Defendant Orange Crush Officers left either nothing to

document the confiscation or left a slip that obscured what had been taken and which officers were involved. *Id.*

These abusive and humiliating shakedowns were repeated in each housing unit of the four prisons. Each time, Defendant Orange Crush Officers entered the unit *en masse* in the same intimidating way, and quickly and in organized fashion lined up in front of the prisoners' cells. During each shakedown, Defendant Orange Crush Officers gave the same commands—including lining each prisoner up in precisely the same way—and gave the same response to prisoners who responded with complaints or requests for medical attention. These humiliating shakedown tactics continue to this day. *Id.* ¶ 38.

Defendant Orange Crush Officers conducted these shakedowns in the same way at each housing unit of each facility because they were acting pursuant to a policy or practice implemented, overseen, and encouraged by prison administrators, including Defendants Warden Gossett (at Illinois River), Warden Roeckeman (at Big Muddy), Warden Duncan (at Lawrence), Warden Butler (at Menard), and IDOC Chief of Operations Yurkovich, who is responsible for the supervision of all Orange Crush teams throughout the State.

Because of the misconduct described above, Mr. Ross brought claims on behalf of himself and all of the men subjected to the humiliating and abusive shakedowns at Illinois River, Menard, Big Muddy, and Lawrence. *Id.* ¶¶ 39–45. He seeks to represent the following class: all individuals housed at Illinois River, Big Muddy, Lawrence, and Menard who were subjected to the 2014 shakedowns in his

claim for damages, and all men confined to those facilities presently or who will be confined to them in the future in his claim for injunctive relief. *Id.* ¶ 40. On behalf of the class, Mr. Ross has alleged that each of the Defendants committed one or more of the following acts: used excessive force against the class, failed to intervene to protect them from excessive force by other officers, conspired with one another to use excessive force and to fail to intervene, and intentionally inflicted emotional distress on the class members. He has also brought a claim under the Prison Rape Elimination Act, 42 U.S.C. § 15607, against Defendant Taylor [1] for injunctive relief to require her to comply with the Prison Rape Elimination Act (PREA) National Standards.

## ARGUMENT

In assessing a motion to dismiss, the Court must "construe all of the plaintiff's factual allegations as true, and must draw all reasonable inferences in the plaintiff's favor." *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009). To state a claim, a plaintiff's complaint need only make out a "plausible account" of his entitlement to relief. *Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Supreme Court in *Iqbal* held that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

---

[1] In their Complaint, Plaintiffs named Donald Stolworthy as a Defendant in his official capacity as Director the Illinois Department of Corrections (IDOC), but Mr. Stolworthy has since been replaced by Gladyse Taylor. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Gladyse Taylor should be substituted for Donald Stolworthy as a defendant in this case. Fed. R. Civ. P. 25(d).

alleged." 556 U.S. at 678. The Court further emphasized that applying the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## I.   Plaintiff has Adequately Pled a Conspiracy Claim Against Defendants.

To properly plead a conspiracy claim, "it is enough . . . to indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with." *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002). There is no heightened pleading standard for conspiracy claims. *E.g., Loubser v. Thacker*, 440 F.3d 439, 442–43 (7th Cir. 2006); *Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003); *Walker v. Benjamin*, 293 F.3d 1030, 1039 (7th Cir. 2002). To prevail on their conspiracy claims, Plaintiffs need only show that Defendants were "voluntary participant[s] in a common venture" and understood "the general objectives of the scheme, accept[ed] them, and agree[d], either explicitly or implicitly, to do [their] part to further them." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1998). They do *not* need to allege or prove that Defendants "agreed on the details of the conspiratorial scheme or even know who the other conspirators are." *Id.* Plaintiffs' conspiracy claims may be alleged through circumstantial, rather than direct, allegations. *Geinosky*, 675 F.3d at 749; *Pisoni v. Illinois*, No. 12 C 0678, 2013 WL 2458522, at *7 (S.D. Ill. June 6, 2013) ("Plaintiffs are not required to make direct allegations of a conspiracy, but can allege circumstances that add up to a plausible account of a conspiracy." (internal quotation marks omitted)).

When assessing the adequacy of a conspiracy claim, courts should examine a complaint in its entirety, rather than a particular allegation in isolation. *See, e.g., Starks v. City of Waukegan*, 946 F. Supp. 3d 780, 790 (N.D. Ill. 2013) (noting that the court would accept all allegations which "allow[ed it] to draw the reasonable inference" of a conspiracy even where one allegation was, on its own, conclusory); *Breiner v. City of Chicago*, No. 13 C 1696, 2014 WL 866419, at *4 (N.D. Ill. Mar. 4, 2014) (denying motion to dismiss plaintiff's conspiracy claim based on totality of plaintiff's allegations); *James v. Vill. of Willowbrook*, No. 11 C 9126, 2012 WL 3017889, at *9 (N.D. Ill. July 19, 2012) (same); *see also Schultz v. Ill. Dep't of Corr.*, No. 00 C 4262, 2001 WL 1803713, at *1 (S.D. Ill. Apr. 12, 2001) (courts must examine complaint as a whole in assessing a motion to dismiss under Rule 12(b)(6)). Indeed, the Seventh Circuit in *Geinosky* looked to a plaintiff's complaint in its entirety when it reversed the dismissal of the plaintiff's conspiracy claim based on allegations of a "pattern of misconduct" by the defendants—despite the fact that the complaint contained only "conclusory direct allegations of conspiracy . . . ." 675 F.3d at 749.

Plaintiffs' conspiracy claim satisfies the standards set forth in *Geinosky*, *Walker*, and *Jones*. *Geinosky*, 675 F.3d at 749; *Walker*, 288 F.3d at 1007; *Jones*, 856 F.2d at 992. Plaintiffs have alleged that all Defendants participated in the conspiracy, and that it began sometime shortly before the first shakedown at Menard in early April 2014. Doc. No. 1 ¶¶ 1–4, 19, 36–38, 58–65. They have further alleged that the purpose of the conspiracy was to maliciously and sadistically inflict

harm on Plaintiff (and the members of the class he seeks to represent, hereafter "Plaintiffs"), and to refrain from intervening to prevent Plaintiffs from being subjected to the excessive force. *Id.* ¶¶ 39–71.

Plaintiffs' allegations of conspiracy also easily meet the *Twombly/Iqbal* standard of plausibility. Plaintiffs alleged a pattern of misconduct by all Defendants from early April 2014 through the present. *Id.* ¶¶ 1–4, 19–35 (describing the shakedown in detail); *id.* ¶¶ 36, 38–45 (discussing the shakedowns at Illinois River, Menard, Big Muddy, and Lawrence, and the similarities between them); *id.* ¶¶ 37, 51–56, 70 (discussing the policies and practices behind the shakedowns). Defendant Orange Crush Officers, all of whom personally participated in the shakedowns at Illinois River, Menard, Big Muddy, and Lawrence, precisely replicated the same coordinated misconduct (each maliciously inflicting pain on prisoners in their care), and did so on several occasions. *Id.* ¶¶ 19–38, 46–51, 66–69. This highly coordinated and repeated misconduct strongly suggests that Defendant Orange Crush Officers came to an agreement prior to the shakedowns to commit this misconduct—that is, they entered into a conspiracy. To suggest that this coordinated and repeated misconduct was pure happenstance is highly implausible. Plaintiff has further alleged that the prison administration Defendants—Warden Gossett, Warden Roeckeman, Warden Duncan, Warden Butler, and Chief of Operations Yurkovich—implemented, oversaw, and encouraged that coordinated misconduct. *Id.* ¶¶ 37–38, 52–56, 70–71.

Defendants make two arguments in favor of dismissing Plaintiffs' conspiracy claim. First, they argue that the paragraphs contained in Count II of Plaintiffs' Complaint, Doc. No. 1 ¶¶ 58–65, do not contain the level of detail required to state a claim of conspiracy. Second, they argue that it is "not plausible" that all Defendants "had a meeting of the minds and conspired to be part of a conspiracy" to violate the Plaintiffs' constitutional rights. Doc. No. 47 (Defs.' Mot. to Dismiss) at 10. Neither argument has merit.

As discussed above, it is the entirety of Plaintiffs' Complaint, not just the eight paragraphs located under the heading of "Count II," that must be taken into account to determine the sufficiency of Plaintiffs' conspiracy claim. *See supra* pg. 8. The entirety of Plaintiffs' Complaint—including allegations of the Defendant Orange Crush Officers' simultaneous parallel acts of misconduct that occurred on multiple occasions in four prisons—plausibly alleges the existence of a conspiracy amongst Defendants to act jointly as they did. *E.g., Breiner*, 2014 WL 866419, at *4 (denying motion to dismiss conspiracy claim because plaintiff "alleged that on multiple occasions over an extended period of time," defendants acted in the same way); *James*, 2012 WL 3017889, at *9 (denying motion to dismiss conspiracy claim where plaintiff alleged repeated instances of misconduct and facts suggesting an opportunity for the defendants to conspire to deprive the plaintiff of his rights); *Petrovic v. City of Chicago*, No. 06 C 6111, 2008 WL 4286954, at *8 (N.D. Ill. Sept. 16, 2008) ("A reasonable jury could conclude from the fact that these officers acted in concert while they used excessive force that there was an implied agreement to

do so."); *Williams v. Brown*, 269 F. Supp. 2d 987, 994–95 (N.D. Ill. 2003) (evidence suggesting that officers arrived *en masse* and subsequently acted in a "cooperative and organized manner" permitted inference that "some planning had taken place in advance" and precluded summary judgment against plaintiff on conspiracy claim).

Defendants' second argument fares no better. As the Seventh Circuit and other courts in this Circuit have repeatedly recognized, conspirators "need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are" if they "understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do [their] part to further them." *Jones*, 856 F.2d at 992; *see also, e.g., McCann v. Mangialardi*, 337 F.3d 782, 789 (7th Cir. 2003); *Williams*, 269 F. Supp.2d at 994–95. Plaintiffs have alleged that Defendants understood the objectives of the scheme—to use excessive force against Plaintiffs—that they agreed to participate in carrying out that scheme, and that they then did so. The fact that each one of the 234 Defendants may not have discussed the conspiracy with all of the remaining 233 Defendants is irrelevant to whether Plaintiffs have met the pleading standards set forth by the Seventh Circuit in *Jones*, *Geinosky*, and *Walker*. *Geinosky*, 675 F.3d at 749; *Walker*, 288 F.3d at 1007; *Jones*, 856 F.2d at 992. They have, and Defendants' motion to dismiss Plaintiffs' conspiracy claim should therefore be denied.

## II.   Plaintiffs Have Sufficiently Pled Claims for Excessive Force and Failure to Intervene Against Defendants.

Defendants argue that Plaintiffs have failed to state a claim for excessive force (Count I) and failure to intervene (Count III). Defendants have not and cannot

argue that assuming the veracity of the allegations in Plaintiffs' Complaint, they have sufficiently alleged that Defendants used excessive force and/or failed to intervene to prevent others from using excessive force. Instead, they complain that Plaintiffs have not specified precisely which of the Defendant Orange Crush Officers did what and to whom. Doc. No. 47 at 4–6 ("Plaintiff[s] cannot sue Defendants jointly without identifying or adequately pleading each individual's involvement."). Because of the lack of detail, they argue, there is no claim against any of them.

Defendants' argument is without merit. "Rule 8(a) is not so rigid that it requires a plaintiff, without the benefit of discovery, to connect every single alleged instance of misconduct in the complaint to every single specific [defendant]." *Koh v. Graf*, No. 11 C 2605, 2013 WL 5348326, at *4 (N.D. Ill. Sept. 24, 2013); *see also Johnson v. Vill. of Maywood*, No. 12 C 3014, 2012 WL 5862756, at *2 (N.D. Ill. Nov. 19, 2012) (plaintiff was not required to list the action of each defendant individually, but instead could make allegations regarding the defendants' conduct as a group); *Warren ex rel. Warren v. Dart*, No. 09 C 3512, 2010 WL 4883923, at *7 (N.D. Ill. Nov. 24, 2010) (plaintiff was not required to specify which officer committed which bad act). At the pleadings stage, a plaintiff's complaint must simply provide fair notice of what the claim is and the grounds upon which it rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) ("[s]pecific facts are not necessary"); *see also Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009) (complaints need only "lay out a plausible grievance"). To hold otherwise would effectively allow correctional officers "to violate constitutional rights with abandon as long as they ensured they

12

could not be individually identified, even if liability for acting in concert (or for aiding and abetting each other) would otherwise apply." *Koh*, 2013 WL 5348326, at *4; *see also Billman v. Ind. Dep't of Corr.*, 56 F.3d 785, 789 (7th Cir. 1995) (reversing dismissal of prisoner's complaint based on his inability to identify his attackers because "[d]ismissal would gratuitously prevent him from using the tools of pretrial discovery to discover the defendants' identity").

Plaintiffs have met their burden. They have alleged that each of the Defendant Orange Crush Officers—a term defined in Plaintiffs' Complaint to include all Defendants except for Defendants Gossett, Roeckeman, Duncan, Butler, Yurkovich, and Taylor—were physically present and personally participated in at least some of the shakedowns at Illinois River, Menard, Big Muddy, and Lawrence. Plaintiffs have alleged in great detail the misconduct committed by the Defendant Orange Crush Officers during those shakedowns—conduct in which either each of the named defendants agreed to perform, directly participated in, or stood by and allowed to happen. It is this jointly agreed upon and carried out misconduct that gives rise to Plaintiffs' claim for excessive force against them. They have further alleged that Defendants knew about the planned misconduct before it occurred, providing them with ample opportunity to intervene to prevent the excessive force from occurring. Accordingly, Plaintiffs have stated claims against Defendants for personally causing the deprivation of their constitutional rights to be free from cruel and unusual punishment by using excessive force and failing to intervene to protect Plaintiffs from harm. *See Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001)

(defendants must be "personally responsible for the deprivation of a constitutional right" to be liable under § 1983).

Plaintiffs admit that they cannot yet identify which Defendant Orange Crush Officers were present at which housing units, primarily because Defendants purposefully conceal their identities to evade responsibility for their misconduct, but that is a matter for discovery, not something that Plaintiffs are required to do before any discovery has been exchanged in this case. *See Fillmore v. Page*, 358 F.3d 496, 507 (7th Cir. 2004) (to prevent officers from  insulating themselves from liability by disguising their identities, courts should "compel prison officials to reveal all information relevant to the task of identifying the responsible parties, including such facts as who was assigned to the particular task that gave rise to the claim"); *Billman*, 56 F.3d at 789 (plaintiffs who plausibly allege constitutional deprivations are entitled to discovery to identify their attackers). Plaintiffs have alleged that every one of the Defendant Orange Crush Officers used excessive force against one of the class members, and that each Defendant failed to intervene to prevent the excessive force. That is sufficient at this point in the litigation.

Defendants' citation to *Fillmore* and *Harper v. Albert*, 400 F.3d 1052 (7th Cir. 2005), is unavailing. In *Harper*, the Seventh Circuit affirmed a jury verdict for the defendants, and the denial of plaintiffs' post-trial motion for judgment as a matter of law. 400 F.3d at 1054. The Seventh Circuit found that because after all of the *evidence* had been presented, the plaintiff still could not identify any particular guard who had committed excessive force against him, the defendants were entitled

to judgment as a matter of law. *Id.* at 1056 ("It was Harper's burden to identify, either through discovery (which was completed to the satisfaction of both parties) or through evidence submitted at trial, those guards that allegedly violated his constitutional rights during the time frame in question . . . ."). There was no evidence in *Harper* that the defendants had agreed in advance to use excessive force—and in fact the court found that there was no opportunity for others to intervene as the evidence showed that the force used was spontaneous. In the instant case, Plaintiffs have alleged exactly what the Seventh Circuit held was required in *Harper*: actual participation by all Defendants in the misconduct, and a clear opportunity to have intervened to stop it.

Similarly, in *Fillmore*, the Seventh Circuit addressed a finding by the district court under Rule 52 that the plaintiff could not prevail on his excessive force claims. 358 F.3d at 506–07. The court rejected the plaintiff's argument that he should be entitled to prevail against other defendants, even if he could never identify the tortfeasor who committed excessive force against him, under a theory of joint liability. *Id.* at 507. The Seventh Circuit found that to prevail, the plaintiff would have to identify at some point prior to trial which prison officials committed the excessive force, but it specifically recognized that "prison guards who take the trouble to disguise themselves beyond recognition are [not] free to abuse inmates without fear of liability." *Id.* The Seventh Circuit advised that when a prisoner sues a group of prison officials for excessive force but cannot identify which one of them actually inflicted the blows, the court should allow (and compel) prison officials to

15

provide the prisoner with discovery to determine which official was responsible. *Id.* at 507–08.

In sum, Plaintiffs have alleged that each of the Defendants was personally responsible for causing the deprivation of their constitutional rights. Defendants were further responsible for causing a deprivation of Plaintiffs' constitutional rights when, having knowledge of the misconduct about to be committed at Illinois River, Menard, Big Muddy, and Lawrence, they failed to intervene to protect Plaintiffs from harm. Accordingly, Plaintiffs have provided Defendants with sufficient notice of their claims and have adequately pled claims for excessive force and failure to intervene. Defendants' motion on this ground should be denied.

## III. Named Plaintiff Demetrius Ross Has Standing to Bring Claims Against All Defendants.

Defendants also argue that Plaintiffs' claims against the Defendants who did not participate in the shakedown at Illinois River should be dismissed under Rule 12(b)(1) because the named Plaintiff, Demetrius Ross, lacks standing to bring them. As Defendants acknowledge, however, the Seventh Circuit in *Payton v. County of Kane*, 308 F.3d 673 (7th Cir. 2003), held that in cases brought on behalf of a putative class where no decision on class certification has yet been made, courts addressing a standing challenge should treat the class as a whole as the relevant entity. 308 F.3d at 679–80.

The named plaintiffs in *Payton*, on behalf of a putative class, sued 19 defendant counties for Eighth Amendment violations, including 17 defendants with whom the named plaintiffs had had no contact. *Id.* at 675. The Seventh Circuit

16

rejected the defendants' argument that the named plaintiffs had no standing to sue the 17 defendants with whom they had not interacted; the court reasoned that if the class were certified under Rule 23, then the class would possess "a legal status separate from and independent of the interest[s] asserted by the named plaintiff[s]" which would change the standing aspects of the lawsuit. *Id.* at 680. The court held that courts should decide the issue of class certification before deciding whether the putative class suit could proceed against defendants for whom the named plaintiffs had no individual claims. *Id.* at 680 (citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999)); *see also In re Gen. Motors Corp. Dex-Cool Prods. Liab. Litig.*, 241 F.R.D. 305, 310 (S.D. Ill. 2007).

In rejecting the defendants' argument, the court in *Payton* embraced the "juridical link" doctrine (although it rejected the name), which allows putative class actions to proceed "if the [putative class] as a group—named and unnamed—have suffered an identical injury at the hands of several parties *related by way of a conspiracy or concerted scheme*, or otherwise juridically related in a manner that suggests a single resolution of the dispute would be expeditious . . . ." *Id.* at 679–80 (emphasis added) (citing *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir. 1973)) (internal quotation marks omitted). Courts have accordingly recognized that the Seventh Circuit's holding in *Payton* therefore creates an exception to the general rule that "a plaintiff cannot bring a class action against defendants with whom he had no dealing." *Hudson v. City of Chicago*, 242 F.R.D.

496, 502 (N.D. Ill. 2007); *see also Landmann v. Bann-Cor*, No. 01 C 0417, 2004 WL 1944789, at *4 (S.D. Ill. Feb. 26, 2004).

Plaintiffs' claims against Defendants fit neatly within the *Payton* holding. For the reasons explained above, Plaintiffs have plausibly alleged that Defendants conspired with one another to commit excessive force and to fail to protect Plaintiffs from excessive force, and have further plausibly alleged that Defendant Orange Crush Officers acted in concert against Plaintiffs pursuant to a policy or practice promulgated by prison administrators. Doc. No. 1 ¶¶ 37–38, 52–56, 70–71. Moreover, as the Seventh Circuit in *Payton* recognized, "there are cases where appropriate relief may only be obtained through one broad suit, and it will be impossible to find a named plaintiff to match each defendant"; this case is such a case. *Payton*, 308 F.3d at 681; *see also Davidson v. Worldwide Asset Purchasing, LLC*, 914 F. Supp. 2d 918, 923 (N.D. Ill. 2012) (describing this scenario as "key" to the Seventh Circuit's adoption of the juridical link in *Payton*). Given Defendants' deliberate attempts to obscure their identities in order to evade responsibility, it is impracticable to require Plaintiffs to identify a named plaintiff to match each defendant. Under the law, it is also unnecessary because Defendants all wronged each member of the class by engaging in the alleged conspiracy.

Defendants' attempts to distinguish *Payton* from the case at hand are unavailing. They first attempt to re-argue whether Plaintiffs have sufficiently stated a conspiracy claim, but for the reasons stated above, that argument fails. *See supra*, pg. 7–11. They further argue that because Plaintiffs' claims require some

individualized inquiry into Defendants' subjective intent[2] and because damages awards may require some individualized assessment of a plaintiff's claim, Mr. Ross does not have standing.

Assuming that Plaintiffs' excessive force claim (or their failure-to-intervene claim) is governed by a subjective standard, this issue and the potential for an individualized assessment of damages are clearly not issues regarding standing—they are issues that go to the merits of Plaintiffs' claims, and may bear in part on the Court's determination of class certification (and even that will depend upon what evidence Plaintiff is able to develop once class discovery commences). As such, they are not proper considerations in determining whether the juridical link applies. *Arreola v. Godinez*, 546 F.3d 788, 795 (7th Cir. 2008) ("In our view, it is best to confine the term 'standing' to the Article III inquiry and thus to keep it separate from the plaintiff's entitlement to relief or her ability to satisfy the Rule 23 criteria.").

Because Plaintiffs' Complaint sufficiently alleges that Plaintiffs' injuries resulted from several Defendants who were related "by way of a conspiracy or

---

[2] Plaintiffs dispute that their excessive force claim should be governed by a subjective standard. The Supreme Court recently addressed the standard for excessive force claims made by pretrial detainees, and held that those claims are governed by an objective standard. *Kingsley v. Hendrickson*, 576 U.S. ___, 2015 WL 2473447, at *5 (U.S. June 22, 2015). In its opinion, the Court acknowledged that its holding and reasoning "may raise questions about the use of a subjective standard in the context of excessive force claims brought by convicted prisoners." *Id.* at *9. Because the reasoning behind the Court's holding applies equally to prisoners before and after conviction, *id.* at *5–9, this Court should apply the Supreme Court's holding in *Kingsley* to this case and assess Plaintiffs' excessive force claim based on an objective standard.

concerted scheme," the juridical link doctrine applies and Plaintiff Ross has standing to proceed against all Defendants. *Payton*, 308 F.3d at 679.

## IV.   Congress Created a Cause of Action Under PREA.

The Supreme Court has set out four factors that courts must consider in determining whether a statue "not expressly providing" a private cause of action should nonetheless be read to create one. *Cort v. Ash*, 422 U.S. 66, 78 (1975). Those factors are: (a) whether the plaintiff is a member of the class "for whose especial benefit the statute was enacted"; (b) whether there is any indication of legislative intent to create such a remedy; (c) whether a private cause of action is consistent with the purposes of the legislative scheme to imply such a remedy; and (d) whether the cause of action is one traditionally relegated to state law. *Id*. The Seventh Circuit has not addressed the issue of a private right of action under PREA, and decisions in this Circuit are mixed. *Compare Sultan v. Duncan*, No. 15 C 0611, 2015 WL 4055387, at *3 (S.D. Ill. July 2, 2015) (PREA claim survives threshold review required under 28 U.S.C. § 1915A of the PLRA) *with Rivera v. Drake*, No. 09 C 1182, 2010 WL 1172602, at *3 (E.D. Wis. Mar. 23, 2010) (dismissing PREA claim on §1915A review). But careful analysis of these factors, an analysis which has not been carried out thus far in this Circuit, favors the conclusion that a private cause of action exists under PREA.

### A.   Plaintiffs Are Members of a Class to be Benefitted by PREA.

There can be no doubt that Plaintiffs are members of the class for whose benefit the statute was enacted.  That "threshold question under *Cort*" is "answered

by looking to the language of the statute itself." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 689 (1979). In this instance, Congress clearly stated that it was enacting the legislation to "enforce" the "Eighth Amendment rights of State and local prisoners." 42 U.S.C. § 15601. To that end, the subject matter of the statute, "prison rape," is defined as "rape of *an inmate in the actual or constructive control of prison officials.*" *Id.* § 15609 (emphasis added). The statute authorizes "grants to protect inmates" which are to be used for "undertaking efforts to more effectively prevent prison rape; . . . investigating incidents of prison rape; or . . . prosecuting incidents of prison rape." *Id.* § 15605. In other words, unlike most statutes, PREA was not "enacted for the protection of the general public." *Cannon*, 441 U.S. at 690. On the contrary, PREA "expressly identifies the class Congress intended to benefit": prisoners. *Id.* This purpose of protecting prisoners is clearly stated in 42 U.S.C. § 15602, which sets forth as goals of the statute "establish[ing] a zero-tolerance standard for the incidence of prison rape in prisons in the United States" and "increas[ing] the accountability of prison officials who fail to detect, prevent, reduce, and punish prison rape." 42 U.S.C. § 15602.

That Congress intended to benefit prisoners in particular is also clear from the findings Congress made in adopting the legislation. Prison rape is a widespread problem, affecting 13 percent of prisoners nationwide (conservatively estimated), with many prisoners suffering repeated assaults. *See id.* § 15601(6). The consequences of prison rape on victims are profound, involving "severe physical and psychological effects," including a "potential death sentence" on victims because of

the risk of transmission of diseases such as HIV/AIDS. *Id.* § 15601(7). Ending these harms to prisoners in particular is clearly the aim of the Act.

      B.    <u>Congress Intended to Create a Cause of Action Under PREA.</u>

Congress's intent to create a private remedy under PREA is implicit in its reliance on Section 5 of the Fourteenth Amendment. As explained in 42 U.S.C. § 15601, the "Eighth Amendment rights of State and local prisoners are protected through the Due Process Clause of the Fourteenth Amendment. Pursuant to the power of Congress under Section Five of the Fourteenth Amendment, Congress may take action to enforce those rights in States where officials have demonstrated such indifference." *Id.* § 15601. The reference to Section 5 of the Fourteenth Amendment is significant: it is well established that "the Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment." *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 727 (2003). Indeed, "Congress can abrogate state sovereign immunity only when it legislates to enforce the Fourteenth Amendment." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 671 (1999). Congress's explicit invocation of Section 5—in a circumstance where it also premised its authority to legislate on the Commerce Clause, s*ee* 42 U.S.C. § 15601(15)—should thus be read to indicate that Congress explicitly recognized and contemplated a curtailment of sovereign immunity. But obviously, curtailment of sovereign immunity has little meaning in the absence of private lawsuits. If Congress had intended that the only remedy was for the federal

government to withhold portions of various grants to the states, then it could have premised PREA on its spending power. Because Congress explicitly chose to base PREA on the Fourteenth Amendment, its intent to provide for enforcement by prisoners is manifest. For this reason, PREA should be understood to endorse a private right of action.

C.    A Private Cause of Action Is Consistent with the Legislative Scheme.

The Supreme Court has established that "a private remedy should not be implied if it would frustrate the underlying purpose of the legislative scheme." *Cannon*, 441 U.S. at 703. Yet "when that remedy is necessary or at least helpful to the accomplishment of the statutory purpose, the Court is decidedly receptive to its implication under the statute." *Id*. Such receptiveness is warranted here. Congress has declared that where a state refuses to "take basic steps to abate prison rape by adopting standards that do not generate significant additional expenditures," it demonstrates deliberate indifference to an prisoner's constitutional right to be free from cruel and unusual punishment. 42 U.S.C. § 15601. As with the Voting Rights Act at issue in *Allen v. State Bd. of Elections*, 393 U.S. 544 (1969), however, "achievement of the Act's laudable goal could be severely hampered" if those who seek its protection have to rely solely on federal government action. A private right of action that hold prisons and prison officials accountable for failure to meet PREA standards will complement the financial penalties of PREA and reinforce the Act's remedial scheme. There is no inconsistency or contradiction between the two.

23

D.      PREA Does Not Involve an Area Typically Relegated to the States.

A private right of action under PREA should not be understood as a cause of action that is traditionally relegated to the states. The rights at issue under PREA are federal constitutional rights to due process and to be free from cruel and unusual punishment. And once again, Congress's reference to Section 5 of the Fourteenth Amendment makes clear that the legislation is "specifically designed to alter the federal-state balance." *Coll. Sav. Bank*, 527 U.S. at 670. When Congress has made that intention clear, there is no reason for courts to defer to the traditional regulatory prerogatives of the state.

Analysis of the *Cort* factors thus leads to the conclusion that a private cause of action exists under PREA. Defendants cite only district court opinions, none of which are from this District; they are not binding on this Court. On the contrary, the only court in this District to address the question found that it passed review under § 1915A. *Sultan*, 2015 WL 4055387, at *4. Further, it appears that many of the plaintiffs in other cases that declined to find a cause of action were *pro se* prisoners, and thus there is no detailed analysis of the *Cort* factors in any of these decisions. *See, e.g., Meeks v. Wisc. Res. Ctr.*, No. 14 C 0850, 2015 WL 847481, at *2 (E.D. Wis. Feb. 26, 2015) (no analysis of the *Cort* factors); *Schuenke v. Wisc. Dep't of Corr.*, No. 13 C 0865, 2014 WL 905529, at *3 (W.D. Wis. Mar. 7, 2014) (same).

In addition, these cases misapprehend the Act itself. The statement in *Meeks* and elsewhere that there is no suggestion of Congressional intent to override sovereign immunity is just wrong. As explained above, in adopting PREA, Congress

24

invoked Section 5 of the Fourteenth Amendment. It was thus clearly asserting federal authority to enforce civil rights in derogation of state prerogative, and strongly suggesting an intention to abrogate sovereign immunity and allow private suits. Without consideration of the *Cort* factors or Congress's purposes in enacting PREA, existing decisional law in this Circuit is unpersuasive and should not be followed. Instead, this Court should apply the four-factor analysis called for by the Supreme Court. That analysis directs a finding that PREA allows a private cause of action, and Plaintiffs' claim should be allowed to proceed.

**V.   This Court Has Jurisdiction of Plaintiffs' Claim for Intentional Infliction of Emotional Distress (IIED).**

A.   <u>Federal Law, Not State Law, Governs This Court's Jurisdiction.</u>

Defendants lastly contend that this Court has no subject-matter jurisdiction over Plaintiffs' IIED claim because the Illinois Court of Claims Act, 705 ILCS 505/8, confers exclusive jurisdiction of that claim to the Illinois Court of Claims. Yet this Court's jurisdiction over Plaintiffs' IIED claim is based on federal law—28 U.S.C. § 1367—and Illinois law cannot limit that jurisdiction. *Rodriguez v. Cook County*, 664 F.3d 627, 631–32 (7th Cir. 2011).

The Seventh Circuit in *Rodriguez* addressed the exact argument advanced by Defendants in this case: that Illinois law deprives federal courts of jurisdiction over certain state-law claims. 664 F.3d at 631. The Court unequivocally rejected this argument, stating that even "if Illinois had purported to insist that all civil litigation against [certain state officials] occur in state courts, that could not curtail federal jurisdiction. Congress, not the states, determines the jurisdictional

25

authority of the federal courts." *Id*. at 632. In other words, "states cannot insist that any particular category of litigation be conducted only in state court." *Id*.

The Seventh Circuit reaffirmed its holding in *Fields v. Wharrie*, 672 F.3d 505 (7th Cir. 2012), finding that "a state employee's sovereign-immunity defense does not impact a federal court's jurisdiction over a case." 672 F.3d at 518. Courts in this Circuit have noted the tension between *Rodriguez* and *Fields*, and earlier Seventh Circuit opinions cited by Defendants in their brief, Doc. No. 47 at 16, and have concluded that "*Rodriguez* and *Fields* appear to reflect the [Seventh Circuit's] current interpretation of state-law sovereign immunity." *Woods v. Cook Cnty., Ill.*, No. 13 C 2607, 2014 WL 340422, at *4 (N.D. Ill. Jan. 30, 2014); *see also Pisoni*, 2013 WL 2458522, at *5 (declining to dismiss plaintiff's state-law claim "in light of *Fields* and *Rodriguez*"); *Stevens v. Dewitt Cnty., Ill.*, No. 11 C 3162, 2012 WL 1066890, at *7 (C.D. Ill. Mar. 28, 2012) (same).

B.   Under Illinois Law, Plaintiffs' IIED Claim Does Not Implicate the Illinois Court of Claims Act.

Even if this Court disregards *Rodriguez* and *Fields*, and instead engages Illinois law to determine the applicability of the Court of Claims Act, that analysis reveals that the Act plays no role in Plaintiffs' IIED claim against Defendants. The Illinois Supreme Court has decided that a claim brought against a state employee is really a claim against the state itself when:

> there are (1) no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment; and (3) where

the complained-of actions involve matters ordinarily within that employee's normal and official functions of the State.

*Healy v. Vaupel*, 133 Ill. 2d 295, 309 (1990) (internal quotation marks omitted). The court in *Healy* clarified that "[s]overeign immunity affords no protection, however, when it is alleged that the State's agent acted in violation of statutory or constitutional law or in excess of his authority, and in those instances an action may be brought in circuit court." *Id.* at 308; *see also Fritz v. Johnston*, 209 Ill. 2d 302, 313 (2004) ("Whenever a state employee performs illegally, unconstitutionally, or without authority, a suit may still be maintained against the employee in his individual capacity and does not constitute an action against the State of Illinois.").

Plaintiffs' IIED claim against Defendants does not implicate the Illinois Court of Claims Act, as construed by the Illinois Supreme Court in *Healy*. First and foremost, Plaintiffs' IIED claim plainly does not satisfy the second prong of the *Healy* test.[3] To the extent that an intentional tort like IIED involves any "duty" whatsoever, it is a duty that every citizen of Illinois owes to every other citizen, and not something unique to correctional officers. *See Cruz v. Cross*, No. 08 C 4873, 2010 WL 3655992, at *4 (N.D. Ill. Sept. 10, 2010) (claims for assault and battery do not involve breach of duty, and if they do, it is a duty owed by all to the general public); *Donelson v. Prado*, No. 09 C 6227, 2011 WL 941233, at *7 (N.D. Ill. Mar. 16, 2011) (same); *see also Sweeney v. Burras*, No. 12 C 564, 2014 WL 1018190, at *8 (N.D. Ill.

---

[3] It is not at all clear that the Illinois courts' sovereign immunity rules even apply to intentional torts. *See Loman v. Freeman*, 229 Ill. 2d 104, 112–13 (2009) (applying *Healy* test "[w]hen the 'issue involved' is the alleged negligence of a state employee"); *Currie v. Lao*, 148 Ill. 2d 151, 158–59 (1992) (applying sovereign immunity test to employee's acts of *negligence*).

Mar. 16, 2014) (declining to dismiss IIED and assault and battery claims because the "duties" at issue did not arise from state employment).

Plaintiffs' IIED claim also does not satisfy the first prong of the *Healy* test. Plaintiffs have plainly alleged that Defendants violated constitutional law by using excessive force and failing to intervene to protect Plaintiffs from excessive force. Doc. No. 1 ¶¶ 46–81. They have further alleged that Defendants acted outside the scope of their authority. *Id.* ¶ 83. Accordingly, application of the *Healy* test demonstrates that Plaintiffs' IIED claim is not barred by the Illinois Court of Claims Act.

In sum, this Court's jurisdiction over Plaintiffs' IIED claim is governed by federal law, and not the Illinois Court of Claims Act or any other state law. *Rodriguez*, 664 F.3d at 631–32. Yet even under the Illinois Court of Claims Act, as interpreted in *Healy* and its progeny, Plaintiffs' state-law claim does not implicate the Illinois Court of Claims Act.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motions to Dismiss (Doc. Nos. 46, 51).

Respectfully submitted,


/s/ Sarah Grady
Sarah Grady
Attorney for Plaintiff


Arthur Loevy
Jon Loevy
Mike Kanovitz
Sarah Grady
LOEVY & LOEVY
312 North May St., Suite 100
Chicago, IL 60607
(312) 243-5900

Alan Mills
UPTOWN PEOPLE'S LAW CENTER
4413 North Sheridan
Chicago, IL 60640
(773) 769-1411

## CERTIFICATE OF SERVICE

I, Sarah Grady, an attorney, certify that on July 9, 2015, I caused the foregoing Plaintiffs' Response to Defendants' Motions to Dismiss to be filed using the Court's CM/ECF system, which effected service on all counsel of record.


/s/ Sarah Grady
Sarah Grady
Attorney for Plaintiff