# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ILLINOIS, EAST ST. LOUIS DIVISION

| | | |
|---|---|---|
| DEMETRIUS ROSS, KEVIN HAMILTON, RONALD SMITH, JONATHAN TOLLIVER, and GLENN VERSER, on behalf of themselves and a class of others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 15 C 0309 |
| GREG GOSSETT, et al., | ) ) | Hon. Staci M. Yandle, J. |
| Defendants. | ) | Hon. Stephen C. Williams, M.J. |

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Arthur Loevy
Jon Loevy
Michael Kanovitz
Sarah Grady
Sam Heppell
Adair Crosley
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
sarah@loevy.com

Alan Mills
Elizabeth Mazur
Nicole Schult
UPTOWN PEOPLE'S LAW CENTER
4413 North Sheridan St.
Chicago, Illinois 60640
(773) 769-1411

## INTRODUCTION

This putative class action arises out of the abusive prison-wide shakedowns conducted at Menard, Illinois River, Big Muddy, and Lawrence in 2014. The abuses suffered by these prisoners were not a mistake or a one-off random violation. Rather, they were designed by the Defendants to inflict unnecessary pain and humiliation on prisoners housed at these four prisons without any proper penological justification. After developing their plan, Defendants communicated it to the rank and file, and administered the shakedowns according to their plan.

Plaintiffs seek to certify the class of men housed at these four prisons on the specific dates when the prison-wide shakedowns occurred on the question of Defendants' liability. Plaintiffs do not intend to certify this class against *all* Defendants named in their Second Amended Complaint, but only against those supervisory Defendants responsible for planning, implementing, and overseeing the shakedown: the IDOC Director, Chief of Operations, Deputy Chief of Operations, Statewide Tact Commanders, Wardens and Assistant Wardens at the four prisons, and Facility Tact Commanders and Assistant Tact Commanders at the four prisons.[1]

Common questions which can and should be determined on a class-wide basis include: whether Defendants developed and implemented a common plan, whether that plan, as designed and implemented, violated the Eighth Amendment, and whether Defendants failed to intervene to stop the abusive shakedowns. Class determination of these issues is particularly appropriate in this case, as discovery has established that there is no dispute between the parties that there was a

---

[1] Specifically, Plaintiffs seek class certification against Defendants Salvador Godinez, Joseph Yurkovich, Michael Atchison, David White, Anthony McAllister, Jerry Witthoft, Frank Eovaldi, Kim Butler, Alex Jones, Robert Arnett, Brian Piper, Greg Gossett, Stephanie Dorethy, David Hermetz, Chris White, Ken Finney, Zachary Roeckeman, Robert Craig, Michael Gilreath, Timothy McAllister, Stephen Duncan, and Richard Moore.

common plan implemented in uniform fashion. Rather, the dispute in this case is whether that uniform practice violated the constitutional rights of the prisoners housed at these four prisons.

Because these common questions predominate in this case, and because the class otherwise meets Rule 23(a)'s numerosity, typicality, and adequacy requirements, this Court should grant Plaintiffs' motion and certify Plaintiffs' proposed class.

## FACTS

The Supreme Court has directed courts making decisions about class certification to do so with the relevant evidence in mind. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013) (discussing the difference between a showing that questions of liability are common to the class, which is required, and a showing that the answer to those questions will be in the class's favor, which is not required). Accordingly, Plaintiffs set forth the relevant facts and supporting evidence that establishes some of the relevant common proof that will be tested at a trial on the class's claims.

## I.     The Four Prisons

Plaintiffs' claims concern shakedowns that occurred at four Illinois Department of Corrections (IDOC) prisons: Menard Correctional Center (Menard), Illinois River Correctional Center (Illinois River), Big Muddy River Correctional Center (Big Muddy), and Lawrence Correctional Center (Lawrence).

Menard includes a maximum security prison, a medium security unit, and a reception and classification center, all located in Chester, Illinois. As of April 2014, there were approximately 3,835 men housed at Menard. Ex. 1 (List of Men at Menard as of April 2014). Illinois River is a medium security prison located in Canton, Illinois. As of April 2014, there were approximately 1,929 men housed at Illinois River. Ex. 2 (List of Men at Illinois River as of April 2014). Big

Muddy is also a medium security prison located in Ina, Illinois. As of May 2014, there were approximately 1,836 men housed at Big Muddy. Ex. 3 (List of Men at Big Muddy as of May 2014). Finally, Lawrence is a medium security prison located in Sumner, Illinois. As of July 2014, there were approximately 2,271 men housed at Lawrence. Ex. 4 (List of Men at Lawrence as of July 2014).

## II.    The IDOC's Tactical Team

The IDOC maintains tactical teams (commonly referred to as "tact teams") at each prison in Illinois made up of correctional staff from the prison. Tact teams are typically utilized in situations where force is likely to be used (e.g., forcible cell extractions, riots, escapes). Ex. 5 (Tact Manual) at 14751-62, 14795. Tact team members wear an orange jumpsuit, a vest, a helmet with a face shield, gloves, a 3' baton, pepper mace, a flashlight, and a radio, among other things. *Id.* at 14796. Their uniforms make it difficult to identify their age or general physical characteristics, and their uniforms purposefully do not bear any identifying insignia (i.e., a name badge). *Id.* at 14796; Ex. 65 (4/23/2014 Email) at 43844. Tact team members are referred to by prisoners and staff alike as "Orange Crush." Ex. 6 (Atchison Dep.) at 162:16-163:17.

Tact teams follow a different command structure than other correctional staff. Tact team members answer to a facility tact commander and one or more assistant commanders,[2] and then to a regional tact commander, and then to a statewide tact commander. Ex. 7 (D. White Dep.) at 18:3-19:6; Ex. 16 (Yurkovich Dep.) at 67:10-69:24; Ex. 17 (McAllister Dep.) at 83:6-84:15. The prison's warden and assistant warden of operations are also responsible for supervising the tact team and their conduct at the prison. Ex. 18 at 105:12-20; Ex. 19 (Gossett Dep.) at 179:23-180:5;

---

[2] Some prisons also have "squad leaders," who are directly underneath assistant tactical commanders within the chain of command. Ex.7 at 18:3-12. Squad leaders and their subordinates are not the subject of this motion to certify.

3

Ex. 20 (Duncan Dep.) at 17:4-16; Ex. 25 (A. Jones Dep.) at 50:22-51:23; Ex. 28 (Dorethy Dep.) at 51:2-16. All tact command staff, in turn, answer to the Deputy Chief of Operations and the Chief of Operations, who in turn, answer to the IDOC Director. Ex. 17 at 83:6-10; 66:3-12; Ex. 16 at 136:14-16.

In 2014 (the time frame relevant to the present case), Salvador Godinez was serving as the IDOC Director. Ex. 17 at 25:16-26:9; Ex. 16 at 10:13-24, 136:14-16. Joseph Yurkovich was the Chief of Operations, and Michael Atchison was the Deputy Chief of Operations. Ex. 16 at 65:2-10; Ex. 6 at 45:11-13. David White was the Statewide Tact Commander, and Anthony McAllister was the Southern Regional Tact Commander. Ex. 7 at 24:13-23, 32:6-8; Ex. 17 at 13:7-10, 56:14-16. As Southern Regional Tact Commander, McAllister was responsible for Big Muddy, Lawrence, and Menard, among others. Ex. 17 at 54:19-56:5. There was no Central Regional Tact Commander. Ex. 7at 32:23-33:11.

The facility tact commanders, assistant tact commanders, wardens, and assistant wardens of operations during 2014 at the relevant prisons were as follows:[3]

- Menard:
  - Jerry Witthoft (tact commander)
  - Frank Eovaldi (assistant tact commander)
  - Kim Butler (Warden)
  - Alex Jones (Assistant Warden of Operations)
- Illinois River
  - Robert Arnett (tact commander)
  - Brian Piper (assistant tact commander)
  - Greg Gossett (Warden)
  - Stephanie Dorethy (Assistant Warden of Operations)

---

[3] Ex. 12 (Witthoft Dep.) at 6:20-23, 10:1-5; Ex. 13 (Eovaldi Dep.) at 11:6-8, 23:13-19; Ex. 14 (Arnett Dep.) at 16:13-23; Ex. 10 (Piper Dep.) at 10:18-20, 17:5-19; Ex. 22 (Hermetz Dep.) at 25:13-20; Ex. 11(C. White Dep.) at 18:4-19:15; Ex. 22 (Hermetz Dep.) at 27:1-3, Ex. 8 (Finney Dep.) at 23:13-23; Ex. 21 (Gilreath Dep.) at 30:7-12; Ex. 23 (T. McAllister Dep.) at 69:19-71:1; Ex. 24 (Harrington Dep.) at 5:21-13:12; Ex. 25 at 34:8-35:18; Ex. 19 at 22:11-17; Ex. 28 at 10:1-10; Ex. 26 (Roeckeman Dep.) at 12:13-16; Ex. 25 at 12:13-22; Ex. 74 (Duncan Interrogatories) at ¶2; Ex. 27 (R. Moore Dep.) at 9:8-16.

- Big Muddy
  - David Hermetz (tact commander)
  - Chris White (assistant tact commander)
  - Ken Finney (assistant tact commander)
  - Zachary Roeckeman (Warden)
  - Robert Craig (Assistant Warden of Operations)
- Lawrence
  - Michael Gilreath (tact commander)
  - Timothy McAllister (assistant tact commander)
  - Stephen Duncan (Warden)
  - Richard Moore (Assistant Warden of Operations)

In 2014, the tactical teams were comprised of approximately 20-40 members. *See* Exs. 74-76 (tact team sign-in sheets for 2014 shakedowns).

## III.    Prison-Wide Shakedowns

As part of their responsibilities, prison staff regularly perform searches of areas throughout each IDOC prison. These searches are commonly referred to as "shakedowns." Ex. 8 at 51:3-52:2. Shakedowns can vary widely in scope, targeting one or more cells or wings, or reaching across an entire prison. Some shakedowns are random—staff are required, for example, to search each cell at least once every 60 days—while others are planned. Ex. 8 at 51:3-52:2; Ex. 84 (AD 05.01.111) at II.D.1. Prior to 2014, prison-wide shakedowns (whether performed by tactical team staff or the prison's correctional staff) were rare or nonexistent. Ex. 66 (3/31/2014 Email) at 17018; Ex. 17 at 108:19-110:24; Ex. 6 at 46:1-6; Ex. 26 (Roeckeman Dep.) at 63:11-64:6; Ex. 19 at 49:18-51:10.

## IV.    Defendants Form and Execute a Common Plan To Perform Prison-Wide Shakedowns in 2014.

### A.    Yurkovich and Atchison Decide To Perform Prison-Wide Shakedowns.

In 2014, Yurkovich and Atchison decided to perform prison-wide shakedowns at several IDOC prisons as part of a "spring cleaning" initiative to remove unwanted items from IDOC

prisons, ranging from trash to excess property, to more serious contraband. Ex. 16 at 93:16-94:10; Ex. 67 (4/18/2014 Email) at 14664 (discussing the upcoming "wave of the 'spring cleaning' whole facility shakedowns"). Yurkovich and Atchison had several conversations amongst themselves to form their plan regarding these shakedowns and their intended purpose. Ex. 6 at 42:4-21, 45:21-47:1.

Yurkovich testified that he did not recall any specific incident or issue that motivated the 2014 shakedowns. Ex. 16 at 103:23-104:15. Rather, his main motivation was simply that these facilities "hadn't been searched on a facility-wide scale in a long time." Ex. 6 at 46:1-10. Atchison described the 2014 Shakedowns as "spring cleaning," a phrase he used intending "no negative connotation at all" but just referring to "cleaning the facility of contraband." Ex. 6 at 135:10-21; Ex. 64.

Prison-wide shakedowns are statewide operations that require use of tact team members from multiple prisons to perform. These statewide operations require approval and supervision by senior members of the IDOC administration, including Atchison, Yurkovich, and Godinez. Ex. 6 at 33:12-22, 46:11-16, 107:20-108:2; Ex. 16 at 100:5-16.

**B.      White and McAllister Get Involved to Develop a Plan to Execute the Shakedowns.**

After conceiving of the plan, Yurkovich and Atchison had a series of "very in-depth conversations" between the two of them, White, and the wardens of the affected facilities. Ex. 6 at 47:21-48:7, 48:23-49:8; Ex. 68 (4/28/2014 Email); Ex. 69 (5/7/2014 Email) at 14856 (Yurkovich tells White he will "get back with" him about shakedown plan); Ex. 70 (4/12/2014 Email). White recalls attending a meeting in Springfield with either Yurkovich or Atchison and possibly also McAllister, during which White first learned about the plan to conduct the 2014 Shakedowns. Ex. 7 at 71:5-72:11. McAllister testified that he was not involved in the decisions

6

about whether a facility-wide shakedown should be conducted, but once the decision was made to perform the shakedowns, he became involved in planning their execution. Ex. 17 at 114:23-115:14; *see also* Ex. 71 (3/22/2014 Email) at 16951 (White asks McAllister to "give me a call" to discuss upcoming shakedown).

To obtain formal approval of the shakedowns, McAllister and White created form "operations orders," created based on a template developed long ago. *See* Ex. 17 at 85:19-86:13; Ex. 7 at 70:1-5; Ex. 6 at 54:3-7, 54:20-55:16; Ex. 17 at 123:3-124:8; Ex. 64 (Group Exhibit of operations orders for Menard, Illinois River, Big Muddy, and Lawrence). The operations orders contain general information about the shakedowns, including the schedule and staffing needs, but not the details of how the tact team would perform the shakedown, including the way men would be marched and how to perform the strip searches. *See, e.g.*, Group Ex. 64 at 2.

In the days before each shakedown, McAllister would call the tact commanders and the warden to discuss the operation. Ex. 17 at 132:5-20; Ex. 20 at 38:21-41:6.

### C.     Defendants Met With Tact Team Members Before Each Shakedown to Discuss the Shakedown Plan.

At least one of the statewide tact commanders, White and McAllister, was present and responsible for supervising tact team members every day of each shakedown. Ex. 6 at 50:6-12; Ex. 17 at 188:4-13. White was the primary supervisor at Menard, although McAllister was there for 1-4 days to supervise. Ex. 17 at 222:9-21. White was also the primary supervisor at Illinois River (McAllister was not present). Ex. 17 at 256:21-257:11, 257:23-258:4; Ex. 9 (Brady Dep.) at 25:20-28:6. When supervising a shakedown, White testified that his job was to oversee the implementation of the plan and ensure "everything was going as planned, no issues." Ex. 7 at 35:19-36:9. McAllister was the primary supervisor for both the Big Muddy and Lawrence

7

shakedowns, and described his main responsibility as "supervis[ing] the activities of the tactical staff." Ex. 17 at 187:4-6, 258:14-261:5, 264:15-265:4.

White and/or McAllister discussed the shakedown plan with tact team members and prison administrative staff (wardens and assistant wardens) every day before the operation. First, there was an initial commanders' oral briefing. During this 5-15 minute briefing, McAllister or White discussed the shakedown plan with facility tact commanders, including the specifics of how the shakedown operation was to be conducted. Ex. 10 at 71:3-73:16, 75:20-23; Ex. 7 at 37:4-6; Ex. 8 at 70:15-20. The briefing consisted of a high level of detail, including "how you would perform your duties of the day," "what [prisoners] could wear out of the cell," "[h]ow you was to cuff," and "[h]ow they were to . . . conduct their self, how to handle the inmates," among others. Ex. 11 (C. White Dep.) at 71:3-73:11. Wardens and assistant wardens also attended these briefings. Ex. 17 at 139:23-140:8; Ex. 12 at 56:15-24; Ex. 7 at 36:23-37:24; Ex. 18 at 56:8-57:9; Ex. 19 at 131:6-132:2.

Second, facility tact commanders and assistant commanders met with the rest of their teams, where they would discuss the shakedown plan with each member of the tact team. Ex. 11 at 65:14-67:8; Ex. 10 at 73:23-74:11, 101:4-13; Ex. 15 (Harmon Dep.) at 73:1-6; Ex. 14 at 40:6-41:10. Finally, immediately before they began marching toward the cellhouse to begin the shakedown, the entire group would convene for a mass group briefing, delivered by the warden and McAllister or White, reiterating the shakedown plan and its objectives. Ex. 8 at 75:19-76:12; Ex. 14 at 40:6-41:10; *see also* Ex. 7 at 36:23-37:24.

This same three-step process was followed each day of every shakedown specifically to ensure the common plan was executed in uniform fashion every time. Ex. 10 at 76:11-77:19; Ex. 11 at 65:4-13; Ex. 14 at 41:11-14.

    **D.**    **White and McAllister, Along With Facility Tact Supervisors, Monitored Every Shakedown.**

During each shakedown, the facility tact commanders and assistant commanders were tasked with monitoring their subordinate tact members to ensure that the shakedown plan was being followed. Ex. 14 at 62:1-14; Ex. 11 at 123:18-124:10; Ex. 10 at 107:22-109:2; Ex. 8 at 80:15-81:22, 86:9-87:8, 89:7-22; Ex. 75 (Clark Interrogatories) at ¶4; Ex. 77 (Hermetz Interrogatories) at ¶2; Ex. 76 (Witthoft Interrogatories) at ¶2; Ex. 7 at 79:10-19. White and McAllister were also responsible for monitoring the tact team during the entire operation. Ex. 11 at 116:7-120:11, 122:13-24; Ex. 8 at 43:16-49:7, 79:15-19; Ex. 7 at 62:23-63:17; Ex. 77 at ¶4.

In addition to the tact leadership, each warden also attended many of the 2014 shakedowns at his or her prison. Ex. 18 at 65:18-68:17; Ex. 19 at 144:2-13, 148:3-16; Ex. 20 at 72:18-73:5; Ex. 78 (Roeckeman Interrogatories) at ¶2. They did this in part because they understood that they were responsible for the conduct of staff within the prison. Ex. 18 at 105:12-20; Ex. 19 at 179:23-180:5; Ex. 20 at 17:4-16.

    **E.**    **Yurkovich and Atchison Maintained Close Oversight Over the Shakedowns.**

Atchison and Yurkovich's involvement did not end once the operations orders were approved. Rather, the two men had daily conversations during the periods of time when the 2014 shakedowns were underway, although Atchison testified that he could not recall any specifics of what was discussed. Ex. 6 at 82:5-18; *see also* Ex. 16 at 178:5-179:5. Additionally, as White's direct supervisor Atchison had regular in-person meetings in addition to frequent phone and email communications with him. Ex. 6 at 43:10-44:7, 44:16-24; Ex. 16 at 251:8-20. After learning of staff misconduct allegations arising from the shakedowns at Menard that he claimed left him with "serious concerns about the Tact Operation," Atchison had a discussion with White about how to conduct future shakedowns. Ex. 6 at 142:9-143:3.

9

## V.   The 2014 Shakedowns at Menard, Illinois River, Big Muddy, and Lawrence Violated the Constitutional Rights of Men Imprisoned at Those Facilities.

The evidence in this case demonstrates that Defendants' plan was implemented in uniform fashion. And Plaintiffs' evidence further demonstrates that Defendants' implementation of the plan resulted in the violation of the class's Eighth Amendment rights.

As each shakedown began, the tact team entered the living unit by yelling loudly and banging their batons on the bars and railings of the unit.[4] Once the tact team was assembled in the living unit, they approached each class member at their cell and ordered them to strip.[5] After

---

[4] Ex. 31 (Ross Dep.)  at 43:10-22; Ex. 33 (Verser Dep.) at 62:1-67:9; Ex. 32 (Hamilton Dep.) at 41:4-45:7; Ex. 29 (Tolliver Dep.) at 45:18-48:13; Ex. 30 (R. Smith Dep.) at 38:16-39:11; Ex. 34 (Dunmore Dep.) at 66:10-75:23; Ex. 35 (Watts Dep.) at 35:23-36:1; Ex. 36 (Clark Dep.) at 30:1-10; 50:20-51:1; Ex. 37 (Truly Dep.) at 41:23-42:9; Ex. 38 (Cortes Dep.) at 21:13-18, 62:17-63:12; Ex. 39 (Fisher Dep.) at 13:11-15; Ex. 40 (Harding Dep.) at 77:1-5, 81:17-20; Ex. 41 (Jammel Johnson Dep.) at 24:10-13, 27:2-5, 28:8-10; Ex. 42 (Knox Dep.) at 32:18-37:14; Ex. 43 (McDaniel Dep.) at 26:2-3; Ex. 44 (H. Miller Dep.) at 33:12-34:19; Ex. 45 (J. Miller Dep.) at 42:8-20; Ex. 46 (V. Smith Dep.) at 34:12-14; Ex. 47 (Sultan Dep.) at 55:16-56:2; Ex. 50 (Lay Video Interview) at 2:08; Ex. 51 (Max Video Interview) at 2:32; Exhibit 54 (Milons Video Interview) at 2:43;  Exhibit 55 (Carillo Video Interview) at 1:52; Exhibit 56 (Durall Video Interview) at 2:16; Exhibit 55 (Grimes Video Interview) at 3:00, 9:02; Exhibit 56 (Hawkins Video Interview) at 2:04; Exhibit 61 (Guzman Video Interview) at 2:05; Group Ex. 49 (Declarations from Putative Class Members) at P003091 ¶5 (R. Williams), P003087 ¶5 (Ingram), P003083 ¶5 (Causey), P002783 ¶5 (Huffman) ; P002795 ¶5 (Nelson), P002811 ¶5 (Edwards), P002843 ¶5 (Skinner), P002988 ¶5 (Lockhart), P003103 ¶5 (W. Williams), P003107¶5 (Williamson), P003099 ¶5 (Mowen), P003071 ¶5 (Lyons), P003040 ¶5 (Whitlock), P003051 ¶5 (West), P002779 ¶5 (Washington), P002815 ¶5 (White), P002831 ¶5 (Gherna), P002847 ¶5 (Burns), P002851 ¶5 (Gil-Ramos), P002859 ¶5 (Wachter), P003000 ¶5 (R. Robinson), P003028 ¶5 (W. Robinson), P003004 ¶5 (Martinez), P002768 ¶5 (A. Smith), P003043 ¶5 (Zoberis), P003020 ¶5 (Basquine), P003059 ¶5 (L. Williams), P002771 ¶5 (B. Smith), P002799 ¶5 (Ramsey), P002823 ¶5 (Weems), P002839 ¶5 (Getty), P003008 ¶5 (Daubman), P003012 ¶5 (Henderson), P003016 ¶5 (Morris), P003020 ¶5 (Jackson), P003024 ¶5 (Price), P003028 ¶5 (Robinson), P003032 ¶5 (Sanders), P003036 ¶5 (Mitchell), P002775 ¶5 (B. Robinson), P002787 ¶5 (Bell), P002791 ¶5 (Coleman), P002803 ¶5 (Jerry Johnson), P002807 ¶5 (Linzy), P002819 ¶5 (Palmer), P002827 ¶5 (Drabing), P002835 ¶5 (P. Johnson), P002855 ¶5 (Truesdell), P002972 ¶5 (Deloney), P002976 ¶5 (Clay), P002980 ¶5 (Thomas), P002984 ¶5 (Kirk),  P002992 ¶5 (Bradford), P002996 ¶5 (Tomberg).

[5] Ex. 31 at 55:4-7; Ex.  33 at 73:1-78:15; Ex. 32 at 48:13-16; Ex. 29 at 45:18-48:13, 51:1-54:17; Ex.  30 at 41:11-42:13; Ex. 34 at 66:10-75:23; Ex. 35 at 21:21-23:13, 33:16, 45:1-53:24; Ex. 36 at 30:14-24; Ex. 37 at 47:14-48:15; Ex. 38 at 24:2-4; Ex. 39 at 13:21-24; Ex. 40 at 93:17-22; Ex. 41 at 30:13-31:18; Ex. 42 at 37:15-46:1; Ex. 43 at 28:12-15; Ex. 44 at 36:14-37:3; Ex. 45 at 49:1-50:6; Ex. 46 at 37:17-42:3; Ex. 47 at 63:19-64:11; Ex. 50 at 2:17, 5:42; Ex. 52 at 2:08; Ex. 54 at 2:56; Ex. 53 at 2:54; Ex. 55 at 2:21, 3:00; Ex. 56 at 3:22; Ex. 58 at 3:30; Ex. 57 at 2:40; Ex. 59 at 2:20; Ex. 60 at 6:55; Ex. 61 at

their clothing was removed, class members were ordered to conduct a demeaning and unsanitary "reverse" strip search, meaning that they were forced to manipulate their genitals and buttocks before (as opposed to after) putting their hands in their mouths.[6] After being strip searched, the class members were ordered to put on their prison shirt, pants, and shoes, but they were not allowed to wear underpants.[7]

2:27; Ex. 62 at 4:05; Ex. 63 at 6:25 - 7:05, 8:20 - 8:35; Group Ex. 49 (R.Williams) at P003091-003092 ¶8; (Ingram) at P003088 ¶9; (Causey) at P003083 ¶8; (Huffman) at P002784 ¶9; (Nelson) at P002796 ¶9;  (Edwards) at P002812 ¶8; (Skinner) at P002844 ¶9; (Lockhart) at P002989 ¶9; (W.Williams) at P003104 ¶9; (Williamson) at P003107-003108 ¶8; (Mowen) at P003100 ¶9; (Lyons) at P003072 ¶9; (Whitlock) at P003040 ¶8; (Graham, written by himself) at BATES 000516; (West) at  P003052 ¶9; (Washington) at P002780 ¶9; (White) at P002816 ¶9; (Gherna) at P002832 ¶9; (Burns) at P002848 ¶9; (Gil-Ramos) at P002851 ¶8; (Wachter) at P002860 ¶9; Robinson) at P003001 ¶9; (Martinez) at P003005 ¶8; (A. Smith) at P002769 ¶9; (Zoberis) at P003043-003044 ¶8; (Basquine) at P003021 ¶9; (L.Williams) at P003060 ¶9; (B. Smith) at P002772 ¶9; (Ramsey) at P002800 ¶9; (Weems) at P002824 ¶9; (Getty) at P002840 ¶8; (Daubman) at P003009 ¶9; (Henderson) at P003013 ¶9; (Morris) at P003017 ¶9; (Jackson) at P003021 ¶8; (Price) at P003024 ¶8; (W. Robinson) at P003029 ¶9; (Sanders) at P003032 ¶8; (Mitchell) at P003036-003037 ¶8; (B.Robinson) at P002776 ¶9; (Bell) at P002788 ¶9; (Coleman) at P002792 ¶9; (Jerry Johnson) at P002804 ¶9; (Linzy) at P002808 ¶9; (Palmer) at P002820 ¶9; (Drabing) at P002828 ¶9; (P.Johnson) at P002836 ¶9; (Truesdell) at P002856 ¶9; (Deloney) at P002973 ¶9; (Clay) at P002977 ¶9; (Thomas) at P002981 ¶9; (Kirk) at P002985 ¶9; (Bradford) at P002993 ¶9; (Tomberg) at P002997 ¶9.

[6] Ex. 31 at 56:19-57:5; Ex. 33 at 73:1-78:15; Ex. 32 at 58:8-12;  Ex. 29 at 51:1-54:17; Ex. 30 at 42:14-42:23; Ex.  34 at 66:10-75:23; Ex. 36 at 54:14-24; 74:20-75:11; Ex. 37 at 47:14-48:15; Ex. 38 at 26:4-16; Ex. 39 at 14:4-11, 22:19-23:15, 37:21-38:3; Ex. 40 at 96:2-5, 110:11-18; Ex. 41 at 30:13-31:18; Ex. 42 at 37:15-46:1; Ex. 43 at 29:13-18, 30:10-12; Ex. 44 at 36:14-37:3; Ex. 45 at 49:1-50:6; Ex. 46 at 40:23-41:15, 84:13-19; Ex. 47 at 63:19-64:11; Ex. 52 at 2:14; Ex. 51 at 3:45; Ex. 57 at 3:28, 9:18; Ex. 61 at 2:32; Group Ex. 49 (Williamson) at P003107-003108 ¶8; (Mowen) at P003100 ¶9;  (Lyons) at P003072 ¶9; (Zoberis) at  P003043-003044 ¶8; (Basquine) at P003021 ¶9; (Daubman) at P003009 ¶9; (Henderson) at P003013 ¶9; (Morris) at P003017 ¶9; (Jackson) at P003021 ¶8; (Mitchell) at P003036-003037 ¶8.

[7] Ex. 31 at 56:19-57:5; Ex. 30 at 44:15-45:3; Ex. 35 at 33:16, 45:1-53:24, 56:2-59:22; Ex. 36 at 72:8-73:6; Ex. 37 at 47:14-48:15; Ex. 38 at 27:3-13; Ex. 39 at 14:24-15:1, 25:7-8; Ex. 40 at 111:18-20; Ex. 41 at 37:4-7; Ex. 42 at 37:15-46:1; Ex. 43 at 61:2-9; Ex. 44 at 36:14-37:3; Ex. 45 at 52:15-19; Ex. 46 at 42:4-22, 83:17-19; Ex. 47 at 133:14-21; Ex. 50 at 2:22, 5:42; Ex. 54 at 3:04; Ex. 55 at 2:38; Ex. 59 at 3:31; Ex. 60 at 8:07; Ex. 61 at 3:10; Ex. 62 at 2:50, 5:32; Group Ex. 49 (R. Williams) at ¶9; (Ingram) at ¶10; (Causey) at P003084 ¶9; (Huffman) at P002784 ¶10; (Nelson) at P002796 ¶10;  (Edwards) at P002812 ¶9; (Skinner) at P002844 ¶10; (Lockhart) at P002989 ¶10; (W. Williams) at P003104 ¶10; (Williamson) at P003108 ¶9; (Mowen) at P003100 ¶10; (Lyons) at P003072 ¶10; (Whitlock) at P003041 ¶9; (Graham, written by himself) at BATES 000516; (West) at P003052 ¶10; (Washington) at P002780 ¶10; (White) at P002816 ¶10; (Gherna) at P002832 ¶10; (Burns) at P002848 ¶10; (Gil-Ramos) at P002852 ¶9; (Wachter) at P002859 ¶10; (R. Robinson) at P003000 ¶10; (Martinez) at P003005 ¶9; (A. Smith) at P002769 ¶10; (Zoberis) at P003043 ¶9; (Basquine) at P003020 ¶11; (B. Smith) at P002772 ¶10; (Ramsey) at P002800 ¶10; (Weems) at P002824 ¶10; (Getty) at P002840 ¶10; (Daubman) at P003009

After the strip searches were completed, class members were handcuffed in a needlessly painful and uncomfortable manner behind their backs, with their palms facing out.[8] They were then forced to march to a holding area, where they stood or sat while the tact team searched their cells.  Class members report that they were forced to march in close formation with prisoners in front and behind such that their genitals were forced to make physical contact with the prisoner in front of them, and that the genitals of the prisoner behind them made contact with their backsides.[9] Many reported being told to line up "nuts to butts."[10] Class members were also

---

¶10; (Henderson) at P003013 ¶10; (Morris) at P003017 ¶10; (Jackson) at P003021 ¶9; (Price) at P003025 ¶9; (W. Robinson) at P003029 ¶10; (Sanders) at P003033 ¶9; (Mitchell) at P003037 ¶9; (B. Robinson) at P002776 ¶10; (Bell) at P002788 ¶10; (Coleman) at P002792 ¶10; (Jerry Johnson) at P002804 ¶10; (Linzy) at P002808 ¶10; (Palmer) at P002820 ¶10; (Drabing) at P002828 ¶10; (P. Johnson) at P002836 ¶10; (Truesdell) at P002855 ¶10; (Javan Deloney) at P002973 ¶10; (Clay) at P002977 ¶10; (Thomas) at P002981 ¶10; (Kirk) at P002985 ¶10; (Bradford) at P002993 ¶10; (Tomberg) at P002997 ¶10.

[8] Ex. 31 at 60:20-61:6; Ex. 33 at 78:16-81:18; Ex. 32 at 63:23-64:01; Ex. 29 at 55:11-64:10; Ex. 30 at 46:15-19. Ex. 34 at 77:1-2, 77:10-11; Ex. 35 at 21:21-23:13, 45:1-53:24; Ex. 36 at 64:1-23, 77:4-78:1; Ex. 37 at 51:3-8; 51:22-52:18; Ex. 38 at 28:3-9; Ex. 39 at 15:9-13; Ex. 40 at 115:17-20,  116:5-117:6; Ex. 41 at 32:11-13, 38:17-20; Ex. 42 at 45:5-50:19; Ex. 43 at 33:9-12; Ex. 44 at 36:14-37:3; Ex. 45 at 53:24-54:16, 101:15-103:2; Ex. 46 at 43:2-44:21, 43:11-44:9; Ex. 47 at 66:6-19; Ex. 50 at 2:32, 6:36; Ex. 52 at 3:32; Ex. 51 at 4:45; Ex. 54 at 5:00, 9:37, 9:47;  Ex. 53 at 2:32, 6:48; Ex. 55 at 2:00; Ex. 56 at 4:07; 9:02; Ex. 57 at 3:40; Ex. 59 at 2:45, 8:23; Ex. 61 at 2:46; Ex. 62 at 6:07, 12:57; Ex. 63 at 18:20-18:32, 22:00 - 22:22;  Group Ex. 49 (R. Williams) at ¶10, 11; (Craig Ingram) at ¶11, 12; (Causey) at P003084 ¶10, 11; (Huffman) at P002784 ¶11; (Nelson) at  P002796 ¶11;  (Edwards) at P002812 ¶10; (Skinner) at P002844 ¶11; (Lockhart) at P002989 ¶11; (W.Williams) at P003104 ¶11; (Williamson) at P003108 ¶10, 11; (Mowen) at P003100 ¶11, 12; (Lyons) at P003072 ¶11, 12; (Whitlock) at P003041 ¶10; (Daw, written by himself) at BATES 000513; (Graham, written by himself) at BATES 000516; (West) at P003052 ¶11, 12; (Washington) at  P002780 ¶11; (White) at  P002816 ¶11; (Gherna) at P002832 ¶11; (Burns) at  P002848 ¶11; (Gil-Ramos) at P002852 ¶10; (Wachter) at P002860 ¶11; (R. Robinson) at P003001 ¶11; (Martinez) at  P003005 ¶10; (A. Smith) at P002769 ¶12; (Zoberis) at  P003044 ¶10, 11; (Basquine) at P003021 ¶12, 13; (B. Smith) at P002772 ¶12; (Ramsey) at P002800 ¶11; (Weems) at P002824 ¶11; (Getty) at P002840 ¶10; (Daubman) at  P003009 ¶11, 12; (Henderson) at P003013 ¶11, 12; (Morris) at P003017 ¶11, 12; (Jackson) at P003021 ¶10; (Price) at P003025 ¶10, 11; (W. Robinson) at P003029 ¶11, 12; (Sanders) at P003033 ¶10, 11; (Mitchell) at P003037 ¶10, 11; (B. Robinson) at P003112 ¶11; (Bell) at P002788 ¶11; (Coleman) at P002792 ¶11; (Jerry Johnson) at P002804 ¶11; (Linzy) at P002808 ¶11; (Palmer) at P002820 ¶11; (Drabing) at P002828 ¶11; (P. Johnson) at P002836 ¶11; (Truesdell) at P002856 ¶11; (Deloney) at P002973 ¶11; (Clay) at P002977 ¶11; (Thomas) at P002981 ¶11; (Kirk) at P002985 ¶11; (Bradford) at P002993 ¶11; (Tomberg) at P002996 ¶5.

[9] Ex. 31 at 74:10-18,147:2-16; Ex. 33 at 62:1- 67:9,92:1-97:15 98:6, 98:6; Ex. 29 at  68:7-79:14; Ex. 30 at 50:14-51:13, 55:19-56:5. Ex. 36 at 44:22-45:23; 88:18-24, 89:1-21, 93:3-94:24 ; Ex. 37 at

---

12

forcibly pushed and shoved by the tact team to ensure that they were in physical contact with one another.[11]

---

61:18-62:2; 64:13-22, 69:23-70:24 ; Ex. 38 at 33:2-12, 62:17-63:12; Ex. 39 at 62:17-63:12; Ex. 40 at 130:9-131:7, 138:1-2, 144:5-7, 71:14-17, 144:5-7; Ex. 41 at 42:4-7, 44:5-23, 45:21-46:3, 49:1-19, 62:4-9, 73:17-23, 76:5-77:5,; Ex. 42 at 63:3-71:18; Ex. 43 at 35:9-13, 38:10-13, 39:9-20, 40:2-7; Ex. 44 at 46:20-50:1, 77:24-78:10; Ex. 45 at 67:13-68:14, 70:2-71:6; Ex. 46 at 56:2-59:5; Ex. 47 at 115:7-120:3; Ex. 52 at 2:42; Ex. 56 at 4:54, 5:23; Ex. 57 at 4:05, 4:11; Ex. 59 at 3:07; Ex. 61 at 5:55; Ex. 62 at 3:03, 7:55; Group Ex. 49 (Causey) at P003084 ¶14, 15, 22; (Huffman) at P002784 ¶14, 17; (Nelson) at P002796 ¶14, 15, 17;  (Edwards) at P002812 ¶12, 13, 15, 22; (Skinner) at P002844 ¶14, 15, 17, 24; (Lockhart) at P002989 ¶14, 15, 17, 24; (W. Williams) at P003104 ¶13, 14, 21; (Williamson) at P003108 ¶13, 14; (Mowen) at P003100 ¶14, 15; (Lyons) at P003073 ¶18, 23; (Whitlock) at P003041 ¶12, 13, 16; (Graham, written by himself) at BATES 000514-000515; (West) at P003052-003053 ¶14, 15, 24; (Washington) at P002780 ¶14, 17; (White) at P002816 ¶14, 15, 17; (Gherna) at P002832 ¶14, 15, 17, 24; (Burns) at P002848 ¶14, 15, 17, 24; (Gil-Ramos) at P002852 ¶13, 14, 16, 23; (Wachter) at P002860 ¶14, 15, 17, 24; (R. Robinson) at P003001 ¶14, 15, 17, 23; (Martinez) at P003005-003006 ¶13, 14, 16, 22; (A. Smith) at P002769-002770 ¶14, 15, 17, 22; (Zoberis) at P003044 ¶13, 14, 16; (Basquine) at P003021-003022 ¶15, 16, 23; (L. Williams) at P003060 ¶11, 12, 21; (B. Smith) at P002772-002773 ¶13, 14, 16, 23; (Ramsey) at P002800 ¶15, 16, 18; (Weems) at P002824-002825 ¶13, 14, 16, 23; (Getty) at P002840-002841 ¶13, 14, 16, 23; (Daubman) at P003009-003010 ¶14, 15, 17, 18; (Henderson) at P003013-003014 ¶14, 15, 22; (Morris) at P003017-003018 ¶14, 15, 17, 24; (Jackson) at P003021-003022 ¶12, 13, 21; (Price) at P003025-003026 ¶13, 14, 22; (W. Robinson) at P003029 ¶14, 15, 17; (Sanders) at P003033-003034 ¶12, 13, 22; (Mitchell) at P003037 ¶13, 14, 16; (B. Robinson) at P003112-003113 ¶14, 17, 18, 23; (Bell) at P002788 ¶14, 15, 17; (Coleman) at P002792 ¶14, 15, 17; (Jerry Johnson) at P002804 ¶14, 15, 17; (Linzy) at P002808-002809 ¶14, 15, 17, 24; (Palmer) at P002820-002821 ¶14, 15, 17, 24; (Drabing) at P002828-002829 ¶14, 15, 17, 24; (P. Johnson) at P002836-002837 ¶14, 15, 17, 23; (Truesdell) at P002856-002857 ¶14, 15, 17, 24; (Deloney) at P002973-002974 ¶14, 15, 16, 23; (Clay) at P002977-2978 ¶14, 15, 16, 23; (Thomas) at P002981 ¶14, 15; (Kirk) at P002985-002986 ¶14, 15, 17, 23; (Bradford) at P002993-002994 ¶14, 15, 17, 24; (Tomberg) at P002997-002998 ¶14, 15, 17, 23.

[10] Ex. 36 at 44:22-46:15, 62:19-21, 85:9-23, 127:18-128:8, 130:11-15; Ex. 38 at 62:17-63:4; Ex. 34 at 62:25-64:25; Ex. 32 at 34:21-36:7, 65:12-67:14, 71:17-72:7, 83:3-9; Ex. 40 at 71:12-21, 209:11-21; Ex. 41 at 42:3-10, 49:7-51:4, 61:23-62:9, 73:14-23, 76:3-12, 81:24-82:7; Ex. 42 at 30:24-31:17, 63:3-7, 66:6-14, 72:6-9, 82:12-17; Ex. 44 at 32:5-17, 43:11-13, 44:14-21, 46:20-22, 48:13-22, 65:14-66:1; Ex.  45 at 67:13-68:10, 83:21-84:8; Ex. 31 at 39:9-40:6, 74:10-75:11; Ex. 30 at 50:14-51:9, 52:18-22, 55:24-56:5, 73:5-22; Ex. 37 at 61:22-24, 64:13-22, 66:12-67:6, 71:16-21; Ex. 33 at 62:1-65:1; Ex. 35 at 37:11-23, 40:16-24; Group Ex. 49 (Henderson) at 3013.

[11] Ex. 31 at 74:10-18, 110:14-112:15, 86:20-89:1, 90:2-94:11; Ex. 33 at 78:16-81:18, 86:23, 92:1-97:15, 98:6, 104:14-109:1, 110:22-112:16. 114:6; Ex. 29 at 55:11-64:10,68:7-79:14, 83:8-94:3, 94:4-113:15; Ex. 30 at 51:23-52:11, 55:19-56:5. Ex. 34 at 83:15-85:6, 89:13-99:22 ; Ex. 35 at 21:21-23:13, 25:4-26:13, 26:20-29:12, 33:16, 45:1-53:24; Ex. 36 at 85:13-86:3, ; Ex. 37 at 34:8-17; 60:18-23, 68:24-69:22; Ex. 38 at 33:13-35:3, 42:14-48:14; Ex. 40 at 113:2-22, 115:17-20, 119:20-9, 120:9-10, 129:16-17, 144: 5-7, 157:2-158:11, 178:22-180:8; Ex. 41 at 39:24-40:8, 46:21-47:5, 49:1-19, 51:1-11, 54:10-20, 54:4-57:3, 57:6-59:1, 59:2-24, 60:1-61:12, 71:22-72:1, 73:17-23, 74:9-76:2, 76:5-77:5; Ex. 42 at 51:15-61:10, 71:19-81:22; Ex. 43 at 35:21-24, 35:9-13, 41:20-42:12; Ex. 44 at 46:20-50:1, 50:7-56:11; Ex. 45 at 65:21-66:1; 69:4-70:1, 75:4-19; Ex. 46 at 55:19-56:8, 56:12-24; Ex. 47 at 73:5-24, 75:21-76:17, 82:21-

Once the men reached the holding area, they were forced to sit or stand handcuffed behind their backs for a lengthy period—despite there being no need for the painful stress positions. Although different spaces were used as holding areas (e.g., some were held in a dining area, while others were held in a gym or chapel) and there is some variation in regard to what they were ordered to do once in the holding area (e.g., some sat at tables with their head down while others were forced to stand with their heads against a wall), nearly all class members remained painfully handcuffed for an unnecessarily long period of time, from one to four hours.[12] After the cell searches were complete, the class was ordered to march back to their cells in the same close "nuts to butts" formation.[13]

---

83:4; Ex. 50 at 6:36; Ex. 52 at 2:28, 2:34, 2:42; Ex. 51 at 5:09, 9:36; Ex. 54 at 4:10; Ex. 53 at 2:26, 6:42; Ex. 55 at 2:13; Ex. 56 at 4:57; Ex. 58 at 5:54; Ex. 59 at 2:53, 2:57, 10:10; Ex. 60 at 3:30; Ex. 62 at 9:10; Group Ex. 49 (R. Williams) at P003092-003093 ¶13, 18; (Ingram) at P003088-003089 ¶14, 19; (Causey) at P003084-003085 ¶14, 19; (Huffman) at P002784-002785 ¶14, 19; (Nelson) at P002796-002797 ¶14, 19; (Edwards) at P002812 ¶12, 17; (Skinner) at P002844-002845 ¶14, 19; (Lockhart) at P002989-002990 ¶14, 19; (W. Williams) at P003103-003104 ¶13, 18; (Williamson) at P003108-003109 ¶13, 18; (Mowen) at P003101-003102 ¶19, 30;  (Lyons) at P003072-003073 ¶13, 18, 19; (Whitlock) at P003041-003042 ¶12, 17, 18; (Daw, written by himself) at BATES 000514-000515; (Marcus West) at  P003052-003053 ¶14, 19, 20; (Washington) at  P002780-002781 ¶13, 19; (White) at P002816 ¶15, 19; (Gherna) at P002832-002833 ¶14, 19; (Burns) at  P002848-002849 ¶14, 19; (Gil-Ramos) at  P002852-002853 ¶13, 18; (Wachter) at P002860-002861 ¶14, 19; (R. Robinson) at P003001-003008 ¶14, 19; (Martinez) at  P003005-003006 ¶13, 18; (A. Smith) at P002769-002770 ¶14, 19; (Zoberis) at P003044 ¶13, 16; (Basquine) at P003021-003022 ¶15, 20; (L. Williams) at P003060 ¶11, 16, 17; (B. Smith) at P002772-002723 ¶13, 18, 19; (Ramsey) at P002800-002801 ¶15, 20, 21; (Weems) at P002824 ¶13, 18; (Getty) at P002840-002841 ¶13, 18; (Daubman) at P003009 ¶14; (Henderson) at P003013-003014 ¶14, 19; (Morris) at P003017-003018 ¶14, 19, 20; (Jackson) at P003021 ¶12, 17; (Price) at P003025-003026 ¶12, 13, 18, 19; (W. Robinson) at P003029 ¶14, 18; (Sanders) at P003033-003034 ¶12, 17, 18; (Mitchell) at P003037-003038 ¶13, 17, 18; (B. Robinson) at P002776 ¶14, 19; (Bell) at P002788 ¶13, 14; (Coleman) at P002792 ¶14, 19; (Jerry Johnson) at P002804-002805 ¶14, 19; (Linzy) at P002808 ¶14, 19; (Palmer) at P002820 ¶14, 19; (Drabing) at P002828-002829 ¶14, 19; (P. Johnson) at P002836 ¶14, 19; (Truesdell) at P002856-002857 ¶14, 19; (Deloney) at P002972 ¶14, 18; (Clay) at P002977-002978 ¶14, 18; (Thomas) at P002981 ¶14, 17, 18; (Kirk) at P002985-002986 ¶14, 19, 20; (Bradford) at P002993-002994 ¶14, 19; (Tomberg) at P002997 ¶14, 19.

[12] Ex. 31 at 102:16-104:11; Ex. 29 at 83:8-94:3;  Ex. 34 at 89:13-99:22; Ex. 35 at 61:22-63:17, 61:22-63:17; Ex. 36 at 121:20-23; Ex. 37 at 78:13-21; Ex. 38 at 35:13-22; Ex. 40 at 165:17-18; Ex. 41 at 70:18-21; Ex. 42 at 71:19-81:22; Ex. 43 at 46:14-18; Ex. 44 at 56:18-65:2; Ex. 45 at 79:6-9; Ex. 46 61:21-23; Ex. 47 at 92:7-10; Ex. 50 at 2:58; Ex. 52 at 3:47; Ex. 51  at 6:10; Ex. 54 at 7:00,11:02; Ex. 53 at 2:40, 7:45; Ex. 56 at 5:54; Ex. 58 at 7:27; Ex. 57 at 5:13; Ex. 59 at 4:10; Ex. 61 at 4:00; Ex.  62at

Discovery has shown that Defendants agree that their plan was executed in uniform fashion. Despite monitoring the shakedowns in action, Defendants observed no behavior during the operations that deviated from their plan. Ex. 17 at 281:18-282:10; Ex. 10 at 107:17-21; Ex. 15 at 129:4-11; Ex. 18 at 68:7-11; Ex. 19 at 184:8-185:15; Ex. 14 at 48:15-49:1; 61:14-62:14; Ex. 26 at 65:10-18; *see also* Ex. 82 at ¶9 (did not witness a deviation from practice); Ex. 80 at ¶9

---

10:12; Ex. \63 at 7:24 - 7:45, 14:24; Group Ex. 49 (R. Williams) at P003093 ¶26; (Ingram) at P003089 ¶26; (Causey) at P003085 ¶26; (Huffman) at P002785 ¶28; (Nelson) at P002797-002798 ¶28;  (Edwards) at P002813 ¶26; (Skinner) at P002846 ¶29; (Lockhart) at P002990 ¶29; (W. Williams) at P003105 ¶24; (Williamson) at P003110 ¶28; (Mowen) at P003101 ¶25; (Lyons) at P003073 ¶27; (Whitlock) at P003042 ¶23; (Daw, written by himself) BATES 000515; (Graham, written by himself) BATES 000517; (West) at P003053 ¶27; (Washington) at P002781 ¶27; (White) at P002817 ¶28; (Gherna) at P002833 ¶28; (Burns) at P002849 ¶28; (Gil-Ramos) at P002853 ¶27; (Wachter) at P002861 ¶28; (R. Robinson) at P003002 ¶27; (Martinez) at P003006 ¶26; (A. Smith) at P003115 ¶26; (Zoberis) at P003045 ¶24; (Basquine) at P003022 ¶27; (L. Williams) at P003061 ¶25; (B. Smith) at P002773 ¶27; (Ramsey) at P002801 ¶29; (Weems) at P002825 ¶27; (Getty) at P002841 ¶27; (Daubman) at P003010 ¶23; (Henderson) at P003014 ¶26; (Morris) at P003018 ¶28; (Jackson) at P003022 ¶24; (Price) at P003026 ¶25; (W. Robinson) at P003030 ¶25; (Sanders) at P003034 ¶26; (Mitchell) at P003038 ¶24; (B. Robinson) at P002777 ¶26; (Bell) at P002789 ¶28; (Coleman) at P002793 ¶28; (Jerry Johnson) at P002805 ¶28; (Linzy) at P002809 ¶26; (Palmer) at P002821 ¶28; (Drabing) at P002829 ¶27; (P. Johnson) at P002837 ¶26; (Truesdell) at P002858 ¶28; (Deloney) at P002974 ¶27; (Clay) at P002978 ¶26; (Thomas) at P002982 ¶24; (Kirk) at P002986 ¶26; (Bradford) at P002995 ¶28; (Tomberg) at P002998 ¶26.

[13] Ex. 31 at 110:14-112:15; Ex. 33 at 117:22-119:17; Ex. 36 at 127:12-128:8; Ex. 37 at 89:22-91:17; 93:4-94:20; Ex. 40 at 177:4-7; Ex. 41 at 73:17-23; Ex. 42 at 81:23-85:12; Ex. 43 at 48:14-17; Ex. 44 at 65:3-67:19; Ex. 45 at 83:24-85:19; Ex. 46 at 68:9-13; Ex. 52 at 4:28; Ex. 62 at 13:17; Group Ex. 49 (R. Williams) at P003094 ¶29; (Ingram) at P003090 ¶29, 30; (Causey) at P003086 ¶29, 30; (Huffman) at P002786 ¶31, 32; (Nelson) at  P002798 ¶31, 32; (Edwards) at P002813 ¶28, 29; (Skinner) at P002846 ¶32, 33; (Lockhart) at P002991 ¶32, 33; (W. Williams) at P003105-3106 ¶27, 28; (Williamson) at P003110 ¶31, 32; (Mowen) at P003102 ¶28, 29; (Lyons) at P003074 ¶30, 31; (Whitlock) at P003042 ¶25, 26; (West) at P003054 ¶30, 31; (Washington) at P002782 ¶30, 31; (White) at P002818 ¶31, 32; (Gherna) at P002834 ¶31, 32; (Burns) at P002850 ¶31, 32; (Gil-Ramos) at P002853-002854 ¶28, 29; (Wachter) at P002862 ¶31, 32; (R. Robinson) at P003003 ¶29, 30; (Martinez) at P003006-003007 ¶29, 30; (Zoberis) at P003045 ¶25, 26; (Basquine) at P003022-003023 ¶29, 30; (L. Williams) at P003061-003062 ¶28, 29; (B. Smith) at P002773 ¶28; (Ramsey) at P002802 ¶32, 33; (Weems) at P002826 ¶30, 31; (Getty) at P002842 ¶30, 31; (Daubman) at P003010 ¶26, 27; (Henderson) at P003015 ¶29, 30; (Morris) at P003019 ¶31, 32; (Jackson) at P003022 ¶26, 27; (Price) at P003026-003027 ¶28, 29; (W. Robinson) at P003030 ¶28, 29; (Sanders) at P003034-003035 ¶28, 29; (Mitchell) at P003038 ¶27, 28; (B. Robinson) at P002777 ¶28, 29; (Bell) at P002790 ¶31, 32; (Coleman) at P002794 ¶31, 32; (Jerry Johnson) at P002806 ¶30, 31; (Linzy) at P002810 ¶31, 32; (Palmer) at P002822 ¶31, 32; (Drabing) at P002830 ¶30, 31; (P. Johnson) at P002837 ¶29, 30; (Truesdell) at P002858 ¶30, 31; (Deloney) at P002975 ¶29, 30; (Clay) at P002979 ¶28, 29; (Thomas) at P002982 ¶26, 27; (Kirk) at P002986-002987 ¶29, 30; (Bradford) at P002995 ¶29, 30; (Tomberg) at P002998 ¶27, 28.

(same). And of the 300 tact team members who answered a survey regarding their involvement in the shakedowns at Menard, Illinois River, Big Muddy, and Lawrence, none reported seeing any member of the tact team act contrary to the briefing that they had received. Ex. 85 (Garden Aff.); Ex. 85.1 (survey response spreadsheet); Ex. 48 (survey group exhibits, question 6 and 8); Ex. 86 (O'Leary Aff.).

Defendants and members of the tact team largely deny the class's account of what happened during the shakedown. But notably, Defendants also concede that these tactics, if employed, served no legitimate penological purpose.[14]

On May 14, 2014, undersigned counsel sent a letter to Director Godinez, informing him of the reports they had received regarding the shakedowns described above and raising serious concerns about the constitutionality of them. Ex. 72 (May 14, 2014 Letter to Godinez). Despite counsel's letter, there is no evidence in the record that Godinez took any action to stop the abusive shakedowns or protect class members.

In the wake of the 2014 shakedowns, class members wrote grievances complaining about the abuse they had suffered. Ex. 90 (Group Exhibit of 33 Grievances from Prisoners). Butler also reported hearing widespread complaints of abuse by class members at Menard, complaints that Atchison testified he believed were true. Ex. 65 at 1-2; Ex. 6 at 139:22-140:4. And Atchison testified that several policies were changed as a result of the 2014 shakedowns to ensure that the abuse did not occur again. Ex. 6 at 58:10-59:3. Yet despite that fact, Defendants conducted just two investigations into allegations of abuse, *see* Ex. 92 (7/26/2014 Email); Ex. 93 (7/1/2014

---

[14] Ex. 6 at 122:4-132:20; Ex. 17 at 205:3-206-14, 214:1-215:16, 235:12-23-239:3; Ex. 28 at 40:18-42:19, 63:16-64:2; Ex. 27 at 109:12-20, 112:3-15; Ex. 90 (Gaetz Dep.) at 139:19-149:19; Ex. 7 at 136:13-140:20, 142:14-148:7; Ex.15 at 96:17-97:1; Ex. 12 at 188:11-189:16; Ex. 16 at 271:1-274:18, 278:20-286:21; Ex. 19 at 239:5-245:5; Ex. 91 (B. Johnson Dep.) at 274:23-280:4; Ex. 25 at 101:1-102:15, 106:10-108:9, 112:4-11, 127:5-8.

Email), and failed to preserve nearly all of the video taken of the shakedowns. *See* Ex. 6 at 65:6-68:6; 143:12-24; Ex. 17 at 265:21-266:2, 270:12-271:15; Ex. 65 at 43811; Ex. 28 at 57:8-16; Ex. 17 at 270:12-271:15; Ex. 7 at 129:8-11; Ex. 81 at ¶11; Ex. 83 at  p. 4, ¶12 (producing largely dysfunctional video clips showing a small portion of one shakedown in one cellhouse on one day at Menard).

## VI. The Experiences of the Proposed Class Representatives Demonstrate that Common Procedures Were Used at all Four Prisons.[15]

### A. Jonathan Tolliver (Menard)

Mr. Tolliver was subject to the April 2014 shakedown at Menard.  The first thing Mr. Tolliver experienced in connection with the shakedown was hearing loud banging and officers yelling "get the fuck up." Ex. 29 at 45:21-46:3. When the officers reached Mr. Tolliver's cell, they ordered him to "get motherfucking naked" and to perform a "reverse" strip search, meaning that Mr. Tolliver was required to manipulate his buttocks and genitals prior to (rather than after) putting his fingers in his mouth. *Id.* at 48:17-52:13. After the strip search, officers ordered Mr. Tolliver to dress, but without underpants. *Id.* at 55:6-13. Mr. Tolliver was then handcuffed behind his back, with his thumbs up and palms out, and ordered to keep his head down. *Id.* at 57:22-58:7, 62:16-21. Mr. Tolliver was then ordered to line up in close formation with other inmates and walk in close formation to the chapel. *Id.* at 68:12-70:21. The officers repeatedly complained about seeing "too much daylight" between the prisoners and physically pushed the prisoners up against each other. *Id.* at 68:12-70:21. As a result, Mr. Tolliver's full front side—including his genitals—made contact with the backside of the prisoner in front of him, and the full front side of the prisoner behind him made contact with his backside. *Id.* at 70:18-22, 76:18-

---

[15] There are additional plaintiffs whose cases were joined with this one. Although the facts of each of those plaintiffs also share a common core of operative facts, Plaintiffs are not seeking to have all of the named plaintiffs designated as class representatives.

22. At the chapel, Mr. Tolliver was ordered stand up facing a wall, with his head touching the wall. *Id.* at 79:15-19, 81:3-5. After prisoners were forced to stand in this position in the chapel for approximately 1.5 hours, prisoners started falling to the ground, at which point the prisoners were allowed to sit in chairs, but with their heads still down. *Id.* at 84:21-25, 85:14-86:16. At some point, Mr. Tolliver asked an officer if he could use the bathroom, and his request was denied. *Id.* at 89:17-90:25. After sitting for approximately 2-2.5 hours, the prisoners were ordered back to their cells, forced to move in the same close body contact formation. *Id.* at 95:2-17; 97:1-98:5. Back at his cell, officers removed Mr. Tolliver's handcuffs in such a forceful manner that it caused bones in his hand to break. *Id.* at 102:23-108:4, 236:23-237:10. After the shakedown, Mr. Tolliver observed several items of property missing, including magazines, pens, and his drinking cup. *Id.* at 111:3-15.

### B.    Ronald Smith (Menard)

Mr. Smith was also subject to the April 2014 shakedown at Menard.  Like the other named plaintiffs, Mr. Smith's first recollection of the shakedown was hearing tact team officers hollering and rattling their batons on bars. Ex. 30 at 38:11-39:5.  An officer approached his cell and ordered him to perform a reverse strip search, which he had never been ordered to previously. *Id.* at 41:11-43:3. Afterward, Mr. Smith was ordered to dress in his prison issued shirt, pants, and boots, but was not allowed to put underpants back on.  Ex. 89 (Smith *Pro Se* Complaint) at 6. Mr. Smith was then handcuffed tightly behind his back, with his palms facing out. Ex. 30 at 46:15-19.  Mr. Smith was ordered into a line with other prisoners that went outside the cell house and then marched to a chapel. *Id.* at 48:14-50:14. The prisoners were ordered to march "nuts to butts," such that Mr. Smith's testicles touched the back of the prisoner in front of him and the testicles of the prisoner behind him touched his back. *Id.* at 50:14-23. During the

transport, Mr. Smith was continually ordered to keep his head down and to stay "nuts to butts" with the other prisoners. *Id.* at 54:23-56:5. Tact team officers poked him with their batons and at one point an officer grabbed Mr. Smith by the neck and bent Mr. Smith's head toward the ground. *Id.* at 56:5-57:24, 28:13-28:24. At the chapel, Mr. Smith was ordered to stand with his head down for approximately 30-50 minutes, at which point Mr. Smith collapsed from pain and discomfort. *Id.* at 62:2-21. Thereafter Mr. Smith was allowed to sit, but with his head down. *Id.* at 69:12-14.  During the shakedown, the tact team ridiculed him and the other prisoners. *Id.* at 69:22-70:1. Mr. Smith was ordered to march back to the cell house in the same "nuts to butts" formation. *Id.* at76:22-77:4. After the shakedown, Mr. Smith found that some of his food had been taken from and/or opened up in his cell. *Id.* at 79:24-80:5.

### C.     Demetrius Ross (Illinois River)

Mr. Ross was subject to the April 2014 shakedown at Illinois River correctional center. The shakedown began with tact team officers banging their batons and yelling loudly on Mr. Ross's unit. Ex. 31 at 43:14-44:7. The officers approached Mr. Ross's cell and ordered him to perform the same reverse strip search. *Id.* at 56:14-57:5. The officers then ordered him to put on his clothes, but without his underpants.  *Id.* Afterwards, the officers handcuffed Mr. Ross tightly behind his back with his palms facing outward.  *Id.* at 60:16-61:6. Thereafter Mr. Ross was forced to walk in a single file line with other prisoners to a holding area—in Mr. Ross's case a gymnasium. During transport, Mr. Ross was ordered to walk "nuts to butts" with other prisoners, bent over at the waist, with his head on the back of a prisoner in front of him. *Id.* at 75:12-77:8, 81:11-22. As a result of these orders, Mr. Ross's genitals made physical contact with the body of the prisoner in front of him. *Id.* at 77:11-78:16. During the transport, tact team officers used force against Mr. Ross, slamming his head down into the back of the person in front of him, and they

19

continually ordered Mr. Ross to keep his head down. *Id.* at 69:13-71:17, 80:8-23. When Mr.

Ross struggled to stay in line, tact team officers pulled him out of line and slapped him. *Id.* at

86:18-89:7. At the gymnasium, Mr. Ross was ordered to stand facing a wall, with his forehead

touching the wall, for approximately two hours. *Id.* at 102:18-21. During this period, Mr. Ross

heard another inmate ask to use the bathroom and the officer told the prisoner to "shut the fuck

up." *Id.* at 104:14-24. When Mr. Ross returned to his cell, he discovered a number of items of

his personal property were taken, including headphones and religious items. *Id.* at 118:2-13.

**D.      Kevin Hamilton (Big Muddy)**

Mr. Hamilton was subject to the May 2014 shakedown at Big Muddy.  Mr. Hamilton's

first experience of the shakedown was hearing tact team officers on his unit screaming, yelling,

and banging objects. Ex. 32 at 41:5-19.  Whenever officers approached his cell, they ordered him

to do a reverse strip search. *Id.* at 58:7-22.  After the search, Mr. Hamilton was allowed to put on

his shirt and pants only, no underpants.  *Id.* at 59:23-60:6. Mr. Hamilton complained about being

ordered to strip because there was a female officer among the tact team on his unit, and his

complaint was met with a tact team officer shoving him into a wall. *Id.* at 50:2-53:13, 55:11-

57:5. The officers then cuffed him behind his back, with his thumbs up. *Id.* at 63:23-64:3. Mr.

Hamilton was then ordered to line up "nuts to butts" with other prisoners and to put his head on

the back of the prisoner behind him. *Id.* at 66:17-67:14. Mr. Hamilton's genitals made contact

with the person in front him as the line moved, and he was ordered to keep his "fucking head

down." *Id.* at 71:17-22, 74:17-21. When he looked up, officers would shove his head back down.

*Id.* at 74:14-76:15. Mr. Hamilton arrived at the cafeteria, and he was ordered to sit at a table with

his head on the table. *Id.* at 77:19-78:14. He was held in this position for approximately two

hours. *Id.* at 78:7-81:9. Mr. Hamilton was ordered to return to his cell in the same "nuts to butts"

formation on the way back to his cell house. *Id.* at 83:3-84:15. When Mr. Hamilton arrived back to his cell, he found his belongings in disarray, and several items of property, primarily food items, had been taken. *Id.* at 84:16-85:5. Officers used disrespectful and profane language toward Mr. Hamilton.  *Id.* at 55:11-22, 74:14-76:15.

> ### E.    Glenn Verser (Lawrence)

Mr. Verser was subject to the July 2014 shakedown at Lawrence.  Like Mr. Ross, Mr. Verser's first experience of the shakedown was hearing officers yelling loudly and banging objects on this living unit. Ex. 33 at 68:8-12. The officers approached Mr. Verser's cell and ordered him to perform a reverse strip search, *id.* at 74:19-24, and then dress himself again, but without underpants, *id.* at 75:24-76:4. Like Mr. Ross, Mr. Verser had never been strip searched in the reverse manner before.  The officers then proceeded to handcuff Mr. Verser behind his back, with his palms facing outward. *Id.* at 100:4-8. Prior to being cuffed, Mr. Verser told the officers that he had a medical permit indicating that he should be handcuffed in the front, not the back.   In response, one of the officers punched him and refused his request. *Id.* at 80:7-82:10. Mr. Verser was then ordered to line up "nuts to butts" with other men, with his head forced onto the back of the man in front of him. *Id.* at 88:1-89:9, 93:4-17, 94:7-97:15. As the line proceeded to the cafeteria, Mr. Verser's genitals made contact with bodies of other men, and other men's genitals made contact with his body.  *Id.* at 64:22-67:9. In the cafeteria, Mr. Verser was forced to sit in handcuffs with his head down on a table. *Id.* at 111:14-112:4. In the cafeteria, Mr. Verser complained about the officer who did not honor his front cuff permit, and in response he was punched and kicked by other officers. *Id.* at 105:3-107:24. Mr. Verser was ordered to return to his cell house in the same "nuts to butts" line formation. *Id.* at 117:22-119:12.  Throughout the encounter, tact team officers used disrespectful and profane language.  *Id.* at 92:1-97:15.

21

# PROPOSED CLASS

## I.   Plaintiffs' Proposed Class Definition

Plaintiffs propose certification of a class of all prisoners housed at:

- Menard between April 4, 2014 and April 16, 2014;
- Illinois River between April 21, 2014 and April 29, 2014;
- Big Muddy between May 12, 2014 and May 19, 2014; or
- Lawrence between July 7, 2014 and July 11, 2014.

Plaintiffs propose that Demetrius Ross, Kevin Hamilton, Ronald Smith, Jonathan Tolliver, and

Glenn Verser serve as class representatives for this class.

Plaintiffs proposed that the class be certified against the following Defendants:

- Salvador Godinez (Director);
- Joseph Yurkovich (Chief of Operations);
- Michael Atchison (Deputy Chief of Operations);
- David White (Statewide Tact Commander);
- Anthony McAllister (Southern Regional Tact Commander);
- Jerry Witthoft (Menard Tact Commander);
- Frank Eovaldi (Menard Assistant Tact Commander);
- Robert Arnett (Illinois River Tact Commander);
- Brian Piper (Illinois River Assistant Tact Commander);
- David Hermetz (Big Muddy Tact Commander);
- Chris White (Big Muddy Assistant Tact Commander);
- Ken Finney (Big Muddy Assistant Tact Commander);
- Michael Gilreath (Lawrence Tact Commander);
- Timothy McAllister (Lawrence Assistant Tact Commander);
- Kim Butler (Menard Warden);
- Alex Jones (Menard Assistant Warden);
- Greg Gossett (Illinois River Warden);
- Stephanie Dorethy (Illinois River Assistant Warden);
- Zachary Roeckeman (Big Muddy Warden);
- Robert Craig (Big Muddy Assistant Warden);
- Stephen Duncan (Lawrence Warden); and
- Richard Moore (Lawrence Assistant Warden).

## II.    Class Claims

The class brings three constitutional claims. First, Defendants designed and implemented procedures to be followed during all four shakedowns that were abusive and humiliating, rather than in furtherance of any proper penological purpose, in violation of the class's rights under the Eighth Amendment to the United States Constitution. Second, Defendants reached an agreement to deprive the class of their constitutional rights and to protect one another from liability for that constitutional deprivation, and acted in furtherance of that agreement. Third, Defendants knew that the class's Eighth Amendment rights were about to be violated and failed to intervene to prevent the constitutional violation.

## ARGUMENT

To obtain class certification, Plaintiffs must demonstrate that the proposed class satisfies the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and that one of the requirements of Rule 23(b) is met. Fed. R. Civ. P. 23(a)-(b); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (plaintiffs must "affirmatively demonstrate [their] compliance"). Plaintiffs seek certification under Rule 23(b)(3), which is appropriate when common questions of law or fact predominate over individualized ones, and proceeding as a class action is superior to other available methods of adjudication. Fed. R. Civ. P. 23(b)(3); *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 759 (7th Cir. 2014). Plaintiffs bear the burden of showing compliance with Rule 23, but they "need not make that showing to a degree of absolute certainty." *Dr. Robert L. Meinders D.C., Ltd. v. Emery Wilson Corp.*, 2016 WL 3402621, at *2 (S.D. Ill. June 21, 2016); *Chi. Teachers Union v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 433 (7th Cir. 2015) (showing compliance with Rule 23 by preponderance of the evidence is sufficient to obtain class certification).

Federal courts have "broad discretion" to determine whether to certify a class action. *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998). This determination involves some, but limited, consideration of the merits: "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc.*, 568 U.S. at 466; *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010) (courts "may take a peek at the merits before certifying a class," but "this peek must be limited to those aspects of the merits that affect the decisions essential under Rule 23.").

## I.      The Class Is Easily Ascertainable.

Federal courts in this Circuit routinely require that, before considering whether the requirements of Rule 23(a) have been met, Plaintiffs show "that the class is indeed identifiable as a class." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). This requirement is intended to protect against a situation where "there is no way to know or readily ascertain who is a member of the class," which "lacks the definiteness required for class certification." *Jamie S. v. Milwaukee Public Sch.*, 668 F.3d 481, 495 (7th Cir. 2012); *see also Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 245 (N.D. Ill. 2014) (absent class members' actual identities need not be determined before class certification if they can be "identified during a claims administration process if the class prevails").

In this case, the class is straightforward and clearly ascertainable. Class membership is defined objectively, based on the class member's location during a defined period of time. *Dr. Robert L. Meinders D.C., Ltd.*, 2016 WL 3402621, at *4 ("To show that a class is ascertainable, a plaintiff must offer a definition that is (1) precise, (2) defined by objective criteria, and (3) not

defined in terms of success on the merits." (citing *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015)). Because class membership is definite and knowable, Plaintiffs have complied with the ascertainability requirement.

In fact, the class may already have been ascertained, thanks to the list of men housed at each of the four prisons at issue during the month that the prison was shaken down. Ex. 1; Ex. 2; Ex. 3; Ex. 4. Because each prison was shaken down in its entirety, these four exhibits represent the identities of all class members. And even if an individual raises a claim that, despite not appearing in any of the four lists, he was present at one of the four prisons during the shakedowns, the individual's housing history (retained in perpetuity by IDOC) will easily confirm or contradict his account.

## II.     Class Certification Is Appropriate Under Rule 23(a).

### A.     The Class Is Sufficiently Numerous.

A class may be certified only if it is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although there is no magic number, courts have found classes of forty or more to be sufficiently large to satisfy Rule 23(a)(1). *See Pruitt v. City of Chicago*, 472 F.3d 925, 926-27 (7th Cir. 2006); *Toney v. Quality Resources, Inc.*, 323 F.R.D. 567, 583 (N.D. Ill. 2018). Other practical considerations, including the economy gained from avoiding multiple actions, ease of identifying class members, geographic diversity of class members, and financial resources of class members (among others), may be relevant to the Court's decision. *Jimenez v. GLK Foods, LLC*, 2014 WL 2515398, at *5 (E.D. Wis. June 4, 2014); *Olson v. Brown*, 284 F.R.D. 398, 407 (N.D. Ind. 2012). Courts should use common sense when determining whether a class satisfies Rule 23's numerosity requirement. *Lacy v. Butts*, 2015 WL 5775497, at *5 (S.D. Ind. Sept. 30, 2015).

According to the documents produced by Defendants, Plaintiffs' class includes approximately 9,871 men. Ex. 1 (3,835 men at Menard in April 2014); Ex. 2 (1,929 men at Illinois River in April 2014); Ex. 3 (1,836 men at Big Muddy in May 2014); Ex. 4 (2,271 men at Lawrence in July 2014). A class of nearly 10,000 members easily clears the numerosity hurdle. *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001).

Other considerations also demonstrate the impracticality of joinder in this case. The class is comprised primarily of easily identified men who are now imprisoned at IDOC prisons throughout the State of Illinois with limited financial means. These men would have difficulty conducting discovery or communicating with witnesses relevant to their claims, and thus would require close judicial supervision in order to ensure that each member's claims were adjudicated on their merits. These circumstances further demonstrate the impracticality of joinder of the class members' claims. *Jimenez*, 2014 WL 2515398, at *5.

### B.   The Class Satisfies Rule 23(a)'s Commonality Requirement.

Rule 23(a)'s second requirement is that "there are questions of law or fact common to the class[.]" Fed. R. Civ. P. 23(a)(2). Commonality requires that Plaintiffs' claims "must depend upon a common contention that is capable of class-wide resolution," meaning that "determining the truth or falsity of the common contention will resolve an issue that is central to the validity of each claim." *Chi. Teachers Union*, 797 F.3d at 434. "The common question (or common questions) need not address every aspect of the plaintiffs' claims, but it must drive the resolution of the litigation." *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 553 (7th Cir. 2016); *Kleen Products LLC v. Int'l Paper Co.*, 831 F.3d 919, 922 (7th Cir. 2016) ("Rule 23 does not demand that *every* issue be common" (emphasis in original)).

In the end, "[w]hat matters to class certification . . . is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc.*, 564 U.S. at 350 (internal quotation marks omitted). Even a single common question will suffice, *Suchanek*, 764 F.3d at 755, and "[a] common nucleus of operative fact is usually enough to satisfy the commonality requirement." *Rench v. TD Bank, N.A.*, 2018 WL 264121, at *3 (S.D. Ill. Jan. 2, 2018) (citing *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998)).

In this case, there are several questions of law and fact that are common to the class. First, the jury will be required to determine whether the admittedly uniform shakedowns at the four prisons were executed humanely and professionally, in the manner Defendants contend, or instead in the manner Plaintiffs contend, including: the unnecessarily intimidating manner in which the tact team entered the living units; the reverse strip search; the unnecessarily painful handcuffing, which class members were forced to endure for lengthy periods of time; the orders to march so closely that their genitals were forced to make contact with other prisoners in line; and the forced stress positions in the holding area. *Supra* Sect. V at pp.10-16; *see also* Ex. 17 at 281:18-282:10; Ex. 10 at 107:17-21; Ex. 15 at 129:4-11; Ex. 18 at 68:7-11; Ex. 19 at 184:8-185:15; Ex. 14 at 48:15-49:1; 61:14-62:14; Ex. 26 at 65:10-18 ; Ex. 82 at ¶9; Ex. 80 at ¶9; Ex. 85. This question will be based on evidence from both Plaintiffs and Defendants that is common to the class and will drive resolution of each of the Plaintiffs' claims.[16] *Bell v. PNC Bank, N.A.*,

---

[16] The answer to this question of fact will drive resolution of all three of Plaintiffs' claims—supervisory liability, conspiracy, and failure to intervene—because each claim is predicated on the existence of a widespread unconstitutional practice. *See Childress v. Walker*, 787 F.3d 433, 441 (7th Cir. 2015) (supervisory liability attaches when supervisor knows of practice and its harmful effect, and fails to act); *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988) (civil conspiracy exists when two or more people agree to perform a constitutional violation, and take action in furtherance of that agreement); *Rosado v. Gonzalez*, 832 F.3d 714, 718 (7th Cir. 2016) (failure-to-intervene claim requires the existence

800 F.3d 360, 375 (7th Cir. 2015); *see also Phillips*, 828 F.3d at 553 (describing with approval Ninth Circuit's certification of a class asserting Eighth Amendment claims predicated on "a particular and sufficiently well-defined set of allegedly illegal policies and practices" (citing *Parsons v. Ryan*, 754 F.3d 657, 679 (9th Cir. 2014)). A second, related common question of law is whether the shakedowns, as the class describes them, violated the Eighth Amendment.

A third common question is whether each of the Defendants against whom the class is certified (all supervisors) knew, facilitated, approved, condoned, and/or turned a blind eye to the uniform shakedown practice. *See Backes v. Vill. of Peoria Heights*, 662 F.3d 866, 870 (7th Cir. 2011). This question of fact is the central element of Plaintiffs' supervisory liability claim and relevant to their conspiracy and failure to intervene claims. *Chi. Teachers Union*, 797 F.3d at 434; *Wal-Mart Stores, Inc.*, 564 U.S. at 350.

A fourth common question is whether Defendants reached an agreement among themselves and/or others to perform the shakedowns in the uniform unconstitutional manner alleged by the class. *See Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) (voluntary participants in a common venture are conspirators, even if they have not "agreed on the details of the conspiratorial scheme or even know who the other conspirators are"); *Geinosky v. City of Chicago*, 675 F.3d 743, 750 (7th Cir. 2012) (conspirators are "jointly liable for later acts of co-conspirators" unless they affirmatively withdraw from the conspiracy). If the jury finds that Defendants entered into a conspiracy to perform the unconstitutional shakedowns—an agreement that the evidence shows was communicated to all participating tact team members before each shakedown—then Defendants are liable to every member of the class. *See Kleen Products LLC*, 831 F.3d at 925-26 (noting the common questions raised by a conspiracy claim).

---

of an underlying constitutional violation). Each of these claims is predicated on the constitutional violation—the uniform shakedown.

Importantly, these common questions of fact or law will each be decided with evidence common to the entire class. *Kleen Products LLC*, 831 F.3d at 926; *Wal-Mart Stores, Inc.*, 564 U.S. at 350. As described in detail above, Plaintiffs' claims all rest on a theory, supported by testimony from class members and Defendants, and circumstantial documentary evidence, that Defendants planned to perform humiliating and abusive shakedowns, and then implemented their plan at each of the four prisons, entering into agreements with other tact team members to execute these unconstitutional shakedowns, and violating Plaintiffs' Eighth Amendment rights through the widespread practice. The parties agree that the practice was widespread; and all intend to introduce classwide evidence to support their view of the contents of that practice and Defendants' knowledge about it. This widespread practice is precisely the kind of "glue" that the Supreme Court in *Wal-Mart* found lacking. *See, e.g., Suchanek*, 764 F.3d at 756 ("Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question."); *Jamie S.*, 668 F.3d at 498 ("an illegal *policy* might provide the 'glue' necessary to litigate other highly individualized claims as a class"); *Parson v. Ryan*, 754 F.3d 657, 678 (8th Cir. 2014) ("[C]lass members are as one in their exposure to a particular and sufficiently well-defined set of allegedly illegal policies and practices, rather than only in their advancement of a general Eighth Amendment legal theory."); *O.B. v. Norwood*, 2016 WL 2866132, at *4 (N.D. Ill. May 17, 2016) (finding commonality because claims were based on "systemic failure" that affected all members of the class); *Porter v. Pipefitters Ass'n Local Union 597*, 208 F. Supp. 3d 894, 905 (N.D. Ill. 2016) ("existence of an illegal policy may provide the 'glue' to hold together class members' claims"); *Holmes v. Godinez*, 311 F.R.D. 177, 218 (N.D. Ill. 2015) (finding commonality because plaintiffs' claims "principally attack[] IDOC's system-wide policies").

In sum, this is not a case where each member of the class is joined to the rest solely by virtue of an Eighth Amendment violation, each committed in a unique way. To the contrary, Defendants admit that there was a common plan. The issue is whether the coordinated implementation of that plain violated the Constitution. These are common questions uniquely suited to classwide determination.

### C.    The Class Representatives' Claims Are Typical of the Claims of the Class.

To meet the typicality requirement, the claims of the named Plaintiffs must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The named Plaintiffs' claims must "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . [be] based on the same legal theory." *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 412 (N.D. Ill. 2012) (citing *De La Fuente v. Stokely-Van Camp*, 713 F.2d 225, 232 (7th Cir. 1983)). "Typical does not mean identical, and the typicality requirement is liberally construed." *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996).

Notably, Rule 23(a)(3) does not require all class members suffer the same injury as the named class representative. *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).  Rather, the Court should look to the defendant's conduct and the plaintiff's legal theory to determine whether Rule 23(a)(3) is satisfied. *Id.*

In this case, the claims of the proposed class representatives—Demetrius Ross, Glenn Verser, Kevin Hamilton, Jonathan Tolliver, and Ronald Smith—are typical of the of the proposed class as a whole. Their claims arise from the same course of conduct that gives rise to the claims of other class members and they are based on the same legal theory. Each of them was subject to the same course of conduct by defendants and their experiences are highly similar not only to one another but also to those of other putative class members.

30

**D.     The Class Representative Will Fairly and Adequately Protect the Interests of the Class.**

Rule 23(a)(4) lastly requires that representative parties must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy of representation involves two inquiries: "the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the class members." *Rench*, 2018 WL 264121, at *4 (citing *Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993)); *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011). In this case, both requirements are satisfied.

**1.     Proposed Class Counsel Are Qualified, Experienced, and Able to Conduct the Proposed Litigation.**

To meet Rule 23(a)(4)'s adequacy requirement, Plaintiffs must demonstrate that proposed counsel be "qualified, experienced, and able to conduct the proposed litigation." *In re Sulfuric Acid Antitrust Litig.*, 2007 WL 898600, at *5 (N.D. Ill. Mar. 21, 2007). In appointing class counsel, the Court must consider counsel's work in investigating potential claims; counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; counsel's knowledge of the applicable law; and the resources counsel will commit to representing the class. *See* Fed. R. Civ. P. 23(g)(1)(A). In this case, consideration of each of these factors weighs strongly in favor of a grant of class certification and appointment of the undersigned attorneys as co-counsel.

Plaintiffs are represented by eight attorneys from Loevy & Loevy and Uptown People's Law Center. Plaintiffs' counsel have worked together for the past four years to identify, investigate, and develop the class's claims. Counsel have spent several hundreds of hours investigating the facts of this case, conducting extensive factual and legal research, propounding

31

and pursuing discovery requests, reviewing tens of thousands of pages in discovery, drafting pleadings and various motions, and deposing dozens of IDOC personnel relevant to the case. Plaintiffs' counsel have significant experience handling class actions and complex litigation, including civil rights actions on behalf of men imprisoned at IDOC facilities across the State of Illinois, and are well-versed in the laws at issue in this case. Group Ex. 87 (Credentials of Alan Mills & Michael Kanovitz); *see also, e.g., Lippert v. Baldwin*, 2017 WL 1545672, at *10 (N.D. Ill. Apr. 28, 2017) ("the Court agrees that plaintiff's counsel [including Uptown People's Law Center] will continue to pursue this action zealously on behalf of the class"); *Rasho v. Walker*, No. 07 C 1298, Dkt. 252 (C.D. Ill. Aug. 14, 2015) (calling attorneys from Uptown People's Law Center "seasoned civil rights litigators"); *Flood v. Dominguez*, 270 F.R.D. 413, 418 (N.D. Ind. 2010) (finding Loevy & Loevy adequate to represent class in jail conditions case); *Young v. County of Cook*, 2007 WL 1238920, at *6 (N.D. Ill. Apr. 25, 2007) ("The Court has no doubt that plaintiffs' counsel [from Loevy & Loevy] will be able to represent fairly the interests of the proposed classes."). Plaintiffs' counsel has and will continue to work diligently to pursue the optimal relief for the class, and will continue to commit the resources necessary to do so. Accordingly, Rule 23(a)(4) and Rule 23(g)'s requirement regarding class counsel is satisfied. *See Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 498 (7th Cir. 2013).

### 2. The Class Representatives Will Ensure Vigorous Advocacy in This Case and Have No Conflicts.

The second aspect of the adequacy requirement asks whether the named plaintiffs have "a sufficient interest in the outcome of the case to ensure vigorous advocacy and do[] not have interests antagonistic to those of the class." *Rench*, 2018 WL 264121, at *4 (citing *Saltman v. Pella Corp.*, 257 F.R.D. 471, 480 (N.D. Ill. 2009)) (internal quotation marks omitted); *see also Toney*, 323 F.R.D. at 585 ("A class is not fairly and adequately represented if class members

have antagonistic or conflicting claims."). "The adequacy-of-representation requirement tends to merge with the commonality and typicality criteria of Rule 23(a)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) (internal quotation marks omitted).

Plaintiffs in this case are more than adequate representatives of the class. There is no question that Plaintiffs—four of whom filed lawsuits *pro se* before they became named Plaintiffs—are sufficiently interested in the case to ensure they will be vigorous advocates. And there is no evidence that any of the Plaintiffs have antagonistic or conflicting claims when compared to the claims of the class. *See Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). Accordingly, Plaintiffs themselves are also adequate representatives for the class in this case.

### III.   Class Certification Is Appropriate Under Rule 23(b)(3).

Having demonstrated their compliance with Rule 23(a), the Court must next determine whether the common questions of law or fact predominate over individualized ones, and whether proceeding as a class action is superior to other available methods of adjudication. Fed. R. Civ. P. 23(b)(3). The focus of Rule 23(b)(3) is to ensure that courts "select the metho[d] best suited to adjudication of the controversy fairly and efficiently." *Amgen Inc.*, 568 U.S. at 460 (internal quotation marks omitted); *Chi. Teachers Union*, 797 F.3d at 433 ("The purpose of class action litigation is to avoid repeated litigation of the same issue and to facilitate prosecution of claims that any one individual might not otherwise bring on her own."). In the present case, considerations of fairness and efficiency strongly counsel in favor of certification.

#### A.   Common Questions Predominate Over Individualized Questions.

The predominance inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important then the non-common, aggregation-defeating,

33

individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. ___, 136 S. Ct. 1036, 1045 (2016). Individual questions are those that require members of a class to present evidence that varies from member to member, whereas common questions are those "susceptible to generalized, class-wide proof." *Id.* Predominance is not determined by simply "counting noses"; rather, it is a qualitative assessment that looks to the importance of the common questions and their ability to drive resolution of the case. *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("common issues need only predominate, not outnumber individual issues").

In evaluating predominance, the Court must pragmatically look at the evidence involved to see whether common questions (rather than individual ones) will be raised in resolving the case, *Suchanek*, 764 F.3d at 760-61, but must not make findings about what the answer to those common questions will be. *Bell*, 800 F.3d at 376; *Amgen Inc.*, 568 U.S. at 459 ("Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class.").

In this case, common questions strongly predominate over any individualized ones. As discussed in detail above, these questions are common because they will be answered with class-wide evidence that applies to all class members equally, including: evidence about the meetings Defendants held to plan the shakedowns and what they discussed, the instructions Defendants gave to tactical team staff in advance of the shakedowns, the presence of Defendants during the shakedowns and their supervisory role, Defendants' admission about the uniformity they observed in the execution of the shakedowns, and the actions taken by Defendants in response to complaints about the abuse and humiliation by members of the class. *See Kleen Prods. LLC*, 831 F.3d at 927 (finding that circumstantial evidence offered to prove existence of conspiracy was common to the class).

Additionally, these questions predominate over any individual questions that may be raised by some members of the class because these common questions are dispositive of the common constitutional claims: if the answer to these questions is in Plaintiffs' favor, then Defendants are liable to each member of the class; if the answer to these questions is in Defendants' favor, then no member of the class may prevail against them. *See Butler*, 727 F.3d at 799 (pointing out that where a favorable answer to common questions will defeat liability, defendants should "welcome" certification because class members would be bound by a defense verdict).

Plaintiffs' case focuses on a widespread practice in place at Menard, Illinois River, Big Muddy, and Lawrence in 2014—a practice overseen and implemented by Defendants. In cases like this one where a policy or widespread practice is challenged, federal courts routinely find that common questions predominate. *See, e.g., Suchanek*, 764 F.3d at 756 ("Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question."); *Streeter v. Sheriff of Cook Cnty.*, 256 F.R.D. 609, 614 (N.D. Ill. 2009) ("When a proposed class challenges a uniform policy, the validity of that policy tends to be the predominant issue in the litigation."); *Young*, 2007 WL 1238920, at *7 (same); *see also Hill v. County of Montgomery*, 2018 WL 3979590, at *14 (N.D.N.Y. Aug. 20, 2018) ("where plaintiffs are allegedly aggrieved by a single policy of the defendants' and there is a strong commonality of the violation and the harm, this is precisely the type of situation for which the class action device is suited" (internal quotation marks omitted)); *Snead v. CoreCivic of Tenn., LLC*, 2018 WL 3157283, at *16-17 (M.D. Tenn. June 27, 2018) (certifying Rule 23(b)(3) class of prisoners who alleged the existence of a widespread practice of denying certain medical

care); *Butler v. Suffolk Cnty.*, 289 F.R.D. 80, 98 (E.D.N.Y. 2013) (certifying Rule 23(b)(3) class of prisoners who claimed they suffered unconstitutional conditions of confinement).

Plaintiffs anticipate that Defendants will argue for denial of Plaintiffs' motion on the basis of a supposed disparity among the class members, but which plays no role in class certification: the harm, *vel non*, suffered by each class member. Neither the harm nor the related concept of damages is relevant. The Seventh Circuit has repeatedly rejected the argument that plaintiffs seeking certification must prove that every member of a liability class suffered harm as a result of the misconduct. *See, e.g., Suchanek*, 764 F.3d at 757 ("If the court thought that no class can be certified until proof exists that every member has been harmed, it was wrong."); *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 823 (7th Cir. 2012) (fact that some class members' claims will fail because they cannot show an injury is irrelevant to certification decision); *Kohen v. Pacific Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) ("a class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable").[17]

Similarly, the Supreme Court and the Seventh Circuit agree that certification of a liability class is appropriate "even though other important matters will have to be tried separately, such as damages . . . ." *Tyson Foods, Inc.*, 136 S. Ct. at 1045; *see also Butler*, 727 F.3d at 800 ("[A] class action limited to determining liability on a class-wide basis, with separate hearings to determine—if liability is established—the damages of individual class members" is permissible and often "the sensible way to proceed."). In *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017), the Seventh Circuit recognized that federal courts were uniform on this

---

[17] The same is true for questions of *causation* (i.e., the link between Defendants' conduct and the injury suffered). *Suchanek*, 764 F.3d at 759 ("Proximate cause . . . is necessarily an individual issue and the need for individual proof alone does not necessarily preclude class certification. (citing *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010)).

point, calling the conclusion "well nigh universal." In this regard, it does not matter whether, at the damages phase, class members may be grouped into similarly situated subclasses or treated individually; so long as there are predominant common questions relating to liability, certification is appropriate. *Bell*, 800 F.3d at 379-80 (recognizing propriety of certification even where "scores of separate trials might be necessary to determine which class members were actually adversely affected by the policy and if they were, what loss each class member sustained."). That is so because the class will have served its purpose in answering the predicate question: liability. *Id.*; *Chi. Teachers Union*, 797 F.3d at 442-43.

In sum, the claims of each member of the class raise common questions, questions that vastly outweigh any individualized liability questions. That the class members' damages may vary—or the fact that some number of them may have suffered no injury—does not defeat the predominance of those common questions.

### B.    Proceeding as a Class Is Superior to Proceeding Individually.

The final issue the Court must consider is whether, practically speaking, certification of a class is superior to individual adjudications. Approximately 20 men previously filed separate lawsuits regarding the 2014 shakedowns at Menard, Illinois River, Big Muddy, or Lawrence, but the Court has already consolidated those cases with this one and appointed Plaintiffs' counsel to represent them.[18] If class certification is denied, this Court will be required to resolve each of

---

[18] Brandon Brooks, *Brooks v. IDOC Director, et al.*, No. 15 C 1060 (S.D. Ill.); Ramon Clark, *Clark v. Tact Team, et al.*, No. 17 C 0146 (S.D. Ill.); Sergio Cortes, *Cortes v. Stolworthy, et al.*, No. 15 C 0309 (S.D. Ill.); James Dunmore, *Dunmore v. Duncan, et al.*, No. 15 C 0706 (S.D.Ill.); Sam Fisher, *Fisher v. McCallister, et al.*, No. 15 C 0007 (S.D. Ill.); Kevin Hamilton, *Hamilton v McAllister, et al.*, No. 15 C 0281 (S.D.Ill.); Harley Miller, *Miller v. Duncan, et al.*, No. 15 C 0415 (S.D. Ill.); Samuel Harding, *Harding v. Balwin, et al.*, No. 16 C 0083 (S.D. Ill.); Jeffrey Miller, *Miller v. Baldwin, et al.*, No. 16 C 0416 (S.D. Ill.); Jammel Johnson, *Johnson v. McAllistor, et al.*, No. 15 C 0308 (S.D. Ill.); Ted Knox, *Knox v. Butler, et al.*, No. 17 C 0494 (S.D. Ill.); Marshall McDaniel, *McDaniel v. McAllistor, et al.*, No. 15 C 0515 (S.D. Ill.); Ronald Smith, *Smith v. Godinez, et al.*, No. 16 C 0248 (S.D.Ill.); Vincent Smith,

these cases individually. In addition, each of the almost 10,000 men who would be in Plaintiffs' proposed class would have the right to bring their own individual damages actions, requiring the Court to hold hundreds, if not thousands, of individual trials, and every trial would require the jury to determine whether these searches violated the Constitution. Given the hundreds of letters that Plaintiffs' counsel have received from other putative class members, *see* Ex. 88 (Pls.' Priv. Log), there is every reason to believe that many of these 10,000 potential plaintiffs will, in fact, file individual cases if class certification is denied once Plaintiffs' counsel informs these putative class members of the Court's decision and their right to file individual suits. *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983) (filing of a putative class action tolls the statute of limitations for all asserted class members).

Denying class certification and requiring putative class members to file individual actions would present additional concerns. The vast majority of documents produced in this case— including centrally relevant documents like operations orders regarding the shakedowns, and emails between Defendants regarding complaints about the shakedowns—are marked attorneys' eyes only. Practically speaking, the vast majority of class members who file individual lawsuits about these shakedowns will file without the assistance of an attorney, and thus be deprived of this centrally relevant information. Certification would solve this problem, as it provides for common counsel, who is able to view these documents and use them in support of the class's claims.

---

*Smith v. Doe #1, et al.*, No. 16 C 745 (S.D.Ill.); Charles Sultan, *Sultan v. Duncan, et al.*, No. 15 C 0611 (S.D. Ill.); Edward Tenney, *Tenney v. Baldwin, et al.*, No. 16 C 0115 (S.D. Ill.); Jonathan Tolliver, *Tolliver v. Wexford Health Sources, et al.*, No. 16 C 0130 (S.D.Ill.); Glenn Verser, *Verser v. Duncan, et al.*, No. 15 C 1263 (S.D.Ill.); Zachary Watts, *Watts v. Big Muddy River Correctional Center, et al.*, No. 15 C 0692 (S.D.Ill.); Clark Truly, *Truly v. Moore, et al.*, No. 16 C 0783 (S.D. Ill.).

The probability of inconsistent verdicts if class members are required to bring and litigate their claims individually also supports certification. *Rench*, 2018 WL 264121, at *6. And although every class action requires some amount of additional work when compared to an individual case, judicial and party resources will actually be served best through certification, given the number of individual cases that will result if certification will be denied. *Id.* ("Given the number of putative class members and the common questions . . . a class action will certainly serve the economies of time, effort and expense and prevent possibly inconsistent results. By contrast, deciding each claim separately would be an extremely inefficient use of both judicial and party resources.").

In sum, the practical implications at play in this case demonstrate that granting Plaintiffs' motion and resolving the case through certification is far superior to the alternative. As such, this Court should grant Plaintiff's motion.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court certify the class pursuant to Federal Rule of Civil Procedure 23(b)(3) and appoint undersigned counsel to represent the class.

Respectfully submitted,


/s/ Sarah Grady
Sarah Grady
Counsel for Plaintiffs

Jon Loevy
Michael Kanovitz
Sarah Grady
Sam Heppell
Adair Crosley
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900

Alan Mills
Elizabeth Mazur
Nicole Schult
UPTOWN PEOPLE'S LAW CENTER
4413 North Sheridan St.
Chicago, Illinois 60640
(773) 769-1411

## <u>CERTIFICATE OF SERVICE</u>

I, Sarah Grady, an attorney, certify that on October 12, 2018, I caused the foregoing Plaintiffs' Motion for Class Certification to be filed using the Court's CM/ECF system, which effected service on all counsel of record.


/s/ Sarah Grady
Sarah Grady
Counsel for Plaintiffs