**IN THE UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION**

DEMETRIUS ROSS, et al., on behalf of   )
themselves and all others similarly situated,  )
  )
               Plaintiffs,   )
  )
               v.   )     Case No. 15 C 0309
  )
GREG GOSSETT, et al.,   )     Hon. Staci M. Yandle
  )
          Defendants.   )     Hon. Stephen C. Williams, Magistrate

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**INTRODUCTION**

Plaintiffs' Complaint alleges that in the spring and summer of 2014, during four facility-wide shakedowns at Menard Correctional Center ("Menard"), Illinois River Correctional Center ("Illinois River"), Big Muddy River Correctional Center ("Big Muddy"), and Lawrence Correctional Center ("Lawrence"), the Illinois Department of Corrections ("IDOC") Tactical Team ("Tact Team") beat, sexually humiliated, and otherwise abused hundreds of prisoners, destroyed their property and gratuitously inflicted punishment for the sole purpose of causing humiliation and needless pain. (ECF No. 197, Plaintiffs' Second Amended Complaint, at 12). Plaintiffs claim that "all of these shakedowns are the direct result of unconstitutional policies and practices in place at the IDOC to conduct periodic Orange Crush[1] shakedowns so as to inflict pain

---

[1] Throughout their complaint and their Motion for Class Certification, Plaintiffs refer to the IDOC Tactical Team as the "Orange Crush." During discovery, both Plaintiffs and Defendants testified that "Orange Crush" is a nickname that inmates have given to the Tactical Team solely because of the color of their uniforms. This is a nickname used by inmates, not the Defendants. (ECF No. 481, Ex. 31, 137:16-138:9; Ex. 32, 99:19-100:8).

and humiliation on prisoners entrusted to its care." (ECF No. 197 at 13). Plaintiffs named over five hundred individual Defendants in their Second Amended Complaint. (ECF No. 197).

In their motion for class certification, Plaintiffs now clarify that they are only seeking class certification against twenty-four (24) Defendants[2] who Plaintiffs claim were supervisors and responsible for planning, implementing, and overseeing the shakedowns. (ECF No. 481, Plaintiffs' Motion for Class Certification at 1). They claim that class certification is proper because the Defendants developed a "uniform plan" to inflict unnecessary pain and humiliation on prisoners housed at these four prisons, and after developing their plan, Defendants communicated it to the rank and file who administered the shakedowns according to their plan. (ECF No. 481 at 1).

Class certification should be denied for at least three independent reasons. First, the named Plaintiffs' claims regarding the alleged "policy," "practice," or "plan" of the Defendants during the shakedowns do not share common questions of fact with the putative class members. Plaintiffs' asserted common questions (ECF No. 481 1-2) are not only ambiguous and vague, but all depend upon a theory that a uniform policy or practice was conceived or administered by every Defendant in each shakedown employed or administered, including:

- Defendant Tact Team members entered the living unit by yelling loudly and banging their batons on the bars and railings of the unit;
- Inmates were ordered to strip and Defendants conducted a "reverse" strip search;
- Inmates were allowed to put their pants and shirt back on, but not their underwear;
- Inmates were handcuffed in a purposefully painful way;
- Inmates were forced to march in a close formation such that their genitals were forced to make physical contact with the prisoner in front of them while the inmates were clothed, and the genitals of the prisoner behind them made contact with their backsides while the inmates were clothed;

---

[2] Plaintiffs have sued over 500 Defendants in this case, and as of this filing date, none have been dismissed. During discovery, Plaintiffs insisted they needed a survey from over 400 Defendants. In fact, on September 17, 2018, the Plaintiffs obtained an additional 21 days to file their class certification brief because they claimed they needed additional surveys from 129 Defendants. It is now clear, however, that Plaintiffs are not seeking class certification against *any* of the Defendants from whom they received or sought surveys.

- Inmates were pushed and shoved by the Defendants to ensure they made physical contact with one another;
- Inmates were held in a holding area for up to 4 hours with their hands cuffed.  (ECF No. 481 at 11-15).

Plaintiffs maintain that all of the above constituted a "plan" executed in "uniform fashion." (ECF No. 481 at 15).  Plaintiffs cannot satisfy the commonality prong of Rule 23(a)(2) because consolidated Plaintiffs and putative class members' testimony refutes Plaintiffs' assertion that such a "common plan," as alleged by Plaintiffs, ever existed.  The testimony of the consolidated Plaintiffs, putative class members, and Defendants demonstrates that inmates were not uniformly strip searched in a "reverse" way, that they were not handcuffed in a way that was purposefully painful, that they were not forced to walk in a close formation specifically so that their genitals would come in contact with other inmates, and were not pushed and shoved by the Defendants. Instead, putative class members and consolidated Plaintiffs' testimony varies dramatically, belying Plaintiffs' claim that there was a uniform "plan" as they describe.  Accordingly, the putative class claims fail the commonality analysis because there is no single answer that will resolve the central issue for all class members' claims.

Second, Plaintiffs' putative class fails Rule 23(a)(2)'s typicality requirement because Plaintiffs cannot show that the four named Plaintiffs possess the same interest and suffered the same injury as the putative class members.  Instead, the named Plaintiffs' description of what occurred to them at the shakedown is markedly different from other consolidated Plaintiffs or putative class members' descriptions of the events.  Thus, instead of a homogenous class, the Plaintiffs' alleged class consists of a loose collection of highly individualized claims with varying legal theories, and an array of possible defenses to each claim.

Third, for similar reasons, Plaintiffs' putative damages class fails Rule 23(b)(3)'s requirement that common issues predominate over individual issues, as each class member will have to testify

separately with regard to liability as to the facts of their experience at the shakedown.

For these reasons, discussed in detail below, class certification must be denied.

## STATEMENT OF FACTS

### 1. Background Facts

The Tactical Team is a select team of correctional officers who are specially trained to respond to emergency situations and to participate in large-scale operations.  (ECF No. 481, Ex. 16, Deposition of Joseph Yurkovich, 41:13-16; 43:12-19).   Tactical Team members respond to escapes, riots, and hostage situations.  (ECF No. 481, Ex. 19, Deposition of Greg Gossett, 38:4-7).  The Tactical Team also conducts cell extractions, enforced medication, and handles transportation of certain inmates.  (ECF No. 481, Ex. 19, 38:4-7; Ex. 16, 43:12-19)  To become a certified member of the Tactical Team, a member must participate in training for a year and then must complete 40 hours of training at the Academy in Springfield.  (ECF No. 481, Ex. 19, 32:1-7; 33:17-19, 33:20-34:4).  Tactical Team members must meet yearly training requirements to remain on the team.  (ECF No. 481, Ex. 19, 32:4-7).  Each facility has its own Tactical Team.  (ECF No. 481, Ex. 16, 47:1-3).

One of the functions of the Tactical Team is to perform facility-wide shakedowns.  (ECF No. 481, Ex. 19, 47:2-6).  Although single-cell shakedowns occur periodically at every facility, facility-wide shakedowns serve an important safety and security function.   Facility-wide shakedowns yield important information including gang rosters, letters among inmates describing planned staff assaults or gambling debts, and the locations of weapons and other contraband.  (Def.'s Ex. 2, Deposition of Kevin Verble, 65:19-66:2).  A facility-wide shakedown, as opposed to a single-cell shakedown, ensures that contraband is not passed among inmates to avoid detection.  (Def.'s Ex. 2, 66:3-15).  For example, inmates, at the outset of facility-wide

shakedowns, knowing that every cell will be searched, throw handmade weapons out of their cell rather than risk being caught with them.  (Def.'s Ex. 3, Deposition of Todd Scott, 21:12-19, Ex. 2, 66:3-15).  Plaintiffs themselves acknowledged that they have seen contraband while in prison, including illegal homemade weapons.  (ECF No. 481, Ex. 34, Deposition of James Dunmore, 109:9-110:12; Ex. 43, Deposition of Marshall McDaniel, 54:11-20).

To perform facility-wide shakedowns, Tactical Team members from the home facility along with Tactical Team members from other facilities work together to complete the shakedown over multiple days. (ECF No. 481, Ex. 19, Deposition of Michael Atchison, 31:22-32:2).  During a facility-wide shakedown, the Tactical Team enters the cell house.  One or two officers stand outside each cell, and conduct a strip search of the inmate while the inmate is still inside their cell. (ECF No. 481, Ex. 51, Operation Orders; Ex. 16:12-16)  The inmates are then ordered to dress, and are handcuffed.  *Id*.  The inmates are moved in a line to a holding area, to wait for their cells to be searched.  *Id*.  While in the holding area, inmates are generally seated, but may stand for short periods of time.  *Id*.  The inmates remain cuffed while in the waiting area.  *Id*.  Tactical Team members thoroughly search each cell and remove contraband.  Tactical Team members complete shakedown slips for every cell which indicate what if any contraband has been located.  (Def.'s Ex. 10, Example of a Shakedown Slip).  Once the cell searches and documentation have been completed, the inmates are moved from the holding area back to the cell house, taken back to their cells, and uncuffed.  (ECF No. 481, Ex. 51).

It is necessary to use Tactical Team members from other facilities to complete facility-wide shakedowns.  A facility's own Tactical Team does not have sufficient numbers of officers to complete a facility-wide shakedown in a matter of days.  Utilizing only the facility's Tactical Team would require a facility to be on lockdown for over a month.  (ECF No. 481, Ex. 6, 32:15-22).  A

5

longer facility-wide shakedown would give inmates an opportunity to hide contraband in recently searched cells, thus avoiding detection and thwarting the purpose of a facility-wide shakedown. (ECF No. 481, Ex. 6, 32:15-22; Ex. 25, Deposition of Alex Jones, 52:16-21).

In the spring and summer of 2014, Defendants began conducting facility-wide shakedowns at many correctional facilities around the state in an effort to eliminate dangerous contraband such as weapons and gang materials, nuisance contraband such as trash or altered appliances, and ensure the integrity of each cell. (ECF No. 481, Ex. 9, Deposition of Rodney Brady, 36:2-6; Ex. 16, 101:17-23, 103:19-22).   Plaintiffs allege that facility-wide shakedowns were "rare or non-existent," but that allegation is incorrect.  (ECF No. 481 at 5; Ex. 16, 48:17-21).  In fact, virtually every Plaintiff testified that they had experienced many other shakedowns prior to 2014.  (*See e.g*., ECF No. 481, Ex. 30, Deposition of Ronald Smith, 15:1-24; Ex. 32, Deposition of Kevin Hamilton, 18:20-22, 19:5-7; Ex. 33, Deposition of Glen Verser, 42:19-22, 43:14-17; *see also*, Ex. 19, Deposition of Defendant Greg Gossett, 47:2-24, Ex. 6, Deposition of Defendant Michael Atchison, 47:13-20).

Facility-wide shakedowns are also often combined with intelligence operations.  (Def.'s Ex. 2, 28:13-16; Ex. 16, 52:3-17).  Members of the Internal Affairs unit conduct interviews to attempt to gain intelligence on gang hierarchy in the prison, the location of contraband, and planned staff assaults.  (Def.'s Ex. 2, 28:13-16; 31:1-9; 39:8-18).  While the inmates are in the holding area, Internal Affairs will conduct interviews with inmates to try to gain intelligence. (Def.'s Ex. 2, 26:18-20; 65:19-66:15).  During the shakedowns at issue, Tactical Team members uncovered a significant number of homemade, illegal weapons and other significant contraband. (Def.'s Ex. 9, 11, pictures and logs showing illegal contraband uncovered during shakedowns).  At Menard alone, 32 weapons were discovered during the 2014 shakedown.  (ECF No. 481, Ex. 16,

185:16-18). In addition, Internal Affairs at Lawrence uncovered a significant amount of gang material and gathered crucial intelligence of gang activity through inmate interviews during the shakedown. (*See, e.g.*, Def.'s Ex. 13, email showing intelligence gathered during Lawrence shakedown).

Prior to each of the four at-issue shakedowns, an operation order was drafted by a Statewide Tactical Commander and approved by the IDOC Chief of Operations, Joseph Yurkovich. (ECF No. 481, Ex. 64; Ex. 25, Deposition of Alex Jones, 43:21-44:2). The operations order included information about the dates of the shakedown, which cell houses and wings would be searched on each day, and information about how the shakedown was to be conducted. *Id.* In addition, prior to each day of the shakedown, the Statewide Tact Commander or Regional Commander along with the Warden would address the Tact Team and go over specifics for the search including which areas are to be searched, where specifically to look for contraband, and how to properly document contraband.[3] (ECF 481, Ex. 19, 130:6-24; 150:1-6; Ex. 6 35:5-12; Ex. 25, 49:3-14; Ex. 17, Deposition of Anthony McAllister, 138:6-21, 150:22-151:3).

**Plaintiffs' Allegations**

Plaintiffs' Second Amended Complaint alleges that during the four shakedowns at issue in 2014, thousands of inmates, during the strip search, were forced to touch their genitals before

---

[3] Plaintiffs make several allegations in their brief that are not relevant to Court's class certification decision but that are also demonstrably false. Plaintiffs claim that Atchison testified that several policies were changed as a result of the 2014 shakedowns to ensure that the abuse did not occur again. (ECF No. 481 at 16). This is a completely inaccurate characterization of the testimony that Plaintiffs cite to from Atchison's deposition. (ECF No. 481, Ex. 6, 139:22-140:4). Plaintiffs claim that Defendants conducted just two investigations into the allegations of abuse. (ECF No. 481 at 16). Plaintiffs appear to be employing a very narrow definition of "investigation" to suit their narrative. Defendants have turned over multiple investigations (not to mention responses to grievances that required investigation) including but not limited to Inmates Devalle (R51705), Thurston (N50920), Latham (K81868), Billops (K04496) at Big Muddy, Inmate Herrera (M38514) at Menard. Finally, Plaintiffs claim that Defendants failed to preserve nearly all of the video taken of the shakedowns. (ECF No. 481 at 17). This statement is wildly misleading. Menard had very few cameras installed at the time of the shakedown, including in only one of the cellhouses. These surveillance videos rewrote themselves frequently. (ECF No. 481, Ex. 18, 88:8-89:3, 93:16-19, 122:6-7). Illinois River had no video cameras anywhere in the facility at the time. (ECF No. 481, Ex. 19, 185:19-186:1). Lawrence did not have operational cameras at the time. (ECF No. 481, Ex. 20, 84:2-5).

touching their mouths.  (ECF. No. 197 at 13).  They allege that inmates were handcuffed painfully tight, with their palms facing outward.  *Id*. They allege that inmates were ordered to march from their cell houses with their heads on the backs of the prisoners in front of them so that one man's clothed genitals were in direct contact with the next man's clothed buttocks, which Tact Team members referred to as "nuts to butts." *Id*.  They allege that Tact Team members carried out violent attacks on the inmates when they broke formation and ordered them to stand in stress positions for several hours.  *Id*.  They allege that throughout the shakedowns, Tact Team members chanted "punish the inmate," and told them that this was punishment for their sins.  *Id*.  Plaintiffs allege that they were ordered to stand in stress positions for several hours.[4] *Id*.

However, the named Plaintiffs' testimony belies many of the allegations in Plaintiffs' complaint.  For example, Kevin Hamilton testified that, during line movement, he could not recall if the person behind him was not touching any part of him. (ECF No. 481, Ex. 32, 72:11-12)  Kevin Hamilton, Glenn Verser, Ronald Smith testified that they were handcuffed in a similar way as they had been at other times at IDOC, not in a new, shakedown-specific way meant to cause pain as Plaintiffs allege.  (ECF No. 481, Ex. 30, 16:16-24; Ex. 32, 64:15-24; Ex. 33, 194:13-195:6)  Ronald Smith testified that he was in the Chapel during the shakedown for "30 minutes to close to an hour," not the several hours Plaintiffs allege. (ECF No. 481, Ex. 30, 67:14-17).

**<u>Consolidated Plaintiffs' and Formerly Named Plaintiffs' Testimony</u>**

In their Second Amended Complaint, Plaintiffs included two additional named Plaintiffs,

---

[4] Plaintiffs appear to have abandoned other allegations contained in their Second Amended Complaint including allegations that Tact Team officers "shoved their batons in between each prisoner's legs and jerked upwards," that all inmates were forced to stand while waiting for the cells to be searched, and that females were present during strip searches.  (ECF No. 197 at 30-31).  This is likely due to the fact that only one Plaintiff testified that someone placed a baton between his legs, that the majority of inmates testified they sat down the entire time their cells were searched, and that most Plaintiffs testified that no females were present during their strip searches.  (*See, e.g*., ECF No. 481, Ex. 41, Jammel Johnson, 35:18-20, no females present, 65:1-4, stood for only 3 minutes before sitting down; Ex.40, Deposition of Samuel Harding, 104:7-21, no females, 160:13-16, sitting at tables; Def.'s Ex. 1, Deposition Edward Tenney, 39:5-9, could not see females).

James Dunmore, an inmate at Lawrence and Zachary Watts, an inmate at Big Muddy. (ECF No. 197 at 7). In their Motion for Class Certification, Plaintiffs no longer include them as named Plaintiffs. (ECF No. 481 at 17-21). And for good reason–neither Dunmore nor Watts participated in line movement during the shakedown. (ECF No. 481, Ex. 34, Deposition of James Dunmore, 89:8-14; Ex. 35, Deposition of Zachary Watts, Ex. 35, 61:22-62:6).

In addition, the Court has consolidated seventeen (17) additional cases with the Ross class action.[5] While all consolidated Plaintiffs were part of the 2014 shakedowns, their testimony varies noticeably from the five named Plaintiffs. For example, consolidated Plaintiff Edward Tenney testified that he was strip searched starting with his head and going down to his feet, *i.e.,* not a "reverse strip" search. (Def.'s Ex. 1, Deposition of Edward Tenney, 36:3-6). Samuel Harding testified that no officer touched him during line movement. (ECF No. 481, Ex. 40, Deposition of Samuel Harding, 140:6-8). Harley T. Miller testified that only his head touched the inmate in front of him. (ECF No. 481, Deposition of Harley T. Miller, Ex. 44, 49:12-50:3) Neither Jeffrey Miller nor Sergio Cortes was shoved into other inmates during line movement. (ECF No. 481, Deposition of Jeffrey Miller, Ex.45, 87:16-21; Deposition of Sergio Cortes, Ex. 38, 33:1-2; 33:16-20). And while Plaintiffs alleged in their Second Amended Complaint that one Defendant ordered prisoners in the waiting area not to ask for medical care because none would be provided, (ECF No. 197 at 32), inmate Clark Truly testified that he was allowed to use his inhaler while in dietary during the shakedown. (ECF No. 481, Deposition of Clark Truly, 81:2-21).

---

[5] *Hamilton*, 15-281; *Harley T. Miller*, 15-415; *McDaniel*, 15-515; *Williams*, 15-523; *Sultan*, 15-611; *Cortes*, 15-690; *Watts*, 15-692; *Brooks*, 15-1060; *Dunmore*, 15-706; *Verser*, 15-1263; *Chairs*, 15-1359; *Turner*, 16-131; *Tolliver*, 16-130; *Ronald Smith*, 16-248; *Tenney*, 16-115; *Harding*, 16-83; *Jeffrey Miller*, 16-416; *Truly*, 16-783; *Fisher*, 15-00007; *Knox*, 17-494; *Vincent Smith*, 16-745.

**Putative Class Member Testimony**

    **a.   Putative Class Member Declarations Submitted by Plaintiffs**

Plaintiffs have submitted, as Exhibit 49 to their Motion, declarations of fifty putative class members.  (ECF No. 481, Ex. 49).  These typed, form declarations are nearly word-for-word identical, and recite the facts set forth in the complaint almost verbatim.  For example, all of the declarations recite: "I was also ordered to position myself in such close contact with the prisoner in front of me that my genital area was in direct contact with the area of his buttocks and his hands" (ECF No. 481, Ex. 49).  They all state, word-for-word, that during line movement, the declarant "made efforts to avoid contact between [his] genital area and the hands/buttocks of the person in front of me, the manner in which they forced us to march made this impossible."  (ECF No. 481, Ex. 49 at ¶ 17).  Nearly all of them state that "During the line movement from the housing unit to the Cafeteria/Gymnasium/Chapel, Orange Crush officers repeatedly instructed us to 'keep our fucking heads down,' or words to that effect."  (ECF No. 481, Ex. 49).

Despite the typed form declarations submitted from some putative class members, the declarations also present noticeable differences in the experiences of putative class members. Many class members do not allege that they were strip searched in a reverse order.  (ECF No. 481, Ex. 49 at 9, 17, 21, 25, 41, 53, 61, 77, 81, 85, 97, 113, 121, 157, 165, 192).  While some putative class members claim that female officers were present while they were being strip searched, others are silent as to any female officers present during strip searches.  (ECF No. 481, Ex. 49 at 6, 113, 78, 146).

    **b.   Putative Class Member Testimony Obtained by Defendants**

Defendants conducted interviews of nearly fifty putative class members.  These interviews, like Plaintiffs' declarations, are a sample of the voluminous class, and indicate that putative class

members had a wide array of experiences at the shakedowns, further undercutting Plaintiffs' insistence that a uniform policy existed as described by Plaintiffs.  For example, many putative class members stated during their interviews that their strip search started with the head and went down, and was not done in reverse.  (Def's Ex. 7, transcripts of putative class member interviews, Bartholomew at Bates 63771-2, Boose at 63781-2, Hawkins at 63849, Barnes at 63765-6, Montanez at 63893, Buchanan at 59487, Deloney[6] at 59481-2, Lucas at 59516, Cowart at 59493, at Menard; Love at 63876-7, Bosomworth at 63791-2, Jones at 63855, Hall at 63844, Dorsey at 63787, Varnado at 63922, Burnside at 63797 at Big Muddy; Moreno at 63897, Carrillo at 63801, at Ill. River; Milons at 63886-7 at Lawrence)  An overwhelming majority of the putative class members did not testify that they were forced to march in a close formation such that their genitals made physical contact with the prisoners in front and behind them.  (Def.'s Ex. 7, 63792, 63861-2, 63907, 63855-6, 63902, 63807-8, 63967, 63759, 63917, 63844-5, 63922-3, 63836, 63797, and 63877-8 at Big Muddy; 63840, 63782-3, 63766, 59487, and 59482 at Menard; 63882-3, 63872, and 63872 at Illinois River; 63887 at Lawrence).

Many stated that they were in the holding area for less than an hour.  (Def.'s Ex. 7, 63862, Kennedy, 30-40 minutes; Scott, 63907, 45 minutes to an hour; Colon, 63813, 30-40 minutes; Jones, 63856, 35-40 minutes; Hall, 63844, 35-40 Minutes; Varnado, 63922, 45 minutes to an hour; Carrillo, 63802, 20 minutes).  One inmate had his handcuffs removed, and two recalled receiving medical care while in the holding area.  (Def.'s Ex. 7, 63807 and 63887).

---

[6] Five inmates were interviewed by Defendants and also provided declarations to Plaintiffs: Quentin Getty, Bruch Smith, Larry Williams, Jerry Clay and Javan Deloney.  Deloney stated in his declaration that during the line movement, tact team officers pushed him with his batons.  (ECF No. 481, Ex. 49 at 99)  Yet, when he was interviewed by Defendants months earlier, he directly contradicted his form declaration, stating that no officer used physical force against him during the shakedown.  (Def.'s Ex. 7, 59482).

## STANDARD FOR CLASS CERTIFICATION

A party seeking to certify a class action must meet two conditions.  First, the movant must show the putative class satisfies the four prerequisites of Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.  Fed. R. Civ. P. 23(a); *Oshana v. Coca-Cola Co*., 472 F.3d 506, 513 (7th Cir. 2006); *Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir. 1992).  Second, the action must qualify under at least one of the three subsections of Rule 23(b). Fed. R. Civ. P. 23(b); *Rosario*, 963 F.2d at 1017.  A party seeking class certification bears the burden of proving that each of these requirements under Rule 23 has been met.  *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 162 (1982).

Before deciding whether to allow a case to proceed as a class action, the court makes whatever factual and legal inquiries are necessary under Rule 23.  In *Wal-Mart*, the Court stated that "an illegal policy might provide the 'glue' necessary to litigate otherwise highly individualized claims as a class," but that plaintiffs must present proof of such a policy.  *Wal-Mart*, 564 U.S. at 352.  Plaintiffs must demonstrate "significant proof" such as an "announced policy" to show that a standard policy or practice existed.  *Wal-Mart*, 564 U.S. at 157-159.  *See also Szabo v. Bridgeport Machines*, *Inc*., 249 F.3d 672, 676 (7th Cir. 2001)("The proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it").  The Court may therefore, "look beyond" the pleadings in determining whether class certification is proper.  *See Dhamer v. Bristol-Myers Squibb Co*., 183 F.R.D. 520, 529-30 (N.D. Ill. 1998).

## ARGUMENT

### A. Plaintiffs Have Failed to Meet the Rule 23(a)(2) Commonality Requirement Because There is No Single Answer That Will Resolve a Central Issue in All Class Members' Claims.

"The *Wal-Mart* decision has heightened the standards for establishing commonality under Rule 23(a)(2)." *M.D. v. Perry*, 675 F.3d 832, 839 (5th Cir. 2012); *DL v. District of Columbia*, 713 F.3d 120, 126 (D.C. Cir. 2013). "Before Wal-Mart,…in order to satisfy commonality, 'the interests and claims of the various plaintiffs need not be identical. Rather the commonality test [was] met when there [was] at least one issue whose resolution [would] affect all or a significant number of the putative class members." *M.D.*, 675 F.3d at 840. "However, in Wal-Mart, the Court expounded on the meaning of its precedent providing that 'commonality requires the plaintiff to demonstrate that the class members have suffered the same injury.'" *Id*. at 840 quoting *Wal-Mart*, 564 U.S. at 350.

The Seventh Circuit, following the decision in *Wal-Mart*, has stated that to satisfy the Rule 23(a)(2) prong, all class members' claims must "share some question of law or fact that can be answered *all at once* and that the *single* answer to that question will resolve a central issue in all class members' claims." *Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481, 497(7th Cir. 2012)(emphasis added). In other words, "what matters to class certification is not the raising of common 'questions'—even in droves—but, rather the capacity of classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. *Wal-Mart*, 564 U.S. at 341 (emphasis in the original). "Where the defendant's alleged injurious conduct differs from plaintiff to plaintiff,...no common answers are likely to be found." *Suchanek v. Sturm Foods*, Inc., 764 F.3d 750, 756 (7th Cir. 2014); *Jamie S*., 668 F.3d at 498 (quoting *Wal-Mart*, 564 U.S. at 352).

Here, Plaintiffs allege three constitutional claims common to each class member:

(1) Defendants designed and implemented procedures to be followed during all four shakedowns that were abusive and humiliating, rather than in furtherance of any proper penological purpose, in violation of the Plaintiffs' Eighth Amendment rights,

(2) Defendants reached an agreement to deprive the class of their constitutional rights and to protect one another from liability for that deprivation, and

(3) Defendants knew that the class's Eighth Amendment rights were about to be violated and failed to intervene to prevent the constitutional violation.  (ECF No. 481 at 23).

Plaintiffs' alleged common questions mirror their alleged constitutional violations:

(1) The jury will be required to determine whether the admittedly uniform shakedowns at the four prisons were executed humanely and professionally, in the manner Defendants contend, or instead in the manner Plaintiffs contend including: the unnecessarily intimidating manner in which the Tact Team entered the living units; the reverse strip search; the unnecessarily painful handcuffing, which class member were forced to endure for lengthy periods of time; the orders to march so closely that their genitals were forced to make contact with other prisoners in line; and the forced stress positions in the holding area.  (ECF No. 481 at 27)

(2) Whether the shakedowns, as the class describes them, violated the Eighth Amendment.  (ECF No. 481 at 28).

(3) Whether each of the Defendants against whom the class is certified (all supervisors) knew, facilitated, approved, condoned, and/or turned a blind eye to the uniform shakedown practice.  (ECF No. 481 at 28).

(4) Whether Defendants reached an agreement among themselves and/or others to perform the shakedowns in the uniform unconstitutional manner alleged by the class.  (ECF No. 481 at 28).

## 1.  Plaintiffs Have Failed to Show a Well-Defined Set of Illegal Policies and Practices

Plaintiffs ignore the significant evidence through Defendants' testimony and Defendants' documents articulating the actual uniform policy and practice used during the shakedowns.  (ECF No. 481, 5, 64).  The reason Plaintiffs ignore this articulated policy and practice is that it does not comport with the allegations set forth in the Second Amended Complaint, but rather demonstrates

a constitutional plan to strip search inmates for a proper penological purpose.  Plaintiffs rely on cases where a class was certified because there was no dispute about what policies actually existed. *Parsons v. Ryan*, 754 F.3d 657 (8th Cir. 2014) (plaintiffs provided documentary evidence and expert reports to show sufficiently well-defined set of allegedly illegal policies existed); *Suchanek v. Sturm Foods*, 764 F.3d 750 (7th Cir. 2014)(plaintiffs satisfied commonality by claiming that language found on *all* packaging was likely to deceive a reasonable consumer); *Streeter v. Sheriff of Cook County*, 256 F.R.D. 609 (N.D. Ill. 2009)(plaintiffs satisfied commonality requirement by showing there was an *undisputed* policy of strip searching all detainees which they argued was a 4th Amendment violation).  Plaintiffs' reliance on these cases is misplaced because they ignore Defendants' actual, legal policies with regard to shakedowns and allege, with insufficient evidence, that there were other secret, unconstitutional policies.

Plaintiffs have failed to show that putative "class members are as one in their exposure to a particular and sufficiently well-defined set of allegedly illegal policies and practices." *Parsons v. Ryan*, 754 F.3d 657, 679-680, 683 (9th Cir. 2014).  The case law is clear that "the court should assess whether the class allegations are satisfied through evidentiary proof." *Suchanek*, 764 F.3d at 760; *Wal-Mart*, 564 U.S. at 352.  An enormous amount of discovery has already taken place in this case.  Plaintiffs have taken nearly 30 depositions of Defendants and have been given over 63,000 documents in discovery.  Plaintiffs have had ample opportunity to show the "significant proof" of a policy required by *Wal-Mart*. 564 U.S. at 341.  And yet, despite the overwhelming amount of discovery Plaintiffs have conducted, there is a striking absence of *any* showing of "significant proof" in Plaintiffs' motion. *Parsons*, 754 F.3d at 679-680, 683.

Plaintiffs instead maintain, in conclusory fashion, that a different set of unconstitutional secret policies existed and were made known to all Defendants.  Throughout their brief, Plaintiffs

purposefully conflate actual "announced" IDOC policies or practices that were constitutional, and alleged secret unconstitutional ones which did not exist.  Plaintiffs continually avoid articulating with specificity these alleged secret "uniform practices," and instead rely on vague, insinuating phrases.  (ECF No. 481 at 10 and 15 "their plan was executed in a uniform fashion", at 27 "admittedly uniform shakedowns," at 35 "widespread practice") *See, M.D.*, 675 F.3d at 844 ("Lurking behind the rather vague and conclusory statement that Defendants had a 'policy and practice'…lies a wide variety of more discrete and particularized practices.").

Plaintiffs have failed to develop any evidence to show that this secret "uniform plan" as described by Plaintiffs was in writing or recorded in any way.  Plaintiffs have failed to show how this secret "uniform plan" was developed, when it was developed, or who was involved in the development.  Plaintiffs have failed to show how this secret, unannounced plan was communicated to the twenty-four Defendants they are now seeking class certification against (much less how it was communicated to all 500 named Defendants).  Instead, Plaintiffs have shown only that some of the Defendants met with each other (ECF No. 481 at 5), or had "very in-depth conversations" of unknown content (ECF No. 481 at 6), or that Tactical Commanders met with tactical team members prior to the shakedown.  (ECF No. 481 at 7).  Plaintiffs have presented no evidence to show that the content of these conversations or meetings was discussion of what the Plaintiffs' have alleged as a secret, unconstitutional plan.  Moreover, Defendants present at these meetings or party to these conversations have testified about what was *actually* discussed at these meetings, and they did *not* in any way discuss any secret, unconstitutional plan that Plaintiffs now allege existed.[7]  (ECF No. 481, Ex. 6, 46:2-49:8, 51:20-52:9, 81:18-21; Ex. 16, 153:3-18, 153:22-154:5,

---

[7] Plaintiffs also allege that there was a conspiracy, entered into by Defendants (either all 500 of them or some of them, it is not clear) to perform the shakedowns in the uniform unconstitutional manner alleged by the class.  (ECF No. 481 at 28.)  Plaintiffs provide no facts or evidence to support this alleged conspiracy including who was a party to the conspiracy or the contents of the conspiratorial agreement.  Pursuant to *Wal-Mart*, they have failed to satisfy

174:20-24)

Thus, this vague alleged secret plan alluded to by Plaintiffs is based solely on *conflicting testimony* of the Plaintiffs and putative class members as to what happened during the shakedown. *See, Civil Rights Education and Enforcement Ctr. v. Hospitality Properties Trust*, 867 F.3d 1093, 1104 (9th Cir. 2017) ("while commonality may be established based on a pattern of officially sanctioned illegal behavior, merely pointing to a pattern of harm, untethered to the defendant's conduct is insufficient."); *Walmart*, 564 U.S. at 358 (Court found that even if every single one of the Plaintiffs' anecdotal accounts about discrimination were true, it would not demonstrate that the entire company operated under a general policy of discrimination, which Plaintiffs were required to show to certify a class). Because each Plaintiff and putative class members' descriptions of the shakedown are so different and distinct, there is no uniform policy that can be gleaned from their testimony. These variances in testimony leave Plaintiffs far short of showing that the alleged conduct was "common to all members of the class." *Phillips v. Sheriff of Cook Cty*., 828 F.3d 541, 557 (7th Cir. 2016)(court denied class certification because plaintiffs could not show the systematic deficiencies and claims of isolated indifference to particular detainees' dental care needs necessary to show commonality); *Suchanek v. Sturm Foods, Inc.,* 764 F.3d 750, 756 (7th Cir. 2014). Instead, what remains, at most, is an "amorphous claim of systematic or widespread misconduct on the part

---

their burden to support their alleged conspiracy common question. 564 U.S. at 341. Two of the cases Plaintiffs cite are not class action cases with a conspiracy claim but are rather just conspiracy cases. *See, Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988)(court found that there is no such thing as accidental or inadvertent participation in a conspiracy, but instead there must be evidence that a defendant acted knowingly or with deliberate reckless indifference; court found there was sufficient evidence for the jury to infer that there was a conspiracy because one defendant police officer hid a report and another filed a deceitful report); *Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012)(court granted defendants motion to dismiss in case where plaintiff alleged claims of equal protection, civil conspiracy, and substantive due process violation after receiving 24 parking tickets he claimed were "bogus"). Moreover, in both cases, there was actual evidence as to who was a party of the conspiracy and what the conspiratorial agreement was. Plaintiffs also rely on *Kleen Products v. Internat'l Paper Co*., a case in which Plaintiffs, consumers, alleged conspiratorial manipulation of the market to increase prices in violation of the Sherman Act. 831 F.3d 919 (7th Cir. 2016). Plaintiffs' reliance is misplaced because that case is factually distinctive and because the court found that plaintiffs offered "extensive evidence" that would prove the existence of a conspiracy. *Id*. at 927.

of the defendants." *M.D.* 675 F.3d at 844 (court found that district court failed to conduct a rigorous analysis into commonality because it only found that plaintiffs had shown common questions, not common answers; claim of "systematic deficiencies" in state's administration of a conservatorship did not meet commonality requirement).

It is understandable why Plaintiffs attempt to avoid the strict requirements for the commonality prong. *Walmart*, 564 U.S. at 341, 358; *Falcon*, 457 U.S. 157-159.  However, Plaintiffs are trying to shove a square peg (thousands of putative class members alleging different Defendant conduct) into a round hole (uniform policy or practice).  *See, M.D.*, 675 F.3d at 844 ("The reciting of the word 'systematic' in mantra-like fashion does not overcome the prerequisites to class certification.")  Plaintiffs must show "standardized conduct towards members of the proposed class" to establish commonality, and they cannot do so.  *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998).   Here, in contrast to the mandates of *Wal-Mart*, Plaintiffs merely allude to vague experiences that some inmates report having had at the shakedown, *i.e.* "the unnecessarily intimidating manner in which the Tact team entered the living units; the reverse strip search; the unnecessarily painful handcuffing, which class members were forced to endure for lengthy periods of time; the orders to march so closely that their genitals were forced to make contact with other prisoners in line; and the forced stress positions in the holding area."  (ECF No. 481 at 29); *see also*, *Wal-Mart*, 564 U.S. at 157-159.   Each of these alleged secret uniform "policies" or "practices" will be addressed in turn.

## The Alleged "Uniform Policies"

### Noise upon Entering the Cellhouse

Plaintiffs allege that at the beginning of each shakedown, "the tact team entered the living unit by yelling loudly and banging their batons on the bars and railings of the unit."  (ECF No. 481

at 10).  Defendants acknowledge that many Tact Team members entered the cells tapping their batons against walls or furniture.  Defendants testified that this was done to make sure the inmates were awake, alert, and ready for the shakedown to begin.  (ECF No. 481, Ex. 6, 123:15-124:2; Ex. 9, 66:1-4; Ex. 16, 270:2-5).  Thus a clear penological purpose for this procedure existed.  The noise made by the Tact Team members did not last long and was isolated to the time it took for the Tact Team to enter the cell house.  (ECF No. 481, Ex. 19, 220:2-9).

No named class member, putative class member or consolidated plaintiff has claimed that they were injured in any way by the Tact Team making noise at the beginning of the shakedown. In fact, the majority of the declarations of putative class members submitted by Plaintiffs state simply "The sounds of the Orange Crush entering the unit startled me."[8]  Sixteen more declarants were silent as to any effect the noise had upon them.[9]

It is unclear and Plaintiffs do not explain how a Tact Team briefly tapping bars and walls with batons and perhaps shouting to let inmates know that a shakedown is about to occur could rise to the level of an Eighth Amendment violation.  (ECF No. 481, at 2-5).  The noise was short, isolated, and done during the day.  (ECF No. 481, Ex. 19, 220:2-9).  At most, it was a condition that "merely caused discomfort or inconvenience" that was not in any way unconstitutional. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  Courts have rarely found even excessive noise, which this objectively was not, to rise to the level of a constitutional violation.  *Lunsford v. Bennet*, 17 F.3d 1574, 1580 (7th Cir. 1994)(affirming summary judgment for prison officials who allegedly subjected prisoners to loud noises over an intercom during a 24-hour period; [t]he record contains no evidence that the noise levels posed a serious risk of injury to the plaintiffs.  Subjecting a

---

[8] 26 of the 50 declarations submitted by Plaintiffs contain this identical statement. ECF No. 481, Ex. 49 at 2, 5, 9, 13, 17, 21, 29, 37, 41, 45, 53, 57, 61, 65, 69, 77, 85, 97, 101, 105, 109, 113, 117, 125, 172, 176.
[9] ECF No. 481, Ex. 49 at 33, 73, 133, 137, 141, 145, 149, 153, 157, 161, 165, 168, 180, 184, 188, 192.

prisoner to a few hours of periodic loud noises that merely annoy, rather than injure the prisoner does not demonstrate a disregard for the prisoner's welfare"); *Spivey v. Doria*, 1994 WL 97756 at *11 (N.D. Ill. March 24, 1994)("Federal courts are not the forums to determine proper lighting and noise levels in jails."). Thus, while Plaintiffs may have identified a uniform practice with respect to Tact Team members entering cells to alert inmates of the upcoming strip search, it is not an "illegal policy" which could form "the glue necessary to litigate otherwise highly individualized claims as a class." *Jamie S.* 668 F.3d at 498.

**Reverse Strip Search**

Plaintiffs allege that "class members were ordered to conduct a demeaning and unsanitary 'reverse' strip search, meaning that they were forced to manipulate their genitals and buttocks before (as opposed to after) putting their hands in their mouths." (ECF No. 481 at 10-11). Strip searches are conducted the same way every time—beginning with the hair, the ears, the mouth, and then going down to the hands, genitals and bottoms of the feet. (ECF No. 481, Ex. 21, Deposition of Michael Gilreath, 169:4-9; Ex.16, 149:24-150:13, 304:7-13; Ex. 17, 150:22-151:12). Defendants testified that a strip search conducted in any other way, including the way Plaintiff's described as a "reverse strip search" would be *against* the articulated and announced IDOC strip search policy. (ECF No. 481, Ex. 6, 122:4-19; Ex. 9, 67:10-22; Ex. 25, 102:4-9; Ex. 17, 214:17-215:10). Beginning at Cadet Training, IDOC personnel are trained on how to conduct a proper strip search and this is the same strip search procedure that is used at all times including during shakedowns. (ECF No. 481, Ex.16, 149:24-150:13; Ex. 17, 344:9-19). There was no special or different strip search procedure used during shakedowns by the tactical team. (ECF No. 481, Ex. 17, 215:5-10). Moreover, at the beginning of every shakedown, Tact team members were reminded on the proper way to do a strip search by Tact Commanders. (Ex. 17, 150:22-151:12).

Of the over 400 surveys from Defendants that were disclosed to Plaintiffs, not a single Defendant indicated that they ever conducted or witnessed a strip search taking place in that manner.  (ECF No. 481, Ex. 48).

Clearly, the allegation of a "reverse strip search" was not an "announced policy."  *See, Wal-Mart*, 564 U.S. at 353.  Thus, Plaintiffs must show "significant proof" of this alleged secret uniform practice.  *Id.* at 341.  Once again, Plaintiffs fall short.  Of the forty-nine declarations of putative class members submitted by Plaintiffs, fifteen – more than 30% of their class "sample" – are completely silent as to how their strip search was conducted.  (ECF No. 481, Ex. 49 at 9, 17, 21, 25, 41, 53, 61, 77, 81, 85, 97, 113, 121, 157, 165, 192).   Of those declarants that are now claiming they were strip searched in a reverse order, only one declarant completed the grievance process after the incident claiming he was strip searched in this manner.  (Def.'s Ex. 5, Bates 63573-63746).  All other declarants now claiming they were strip searched in the reverse order failed to allege this in a grievance and complete the grievance process. (Def.'s Ex. 5; Def.'s Ex. 6, Declaration of Sarah Johnson).[10]

Consolidated Plaintiff Edward Tenney testified that his strip search was conducted pursuant to IDOC policy—head first, and then going down.  (Def.'s Ex. 1, Deposition of Consolidated Plaintiff Edward Tenney, 36:3-6).  Moreover, nineteen of the putative class members interviewed by Defendants – more than 38% of that putative class sample – including at least one from each of the facilities, stated that they were strip searched normally, beginning with their head and going down.  (Def.'s Ex. 7 at 59487, 59481-2, 59516, 59493, 63791-2, 63855, 63855, 63844, 63922, 63797, 63771-2, 63897, 63771-2, 63897, 63781-2, 63849, 63801-2, 63765).

---

[10] In their Index of Exhibits, Plaintiffs list 50 declarations, however no declaration was submitted for Lettories Causey.  (ECF No. 481, Ex. 1 at 2).  Of the remaining 49 declarations, only 15 inmates appealed grievances to the ARB complaining about the shakedowns. (Def's Ex. 5, 6).

Accordingly, Plaintiffs have failed to cull together sufficient evidence of a "uniform practice" of a "reverse strip search"—even from their own handpicked declarants—much less the consolidated Plaintiffs and putative class members interviewed by Defendants.  Plaintiffs, therefore, have merely alleged "injurious conduct that differs from plaintiff to plaintiff," and consequently, "no common answers can be found."  *Suchanek*, 764 F.3d at 756.

**Clothes Allowed Following Strip Search**

Plaintiffs allege that after being strip searched, they were allowed to put their shirts, pants, and shoes back on but not their underwear or socks.  (ECF No. 481 at 11).  Inmates were at all times wearing pants and shirts after the strip search was completed.  However, for the most part, inmates were not allowed to wear underwear or socks, for the penological purpose of preventing inmates from hiding contraband in those items of clothing.  (ECF No. 217 at 28; ECF No. 481, Ex. 9, 84:14-15).  Defendants testified that there had been issues in the past with inmates hiding contraband in their underwear after a strip search.  (ECF No. 481, Ex. 16, 267:18-20; Ex. 17, 342:24-343:4; Ex. 7, 166:24-167:5).

It is well settled that "correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities."  *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 328 (2012). Here, there is a clearly stated penological interest.  (ECF No. 217 at 28; ECF No. 481, Ex. 9, 84:14-15; Ex. 17, 342:24-343:4).  Plaintiffs have once again failed to point to an "illegal policy" which could form "the glue necessary to litigate otherwise highly individualized claims as a class."  *Jamie S*. 668 F.3d at 498.

**Handcuffing**

Plaintiffs allege that "class members were handcuffed in a needlessly painful and uncomfortable manner behind their backs, with their palms facing out."  Defendants were trained

to handcuff with palms facing out, not because it was painful or uncomfortable, but because it was more secure.  (ECF No. 481, Ex. 19, 55:14-16; 56:16-17; Ex. 21, 170:15-21, 171:4-7; Ex. 16, 302: 14-20; Def.'s Ex. 12, Deposition of Bryan Bailey, 301:3-17).  Plaintiffs can point to no direct evidence showing that Defendants were cuffed in this manner because it was "needlessly painful and uncomfortable."  *See, White v. Albers*, 475 U.S. 312, 319 (1986)("[T]he question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.")  Defendants testified that it was the Tact Teams' common practice, once inmates were brought to the gym or cafeteria, to loosen cuffs that were too tight.  (*See e.g.*, ECF No. 481, Ex. 48, Surveys of Defendants, at 5, 20, 97, 111, 583).  Putative class members (those interviewed by Defendants as well as Plaintiffs' own declarants) confirmed that Defendants loosened cuffs that were too tight.  (ECF No. 481, Ex. 49).

Named Plaintiff Kevin Hamilton testified that while he was handcuffed behind his back, this method was similar to other shakedowns.  (ECF No. 481, Ex. 32, 64:15-24.)  Many putative class members did not allege any pain due to the cuffing and few testified to injuries due to the cuffing.  (ECF No. 481, Ex. 49).  Of Plaintiffs' declarants, some simply made the identical statement that "the handcuffs were applied more tightly than usual, which caused pain and discomfort."[11]  The vast majority of Plaintiffs' declarants – over 90% – did not report an injury of any kind from being cuffed.[12]  Notably, of the declarants now claiming their cuffs caused them pain during the shakedown, only two completed the grievance process with complaints of their

---

[11] ECF No. 481, Ex. 49 at  3, 10, 14, 18, 21, 26, 30, 34, 38, 42, 46, 50, 54, 58, 62, 66, 70, 74, 78, 82, 86, 90, 94, 98, 102, 106, 110, 114, 118, 122, 126, 130, 134, 138, 142, 146, 150, 154, 158, 162, 165, 169, 172, 189.
[12] Four declarants, Daubman, Henderson, Morris, and Mitchell claimed they had marks or bruises on their hands after the cuffs were removed.  All others were silent as to any injury from the handcuffing.  (ECF No. 481, Ex. 49 at 134, 138, 142, 162).

cuffs.  Three of Plaintiffs' handpicked declarants were completely silent as to painful cuffing during the shakedown.  (ECF No. 481, Ex. 49 at 5-8, 176-183). Of the putative class members interviewed by Defendants, none reported being subject to a "painful" method of handcuffing. (Def.'s Ex. 7).

Plaintiffs have pointed to no evidence to indicate that Defendants created a "uniform policy" to use a cuffing procedure they knew was "needlessly painful" and uncomfortable.  Instead, only a small portion of individual class members reported that the cuffing procedure caused pain and discomfort, and virtually none reported injuries as a result of the cuffing.  Plaintiffs have, at most, identified that some inmates were handcuffed in a way that they found merely caused discomfort or inconvenience.  Such evidence does not show a constitutional violation and does not show significant proof of an illegal policy necessary to prove commonality.  *See, Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *Jamie S.* 668 F.3d at 498.

**Line Movement**

Plaintiffs allege that class members were "forced to march in close formation with prisoners in front and behind such that their genitals were forced to make physical contact with the prisoner in front of them, and that the genitals of the prisoner behind them made contact with their backsides."  (ECF No. 481 at 12).  Plaintiffs state further that "many reported being told to line up 'nuts to butts.'" (ECF No. 481 at 12).  Finally, Plaintiffs claim that all class members were "forcibly pushed and shoved by the tact team to ensure that they were in physical contact with one another." (ECF No. 481 12-13).

Photographs of the line movement taken during the 2014 shakedown directly contradict Plaintiff's allegations.  The photos show that Plaintiffs' allegation of a formation so close that inmates were forced to make contact with other inmates' clothed genitals simply did not occur and

was not a "uniform practice." (Def.'s Ex. 8, Photographs of the line movement at 2014 Lawrence

shakedown; ECF No. 481, Ex. 17, 328:12-21; 334:6-8; 336:3-7; 336:14-18; 339:1-6).  Defendants

testified as to the actual line movement policy. Inmates were generally paired in twos, and ordered

to keep their heads down and to walk in a tight formation.  (ECF No. 481, Ex. 25, 103:9-15).  Tact

Team officers gave these orders to ensure the inmate was orderly and safe, as Tact Team members

were outnumbered by inmates.  (ECF 481, Ex. 16, 272:11-17; Def.'s Ex. 8).

Defendants testified that there was no uniform policy (announced or otherwise) to force

prisoners to touch each other's genitals during line movement, and that any order given to that

effect would be against policy.  (ECF No. 481, Ex. 6, 125:4-22; Ex. 9, 79:13-80:4; Ex. 21, 171:16-

172:6).   Likewise, testimony from named Plaintiffs, consolidated plaintiffs and putative class

members differs significantly, indicating that no such uniform policy or practice existed requiring

prisoners to touch each other's genitals during line movement.   For example, named Plaintiff

Kevin Hamilton testified that he does not recall touching anything of the person behind him during

line movement.  (ECF No. 481, Ex. 32, 72:11-12).   Consolidated Plaintiff Harley Miller testified

that he did not touch the inmates in front or behind him during line movement except for the top

of his head.  (ECF No. 481, Ex. 44, 49:12-50:3).  In contrast, the typed declarations submitted by

Plaintiffs of putative class members contain almost word-for-word descriptions of this so-called

formation involving genital contact. (ECF No. 481, Ex. 49, all declarations at ¶ 15-16).  However,

of those inmates for whom Plaintiffs submitted declarations, only five filed contemporaneous

grievances and completed the grievance process complaining of genital contact during line

movement. (Def.'s Ex. 5).

As to Plaintiffs' claim that many inmates reported being told to line up "nuts to butts,"

there is no evidence that this was Defendants' "uniform policy or practice."   Some Defendants

who were formerly in the military testified that they recalled the phrase "nuts to butts" being used in the military to denote close line formation.  (ECF No. 481, Ex. 25, 104:16-105:14).  But, Defendants who were deposed testified that they had never heard the phrase used during a shakedown.  (*See, e.g.*, ECF No. 481, Ex. 19, 228:8-14, Ex. 6, 112:4-12; Ex. 21, 169:10-13, Ex. 25, 105:12-14; Ex. 16, 274:19-21).  Likewise, many of the consolidated Plaintiffs did not hear the phrase "nuts to butts" during the shakedown including Sam Harding, Edward Tenney, and Jonathan Tolliver.  (ECF No. 481, Ex. 40 177:19-23, 178:1-7; Ex. 29, 62:16-25, 68:6-11, 69:2-16, 77:12-17; Def.'s Ex. 1, 54:3-7, 57:12-16). Named Plaintiff Demetrius Ross testified that while he heard the phrase "nuts to butts," he understood it to mean stand close.  (ECF No. 481, Ex. 31, 40:13-15).  Thus, it is clear that use of the phrase "nuts to butts" was not a uniform policy or practice employed by Defendants.

Finally, Plaintiffs allege that all class members were "forcibly pushed and shoved by the tact team to ensure that they were in physical contact with one another."  (ECF No. 481 at 13). This is demonstrably inaccurate.  Defendants testified that there was no such policy to forcibly push or shove inmates to ensure physical contact, and none stated that they witnessed such an occurrence. (ECF. No. 481 Ex. 19, 223:19-22; 226:4-9). In fact, Defendants testified that such pushing and shoving would be against IDOC policy and that IDOC had no tolerance for excessive force.  (ECF No. 481, Ex. 6, 87:9-22).  Any use of force would be considered an unusual incident and would have required paperwork to be generated justifying the force.  (ECF No. 481, Ex. 16, 157:8-9; Ex. 17, 161:11-162:9). Thus, it is not surprising that consolidated Plaintiffs Sergio Cortes and Sam Harding testified that no officer touched them during line movement.  (ECF No. 481, Ex. 38, 32:19-20; Ex. 40, 142:6-8, 177:8-13).  And while many of Plaintiffs' typed declarations contain identical statements about being shoved or seeing another inmate being shoved during line

movement, only five of Plaintiffs' declarants contemporaneously completed the grievance process and complained of being shoved during line movement.  (Def.'s Ex. 5; Def.'s Ex. 6).  Interestingly, in May of 2018, putative class member Javan Deloney stated that no officer used physical force against him during the shakedown. In contrast, his typed declaration, submitted by the Plaintiffs, contains the form statement that "during the line movement, Tact Team officers pushed him with their batons."  (Def.'s Ex. 7 at 59482; ECF No. 481, Ex. 49 at 99)  These facts demonstrate that each inmate had a different experience during line movement.  No uniform policy or practice, as described Plaintiff, existed to show commonality among the class members.

**Holding Area**

Plaintiffs allege that "once the men reached the holding area, they were forced to sit or stand handcuffed behind their backs for a lengthy period—despite there being no need for the painful stress position.[13]"  (ECF No. 481 at 14).  Plaintiffs, themselves, acknowledge that there was "some variation in regard to what [the inmates] were ordered to do once in the holding area (*e.g.,* some sat at tables with their head down while others were forced to stand with their heads against a wall)."  (ECF No. 481 at 14).  Plaintiffs allege that inmates remained in the holding area "from one to four hours." (ECF No. 481 at 14).

Here, Plaintiffs' own description of what occurred during the shakedown in the holding area varies greatly.  Inmates either sat or stood.  Their heads were down or against the wall.  They were held in a different common area for anywhere from 1-4 hours.  This description on its face does not evidence a uniform policy or practice.  Moreover, Plaintiffs' and putative class members'

---

[13] Plaintiffs use the phrase "stress position" liberally throughout their Second Amended Complaint and Motion in Support of Class Certification.  However, Plaintiffs fail to describe what the phrase means or how handcuffing behind the back constitutes a stress position.  Definitions of "stress position" indicate that it is an "enforced body position… which cause the victim pain by concentrating a large amount of his or her weight on a small number of muscles, joints, etc."  *See*, collinsdictionary.com/dictionary/English/stress-position.  This definition does not comport with Plaintiffs' use of the phrase.

testimony is equally diverse, further contradicting Plaintiffs' claim of a uniform policy or practice. Most named and consolidated Plaintiffs sat down the entire time while they waited in the holding area for their cells to be searched.[14]  Consolidated Plaintiff Jeffrey Miller testified that he heard other inmates being allowed to use the restroom while in the holding area.  (ECF No. 481, Ex. 45, 80:4-9).

Many putative class members stated that they were in the holding area for less than an hour.[15]  Miguel Chiacom at Big Muddy reported that after feeling nauseous in the dining hall, he was seen by a nurse who treated him, gave him water and removed his handcuffs.  (Def.'s Ex. 7 at 63807).  Calvin Milons at Lawrence was given permission to use his asthma inhaler while waiting in the gym.  (Def.'s Ex. 7 at 63887).

Furthermore, Plaintiffs' allegations of being in the holding area for more than two hours would not have been temporally possible.  The Operation Orders show that the Tact Team searched three wings of a facility every day.  (ECF No. 481, Ex. 64).  Defendants testified that the team would search the wings consecutively (one wing, then another wing, then the final wing) rather than simultaneously.  (ECF No. 481, Ex. 19, 267:10-22).  Defendants also testified that they typically began the shakedowns at 7:30 a.m. and left the facility by 3:00 p.m.  (ECF No. 481, Ex. 19, 137:1-8).  Defendants testified that it takes about an hour to an hour and half to complete a shakedown of a wing.  (*See*, ECF No. 481, Ex. 19, 117:11-12, 136:11-17).  Consequently, Defendants could not have held inmates in the holding area for the three or four hours some claim. Therefore, Plaintiffs allegation of a "uniform practice" during the shakedowns in the holding area

---

[14] ECF No. 481,Verser, Ex. 33, 104:14-16; Harding, Ex. 40, 160:13-16; Hamilton, McDaniel, Ex. 43, 44:13-16; Truly, Ex. 37, 78:13-16; Miller, Ex. 45, 77:4-21; Cortes, Ex. 38, 36:2-4; Fisher, Ex. 39, 48:17-21.
[15] Def.'s Ex. 7, 63862, Kennedy, 30-40 minutes; Scott, 63907, 45 minutes to an hour;  Colon, 63813, 30-40 minutes; Jones, 63856, 35-40 minutes; Hall, 63844, 35-40 Minutes; Varnado, 63922, 45 minutes to an hour; Carrillo, 63802, 20 minutes.

is belied by Plaintiffs own descriptions, the differing accounts of named and consolidated Plaintiffs, and the differing accounts of the putative class members.

### 2. No Commonality Exists for Plaintiffs' Failure to Intervene Claim

To show a claim for failure to intervene, Plaintiffs must show that (1) he suffered an objectively "sufficiently serious" injury, and (2) that he was "incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan,* 511 US 825, 834 (1994). A prison official is liable under the Eighth Amendment only if "he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. To allege deliberate indifference to a substantial risk of serious harm, the plaintiff must allege that the defendant had *actual knowledge of a specific threat." Guzman v. Sheahan*, 495 F.3d 852, 858 (7th Cir. 2007) (emphasis added). Here, it is completely unclear who knew, what they knew, and at what point in time Plaintiffs are alleging a constitutional violation occurred. Plaintiffs are seeking class certification against twenty-four Defendants, the majority of whom were not present at all of the shakedowns. (*See, e.g.*, ECF No. 481, Ex. 19, 143:3-14 (Yurkovich, Atchison, Godinez not present at Illinois River shakedown); Ex. 17, 257:23-258:2 (A. McAllister not present for Illinois River); Ex. 16, 136:1-5 (Yurkovich likely only went to Lawrence); Ex. 6, 76:13-14 (Atchison not at any of the at-issue shakedowns)). Each of the named Plaintiffs was at a different facility, and each testified differently about who they saw present at the facility during the shakedown.[16]

To establish a claim for failure to intervene, each Plaintiff would have to show: (1) what injury

---

[16] ECF No. 481, Ex. 31, 125:5-17, 130:16-20 (Ross only saw unidentified officer he believes was Officer Law as being present at the shakedown at Illinois River); Ex. 29, 113:19-125:4 (Tolliver only identified an Officer Winter as being present at the shakedown at Menard); Ex. 30, 83:15-19 (R. Smith only identified an Officer Clark and Defendants Harrington and Butler as being present at the shakedown at Menard); Ex. 32, 87:13-19 (Hamilton only saw Defendant Roeckeman on the day of the shakedown at Big Muddy); Ex. 33, 159:22-188:13 (Verser saw approximately 30 of the 70 Defendants he named in his initial complaint on the day of the shakedown at Lawrence).

he received and how it was "sufficiently serious", (2) what conditions he suffered from that posed a substantial risk of serious harm, and (3) how each defendant had actual knowledge of a specific threat. Each of these inquiries would yield a different answer for each class member as not all of the alleged force was excessive; not all of the alleged constitutional violations occurred at the same time or in the same way; not all Defendants were present at each different shakedown, and not all Defendants present at the shakedown saw every event on every day of the shakedown. Furthermore, whether a particular Defendant had specific knowledge of a threat *and* a reasonable opportunity to intervene upon witnessing a constitutional violation is an inquiry that is inherently individualized. These type of fact-specific individualized assessment requirements dictate against a common question for Plaintiffs' failure to protect claim. *See, Chaffee v. Johnson*, 229 F. Supp. 445, 448 (S.D. Miss. 1964)("The vague and indefinite description of the purported class depends upon the state of mind of a particular individual, rendering it difficult, if not impossible, to determine whether any given individual is within or without the alleged class.")

   **B. Plaintiffs Have Failed to Meet the Typicality Requirement Because the Named Plaintiffs' Claims Are Not Typical of the Claims of the Proposed Class.**

   In order to meet the requirements for typicality in Rule 23(a)(3), the plaintiffs must show that a class representative is "part of the class and possess[es] the same interest and suffer[s] the same injury as the class members." *Wal-Mart*, 564 U.S. at 341. "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re AMS*, 75 F.3d at 1082.

   Here, Plaintiffs assert the claims of the proposed class representatives are typical of the proposed class. The only support the Plaintiffs give for this contention is the conclusory statement that their claims arise from "the same course of conduct that gives rise to the claims of other class members and they are based on the same legal theory." (ECF No. 481 at 30). Plaintiffs claim,

without factual support, that "each of them was subject to the same course of conduct by Defendants and their experiences are highly similar not only to one another but also to those of other putative class members."  (ECF No. 481 at 30).

As has been described above, named plaintiffs, consolidated plaintiffs, and putative class members did not describe the "same course of conduct" and their experiences were not "highly similar" to one another.  *See Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415, 428 (N.D. Ill. 2003)(the inquiry into whether plaintiffs' "claims are typical of those of the class members they represent is closely related to the commonality inquiry.")

## 1.  Named Plaintiff Demetrius Ross's Claims are not typical of Putative Class Members at Illinois River

Named Plaintiff Demetrius Ross, who was incarcerated at Illinois River, testified that he was strip searched in reverse order, that he was hit on the back of the head several times, that he was pulled out of line and pushed to his knees, and that he stood the entire time while the inmates were waiting in the gym for their cells to be searched.  (ECF No. 481, Ex. 31, 56:14-24; 57:1-5; 90:2-23; 87:13-17; 103:11-17; 104:8-11).  In contrast, putative class member and Plaintiff's declarant, Shawn Skinner, also incarcerated at Illinois River, did not state that his strip search was done in reverse.  (ECF No. 481, Ex. 49 at 77).  Skinner also stated that once he got to the gymnasium, his handcuffs were loosened.  (ECF No. 481, Ex. 49 at 78).  Illinois River inmates Joseph Max and Kenneth Lay stated that they had no physical force used against them at any point during the shakedown.  (Def.'s Ex. 7 at 63882 (Max), 63872 (Lay)).  Illinois River inmates James Moreno and Jovanie Carillo testified that their strip searches were done in the normal manner, starting from the top.  (Def.'s Ex. 7 at 63897 (Moreno), 63801-2 (Carillo))  Carillo also stated that he was not standing in the holding area for hours, but rather was asked kneel for about 20 minutes before returning to his cell.  (Def.'s Ex.7 at 63802).

## 2.  Named Plaintiffs Tolliver's and Smith's Claims are not Typical of other Putative Class Members at Menard

Named Plaintiffs Tolliver and Ronald Smith were both incarcerated at Menard during the shakedowns.  Tolliver and Smith testified that they were strip searched in reverse order (ECF 481, Ex. 29, 51:4-14; 51:23-25; Ex. 30 41:13-20).  Both Tolliver and Smith allege that they sustained injuries from the cuffing during the shakedown and that they had force used against them during line movement. (ECF 481, Ex. 2958:5-7; Ex. 30, 47:15-16).  Tolliver testified that he was in the Chapel for two and half hours, sitting the entire time, while Smith testified that he was in the Chapel for less than an hour, and that he started out standing, but was allowed to sit down after a time.  (ECF 481, Ex. 29, 84:19-22; Ex. 30, 67:14-17, 62:6-8).  Both Tolliver and Smith testified that they were denied their request to use the bathroom.  (ECF 481, Ex. 29, 89:24-25, 90:1-11; Ex. 30, 64:6-8).

In contrast, Plaintiffs' own declarants who were incarcerated at Menard, including Bell, Coleman, Deloney, Palmer, Price, Burt Robinson, Wesley Robinson, Sanders, Thomas, and Tomberg, did not testify they were strip searched in reverse order.  (ECF 481, Ex. 49 at 10, 22, 26, 54, 98, 106, 122, 150, 154, 158).  Plaintiff's declarant Jerry Clay stated that inmates were allowed to use the bathroom while waiting for their cells to be searched.  (ECF 481, Ex. 49 at 103).  Neither Robert Robinson nor Gregory Tomberg were physically touched during the shakedown.  (ECF 481, Ex. 49 at 123, 127).  Furthermore, Tolliver and Smith's claims are not typical of other putative class members' recollections of the Menard shakedown.  Brian Buchanan, Willie Lucas, Charles Cowart, Thomas Bartholomew, Percy Hawkins, Demond Barnes, Carlos Montanez and Ollie Boose all reported being strip searched starting from their head down.  (Def.'s Ex.  7 at 59487, 59516, 59493, 63771-2, 63849, 63765-6, 63893, 63781-2).  Boose, Guzman, Cowart, Lucas, Deloney, and Buchanan all reported they had no physical force used against them.  (Def.'s Ex.7 at

63782-3, 63840, 59494-5, 59517, 59482, 59487-8).

### 3. Named Plaintiff Hamilton's Claims are not Typical of Putative Class Members at Big Muddy

Named Plaintiff Kevin Hamilton, who was incarcerated at Big Muddy, testified that he was strip searched from bottom to top, that he was slammed against a wall for saying something to one of the Tact Team officers, and that he was nudged in the ribs a few times during line movement. (ECF No. 481, Ex. 32, 58:8-12; 79:9-11; 84:5-9)  Hamilton testified that he sat in dietary for two hours while the Tact Team searched the inmates' cells.  (ECF No. 481, Ex. 32, 81:7-10)  In contrast, putative class members from Big Muddy Jon Bosomworth, Antwan Jones, Brandon Hall, Demitri Varnado, and Michael Burnside reported that their strip searches were normal, beginning at the head.  (Def.'s Ex. 7 at 63791-2, 63855, 63844, 63922, 63797)  Kennedy stated that he was never hit with a baton.   Kennedy, Scott, and Jones testified that they waited in dietary for about 30-40 minutes.  (Def.'s Ex. 7 at 63862, 63907, 63856)  Scott testified that he was in dietary for about 45 minutes to an hour.  (Def.'s Ex. 7 at)  Durall, Hall, Burnside, Kevin Akins, Deon Livingston had no force used against them during the shakedown.  (Def.'s Ex. 7 at 63818, 63844, 63797-8, 63754, 63759)

### 4. Named Plaintiff Verser's Claims are not Typical of Putative Class Members at Lawrence

Named Plaintiff Glenn Verser claimed that he was strip searched in the reverse order and outside of his cell.  (ECF 481, Ex. 33, 74:14-24, 76:5-9)  Verser testified that he was beaten twice (punched in the stomach, kneed in the groin, and grabbed by the throat) during the shakedown by three different Tact Team officers.  (ECF 481, Ex. 33, 80:7-18, 81:2-14, 106:2-24, 107:1-24, 109:6-24, 110:1-5).   Verser maintained that these "beatings" occurred while he was being handcuffed and while he was in dietary.  *Id*.  Verser claimed that during line movement officers forcefully put his head on his cellmate's head, and that officers forced his private parts onto his

33

cellmate's hands by pushing the two inmates together.  (ECF 481, Ex. 33, 88:2-23, 101:12-24).

In contrast, Plaintiffs' declarants and inmates at Lawrence, including Burns, Gil-Ramos, Graham, White, and Rashad Whitlock did not testify that they were searched in reverse order. (ECF 481, Ex. 49 at 50, 82, 86, 166, 192)  Consolidated Plaintiffs Samuel Harding, Clark Truly, Charles Sultan, and Sergio Cortes testified they were strip searched inside of their cells, not outside.   (ECF 481, Ex. 40, 83:16-23; Ex. 37, 47:17-19; Ex. 38 25:17-20; Ex. 47, 61:2-7). Consolidated Plaintiff had no force used against him during line movement.  (ECF 481, Ex. 38, 32:19-21).  Consolidated Plaintiff Clark Truly did not have force used against him while in dietary. (ECF 481, Ex. 37, 85:24, 86:1-6).  Putative class member Calvin Milons testified that other than being tapped by batons (which he stated did not hurt), no force was used against him during the shakedown.  (Def.'s Ex. 7 at 63888) Milons did not state that his genitals came into contact with the person in front of him, but rather that his forehead was on the back of the person in front of him. (Def.'s Ex. 7 at 63887)

### 5.  Named Plaintiffs' Claims are not Typical of Putative Class Members for the Failure to Intervene Claim

Additionally, as to Plaintiffs' common question for failure to intervene against the Defendants, it is nearly impossible for Plaintiffs to show that the named Plaintiffs' claims are typical to those of the proposed class.  Each of the named Plaintiffs was at a different facility, and each testified differently about who they saw present at the facility during the shakedown.  For example, named Plaintiff Ross only identified an Officer Law as being present at the shakedown at Illinois River. (ECF 481, Ex. 31, 125:5-17, 130:16-20).  Named Plaintiff Hamilton only identified Defendant Zach Roeckeman as being present at the shakedown.  (ECF 481, Ex. 32, 87:13-19).

Named Plaintiffs' answers as to the individuals who were present is different from the testimony of the consolidated Plaintiffs.  For example, consolidated Plaintiff Samuel Harding only

recalls seeing a Sergeant Gray during the shakedowns.  (ECF 481, Ex. 40, 90:2-15).  No two Plaintiffs agree on when precisely a constitutional violation occurred during the shakedown. Moreover, every constitutional violation, even, *arguendo*, if it did occur, would require testimony of different Defendant witnesses as to whether they had knowledge of a specific threat and a reasonable opportunity to intervene.  Thus, each Defendant would have "a unique defense" which "destroys typicality" because it "consumes the merits of the case."  *Ellis*, 217 F.R.D. at 428 ("unique defenses consuming the merits destroy typicality because they eliminate a primary purpose of a class action: to allow the named plaintiffs to 'establish the bulk of the elements of each class member's claims when they prove their own.'")  Thus, even if each named Plaintiff were able to establish the elements of a failure to intervene claim it would in no way prove the elements for any other putative class member, as the inquiry is decidedly fact-specific and individualized. *Guzman v. Sheahan*, 495 F.3d 852, 858 (7th Cir. 2007)

### C.  Plaintiffs Have Failed to Meet the Requirements of 23(b)(3)[17] Because Individual Issues Predominate.

Plaintiffs are seeking certification of a class pursuant to Rule 23(b)(3).  (ECF 481 at 33). Certification of a Rule 23(b)(3) class requires a court find that common questions predominate over questions affecting individual members and that the class action is superior to other methods of adjudicating the case.  Fed. R. Civ. P. 23(b)(3).  The inquiry is similar to commonality, but is more demanding.  *See, e.g., Thomas v. Matrix Corp. Servs, Inc.*, 2012 WL 3581298, at *2 (N.D. Ill. Aug. 17, 2012).  To determine whether predominance and superiority are satisfied, courts examine the substantive elements of plaintiffs' claims, the proof necessary for those elements, and the manageability of trial on those issues.  *Reed v. Advocate Health Care*, 2009 WL 3146999, at

---

[17] In their Second Amended Complaint, Plaintiffs sought injunctive relief pursuant to Rule 23(b)(2) as well as damages pursuant to 23(b)(3).  (ECF No. 197 at 35).  However, in their Motion for Class Certification, Plaintiffs seek to certify only a damages class pursuant to 23(b)(3).  (ECF No. 481 at 33).

*4 (N.D. Ill. Sept. 28, 2009).

Here, the testimony of the putative class members, consolidated Plaintiffs and named Plaintiffs differs in many key factual allegations underpinning Plaintiffs' Eighth Amendment claim.  These differences, as described above, dissolve Plaintiffs' claim of a uniform practice.  Without a uniform practice, each putative class member will have to prove, for purposes of liability, the following individualized facts: (1) he was strip searched in a reverse order, (2) whether he was handcuffed in a purposefully painful way (3) he was forced to walk in a line with his genitals touching while being pushed and shoved together, (4) he was forced to be in a stress position for many hours. After all of these inquiries have been decided, a class member would then, as to the failure to intervene common question, have to show that a Defendant witnessed a constitutional violation committed against the class member, had a reasonable opportunity to intervene, and did not do so.[18]

Such individualized inquiries necessary to support Plaintiffs' Eighth Amendment claims clearly predominate over common issues. At most, what Plaintiffs have alleged is an improper implementation of policy as to some inmates by some Defendants. *Smentek*, 2014 WL 7330792, at *10 ("While questions may predominate in cases that allege a uniform policy or practice constituting deliberate indifference, courts often refuse to certify classes under Rule 23(b)(3) in cases alleging improper implementation of uniform policies.)  In cases which involve simply an improper implementation of uniform policies, courts have found continually that individual issues

---

[18] Alternatively, the class is overbroad as defined because it includes many individuals who did not experience the same conduct and therefore did not suffer any Eighth Amendment injury because of that conduct.  *See, Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 825 (7th Cir. 2012).  Without a uniform policy or procedure to act as the glue to hold the class definition together, Plaintiffs class definition becomes an individual inquiry that is too vague and requires a highly individualized assessment for each class member.  *Tijerina v. Henry*, 398 U.S. 922, 923 (1970).  Courts have required that "members of a class be capable of definite identification," and here they are not. *Id.*  The proposed class definition could include inmates who may have been harmed, though the harm was not due to any unconstitutional policy or practice.

36

predominate over common issues. *Id*. at *10; *In Re AMS*, 75 F.3d 1069, 1083 (6th Cir. 1996).

Plaintiffs contend that the fact that not all class members were harmed or that each class member cannot show an injury is not a bar to class certification. (ECF No. 481 at 35-36). Plaintiffs go as far as to say that "[n]either the harm nor the related concept of damages is relevant." (ECF No. 481 at 36). For this contention, Plaintiffs rely almost entirely on cases decided before the *Wal-mart* decision. This statement is directly contradicted by *Wal-Mart* and its progeny which states that "commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-Mart*, 564 U.S. at 350; *Phillips v. Sheriff of Cook County*, 828 F.3d 541, 552 (7th Cir. 2016); *Suchanek*, 764 F.3d at 758; *Jamie S.*, 668 F.3d at 497. Here, not only would individual issues of liability predominate, but individual issues regarding harm also doom class certification.

## CONCLUSION

Plaintiffs have failed to meet the Rule 23 requirements to certify a class. Specifically, Plaintiffs have failed to show commonality as required by Rule 23(a)(2) and typicality as required by Rule 23(a)(3). Additionally, Plaintiffs have failed to meet the requirements of Rule 23(b)(3).

WHERFORE, for the reasons articulated above, Defendants respectfully request this Honorable Court DENY class certification and grant such other further relief the Court deems just and fair.

Respectfully submitted,

By:     /s/ Emma Steimel
        Emma Steimel
        Assistant Attorney General
        100 West Randolph St., 13th Floor
        Chicago, Illinois 60601
        (312) 814-5163
        esteimel@atg.state.il.us

## <u>CERTIFICATE OF SERVICE</u>

I, Emma Steimel, an attorney, certify that on November 16, 2018, I caused the foregoing Defendant's Brief in Opposition to Class Certification to be filed using the Court's CM/ECF system, which effected service on all counsel of record.

By:     <u>/s/ Emma Steimel</u>
         Emma Steimel
         Assistant Attorneys General
         100 West Randolph St., 13th Floor
         Chicago, Illinois 60601
         (312) 814-5163
         esteimel@atg.state.il.us