1          IN THE UNITED STATES DISTRICT COURT
2           SOUTHERN DISTRICT OF ILLINOIS
3              EAST ST. LOUIS DIVISION
4   DEMETRIUS ROSS, et al.,      )
5          Plaintiffs,           )
6          -vs-                  )  No. 15 C 0309
7   GREG GOSSETT, et al.         )
8          Defendants.           )
9          The videoconferenced deposition of
10  EDWARD TENNEY called for examination pursuant to
11  Notice and the Rules of Civil Procedure for the
12  United States District Courts pertaining to the
13  taking of depositions, taken before Jana E. Cox, at
14  100 West Randolph Street, Fourth Floor, Chicago,
15  Illinois, on the 17th day of July, 2018, at the
16  hour of 12:52 p.m.
17
18
19
20
21
22
23  Reported By: Jana E. Cox, CSR
24  License No.: 084-004399

                                                    1

1   APPEARANCES:
2       LOEVY & LOEVY
3       BY:  MS. ADAIR CROSLEY (via VTC)
4       311 North Aberdeen Street, 3rd Floor
5       Chicago, Illinois 60607
6       (312) 243-5900
7          Representing the Plaintiffs;
8
9       ILLINOIS ATTORNEY GENERAL
10      BY:  MS. EMMA STEIMEL
11      100 West Randolph Street, 13th Floor
12      Chicago, Illinois 60601
13      (312) 814-3695
14      esteimel@atg.state.il.us
15         Representing the Defendants.
16
17
18
19
20
21
22
23
24

                                                    2

1                    I N D E X
2   WITNESS                          EXAMINATION
3   EDWARD TENNEY (via VTC)
4     By Ms. Steimel                      4
5
6
7
8
9
10                 E X H I B I T S
11  NUMBER                        MARKED FOR ID
12              (NONE MARKED)
13
14
15
16
17
18
19
20
21
22
23
24

                                                    3

1              (Witness sworn.)
2   WHEREUPON:
3              EDWARD TENNEY,
4   called as a witness herein, having been first duly
5   sworn, was examined and testified as follows:
6                  EXAMINATION
7   BY MS. STEIMEL:
8       Q.  Mr. Tenney, can you please state your name
9   for the record?
10      A.  Edward Tenney, T-E-N-N-E-Y.
11      Q.  Have you ever had your deposition taken
12  before?
13      A.  No, ma'am.
14      Q.  All right.  I'm going to go over a couple
15  of rules at the beginning.  They're just helpful
16  rules to keep in mind while we go through this
17  procedure.  Do you understand that you must answer
18  each question truthfully as if the judge were
19  present?
20      A.  Yes, ma'am.
21      Q.  Are you taking any medication or do you
22  have any illness that would prevent you from
23  answering truthfully?
24      A.  No, ma'am.

                                                    4



1    Q.   Is there anything that would prevent you
2  from answering truthfully today?
3    A.   No, ma'am.
4    Q.   All right.  As you can see, I have a court
5  reporter with me, and she is taking down everything
6  we're saying.  So it is important that you answer
7  each question verbally.  She can't take down head
8  nods or physical movement or descriptions or uh-huh
9  or uh-uh.  Does that make sense?
10   A.   Yes, ma'am.
11   Q.   Great.  And if you don't understand a
12 question, just let me know.  I am happy to rephrase
13 it for you.  However, if you do answer the
14 question, I will assume that you've understood it.
15 Does that make sense?
16   A.   Yes, ma'am.
17   Q.   All right.  The last thing is that there
18 may be some questions that you know where I'm going
19 or that you anticipate what I'm asking.  However,
20 it is important to let me finish my question just
21 so the court reporter can get everything straight
22 on the record.  Okay?
23   A.   Yes, ma'am.
24   Q.   What's your date of birth?

5

1    Q.   Okay.  What was your conviction in 1977
2  that led to your incarceration?
3    A.   Four and one attempted armed robberies.
4    Q.   Okay.  How long was your sentence?
5    A.   I had 6 to 18 years.
6    Q.   How long did you serve?
7    A.   About four and a half.
8    Q.   So from 1977 to 1981?
9    A.   Yes, ma'am.
10   Q.   What facility were you at during that
11 time?
12   A.   Pontiac Correctional Center.
13   Q.   Did you serve your entire term there?
14   A.   Yes, ma'am.
15   Q.   And then after 1981, did you become
16 incarcerated again at the Department of Corrections
17 in Illinois?
18   A.   In Illinois, no.  I went -- I violated
19 parole, went down to Florida, and stayed from '81
20 to '90.
21   Q.   While you were in Florida, were you
22 arrested and convicted of something that required
23 you to be incarcerated?
24   A.   Yes, ma'am.

7

1    A.   7-30-59.
2    Q.   Where were you born?
3    A.   Villa Park or Elmhurst, Illinois.
4    Q.   What's your highest level of education?
5    A.   GED.
6    Q.   When did you obtain your GED?
7    A.   In prison in Florida in the '80s.
8    Q.   Do you have any college credit?
9    A.   No, ma'am.
10   Q.   Do you have any certificates?
11   A.   Yes, ma'am.
12   Q.   What are your certificates in?
13   A.   Vocational horticulture.
14   Q.   When did you obtain that certificate?
15   A.   In the late '80s in Florida.
16   Q.   Do you have any education in the medical
17 field?
18   A.   No, ma'am.
19   Q.   All right.  Can you tell me when you first
20 became incarcerated at the Department of
21 Corrections in Illinois?
22   A.   1977.  Well, '76 I was arrested, but
23 '77 -- I bonded out.  '77 I went full
24 incarceration.

6

1    Q.   What were you convicted of in Florida?
2    A.   Robbery second class, kidnapping, grand
3  theft, battery, and law enforcement officer and two
4  escapes.  Oh, possession of a weapon by a convicted
5  felon and UUW.
6    Q.   When did you start your term in Florida?
7    A.   I was arrested at the end of '81.
8  Exactly -- November, December.  I'm not exactly
9  positive.
10   Q.   Okay.  How long were you in prison in
11 Florida?
12   A.   Until January '90.
13   Q.   Then at some point after that -- after you
14 got out of prison, did you return to Illinois?
15   A.   Yes, ma'am.  Paroled out to Illinois.
16   Q.   And then at some point, were you arrested
17 again in Illinois?
18   A.   Late '93.  Spent '93 to '95 incarcerated
19 Taylorville.
20   Q.   What was the conviction for that?
21   A.   UUW.
22   Q.   What's UUW?
23   A.   Possession of a weapon by a convicted
24 felon.

8

**Page 9**

```
 1     Q.   Okay.  And then did you get released in
 2  1995?
 3     A.   Yes, ma'am.
 4     Q.   Then did you get arrested after that?
 5     A.   Yes.  September, October of '95.  No.
 6  May 1st of -- May 3rd of '95 when I was physically
 7  arrested.
 8     Q.   Did that arrest lead to a conviction?
 9     A.   Yes, ma'am.
10     Q.   What were you convicted of?
11     A.   Murder.
12     Q.   First degree?
13     A.   Yes, ma'am.
14     Q.   Is that the sentence you're currently
15  serving?
16     A.   Yes, ma'am.
17     Q.   Okay.  Did you have a trial?
18     A.   Yes, ma'am.
19     Q.   I assume you were in jail during your
20  trial?
21     A.   Yes, ma'am.
22     Q.   What county?
23     A.   Kane County.
24     Q.   After you were convicted by a jury, when
                                                      9
```

**Page 10**

```
 1  did you first enter the Department of Corrections?
 2     A.   1999.  Can't be exact.  I think it was the
 3  summer.
 4     Q.   Did you go first to Joliet?
 5     A.   No.  I received a death sentence.
 6     Q.   Okay.  Where did you go?
 7     A.   I went to Joliet, but I was processed out
 8  within an hour and in a van on down to Menard.
 9     Q.   How long were you at Menard?
10     A.   Shortly because I was called back on
11  another writ to another county.
12     Q.   Okay.  So from 1999 to --
13     A.   Later that year.
14     Q.   Okay.  And then what was the next IDOC
15  facility you were at?
16     A.   Pontiac.
17     Q.   Do you remember when you first got to
18  Pontiac after your court writ?
19     A.   March or April of 20, I believe, 10.
20     Q.   Okay.  How long did you stay at Pontiac?
21     A.   A year.
22     Q.   So until 2001?
23     A.   '11.
24     Q.   2001?
                                                     10
```

**Page 11**

```
 1     A.   '11.
 2     Q.   How long were you out on a court writ?
 3     A.   About ten years.
 4     Q.   So you got to Pontiac in March of what
 5  year?
 6     A.   I don't mind explaining because it is on
 7  the record.  It is open.  I went -- when I left
 8  Menard back in '99, I was called back to another
 9  county, DuPage.
10     Q.   Okay.
11     A.   DuPage kept me until they figured out
12  which way the death penalty was going to go.  Once
13  they heard -- you know, kind of put a memoriam on
14  it, and they gave me another death sentence on
15  another case.  They sent me down -- this time I
16  went to Pontiac on another death sentence, the
17  second.
18     Q.   What was your second death sentence for?
19     A.   Armed robbery murder.
20     Q.   When was that arrest?
21     A.   January of '96.
22     Q.   Okay.  So when did you first get to
23  Pontiac after you were in DuPage County Jail?
24     A.   March or April of 2010.
                                                     11
```

**Page 12**

```
 1     Q.   I see.  Then you were there until 2011; is
 2  that right?
 3     A.   Yes.
 4     Q.   Where did you go after that?
 5     A.   When the death penalty was abolished, I
 6  was sent back to Menard, my parent institution.
 7     Q.   Have you been at Menard from 2011 to the
 8  present?
 9     A.   Yes, ma'am.
10     Q.   Do you currently have one life sentence or
11  two?
12     A.   Three and a half for life and 60 years,
13  but I guess they're all concurrent.
14     Q.   Have you ever been a party to another
15  lawsuit?
16     A.   I filed one in Kane County on civil rights
17  violations, but that was in early, middle '90s
18  against Kane County.  And the person I filed it on,
19  after I filed it, seemed to kept intercepting my
20  mail, taking papers out, and the court telling me
21  that they're not receiving stuff.  So eventually it
22  was just dropped because I couldn't get papers to
23  them, and all the papers weren't coming to me.
24     Q.   Okay.  What was the basis of your claims
                                                     12
```

1  in that lawsuit?

2      A.   Going through my mail, taking my legal
3  mail, taking my transcripts, deleting stuff so I
4  couldn't talk to my lawyers about it.  I went to
5  seg on a 30-day ticket.  Then spent a year in the
6  hole.

7      Q.   Okay.  Any other lawsuits that -- sorry.
8  Any other lawsuits that you have been a party to?

9      A.   Not that I know of.

10     Q.   Do you have a nickname in prison?

11     A.   No.  Go by Ed.

12     Q.   Have you ever had any aliases?

13     A.   Yes, but I couldn't really -- to be
14  honest, I couldn't remember the few that I did use.

15     Q.   Okay.  But it's fair to say you've had a
16  few while you've been out?

17     A.   When I was out, yes, ma'am.  I had
18  problems getting jobs with my record.

19     Q.   Do you have any medical conditions?

20     A.   No, ma'am.

21     Q.   Have you ever been a member of a gang?

22     A.   Yes, ma'am.

23     Q.   What was the gang that you were a member
24  of?

13

1      A.   It was Aryan Nation.

2      Q.   Are you currently a member of that gang?

3      A.   No, ma'am.

4      Q.   Have you gone through the renunciation
5  process with IDOC?

6      A.   No, ma'am.

7      Q.   Do you know if IDOC considers you still to
8  be in that gang?

9      A.   No, ma'am.

10     Q.   Did you review documents in preparation
11  for your deposition today?

12     A.   Yes.  What was given to me, yes.

13     Q.   Do you know what you reviewed?

14     A.   My original lawsuit with original papers I
15  filed, some papers my lawyer handed me about -- I
16  guess another -- was it Ross versus Gossett?  And
17  responses to request to admit and responses to
18  defendant's first set of interrogatories.

19     Q.   Did you review all of those documents?

20     A.   Yes, ma'am.

21     Q.   Aside from your attorneys, who have you
22  talked to about your case?

23     A.   No one.

24     Q.   Did you talk to anybody about your

14

1  deposition today?

2      A.   Some inmates on the gallery asked if I had
3  a visit -- if I have finally gotten a visit.  Told
4  them no.  It was legal stuff.  That was it.

5      Q.   Okay.  Do you have any mental health
6  condition that you've been diagnosed with?

7      A.   No, ma'am.

8      Q.   You don't take any medication for your
9  mental health; is that right?

10     A.   I have no mental health.  So I take no
11  medication for it.

12     Q.   When you were first incarcerated at
13  Pontiac from 1977 to 1981, do you recall any
14  tactical team shakedowns?

15     A.   Yes, ma'am.

16     Q.   And what do you recall, if anything, about
17  those shakedowns?

18     A.   The worst one was in the Pontiac when
19  several guards got killed.  National Guard took
20  back the institution.  It was the worst one, but
21  otherwise, the other ones were not as bad or as
22  aggressive.

23     Q.   So there was a shakedown that occurred
24  after the Pontiac riot; is that right?

15

1      A.   Definitely, yes, ma'am.

2      Q.   Do you recall what year the Pontiac riot
3  was?

4      A.   '77.

5      Q.   Do you have any independent recollections
6  about anything that occurred at the shakedowns in
7  Pontiac during these years?

8      A.   That specific one, yeah.  I really got my
9  butt beat my National Guard COs.  After that event,
10  I didn't.

11     Q.   Do you recall if you had experienced any
12  shakedowns between 1993 and 1995 while you were at
13  Taylorville?

14     A.   No.

15     Q.   When you were incarcerated in 1999 at
16  Menard -- and you said you were there for just a
17  few months -- do you recall if you had any tack
18  team shakedowns then?

19     A.   None.

20     Q.   What about Pontiac 2010 to 2011?

21     A.   One shakedown.  What we call a rookie
22  shakedown.  Cadets.

23     Q.   Anything you recall about that cadet
24  shakedown?

16

1    A.    Yeah.  They stole a bag of candy.

2    Q.    Anything else?

3    A.    No, ma'am.

4    Q.    All right.  So then I want to talk to you

5  about any shakedown you recall at Menard from 2011

6  until the one that we're here to talk about today

7  in April of 2014.  So I'll talk about that one in

8  detail later, but I want to know do you recall any

9  shakedowns occurring between 2011 and April of

10  2014?  And I want to be specific.  I'm talking only

11  about shakedowns where the tack team was involved.

12    A.    Yeah.  Menard doesn't -- well, officers do

13  minor shakedowns.  Occasionally, you get you a

14  rookie shakedown.  Everybody knows when tack team

15  shows up and wants to shake down whatever they're

16  shaking down.

17    Q.    Tell me about any shakedown you recall by

18  the tack team between 2011 and April of 2014.

19    A.    A couple years ago.  I was in the lowers,

20  336.  I got into it with an officer, one of the

21  tack team officers because he put his hand down --

22  when I bent over with my chin on my chest,

23  hands cuffed behind my back, he put his hand down

24  into my face.

17

1    Q.    Do you recall what year that was?

2    A.    '15 or '16.

3    Q.    Okay.  So that was actually after the

4  April 2014 shakedown; is that right?

5    A.    Yeah.  Yes, ma'am.

6    Q.    Do you recall any shakedowns between 2011

7  and April of 2014?

8    A.    Recall an exact year, no.  Now, when we

9  were shook down, but just beside the toss cell and

10  us standing -- that was standing there because now

11  we sit.  Before everybody stood.  Just like now.

12  They use cameras.  They never used cameras before.

13    Q.    Okay.  So you said that you recall a

14  shakedown that occurred either 2015 or 2016 and the

15  thing that you recall about that one is getting

16  into it with a tactical team officer who got into

17  your face; is that right?

18    A.    Yes, ma'am.

19    Q.    Okay.  Do you recall any other shakedowns

20  that occurred after April of 2014?

21    A.    Yes.  Yes, ma'am.  I was in south -- I was

22  in south upper seven gallery, 740.

23    Q.    Okay.  What do you recall about that

24  shakedown?

18

1    A.    They came as they usually do, toss the

2  cell as they usually did.  They weren't as brutal

3  as they usually were, but a few people still get

4  slaps in the back of the head.

5    Q.    So would you say there's been -- there

6  have been two tack team shakedowns since April 2014

7  shakedown?

8    A.    Where I was involved, yes.

9    Q.    Okay.  You said that they are different in

10  that they are not as aggressive; is that correct?

11    A.    As aggressive.

12    Q.    And they videotape them?

13    A.    The one I got into it with the officer was

14  videotaped.  The other one, I cannot say

15  specifically.  When they hit me on the head, I kind

16  of doubt that was videotaped.

17    Q.    Do you remember anything specific about

18  the strip searches in the 2015, 2016 shakedowns?

19    A.    Standard.  Keep your head down, back up,

20  back up, turn around.  You strip search in front of

21  the officers that are standing in front of your

22  cell.  He hands you back your blues.  You usually

23  have whites on.  You cuff back up, step back to the

24  cell, and they do your celly.

19

1    Q.    Okay.  When was the first time you heard

2  about the Ross class action?

3    A.    '14, '15 -- '15 or '16.

4    Q.    Did you hear about it before you filed

5  your complaint?

6    A.    Before I filed mine.  I heard it in the

7  library.

8    Q.    Do you recall who you heard about it from?

9    A.    It was an inmate worker.

10    Q.    Do you know his name?

11    A.    No, ma'am.

12    Q.    Do you recall --

13    A.    I was working on mine at the time asking

14  for help.

15    Q.    Okay.  Do you recall what he said?

16    A.    That another lawsuit has been filed by

17  other institutions that were involved.

18    Q.    Did you see a copy of the complaint before

19  you filed your lawsuit?

20    A.    No, ma'am.

21    Q.    Did you see any documents in the Ross case

22  before you filed your lawsuit?

23    A.    No, ma'am.

24    Q.    Do you recall anything else this inmate

20



1    said about the Ross case during that conversation?
2        A.   About the Ross case?  No.  He said several
3    people from Menard had already filed, but he didn't
4    know exactly who.  And that was it.
5        Q.   In front of you, I believe you have your
6    initial complaint.  Do you see that?
7        A.   Yes, ma'am.
8        Q.   Okay.  It may have what's called a merit
9    review on top of it.
10       A.   Memorandum and order?
11       Q.   Yes.  So I'd like for you to skip that and
12   go to where your complaint starts, and it says
13   document 1 at the top.
14       A.   Yes, ma'am.
15       Q.   Do you recognize this document?
16       A.   Do I recognize the document?  Not exactly,
17   but I know my handwriting.  I recognize my
18   handwriting.
19       Q.   Did you write this complaint?
20       A.   Yes, ma'am.
21       Q.   Did you get any help?
22       A.   Repeat.
23       Q.   Did you get any help?
24       A.   Yes, ma'am.

                                                    21

1        Q.   Who helped you?
2        A.   Inmate at the library because I didn't
3    know generally how -- needed help filling it out.
4        Q.   Does this complaint accurately reflect
5    your claims in this case?
6        A.   Yes, ma'am.
7        Q.   Did you include everything that happened
8    to you in this complaint?
9        A.   Yes, ma'am.
10       Q.   Your claims in your complaint look very
11   similar to the claims that are in the Ross
12   complaint.  Can you tell me why?
13       A.   No, ma'am.
14       Q.   All right.  I see that you have sued
15   Warden Harrington.  Do you see that?
16       A.   Mine starts at page 2.  I see
17   Kimberly Butler is defendant No. 2.
18       MS. CROSLEY:  Two-sided.
19   BY THE WITNESS:
20       A.   Yes, ma'am.  I see Warden Harrington who
21   was there at the time.
22       Q.   Okay.  Do you recall if you saw him at all
23   during the day of the shakedown in April of 2014?
24       A.   Yes, ma'am.  I was just about -- I was

                                                    22

1    just about to -- when we were all kind of watching
2    crush pushing us down the line assaulting us kind
3    of.  So when you looked up a little bit, you could
4    see Butler and Harrington were standing near the
5    officer's kitchen.
6        Q.   Okay.  So you saw them during the line
7    movement to -- where did you guys go?
8        A.   Randolph Hall.
9        Q.   Is that the gym or the chapel?
10       A.   That would be the gym in north two.  I was
11   in north two at the time on three gallery.  All of
12   us went to Randolph Hall.  That is like a jail chow
13   hall, multipurpose type area.
14       Q.   I see.  You saw Warden Butler and
15   Warden Harrington at the entrance of that building?
16       A.   Not that building, but it is like in an
17   L shape.  After Randolph Hall, you got the laundry.
18   You got the officer's kitchen completing that L,
19   the short line of an L.
20       Q.   Okay.  And could you see if they could see
21   the line movement?
22       A.   Without a doubt.
23       Q.   And then you've also named
24   Joseph Yurkovich.  Do you see that?

                                                    23

1        A.   Yes, ma'am.
2        Q.   Do you know who he is?
3        A.   Yes, ma'am.  He was head of security at
4    the time of Menard.
5        Q.   Well, I'll submit to you he was actually
6    chief of operations at the Department of
7    Corrections.  Have you ever seen him before?
8        A.   Bald head, clean shaven, yes.
9        Q.   Did you see him on the day that your cell
10   was shaken down?
11       A.   Yes, ma'am.  Sure looked like him.
12       Q.   Where did you see him?
13       A.   He was within, I would say, 15, 20 feet of
14   Warden Harrington and Butler.
15       Q.   Okay.  I'll submit to you that
16   Mr. Yurkovich has been deposed in this case, and he
17   testified that he was not there.  Are you sure it
18   was him that you saw on that day?
19       A.   It looked like him.  It looked awful like
20   him.
21       Q.   When else had you seen him before that
22   day?
23       A.   Walking around Menard institution before.
24       Q.   Did you ever have a conversation with him?

                                                    24



1     A.   Too many inmates, no.
2     Q.   So as you sit there today, it is possible
3  it was somebody else that was standing with him; is
4  that correct?
5     A.   It looked like him standing right there
6  within 15, 20 feet of the wardens.  Even without
7  going too far to volunteer, white guy, dark hair
8  wearing a black jacket SRT or CRT Springfield
9  director.  Had this on the back of his jacket.
10    Q.   Okay.  So you saw the person that you saw
11 was a white guy with dark hair, and he had a jacket
12 that says, "Springfield director;" is that correct?
13    A.   Not director.  CRT.  SRT or CRT director,
14 Springfield.
15    Q.   Okay.
16    A.   Not director of IDOC type thing.
17    Q.   All right.  That's the person that you had
18 seen around the cell house before?
19    A.   No.
20    Q.   Oh.
21    A.   I seen him standing right there in the
22 group of the wardens.
23    Q.   That's the person that you believe was
24 Yurkovich?

25

1     A.   No.
2     Q.   Oh.
3     A.   Yurkovich was right there in that group.
4     Q.   I see.  So you saw Warden Butler?
5  Warden Harrington?
6     A.   Yes.
7     Q.   The guy with the jacket that said,
8  "director"?
9     A.   No.  You're saying -- leaving out the
10 words "SRT" or "CRT director Springfield."
11    Q.   Okay.  And you saw also Yurkovich you
12 believe there as well?
13    A.   Yes.
14    Q.   Can you tell me again what you thought --
15 what you believe Yurkovich looked like?
16    A.   Little bit stocky, bald head, clean
17 shaven.
18    Q.   Okay.  About how old was he?  Do you know?
19    A.   Late 30s, 40s.  In his 40s.  I would say
20 in his 40s.
21    Q.   Okay.
22    A.   I don't look my age.  So it's kind of hard
23 either if you were going to guess my age without
24 knowing either.

26

1     Q.   You don't know who the person was with the
2  jacket you described?
3     A.   I just read what was on the back of his
4  jacket.
5     Q.   In front of you, there is also a complaint
6  called the second amended complaint for Ross v.
7  Gossett.
8     A.   Yes, ma'am.
9     Q.   Have you seen this document before?
10    A.   No, ma'am.
11    Q.   Did you review this document in
12 preparation for today's deposition?
13    A.   I read it once, yes.
14    Q.   So you have seen this document?
15    A.   That it was mailed to me by the attorneys.
16    Q.   It was mailed to you by your attorneys?
17    A.   Yes.
18    Q.   You reviewed it in preparation for today?
19    A.   Yes.
20    Q.   Okay.  Have you ever heard the term "nuts
21 to butts"?
22    A.   Yes, ma'am.
23    Q.   When was the first time you heard it?
24    A.   I had heard it before several other

27

1  shakedowns, but it was repeatedly repeated on the
2  20 -- April 2014 shakedown.
3     Q.   Were you ever in the military, Mr. Tenney?
4     A.   No, ma'am.
5     Q.   When was the first shakedown that you
6  heard the term?
7     A.   It was here at Menard.
8     Q.   Did you understand that term to mean get
9  really close to the inmate in front of you?
10    A.   No.  There was a letter I filed with my
11 original lawsuit I had wrote to the law center
12 asking about that.
13    Q.   What did you understand the phrase to
14 mean?
15    A.   You being pushed on the person in front of
16 you, and the person behind you being pushed up onto
17 you.  Their genitals were through their clothes
18 touching your hands and vice versa.
19    Q.   Okay.  How many officers did you hear use
20 that phrase during the shakedown in April of 2014?
21    A.   Use the phrase?  I didn't hear any use
22 that specific phrase.
23    Q.   Okay.  Tell me what day your cell was
24 taken down in April of 2014.

28

1    A.   I believe it's the 12th, I said.  I
2  believe it was April 12th.
3    Q.   Do you recall --
4    A.   I'm not -- without seeing the paper.
5    Q.   I'll submit to you that that is also what
6  I have read in your documents it happened on
7  April 12th.
8    A.   All right.
9    Q.   Who was your cell mate at the time of the
10 shakedown?
11   A.   I've been back from two weeks on a court
12 writ.  I did not know who the young, white kid was,
13 first or last name.  If I heard the last name, I'd
14 probably recognize it, but I didn't -- I don't know
15 really who he is.
16   Q.   What were you on a court writ prior to the
17 shakedown?
18   A.   Post conviction.
19   Q.   And what cell were you in in April of
20 2014?
21   A.   North two, 330.
22   Q.   What floor was that on?
23   A.   Third floor.
24   Q.   Was the wing called north two?

29

1    A.   Repeat.
2    Q.   Was the wing called north two?
3    A.   The whole cell house was north two.
4    Q.   Okay.  What wing were you on?
5    A.   Third floor.
6    Q.   Okay.  Was that in segregation?
7    A.   No, ma'am.  That's the other side of the
8  building.
9    Q.   Got it.  What time do you recall the tack
10 team entering the cell house?
11   A.   7:35.  Well, what time they went on three
12 gallery was 7:35 in the morning.  What time they
13 came into the cell house, I have no idea.
14   Q.   Do you know if you were the first gallery
15 to be shaken down that day?
16   A.   No, ma'am.
17   Q.   How did you know exactly what time they
18 came to the cell house -- excuse me -- to your
19 wing?
20   A.   Because usually a little after
21 7:00 o'clock they open the doors.  They unlock
22 your -- deadlock your doors.  And by 7:30 when they
23 have deadlocked your doors, I was standing on the
24 bar -- my arm on the bars with a mirror looking up

30

and down the gallery when I seen -- well, I didn't
2  know what officer, but I seen an officer down in
3  the gallery kind of -- he's standing on the stairs
4  peaking around wearing an orange jump suit.  So I
5  yelled crush in the house.
6    Q.   Was that to alert the other inmates that
7  the tack team was coming?
8    A.   Yes, ma'am.
9    Q.   Does somebody usually -- another inmate
10 alert the other inmates if there is a tack team
11 coming?
12   A.   Generally, somebody will say something.
13   Q.   Do you have a clock or a TV in your cell?
14   A.   Yes, ma'am.
15   Q.   Do you have both?
16   A.   Both.  Both.
17   Q.   Did you look at --
18   A.   Watch.
19   Q.   You have a watch and a TV?
20   A.   Yes, ma'am.
21   Q.   Did you look at your watch when you saw
22 the tack team member?
23   A.   Yes, ma'am.
24   Q.   Had you eaten breakfast before the tack

31

team came on?
2    A.   They fed us between 3:00 and like 4:30,
3  5:00 o'clock in the morning.  We feed in.
4    Q.   That means they give you trays in your
5  cells?
6    A.   Yes, ma'am.
7    Q.   What do you recall when the tack team
8  started coming onto the gallery?
9    A.   They were helmeted.  They were screaming.
10 They were beating the batons against the bars.
11 Everybody up.  Lights on.
12   Q.   Do you recall anything else they were
13 saying?
14   A.   With all the noise -- and it would have
15 been hard to say anything extra really, but those I
16 recognized.
17   Q.   What were you wearing when the tack team
18 came on the wing?
19   A.   Shower shoes, a pair of gym shorts, and a
20 T-shirt.
21   Q.   Were you wearing underwear?
22   A.   Yes, ma'am.
23   Q.   Were you wearing socks?
24   A.   No, not yet.

32

1    Q.   How many officers came to your cell?
2    A.   There was two or three standing right in
3  that area.  Those were especially small cells in
4  that area, and so your neighbors would be kind of
5  overlapping also.  So it's -- we had two to
6  possibly three.
7    Q.   Do you know who they were?
8    A.   Definitely not.
9    Q.   Do you recall any distinguishing features
10 of the officers that came to your cell?
11   A.   To my cell?
12   Q.   Yes.
13   A.   No.
14   Q.   Were they white?
15   A.   They were white.  They had helmets and all
16 dressed covered up.  Yes.  You could not identify
17 who the officer was.  No name tags, no
18 distinguishing sizes or maybe weights, color.
19   Q.   Do you recall their size or weight?
20   A.   One was a little bit -- I'm 6 foot.  One
21 was a little shorter than me.  One was a couple
22 inches taller than me.
23   Q.   Anything about their weight?
24   A.   One was about my weight.  One was heavier.

33

1    Q.   Are their visors clear?
2    A.   Excuse me?
3    Q.   Do they have clear visors?
4    A.   I believe it's semiclear.
5    Q.   Okay.  They weren't wearing like ski
6  masks, were they?
7    A.   A ski mask?  No.  Some looked like they
8  had something darkened on their faces that we had
9  seen in the past.
10   Q.   But at this shakedown?
11   A.   It's a dim area.  If you look down the
12 gallery -- we're in the same building right now
13 that you're interviewing me.  Right down the way.
14 It's a dim area.  Three gallery is generally a dim
15 area.  330 is in a dim area.  I have no window.  My
16 cell is a dark cell.
17   Q.   Okay.  Do you recall anything that either
18 of the officers said when they came to your cell?
19   A.   Face the back.  Face the back of the cell.
20 Hands behind the back.  Chin to chest.
21   Q.   Did they strip search you or your cell
22 mate first?
23   A.   I believe it was me.  I'm not positive.  I
24 believe it was me.

34

1    Q.   Were you inside your cell while you were
2  being strip searched?
3    A.   Yes, ma'am.
4    Q.   Was the door closed while you were being
5  strip searched?
6    A.   Yes, ma'am.
7    Q.   What did they say to you to indicate --
8  did they tell you to take your clothes off?
9    A.   Yes, ma'am.
10   Q.   Do you recall specifically what they said
11 to indicate that you needed to take your clothes
12 off?
13   A.   Get naked.
14   Q.   Okay.  That's pretty straightforward.  And
15 then what do you recall about what they said to you
16 while you were being strip searched?
17   A.   Don't look at -- one, don't look at me.  I
18 stood -- kept my head down facing him, took my
19 clothes off, set them on the bars, kept my head
20 down.  He went through them.  He said throw your
21 underwear, T-shirt, and socks on your bed, put your
22 boots and your blues on.
23   Q.   Okay.  And was there anything about this
24 strip search that was different than any other

35

1  strip search you had been to?
2    A.   Usually put your boxers back on, but --
3    Q.   But they started with your head and went
4  down; is that right?
5    A.   Yeah.  That was -- that's generally how it
6  is always.
7    Q.   Did they physically touch you at all while
8  you were being strip searched?
9    A.   Being strip searched, no.
10   Q.   And so then they told you you could not
11 wear your underwear?  Put your blues back on?  Is
12 that right?
13   A.   Yes, ma'am.
14   Q.   Did they say you could wear socks?
15   A.   No, ma'am.  Told me throw -- those are
16 whites go on the bed.
17   Q.   What shoes did you put on?
18   A.   Pair of boots like I'm wearing right now.
19   Q.   And then were you handcuffed right after
20 your strip search?
21   A.   Yes, ma'am.
22   Q.   Do you recall anything else they said to
23 you during your strip search?
24   A.   Head down, back -- face the back of the

36



1  cell.
2      Q.  Were you handcuffed in any way particular?
3      A.  It's thumbs up.  Wrist touches like that
4  with your thumbs up.  So you're bent somewhat over.
5      Q.  Okay.
6      MS. CROSLEY:  He's got his --
7  BY MS. STEIMEL:
8      Q.  Let me describe it.
9      MS. CROSLEY:  Sure.
10     MS. STEIMEL:  Thank you.
11         Let the record reflect that the inmate put
12 his hand and fists, and he had his wrists together.
13 And his thumbs were up, and his palms were facing
14 out but in fists.
15 BY MS. STEIMEL:
16     Q.  Had you been handcuffed that way before,
17 Mr. Tenney?
18     A.  Yes.  Crush usually does it like that.
19     Q.  Okay.  When you say, "crush," can we agree
20 that you're referring to the tactical team?
21     A.  Yes, ma'am.
22     Q.  Had you been handcuffed that way while you
23 were in jail at either DuPage or Kane?
24     A.  No, ma'am.

                                              37

1      Q.  What about in Florida?
2      A.  No, ma'am.
3      Q.  Do you understand that to be more a secure
4  way to be handcuffed?
5      A.  As was -- the way you're saying, more
6  secure way?  They may claim that.
7      Q.  Okay.
8      A.  I would call it a paramilitary torture
9  technique, but yeah, because it's hard on your
10 shoulders and on your wrists.
11     Q.  Could you see outside of your cell while
12 you were being strip searched?
13     A.  No, ma'am.  Window is off at an angle.
14     Q.  Could you see anybody else be strip
15 searched?
16     A.  No, ma'am, because all of us are facing
17 one direction.
18     Q.  Okay.  So you couldn't see into any other
19 cell?  That's right?
20     A.  No, ma'am.
21     Q.  Okay.  And did you see any females while
22 you were being strip searched?
23     A.  I could not be able to tell you like that.
24     Q.  Well, neither of the officers who strip

                                              38

1  searched you were females; is that right?
2      A.  I would guess not unless they were a
3  little bit masculine, but I'm not -- I don't think
4  neither one of mine was.
5      Q.  Okay.  And you could not visually see any
6  other female strip searching an inmate; is that
7  right?
8      A.  Not possible.  We know there are females
9  there because we heard voices.
10     Q.  All right.  But you don't know where those
11 voices were coming from; is that right?
12     A.  No --
13     Q.  You don't know --
14     A.  -- was on the gallery.  If it was an
15 inmate, there's only other people there were orange
16 wearing orange suits.
17     Q.  You don't know -- well, that's it.
18         Were you instructed to face the wall while
19 your cell mate was being strip searched?
20     A.  Yes, ma'am.
21     Q.  And do you recall anything that the
22 officer said to your cell mate while he was being
23 strip searched?
24     A.  Same thing more or less.  Same thing as he

                                              39

1  said to me.
2      Q.  Okay.  And they did his strip search the
3  same way starting with the head and going down?
4      A.  Can't say.
5      Q.  Okay.  You just don't know?
6      A.  Yeah.  Don't -- I don't know on that one.
7      Q.  Okay.  Have we talked about everything you
8  recall happening just during the strip search
9  portion of this day?
10     A.  Just in the strip search, yes.
11     Q.  Have we talked about everything that you
12 recall any tack member saying just during the strip
13 search portion of this day?
14     A.  Yes.
15     Q.  About how long did your strip search and
16 your cell mate's strip search last?
17     A.  No more than 15, 20 minutes.
18     Q.  And then after that, were you lined up
19 outside of your cell?
20     A.  Yeah.  They rolled the doors.  We backed
21 out to an officer.  He grabbed our cuff.
22     Q.  He grabbed your cuff and then put you in a
23 line?
24     A.  Yes.  Right there on the gallery.

                                              40

1   Q.   Who was in front of you on that line?
2   A.   Exactly in front of me I believe -- I
3   believe it was an officer.
4   Q.   Okay.  You think you were at the front of
5   the line?
6   A.   Oh, no.
7   Q.   Okay.  Was there -- sorry.
8   A.   Other people, other officers, other
9   inmates who came out of the cell.  There was a line
10  of us.
11  Q.   Do you recall anything the officer said
12  while you were lining up inside the cell house?
13  A.   Some verbal assault.  Some slap on the
14  heads while telling us to put our heads down.
15  Q.   Do you recall anything specifically that
16  you would consider a verbal assault?
17  A.   Look down, asshole, and slap on the back
18  of the head.
19  Q.   Do you know who said that?
20  A.   One of the orange crush who was standing
21  there.  I don't know if it was the officer with me
22  or the one standing nearby.
23  Q.   But you can't say a name of anybody who
24  said that?

41

1   A.   No.
2   Q.   And then you said some people were being
3   slapped on the back of the head.  Is that something
4   you personally witnessed?
5   A.   I received it a few times.
6   Q.   This was all still while you were in the
7   cell house; is that right?
8   A.   Yes.
9   Q.   So who slapped you on the back of the
10  head?
11  A.   As I stated, I cannot see because my chin
12  is on my chest with my eyes down.
13  Q.   How many times were you slapped?
14  A.   Still in the cell house, three.
15  Q.   Was it one officer who did it or more than
16  one officer?
17  A.   Unable to say exactly on that one.
18  Q.   And as you sit there today, you don't know
19  anybody's name who slapped you on the back of the
20  head?
21  A.   While in the cell house, no.
22  Q.   Did it leave a mark?
23  A.   Headaches or head, but that's it.  As a
24  mark, didn't break the skin.

42

1   Q.   Did you seek any medical care for anything
2   to do with the slaps on the back of the head?
3   A.   I'm a poor indigent.  Can't afford to pay
4   a $5 copay.
5   Q.   So that's a no, right?
6   A.   Yes, ma'am.
7   Q.   You didn't have a front cuff permit at
8   that time; is that right?
9   A.   No, ma'am.
10  Q.   Did you know anybody who had front cuff
11  permits?
12  A.   I have no idea.
13  Q.   Did you see anybody on that day with their
14  hands cuffed in front?
15  A.   I couldn't tell you that even.
16  Q.   Okay.  Have you ever had a front cuff
17  permit?
18  A.   Not so lucky.
19  Q.   Okay.  How long did it take you to get
20  outside once you were lined up in the cell house?
21  A.   We stop started a couple times until they
22  stared eventually moving us out.
23  Q.   Okay.  So about how long?
24  A.   Five, seven, eight minutes.

43

1   Q.   Other than being slapped on the back of
2   the head, were you physically touched in any other
3   way by an officer while you were still in the cell
4   house?
5   A.   Just with the one grabbing my arm bringing
6   me first off the gallery.
7   Q.   Is that when they put you in a line after
8   you were done with your strip search?
9   A.   Yes.
10  Q.   Did that hurt?
11  A.   No.
12  Q.   Have we talked about everything you recall
13  happening before you left the cell house?
14  A.   Repeat.
15  Q.   Actually, I'm going to strike that
16  question.  I'm going to ask you a different
17  question.
18       As you were moving out of the cell house,
19  did you have to touch the inmate in front of you?
20  A.   You were close, but you had off and on --
21  I had an officer in front of me with the cells --
22  inmate from the cell next door to me.  So no.  I
23  might have had my celly close to me, but we weren't
24  touching unless we bumped --

44



Q.   Okay.

A.   -- leaving off the gallery.

Q.   You had to go down some flights of stairs; is that right?

A.   Yes, ma'am.

Q.   Have we talked about everything you recall occurring while in the cell house, but before you got outside?

A.   I believe so.

Q.   Have we talked about everything you recall any officer saying while in the cell house, but before you got outside?

A.   Unsure on that.  I know there's a lot of verbal insults going down the way, being told repeatedly keep your head to the chest, keep your eyes down, slaps in the back of the head.  That would be it.

Q.   Okay.  Any other specific things you recall the officer saying?

A.   Step -- step up, close the line.

Q.   Okay.  All right.  Let's talk about when you exited the cell house and you went to you said the gym/multipurpose room.  You called it Randolph Hall; is that right?

45

A.   Yes, ma'am.

Q.   All right.  Were you in line -- were you in a single-file line or two-by-two line?

A.   Single file.  Started out single file.  Then they started doubling us.

Q.   Do you recall who was in front of you?

A.   The person who was probably in cell 31, I believe.

Q.   Do you recall who was behind you?

A.   Probably people who were in 3 -- 29.  No.  Let's see.  In front of me, I was on 30 headed to the high end.  I would have had people in cell 31.  I would have had people in 29 behind me.

Q.   Do you recall who was beside you once you doubled up?

A.   My celly.

Q.   As you're walking towards Randolph Hall, were you on the right or the left side of the line?

A.   Right.

Q.   Was any part of the front of you touching the person in front of you?

A.   Once they paired us up, yes.

Q.   What do you mean by that?

A.   When you first came out of the door, we

46

were single file.  After made it out, we were doubled up.  They doubled us all up.  Close the line.  Everybody -- you were on the person in front.  Person behind was on you.

Q.   So was your whole front touching the person in front of you?

A.   My back was -- my head would be touching the person's back just about.

Q.   Okay.

A.   I was -- the person behind me would be touching me.  I was close enough when police kept pushing to close the line, my genitals generally would touch his -- same way.  Whoever is behind me would have the -- would be having the same happen.

Q.   So your head was touching the person in front of you?

A.   Yes, ma'am.

Q.   Was it your forehead or the top of your head that was touching the person in front of you?

A.   Upper forehead.

Q.   I would consider that the top of your head.  Is that correct?

A.   Here.  Upper forehead.  This is my head.  Upper head, but --

47

Q.   Okay.  All right.  Where on the person in front of you's back was your upper forehead?

A.   Right around the shoulder blades area.

Q.   So between his shoulder blades?

A.   Right in that area.

Q.   Was he taller or shorter than you?

A.   Little bit taller.

Q.   Did you say you know his name?

A.   I just know the dude was called -- dude was transferred in.  I believe his name was White.

Q.   Okay.  Were his hands over his back or his butt?

A.   Right around his butt area, upper butt, if I had to take a guess.

Q.   Okay.  And aside from your head, was there any other part of you touching him?

A.   Every time they pushed us, say close the line, yeah, my genitals will be touching his hand.

Q.   So they matched up perfectly like that?

A.   No.  Only when the police kept pushing us.

Q.   Okay.  So was he holding them, or was it just a brush?

A.   If I -- you push somebody, you're going to go up against them constantly.  And us -- every

48



1   time they stopped the line, they say close the
2   line.  Every time we tried to break it, they
3   screamed close the line, keep your head down, poke
4   us, hit us with their hands or whatever; but you
5   were brushing up not in a complete spoon, but you
6   ain't far off from spooning just about.
7       Q.   Were you bent at the waist at all?
8       A.   Head down, yeah, kind of.  I would have a
9   bended area, yes.
10      Q.   But it wasn't a 90-degree bend; is that
11  right?
12      A.   No, it wasn't a full 90.
13      Q.   And do you know what of the person behind
14  you was touching you?
15      A.   Yeah.  Somebody kept brushing against my
16  hands.
17      Q.   But you don't know if it was genitals or
18  not?
19      A.   I would assume.  I don't really think it
20  was his stomach.  He wasn't tall enough to have his
21  kneecaps up in that area.  So...
22      Q.   Was he taller or shorter than you, the
23  person behind you?
24      A.   We were about the -- just close to the

49

1   same height.
2       Q.   Were your hands over your lower back or
3   your butt?
4       A.   Down by my butt.  Well, upper butt, if I
5   had to take a guess.
6       Q.   I mean, we can agree that not every inmate
7   was the same height in the line; is that right?
8       A.   Yes, ma'am.
9       Q.   So we can agree that not everybody's --
10  every inmate's genitals would line up perfectly
11  with the person in front of them's hands; is that
12  right?
13      A.   Yes.  I can't see what else is going in
14  front of me, but yes.
15      Q.   All right.  Tell me, were you physically
16  touched at all by any officer during the movement
17  to Randolph Hall?
18      A.   Slapped, poked.
19      Q.   Okay.  Slapped where?
20      A.   Head, neck, once in the side.  Like he was
21  trying to box my ears or something.
22      Q.   Side of the head?
23      A.   Yes.
24      Q.   How many times were you slapped?

50

1       A.   A few.
2       Q.   More than two?
3       A.   Definitely.
4       Q.   More than five?
5       A.   I would say probably about five, six from
6   our door to Randolph Hall.
7       Q.   And was it one officer or different
8   officers?
9       A.   Different officers, if I would take a
10  guess.  We ran a gauntlet.
11      Q.   Did you have your head up at the time that
12  your head was hit?
13      A.   Completely up as you were standing
14  straight up?  No.
15      Q.   Was it slightly up?
16      A.   Slightly, yes, because after keeping your
17  head down bent chin to chest for a length of time,
18  your neck starts bothering you.
19      Q.   Did any of these slaps leave a mark on
20  either your head or neck?
21      A.   Ears -- I can't see my head.  I have no
22  idea about that one.  If you go futuristic -- when
23  I came back to the cell after all this, my mirrors
24  are gone.  That was in my grievance.  My mirrors

51

1   are gone.  Disappeared somehow.  But I would
2   imagine the one good slap on the side of my head
3   probably left a good, nice, red mark for a while.
4       Q.   But you don't know because you --
5       A.   Didn't have no mirrors.  They were stolen.
6       Q.   Did you ask anybody if they could see a
7   mark on the side of your head?
8       A.   No, because you were in your cell.  My
9   neighbor couldn't see me.  I can't see my neighbor.
10      Q.   You had a cell mate in your cell; is that
11  right?
12      A.   If you got along with him, yeah.
13      Q.   You didn't get along with your cell mate
14  at the time?
15      A.   Not particularly.
16      Q.   Then you also said you were poked.  How
17  many times were you poked?
18      A.   Let's see.  Poked?  About four, five times
19  separately.  Hit across the back three times.
20      Q.   Were they poking you with their stick,
21  their baton?
22      A.   Yes, ma'am.
23      Q.   Where did they poke you with their baton?
24      A.   Where?

52



1    Q.   Yes.
2    A.   Ribs, side of the arms.
3    Q.   Which part -- which side of the ribs?
4    A.   Your hands are behind you.  It would be
5  right here.
6    Q.   Right or left?
7    A.   Right.
8    Q.   What about -- which arm?
9    A.   Right.  That was the only one facing the
10  officer side.
11    Q.   Did any of these pokes hurt?
12    A.   Yes.
13    Q.   Did they leave marks?
14    A.   One left like a scrape.
15    Q.   Did it bleed?
16    A.   No.
17    Q.   All right.  Then you also said -- sorry.
18  What's that?
19    A.   Like road rash.  Didn't bleed.  Just left
20  a red mark.
21    Q.   Then you also said that you were hit
22  across the back.  Well, let me ask you this:  The
23  pokes, were they poking you to keep your head down?
24    A.   No.  That was not -- that is not a poke to

53

1  keep your head down.  That was a poke as if
2  somebody poking you jabbing at you.
3    Q.   Did they say anything when they poked you?
4    A.   Called us assholes, keep our heads down,
5  pair up, hurry up, get -- hurry up and condense --
6  get up on the next person just about.  Close the
7  lines is the word.
8    Q.   Then you said you were also at some point
9  hit across the back?
10    A.   Yes.
11    Q.   Was that different than when you described
12  being slapped and poked?
13    A.   Yes.
14    Q.   Okay.  How were you hit across the back?
15  With a baton or a hand?
16    A.   That was definitely a baton.
17    Q.   Okay.  What part of your back was hit?
18    A.   Across middle about the center of my back.
19    Q.   Do you know why you were hit across the
20  back?
21    A.   No.
22    Q.   Did it leave a mark?
23    A.   I have no idea.  I didn't -- can't see it,
24  couldn't see it there.

54

1    Q.   Did it hurt?
2    A.   Yes, ma'am.
3    Q.   How long did it hurt for?
4    A.   On the shoulder blades for a couple days.
5    Q.   Now, as you sit there today, can you name
6  anybody by name who you believe slapped, poked, or
7  hit you across the back?
8    A.   I can only semi-identify one person
9  because of his stature, what he looked like.  We
10  only had one dwarf.  I don't know the proper term.
11    Q.   So there was a --
12    A.   He was a dwarf.  We had one.
13    Q.   Okay.  And where was he?
14    A.   He was in the line working here at Menard
15  as crush.  He's not here no more.
16    Q.   Did he participate in any of the slapping,
17  poking, or hitting you across the back?
18    A.   Yes, ma'am.  He was one of the -- I seen
19  him on a poke.
20    Q.   He poked you once?
21    A.   Yes, ma'am.
22    Q.   What was his name?
23    A.   Unfortunately, I'm not good at names
24  unless officers are around me, but he -- the only

55

1  dwarf who worked here who caught a case and is in
2  prison right now in another institution.
3    Q.   So it is your understanding that this guy
4  was a tactical team officer, but he is now
5  currently incarcerated?
6    A.   Yes, ma'am.  He road killed a couple
7  people.
8    Q.   He did what?
9    A.   Vehicular homicide, I believe the charge
10  was.
11    Q.   Okay.  And I believe that you said at the
12  beginning that you also saw the wardens during line
13  movement; is that right?
14    A.   Yes, ma'am, when I was closer to
15  Randolph Hall door.
16    Q.   Okay.  Did you see them while you were
17  being slapped, poked, or hit across the back?
18    A.   Yes, because that was what generally make
19  me move my head to look over that direction.
20    Q.   Did you see them watching you be slapped,
21  poked, or hit across the back?
22    A.   They were facing us.
23    Q.   How long did the walk take?
24    A.   Five, seven -- five, seven minutes

56

1  probably.  Stop, start, stop, start, stop, start.
2  Probably five, seven minutes.
3      Q.  Have we talked about every time any
4  officer made any physical contact with you during
5  the walk?
6      A.  Poke, slap, hits, yes.
7      Q.  Okay.  And you did not seek any medical
8  care for any of these physical contacts?
9      A.  No.  I'm poor.  I can't afford that.
10 $5 copay, but I only earn $10 if we're not on
11 lockdown.
12     Q.  Have we talked about every direct order or
13 any other statement you recall any tack team making
14 during the walk?
15     A.  There was a lot of yelling, a lot of
16 insults, a lot of swearing.
17     Q.  Do you recall anything specific?
18     A.  Besides the pairing -- besides pairing up,
19 move the line, keep the line tight, being pushed on
20 somebody, having somebody being pushed on me, I
21 believe I got most of it.
22     Q.  Okay.  So have we talked about everything
23 you recall happening during the line movement?
24     A.  I don't know what happened besides me --

57

1  I'm unsure on what else happened on the line.  I
2  know others were assaulted.  You could hear hits.
3      Q.  Did you witness anybody be physically
4  touched by any other officer?
5      A.  Through the whole time or just that
6  specific time?
7      Q.  Sorry.  Thank you for clarifying.  Just
8  during the line movement.
9      A.  No.  You could hear hand -- you can hear
10 flesh getting hit or a thud.  So you know
11 somebody's getting slapped or hit.  The sound is
12 very distinct.
13     Q.  Okay.  Have you talked to anybody else who
14 told you that they were physically touched during
15 line movement?
16     A.  No.  I really didn't talk to a lot of
17 people, try to talk to people about what went on.
18     Q.  Okay.  Let's go to when you got to
19 Randolph Hall.  What do you remember occurring?
20     A.  They bought us in.  They separated the
21 lines.  First, like one end.  They started
22 condensing people from two to one line.  They went
23 down a certain length in Randolph Hall facing --
24 come in the door.  Facing the wall in the direction

58

1  of the river Missouri west.
2      Q.  Okay.  So there was one line of inmates
3  facing the wall and then another line of inmates
4  behind them?
5      A.  That would come in -- once they filled up
6  that area, next line would come in.  Be right there
7  on their heels.  Literally your head and your --
8  you would be right there on their heels physically.
9  Three lines.  I believe it was three or four lines.
10     Q.  Were you in the -- were you facing the
11 wall, or were you facing an inmate?
12     A.  I was in the second line.
13     Q.  Do you know who was in front of you?
14     A.  Somebody black, best I can say.  Somebody
15 black.
16     Q.  Do you know who was behind you?
17     A.  No.
18     Q.  Can you tell me anybody who was on either
19 side of you?
20     A.  My celly was on the side of me.  I believe
21 one of my neighbors was on my other side of me.
22     Q.  Okay.  Do you recall anything any officer
23 said to you while you were in the Randolph Hall?
24     A.  Keep your fucking head down, assholes.

59

1  No, I won't unloosen your cuffs.  Quit moving
2  around.  Those are the general.  Slaps on the head.
3  Keep your head down.
4      Q.  Were you slapped on the head?
5      A.  Yes, ma'am.  Couple times.
6      Q.  So you were slapped on the head twice
7  while you were in Randolph Hall?
8      A.  I would say two to possible three.  I
9  remember one push.  Two were slaps and one was a
10 physical hand going to the back of my head pushing
11 down.
12     Q.  Do you know who slapped you?
13     A.  No, ma'am.  Somebody in orange.
14     Q.  Do you know who pushed your head down?
15     A.  Has to be somebody in orange.  All
16 referring to crush or certain team -- somebody in
17 orange.
18     Q.  But you don't know their names?
19     A.  No.
20     Q.  When they slapped you, was it because your
21 head was up?
22     A.  Not standing up like I'm facing you.  Just
23 wasn't down as far as they wanted.
24     Q.  What about the push?  Were you pushed

60

1  because your head was up?
2      A.  Same way.  My head wasn't down as far as
3  they wanted.
4      Q.  How long were you standing?
5      A.  The whole incident -- well, say standing.
6  Well, 7:35 when they came on the gallery, and it
7  was like between 12:00 and 12:15 when finally they
8  sit there.  They're going to let us line us back up
9  to go back to the cell house.
10     Q.  Did you say 11:15?
11     A.  No.  12:00, 12:15.
12     Q.  How did you know what time it was when
13 they lined you up?
14     A.  Because there is a clock in Randolph Hall.
15 I kind of bobbed my head up to see.  We were coming
16 back.  We were told to pair up.  Kind of raised my
17 head some to look up.
18     Q.  Were you ever sitting down while you were
19 in Randolph Hall?
20     A.  No, ma'am.  Nobody was unless you fell
21 out.
22     Q.  Did you ever see a nurse there?
23     A.  No, ma'am.  Only the ones who fell out
24 were diabetics ever seen the nurse.

61

1      Q.  But was there a nurse present in Randolph
2  Hall?
3      A.  I don't know if the whole time; but I know
4  when we were looking and a couple times during the
5  time, you could hear somebody fall.  You can hear
6  little rumble.  Then all bring him back here.  You
7  know they were getting dragged back into the
8  farther end of the back.
9      Q.  So you do think there was a nurse present
10 in Randolph Hall?
11     A.  Yes, ma'am.
12     Q.  Did you hear anybody ask for healthcare
13 and be denied?
14     A.  I know somebody was -- somebody said they
15 needed their cuffs undid because they said they
16 were too tight.  Their head was slammed against the
17 wall literally because you could hear it hit the
18 wall and a Spanish person named Jamie who was
19 bleeding.
20     Q.  How do you know he was bleeding?
21     A.  Because we seen him later on the way back
22 that wall, started peaking around trying to see
23 what happened, see who it happened to.
24     Q.  Is his name Jamie or Jesse?

62

1      A.  Jamie, Jesse.  It wasn't James.  It was
2  Jamie, Jesse.  Close enough.  I thought it was
3  Jamie.  Could have been Jesse, but it wasn't James.
4  I know that.  He was Spanish.
5      Q.  Did you ask to go to the bathroom?
6      A.  No, ma'am.
7      Q.  Did you hear anybody else ask to go to the
8  bathroom?
9      A.  A few people.
10     Q.  Were they --
11     A.  They were denied.
12     Q.  Did you hear anybody --
13     A.  I even know some peed on themselves.
14     Q.  Can you tell me any of the names of the
15 people that peed on themselves?
16     A.  I had just been back from a court writ
17 two weeks.  I didn't really know anybody there.
18     Q.  Did you witness them peeing on themselves,
19 or did you just hear about it after?
20     A.  In there, yes.  In Randolph Hall, I heard
21 them complain about it.
22     Q.  You heard them complain that they were
23 peeing on themselves?
24     A.  I got to go.  Then they mentioned hey, I

63

1  pissed on myself.  I got to use the bathroom.
2      Q.  Okay.  Do you recall anything else any
3  inmate said while you were in Randolph Hall?
4      A.  One said something to an officer.  I don't
5  remember what it was.  An officer told me -- told
6  him don't make me do my job is the exact -- was the
7  exact words.
8      Q.  Did you say anything to any officer while
9  you were in Randolph Hall --
10     A.  No.
11     Q.  -- to any -- go ahead.
12     A.  Not advisable.
13     Q.  Did any officer say anything to you
14 specifically while you were in Randolph Hall?
15     A.  Yeah.  Slapped.  Keep your head down,
16 asshole.
17     Q.  Okay.  Anything besides that?
18     A.  No.  Step up, close the line, head down.
19 Keep your fucking head down.  Yeah.  That would be
20 it.
21     Q.  How many tack teams officers were present
22 in Randolph Hall?
23     A.  I have no idea on that.
24     Q.  Can you name any tack team officer by name

64



who was present in Randolph Hall?

  A. No. You would have me guess. I think one -- I'm not positive. I'm not -- I think Winters was there, but I am not positive.

  Q. What is Winters' first name?

  A. He was over by the bathroom. It was Officer Winters.

  Q. What's Winters' first name?

  A. I'm not that -- like that with the officers.

  Q. Why do you think Winters was there?

  A. I believe he was the one who took off his helmet.

  Q. Did you see him?

  A. Yes, when they were pairing us up. I believe he was the one pairing us up.

  Q. What does he look like?

  A. Crew cut, kind of clean shaven. Crew cut. About 6'3," 6'4". About 2 -- I would say 240, 250. Probably in his 40s somewhere. 40s, early 50s. I would say 40s somewhere.

  Q. Any other officers you know by name were present?

  A. Not that I can say, no.

65

  Q. Any other IDOC personnel present that you can name?

  A. I just remember mostly orange right there inside that building.

  Q. Is there anything else you recall any officer saying while you were in Randolph Hall that we haven't discussed?

  A. Not that I recall.

  Q. Other than the two slaps and the push, were you physically touched at all any other time while in Randolph Hall?

  A. No.

  Q. Have we exhausted your memory as to everything that happened in Randolph Hall on that day?

  A. I know people were complaining to see a nurse and medical stuff. I can hear grumbles about that.

  Q. Okay. Do you know any inmates who asked to see a nurse?

  A. That's why I said I've only been there two weeks. I do not really know any of the inmates who were over in that area at the time.

  Q. Okay. Anything else?

66

  A. No.

  Q. And then you think at 12:15 -- what time -- did you look at the clock when you got to Randolph Hall?

  A. No.

  Q. So you don't know what time you got to Randolph Hall; is that right?

  A. I would say -- shake down took 20 minutes maybe in the cell. Five, seven -- five, eight -- five, eight minutes maybe getting over there to Randolph Hall from around that area.

  Q. Okay.

  A. About -- about maybe a half hour from start to finish to Randolph Hall if I had a good guess.

  MS. STEIMEL: Can we take a quick break?

  MS. CROSLEY: Yeah.

         (Discussion off the record.)

BY MS. STEIMEL:

  Q. What, if any, orders did you get to line up to go back to the cell house?

  A. I couldn't understand the beginning of that.

  Q. What, if any, orders did you get to line

67

up to go back to the cell house?

  A. They started with the back row, lining them up to go to the door. We all went out kind of single file. Then they kind of put us together again double line and run us through again kind of.

  Q. Were you on the right or the left side of the line going back to the cell house?

  A. Right. Facing closest to the wall.

  Q. Who was in front of you in the line going back to the cell?

  A. The neighbor in 31, 331.

  Q. Who was besides you?

  A. I believe it was my celly still.

  Q. Who was behind you?

  A. That one, I couldn't swear to. I would assume 29. I would assume 29. I'm sure, but I can't say for sure.

  Q. What do you recall, if anything, happening on the way back to the cell?

  A. It wasn't as aggressive. We weren't treated as bad as we were coming out.

  Q. Were you physically touched during the walk back to your cell?

  A. No. Just heads down, you know, close the

68

1  line. Every once in a while, somebody would yell
2  out asshole or inmate or whatever.
3      Q.  Do you recall anything else any officer
4  said on the way back to the cell?
5      A.  No, not really. I wasn't thinking about
6  what they were saying more or less.
7      Q.  Were you physically touching the person in
8  front of you?
9      A.  Only when an officer said stop the line
10 and we had to close the line, then we ended up
11 doing it.
12     Q.  Okay.
13     A.  You would be stepping on the person's
14 heels a lot. Really most of the time you'd be
15 stepping on the person's -- on their heels; but if
16 you all of sudden stopped the line, usually you
17 bump the person in front of you. You're usually on
18 it -- when they say close the line, they start
19 pushing everybody up closer, then you would be on
20 them.
21     Q.  So how many times did they close the line?
22     A.  Two or three.
23     Q.  And when they closed the line, was your
24 head touching the inmate in front of you?

69

1      A.  Yes.
2      Q.  Were other parts of you touching the
3  inmate in front of you?
4      A.  Once or twice, yes.
5      Q.  What other parts?
6      A.  My groin area.
7      Q.  Okay.
8      A.  Stepping on his heels.
9      Q.  Okay. Anything else touching the person
10 in front of you?
11     A.  No.
12     Q.  What about anything of your back touching
13 the inmate behind you?
14     A.  I can feel somebody's head bumping into my
15 back. Somebody brushing up on me. I'm taking
16 their groin area brushing up on my back down my
17 cuffed hands.
18     Q.  So aside from their head and your hands on
19 their groin area, did you touch anything in the
20 back of you?
21     A.  Step on my heels. Same way.
22     Q.  Okay. Anything else?
23     A.  No.
24     Q.  Did you see any other inmate be physically

70

1  touched on the way back to the cell house?
2      A.  The way back?
3      Q.  Yes.
4      A.  No. You'll hear the officer saying
5  something, but you really didn't hear the hits with
6  the slaps as we had the first time around.
7      Q.  Do you recall anything else about the walk
8  back to your cell house that we have not discussed?
9      A.  No, not that I recall.
10     Q.  When you got back to your cell house, did
11 you have a shakedown slip?
12     A.  We were brought back in the cell house.
13 While me and my celly were being pushed into our
14 cell, I know there was a skirmish where whatever
15 crush decided to jump on one of the inmates in cell
16 29 --
17     Q.  Okay.
18     A.  -- because I could see him on the floor,
19 and I could see an officer swinging on him.
20     Q.  How many officers? Do you know --
21     A.  Black inmate. One of the black inmates
22 over in cell 29.
23     Q.  Do you know his name?
24     A.  No.

71

1      Q.  You said that you witnessed him being on
2  the floor; is that right?
3      A.  Yes, ma'am.
4      Q.  You witnessed two other officers make
5  physical contact with him; is that right?
6      A.  Definitely.
7      Q.  Do you know why they were making physical
8  contact with him?
9      A.  No, ma'am.
10     Q.  Did you ever talk to that inmate again
11 about what had happened?
12     A.  They took him away while me and my celly
13 were finished -- pushed physically in the cell door
14 slammed shut. Still don't look around, stare at
15 the back of the cell.
16     Q.  Okay. How many times was he hit by those
17 two officers?
18     A.  I seen both connect pretty good with him.
19     Q.  Was he being punched or kicked or what?
20     A.  No. No. Down. He was just about
21 complete -- I seen his leg, but I know I could see
22 one officer's knee on the back of his neck. And I
23 could see the other one -- other one taking a good
24 cheap shot.

72



1    Q.    Where was he hitting him when you say,
2  "cheap shot"?
3    A.    He either got caught in the side of the
4  head, neck head area, or right here (indicating).
5    Q.    In the back of the neck?
6    A.    Side, back -- I don't know how that is
7  called.
8    Q.    The side of the neck?
9    A.    Yeah.
10    Q.    And as you sit there today, can you name
11  either of the officers that was in the --
12    A.    No.
13    Q.    Is this something that you saw as you were
14  walking down the hall to your cell?
15    A.    Going into my cell.
16    Q.    Do you know the name of the officer who
17  pushed you into your cell?
18    A.    No.
19    Q.    Did it hurt?
20    A.    Him pushing?
21    Q.    Yes.
22    A.    No.
23    Q.    Was that a no?
24    A.    It was a push.

73

1    Q.    And then when you got back to your cell,
2  did you have a shakedown slip?
3    A.    There was a shakedown slip.
4    Q.    Did it indicate that there was any
5  contraband in the cell?
6    A.    No contraband.
7    Q.    Could you see the name of the officer who
8  had shaken down your cell on the shakedown slip?
9    A.    I couldn't. My celly couldn't. Neither
10  could our regular CO who -- whoever was working
11  that day because I had stopped in and asked him
12  who -- to try to help identify who that was.
13    Q.    Did it have an officer number on it?
14    A.    I included that with the suit, my original
15  suit. It was included with part of it as
16  paperwork.
17    Q.    Okay. Have you at this time been able to
18  identify who that was by the number?
19    A.    No. Officer said he couldn't even
20  identify it. He says it was probably not an
21  officer from Menard.
22    Q.    Did it have the name of the facility where
23  the officer came from?
24    A.    Didn't even have that.

74

1    Q.    So we have talked about a couple of people
2  that you recall seeing during the shakedown. Let
3  me just go over them from my notes. You talked
4  about the man who you described as a dwarf, but
5  whose name you can't remember?
6    A.    Yes, ma'am.
7    Q.    You talked about seeing Warden Butler,
8  Warden Harrington, the person that you believe is
9  Yurkovich, the other person who had -- I don't want
10  to misquote you. Whatever it is he had on his
11  jacket. And then you say that you also saw you
12  believe Officer Winters in Randolph Hall while you
13  guys were standing there or at the end of the
14  standing period; is that right?
15    A.    Yes, ma'am.
16    Q.    Okay. Is there anyone -- other tack team
17  officer by name that you saw that day at the
18  shakedown?
19    A.    Not that I could identify, no.
20    Q.    And is there any other IDOC personnel that
21  you saw that you can identify as being present at
22  the shakedown?
23    A.    No.
24    Q.    Have we talked about every inmate you saw

75

1  use force against them during the shakedown?
2    MS. CROSLEY:  Objection, form.
3  BY MS. STEIMEL:
4    Q.    You can answer.
5    A.    I believe so.
6    Q.    And have we talked about everything you
7  recall having happened at this shakedown on
8  April 12, 2014?
9    A.    My cell was trashed. No one ever talked
10  about the stuff that was missing mentioned in the
11  grievance. The cell trashed like it was -- that
12  was mentioned in the grievance. TV hanging by the
13  cable cord. That's still -- the fan had to get
14  turned in and destroyed because they broke it when
15  they grabbed it and deliberately crushed the frame
16  of it, but --
17    Q.    Okay. What were you missing of your
18  property?
19    A.    That's mentioned all on the grievance.
20  That was filed with it that I sent a copy to
21  everyone.
22    Q.    Did you ever receive any replacement
23  property?
24    A.    No, ma'am. They said nothing was taken,

76



1 but I just came back. It was on the property slip
2 coming out of the -- property. I just came from a
3 court writ. It was there then, but their excuse is
4 how did we know you had it two weeks later?
5    Q.   Okay. Have you ever had discipline while
6 you've been at IDOC for having contraband?
7    A.   No, ma'am.
8    Q.   Have you ever been disciplined or gotten a
9 disciplinary ticket at IDOC?
10   A.   Which time?
11   Q.   Any time.
12   A.   Yes, ma'am. In my youth, I was not
13 very --
14   Q.   Since 2011, when you came to Menard the
15 last time, have you gotten any disciplinary
16 tickets?
17   A.   No, ma'am.
18   Q.   I'm not going to ask you what you saw or
19 who had it, but have you ever seen contraband at an
20 IDOC facility?
21   A.   Yes, ma'am.
22   Q.   Do you see it often?
23   A.   In IDOC facility?
24   Q.   Yes.

77

1    A.   I really don't go look around. I don't go
2 in other people's cells. I don't look around to
3 see if they've got contraband. So that's kind of
4 hard to say. If I hand you a newspaper, they could
5 say that's trafficking and trading against the
6 rules. So what is wrong with having somebody -- a
7 newspaper to read instead of throwing it away?
8    Q.   I'm not going to ask you who had them or
9 where you saw them, but while you've been at IDOC,
10 have you ever seen an inmate have a weapon?
11   A.   No.
12   Q.   Have you ever seen inmates throw out
13 weapons at the beginning of a shakedown?
14   A.   I believe there was one time in the past
15 when I was in the west house when crush came
16 through. A weapon had been thrown on the gallery
17 by some -- one of the kids.
18   Q.   When did you first hear the term "orange
19 crush"?
20   A.   Probably 2010. I don't remember what
21 Pontiac's team was.
22   Q.   Was it a term that the inmates used to
23 describe the tack team?
24   A.   Yes, ma'am.

78

1    Q.   Have you ever heard a tack team member
2 call themselves orange crush?
3    A.   I really never listened to what they call
4 themselves.
5    Q.   So that's a no?
6    A.   Never heard it. I never paid attention to
7 it.
8    Q.   Do you have a job?
9    A.   No, ma'am. They just raised my security
10 level.
11   Q.   What's your security level currently?
12   A.   High.
13   Q.   Do you know if you're considered an escape
14 risk?
15   A.   That's what they're trying to claim now.
16   Q.   Do you know what that's based on?
17   A.   I was just -- 2015 my security was lowered
18 to moderate. I went three years with moderate
19 until the counselor took it upon herself when
20 somebody was asking about giving me a job -- oh, he
21 has history. She took it upon herself to push to
22 have my security level raised after three years.
23   Q.   Well, at Menard, have you ever had a job?
24   A.   No, ma'am.

79

1    Q.   Did you ever seek medical -- I think you
2 answered this, but I just want to confirm. You
3 never sought medical care after the shakedown; is
4 that right?
5    A.   No. Can't afford to sit there and pay $5
6 copay.
7    Q.   Did you ever seek any mental healthcare
8 after the shakedown?
9    A.   Yes, ma'am.
10   Q.   Did you seek mental healthcare because of
11 the shakedown?
12   A.   That's hard to say. Probably accumulation
13 of things.
14   Q.   Okay. Do you see a mental health
15 professional on a regular basis?
16   A.   No. They show up whenever they show up.
17 I wouldn't call it anything regular. Might be a
18 month; might be five months.
19   Q.   When after the shakedown in April of 2014
20 did you first see a mental health professional?
21   A.   It wasn't that long. It wasn't that long.
22   Q.   Was it the next month?
23   A.   I couldn't say. It's been a length of
24 time. I cannot say with all certainty if it was

80



1  within 30 or 60 days.
2      Q.   Did you discuss with this mental health
3  professional anything to do with the shakedown?
4      A.   Yes.
5      Q.   Did you get any diagnoses from her with
6  regard to anything that occurred at the shakedown?
7      A.   No.
8      Q.   Are you claiming any mental health damages
9  from the shakedown?
10     A.   I didn't write mental health.  Nothing
11  mental health down.
12     Q.   Okay.  So you're not claiming any --
13     A.   Do I have problems when the officers come
14  up on the gallery with metal bar banging on the
15  bars?  Yeah.  That's one of the first things that
16  comes up that day, but after that, I'm not -- you
17  think about it.  It bothers you.  You wake up
18  sometimes maybe about it, but that's it.
19     Q.   Okay.  Do you have any medical issues
20  currently from the shakedown of April of 2014?
21     A.   No, ma'am.
22     Q.   And you said the pain from the shakedown
23  lasted about -- what did you say? -- one week?
24     A.   Week, week and a half, yes.

81

1      Q.   Any other mental health issues you're
2  claiming with regard to the shakedown that we have
3  not discussed?
4      A.   No, ma'am.
5      Q.   Do you workout, Mr. Tenney?
6      A.   No.  My shoulder hurts.  I had a problem
7  with a pulled muscle.
8      Q.   When did you get a pulled muscle?
9      A.   Back in January.
10     Q.   Prior to your pulled muscle in January,
11  did you work out on a regular basis?
12     A.   Yes, ma'am.
13     Q.   How often did you work out?
14     A.   Usually about three times a week.  If we
15  were off of lockdown with regular movement, head
16  for the yards.
17     Q.   Okay.  From 2011 to January of 2018, did
18  you pretty much keep the same workout routine
19  unless you were on lockdown?
20     A.   Yes, ma'am.
21     Q.   Do you lift weights?
22     A.   Yes, ma'am.
23     Q.   Do you do cardio?
24     A.   Not as much as I should.

82

1      Q.   Okay.
2      A.   Stairs.  I did stairs.
3      Q.   Okay.
4      A.   Not as --
5      Q.   I noticed that you gave your attorney some
6  documents.  Well, let me ask you this:  I don't
7  want to know anything that you're communicating
8  with your attorney about, but did you give your
9  attorney some documents prior to the deposition?
10     A.   Documents?  A piece of paper, yes.
11     Q.   Okay.  It was not a document; is that
12  correct?
13     A.   No, not no document.
14     Q.   Would you consider it more of a
15  communication with your attorney?
16     A.   Yes.
17     MS. STEIMEL:  All right.  Give me one minute.
18  I'm just going to look over my notes.
19         I don't have anything further.
20     MS. CROSLEY:  I don't have any questions.
21         You have the option of reviewing the
22  transcript for accuracy or waiving your signature,
23  which is your way of saying you trust that the
24  court reporter got it right.  Would you like to

83

1  waive your signature?
2      THE WITNESS:  Yes, ma'am.
3      MS. CROSLEY:  Waiving signature.
4                     (Whereupon, the deposition
5                      concluded at 2:37 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

84

```
 1  STATE OF ILLINOIS  )
 2                     )  SS:
 3  COUNTY OF C O O K  )
 4          I, Jana E. Cox, an Officer of the Court,
 5  do hereby certify that heretofore, to-wit, on the
 6  17th day of July, 2018, personally appeared before
 7  me EDWARD TENNEY, a witness in a certain cause now
 8  pending and undetermined in the United States
 9  District Court, Southern District of Illinois,
10  East St. Louis Division, wherein DEMETRIUS ROSS is
11  the Plaintiff and GREG GOSSETT is the Defendant.
12          I further certify that the said
13  EDWARD TENNEY was by me first duly sworn to testify
14  the truth, the whole truth, and nothing but the
15  truth in the cause aforesaid; that the testimony
16  then given by said witness was reported
17  stenographically by me in the presence of said
18  witness and afterwards reduced to typewriting by
19  Computer-Aided Transcription, and the foregoing is
20  a true and correct transcript of the testimony so
21  given by said witness as aforesaid.
22          I further certify that the signature to
23  the foregoing deposition was waived by counsel for
24  the respective parties.
                                                    85
```

```
 1          I further certify that the taking of this
 2  deposition was pursuant to Notice and that there
 3  were present at the deposition the attorneys
 4  hereinbefore mentioned.
 5          I further certify that I am not counsel
 6  for nor in any way related to the parties to this
 7  suit, nor am I in any way interested in the outcome
 8  thereof.
 9          IN TESTIMONY WHEREOF:  I have hereunto set
10  my verified digital signature this 1st day of
11  August, 2018.
12
13
14
15  _ _ _ _____
16      Illinois Certified Shorthand Reporter
17
18
19
20
21
22
23
24
                                                    86
```











