IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DEMETRIUS ROSS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 3:15-CV-309-SMY-MAB |
| | ) | |
| GREG GOSSETT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

**BEATTY, Magistrate Judge:**

This matter is before the Court on the Motion for Protective Order Regarding Certain Topics of Plaintiffs' Notice for Rule 30(b)(6) Deposition (Doc. 556) filed by all Defendants, the Motion for Leave to Serve Revised Requests to Admit (Doc. 557) filed by Plaintiffs, and the Motion for Extension of Time to Complete Discovery as to Certain Specified Items (Doc. 558) filed by Plaintiffs. Pursuant to 28 U.S.C. § 636(b)(1)(A) and Amended Administrative Order No. 257, District Judge Staci M. Yandle referred these three motions to the undersigned for a ruling (Doc. 560).

The undersigned held a hearing on the three motions on February 2, 2021 (Docs. 565, 567). Defendants' motion for protective order was denied on the record at the hearing and Plaintiffs' two motions were taken under advisement. Before delving into the merits of Plaintiffs' motions, it is useful to give a brief background on the procedural history of this case.

This class action concerns facility-wide shakedowns conducted in 2014 at four

Illinois Department of Corrections prisons: Menard, Illinois River, Big Muddy, and Lawrence. Plaintiffs are inmates and they contend the shakedowns were executed in a uniform manner by the "Orange Crush" Tact Team in accordance with a plan that was formulated by senior prison officials. Plaintiffs further contend that the shakedowns were conducted in an abusive and unconstitutional fashion.

Judge Yandle granted Plaintiffs' motion for class certification on March 26, 2020 and certified a class against the 22 administrative Defendants (Doc. 519).[1] She subsequently instructed the parties to submit a joint proposed revised scheduling order, including deadlines for discovery on the merits of Plaintiffs' claims (Doc. 521). The parties proposed a deadline of September 7, 2020 for fact discovery and a deadline of December 7, 2020 for expert discovery, which were accepted by Judge Yandle in a scheduling order entered on April 14, 2020 (Docs. 523, 525). Defendants then requested a stay of discovery while they pursued an appeal of the class certification order (Docs. 524, 536). Plaintiffs opposed Defendants' request, arguing that a stay on all discovery would "[grind] all progress to a halt" and simply prolong the inevitable because fact discovery would have to take place regardless of the outcome of the appeal (Docs. 526, 540). That is, even if class certification was overturned, the Plaintiffs' individual claims related to the shakedowns would still move forward (Docs. 526, 540). On July 21, 2020, Judge Yandle agreed to stay expert discovery but ordered fact discovery to continue (Doc. 541).

---

[1] There are several hundred other individual Defendants who were IDOC employees and participated in the shakedowns (*see* Doc. 197). In total, there are approximately 500 Defendants.

On September 1, 2020 — six days before the deadline for fact discovery — Plaintiffs filed a motion asking to extend the deadline (Doc. 545). Despite their previous insistence that discovery *must* go on and this case *must* continue to move forward, Plaintiffs had not conducted any of their own discovery in the four and half months since the scheduling order was entered (*see* Doc. 545, p. 7; Doc. 546, pp. 2, 3). Judge Yandle agreed to a slight extension and ordered written discovery to be served by October 15, 2020 and all fact discovery to be completed by December 15, 2020 (Doc. 549). Notably, Plaintiffs contemplated that the deadline for written discovery applied to requests for admission under Rule 36 (*see* Doc. 545, p. 4). Judge Yandle warned the parties that the deadlines would not be continued "absent extraordinary circumstances" (Doc. 549).

Plaintiffs issued two sets of Requests to Admit, the first on September 29 and the second on October 15, 2020, to each of the 22 class Defendants (*see* Docs. 550, 551, 554). In total, there were 178 Requests that required a response from each Defendant individually. It amounted to 3,916 Requests.[2] Defendants asked for and were granted a protective order and relieved of their obligation to respond to the Requests (Doc. 554). The undersigned concluded that Plaintiffs' shotgun approach was inappropriate. The number of Requests — 3,916 in total — was excessive, particularly at this stage of the proceedings after a massive amount of discovery had already been done. The Requests did not reflect the discovery already obtained, were not tailored to the specific Defendants, and were duplicative of discovery already obtained (Doc. 554).

---

[2] Plaintiffs also issued 41 interrogatories to each of the 22 Defendants and ten requests to produce (Doc. 550, p. 1). Defendants did not seek a protective order as to the interrogatories or requests to produce.

On December 15, 2020—the deadline for all fact discovery—Plaintiffs filed motions seeking another extension of the deadline for an unspecified duration so that they could conduct 32 additional depositions and issue to the 22 class Defendants against whom the class was certified a collective total of 925 revised Requests to Admit and 506 revised interrogatories (Doc. 558; Doc. 557).[3] Defendants filed responses in opposition to both motions (Docs. 561, 562). Plaintiffs filed a reply in support of their motion to extend the discovery deadline (Do. 564).

## DISCUSSION

"Scheduling orders and court-imposed deadlines matter." *Bowman v. Korte*, 962 F.3d 995, 998 (7th Cir. 2020). Rule 16 provides that "[a] schedule may be modified only for good cause and with the judge's consent." FED. R. CIV. P. 16(b)(4). "In making a Rule 16(b) good-cause determination, the primary consideration for district courts is the diligence of the party seeking amendment." *Alioto v. Town of Lisbon*, 651 F.3d 715, 720 (7th Cir. 2011) (citations omitted). Furthermore, Judge Yandle previously warned the parties that the discovery deadlines in this case were firm and would only be modified upon a showing of extraordinary circumstances (Doc. 549).

When it comes to discovery, the district court has wide discretion in settling disputes, determining the scope of discovery, and otherwise controlling the manner

---

[3] To the extent that Defendants take issue with Plaintiffs' updated Rule 26(a)(1) disclosures that were served on December 15, 2020 adding numerous potential class member witnesses (*see* Doc. 561), this issue is not properly before the Court. Defendants must file a motion at the appropriate time challenging these disclosures.

of discovery. *See, e.g., Thermal Design, Inc. v. American Soc'y of Heating, Refrigerating and Air–Conditioning Engrs., Inc.,* 755 F.3d 832, 839 (7th Cir. 2014) (citation and quotation omitted). There were a number of considerations the undersigned took into account in deciding the motions at issue. One the one hand, the undersigned is cautious about foreclosing any legitimate avenue of discovery prematurely and does not want to hamstring Plaintiffs in discovering relevant information necessary to prove their case. But by the same token, a district court has a duty, "of special significance in lengthy and complex cases where the possibility of abuse is always present," to supervise and limit discovery when it feels the discovery is cumulative, unnecessary, designed to annoy or harass, excessively expensive, or only marginally important. *Mr. Frank, Inc. v. Waste Mgmt., Inc.,* No. 80 C 3498, 1983 WL 1859, at *1 (N.D. Ill. July 7, 1983) (citations omitted). "The discovery rules are not a ticket . . . to an unlimited, never-ending exploration of every conceivable matter that captures an attorney's interest." *Robinson v. Stanley*, No. 06 C 5158, 2009 WL 3233909, at *3 (N.D. Ill. Oct. 8, 2009) (quoting *Vakharia v. Swedish Covenant Hosp.,* 1994 WL 75055 at *2 (N.D. Ill. 1994)). "Parties are entitled to a reasonable opportunity to investigate the facts—and no more." *Robinson*, 2009 WL 3233909, at *3 (quoting *Vakharia*, 2009 WL 3233909, at *3).

A massive amount of discovery has already taken place in this case. Plaintiffs have thus far issued a collective total of over 1,000 interrogatories to the 22 class Defendants (Doc. 550, p. 1 n.1, p. 3; Doc. 562, p. 3). Plaintiffs have issued over 60 requests to produce, and in response, Defendants have thus far turned over nearly 64,000 pages of documents (Doc. 550, p. 1 n.1, p. 3; Doc. 562, p. 3). Defendants have issued at least 500 of their own

interrogatories, as well as their own requests to produce. Additionally, more than a dozen putative class members have been interviewed and at least 50 others have submitted declarations (*see* Doc. 481-1). All 500-something Defendants have filled out a survey. And between the two sides, approximately 50 depositions have been taken (*see* Doc. 481-1, *see* Doc. 561, pp. 3, 7). The parties have also agreed that two more individual depositions will occur, as will a corporate representative deposition covering dozens of topics and subtopics (*see* Doc. 556-1). And, of course, the parties still anticipate expert discovery, which is currently on hold pending resolution of Defendants' appeal (Doc. 541).

Plaintiffs are now seeking to extend the deadline for fact discovery so they can conduct 32 more depositions and issue revised Requests to Admit that will require hundreds of individual responses (as well as issue a revised version of the interrogatories they already served but Defendants have not yet responded to). At no point did Plaintiffs ever indicate how much additional time they wanted or offer an estimate for how long they thought the additional discovery would take.

Plaintiff's last-minute wish list is eye-popping, given the timing of it and the extent of what they are seeking on top of the mountains of discovery already furnished. They did not articulate any extraordinary circumstances that justify extending the discovery deadline (*see* Docs. 557, 558, 564). Nor did Plaintiffs explain how they have been diligent in pursuing discovery (*see* Docs. 557, 558, 564). Indeed, from a review of the record, the Court would be hard pressed to see how Plaintiffs could reasonably argue that they have been diligent during the merits-based discovery period. As previously indicated, Plaintiffs conducted no discovery whatsoever for the first four and a half months after

the scheduling order was entered and had to request an extension of time. Then they waited until the last four days of the extended discovery period to tell Defendants they wanted to take 32 more depositions.

Notably, Plaintiffs did not serve Notices of Deposition, they simply told defense counsel via email they intended to conduct these depositions (Doc. 561-2, Doc. 561-3). Defense counsel responded via email and, of course, refused to agree to the request (Doc. 561-4). Plaintiffs' counsel then replied, indicating they "were somewhat surprised" by defense counsel's refusal but "given [the] objection, [they would] seek leave of the Court to conduct depositions of the witnesses [they] have identified" (*Id.*).[4] After the motions were fully briefed (Docs. 556–558, 561–564), one month went by before a hearing was held on the motions (Docs. 565, 567). During that time, Plaintiffs made no attempt to negotiate with Defendants and pare down their list, or reach some sort of compromise. They simply left it to the Court to sort out.

As for the revised Requests to Admit, Plaintiffs waited until two weeks before their extended deadline of October 15, 2020 to serve the bulk of their initial Requests (156 Requests), and then served twenty-two more on the deadline itself (*see* Docs. 550-1, 550-2). Defendants moved for a protective order, and Plaintiffs responded, arguing only that Defendants' motion should be denied (Doc. 551). Plaintiffs never asked for permission to amend and re-serve their Requests in the event the protective order was granted (*see* Doc. 551). And after the protective order was granted on December 4, 2020 (Doc. 554), Plaintiffs

---

[4] To the extent there were any other conversations between the parties before Plaintiffs filed their motions, the Court is unaware of them.

waited another eleven days—until the day of the discovery cut off—to ask for leave to serve revised Requests (Doc. 557). Again here, there is no indication that Plaintiffs made any effort to discuss or reach an agreement with Defendants regarding their desire to serve revised Requests before filing their motion or while awaiting the hearing (*see*, Docs. 557, 562).

In addition to Plaintiffs' dilatoriness and lack of exceptional circumstances, the Court also has concerns regarding the purpose of the additional discovery Plaintiffs want to conduct. It is not clear or obvious to the Court what the importance of the discovery is in resolving the issues. The volume of the last-minute discovery Plaintiffs seek is staggering. As Defendants pointed out, the 32 depositions Plaintiffs now want to take is more than ten times the number of depositions they noticed up during the entire merits-based discovery period from April 2020 to December 15, 2020 (Doc. 561, p. 5). And it is more than the total number of depositions Plaintiffs took—26—over the course of the entire case (*Id.*).

Additionally, Plaintiffs have long known about the individuals they want to depose. Twenty of those individuals are named as Defendants in the operative complaint but are not part of the group of 22 against whom the class was certified. Plaintiffs have known about some of these individuals since the inception of the case in March 2015 and others since at least October 2016, when the amended complaint was filed (*see* Docs. 1, 197). The other 12 individuals that Plaintiffs want to depose are IDOC medical officials. Plaintiffs have known that medical personnel were potential witnesses since April 2016, when Defendants filed their initial disclosures (Doc. 561-5). And Plaintiffs learned the

specific identity of these medical personnel on October 30, 2020 (Doc. 561, p. 7; *see* Doc. 561-4). That left Plaintiffs with 45 days until the discovery cutoff on December 15, 2020 to notice up the depositions. But they never did. Rather, Plaintiffs waited until four days before discovery cutoff to tell defense counsel that they wanted to depose the twelve medical officials and six of the individual Defendants (Doc. 561-2). And they waited until one day before the discovery cutoff to say that they wanted to schedule depositions for fourteen other Defendants (Doc. 561-3).

The Court was wholly unpersuaded by the reasons Plaintiffs gave as to why they waited until the eleventh hour to get the ball rolling on deposing these 32 individuals. Plaintiffs' main contention was there was a misunderstanding between the parties—they thought Defendants did not object to conducting depositions past the discovery deadline so long as the deponents had been identified before the discovery cut-off (Doc. 558). But that simply does nothing to explain why Plaintiffs waited until the waning hours of discovery to divulge their intention to depose these individuals when they could have done so much sooner. "[W]hen parties wait until the last minute to comply with a deadline, they are playing with fire." *Spears v. City of Indianapolis,* 74 F.3d 153, 157 (7th Cir. 1996).

As another example, at one point, Plaintiffs' counsel remarked that discovery has proceeded in phases and "until recently" it was focused on class certification issues. But discovery related to class certification was *long* over by the time Judge Yandle entered the

scheduling order officially commencing merits-based discovery on April 14, 2020.[5] It is unclear how anything related to class-certification discovery could have impeded or distracted from merits-based discovery. Plaintiffs' counsel also lamented that defense counsel disclosed all 500-something Defendants as potential witnesses and never tried to pare down that list. The irony of this finger pointing is not lost on the Court. Plaintiffs, of course, are the ones who sued 500-something defendants in the first place. They have the power to narrow the list of potential Defendant-witnesses anytime they want by simply dismissing some of those individuals. In short, Plaintiffs did not provide any good reason why they could not have sought to depose these 32 individuals sooner.

Plaintiffs also did not give the Court any reason to think that all 32 depositions were necessary. The most they could offer is that they were "trying to avoid trial by ambush." But it is clear that Plaintiffs are not completely in the dark as to what these individuals will testify about. As defense counsel pointed out, Plaintiffs have received medical records as well as surveys from each of the 500-something Defendants regarding their personal recollections of the shakedowns. Simply put, when Plaintiffs were specifically asked why these depositions were necessary and what new information they hoped to gain, they offered one generality, without any concrete reasons or specifics.

Finally, Plaintiffs never tried to negotiate with defense counsel or propose a

---

[5] As far as the Court can tell, discovery related to class certification was complete by the time Plaintiffs filed their motion for Class certification on October 12, 2018 (*see* Doc. 481, Doc. 481-1, Doc. 486, Doc. 491). The motion was fully briefed by December 2018 (*see* Doc. 503). It is not clear, and Plaintiffs did not explain, whether there was any discovery related to class certification that remained outstanding after the briefing was completed (*see* Doc. 558).

number of depositions less than 32. And they never gave the Court a compromise position either. Once again, Plaintiffs have taken an all or nothing approach to this particular discovery issue (*see* Doc. 554).

As for the revised Requests to Admit, Plaintiffs want to serve 37 Requests on all 22 Defendants, as well as, three additional Requests for each of the four facilities on only "the sub-set of Defendants likely to have knowledge about that specific facility" (as Plaintiffs put it) (Doc. 557, p. 3). All in all, it amounts to a collective total of 925 Requests to Admit.[6] As outlined above, Plaintiffs were not particularly diligent in seeking to issue their original Requests to Admit or the revised version. And the Court has concerns regarding the form of these Requests and whether they will actually serve a useful purpose.

When used properly, "Rule 36 allows parties to narrow the issues to be resolved at trial by effectively identifying and eliminating those matters on which the parties agree." *United States v. Kasuboski,* 834 F.2d 1345 (7th Cir. 1987); *see also, e.g.,* 8A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2256 (3d ed.) ("[T]he purpose of the rule . . . was and is to eliminate from controversy matters that will not be disputed."). "Essentially, Rule 36 is a time-saver, designed 'to expedite the trial and to relieve the parties of the cost of proving *facts that will not be disputed at trial.*'" *Perez v. Miami-Dade Cty.,* 297 F.3d 1255, 1268 (11th Cir. 2002) (emphasis in original) (citation excluded); *accord Tamas v. Family Video Movie Club, Inc.,* 301 F.R.D. 346, 347 (N.D. Ill. 2014).

---

[6] Some of the Requests may lend themselves to a collective answer from Defendants, but many of the Requests require individual responses, which Plaintiffs' counsel acknowledged at the hearing.

The Court begins by noting that Plaintiffs have cleaved away three-quarters of the Requests they originally served. They went from a collective total of 3,916 Requests to a revised collective total of 925. Defendants assert the revised number is still excessive (Doc. 562). Rule 36 does not limit the number of requests that can be served, *see* FED. R. CIV. P. 36, however, "[c]ourts 'routinely disallow requests for admission that run into the hundreds on the grounds that they are abusive, unreasonable, and oppressive." *Tamas v. Family Video Movie Club, Inc.*, 301 F.R.D. 346, 347 (N.D. Ill. 2014) (citation omitted). While 925 is certainly a lot, the Court is not necessarily convinced that it is *per se* excessive given the number of Defendants and the nature of the claims. However, there are other problems with Plaintiffs' Requests.

Plaintiffs have been adamant in their briefs and at the hearing that the purpose of their Requests is to take uncontested issues of fact off the table at trial (*see, e.g.*, Docs. 557, 551). But that assertion does not hold water for many of the Requests. For instance, Plaintiffs issued a number of Requests pertaining to portable video equipment, photographs, preservation of video footage (*see* Doc. 557-1). These issues are also the subject of interrogatories that Plaintiffs served (*see, e.g.*, Doc. 557-2) and topics included for discussion during the Rule 30(b)(6) corporate representative deposition (Doc. 556-1), which demonstrates Plaintiffs do not yet know all the facts concerning these issues. Therefore, the purpose of these Requests is to gather information, and they are just one of several tactics Plaintiffs are using as part of a discovery sweep to get that information. This is not the proper use of Requests to Admit. Requests to Admit are intended to

confirm facts already known to both sides.[7]

Plaintiffs also want to serve other Requests they cannot seriously or reasonably expect to be admitted, and which therefore cannot possibly serve to eliminate an uncontested issue. Generally speaking, requests about controversial or disputed issues are permissible. *See* Fed. R. Civ. P. 36(a)(5). However, courts in some instances have declined to compel a party to respond to requests to admit that seek information related to the fundamental disagreement of the lawsuit, perceiving it to be "a useless exercise." *Sommerfield v. City of Chicago*, 251 F.R.D. 353, 356 (N.D. Ill. 2008) (citing *Vakharia v. Swedish Covenant Hospital*, 1994 WL 75055 at *7 (N.D. Ill. 1994)).[8]

Here, for example, Defendants ask nine Defendants, including Greg Gossett (who was the warden at Illinois River at the time of the shakedowns at issue), to admit "there were fixed-position video cameras installed at Illinois River in 2014 recording areas of the prison that would have captured all or part of the events of the April 2014 Shakedowns at Illinois River" (Doc. 557-1, no. 42). However, Gossett clearly and unequivocally

---

[7] 8B FEDERAL PRACTICE AND PROCEDURE § 2253 ("Strictly speaking Rule 36 is not a discovery procedure at all, since it presupposes that the party proceeding under it knows the facts or has the document and merely wishes its opponent to concede their genuineness."); 7 MOORE'S FEDERAL PRACTICE § 36.02[2] (3d ed. 2000) ("Because Rule 36 was not designed to elicit information, to obtain discovery of the existence of facts, or obtain production of documents, requests for admission should not be used as a method of discovery for those purposes."). *See also, e.g., Tamas*, 301 F.R.D. at 347 ("Rule 36 is not a discovery procedure.").

[8] *See also Tamas v. Family Video Movie Club*, 301 F.R.D. 346, 347 (N.D. Ill. 2014) (excusing the plaintiffs from responding to requests to admit because, in part, the requests sought information related to the fundamental disagreement of the lawsuit and were therefore not "designed to identify and eliminate those matters on which the parties agree"); Colin E. Flora, *It's A Trap! The Ethical Dark Side of Requests for Admission*, 8 ST. MARY'S J. LEGAL MAL. & ETHICS 2, 32 (2017) ("When the matter is clearly subject to a good faith dispute—such that no reasonable party would admit—the good-faith obligation dictates that requests not be sought.")

testified at his deposition that there were *no* video cameras in the cellhouse or anywhere in the facility at the time of the shakedowns (Doc. 562, p. 4; Doc. 562-4). Defendant David White also testified that he was not aware of any video cameras at Illinois River (Doc. 562, p. 4; Doc. 562-5). Plaintiffs never gave the Court any reason to believe there was other evidence tending to show that there *were* cameras at Illinois River. Likewise, nine of the revised Requests begin: "Admit that the plan for the 2014 Shakedowns created by Defendants White and McAllister called for members of the Tact Team to . . . . " (*see* Doc. 557-1, pp. 2–3). Whether such a plan existed is one of the central disputes in this case. And Defendants have repeatedly and vociferously denied there was a plan; they have also thoroughly explained the reasons for their denial (Doc. 562, p. 5; Doc. 491, pp. 3, 15–17).

For these example Requests, it appears to the Court that Plaintiffs are not trying to narrow issues for trial but are instead just duplicating discovery already conducted. Plaintiffs have not shown there is anything to be gained from posing such Requests. They will not serve the ultimate purpose of the Rule or lead to useful information that Plaintiffs do not already have (or are simultaneously seeking to gain through other means). They will only serve to drive up costs and extend an already protracted discovery campaign.

Furthermore, many of the revised Requests, like the originals, are not tailored in any manner. One of the court's main criticisms of the original Requests was that they were not tailored to any specific Defendant—the exact same 178 requests were issued to all 22 Defendants (*see* Doc. 554). In their revised version, Plaintiffs heeded the Court's criticism for 12 of its Requests—they posed the same three Requests as to each of the four

facilities at issue to only "the sub-set Defendants likely to have knowledge about that specific facility." (*see* Doc. 557-1, no. 38–49). Plaintiffs did not, however, heed the Court's critique as to other Requests and left them completely untailored (*see id.*, no. 1–28).

The first seven revised Requests pertain to Defendants' authority to record or photograph the shakedowns and to preserve the footage (Doc. 557-1). They ask about the "2014 Shakedowns" generally (*see id.*). For example, Request #4 asks all 22 Defendants to admit that they "had the authority to order that portable video camera equipment be utilized to record any portion of the 2014 Shakedowns" (Doc. 557-1, no. 4; *see also* 1–3, 5–7). Plaintiffs are asking all 22 Defendants to admit that they had authority to issue orders as to every facility at issue. But 17 of the 22 Defendants were officials at *only one* facility. That is, they were wardens, assistant wardens, tact commanders, and assistant tact commanders at Menard, Illinois River, Big Muddy, *or* Lawrence. There is no indication these individuals had authority to issue orders at facilities other than the one where they worked. Thus there is no reason to think, for example, that the assistant warden at Illinois River had any authority to issue orders at Menard. Consequently, a significant majority of the Defendants will not be able to simply admit or deny this Request, or other similar Requests, without qualification or explanation.[9]

Another category of the revised Requests asks about the facts of how the shakedowns were conducted, such as staffing levels, how strip searches were conducted,

---

[9] *E.g., Sommerfield*, 251 F.R.D. at 355 ("[R]equests for admission must be simple, direct and concise so they may be admitted or denied with little or no explanation or qualification.") (citation omitted); 8B FEDERAL PRACTICE AND PROCEDURE § 2258 ("Each request for an admission should be phrased simply and directly so that it can be admitted or denied without explanation.")

how prisoners were handcuffed, how the prisoners were lined up and moved through the facility, *etc.* (Doc. 557-1). Plaintiffs originally issued separate requests about each aspect of the shakedowns as to each facility (*see* Doc. 550-1). But in an effort to reduce the overall number of Requests, Plaintiffs combined their singular requests about the shakedown at each facility into one request about the "2014 Shakedowns" generally (*see id.*). For example, revised Request #10 asks Defendants to "admit that, during the 2014 Shakedowns, members of the Tact Team shouted and used their batons to bang on bars and railings as they entered the housing unit." (Doc. 557-1, no. 10; *see also* no. 1–9, 12, 14, 16, 18, 20, 21, 24, 26, 28). Plaintiffs are asking all 22 Defendants about the facts of every shakedown at every facility at issue. But, again, 17 of the 22 Defendants were officials at *only one facility*. They did not oversee and were not present for the shakedowns at facilities other than the one they worked at. By asking, for example, officials from Illinois River, Big Muddy, and Lawrence about events that occurred at Menard, Plaintiffs are essentially doing nothing more than asking those officials to affirm testimony made by other witnesses (namely, officials from Menard) during their depositions. There are cases that hold this type of request to admit is permissible,[10]  while other cases come to the opposite

---

[10] *See generally T. Rowe Price Small-Cap Fund, Inc. v. Oppenheimer & Co.*, 174 F.R.D. 38, 43 (S.D.N.Y. 1997) ("[U]nder certain circumstances, parties may be required to inquire of third parties in order to properly respond to requests to admit, such a requirement is far from absolute."). *See also Odom v. Roberts*, No. 5:19-CV-253-MCR/MJF, 2020 WL 6882944, at *4 (N.D. Fla. Nov. 9, 2020) ("A reasonable inquiry generally includes requesting information from co-defendants and their counsel.  A review of a deposition transcript also would be part of a 'reasonable inquiry.'") (citations omitted); *Uniden Am. Corp. v. Ericsson Inc.*, 181 F.R.D. 302, 304 (M.D.N.C. 1998) ("[A] party must make inquiry of a third party when there is some identity of interest manifested, such as by both being parties to the litigation, a present or prior relationship of mutual concerns, or their active cooperation in the litigation, and when there is no manifest or potential conflict between the party and the third party. Also, if the third party has spoken to the matter in a deposition, a party can be compelled via Rule 36 to admit or deny, that is, to indicate whether it will

conclusion.[11]

Here, the Court still does not understand what purpose it serves to ask all 22 Defendants to admit what happened at each facility. Plaintiffs did not offer any satisfactory explanation. They argued at the hearing that having only some of the Defendants respond "doesn't advance the ball for us . . . that's an imperfect admission. . . . It doesn't take the issue off the table." According to Plaintiffs, the Defendants who did not respond are not bound by the admissions, and they could come to trial and testify to the contrary. But Plaintiffs' argument is unconvincing at this stage in the litigation. For one thing, we don't yet know whether this case will be tried as a class action or not. And even if all 22 Defendants against whom the class is served admit a Request, there are still some 500 other Defendants still in this case who will not be bound by the responses.

---

introduce contrary evidence."); *A. Farber & Partners, Inc. v. Garber,* 237 F.R.D. 250, 256 (C.D. Cal. 2006) (defendants had to consult with one another in order to satisfy reasonable inquiry requirement where they all had close personal and business relationship with each other, were represented by the same counsel, and had common interest against the plaintiff); *In re Gulf Oil/Cities Serv. Tender Offer Litig.,* Nos. 82 Civ. 5253, 87 Civ. 8982(MBM), 1990 WL 657537, at *3–4 (S.D.N.Y. May 2, 1990) (finding plaintiff must consult non-party's' counsel regarding figures in documents produced by non-party, where plaintiff and non-party have parallel interests and have been closely cooperating in conducting discovery in two related cases); *Al–Jundi v. Rockefeller,* 91 F.R.D. 590, 594–95 (W.D.N.Y. 1981) (defendant must consult with co-defendants and their counsel, where such efforts do not require extraordinary expense or effort).

[11] *See Reitz v. Creighton,* No. 15 C 1854, 2019 WL 5798680, at *2–3 (N.D. Ill. Nov. 7, 2019) (requests to admit asking defendant to admit what other co-defendants did or saw were not proper and defendant did not have to review co-defendants' deposition transcripts in order to satisfy reasonable inquiry requirement; "it is unnecessary to demand a party admit or deny what is contained in a deposition."); *Knapp v. Cate,* No. 1:08-CV-01779-AWI, 2012 WL 2912254, at *2 (E.D. Cal. July 16, 2012) (issuing protective order and excusing defendants from responding to requests to admit about incidents they were not involved in); *Hanley v. Como Inn, Inc.,* No. 99 C 1486, 2003 WL 1989607, at *4 (N.D. Ill. Apr. 28, 2003) (defendant not required to consult with co-defendants in order to make a reasonable inquiry when they did not have an amicable relationship); *T. Rowe Price,* 174 F.R.D. at 43 (defendant cannot be forced to admit or deny facts testified to by a third party witness when about which defendant has no personal knowledge about the matter, there may be other evidence on the matter and defendant has reason to believe the third party may have interests adverse or hostile to defendant's).

Therefore, it cannot be determined at this point what effect an admission from all 22 class Defendants will actually have on issues at trial.

Second, Plaintiffs' fear about the consequence of not having all 22 Defendants respond appears to be overblown. For example, if the officials from Menard (and higher-level administrators responsible for supervising the shakedowns) admit that the tact team shouted and banged their batons as they entered the cellhouse at Menard, then it is a virtual certainty the warden from Lawrence—who was not present for nor involved in the shakedowns at Menard—is not going to be called to offer contrary testimony. *See* FED. R. EVID. 602 (requiring a witness to have personal knowledge of the matters to which he testifies).

In considering the totality of the circumstances, particularly Plaintiffs' unexplained dilatoriness in pursuing their Requests to Admit, the lack of exceptional circumstances, and the myriad problems with the revised Requests, Plaintiffs' motion for leave to serve them must be denied.[12]

As previously stated, the undersigned does not endeavor to hamstring Plaintiffs in their ability to prove their case. The Court probed and probed to get to the heart of the matter and fully understand Plaintiffs' reasons for wanting to conduct 32 depositions and issue hundreds of Requests to Admit. None of the explanations Plaintiffs offered for their extraordinary discovery request passed muster.

---

[12] The parties addressed the revised Requests to Admit only generally and collectively, and so the Court likewise will not individually address the revised Requests to determine whether any of them are appropriate to be served as is.

That being said, there is an obvious benefit to eliminating uncontested issues of fact and reducing the time spent in trial. The Court is therefore willing to entertain a request for leave to serve Requests to Admit from either side after fact discovery is fully complete. Any such Requests must be carefully drafted—simple, straightforward, and precise—must reflect the evidence produced in the case, and must be directed *only* at the appropriate parties. To the extent Requests are directed at all Plaintiffs or all Defendants, counsel must have a clear and defensible reason for doing so.

As a final matter, the parties are instructed that before filing any future motions about discovery disputes, they are expected to engage in the meet and confer process outlined in the undersigned's case management procedures. Namely, the parties must, in good faith, confer or attempt to confer with one another regarding the dispute. A good faith effort means more than simply an exchange of letters or e-mails. It means the parties have attempted to resolve the dispute through a telephone call or a video conference. And in this instance, the Court would encourage the parties to engage in a video conference to enhance the dialogue and communication between the parties. Simply put, the parties are expected to have actually spoken to one another about the issue in dispute. Any future discovery motion that does not satisfy this meet and confer process will be summarily denied.

Additionally, the parties are further cautioned that, for any future discovery disputes in this case, the Court will consider imposing attorney fees and costs against the non-prevailing party.

Plaintiffs' Motion for Leave to Serve Revised Requests to Admit (Doc. 557) and

Motion for Extension of Time to Complete Discovery as to Certain Specified Items (Doc. 558) are **DENIED**.


**IT IS SO ORDERED.**

**DATED: February 18, 2021**

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**
