## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DEMETRIUS ROSS, et al., on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GREG GOSSETT, et al., <br><br> Defendants. | Case No. 15-cv-0309 <br><br> Hon. Staci M. Yandle |

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### AND MEMORANDUM OF LAW IN SUPPORT

Dated: May 22, 2024

KWAME RAOUL
Attorney General of Illinois

Emma Steimel
Assistant Attorney General
115 S. LaSalle Street
Chicago, IL 60603
(312) 814-5163
emma.steimel@ilag.gov

*Counsel for Defendants*

Joseph N. Rupcich
Joy C. Syrcle
Special Assistant Attorneys General
Cassiday Schade LLP
2040 W. Iles, Suite B
Springfield, IL 62704
(217) 572-1714
jrupcich@cassiday.com
jsyrcle@cassiday.com

*Counsel for Supervisory Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF MATERIAL FACTS ............................................................................. 2

      A.      The Department's Search Policies ......................................................... 2

      B.      The 2014 Searches ................................................................................. 8

      C.      The Supervisory Defendants and Their Roles in the Searches ............. 12

      D.      These Proceedings ................................................................................. 25

LEGAL STANDARD ........................................................................................................ 29

ARGUMENT ..................................................................................................................... 30

I.      Summary Judgment Is Proper As To The Supervisory Defendants On Plaintiffs' Eighth Amendment Claims. ............................................................................ 31

      A.      There Is No Evidence Of A Uniform Plan To Violate Plaintiffs' Rights. ............. 33

            1.      The facility-wide searches, which were conducted pursuant to Department policy and procedure, did not violate plaintiffs' Eighth Amendment rights. ................................................................. 33

            2.      There is no evidence of a clandestine uniform plan to violate plaintiffs' rights. ............................................................................. 39

      B.      There Is No Evidence Each Supervisory Defendant Personally Participated In Such A Plan. ................................................................... 45

II.      Summary Judgment Is Proper As To Most Of The Non-Supervisory Defendants On Plaintiffs' Eighth Amendment Claims. ...................................................... 47

III.      Summary Judgment Is Required On Other Grounds. ...................................... 48

      A.      Plaintiffs' Damages Claims Are Barred By Qualified Immunity. ......... 49

      B.      Any Official-Capacity Claims Fail For Lack Of Standing And On The Merits. .... 50

      C.      Plaintiffs' IIED Claims Are Barred By Sovereign Immunity And Fail On The Merits. ................................................................................. 52

IV.      In The Alternative, The Court Should Grant Partial Summary Judgment As To Aspects of Plaintiffs' Eighth Amendment Claims. ...................................................... 55

CONCLUSION..................................................................................................................57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ames v. Stigler*,
2009 WL 9097015 (N.D. Ill. Sept. 3, 2009) ........................................................35, 38, 50

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................................................................................................30

*Beal v. Foster*,
803 F.3d 356 (7th Cir. 2015) ......................................................................................44

*Bell v. PNC Bank*,
800 F.3d 360 (7th Cir. 2015) .................................................................................33, 47

*Benton v. Little League Baseball, Inc.*,
181 N.E.3d 902 (Ill. App. 2020) .................................................................................54

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................................................................................................45

*Chairs v. Ill. Dep't of Corr's*,
2022 WL 3716170 (S.D. Ill. Aug. 29, 2022) ...............................................................35

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)......................................................................................................51

*Curiel v. Stigler*,
2008 WL 904894 (N.D. Ill. Mar. 31, 2008)................................................35, 38, 39, 50

*DeWalt v. Carter*,
224 F.3d 607 (7th Cir. 2000) ......................................................................................44

*Driftless Area Land Conservancy v. Valcq*,
16 F.4th 508 (7th Cir. 2021) .......................................................................................52

*Farmer v. Brennan*,
511 U.S. 825 (1994)....................................................................................................38

*Feltmeier v. Feltmeier*,
798 N.E.2d 75 (Ill. 2003) .......................................................................................54, 55

*Frazier v. Ill. Dep't of Corr's*,
2023 WL 6276040 (S.D. Ill. Sept. 26, 2023).................................................................39

*Green v. State,*
    229 N.E.3d 387 (Ill. App. 2023) ...................................................................54

*Haywood v. Hathaway,*
    842 F.3d 1026 (7th Cir. 2016) (per curiam)..............................................32, 45

*Healy v. Vaupel,*
    549 N.E.2d 1240 (Ill. 1990) ..................................................................53, 54

*Hernandez v. Battaglia,*
    673 F. Supp. 2d 673 (N.D. Ill. 2009) ..............................................35, 38, 50

*Hill v. Shelander,*
    924 F.2d 1370 (7th Cir. 1991) ...............................................................48, 50

*Hope v. Pelzer,*
    536 U.S. 730 (2002)...............................................................................36, 37

*Hudson v. McMillian,*
    503 U.S. 1 (1992).........................................................................................36

*Lawrence v. Kenosha Cnty.,*
    391 F.3d 837 (7th Cir. 2004) .......................................................................30

*Leiser v. Kloth,*
    933 F.3d 696 (7th Cir. 2019) .......................................................................49

*Lunsford v. Bennett,*
    17 F.3d 1574 (7th Cir. 1994) .......................................................................39

*Miller v. Smith,*
    220 F.3d 491 (7th Cir. 2000) ...............................................................48, 50

*Modrowski v. Pigatto,*
    712 F.3d 1166 (7th Cir. 2013) ...........................................................45, 46, 48

*O'Leary v. Iowa State Men's Reformatory,*
    79 F.3d 82 (8th Cir. 1996) ...........................................................................39

*Parker v. Jefferys,*
    2020 WL 3413000 (S.D. Ill. June 22, 2020).................................................51

*Parmar v. Madigan,*
    106 N.E.3d 1004 (Ill. 2018)..........................................................................54

*Pearson v. Callahan,*
    555 U.S. 223 (2009)......................................................................................49

*Perkins v. Pfister*,
711 F. App'x 335 (7th Cir. 2017) ..................................................................36

*Reichle v. Howards*,
566 U.S. 658 (2012)..................................................................................49, 50

*Rhodes v. Chapman*,
452 U.S. 337 (1981)..........................................................................................39

*Ross v. Gossett*,
33 F.4th 433 (7th Cir. 2022) ................................................................... *passim*

*Servicios Especiales Al Comercio Exterior v. Johnson Controls, Inc.*,
791 F. Supp. 2d 626 (E.D. Wis. 2011)............................................................55

*Spivey v. Doria*,
1994 WL 97756 (N.D. Ill. March 24, 1994).....................................................39

*Steen v. Myers*,
486 F.3d 1017 (7th Cir. 2007) ........................................................................30

*Stewart v. McGinnis*,
5 F.3d 1031 (7th Cir. 1993) .......................................................................51, 52

*Stockton v. Milwaukee Cnty.*,
44 F.4th 605 (7th Cir. 2022) .........................................32, 33, 45, 46, 47, 48

*T.S. v. Cook Cnty.*,
67 F.4th 884 (7th Cir. 2023) .....................................................................53, 54

*Walsh v. Dayemi Org.*,
608 F. Supp. 3d 715 (S.D. Ill. 2022)................................................................30

*Whitman v. Nesic*,
368 F.3d 931 (7th Cir. 2004) .......................................32, 34, 37, 41, 42, 44, 45

*Wilson v. Seiter*,
501 U.S. 294 (1991)..........................................................................................39

**Statutes, Rules, and Other Authorities**

Federal Rule of Civil Procedure 56 ........................................................29, 55

705 ILCS 505/8..................................................................................................53

Ill. Dep't of Corrections, *Individual in Custody Search*,
https://idoc.illinois.gov/offender/inmatesearch.html .....................................51

## INTRODUCTION

The Illinois Department of Corrections has long had robust policies that govern searches at its facilities and ensure its penological goals are met while minimizing intrusions on inmates' privacy.  In the spring of 2014, the Department initiated a series of facility-wide searches at correctional facilities across the State.  The searches were designed to sweep for contraband—weapons, drugs, and more—and succeeded in those aims, identifying contraband and securing the integrity of the Department's facilities.

Plaintiffs are current and former inmates at four of these facilities.  They allege in this class action that something went wrong: that the searches at these four facilities were not conducted in a manner that furthered the Department's penological goals but were instead intentionally designed and executed to inflict cruelty.  Indeed, plaintiffs' argument is more expansive still:  They argue not that there were isolated deviations from Department policy during the four facility-wide searches, but that the senior leadership of the Department and the facilities in question designed and executed a uniform plan intentionally intended to "inflict unnecessary pain and humiliation on prisoners housed at these four prisons." Doc. 481 at 1.  Plaintiffs name 22 supervisory and over 400 non-supervisory Department employees as defendants. They obtained class certification as to their Eighth Amendment claims against the 22 supervisory defendants on that theory, and the Seventh Circuit affirmed, explaining that, on remand, the plaintiffs would be required to show that the searches "were conducted pursuant to the uniform plan as they describe it and that those plans were themselves unconstitutional." *Ross v. Gossett*, 33 F.4th 433, 442 (7th Cir. 2022).

After seven years of discovery, including almost 100 depositions, plaintiffs have identified no evidence of a uniform plan to violate inmates' rights—no single document, no statement from any defendant, nothing except plaintiffs' own statements that they recall certain conduct occurred in a way they maintain was consistent across these four facilities.  The argument is badly flawed

1

and cannot justify sending plaintiffs' claims to a jury.  Defendants hereby move for summary judgment under Federal Rule of Civil Procedure 56.

**STATEMENT OF MATERIAL FACTS[1]**

**A.      The Department's Search Policies**

1.      This case concerns the constitutionality of facility-wide searches conducted in the spring and summer of 2014 at four IDOC correctional facilities: Menard, Illinois River, Big Muddy, and Lawrence Correctional Centers.  Doc. 197 ("Compl.") at 29-35 (¶¶ 40-60).

2.      Department staff search inmates' cells at IDOC facilities regularly to ensure that inmates cannot hide contraband, including weapons and drugs.  Yurkovich Dep. Tr. 54:8-12, 101:17-13, 105:2-106:9 (Def. Ex. A); Admin. Dir. 05.01.111 (Def. Ex. B); Expert Report of Larry Reid ("Reid Rep.") at 13-14 (¶¶ 15-16) (Def. Ex. C); D. White Dep. Tr. 71:5-72:7 (Def. Ex. D); *see also* Sarver Decl. ¶ 2 (Def. Ex. ZZ).

3.      Because cell-by-cell searches permit inmates to hand off contraband to one another when they realize such searches are impending, the Department also conducts facility-wide searches, in which entire IDOC facilities or portions thereof are placed into lockdown while staff search *every* cell, one by one.  Gossett Dep. Tr. 45:19-48:14 (Def. Ex. E); Yurkovich Dep. Tr. 93:13-94:16; 304:14-305:3 (Def. Ex. A); Reid Rep. 13-14 (¶¶ 15-16) (Def. Ex. C); Bordner Dep. Tr. 28:3-29:11 (Def. Ex. F); Jennings Dep. Tr. 221:18-222:17 (Def. Ex. G).

4.      Contraband includes any unlawful substance in an inmate's cell, including drugs, weapons, metal, any item that belongs to another inmate, and any item that has been altered from its original state.  Bordner Dep. Tr. 97:3-11 (Def. Ex. F).

5.      Facility-wide searches serve multiple penological purposes.  Reid Rep. 13-14

---

[1] These facts are undisputed by defendants for purposes of this summary judgment motion only.

(¶¶ 15-16) (Def. Ex. C); Yurkovich Dep. Tr. 304:14-305:3 (Def. Ex. A).

6.     Facility-wide searches are a more effective tool than cell-by-cell searches for locating contraband (including weapons and drugs), because inmates cannot hand contraband to one another during a facility-wide search.  Reid Rep. 13-14 (¶¶ 15-16) (Def. Ex. C); Yurkovich Dep. Tr. 304:14-305:3 (Def. Ex. A).

7.     Facility-wide searches are also a useful tool for obtaining intelligence about gang activity, both by locating evidence of gang associations left behind in cells and by interrogating inmates during lockdown periods.  Reid Rep. 13-14 (¶¶ 15-16) (Def. Ex. C); Jennings Dep. Tr. 272:3-25 (Def. Ex. G); Yurkovich Dep. Tr. 94:11-16, 101:15-102:14 (Def. Ex. A).

8.     The purposes of facility-wide searches are achieved primarily by detaining inmates in a holding area while Department staff search the facilities on a cell-by-cell basis.  *See* Reid Rep. 38 (¶ 55) (Def. Ex. C); Jennings Dep. Tr. 272:3-25 (Def. Ex. G); A. McAllister Dep. Tr. 231:7-10 (Def. Ex. H).

9.     It is a "common practice" across the United States to conduct facility-wide searches to "ensure that facilities are free from dangerous contraband and as safe as possible for inmates and staff."  Reid Rep. 15-16 (¶ 18) (Def. Ex. C); Hurley Dep. Tr. 66:7-12, 67:1-3 (Def. Ex. WW).

10.    In Illinois, facility-wide searches are generally handled by an IDOC unit known as the "tact team" (or tactical team).  Gossett Dep. Tr. 38:1-7, 45:19-48:14 (Def. Ex. E); D. White Dep Tr. 35:20-36:1 (Def. Ex. D); Yurkovich Dep. Tr. 44:18-21 (Def. Ex. A).

11.    Tact team members are responsible for handling particularly complex situations within the Department, including riots, escapes, and forcible cell extractions.  Gossett Dep. Tr. 38:1-7 (Def. Ex. E); Tact Manual Excerpts, Bates 14795 (Def. Ex. I); Sarver Dep. Tr. 35:11-36:12

(Def. Ex. J); Yurkovich Dep. Tr. 43:11-45:4 (Def. Ex. A); *see also* Sarver Decl. ¶ 2 (Def. Ex. ZZ).[2]

12.     Tact team members are specifically selected for their ability to handle emergency situations and are required to participate in additional training both at the outset of their service and on an ongoing basis.  Tact Manual Excerpts, Bates 14795-96 (Def. Ex. I); Gossett Dep. Tr. 33:8-34:18 (Def. Ex. E); Yurkovich Dep. Tr. 43:11-19 (Def. Ex. A).

13.     The Department has developed and communicated policies and procedures to guide searches at IDOC facilities, including facility-wide searches. Adams Dep. Tr. 18:6-19:3; 27:13-28:4; 28:18-30:5 (Def. Ex. K).

14.     For instance, during the period in question, Menard had a policy that dictated how officers should conduct strip searches of inmates.  Menard Inst. Dir. 05.01.109 at 10 (Def. Ex. L); *see also* Sarver Decl. ¶ 2 (Def. Ex. ZZ).

15.     Menard's strip-search policy directs officers to conduct strip searches beginning with an inmate's head and proceeding downward to his feet and instructs them not to conduct strip searches with members of the opposite gender present.  Menard Inst. Dir. 05.01.109 at 10-12 (Def. Ex. L); Stark Dep. Tr. 39:17-20 (Def. Ex. M).

16.     The Menard strip search policy mirrors the Department procedure more generally, in that the Department trains staff beginning at cadet training about how to conduct strip searches of inmates in the same manner as the Menard policy—*i.e.*, officers conduct strip searches from the

---

[2] The "tact manual" was originally produced attorneys'-eyes-only ("AEO") under the confidentiality order entered by the Court. *See* Doc. 358.  Defendants have now agreed that certain pages can be filed on the public docket, which are filed here as Defendants' Exhibit I.  Similarly, although defendants initially produced the "operations orders" that governed the searches in this case AEO, defendants now agree that the orders can be filed on the public docket; they are filed here as Defendants' Exhibits FF, GG, HH, II, and JJ.  Finally, consistent with their treatment of these documents, defendants have filed unredacted deposition transcripts on the public docket, given that the only portions of those transcripts that were designated AEO were so designated because they discussed documents that have now been filed on the public docket in relevant part.

head to the feet.  D. White Dep. Tr. 136:13-137:10 (Def. Ex. D); Yurkovich Dep. Tr. 149:24-150:13, 304:7-13 (Def. Ex. A); A. McAllister Dep. Tr. 150:22-151:12, 344:4-19 (Def. Ex. H); Gilreath Dep. Tr. 169:4-9 (Def. Ex. N) ; Jennings Dep. Tr. 229:5-230:16, 231:20-23, 234:13-18, 235:1-12 (Def. Ex. G); Adams Dep. Tr. 19:13-19; 45:15-20 (Dep. Ex. K); C. White Dep. Tr. 86:6-87:23 (Def. Ex. O); Finney Dep. Tr. 93:8-95:10 (Def. Ex. P).

17.     The Department does not permit female officers to be present during strip searches of male inmates (and vice versa), absent an emergency.   Menard Inst. Dir. 05.01.109 at 10 (Def. Ex. L); Bordner Dep. Tr. 63:20-64:16 (Def. Ex. F); Butler Dep. Tr. 65:8-17 (Def. Ex. Q); Arnett Dep. Tr. 70:6-12 (Def. Ex. R); Duncan Dep. Tr. 74:19-75:19 (Def. Ex. S).

18.     When circumstances require that inmates be moved in large numbers, Department policy requires officers to move inmates in pairs, with their heads down, and in a tight formation. Jones Dep. Tr. 103:9-15 (Def. Ex. T); Yurkovich Dep. Tr. 272:4-17 (Def. Ex. A); Bordner Dep. Tr. 69:14-19, 70:13-71:2 (Def. Ex. F); Butler Dep. Tr. 67:17-68:6 (Def. Ex. Q).

19.     The Department's movement policy ensures the safety of both the inmates and Department staff:  It ensures that inmates are looking at the ground in front of them while also minimizing the overall size of the group of inmates, thus maximizing IDOC officers' ability to control line movement.  Reid Rep. 34-36 (¶¶ 51-53) (Def. Ex. C); Bordner Dep. Tr. 71:20-72:2, 73:12-18 (Def. Ex. F).

20.     Requiring individuals to keep their heads down also creates a more secure environment by making it more difficult for inmates to communicate with each other and to assault each other (if, for instance, one believes another was the "snitch" that precipitated the search). Atchison Dep. Tr. 126:8-16, 127:8-14 (Def. Ex. U); Bordner Dep. Tr. 79:4-80:8 (Def. Ex. F); Yurkovich Dep. Tr. 272:9-17 (Def. Ex. A).

21.     During facility-wide searches, the Department's general policy is to handcuff inmates during movements with their hands behind their back, palms facing out.  Yurkovich Dep. Tr. 302:14-20 (Def. Ex. A); Gossett Dep. Tr. 55:14-16, 56:16-17 (Def. Ex. E); Gilreath Dep. Tr. 170:15-21, 171:4-7 (Def. Ex. N); Bailey Dep. Tr. 301:3-17 (Def. Ex. V); Bordner Dep. Tr. 78:23-25 (Def. Ex. F); A. McAllister Dep. Tr. 247:2-7 (Def. Ex. H); C. White Dep. Tr. 126:8-10 (Def. Ex. O); Jones Dep. Tr. 107:17-108:13 (Def. Ex. T).

22.     Handcuffing inmates during movement serves the penological goal of preventing inmates from assaulting staff or one another.  Bordner Dep. Tr. 79:4-80:8 (Def. Ex. F).

23.     The Department's method also maximizes the safety of inmates and IDOC staff, including by making inmates' palms visible to staff and preventing them from securing contraband in their hands during movements.  Reid Rep. 36-38 (¶ 54) (Def. Ex. C).

24.     Inmates with documented medical issues can obtain and present a "cuffing permit" to have their restraints applied in a different manner, including during a facility-wide search.  *Id.*; Stark Dep. Tr. 86:7-18 (Def. Ex. M); Sarver Dep. Tr. 124:22-125:2 (Def. Ex. J); Atchison Dep. Tr. 130:20-22 (Def. Ex. U); Bordner Dep. Tr. 112:2-18 (Def. Ex. F); Yurkovich Dep. Tr. 263:21-264:1 (Def. Ex. A); A. McAllister Dep. Tr. 212:11-23, 214:1-6 (Def. Ex. H); Hermetz Dep. Tr. 145:18-146:6 (Def. Ex. W); C. White Dep. Tr. 126:15:18 (Def. Ex. O); Dorethy Dep. Tr. 105:23-106:11 (Def. Ex. X).

25.     The Department's handcuffing policy is a "generally accepted practice[]" that "increases the safety of all staff and inmates" by making inmates' palms visible to officers and preventing them from securing contraband in their hands during movements.   Reid Rep. 36-38 (¶ 54) (Def. Ex. C); *see also* Sarver Dep. Tr. 124:3-125:2; 134:1-137:21 (Def. Ex. J).

26.     The Department's policy regarding cell searches includes a visual sweep, followed

by a close inspection of the cell fixtures, including plumbing, walls, ceiling, floor, windows, shelving, desks, drawers, and hot air registers, ventilation grills, and radiators.  Bordner Dep. Tr. 92:5-94:18 (Def. Ex. F).

27.     The Department's policy regarding cell searches also requires an in-depth search of all inmate property within the cell, including all clothing, toiletries, mattresses and bedding, books, and electronics.  Bordner Dep. Tr. 92:5-94:18 (Def. Ex. F).

28.     Department policy requires each tactical team member to complete a "shakedown slip" for any cell he or she searches.  Atchison Dep. Tr. 89:13-15 (Def. Ex. U); A. McAllister Dep. Tr. 169:9-19 (Def. Ex. H); Hermetz Dep. Tr. 127:13-17 (Def. Ex. W); Finney Dep. Tr. 148:7-10 (Def. Ex. P); Gossett Dep. Tr. 187:5-8 (Def. Ex. E); Jones Dep. Tr. 118:23-119:8 (Def. Ex. T); *see also* July 9, 2014 E-Mail From A. McAllister (Def. Ex. Y); *see also* Sarver Decl. ¶ 5 (Def. Ex. ZZ).

29.     If any property is confiscated in the search, that property is documented on the shakedown slip.  Sarver Dep. Tr. 103:23-104:2 (Def. Ex. J); D. White Dep. Tr. 96:1-97:24 (Def. Ex. D); Bordner Dep. 45:17-46:7; 96:10-18 (Def. Ex. F).

30.     Confiscation of property is permitted only with good cause.  *See* Stark Dep. Tr. 69:21-70:2; 71:1-10. (Def. Ex. M); Schuler Dep. Tr. 11:20-25. (Def. Ex. Z).

31.     As a general matter, facility-wide searches are expected to occur pursuant to these policies and procedures. Yurkovich Dep. Tr. 140:3-19, 149:12-150:13, 153:3-18, 159:18-160:4, 304:7-13 (Def. Ex. A).

32.     The manual for tact teams expressly requires tact teams to conduct strip searches from inmates' head to their legs and move inmates in pairs and handcuffed behind the back.  Tact Manual Excerpts, Bates 14756-57 (Def. Ex. I).

33.     The Department regularly trains both officers and executives (including wardens and assistant wardens) on how to conduct handcuffing, line movement, cell searches, and strip searches and how to supervise others in doing so, including during large shakedowns like the facility-wide searches at issue here.  Adams Dep. Tr. 45:21-46:25; 49:8-17 (Def. Ex. K).

**B.     The 2014 Searches**

34.     In the spring of 2014, the Department initiated a series of facility-wide searches at multiple Department facilities statewide to search for and eliminate contraband.  D. White Dep. Tr. 71:5-16, 73:3-77:11 (Def. Ex. D); Yurkovich Dep. Tr. 98:15-99:2, 100:18-21, 101:17-102:14, 103:12-22 (Def. Ex. A); Brady Dep. Tr. 26:2-6 (Def. Ex. AA); A. McAllister Dep. Tr. 117:8-11, 256:15-17 (Def. Ex. H); Arnett Dep. Tr. 32:10-12 (Def. Ex. R).

35.     This case concerns the facility-wide searches that occurred at only four of these facilities: Menard, Illinois River, Big Muddy, and Lawrence Correctional Centers.  Compl. 29-35 (¶¶ 40-60).

36.     There were approximately 9,871 men housed in these facilities during the timeframes at issue: 3,835 at Menard, 1,929 at Illinois River, 1,836 at Big Muddy, and 2,271 at Lawrence.  *See* Menard Inmate List (Def. Ex. BB); Illinois River Inmate List (Def. Ex. CC); Big Muddy Inmate List (Def. Ex. DD); Lawrence Inmate List (Def. Ex. EE); *see also* Sarver Decl. ¶ 3 (Def. Ex. ZZ).

37.     The facility-wide searches occurred pursuant to operations orders prepared by the statewide tact team commander, defendant David White, and approved by the Department's chief of operations, defendant Joseph Yurkovich.  *See* D. White Dep. Tr. 70:1-5, 78:7-79:6 (Def. Ex. D); Jones Dep. Tr. 43:21-44:2 (Def. Ex. T); Yurkovich Dep. Tr. 106:12-107:16 (Def. Ex. A); Menard Apr. 2 Ops. Order (Def. Ex. FF); Menard Apr. 4-15 Ops. Orders (Def. Ex. GG); Illinois River Ops. Order (Def. Ex. HH); Big Muddy Ops. Order (Def. Ex. II); Lawrence Ops. Order (Def.

Ex. KK); *see also* Sarver Decl. ¶ 2 (Def. Ex. ZZ).

38.     The searches were conducted using tact team members from multiple facilities to ensure they were completed as quickly as possible and to prohibit the movement of contraband among cells. Atchison Dep. Tr. 31:14-32:2; 32:20-22; 33:1-5. (Def. Ex. U) Bordner Dep. Tr. 30:19-31:4, 34:17-35:10 (Def. Ex. F); Yurkovich Dep. Tr. 55:4-56:10 (Def. Ex. A); Moore Dep. Tr. 85:18-86:11 (Def. Ex. KK).

39.     During the operation, tact team members would report to the regional tact team commanders and the statewide commander, not the assistant wardens or warden at the facility. Bordner Dep. Tr. 40:4-41:5 (Def. Ex. F).

40.     The operations orders required the tact teams to execute the searches consistently across facilities.  *See* Menard Apr. 2 Ops. Order (Def. Ex. FF); Menard Apr. 4-15 Ops. Orders (Def. Ex. GG); Illinois River Ops. Order (Def. Ex. HH); Big Muddy Ops. Order (Def. Ex. II); Lawrence Ops. Order (Def. Ex. KK); Yurkovich Dep. Tr. 139:21-140:22, 201:4-11 (Def. Ex. A).

41.     Officers generally began the searches by entering the inmates' living area quickly and noisily, including by banging batons on railings, to alert the inmates and put them on notice that a search was going to occur.  D. White Dep. Tr. 141:4-20 (Def. Ex. D) Atchison Dep. Tr. 123:15-17 (Def. Ex. U); Jennings Dep. Tr. 239:6-240:20 (Def. Ex. G); C. White Dep. Tr. 91:22-92:7 (Def. Ex. O).

42.     Entering living areas quickly and in a noisy manner can surprise inmates, which prevents them from destroying or hiding contraband.  *See* Jennings Dep. Tr. 239:6-21 (Def. Ex. G); A. McAllister Dep. Tr. 206:15-207:8 (Def. Ex. H); Reid Rep. 38-39 (¶ 57) (Def. Ex. C).

43.     Officers strip searched inmates individually in their cells, proceeding from head to toe, according to Department policy.  *See* Stark Dep. Tr. 36:17-37; 38:5-11 (Def. Ex. M); Sarver

Dep. Tr. 122:7-123:17 (Def. Ex. J); Bordner Dep. Tr. 54:12-14; 55:12-57:23; 61:2-6 (Def. Ex. F); C. White Dep. Tr. 86:6-87:23 (Def. Ex. O); Eovaldi Dep. Tr. 54:12-56:20 (Def. Ex. LL); T. McAllister Dep. Tr. 69:5-18 (Def. Ex. MM).

44.     Some officers instructed inmates to dress only in their blue Department uniforms, without donning socks or underwear. *Compare* Edward Tenney Dep. Tr. at 36:10-16 (Def. Ex. NN) *with* Hermetz Dep. Tr. 75:22-76:7, 77:8-13 (Def. Ex. W); T. McAllister Dep. Tr. 127:15-128:15 (Def. Ex. MM).

45.     Inmates may hide contraband in socks and underwear, Reid Rep. 40-41 (¶ 60) (Def. Ex. C), and directing inmates to leave these items in the cells allows officers to search them more thoroughly as part of the search of the cells rather than as part of the strip search (during which time inmates are present and officers' attention is devoted in part to ensuring the cells are secure), Sarver Dep. Tr. 120:17-122:6 (Def. Ex. J).

46.     Requiring inmates to dress only in uniforms, without socks or underwear, thus has the effect of deterring inmates from hiding contraband in socks or underwear in the first place. Reid Rep. 40-41 (¶ 60) (Def. Ex. C).

47.     Officers then escorted inmates to waiting areas in pairs, walking in close formation, with their heads down, and handcuffed in the back with their palms facing out and thumbs up, consistent with Department policy. *See* D. White Dep. Tr. 82:16-83:24 (Def. Ex. D); Stark Dep. Tr. 48:3-21, 54:11-18, 57:4-17, 81:20-25, 83:20-23. (Def. Ex. M); Sarver Dep. Tr. 134:1-135:22 (Def. Ex. J); Bordner Dep. Tr. 69:14-19, 70:13-71:2, 71:20-72:2, 73:12-18, 78:23-25 (Def. Ex. F); Jennings Dep. Tr. 78:23-80:14 (Def. Ex. G); Dorethy Dep. Tr. 60:5-11 (Def. Ex. X).

48.     Inmates then remained in the waiting area while the tact teams searched every cell before being returned to their cells. *See* D. White Dep. Tr. 90:19-92:1 (Def. Ex. D); Stark Dep.

Tr. 24:18-22 (Def. Ex. M); Bordner Dep. Tr. 105:1-106:1 (Def. Ex. F); A. McAllister Dep. Tr. 241:11-18 (Def. Ex. H); Dorethy Dep. Tr. 69:6-9 (Def. Ex. X).

49.     The wardens of the respective facilities sent Yurkovich summaries of the searches after they were completed.  *See* May 24, 2014 E-Mail From Yurkovich (Def. Ex OO); July 11, 2014 E-Mail From Duncan (Def. Ex. PP); Yurkovich Dep. Tr. 128:14-129:23 (Def. Ex. A); *see also* Sarver Decl. ¶¶ 6-7 (Def. Ex. ZZ).

50.     The summaries identify "no major issues" with the searches, with contraband reported confiscated at multiple facilities.  May 24, 2014 E-Mail From Yurkovich (Def. Ex OO); July 11, 2014 E-Mail From Duncan (Def. Ex. PP); *see also* D. White Dep. Tr. 58:10-59:9 (Def. Ex. D) (tact teams found "a lot of knives" at Menard); Yurkovich Dep. Tr. 184:7-12, 184:23-185:18 (Def. Ex. A) (contraband found included "a lot of weapons").

51.     Following the four facility-wide searches in question, approximately 258 out of almost 10,000 inmates, or roughly 2.6% of the inmate population, submitted grievances regarding the searches.  Reid Rep. 23 (¶ 31) (Def. Ex. C).

52.     Over 70% of those grievances concerned allegations of missing property, and fewer than 50 (less than 0.5% of the prisons' populations) alleged that any of plaintiffs' central complaints—including "reverse" strip searches, contact between inmates' genitals and other inmates' bodies while moving to holding areas, and the like—occurred.  *Id.*

53.     Specifically, only three of nearly 10,000 inmates submitted grievances claiming they had had a cuffing permit that was not honored.  Reid Rep. 23 (¶ 32) (Def. Ex. C).

54.     Only 18 of nearly 10,000 inmates submitted grievances claiming they experienced a reverse strip search, and two-thirds of those arose from one facility (Illinois River).  *Id.* at 23-24 (¶¶ 32, 34).

55.     Only 16 of nearly 10,000 inmates submitted grievances claiming they were forced to walk so closely to their fellow inmates that their genitals touched, and over half of those arose from one facility (Menard).  *Id.* at 24 (¶ 34).

56.     Only 11 of nearly 10,000 inmates (almost all at Big Muddy) submitted grievances alleging female officers had been present at their strip searches.  *Id.*

### C.     The Supervisory Defendants and Their Roles in the Searches

<u>The Statewide Supervisors</u>

57.     Defendant Salvador Godinez was the Department's director in 2014, with administrative oversight over more than 11,000 employees at nearly 30 IDOC facilities housing over 50,000 inmates. Godinez Dep. Tr. 17:10-18:12, 24:10-22 (Def. Ex. QQ).

58.     Godinez neither planned nor was present for the facility-wide searches that are the subject of this action and does not "know what the operation plan was." *Id.* 35:20-37:8, 80:20-21.

59.     Godinez did not participate in planning the searches, and did not develop, communicate, or take part in developing or communicating any clandestine uniform plan that would have required officers to deviate from Department policies in the ways plaintiffs allege occurred (including "reverse" strip searches, contact between inmates' genitals and other inmates' bodies, and the like).  *See generally id.*

60.     Defendant Joseph Yurkovich was the Department's chief of operations in 2014, with operational responsibilities over the entire prison system. Yurkovich Dep. Tr. 34:23-35:3, 58:13-59:3 (Def. Ex. A).

61.     Sometime after June 2013, Yurkovich began planning facility-wide searches at facilities across the State, the purpose of which was to find "weapons or drugs" and to gather intelligence. *Id*. 101:17-102:13, 105:2-106:9.

62.     Department statewide and regional tactical commanders worked with facility

wardens to draft operations orders for the searches.  *Id*. 106:12-107:16.

63.     Draft orders for each of the four facilities were reviewed by the Department's operations deputy director and deputy chief, then approved by Yurkovich.  *Id*. 106:12-107:16.

64.     The "guiding principles . . . approaches . . . polices . . . [and] instructions . . . [listed in the operations orders] stayed the same throughout the initiative."  Yurkovich Dep. Tr. 139:21-140:22.

65.     Yurkovich did not develop, communicate, or take part in developing or communicating, any clandestine uniform plan that would have required officers to deviate from Department policies in the ways plaintiffs allege occurred.  *See generally id.*

66.     Defendant Michael Atchison was the Department's deputy chief of operations in 2014.  Atchison Dep. Tr. 45:11-13 (Def. Ex. U).

67.     Atchison supervised deputy directors of the three Department regions, each of which contained eight to ten facilities; he also supervised ancillary Department units that were operational in nature.  *Id.* 38:17-22.

68.     The facility-wide searches at issue were "under [Atchison's] supervision at a high level."  *Id.* 49:9-23.

69.     Atchison would receive reports of "significant incidents" that occurred during the operations.  *Id.*

70.     In terms of planning, operations orders for the searches drafted by Department tactical commanders were delivered to Atchinson, and then to the chief of operations, for approval.  *Id*. 54:3-7, 55:4-16.

71.     Atchison has no memory of attending any of the four searches at issue.  *Id*. 76:11-14.

72. Atchison did not develop, communicate, or take part in developing or communicating, any clandestine uniform plan that would have required officers to deviate from Department policies in the ways plaintiffs allege occurred. *See generally id.*

73. Defendant David White was the Department's statewide tactical commander in 2014. D. White Dep Tr. 24:13-23 (Def. Ex. D).

74. White assisted in overseeing the Department's training academy and oversaw the Department's statewide firearms and tactical operations. *Id*. 29:11-17.

75. White supervised at least 50 facility-wide searches as the statewide tactical commander. *Id*. 35:20-36:1.

76. In late 2013 or early 2014, White was told by the chief of operations that the Department was going to "start doing statewide facility shakedowns to rid the institutions of contraband," including "weapons, toxins, [and] excess property." *Id*. 71:5-72:7.

77. Working with regional tactical commanders, White was to formulate draft operations orders "to meet the[se] goals." *Id*. 74:13-75:20.

78. White drafted the operations orders (*see id*. 82:1-15,120:3-6) and attended at least one day of searches at each of the facilities at issue (*id*. 33:23-34:11).

79. For the operations White attended, he (along with the facility warden) first met with the facility tactical leadership, and then with the entire tactical team, to discuss the day's expected "chain of events," after which the operations began. *Id*. 36:23-37:24.

80. White then observed and supervised the various search stages; the operations concluded with a tactical leadership debriefing. *Id*. 41:11-50:2.

81. White did not develop, communicate, or take part in developing or communicating, any clandestine uniform plan that would have required officers to deviate from Department

policies in the ways plaintiffs allege occurred.  *See generally id.*

82.    Defendant Anthony McAllister was the tactical commander for the Department's southern region in 2014, responsible for planning statewide tactical operations there.    A. McAllister Dep. Tr. 7:20-21, 37:17-21, 54:19-22 (Def. Ex. H).

83.    McAllister participated in drafting operations orders for the facility-wide searches at issue.  *See id*. 258:14-259:5, 264:15-19.

84.    After an operations order was approved, McAllister contacted the facility warden and tactical team leaders to advise them of the operation, and to direct the tactical leaders to assign team members to the operation.  *Id*. 132: 5-20.

85.    McAllister participated in some of the searches.  *Id.* 187:24-190:6, 253:11-21, 258:14-21.

86.    When McAllister was the most senior statewide tactical leader present at a facility-wide search, he first gathered all tactical commanders to review procedures for the search and then met with the full tactical team for that same purpose.  *See id*. 138:6-141:24, 190:14-21.

87.    Once the operations began, McAllister generally supervised search activities.  *See id*. 210:12-212:19, 240:2-241:8, 248:23-250:2.

88.    McAllister did not develop, communicate, or take part in developing or communicating, any clandestine uniform plan that would have required officers to deviate from Department policies in the ways plaintiffs allege occurred.  *See generally id.*

The Big Muddy Supervisors

89.    Defendant Zack Roeckeman was the Big Muddy warden in 2014, responsible for the "overall supervision of the facility, including all safety and security" and the "supervision of staff."  Roeckeman Dep. Tr. 12:13-16, 25:16-22 (Def. Ex. RR).

15

90.     Roeckeman was not involved in deciding to conduct a facility-wide search at Big Muddy but did help draft the operations order for the search.  *Id*. 30:6-12, 35:9-23.

91.     Roeckeman was present for the first day of the operation to welcome the tactical team, thanking them in their effort to "help us make the facility safer."  *Id*. 32:8-33:14.

92.     During the search week, Roeckeman "stopped by just to check how things were going from time to time."  *Id*. 47:19-24.

93.     Roeckeman did not develop, communicate, or take part in developing or communicating, any clandestine uniform plan that would have required officers to deviate from Department policies in the ways plaintiffs allege occurred.  *See generally id.*

94.     Defendant Robert Craig was the Big Muddy assistant warden of operations in 2014, responsible for "the day-to-day operations and the staff . . . of the facility."  Craig Dep. Tr. 22:22-23:6 (Def. Ex. SS).

95.     Craig had no role in deciding to conduct a facility-wide search at Big Muddy and no role in deciding the logistics of the search.  *Id.* 28:18-29:5.

96.     Craig did not speak to the tactical team members during their pre-search meetings; while the searches were taking place, he "went along with [his] regular daily responsibilities."  *Id.* 29:6-19, 31:23-32:4.

97.     Craig did not develop, communicate, or take part in developing or communicating, any clandestine uniform plan that would have required officers to deviate from Department policies in the ways plaintiffs allege occurred.  *See generally id.*

98.     Defendant David Hermetz was the Big Muddy tactical commander in 2014 and was present for the Big Muddy and Menard facility-wide searches. Hermetz Dep. Tr. 26:14-18, 35:15:19 (Def. Ex. W).

16

99.     Hermetz played no role in arranging any facility-wide searches. *Id*. 54:2-9.

100.     Hermetz attended the pre-operation briefings held for tactical commanders for both the Big Muddy and Menard searches, which he described as "very similar." *Id*. 60:4-24.

101.     After the pre-operation briefings, Hermetz's responsibilities included orally communicating to tactical team members the operations order details from those briefings (*id*. 47:3-21) and ensuring team members carried out the searches consistent with those instructions (*id*. 50:6-12, 67:5-14).

102.     Hermetz did not develop, communicate, or take part in developing or communicating, any clandestine uniform plan that would have required officers to deviate from Department policies in the ways plaintiffs allege occurred. *See generally id.*

103.     Defendant Chris White was the Big Muddy assistant tactical commander in the spring of 2014, and was then appointed tactical commander later that summer. C. White Dep. Tr. 170:24-171:23 (Def. Ex. O).

104.     He was not present during the Big Muddy facility-wide searches at issue (*id*. 53:2-8) and has no specific memory of participating in the Illinois River, Menard, or Lawrence searches (*id.* 78:16-83:7).

105.     Generally, tactical team leadership obtains operational information regarding facility-wide searches at a commander's briefing conducted each day of facility-wide multiday searches. *Id*. 65:4-7, 71:3-72:6.

106.     White has no specific memory of attending such briefings for the searches at issue. *See id*. 63:20-23.

107.     White did not develop, communicate, or take part in developing or communicating, any clandestine uniform plan that would have required officers to deviate from Department

policies in the ways plaintiffs allege occurred. *See generally id.*

108. Defendant Kenneth Finney became the Big Muddy assistant tactical commander sometime during the summer of 2014. Finney Dep. Tr. 23:4-8, 142:4-143:16 (Def. Ex. P).

109. Finney has never seen an operations order for an IDOC facility-wide search. *Id*. 144:8-145:2.

110. Finney has no memory of participating in the facility-wide searches at issue. *Id*. 120:19-24, 122:4-124:23.

111. Finney did not develop, communicate, or take part in developing or communicating, any clandestine uniform plan that would have required officers to deviate from Department policies in the ways plaintiffs allege occurred. *See generally id.*

### The Illinois River Supervisors

112. Defendant Gregory Gossett was the Illinois River warden in 2014, responsible for daily operations. Gossett Dep. Tr. 22:11-17, 26:7-17 (Def. Ex. E).

113. At the direction of the Department's chief of operations, Gossett took part in drafting the operations order for the Illinois River facility-wide search. *Id*. 103:19-105:22.

114. On the first day of the search, Gossett addressed the tactical team with a "[w]elcome, and thank you," telling the team where they could get assistance should they have any questions about the facility or its operations. *Id*. 149:8-150:18.

115. Once the operation began, Gossett toured the facility each day of the search, observing "all stages" of the operation. *Id*. 144:5-13, 175:7-23.

116. Gossett did not develop, communicate, or take part in developing or communicating, any clandestine uniform plan that would have required officers to deviate from Department policies in the ways plaintiffs allege occurred. *See generally id.*

117.    Defendant Stephanie Dorethy was the Illinois River assistant warden of operations in 2014, overseeing "the operations of the facility, various departments like security, dietary, maintenance." Dorethy Dep. Tr. 10:7-23, 26:10-17 (Def. Ex. X).

118.    For the facility-wide searches at issue, the tactical teams reported to the tactical commander, who then addressed any "issues or concerns or questions" to the facility warden, assistant warden, or central regional commander. *Id.* 51:10-19.

119.    During the operations, Dorethy did not stay with the tactical team, but was instead "intermingling throughout the facility," "basically kind of check[ing] things out, mak[ing] sure there's no issues," and then attending to her regular duties as assistant warden. *Id.* 52:8-54:14.

120.    Dorethy did not develop, communicate, or take part in developing or communicating, any clandestine uniform plan that would have required officers to deviate from Department policies in the ways plaintiffs allege occurred. *See generally id.*

121.    Defendant Robert Arnett was the Illinois River tactical commander in 2014. Arnett Dep. Tr. 16:13-16, 26:18:23 (Def. Ex. R).

122.    Since joining the Department's tactical team, Arnett has participated in 30 to 40 searches at various facilities. *Id.*

123.    Arnett participated in the Illinois River facility-wide search, but not those at the other three facilities*. Id.* 27:22-28:5, 31:11-22.

124.    Arnett's primary role for the Illinois River search was to help instruct tactical team members during the operation. *Id.* 34:7-10, 57:4-15.

125.    Arnett, as "the host commander" at Illinois River, did anything that was needed to be done for the logistics of the search—getting more gloves, obtaining water for team members, making sure inmates were restrained, strip searched, lined up, and directed to the holding area, and

ensuring the Illinois River tactical team was "carrying out the operation according to the procedures . . . discussed during the [pre-operations] commanders briefing." *Id*. 34:11-21, 62:1-7, 68:6-70:5.

126.    Arnett did not develop, communicate, or take part in developing or communicating, any clandestine uniform plan that would have required officers to deviate from Department policies in the ways plaintiffs allege occurred. *See generally id.*

127.    Defendant Brian Piper was the Illinois River assistant tactical commander in 2014. Piper Dep. Tr. 16:2-17:19 (Def. Ex. TT).

128.    Piper's role included ensuring that the required number of facility tactical team members were assigned to the search; he arrived at the facility early to gather supplies needed for the tactical teams. *Id*. 82:8-21.

129.    Piper participated in each day of the Illinois River search, assigned to overseeing the gymnasium or segregation yard holding areas where inmates waited while their cells were searched; he did not take part in searching housing unit cells. *Id*. 88:16-90:5, 109:3-22.

130.    After the morning briefings for the tactical teams, but prior to the inmates' arrival at the day's holding area, Piper's team swept the holding area for contraband, and did so again after the inmates left the holding area. *Id*. 93:22-94:16, 110:3-12.

131.    Piper was responsible for ensuring that operations in the holding area were conducted consistent with the morning briefing. *Id*. 108:20-109:2.

132.    Piper did not develop, communicate, or take part in developing or communicating, any clandestine uniform plan that would have required officers to deviate from Department policies in the ways plaintiffs allege occurred. *See generally id.*

<u>The Lawrence Supervisors</u>

133.   Defendant Stephan Duncan was the Lawrence warden in 2014, overseeing operations for the entire facility and responsible for the safety of inmates and staff. Duncan Dep. Tr. 6:7-9, 17:5-16 (Def. Ex. S).

134.   Duncan provided input on the drafting of the operations order for the Lawrence search and attended the operations, as well as several pre-operations tactical team briefings.  *Id.* 40:2-22, 41:24-42:2, 51:12-16, 53:6-10.

135.   During those briefings, Duncan would address the team, focusing on the types of contraband being searched for, advising the non-Lawrence team members about the types of personal property allowed at the facility, and stressing that the team be professional and follow the chain of command. *Id.* 51:17-22, 66:15-23.

136.   Once the operations began, Duncan undertook his normal duties and "ran the facility," but would "periodically . . . check, see how things were going, watch some of the movement . . . go to the cell houses while they were conducting the strip searches." *Id.* 68:16-69:7, 72:18-73:5.

137.   Duncan "witnessed that whole operation at least two or three times that week." *Id.*

138.   Duncan did not develop, communicate, or take part in developing or communicating, any clandestine uniform plan that would have required officers to deviate from Department policies in the ways plaintiffs allege occurred.  *See generally id.*

139.   Defendant Richard Moore was the Lawrence assistant warden of operations in 2014, responsible for security-related issues and inmate movements throughout the facility.  Moore Dep. Tr. 9:10-16, 21:20-22:12. (Def. Ex. KK).

140.   Moore had no role in planning the facility-wide search at Lawrence or in drafting

the operations order for the search.  *Id*. 62:13-64:4.

141.    Moore's only role during pre-operations tactical team meetings was to "be cordial with the members" and "thank them for their hard work."  *Id*. 67:7-68:8.

142.    In terms of the operations themselves, Moore's role was to "offer support and backup if [the regional tactical commander] needed it."  *Id*. 81:6-13; *see also id.* ("[A]s a rule, the tactical commanders, they're in charge" of the operations.).

143.    Moore did not develop, communicate, or take part in developing or communicating, any clandestine uniform plan that would have required officers to deviate from Department policies in the ways plaintiffs allege occurred.  *See generally id.*

144.    Defendant Michael Gilreath was transitioning to active military service and away from being the Lawrence tactical commander in 2014. Gilreath Dep. Tr. 67:3-72:23 (Def. Ex. N).

145.    Gilreath played no role in drafting the operations order and has only a general memory of the Lawrence searches.  *Id*. 70:14-20, 73:13-14, 125:13-21; *see id.* ("I don't have any memory one way or the other.").

146.    Gilreath has no memory of the pre-operation briefings, the strip searches, the cell searches, or the movement of inmates.  *Id*. 129:23-130:14.

147.    Gilreath did not develop, communicate, or take part in developing or communicating, any clandestine uniform plan that would have required officers to deviate from Department policies in the ways plaintiffs allege occurred.  *See generally id.*

148.    Defendant Tim McAllister was transitioning from his role as the Lawrence assistant tactical commander to the role of tactical commander in 2014, overseeing tactical members good standing, training, assignments, and communications.  T. McAllister Dep. Tr. 45:17-21, 69:19-70:21, 72:12-24 (Def. Ex. MM).

149.    McAllister had no role in preparing the search operations order and learned about the Lawrence searches the day before the operation, being told he was to arrange for 25 tactical team members for the searches. *Id*. 99:4-21, 119:24-120:14.

150.    On operation day, McAllister arrived before other team members and obtained any needed supplies for the day's work. *Id*. 105:2-19.

151.    McAllister attended the pre-operations tactical commanders' briefings, in which the operations were outlined, after which commanders met with their individual teams to convey the day's operation detail; the entire tactical group then met, and the day's operation would begin. *Id*. 117:4-119:23.

152.    Through the course of the Lawrence facility operation, McAllister participated in some strip searches (*id*. 148:15-149:1) and searched some cells (*id*. 168:4-9), going "back and forth" from the cellhouses to the inmate holding area (*id*. 164:10-20).

153.    McAllister did not develop, communicate, or take part in developing or communicating, any clandestine uniform plan that would have required officers to deviate from Department policies in the ways plaintiffs allege occurred. *See generally id*.

The Menard Supervisors

154.    Defendant Kimberly Butler was transitioning from the Menard assistant warden of programs to facility warden in April 2014, in which capacity she was responsible for the entire operation of the facility. Butler Dep. Tr. 26:16-29:2 (Def. Ex. Q).

155.    Butler does not recall playing any role in either planning the searches or in drafting the search operations orders. *Id.* 36:11-16, 38:8-14, 39:7-12, 40:9-13, 41:15-18.

156.    Butler attended several of the pre-operation tactical briefings for the purpose of "welcoming all of the tact team members to the facility, giving them an idea of what they were

searching for in regards to weapons. That would basically be it." *Id*. 56:11-20.

157.     During the searches, Butler and her senior staff "would just walk around the galleries and talk to staff and talk to the offenders . . . .  Just to make ourselves available, you know, be seen, and if anyone had any issues, they could talk to us about them." *Id*. 32:11-24.

158.     Butler did not develop, communicate, or take part in developing or communicating, any clandestine uniform plan that would have required officers to deviate from Department policies in the ways plaintiffs allege occurred. *See generally id.*

159.     Defendant Alex Jones was temporarily assigned as Menard's assistant warden of operations during the 2014 facility-wide searches.  Jones Dep. Tr. 36:20-37:4 (Def. Ex. T).

160.     Jones has no memory of the search operations at Menard.  *Id*. 37:19-22, 45:12-14, 50:3-7.

161.     Jones has no memory of playing a role in either planning the operations or drafting the operations orders; he has no memory of receiving the operations orders.  *Id*. 43:9-21, 44:5-9.

162.     Jones has no "independent recollection of the April 2014" searches at Menard.  *Id*. 37:19-22.

163.     Jones did not develop, communicate, or take part in developing or communicating, any clandestine uniform plan that would have required officers to deviate from Department policies in the ways plaintiffs allege occurred.  *See generally id.*

164.     Defendant Jerry Witthoft was the Menard tactical team commander in 2014, responsible for overseeing tactical team training, recruitment, and operations.  Witthoft Dep. Tr. 35:9-36:10, 37:5-38:1, 52:11-17 (Def. Ex. AAA).

165.     Witthoft has no memory of the 2014 searches at Menard.  *Id*. 57:13-16.

166.     During such operations, however, Witthoft would have been responsible as the

"institutional commander" for assigning facility tactical team members to the holding areas where inmates wait while the cellhouse searches occurred, and for assigning team members to cellhouse searches.  *Id*. 72:19-74:4.

167.    When participating in a facility-wide search as the tactical team commander, Witthoft supervises the team's search operations, including "assist[ing] them to do their job," and to ensure they "adher[e] to policy."  *Id.* 78:8-24.

168.    Witthoft did not develop, communicate, or take part in developing or communicating, any clandestine uniform plan that would have required officers to deviate from Department policies in the ways plaintiffs allege occurred.  *See generally id.*

169.    Defendant Frank Eovaldi was the Menard assistant tactical team commander in 2014, responsible for tracking team members' hours, rostering team members for operations, and generally overseeing the facility tactical team.  Eovaldi Dep. Tr. 23:17-24 (Def. Ex. LL).

170.    While he has no memory of specific operation days, Eovaldi believes he participated in the 2014 facility-wide searches at Menard, Big Muddy, and Lawrence.  *Id*. 39:4-40:4, 41:9-42:6, 43:16-44:14.

171.    Eovaldi did not develop, communicate, or take part in developing or communicating, any clandestine uniform plan that would have required officers to deviate from Department policies in the ways plaintiffs allege occurred.  *See generally id.*

**D.    These Proceedings**

172.    Plaintiffs are current and former inmates who were housed at the four facilities in question during the period in which the Department undertook facility-wide searches.  Doc. 519 at 12-13.

173.    Plaintiffs contend Department leaders "crafted a plan to conduct" facility-wide searches "that were intended to inflict unnecessary pain and humiliation without any legitimate

penological justification, in violation of the Eighth Amendment."  7th Cir. Doc. 38 ("7th Cir. Br.") at 19-20.

174.    Plaintiffs raise several specific complaints about the 2014 searches, including that they were handcuffed in an unusually painful way; that they were made to wait for an unnecessarily long period of time in holding areas (and in uncomfortable positions); that they were searched, contrary to Department policy, in "reverse" order, such that they touched their genitals before touching their mouths; and that officers physically and verbally harassed them during the searches. *Id.* at 7-10.

175.    The supervisory defendants testified that the searches were conducted according to Department handcuffing policy, which requires the handcuffing of inmates behind their backs, palms out, with exceptions for those with "cuffing permits."  A. McAllister Dep. Tr. 247:2-7 (Def. Ex. H); Jones Dep. Tr. 107:17-108:13 (Def. Ex. T); *see also* Bordner Dep. Tr. 107:7-111:9 (Def. Ex. F); Sarver Dep. Tr. 124:3-125:2; 134:1-137:21 (Def. Ex. J).

176.    The supervisory defendants also agreed that inmates were required to wait in the holding areas only as long as it took to search the facilities cell-by-cell.  A. McAllister Dep. Tr. 231:7-10 (Def. Ex. H); Dorethy Dep. Tr. 69:6-9 (Def. Ex. X); Piper Dep. Tr. 128:4-16 (Def. Ex. TT); Butler Dep. Tr. 83:5-9 (Def. Ex. Q).

177.    The supervisory defendants testified that the Department's strip-search policy was to search inmates from head to toe, that cadets were taught how to conduct strip searches in this manner from the beginning of their time at the Department, and that searches conducted in any other manner would have been contrary to Department policy.  D. White Dep. Tr. 136:13-139:1 (Def. Ex. D); Yurkovich Dep. Tr. 271:10-14 (Def. Ex. A); C. White Dep. Tr. 86:6-87:23 (Def. Ex. O); Finney Dep. Tr. 93:8-95:10 (Def. Ex. P); Gossett Dep. Tr. 240:13-22 (Def. Ex. E); *see also*

Bordner Dep. Tr. 54:12-14, 55:12-58:1, 61:2-6 (Def. Ex. F); Jennings Dep. Tr. 229:20-230:16, 231:20-23, 234:13-18, 235:1-236:24 (Def. Ex. H).

178.    No contemporaneous emails exist among the supervisory defendants discussing or acknowledging complaints of reverse strip searches.

179.    The supervisory defendants likewise testified that moving inmates in a manner that forced inmates' genitals to touch the inmates in front of them would have been against Department policy.  D. White Dep. Tr. 143:15-144:11 (Def. Ex. D); Yurkovich Dep. Tr. 274 274:16-18 (Def. Ex. A); A. McAllister Dep. Tr. 238:7-13 (Def. Ex. H); Jones Dep. Tr. 101:23-102:9 (Def. Ex. T); *see also* Bordner Dep. Tr. 77:25-78:15 (Def. Ex. F); Jennings Dep. Tr. 131:21-133:13 (Def. Ex. G).

180.    The supervisory defendants testified that it would have been against Department policy to physically or verbally harass inmates.  D. White Dep. Tr. 144:12-145:7 (Def. Ex. D); Yurkovich Dep. Tr. 278:20-279:18 (Def. Ex. A); A. McAllister Dep. Tr. 235:12-236:18 (Def. Ex. H); *see also* Bordner Dep. Tr. 82:12-84:25; 114:17-115:5 (Def. Ex. F); Jennings Dep. Tr. 246:7-22 (Def. Ex. G).

181.    As part of discovery in this case, all non-supervisory defendants were surveyed, and only one defendant who was present for the strip searches stated in surveys that he had seen or conducted a reverse strip search of an inmate.  *See* Splitek Decl. ¶¶ 7, 9 (Def. Ex. UU).[3]

182.    None of those defendants who were present for the facility-wide searches stated in surveys that they had seen any officer use excessive force on an inmate.  *Id.* ¶ 6.

183.    Photographs of the line movement taken during the 2014 search at Lawrence show

---

[3] This declaration is filed pursuant to Federal Rule of Evidence 1006 as a summary of voluminous writings to prove the content of those writings. The original materials being summarized were produced to plaintiffs.

that the movement of inmates to the holding areas was generally consistent with Department policy—that is, with inmates marching in a tight formation, but with no contact between inmates' genitals and the bodies of the inmates in front of them. *See* July 2014 Lawrence Photographs (Def. Ex. VV).

184.    To the extent inmates may have walked or stood in closer formation at some points during some movements than others, such variation simply reflects the dynamic nature of line movement. *See* Jennings Dep. Tr. 124:10-125:5 (Def. Ex. G).

185.    Plaintiffs' testimony reflects that inmates waited in a variety of locations (ranging from a gym to a chapel) in a variety of positions (some sitting, some standing) for a variety of time periods (ranging from 20 minutes to several hours) during the searches. *See* Doc. 481-30 at 67 (standing in chapel 30 to 60 minutes); Doc. 481-33 at  Doc. 491-7 at 103 (5:24-6:2, 6:15-18) (seated in cafeteria 30 to 40 minutes), 134 (8:8-17) (seated in cafeteria 35 to 45 minutes), 146 (11:3-5) (seated in cafeteria 30 minutes), 152 (9:13-15) (seated in cafeteria 30 minutes), 197 (6:2-4, 7:6-11) (seated in cafeteria 45 to 60 minutes), 212 (4:15-23) (seated in cafeteria 45 to 60 minutes); *see* 7th Cir. Br. 9-10 (agreeing that "there is some variation in regard to what [plaintiffs] were ordered to do once in the holding area[s]").

186.    At the class-certification stage, the parties presented testimony from 111 inmates, only 59 of whom testified that they had experienced a reverse strip search. *See* Doc. 481-35 at 47; Doc. 481-51 at 10, 18, 22, 26, 42, 50, 54, 62, 70, 78, 82, 85, 98, 106, 110, 114, 122, 149, 154, 165, 184, 192-94; Doc. 491-1 at 35-36; Doc. 491-7 at 2, 7, 13, 18-19, 29-30, 32-33, 55-57, 60-66, 72, 77-78, 81-83, 87, 92, 96-99, 102-04, 107-09, 112-13, 134, 138-41, 144-47, 156-58, 161-62, 166-68, 176-78, 182-83, 187-88, 206-09, 212-13 (all accounts that did not include a reverse strip search).

187.    More than 30% of the declarations that plaintiffs introduced are silent as to how any strip search was conducted.  Doc. 481-51 at 9-10, 17-18, 21-22, 25-26, 41-42, 53-54, 61-62, 77-78, 81-82, 85-86, 97-98, 113-14, 121-22, 157-58, 165-66, 192.

188.    Almost 40% of the inmates that defendants interviewed agreed the strip searches were conducted in the same manner as all other strip searches, that is, from head to toe.  Doc. 491-7 at 1-2 (4:22-5:6), 7 (5:11-16), 13 (6:6-21), 36 (6:12-15), 55-56 (4:11-5:2), 62 (9:1-10), 72 (5:24-6:19), 81-82 (4:24-5:11), 87 (6:3-14), 91 (4:21-5:7), 134 (5:12-18), 139 (7:8-8:11), 145 (6:1-18), 187 (4:11-13), 212 (3:13-17).

189.    Many of the consolidated plaintiffs said they were not touched or shoved into other inmates during the line movement.  Doc. 481-38 at 32:19-33:12; Doc. 481-40 at 142:6-9, 177:8-13; Doc. 481-45 at 87:16-21.

190.    Only five of the inmates who executed declarations in support of plaintiffs' class certification motion submitted contemporaneous post-search grievances complaining that they had been shoved during line movement.  Docs. 491-5, 491-6.

191.    Plaintiffs' expert Patrick Hurley agreed that the policies for the searches, as set out in the operations orders, were "acceptable."  Hurley Dep. Tr. 246:1-2 (Def. Ex. WW).

192.    Hurley also agreed that multiple aspects of the Department's handcuffing policies are "reasonable and generally accepted."  Hurley Rep. 16-17 (Def. Ex. XX).

193.    Although plaintiffs' expert Daniel Pacholke objected to the Department's policy of handcuffing inmates behind their backs, he did so only on the ground that it can be inappropriate if applied "for a protracted period of time."  Pacholke Rep. 26-27 (Def. Ex. YY).

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Material facts" are those that "might affect the outcome of the suit," and a dispute over "material fact" is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  "If the evidence is merely colorable or is not sufficiently probative, summary judgment should be granted."  *Walsh v. Dayemi Org.*, 608 F. Supp. 3d 715, 720 (S.D. Ill. 2022).  In determining whether a genuine issue of material fact exists, the court must consider evidence in the light most favorable to the nonmoving party.  *Lawrence v. Kenosha Cnty.*, 391 F.3d 837, 841 (7th Cir. 2004).  Summary judgment is "the put up or shut up moment in a lawsuit, when a party must show evidence it has that would convince a trier of fact to accept its version of the events."  *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007).

## ARGUMENT

Plaintiffs told the Seventh Circuit three years ago that they would show on remand that the 22 supervisory defendants against whom their class claims were certified "crafted a plan to conduct shakedowns that were intended to inflict unnecessary pain and humiliation without any legitimate penological justification, in violation of the Eighth Amendment."  7th Cir. Br. 19-20.  After seven years of discovery and almost 100 depositions, there is no evidence that such a plan ever existed. Instead, the evidence establishes that the defendants undertook facility-wide searches in the spring of 2014 pursuant to Department policies that are grounded in legitimate penological interests.  To the extent individual plaintiffs before the Court believe that they experienced deprivations of their constitutional rights during those searches, those plaintiffs can and should bring those claims against the officers who injured them.  But plaintiffs cannot identify evidence that would permit a reasonable jury to credit their theory that the Department developed and implemented a uniform and clandestine plan to direct its officers to deviate from its established policies and procedures in the ways that plaintiffs allege.

Defendants' motion proceeds as follows.  Section I seeks summary judgment on behalf of the 22 supervisory defendants as to Counts I, II, and III for two independent reasons: (a) Plaintiffs have not identified evidence of a "uniform plan" to violate their Eighth Amendment rights; and (b) not only is there no evidence of such a plan, there is likewise no evidence that *each* individual supervisory defendant was personally involved in developing or executing such a plan.  Section II seeks summary judgment on behalf of all but nine of the non-supervisory defendants on the same claims because there is no evidence connecting these individuals to any violation of any plaintiff's rights.  Section III seeks summary judgment on behalf of these same defendants (and the Acting Director of the Department in her official capacity) on plaintiffs' claims in other respects, including (a) that their damages claims are barred by qualified immunity; (b) their official-capacity claim against the Director fails; and (c) their claim (in Count V) that defendants committed the state-law tort of intentional infliction of emotional distress ("IIED") is barred by sovereign immunity and fails on the merits.  Finally, Section IV seeks (in the alternative) partial summary judgment as to aspects of plaintiffs' claims to guide and clarify the scope of any future proceedings.[4]

## I.   Summary Judgment Is Proper As To The Supervisory Defendants On Plaintiffs' Eighth Amendment Claims.

The Court should grant summary judgment to the 22 supervisory defendants on plaintiffs' classwide Eighth Amendment claims (Counts I, II, and III).  Plaintiffs' primary claim is that the supervisory defendants violated their Eighth Amendment rights by inflicting unnecessary and gratuitous pain during the facility-wide searches.  Compl. ¶¶ 68-79.[5]  Plaintiffs face a heavy burden

---

[4]  The Court previously dismissed Count IV, Doc. 76 at 8, and the operative complaint re-alleges it for the sole purpose of preserving it for appeal, Compl. p. 43 n. 1.  Accordingly, this motion does not address Count IV.

[5]  Plaintiffs also allege that defendants engaged in a conspiracy to violate their constitutional rights, *id.* ¶¶ 80-87; and that defendants failed to intervene to prevent others from violating their rights,

on that claim. "The Eighth Amendment prohibits punishments which involve the unnecessary and wanton infliction of pain, are grossly disproportionate to the severity of the crime for which an inmate was imprisoned, or are totally without penological justification." *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004). As the Seventh Circuit has explained, when an Eighth Amendment claim turns on the constitutionality of a prison search, "only those searches that are 'maliciously motivated, unrelated to institutional security, and hence totally without penological justification' are considered unconstitutional." *Id.* (quoting *Meriweather v. Faulkner*, 821 F.2d 408, 418 (7th Cir. 1987)). "In other words, the search must amount to 'calculated harassment unrelated to prison needs,' with the intent to humiliate and inflict psychological pain." *Id.* (quoting *Meriweather*, 821 F.2d at 418) (citations omitted). In an Eighth Amendment case, a plaintiff must show both that the alleged constitutional deprivation is objectively severe and that the defendant subjectively "intended to deliberately harm" the plaintiff in permitting it to occur. *Id.* at 934-35.

Plaintiffs' claims against the supervisory defendants require even more. "[S]upervisors are not vicariously liable for their subordinates' misdeeds," *Haywood v. Hathaway*, 842 F.3d 1026, 1030 (7th Cir. 2016) (per curiam), and so plaintiffs must show that the supervisory defendants are "personally responsible for a deprivation of a constitutional right," *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 619 (7th Cir. 2022). As the Seventh Circuit explained, the plaintiffs are thus required to show that the supervisory defendants "designed and implemented" a uniform plan that was "planned to cause pain or humiliation with no penological justification." *Ross*, 33 F.4th at 441.

---

*id.* ¶¶ 88-93. But all three claims are premised on the same underlying Eighth Amendment theory, as plaintiffs explained on appeal. *See* 7th Cir. Br. 19-20 (explaining that all three claims shared "the contention that [defendants] crafted a plan to conduct shakedowns that were intended to inflict unnecessary pain and humiliation without any legitimate penological justification" and that the conspiracy and failure-to-intervene required plaintiffs to establish "additional" elements). So if plaintiffs' core Eighth Amendment claim (Count I) fails, their conspiracy and failure-to-intervene claims (Counts II and III) likewise fail.

But there is no evidence of such a plan in the record.  Instead, the record shows that the searches were conducted pursuant to Department policies and procedures, which plaintiffs' own experts concede do not violate the Constitution.  No reasonable jury could conclude otherwise.

Summary judgment is therefore appropriate as to the 22 supervisory defendants, on either of two grounds.  First, there is no evidence of a uniform plan—at all—to violate plaintiffs' rights.  Second, plaintiffs cannot show that *each* supervisory defendant "personally," *Stockton*, 44 F.4th at 619, participated in the development or execution of any such plan.  The Court should grant summary judgment to the supervisory defendants.

### A.     There Is No Evidence Of A Uniform Plan To Violate Plaintiffs' Rights.

Plaintiffs cannot meet their substantial burden because, even after years of discovery and almost 100 depositions, there is no evidence of a clandestine uniform plan to violate plaintiffs' rights.  Plaintiffs' Eighth Amendment claims against the supervisory defendants therefore "fail," and the class must "be decertified."  *Bell v. PNC Bank*, 800 F.3d 360, 379 (7th Cir. 2015).

### 1.     The facility-wide searches, which were conducted pursuant to Department policy and procedure, did not violate plaintiffs' Eighth Amendment rights.

The record establishes that the 2014 facility-wide searches were conducted pursuant to Department policies, and that those policies are designed not to "cause pain or humiliation," *Ross*, 33 F.4th at 441, but to further the Department's penological objectives.  No reasonable jury could conclude otherwise.

The record shows that the Department decided in 2014 to conduct facility-wide searches with the goal of locating and confiscating contraband.  SMF 34.  It conducted those searches using specially trained "tact team" members from multiple facilities to ensure searches were conducted as quickly as possible.  SMF 10, 38.  The plan for each search was set out in an operations order, and Department officers were expected to follow the operations order as well as Department

33

policies and procedures.  SMF 31, 37, 40.  Officers generally began the searches by entering the inmates' living area loudly, including by banging batons on cell bars, to surprise the inmates.  SMF 41.  Officers strip searched inmates in their cells, proceeding from head to toe, according to Department policy.  SMF 43.  Officers then escorted inmates to a waiting area in pairs, walking in close formation, with their heads down, and handcuffed in the back with their palms facing out— again, all consistent with Department policy.  SMF 47.  Inmates then remained in the waiting area while the tact teams conducted a thorough search of every cell before being returned to their cells.  SMF 48.

No reasonable jury could conclude that the searches described above were designed "with the intent to humiliate and inflict psychological pain."  *Whitman*, 368 F.3d at 934.  To start, there is no serious question that the basic framework for the searches, as set out in the operations orders, did not violate plaintiffs' constitutional rights.  As defendants' expert Larry Reid explained, it is a "common practice" across the United States to conduct facility-wide searches to "ensure that facilities are free from dangerous contraband and as safe as possible for inmates and staff."  Reid Rep. 15-16 (¶ 18) (Def. Ex. C); *see* SMF 9.  To conduct such searches, correctional officers must do exactly what the Department did in 2014: strip search each inmate (to ensure that he is not hiding contraband on his person), move all inmates to a separate holding location, search each cell one by one (to ensure there is no contraband in the cell), and then return the inmates to their cells.  Such searches are plainly designed to further the "penological justification" of identifying and securing contraband, rather than "to cause pain and humiliation."  *Ross*, 33 F.4th at 441.  And they were successful:  Multiple facilities reported finding weapons and other contraband at the conclusion of the searches.  SMF 50.  Even plaintiffs' expert agreed that the policies for the facility-wide searches, as set out in the operations orders, were "acceptable."  SMF 191.

Indeed, the Illinois federal courts have routinely rejected Eighth Amendment challenges to facility-wide searches similar to those at issue here.  In September 2005, the Department conducted a facility-wide search at Stateville Correctional Center, during which inmates were (as here) strip searched, escorted to a holding area (there, an outdoor segregation yard) and held, handcuffed, for three to five hours.  *See Hernandez v. Battaglia*, 673 F. Supp. 2d 673, 674-75 (N.D. Ill. 2009).  At least three inmates challenged the constitutionality of that search in separate cases, but judges in the Northern District rejected all those challenges, explaining that the searches were "not the kind of serious deprivations which would give rise to an Eighth Amendment violation."  *Id.* at 676-77; *accord Ames v. Stigler*, 2009 WL 9097015, at *3 (N.D. Ill. Sept. 3, 2009); *Curiel v. Stigler*, 2008 WL 904894, at *8 (N.D. Ill. Mar. 31, 2008).  This Court reached the same conclusion two years ago with respect to a case challenging facility-wide searches that took place at Menard only months after those at issue here, holding that an individual who had been handcuffed, subjected to physical and verbal harassment, and held for a "significant period of time" in a holding area had not shown a violation of his Eighth Amendment rights.  *Chairs v. Ill. Dep't of Corr's*, 2022 WL 3716170, at *2-3 (S.D. Ill. Aug. 29, 2022) (Yandle, J.).  These events, the Court explained, "could not reasonably be found to be sadistic, malicious, or repugnant."  *Id.* at *3.

Nothing about the policies governing the way these specific searches took place alters that basic conclusion.  Again, to show that these policies violate the Eighth Amendment, plaintiffs must establish that they have "no penological justification" and instead were implemented for the *purpose* of "caus[ing] pain or humiliation."  *Ross*, 33 F.4th at 441.  Plaintiffs cannot make that showing with respect to any aspect of the way the supervisory defendants planned and oversaw the facility-wide searches at issue here.

For instance, plaintiffs complain that the Department's policy on restraining inmates—i.e.,

to apply handcuffs to inmates with their hands behind their backs and their palms facing out—is "needlessly painful and uncomfortable." 7th Cir. Br. 8.  But the Department's handcuffing policy is a "generally accepted practice[]" that "increases the safety of all staff and inmates" by making inmates' palms visible to officers and preventing them from securing contraband in their hands during movements.   SMF 25.  It thus plainly has a "penological justification," *Ross*, 33 F.4th at 441, as even plaintiffs' experts do not seriously dispute.  *See* Hurley Rep. 16-17 (Def. Ex. XX) (describing IDOC cuffing policies as "reasonable and generally accepted"); Pacholke Rep. 26-27 (Def. Ex. YY) (arguing only that palms-out cuffing is inappropriate if applied "for a protracted period of time"); *see* SMF 192-93.  Plaintiffs complain that palms-out cuffing is not comfortable, but "routine discomfort" is an ordinary part of prison life, *Hudson v. McMillian*, 503 U.S. 1, 9 (1992), and does not violate the Eighth Amendment.  *Accord Perkins v. Pfister*, 711 F. App'x 335, 337 (7th Cir. 2017) ("We do not agree . . . that, as a matter of law, the Eighth Amendment would be violated by a policy requiring inmates during periods of heightened security to navigate stairs while handcuffed behind the back.").

Some plaintiffs have asserted that their handcuffs were fastened more tightly than usual during the facility-wide searches.  7th Cir. Br. 9-10.  But plaintiffs have identified no evidence that the supervisory defendants intentionally designed a plan to go above and beyond Department policy and "gratuitous[ly] inflict[] . . . 'wanton and unnecessary' pain" on inmates, *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (quoting *Trop v. Dulles*, 356 U.S. 86, 100 (1958)), by over-tightening handcuffs during the 2014 searches.  Rather, the uniform testimony of the supervisory defendants was that the searches were conducted according to Department policy, which requires the handcuffing of inmates behind their backs, palms out, with exceptions for those with "cuffing permits."  SMF 175.  Indeed, in the wake of the searches, only *three* inmates out of *almost 10,000*

submitted grievances indicating that they had had a cuffing permit that was not honored.  SMF 53.

To be sure, some of the class members (roughly 65) have provided individual declarations or

statements asserting that they believe their handcuffs were fastened too tightly.  7th Cir. Br. 9-10

& nn.4, 6.  But those statements attesting to individualized discomfort do not create a genuine

question of material fact as to whether the supervisory defendants intentionally designed and

oversaw a plan to "deliberately harm" *all* inmates by ensuring that their handcuffs were tightened

too tightly.  *Whitman*, 368 F.3d at 934-35.  And to the extent plaintiffs' argument is that some of

them *individually* experienced "wanton and unnecessary" pain during the time they were

handcuffed, *Hope*, 536 U.S. at 738, that argument cannot support the classwide claims against the

supervisory defendants, as the Seventh Circuit explained on appeal.  *See Ross*, 33 F.4th at 441-42

(plaintiffs' claim against supervisory defendants was not that "handcuffs were too tight" as to

"individual inmate[s]" but that "the plan unconstitutionally mandated the use of a particularly

painful handcuff position that had no corresponding penological benefit").  No rational jury could

find that the supervisory defendants developed and oversaw such a plan.

Plaintiffs also complain that they were "forced to sit or stand handcuffed behind their backs

for a lengthy period while in the holding area."  7th Cir. Br. 9.  But there is transparently a

penological purpose in detaining inmates in a holding area while Department staff search the cells

(to ensure the cells are clear for the search) and an equally obvious purpose in requiring inmates

to remain handcuffed (to ensure the security of the holding area).  *See* SMF 8, 22.  And plaintiffs

mount no serious argument—and the record contains no evidence—that the supervisory

defendants *intentionally* made inmates wait in the holding areas for longer than was necessary to

search the cells to ensure the "unnecessary and wanton infliction of pain."  *Whitman*, 368 F.3d at

934.  To the contrary, the supervisory defendants agreed that, consistent with Department policy,

inmates were required to wait in the holding areas only as long as it took to search the facilities cell-by-cell.  SMF 176.  And plaintiffs' own testimony reflects that inmates waited in a variety of locations (ranging from a gym to a chapel) in a variety of positions (some sitting, some standing) for a variety of time periods (ranging from 20 minutes to four hours) during the searches.  SMF 185.  Even plaintiffs have conceded that the record reflects that inmates had "different" experiences while waiting for the cell searches to conclude and that there was "variation" in the time, place, and manner of their waits in the holding areas.  7th Cir. Br. 8-9.  There is simply no serious argument that the supervisory defendants violated plaintiffs' Eighth Amendment rights by detaining them in holding areas in handcuffs while their cells were searched.  Indeed, every court to have considered similar claims regarding the Stateville searches reached the same conclusion even considering claims that inmates spent *hours* in waiting areas.  *See Hernandez*, 673 F. Supp. 2d at 677; *Ames*, 2009 WL 9097015, at *3; *Curiel*, 2008 WL 904894.

Finally, plaintiffs take issue with minor details, including that tact team officers made noise when entering inmates' cells and that some instructed inmates to dress (after being strip searched) in prison uniforms only, without their socks or underwear.  7th Cir. Br. 7-8.  But these tertiary aspects of the searches did not violate plaintiffs' Eighth Amendment rights, to the extent that they occurred, for multiple reasons.  For one, each had a penological purpose:  Entering inmates' cells in a noisy manner can surprise the inmate population and prevent inmates from destroying or hiding contraband, SMF 42, and directing inmates to leave their socks and underwear in the cells while the cells are searched both allows officers to search those items more thoroughly and deters inmates from hiding contraband in them, SMF 45-46.  Nor did either practice impose the kind of deprivation of privacy that could be described as "the denial of the minimal civilized measure of life's necessities," as is necessary for an Eighth Amendment violation, *Farmer v. Brennan*, 511

U.S. 825, 834 (1994).  To the contrary, courts have repeatedly and consistently held that neither noise nor the temporary deprivation of underwear constitutes an Eighth Amendment violation, *see Lunsford v. Bennett*, 17 F.3d 1574, 1580 (7th Cir. 1994) (noise); *Spivey v. Doria*, 1994 WL 97756, at *11 (N.D. Ill. March 24, 1994) (noise); *O'Leary v. Iowa State Men's Reformatory*, 79 F.3d 82, 83 (8th Cir. 1996) (underwear); *Frazier v. Ill. Dep't of Corr's*, 2023 WL 6276040, at *2 (S.D. Ill. Sept. 26, 2023) (Beatty, M.J.) (clean underwear).  The same is true here.

To the extent plaintiffs' view is that the conditions described above, although individually *de minimis*, can be somehow aggregated together to give rise to a single Eighth Amendment claim, they are wrong.  Although "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone," that is the case only when otherwise *de minimis* conditions "have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)) (emphasis in original).  Plaintiffs' claims are not of that sort:  They do not allege that the individual indignities they experienced somehow worked together to deprive them of some fundamental "human need," nor could they realistically do so.  Plaintiffs' complaints about handcuffing, noise, and the like must therefore be evaluated on their own merits rather than as part and parcel of some overall "mutually reinforcing" plan.  *See Curiel*, 2008 WL 904894, at *4 ("address[ing] each of the plaintiff's ostensible hardships in turn"). In the end, "the Constitution does not mandate comfortable prisons," *Rhodes*, 452 U.S. at 349, and the kind of minor deprivations that plaintiffs describe here do not rise to the level of an Eighth Amendment violation.  No reasonable jury could conclude otherwise.

2.      There is no evidence of a clandestine uniform plan to violate plaintiffs' rights.

Plaintiffs' Eighth Amendment claims rest largely on their allegation that the Department

developed and executed a clandestine policy for conducting the facility-wide searches in a manner that deviated widely from its established policies and practices and from the account set out above. *See* 7th Cir. Br. 7-10.  Plaintiffs allege the existence of a uniform plan to (a) conduct so-called "reverse" strip searches, requiring inmates to manipulate their genitals and buttocks before putting their hands in their mouths; and (b) force inmates to move to the holding area in such close formation that their genitals touched the inmates in front of them (which they say is referred to as "nuts to butts").  *Id.*  Plaintiffs also identify various other complaints raised by individual inmates, including that some were pushed, shoved, and verbally harassed while moving to the holding area; that there were female officers present during some strip searches; and that some inmates returned to their holding cells to find their property confiscated.  *Id.*; *see also* Doc. 481 at 18, 20.  But after years of discovery and almost 100 depositions, plaintiffs have identified no evidence of a "uniform plan," *Ross*, 33 F.4th at 440, requiring tact team members to deviate from Department policy in such a manner.

Plaintiffs' most eye-catching allegation is that tact team members conducted "reverse" strip searches, requiring inmates to manipulate their genitals and buttocks before touching their mouths rather than vice versa.  7th Cir. Br. 7-8.  But no evidence in the record supports the claim that any such searches were the result of a uniform plan created and overseen by the supervisory defendants. The Menard strip search policy requires Department officers to conduct strip searches from top to bottom, beginning with an inmate's hair and moving to his feet.  SMF 15.  And the supervisory defendants testified that this was the Department's policy, that cadets were taught how to conduct strip searches in this manner from the beginning of their time at the Department, and that searches conducted in any other manner would have been contrary to Department policy.  SMF 16, 177. Only *one* of the over 400 non-supervisory defendants who were present during the searches stated

that he searched inmates in the manner that plaintiffs describe or saw any other officer do so.  SMF 181.  Years of discovery, in other words, have revealed no evidence of a public uniform plan to conduct reverse strip searches during the 2014 searches; instead, all defendants agree that such conduct would have been deeply contrary to policy and practice.

Plaintiffs' burden, then, is to establish that there was an unwritten and clandestine uniform plan, one that the supervisory defendants secretly developed, communicated, and ensured was executed in a uniform way—a plan to deviate profoundly from Department policy and procedure in a manner *designed* to "humiliate and inflict psychological pain."  *Whitman*, 368 F.3d at 934.  Plaintiffs have identified no evidence that would create a genuine question of material fact on that issue.  Indeed, the only evidence that suggests *any* inmates experienced reverse strip searches in 2014 is inmate testimony, but that testimony is fractured, not uniform, and contradicted by other contemporaneous evidence.  At the class-certification stage, the parties presented testimony from 111 inmates, only 59 of whom—barely over half—testified that they had experienced a reverse strip search.  SMF 186.  More than 30% of the declarations that *plaintiffs* introduced are silent as to how any strip search was conducted, SMF 187, and almost 40% of the inmates that were interviewed agreed that the strip searches were conducted in the normal manner, top to bottom, SMF 188.  Even if a jury were to credit this evidence, it at most could support the idea that some tact team members in some facilities deviated from Department policy, not that the supervisory defendants devised and executed a secret plan to depart from that policy in the uniform manner that plaintiffs describe.

That is especially so given that the contemporaneous evidence refutes plaintiffs' reverse strip search claim.  Only 18 inmates out of nearly 10,000—and only one of plaintiffs' declarants— submitted post-search grievances claiming that they experienced a reverse strip search.  SMF 54.

Were the practice widespread, common, or uniform, as plaintiffs now assert, hundreds of inmates would presumably have filed grievances.  *See* Reid Rep. 25 (¶ 35) (Def. Ex. C) (inmates "would have known that this claimed 'reverse' search deviated from normal procedures and would have mentioned that in their grievances").  Two thirds of those complaints also arose from one facility— Illinois River—casting further doubt on the claim that any reverse strip searches were the result of a uniform plan developed and overseen by the supervisory defendants, as opposed to the rogue actions of errant tact team members.  *See id.* at 24 (¶ 34).  And no contemporaneous emails exist among the defendants discussing or acknowledging complaints of reverse strip searches.  SMF 178.  The lack of contemporaneous evidence supporting plaintiffs' reverse strip search allegation demonstrates, again, that (at most) some tact team members in some facilities deviated from Department policies, not that the supervisory defendants developed a "uniform plan," *Ross*, 33 F.4th at 440, requiring tact team members conduct reverse strip searches for the specific goal of "humiliat[ing] and inflict[ing] psychological pain," *Whitman*, 368 F.3d at 934.  No rational jury could conclude otherwise.

The same is true of plaintiffs' claim that the supervisory defendants developed and oversaw a uniform plan to make inmates move to the holding area in such close formation that their genitals touched the inmates in front of them (a formation they say is called "nuts to butts").  7th Cir. Br. 8-9.  Again, no record evidence supports that claim.  Although Department policy instructs officers to move inmates in pairs, with their heads down, and in a tight formation, in order to ensure the safety of both inmates and Department staff, SMF 18-20, it does not permit officers to force inmates to walk so close to one another that their genitals touch other inmates; indeed, the supervisory defendants agreed that intentionally moving inmates in this manner would have been against Department policy, SMF 179.  It is thus essentially undisputed that there was no public

uniform plan to have tact team members intentionally move inmates to the holding areas in a way that would ensure their genitals touched the bodies of the inmates in front of them.

And plaintiffs cannot prove, as they must, that there was a clandestine uniform plan to do so.  The inmate testimony cannot support that claim:  Although plaintiffs filed typed declarations in support of class certification containing descriptions of the alleged physical conduct that were essentially word-for-word identical, Doc. 481-51, only 16 inmates out of nearly 10,000 submitted post-search grievances alleging that they were required to walk so closely to their fellow inmates that their genitals touched, and over half of those complaints came from inmates at Menard, SMF 55.  Photographs of the line movement taken during the 2014 search at Lawrence, by contrast, show that the movement of inmates to the holding areas was generally consistent with Department policy, SMF 184—that is, with inmates marching in a tight formation, in order to ensure the safety of tact team members and inmates alike, but with no contact between inmates' genitals and the bodies of the inmates in front of them.  There is no question of material fact about whether the supervisory defendants developed and executed a clandestine plan to force inmates to press against each other in the way that plaintiffs describe.

Finally, plaintiffs' scattered claims that individual defendants engaged in other conduct that they characterize as humiliating or demeaning cannot establish that there was a uniform policy to require tact team members to act in such a manner, as plaintiffs' claims require.  For instance, plaintiffs allege that some tact team members pushed, shoved, and verbally harassed inmates while moving them to the holding area, *see* 7th Cir. Br. 9, but there is no evidence that the supervisory defendants established a plan or policy to that effect.  Instead, defendants uniformly agreed that it would have been against Department policy to physically or verbally harass inmates, SMF 180; none of the non-supervisory defendants who were present stated that they had witnessed the use

of excessive force, SMF 182; many of the consolidated plaintiffs said that they were not touched or shoved into other inmates during the line movement, SMF 189; and only five of the inmates who executed declarations in support of plaintiffs' class certification motion in fact submitted post-search grievances complaining that they had been shoved during line movement, SMF 190.  To the extent that the inmates' testimony gives rise to any question of material fact as to class members' exposure to physical or verbal harassment that sounds in the Eighth Amendment, *but see Beal v. Foster*, 803 F.3d 356, 358 (7th Cir. 2015) ("Simple or complex, most verbal harassment by jail or prison guards does not rise to the level of cruel and unusual punishment."); *DeWalt v. Carter*, 224 F.3d 607, 720 (7th Cir. 2000) ("[N]ot every push or shove by a prison guard violates a prisoner's constitutional rights."), it does not give rise to a question of material fact as to whether the supervisory defendants intentionally developed and supervised the execution of a "uniform plan," *Ross*, 33 F.4th at 440, to have tact team members physically or verbally harass inmates to "humiliate and inflict psychological pain," *Whitman*, 368 F.3d at 934.  No reasonable jury could conclude otherwise.

Plaintiffs' scattered allegations that some inmates experienced other issues during the 2014 searches fare no better.  One (but only one) of the class representatives testified, for instance, that a female officer was present during his strip search, *e.g.*, Doc. 481 at 20, and he and two others testified that their personal property was taken during the searches of their cells, *id.* at 18, 20-21.  But plaintiffs did not suggest in their class certification motion or on appeal that either the presence of female officers or the loss of property was uniformly experienced by the class, *see id.* at 10-14 (describing the allegedly "uniform" parts of the 2014 searches and not mentioning these); 7th Cir. Br. 7-10 (same), and for good reason:  There is no evidence that defendants established a uniform plan that would have required tact team officers to conduct strip searches with opposite-sex guards

44

present or authorized those officers to take non-contraband property from inmate cells.  Indeed, Department policy does not permit opposite-sex officers to be present during strip searches, SMF 17, and only 11 inmates out of almost 10,000 (almost all at Big Muddy) submitted grievances alleging that female officers had been present at their strip searches, SMF 56.  Similarly, Department policy prohibits officers from taking property without good cause and requires officers to leave a so-called "shakedown slip" whenever a search is completed, including where property is taken.  SMF 28.  Although some inmates filed grievances attesting to the confiscation or loss of property, there is no evidence of any kind that the supervisory defendants developed or executed a plan that would have authorized deviations from Department policy in that way for the purpose of humiliating inmates.  *See Whitman*, 368 F.3d at 934.  No reasonable jury could reach a contrary conclusion.

## B.   There Is No Evidence Each Supervisory Defendant Personally Participated In Such A Plan.

Even if there were evidence of some uniform plan to violate plaintiffs' Eighth Amendment rights, that would still not be enough for plaintiffs' claims against each one of the 22 supervisory defendants to go to a jury.  Plaintiffs cannot obtain a verdict against the supervisors en masse; rather, they must show that *each* supervisory defendant "personally," *Stockton*, 44 F.4th at 619, participated in the development or execution of such a plan.  *See Haywood*, 842 F.3d at 1030 (supervisors "are liable for their own acts but not derivatively liable for other persons' acts").  And because it is plaintiffs' ultimate burden to plead and prove their claims against the supervisory defendants, it is likewise plaintiffs' burden at this stage to show there is sufficient evidence in the record to survive summary judgment—that is, that there is evidence *now* that would permit a reasonable jury to rule in their favor, against each individual supervisory defendant, at trial.  *See Modrowski v. Pigatto*, 712 F.3d 1166, 1168-69 (7th Cir. 2013); *Celotex Corp. v. Catrett*, 477 U.S.

317, 325 (1986).  Plaintiffs cannot make that showing, and so the Court should enter summary judgment for each supervisory defendant against whom plaintiffs have failed to establish a genuine question of material fact as to that defendant's personal liability.

Although it is plaintiffs' burden to show that there is sufficient evidence for a rational jury could rule against each individual defendant (not defendants' burden to demonstrate a lack of such evidence), *see Modrowski*, 712 F.3d at 1168 (a movant need not "support its motion with affidavits or other similar materials negating [the nonmovant's] claim" (emphasis omitted)), the evidence amassed to date shows that plaintiffs cannot meet that burden.  *See* SMF 57-171.  For instance, defendant Godinez did not plan the searches at issue here, was not present for them, and does not even "know what the operation plan was."  SMF 57-59.  Many of these defendants had no substantive involvement with either the development of the search plans, their execution, or both: Defendants Craig, Hermetz, Finney, and more did not participate in any way in planning the searches, SMF 95, 99, 109-10, and Finney testified under oath that he had never even *seen* an operations order, SMF 109.  Multiple allegedly "supervisory" defendants testified that they were not present for the execution of the searches or have no memory of participating in them.  *See* SMF 96 (Craig performed "[his] regular daily responsibilities" during searches); SMF 119 (similar for Dorethy); SMF 145 (Gilreath has no memory of participating in the searches); SMF 162 (same for Jones).  On this record, plaintiffs cannot carry their burden of showing that each of the supervisory defendants "personally," *Stockton*, 44 F.4th at 619, participated in the development or execution of a uniform plan to deprive plaintiffs of their rights.  And even if plaintiffs could identify evidence that could somehow give rise to a genuine question of material fact on whether *some* of the supervisory defendants developed and executed such a plan, summary judgment in favor of the remaining supervisory defendants must nonetheless be granted.

46

More broadly, there is *no* evidence that *any* individual supervisory defendant developed, communicated, or took part in developing or communicating, any clandestine uniform plan that would have required Department officers to deviate from its policies in the ways plaintiffs allege occurred (including "reverse" strip searches, contact between inmates' genitals and other inmates' bodies, and the like).  SMF 57-171.  Plaintiffs' burden is to establish not only that some plan of this kind existed (which it did not, *supra* pp. 39-45); it is to establish that one or more of the defendants against whom a class was certified "personally," *Stockton*, 44 F.4th at 619, participated in its development or execution.  Plaintiffs cannot do so.  The class should therefore be decertified, *Bell*, 800 F.3d at 379, and the named and consolidated plaintiffs' claims should proceed, if at all, against those *individual* Department officers who allegedly violated their constitutional rights in the spring and summer of 2014.

## II.   Summary Judgment Is Proper As To Most Of The Non-Supervisory Defendants On Plaintiffs' Eighth Amendment Claims.

Although the proceedings to date have focused primarily on the 22 supervisory defendants, plaintiffs also allege claims against over 400 non-supervisory defendants—individual tact team officers who plaintiffs allege personally violated their Eighth Amendment rights by participating in the 2014 facility-wide searches.  Compl. ¶¶ 14-21.  But only nine of those defendants were ever named by any named or consolidated plaintiff as having personally engaged in any specific conduct that plaintiffs assert is unconstitutional.[6]  The remaining non-supervisory defendants hereby move for summary judgment on plaintiffs' Eighth Amendment claims.

---

[6]  These nine defendants—Bradley Clark, Steven Conrad, Justin Eckelberry, Jason Furlow, James Gray, Marcus Jenkins, Brian Livingston, John Maragni, and Carson Winters—maintain that they acted constitutionally at all times, and will defend their conduct at trial if the relevant individual plaintiffs choose to proceed with their claims.  This section of the motion is brought on behalf of the 432 remaining non-supervisory defendants.

To be sure, these defendants participated in the 2014 facility-wide searches at one or more of the four facilities at issue here.  But that is not sufficient to establish these defendants' *individual* liability; plaintiffs must identify evidence that each individual defendant "personally," *Stockton*, 44 F.4th at 619, violated an individual plaintiff's Eighth Amendment rights.  The record evidence shows otherwise:  Almost every defendant who was present denied having conducted or seen any "reverse" strip searches and denied having seen any officer use excessive force, among other things.  SMF 181-82.  Regardless, though, these defendants do not need to point to evidence disproving their individual liability.  Rather, as the Seventh Circuit has explained, because it is plaintiffs who bear the burden of proving their claims at trial, once defendants "point out to the district court . . . that there is an absence of evidence to support the nonmoving party's case"— here, the plaintiffs' case—the burden shifts to the plaintiffs "to demonstrate that there is evidence 'upon which a jury could properly proceed to find a verdict'" in their favor.  *Modrowski*, 712 F.3d at 1168-69 (quoting *Anderson*, 477 U.S. at 241).  Plaintiffs cannot make that showing with respect to each individual defendant, given the lack of evidence in the record connecting the movants to the allegations made by the named and consolidated plaintiffs. Summary judgment in favor of the 432 non-supervisory defendants other than those named above, *supra* p. 47 n.5, is required.

## III.   Summary Judgment Is Required On Other Grounds.

Plaintiffs' claims fail for other reasons.  Plaintiffs have brought almost exclusively claims against defendants in their individual capacities, pursuant to which they can recover damages.  *See, e.g.*, Compl. ¶ 38 (Godinez sued "in his individual capacity"); *Miller v. Smith*, 220 F.3d 491, 493-94 (7th Cir. 2000); *Hill v. Shelander*, 924 F.2d 1370, 1372-74 (7th Cir. 1991).  But those claims are barred by qualified immunity, irrespective of their merits.  And any official-capacity claims that plaintiffs intend to bring against the Acting Director of the Department, Compl. ¶ 39, fail both on the merits and on standing grounds.  Finally, plaintiffs' state-law claim, Count V, is barred by

state-law sovereign immunity and fails on the merits.

### A.    Plaintiffs' Damages Claims Are Barred By Qualified Immunity.

Defendants are, at minimum, entitled to qualified immunity against plaintiffs' damages claims.  The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks omitted).   "[O]nce raised, the burden shifts to the plaintiff to defeat" a qualified immunity defense. *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019).  To do so, plaintiffs must establish both that (a) the facts "show 'a violation of a constitutional right'" and (b) "the 'constitutional right was clearly established at the time of the alleged violation.'"  *Id.* (quoting *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017)).  To make the latter showing, plaintiffs must "show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law."  *Id.*  In the end, "'[t]o be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right[,]" meaning that "'existing precedent must have placed the statutory or constitutional question beyond debate.'"  *Id.* at 702 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up)).

Plaintiffs cannot show, at a minimum, that "existing precedent" placed the constitutionality of the searches "beyond debate."  *Reichle*, 566 U.S. at 664.  As discussed, the policies pursuant to which these searches occurred—*i.e.*, under which inmates were strip searched, handcuffed with their palms out, moved to secure areas, and returned after their cells were searched—are grounded in penological purposes and consistent with common practice across the United States. *Supra* pp. 33-39.  Plaintiffs can point to no precedent condemning facility-wide searches of this sort as a

violation of the Eighth Amendment. Indeed, as discussed, *supra* p. 34, district court opinions arising out of facility-wide searches at Stateville Correctional Center (likewise conducted by the Department's tact teams) in the mid-2000s uniformly rejected Eighth Amendment challenges to those searches on the merits. *See Hernandez*, 673 F. Supp. 2d at 676; *Ames*, 2009 WL 9097015, at *3; *Curiel*, 2008 WL 904894, at *8. Thus, far from placing the constitutionality of the Department's facility-wide search protocols "beyond debate," *Reichle*, 566 U.S. at 664, existing precedent would have given all defendants (supervisory and non-) no reason to doubt the constitutionality of searches conducted pursuant to those policies. And even if the searches were conducted as plaintiffs say, *supra* pp. 39-40, it is still plaintiffs' burden to establish that any constitutional violations that occurred were obvious under "existing precedent," such that "every reasonable official" would have understood that the searches violated plaintiffs' rights. *Id.* Plaintiffs cannot meet that burden, and defendants are thus entitled to qualified immunity on their Eighth Amendment claims.

**B.** **Any Official-Capacity Claims Fail For Lack Of Standing And On The Merits.**

Although proceedings to date have focused on plaintiffs' personal-capacity claims against the supervisory and non-supervisory defendants who actually participated in the 2014 searches, in their amended complaint plaintiffs also pleaded official-capacity claims against the Director of the Department, presumably for the purpose of seeking injunctive relief. *See* Compl. 29 (¶ 39); *see also id.* at 40-41 (¶¶ 78, 86) (requesting "injunctive relief" as to Counts I and II).[7] (The Director is immune from damages claims under the Eleventh Amendment. *Miller*, 220 F.3d at 493-94; *Hill*, 924 F.2d at 1372-74.) To the extent plaintiffs continue to pursue these official-capacity claims,

---

[7] The current Acting Director of the Department, Latoya Hughes, is automatically substituted for former director James Baldwin under Federal Rule of Civil Procedure 25(d).

they fail for multiple reasons, including that plaintiffs lack standing to seek injunctive relief and that the claims fail on the merits.

First, plaintiffs lack standing to seek injunctive relief.  The Court certified the class as a damages-only class under Rule 23(b)(3), Doc. 519 at 10, meaning that the only plaintiffs who have live claims for injunctive relief are the named plaintiffs and those whose separate cases have been consolidated with this one.  Those plaintiffs must show that there is a "real and immediate threat" that they will again—personally—experience the conduct that they allege is unconstitutional.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *Stewart v. McGinnis*, 5 F.3d 1031, 1037-38 (7th Cir. 1993).  They cannot do so.  Many—including named plaintiffs Ross, Hamilton, and Verser—are no longer incarcerated, and so plainly lack standing to seek injunctive relief, no matter how their claims are styled.  *See Stewart*, 5 F.3d at 1038 (no standing where plaintiff "no longer" incarcerated at specific prison and so "under no immediate threat of harm from official conduct" there).[8]  And the named and consolidated plaintiffs who remain incarcerated cannot show they are *likely* to experience the conduct they claim is unconstitutional again.  That is certainly true with respect to plaintiffs' allegations of reverse strip searches, uncomfortably close line movement, and the like—*i.e.*, those aspects of plaintiffs' claims that involve deviations from Department policy and practice, *supra* pp. 39-40.  As the Supreme Court held in *Lyons*, it is "incredible" to suggest that a plaintiff personally faces an "immediate threat" from the prospect that public officials might intentionally "disobey their instructions" in such a manner, 461 U.S. at 106, and plaintiffs have pointed to no evidence that would give them standing to obtain injunctive relief against such a

---

[8]  The Court can take judicial notice of the fact that no record of these three inmates appears in the Department's online database of individuals in custody.  *See* Ill. Dep't of Corrections, *Individual in Custody Search*, https://idoc.illinois.gov/offender/inmatesearch.html (last visited May 21, 2024); *Parker v. Jefferys*, 2020 WL 3413000, at *3 (S.D. Ill. June 22, 2020) (Yandle, J.) (taking judicial notice of an inmate's incarceration status using this database).

"speculative" possibility.  *Stewart*, 5 F.3d at 1038.  And to the extent plaintiffs seek injunctive relief against the possibility they will personally experience future facility-wide shakedowns conducted *pursuant* to Department policy while they are incarcerated, *supra* pp. 33-39, the record is devoid of evidence regarding the Department's ongoing practices on that score, given plaintiffs' focus on obtaining relief for events that occurred in 2014.  Plaintiffs thus lack standing to obtain any injunctive relief.

For similar reasons, any official-capacity claims plaintiffs intend to press as to the Director fail on the merits.  The Director is amenable to suit, if at all, only to remedy "an ongoing violation of federal law."  *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 521 (7th Cir. 2021).  But plaintiffs have identified no ongoing violation of federal law.  As explained, *supra* pp. 33-39, the policies and procedures the Department established and implemented in 2014 to govern searches at its facilities do not violate the Eighth Amendment.  And there is no evidence that the things plaintiffs allege occurred in 2014 that departed from Department policy—reverse strip searches, uncomfortably close line movement, and the like—are "ongoing."  *See Driftless*, 16 F.4th at 522 ("An ongoing violation of federal law is one that is 'continuing.'" (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)).  So even if a jury were to conclude that plaintiffs' rights were violated "at one time or over a period of time in the past," *id.*, that would not entitle them to prospective relief against the Director today.  Indeed, the Department's policies have changed in multiple respects in the past decade, as would be expected of any large institution—changes plaintiffs have made no effort to identify or develop evidence on.  The Director is thus entitled to summary judgment as to plaintiffs' official-capacity claims, to the extent plaintiffs continue to pursue them.

C.   **Plaintiffs' IIED Claims Are Barred By Sovereign Immunity And Fail On The Merits.**

The Court should also grant summary judgment to all defendants (supervisory and non-)

on Count V, which alleges that defendants committed the state-law tort of intentional infliction of emotional distress ("IIED").  Compl. 45-50 (¶¶ 104-109).  The IIED claim fails for two separate reasons.

First, plaintiffs' IIED claim is barred by Illinois state-law sovereign immunity and cannot be heard in federal court.  Illinois's law of sovereign immunity governs state-law claims brought against the State in federal court.  *T.S. v. Cook Cnty.*, 67 F.4th 884, 890 (7th Cir. 2023).  And under Illinois law, "the State of Illinois shall not be made a defendant or party in any court."  745 ILCS 5/1.  Instead, as the Seventh Circuit held just last year, "the Illinois Court of Claims has exclusive jurisdiction over 'all claims against the State founded upon any law of the State of Illinois.'"  *T.S.*, 67 F.4th at 891 (quoting 705 ILCS 505/8(a)).

Plaintiffs' IIED claim is a "claim[] against the State," 705 ILCS 505/8(a), and thus belongs in the Court of Claims, not in federal court.  As the Seventh Circuit explained in *T.S.*, the State's sovereign immunity "cannot be evaded by making an action nominally one against the servants or agents of the State."  67 F.4th at 891.  In such a case, a court looks to three factors to assess whether an action is genuinely one against the State: (a) whether the defendant was acting within the scope of his authority in taking the action in question; (b) whether the duty the defendant is alleged to have breached is one owed to the public independent of State employment; and (c) whether the "complained-of actions involve matters ordinarily within that employee's normal and official functions of the State."  *Healy v. Vaupel*, 549 N.E.2d 1240, 1247 (Ill. 1990); *see T.S.*, 67 F.4th at 892-93.  Here, as in *T.S.*, all three factors establish that plaintiffs' IIED claim is a claim against the State, not against the defendants as individuals:  The defendants acted within the scope of their authority as Department officials in conducting the 2014 facility-wide searches, as plaintiffs agree, *see* Compl. 45 (¶ 108); they allegedly breached a duty they owed to plaintiffs only by virtue of that

53

authority, *see T.S.*, 67 F.4th at 893 (likewise concluding that "any duty" defendant "owed to the detainees stem[med] solely from his role as superintendent"); and the facility-wide searches were "matters ordinarily within" the defendants' "normal and official functions," *Healy*, 549 N.E.2d at 1247.  The IIED claim is thus one against the State, not against the defendants as individuals, and it is barred by sovereign immunity.

The Court previously rejected defendants' motion to dismiss the IIED claim on sovereign-immunity grounds, reasoning that the "officer suit" exception to sovereign immunity applied.  Doc. 76 at 8-9.  Under that exception, state sovereign immunity does not apply "when it is alleged that the State's agent acted in violation of statutory or constitutional law or in excess of his authority." *Healy*, 549 N.E.2d at 1247; *see T.S.*, 67 F.4th at 893-95 (discussing this exception).  But since the Court issued that opinion, the Illinois Supreme Court has clarified that the officer-suit exception applies only to claims seeking prospective injunctive or declaratory relief; it "does not apply in a damages suit." *T.S.*, 67 F.4th at 894; *see Parmar v. Madigan*, 106 N.E.3d 1004, 1010 (Ill. 2018) ("[A] complaint seeking damages for a past wrong does not fall within the officer suit exception to sovereign immunity."); *Green v. State*, 229 N.E.3d 387, 394-95 (Ill. App. 2023).  The officer-suit exception thus does not salvage the IIED claim, which should be dismissed as to all defendants.

Second, and independently, the IIED claim fails on the merits as to (a) the supervisory defendants and (b) the 432 non-supervisory defendants who have moved for summary judgment, because there is no evidence that these defendants intended to cause any harm to plaintiffs, much less acted in the outrageous manner required under Illinois law.  *See, e.g.*, *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003); *Benton v. Little League Baseball, Inc.*, 181 N.E.3d 902, 926 (Ill. App. 2020).  Under Illinois law, conduct is not actionable as IIED unless (a) it is "truly extreme and outrageous" and (b) the defendant either "*intend* that his conduct inflict severe emotional

distress, or know that there is at least a high probability" that the conduct would do so. *Feltmeier*, 798 N.E.2d at 80 (emphasis in original). The record here is devoid of such evidence, for all the reasons set out in this motion. All defendants acted with a valid penological purpose in designing and implementing the 2014 facility-wide searches, *supra* pp. 33-39, and there is no evidence that either (a) the supervisory defendants developed and oversaw the execution of a uniform plan that was designed specifically to harm plaintiffs, *supra* pp. 39-45, or (b) the individual defendants who have moved for summary judgment personally caused any named or consolidated plaintiff any such harm, *supra* pp. 47-48. Absent such evidence, the IIED claim fails.

## IV. In The Alternative, The Court Should Grant Partial Summary Judgment As To Aspects of Plaintiffs' Eighth Amendment Claims.

Defendants have explained why the Court should grant summary judgment on all claims as to essentially all defendants, leaving only individual Eighth Amendment claims brought against nine individual tact team officers (*see supra* p. 47 n.5). Even if the Court disagrees, however, it should grant partial summary judgment as to those "part[s]" of plaintiffs' Eighth Amendment claims, Fed. R. Civ. P. 56(a), on which there is no genuine dispute of material fact. Doing so would promote the just and efficient resolution of this complex case—with almost 10,000 plaintiffs and over 400 defendants—by ensuring that only those aspects of plaintiffs' claims with arguable merit proceed to trial.

Rule 56(a) expressly permits a party to seek, and a court to grant, partial summary judgment on a subclaim—in the Rule's words, a "part of [a] claim." Fed. R. Civ. P. 56(a). Rule 56(a) thus permits a court to provide an "issue-narrowing adjudication," i.e., one that disposes of "legal issues that make up parts of various claims" to streamline a case as it proceeds toward trial. *Servicios Especiales Al Comercio Exterior v. Johnson Controls, Inc.*, 791 F. Supp. 2d 626, 632 (E.D. Wis. 2011). If the Court concludes there is a genuine dispute of material fact as to some aspect of

plaintiffs' Eighth Amendment claims, but that there is no such dispute as to other aspects of those claims, it should grant partial summary judgment as to any subclaims as to which the summary judgment standard is met.

The Court should grant partial summary judgment on any subclaim on which defendants have met the summary judgment standard even if it allows some part of the Eighth Amendment claims to proceed to trial.  For instance:

- ***Policies and procedures.***  Defendants have explained why plaintiffs' Eighth Amendment claims fail as a matter of law to the extent they challenge the Department's policies and procedures.  *Supra* pp. 33-39.  If the Court agrees, but concludes that a material question of fact remains as to whether some or all defendants deviated from those policies in 2014, *supra* pp. 39-45, it should grant partial summary judgment to defendants on those aspects of the Eighth Amendment claims that challenge Department policy.

- ***Discrete allegations.*** Defendants have also explained why discrete practices that occurred during the 2014 searches (including the noise made by officers upon entering the cellblock and the instruction that inmates should dress only in prison uniforms after being searched) do not violate the Eighth Amendment.  *Supra* pp. 38-39.  If the Court agrees, but concludes that other alleged conduct may have violated the Eighth Amendment, it should grant partial summary judgment on those aspects of the Eighth Amendment claims that fail as a matter of law.

An order granting partial summary judgment to defendants as to any aspects of the case in which plaintiffs have failed to identify evidence on which a jury could find defendants liable would have the effect of clarifying the issues that remain in this case if some portion of it is to proceed to trial.

## CONCLUSION

The astronomer Carl Sagan once said that "extraordinary claims require extraordinary evidence." By alleging a clandestine uniform plan that required hundreds of officers to deviate from Department policies at the direction of high-ranking state officials for the sole purpose of harassing inmates for reasons unknown, plaintiffs have satisfied the first part of Mr. Sagan's aphorism. As to the second, however, plaintiffs have failed not only to identify extraordinary evidence, they have failed to identify any evidence at all. Defendants' motion for summary judgment should be granted.

Respectfully submitted,

KWAME RAOUL
Attorney General of Illinois

/s/ Emma Steimel
Emma Steimel
Assistant Attorney General
115 S. LaSalle Street
Chicago, IL 60603
(312) 814-5163
emma.steimel@ilag.gov

*Counsel for Defendants*

Joseph N. Rupcich
Joy C. Syrcle
Special Assistant Attorneys General
Cassiday Schade LLP
2040 W. Iles, Suite B
Springfield, IL 62704
(217) 572-1714
jrupcich@cassiday.com
jsyrcle@cassiday.com

*Counsel for Supervisory Defendants*

## CERTIFICATE OF COMPLIANCE

I, Emma Steimel, an attorney, certify that this motion complies with the page limit set out in Local Rules 7.1(a)(3) and 56.1(d), as modified by this Court's order of May 15, 2024, because the motion, exclusive of those items set out in Local Rules 7.1(a)(3) and 56.1(d), is approximately 30 pages in length.

/s/ Emma Steimel
Emma Steimel
Assistant Attorney General
115 S. LaSalle Street
Chicago, IL 60603
(312) 814-5163
emma.steimel@ilag.gov

Dated: May 22, 2024

**CERTIFICATE OF SERVICE**

I, Emma Steimel, an attorney, certify that on May 22, 2024, I caused the foregoing Motion

for Summary Judgment to be filed using the Court's CM/ECF system, which effected service on

all counsel of record.


/s/ Emma Steimel
Emma Steimel
Assistant Attorney General
115 S. LaSalle Street
Chicago, IL 60603
(312) 814-5163
emma.steimel@ilag.gov