*Ross v. Gossett*, No. 15-cv-309 (S.D. Ill.)
Defendants' Motion for Summary Judgment


**Defendants' Exhibit J**
Zachary Sarver Deposition Transcript



CASE NO. 15 C 0309

DEMETRIUS ROSS, ET AL., ON BEHALF OF THEMSELVES

AND ALL OTHERS SIMILARLY SITUATED

V.

GREG GOSSETT, ET AL.

DEPONENT:

ZACHARY SARVER

DATE:

APRIL 5, 2024

 schedule@churchillreporting.com

 877.808.5856

www.churchillreporting.com

1    IN THE UNITED STATES DISTRICT COURT

2   FOR THE SOUTHERN DISTRICT OF ILLINOIS

3    HON. STACI M. YANDLE, JUDGE

4     CASE NO. 15 C 0309

5

6

7  DEMETRIUS ROSS, ET AL., ON BEHALF OF THEMSELVES

8   AND ALL OTHERS SIMILARLY SITUATED,

9      Plaintiffs

10

11       V.

12

13    GREG GOSSETT, ET AL.,

14      Defendants

15

16

17

18

19

20

21

22

23 DEPONENT:  ZACHARY SARVER

24 DATE:    APRIL 5, 2024

25 REPORTER:  SYDNEY LITTLE



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 2

APPEARANCES

1                    APPEARANCES
2
3  ON BEHALF OF THE PLAINTIFFS, DEMETRIUS ROSS, HARLEY T.
4  MILLER, CHARLES SULTAN, MASHALL MCDANIEL, KEVIN L.
5  HAMILTON:
6    Sarah Grady, Esquire
7    Kaplan & Grady, LLC
8    2071 North Southport Avenue
9    Suite 205
10   Chicago, Illinois 60614
11   Telephone No.: (312) 243-5900
12   E-mail: sarah@kaplangrady.com
13   (Appeared via videoconference)
14
15 AND
16
17   Nicole Schult, Esquire
18   Uptown People's Law Center
19   4413 North Sheridan Road
20   Chicago, Illinois 60640
21   Telephone No.: (773) 769-1411
22   E-mail: nicole@uplcchicago.org
23   (Appeared via videoconference)
24
25

Page 3

APPEARANCES (CONTINUED)

1              APPEARANCES (CONTINUED)
2
3  ON BEHALF OF THE DEFENDANT, ILLINOIS DEPARTMENT OF
4  CORRECTIONS:
5    Joseph Rupcich, Esquire
6    Cassiday Schade LLP
7    2040 West Iles
8    Suite B
9    Springfield, Illinois 62704
10   Telephone No.: (312) 641-3100
11   E-mail: jrupich@cassiday.com
12   (Appeared via videoconference)
13
14 ON BEHALF OF THE DEFENDANTS, ZACH ROECKEMAN, KIMBERLY
15 BUTLER, GREG GOSSETT, JOSEPH YURKOVICH, STEPHEN DUNCAN:
16   Emma Steimel, Esquire
17   Laura Bautista, Esquire
18   Illinois Attorney General's Office
19   115 South LaSalle Street
20   Chicago, Illinois 60603
21   Telephone No.: (312) 814-3000
22   E-mail: laura.bautista@ilag.gov
23           emma.steimel@ilag.gov
24   (Appeared via videoconference)
25

Page 4

INDEX

1                    INDEX
2                                     Page
3  PROCEEDINGS                             6
4  DIRECT EXAMINATION BY MS. GRADY         8
5  CROSS-EXAMINATION BY MS. BAUTISTA     118
6  REDIRECT EXAMINATION BY MS. GRADY     127
7  CONFIDENTIAL PORTION I REDACTED        9
8  CONFIDENTIAL PORTION II REDACTED     110
9  CONFIDENTIAL PORTION III REDACTED    130
10
11
12                 EXHIBITS
13 Exhibit                           Page
14 1 - Survey for Correctional Officer
15    Defendants                       24
16 2 - Operational Overtime Totals May 15, 2014
17    - ROSS DEF 25                79
18 3 - Operational Overtime Totals May 16, 2014
19    - ROSS DEF 39                80
20 4 - Defendant's First Amended Rule 26(a)(2)
21    Disclosure                   104
22
23
24
25

Page 5

STIPULATION

1                    STIPULATION
2
3  The VIDEO deposition of ZACHARY SARVER was taken at
4  CHURCHILL REPORTING, 110 NORTH WACKER DRIVE, CHICAGO,
5  ILLINOIS 60606, via videoconference in which all
6  participants attended remotely, on FRIDAY the 5th day of
7  APRIL 2024 at 11:00 a.m. (CT); said VIDEO deposition was
8  taken pursuant to the FEDERAL Rules of Civil Procedure.
9  The oath in this matter was sworn remotely pursuant to
10 FRCP 30.
11
12 It is agreed that SYDNEY LITTLE, being a Notary Public
13 and Digital Reporter for the State of ILLINOIS, may
14 swear the witness and that the reading and signing of
15 the completed transcript by the witness is not waived.
16
17
18
19
20
21
22
23
24
25

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 6

```
 1                    PROCEEDINGS
 2
 3         THE REPORTER:  We are on record.  My name is
 4   Sydney Little.  I'm the online video technician and
 5   court reporter today, representing Churchill
 6   Reporting located at 110 North Wacker Drive,
 7   Chicago, Illinois 60606.  Today is the 5th day of
 8   April, 2024, and the time is 11:00 a.m. Central.
 9         We are convened by videoconference to take the
10   deposition of Zachary Sarver in the matter of
11   Demetrius Ross, et al., on behalf of themselves and
12   all others similarly situated, v. Greg Gossett, et
13   al., pending in the United States District Court
14   for the Southern District of Illinois, East St.
15   Louis Division, Case Number 15 C 0309.  Will
16   everyone but the witness please state your
17   appearance, how you're attending, and location
18   you're attending from, starting with plaintiff's
19   counsel?
20         MS. GRADY:  This is Sarah Grady.  I am
21   attending remotely from Chicago, Illinois, and I
22   believe actually, Nikki Schultz from Uptown
23   People's Law Center might be joining after we get
24   underway.  And she, I believe, will also be
25   attending remotely from Chicago, Illinois.
```

Page 7

```
 1         MS. BAUTISTA:  This is Laura Bautista.  I
 2   represent the defendants in this case.  I am with
 3   the deponent in Springfield, Illinois.  Joe
 4   Rupcich, who also represents the defendants, will
 5   likely be joining at some point, and he will be in
 6   the St. Louis, Missouri area.
 7         MS. STEIMEL:  And my name is Emma Steimel.  I'm
 8   an Assistant Attorney General, and I also represent
 9   the defendants in this case.
10         THE REPORTER:  Thank you, Mr. Sarver --
11         MS. STEIMEL:  Oh, and I'm in Chicago.  Sorry.
12         THE REPORTER:  Oh, that's okay.  Mr. Sarver,
13   will you please state your name for the record?
14         THE WITNESS:  Zachary Wyatt Sarver.
15         THE REPORTER:  And do all parties stipulate
16   that the witness is in fact Zachary Sarver?
17         MS. GRADY:  We do.
18         MS. BAUTISTA:  Yes.
19         THE REPORTER:  Thank you.  And Mr. Sarver,
20   will you please raise your right hand?  Do you
21   solemnly swear or affirm that the testimony you're
22   about to give will be the truth, the whole truth,
23   and nothing but the truth?
24         THE WITNESS:  I do.
25         THE REPORTER:  Thank you.  Counsel may begin.
```

Page 8

```
 1                  DIRECT EXAMINATION
 2   BY MS. GRADY:
 3         Q.   Good morning.  Can you please state and spell
 4   your name for the record?
 5         A.   Yes.  My name is Zachary, Z-A-C-H-A-R-Y.
 6   Middle name is Wyatt, W-Y-A-T-T.  Last name Sarver, S as
 7   in Sam, A-R, V as in Victor, E-R.
 8         Q.   Thank you.  And are you currently employed
 9   with the Illinois Department of Corrections?
10         A.   Yes, I am.
11         Q.   What is your current title and rank?
12         A.   I am the Special Operations Commander.  My
13   payroll title is shift supervisor.
14         Q.   Okay.  So can you tell me how you prefer to be
15   addressed?  Is it Commander Sarver or Major Sarver?
16         A.   Zach is fine.
17         Q.   Commander?
18         A.   Zach is --
19         Q.   Oh, Zach?
20         A.   Yeah.
21         Q.   Well that's a little too informal for me, sir.
22   Can I call you Mr. Sarver or --
23         A.   That's -- that's fine.  Yes.
24         Q.   Okay.  And you understand that we're here
25   today in part because -- well, we're here today on the
```

Page 9

```
 1   class action involving the 2014 shakedowns at Menard,
 2   Lawrence, Big Muddy River, and Illinois River
 3   Correctional Centers, right?
 4         A.   Correct.
 5         Q.   And you understand that you were named as a
 6   defendant in that case, yes?
 7         A.   Yes.
 8         Q.   The class -- a class of individuals who were
 9   incarcerated during -- in those prisons during those
10   shakedowns has been certified, but not against you in
11   particular.  Do you understand that?
12         A.   Yes.
13         Q.   Okay.  And you also understand that you've
14   been identified by defendants as an expert for a variety
15   of topics?
16         A.   Yes.
17         Q.   Okay.  We're going to touch on all of those
18   things.  Let me first start by asking you, sir, whether
19   there's any reason, any medication you're taking, or any
20   mental or physical health condition that you have that
21   would prevent you from providing truthful and accurate
22   testimony today?
23         A.   No.
24              (CONFIDENTIAL PORTION I REDACTED)
25   BY MS. GRADY:
```

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY    Document 642-11    Filed 05/22/24    Page 6 of 60    Page ID #23374
The Deposition of ZACHARY SARVER, taken on April 5, 2022
10..13

Page 10

1    Q.   I want to talk about what documents and other
2    materials you reviewed in preparation for your
3    deposition today.  So let's start first with documents.
4    Can you tell me what, if any, documents you reviewed to
5    prepare for today's deposition?
6    A.   I reviewed our -- I wouldn't say case file,
7    but it's our -- our operations file, which includes the
8    operations order, as -- as well as overtime rosters that
9    we used, in particular to -- to identify folks that were
10   at the operation from our tactical facilities.  I did,
11   of course, review the subpoena, and as well as
12   transcripts from Mr. Godinez and Mr. Brady.
13   Q.   Okay.  Let's take each of those in turn.  So
14   the operations file you mentioned contained -- and the
15   operations file, you're referencing the operations file
16   for one or more of the 2014 shakedowns?
17   A.   Correct.  They're -- they're -- it is just a
18   folder that we keep in our office.  The -- it -- it --
19   again, it -- it contains the operations order, as well
20   as the -- the list of tactical personnel who would be --
21   who would've been assigned to that operation.
22   Q.   Okay.  And was this file for all of the -- all
23   of the shakedowns that occurred at any prisons within
24   2014, or was this just for the four that are at issue in
25   this lawsuit?  Again, that's Menard, Illinois River, Big

Page 11

1    Muddy River, and Lawrence?
2    A.   I just reviewed the files in particular to the
3    -- to the operations in question.
4    Q.   Okay.  So just those four prisons?
5    A.   Correct.
6    Q.   And when you say, "our office," is that the
7    SORT team office?
8    A.   Yes.
9    Q.   And is that office located in Springfield,
10   Illinois, or is that at the -- at IDOC headquarters, or
11   is it somewhere else?
12   A.   No, on Concordia Court in Springfield, yes.
13   Q.   Okay.  And other than the operations orders --
14   and you said, who would've been a -- strike that.  I'm
15   sorry.  Let me ask a clearer question.  One of the
16   things you said in describing what was in the operations
17   files was who would've been assigned.  Was that through
18   overtime records?
19   A.   We use an -- an overtime report for that.  The
20   purpose for that report isn't -- we don't necessarily
21   care about the overtime, it's just an easy way to track
22   who was there.
23   Q.   Okay.  There isn't a separate document that
24   contains the names of everybody who was there, apart --
25   in the operations file, apart from the overtime files?

Page 12

1    A.   There was a period of time -- and I don't
2    remember exactly what that period of time was, but there
3    was a period of time where we also used operational
4    hours to -- to count for training hours.  And so, a -- a
5    -- a training -- a training roster would also be filled
6    out.
7    Q.   And were there training rosters in these
8    particular operations files that you reviewed?
9    A.   Those -- those are redundant to us.  Those are
10   sent to the training coordinators for those to document
11   the hours in -- in what then would've been a system
12   called Path 4 (phonetic).
13   Q.   Okay.  So I'm just trying to understand
14   whether they were in those files that you reviewed to
15   prepare for today's deposition.
16   A.   They were not.
17   Q.   Okay.  So am I correct that in the operation
18   files you reviewed, there were two types of documents
19   only, the operations order for the operation and the
20   overtime files?
21   A.   That's correct.
22   Q.   Okay.  You also reviewed the subpoena.  That's
23   just the subpoena that we gave -- served on you through
24   your counsel marking the date and time of this
25   deposition, right?

Page 13

1    A.   Yes.
2    Q.   And then you said you reviewed transcripts.
3    You mentioned Godinez and Brady by name.  Did you review
4    transcripts of anyone else's deposition testimony in
5    this case?
6    A.   No, I did not.
7    Q.   Can you tell me what if -- did you review the
8    transcripts for Director Godinez and Commander Brady in
9    their entirety, or did you review only portions?
10   A.   Only -- only portions.  Much less of Director
11   Godinez's, more so of Commander Brady's.
12   Q.   And what -- can you tell me by subject, what
13   you recall from your review?  What testimony did you
14   recall reviewing?
15   A.   Well, I was really more concerned about the --
16   the tempo and types of questioning.  There's not a lot
17   that was -- that stood out to me, as far as his
18   testimony.  His -- his testimony is -- was what I
19   expected his testimony would be.  I don't know that I
20   understand any further your question.
21   Q.   Okay.  Well whether it was surprising or not,
22   what I'm trying to understand is, what -- about what
23   testimony -- strike that.  What I'm trying to understand
24   is, of the testimony he gave, what part you reviewed.
25   So I'll give you an example.  You might have reviewed

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 14

1  the portion of his testimony where he testified about
2  how during a shakedown there are intelligence
3  interviews.  But instead you might have reviewed
4  testimony about his background within the Department of
5  Corrections.  Do you understand what I'm asking after?
6      A.   And -- and I -- I did review the portion of
7  his background, and his education, and just the -- the
8  different questions that were asked of -- I don't want
9  to say personal in nature, but of -- of his career, as -
10  - as well as his -- the questions and his answers
11  regarding operational procedures.  None of that was read
12  -- I did not read the transcript in entirety, but just -
13  - more than a skim through, but skimmed through in -- in
14  -- in depth, if you will.
15      Q.   Okay.  And what do you recall reviewing of
16  Director Godinez' deposition?  What subject matters was
17  he testifying about that you reviewed?
18      A.   Very little.  A lot of it -- in the very
19  beginning of it, just what I reviewed pertained to his
20  knowledge of these operations, who he coordinated with,
21  with these operations, or did not coordinate with.  And
22  I -- I reviewed a part -- I don't remember the
23  specifics, but I remember reading a -- a part about his
24  conversation, or lack thereof, with -- with Mr.
25  Yurkovich.

Page 15

1      Q.   Okay.  All right.  Can you tell me, other than
2  documents, did you review any other materials to prepare
3  for your deposition today?
4      A.   I don't believe so.  I believe that's all the
5  documents that I reviewed.
6      Q.   Okay.  And I -- now I'm -- I appreciate that
7  clarification.  Now I'm moving on from documents to
8  other materials.  So for example, your counsel produced
9  to us a video.  It's my understanding that you reviewed
10  that, potentially in preparation for today's deposition.
11  Do you recall reviewing a video in advance of this
12  deposition?
13      A.   Was -- we did review a video.  It was a video
14  that was provided by the Department in a future
15  operation.
16      Q.   Right.  Shakedown that occurred at Stateville
17  in, I believe, the fall, or maybe getting onto the
18  winter of 2023?
19      A.   That would've been Menard Correctional Center
20  in February 9, 2023.
21      Q.   That's the video you reviewed?
22      A.   Yes.
23      Q.   Did you review a video from Stateville
24  Correctional Center in the fall of 2023?
25      A.   I don't recall watching a Stateville video,

Page 16

1  no.
2          MS. BAUTISTA:  And just to be clear, Sarah, we
3      did not send you a Stateville video.  We sent you a
4      Menard video from February 9, 2023.
5          MS. GRADY:  Oh, okay.  Then I think there's
6      been some confusion.  So can we just go off the
7      record for a second?
8          THE REPORTER:  Sure.  We're off the record.
9      The time's 11:14.
10          (OFF THE RECORD)
11          THE REPORTER:  We are back on the record for
12      the deposition of Zachary Sarver being conducted by
13      videoconference.  Today is April 5, 2024, and the
14      time is 11:15 a.m. Central.
15  BY MS. GRADY:
16      Q.   Okay.  So during the break, we confirmed the
17  video that was produced.  So can you just tell me again,
18  it was a video from Menard in February of 2023?
19      A.   That's correct.
20      Q.   Okay.  Did you review any other video files,
21  other than this -- the video of a shakedown at Menard in
22  February of 2023, to prepare for today's deposition?
23      A.   No, I did not.
24      Q.   And any other materials that you reviewed to
25  prepare for today's deposition?

Page 17

1      A.   Not that I can recall, no.
2      Q.   Other than your counsel, have you spoken with
3  anyone about your deposition today?
4      A.   No.
5      Q.   Have you ever sat for a deposition before
6  today?
7      A.   Yes.
8      Q.   How many times have you been deposed?
9      A.   I'm trying to think.  How many times have been
10  deposed?  Three or four times.  I -- I've testified in -
11  - in criminal cases, in the civil service commissions
12  many times.  But as far as an actual deposition, just a
13  handful of times.
14      Q.   Okay.  And we'll get to the testimony that you
15  referenced in court and at civil -- for the Civil
16  Service Commission, but let's focus on those deps. Were
17  all of those other depositions in connection with your
18  employment with the Illinois Department of Corrections?
19      A.   I don't believe any of those depositions were.
20      Q.   Okay.  Can you tell me, were they in
21  connection with some other professional role that you
22  have had, or have at this time?
23      A.   As -- as a police officer for a small town,
24  Cowden, Illinois, and then a -- a civil -- civil medical
25  malpractice case.

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 8 of 60   Page ID #23376
The Deposition of ZACHARY SARVER, taken on April 5, 2022
18..21

Page 18

1    Q.   Okay.  And how many of those were in
2  connection with your -- and you were the Chief of Police
3  of that police department, right?
4    A.   That's correct.
5    Q.   Were those -- were one or more of those
6  depositions in connection with your role as Chief of
7  Police of the -- was it Cowden Police Department?
8    A.   I -- I want to say yes, but I'm -- I'm trying
9  to think of a particular case.  I don't remember exactly
10  what cases those would be in -- in a deposition.
11    Q.   Do you know one way or other whether you were
12  a defendant in those one or more cases, for which you
13  sat at for a deposition?
14    A.   I was not.  No.
15    Q.   Do you know how many of those three to four
16  depositions were connected with your work as Chief of
17  Police for the department?
18    A.   No, I do not.
19    Q.   You said you also testified at a deposition
20  for a civil medical malpractice case.  Was that a case
21  in which you were a party?
22    A.   Yes.
23    Q.   You were a plaintiff?
24    A.   Plaintiff, yes.
25    Q.   And can you tell me the years of those

Page 19

1  depositions?  Were these depositions, or depositions
2  from long ago?
3    A.   Long ago.  2000 and -- early 2000s, 2004 or
4  2005.  Somewhere in that time frame.
5    Q.   Okay.  You said you've testified in criminal
6  cases.  Have you ever been a defendant in any of those
7  cases in which you gave court testimony?
8    A.   No.
9    Q.   Was that in connection with your work for the
10  police department, or was that in connection with your
11  work for the IDOC, or both?
12    A.   For -- as a police officer.  As -- as Chief of
13  Police.
14    Q.   Okay.  And you -- can you give me an estimate
15  of how many times you've testified in court in criminal
16  matters?
17    A.   A couple dozen.
18    Q.   Okay.
19    A.   Or -- or more.  Several times.
20    Q.   And you said you also testified at a Civil
21  Service Commission.  Can you just explain to me what
22  that is?
23    A.   If -- if someone is terminated in the Illinois
24  Department of Corrections, they'll -- they will -- they
25  can attempt to get their -- their job back.  And I don't

Page 20

1  really understand all the specifics of, but they will go
2  through a -- a Civil Service Commission in those cases.
3  I was asked to testify.  They were -- they were cases
4  involving a -- a -- a lack of ability to qualify with a
5  firearm.  And I was to testify.  I testified on our
6  department's standards, and -- and the training that
7  they received.
8    Q.   Can you give me an estimate of how many times
9  you've testified before the Civil Service Commission?
10    A.   I believe that's two.
11    Q.   And each of those, you were testifying
12  regarding the standards for qualification with a fire --
13  to have a firearm?
14    A.   That's correct.
15    Q.   Okay.  Let's talk a little bit about your
16  history with the Department of Corrections.  Can you
17  tell me when you first began working for the department?
18    A.   January of 2000.
19    Q.   And give me an overview of the positions that
20  you've held throughout your career.
21    A.   I was a correctional officer at Decatur
22  Correctional Center, starting in early 2000.  I stayed
23  as a correctional officer at Decatur.  In approximately
24  2001, maybe early 2002, I became the assistant tactical
25  unit commander at Decatur Correctional Center.  I was

Page 21

1  never appointed, but did work as the tactical unit
2  commander.  Our -- our tactical unit commander had a
3  medical procedure done and was out on LOA.  So I filled
4  that role for a while.
5        In 2004, I tried out for the tactical response
6  team and made that team, and so that's a -- at the time,
7  that was a part-time team.  So I continued to work at
8  Decatur as a correctional officer while working as a
9  tactical response team member, as situations arose, as
10  we were called out.  In 2014, I believe it was January
11  '14.  I could have my -- my months off, but I -- I
12  transferred to Vandalia Correctional Center as a
13  correctional officer.  Remained on the Vandalia Tactical
14  Unit as well as a member of the tactical response team.
15        In 2015, I promoted to Lieutenant at Vandalia
16  Correctional Center, again, remaining on the tactical
17  unit, and working on the Tactical Response Team,
18  remaining as a member on that team.  I believe it was
19  August of 2015 I was asked to be the Central Region
20  Special Operations Commander.  And that is a -- that is
21  a detailed position.  It's a -- it's a full-time
22  position, but you're still assigned to a facility,
23  detailed to Springfield to serve in that capacity.  I
24  served as a Regional Special Operations Commander until,
25  I believe it was 2019, January of 2019, where I became

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY  Document 642-11  Filed 05/22/24  Page 9 of 60  Page ID #23377
The Deposition of ZACHARY SARVER, taken on April 05, 2022

22..25

Page 22

1  the Special Operations Commander for the department.
2          And I want to back up just -- about a year
3  prior to that.  I -- I also was promoted to shift
4  supervisor to major, and was allowed to stay in that
5  detailed position as a shift supervisor.
6      Q.  Okay.  When did you become a lieutenant --
7  when did you promote to lieutenant at Vandalia
8  Correctional Center?  I missed that date.
9      A.  I -- I believe it was January of 2015.  I -- I
10 think it was exactly a year after I transferred from
11 Decatur to -- to Vandalia.
12     Q.  Okay.  So during these 2014 shakedowns that
13 are at issue in our case, you were a correctional
14 officer at Vandalia, who was a member of both the
15 tactical team and the -- what is it?  The Tactical
16 Response Team, TRT?
17     A.  Yes.
18     Q.  Okay.  And you participated in one or more of
19 the shakedowns at issue in this case, true?
20     A.  Yes.
21     Q.  Which prisons did you participate in
22 shakedowns?
23     A.  So I participated in Big Muddy, where -- I'm
24 sure of that.  I -- I don't -- I don't have a direct
25 recollection of participating, only that in the rosters

Page 23

1  that I was able to review, I seen that I was a member of
2  the Vandalia Tactical Unit on one of those days at Big
3  Muddy.
4          I also answered in an -- in an interrogatory.
5  Let me -- let me -- let me step back.  I also reviewed
6  my written interrogatory.  In that, I noticed that I
7  marked no initially for Menard, and then initialed that
8  and marked yes.  I have no idea why I marked yes.  I'm
9  assuming for good reason.  I don't know whether that's
10 someone said, "Oh, no, I remember you being there."  I
11 looked for documents that would say or not whether I was
12 there.  It's quite possible that I was there as a
13 tactical response team member, and not a -- not a
14 tactical unit member for Vandalia.
15         So I believe that I was there.  I don't think
16 that I would've marked it out and put, yes.  I just
17 don't recall the reason as to why I was -- said no, and
18 then changed it on my form.
19     Q.  Fair to say you don't have any recollection,
20 if you were present at Menard, of the 2014 shakedown at
21 Menard?
22     A.  That's correct.
23     Q.  Okay.  And I -- my review of the records was
24 the same as yours, but your review of the operations
25 files for the Menard 2014 shakedown didn't yield any

Page 24

1  light as to your presence, right?
2      A.  Correct.
3      Q.  You said you reviewed interrogatories.  Was
4  that the -- here, I'll put it on the screen.
5      Q.  Let's mark it as Exhibit 1.  All right.  I'm
6  putting on the screen Exhibit 1, which is titled,
7  "Survey for Correctional Officer Defendants."  And on
8  this Exhibit 1 at the top is handwritten, likely not in
9  your handwriting, "Sarver."  Is this the document that
10 you reviewed?
11         (EXHIBIT 1 MARKED FOR IDENTIFICATION)
12     A.  Yes.
13 BY MS. GRADY:
14     Q.  Okay.  Okay.  You testified that you know that
15 you participated in the Big Muddy River shakedowns, and
16 -- although you don't recall participating.  Is your
17 certainty that you participated because in the
18 operations file you saw that you were included amongst
19 the list of names for overtime reports?
20     A.  That's correct.
21     Q.  And were you designated as being in overtime
22 reports for both -- well, you were designated as being -
23 - as having overtime reported for you on May 15, 2014,
24 right?
25     A.  That's correct.

Page 25

1      Q.  And were you also designated as having
2  overtime, and so participating in the May 16th shakedown
3  at Big Muddy?
4      A.  I only saw my name on one of those reports.
5  That's not to say I didn't -- didn't miss something, but
6  that's the only one that I -- that I noticed.
7      Q.  Okay.  We'll come back to your participation
8  in these shakedowns.  You began -- I said -- I think you
9  said, was your first role in the tac team as Assistant
10 Tac Commander?
11     A.  No, I joined the team and then -- and then
12 shortly thereafter, a matter of months, I was -- I was
13 asked to be the assistant commander.
14     Q.  Okay.  Did you join the team shortly after you
15 began working as a correctional officer at Decatur?
16     A.  It was a few -- it was a few months.  We -- it
17 was a brand new facility.  They just reopened it and
18 remodeled it.  It used to be a -- a -- they had a Meyer
19 Mental Health facility.  So they -- again, they
20 remodeled it, opened it in a couple months before I got
21 there.  And it was -- it was some months after I got to
22 Decatur out of the academy that they -- that they
23 started the tactical unit.  I'm going to say late 2000.
24 And that's -- that's a -- that's a -- going to be a
25 fairly close guess.

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 10 of 60   Page ID #23378
The Deposition of ZACHARY SAWYER, taken on April 09, 2024
26..29

Page 26

1    Q.   Okay.  And why did you join the tac team?
2    A.   I have a -- military background.  I -- it
3  seemed like an -- an exciting fun thing to do.  I always
4  like new challenges.  I -- I love to train, and I also
5  was not sure whether or not I was going to stay with the
6  department.  I thought about federal or state law
7  enforcement, and I thought it would also be something
8  that would potentially boost my resume.
9    Q.   Okay.  Can you tell me -- that, you know, jogs
10 the question in my mind, why did you apply for the
11 Department of Corrections in the first place?
12   A.   Because I had a new son on the way, and I
13 needed a job badly.
14   Q.   And you mentioned that you have a military
15 background, and you talked a little bit about that
16 earlier.  What -- can you tell me, what is your military
17 background?
18   A.   I -- I joined the Army in 1993.  I served four
19 years as a reconnaissance specialist.  And after --
20   Q.   What did -- go ahead.
21   A.   I'm sorry?
22   Q.   No, go ahead.
23   A.   And then after my four-year -- (Coughs) excuse
24 me -- four-year enlistment, I joined the Louisiana
25 National Guard while I was going to college in

Page 27

1  Louisiana, and then later transferred to the Illinois
2  National Guard.  While I was in the Illinois National
3  Guard, I -- I did, you know, numerous deployments and
4  trips, Bulgaria, Ukraine, Germany for eight months, Iraq
5  for a year, in Afghanistan for nine months.  I retired
6  as a First Sergeant of Infantry Company out of
7  Litchfield, Litchfield, Illinois, in 2013.
8    Q.   So when you moved to Illinois -- did you move
9  to Illinois from Louisiana, or did you go someplace else
10 first?
11   A.   I moved to Illinois from Louisiana.
12   Q.   And you remained enlisted with the National
13 Guard through Illinois at that point?
14   A.   That's correct.
15   Q.   And you mentioned your retirement, so is that
16 an honorable discharge, or is that actually retirement?
17 What is the phrase that the -- is used?
18   A.   It's -- it's retirement.  It's -- it's an
19 honorable discharge, but actually, it's a retirement.
20   Q.   Okay.  And what is a reconnaissance
21 specialist?
22   A.   The -- full actual term is armored
23 reconnaissance specialists.  They -- they do
24 reconnaissance for -- for friendly units, such as
25 infantry and armor units, in -- in particular to

Page 28

1  identify -- at the time, of course, it was, you know,
2  late Cold War era, but armored -- to -- to identify
3  armored -- enemy armored assets.
4    Q.   And did you serve abroad during your four-year
5  period with the Army?
6    A.   I did one -- one year tour in Korea.
7    Q.   Okay.  You said you weren't sure that you
8  wanted to stay with the department.  Did you seek
9  employment with federal or state law enforcement?
10   A.   So whenever I was -- I was going to school.  I
11 was a psych major at NSU in Louisiana, and I had had
12 hopes of federal law enforcement, if not going back home
13 to Illinois, and the Illinois State Police.  My wife at
14 the time, we got pregnant, and she got out of the
15 military, and we moved back home to Illinois.
16        So I -- I basically cashed in.  I was a -- I
17 was -- had 86 hours towards my bachelor's degree in
18 psychology.  I basically cashed that in for a general
19 studies associate's and thought that I would come home
20 and hopefully go to work with my military background.
21 I'm -- I'm a Ranger School graduate as well, and thought
22 that I would stand a very good chance of getting in
23 Illinois State Police.
24        Little -- little did I know that Illinois
25 State Police, in the time that I was gone from 1993 to

Page 29

1  1997, changed their requirements from associate's degree
2  to a bachelor's degree.  So I -- as well as very
3  competitive in law enforcement, and basically no local
4  agencies were hiring.  So I applied for the Department
5  of Corrections.
6    Q.   You said you were a Ranger School graduate as
7  well.  Is -- did I get that right?
8    A.   Correct.
9    Q.   I'm just not -- I'm just not familiar with
10 Ranger School.  Can you just tell me what that is?
11   A.   The Army Ranger School, being an Army Ranger,
12 it's the -- it's the United States Army's most elite,
13 they -- they will call it an advanced leadership course.
14 It's a Special Operations course designed for a ranger's
15 mission.  Their primary mission would be airfield
16 seizure, or other Special Operations units to come in.
17 But it's a -- it's -- it's a Special Operations tactical
18 course that focuses on military leadership in the most
19 strenuous combat replicated environments.
20   Q.   Did you -- once you began working for the
21 Department, did you ever at that point earn your
22 bachelor's, or is your associate's the highest degree
23 that you've achieved to date?
24   A.   Once the dust settled and I got back home, I
25 went to school at Eastern Illinois University and -- and

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 11 of 60   Page ID #23379
The Deposition of ZACHARY  SAWYER, taken on April 05, 2024
30..33

Page 30

1   have a -- a bachelor's in general studies.
2        Q.   And when did you obtain that degree?
3        A.   I believe it was December of 2014.
4        Q.   So you were attending part-time while still
5   working with the Illinois Department of Corrections?
6        A.   That's correct.
7        Q.   And have you obtained any degrees beyond the
8   bachelor's in general studies from Eastern Illinois
9   University?
10       A.   No.
11       Q.   Did you, after you began working for the
12  Illinois Department of Corrections, seek employment in
13  federal or state law enforcement at any point up to the
14  present time?
15       A.   I have applied for a position with BOP years
16  ago.  I -- I did not pursue on -- on my own.  I -- I
17  didn't not get hired.  I -- I just -- I declined to go
18  any further in application process.  I've also applied
19  as a gaming special agent for Illinois Gaming Board, and
20  did not get hired, and I believe that is it.
21       Q.   Okay.  So during your tenure at Decatur
22  Correctional Center in 2004, you joined the Tactical
23  Response Team, right?
24       A.   Yes.
25       Q.   And can you tell me from -- let's see.  You

Page 31

1   were at Decatur for almost 14 years, right?
2        A.   Yes.
3        Q.   Can you tell me how many facility-wide
4   shakedowns at Decatur Correctional Center occurred
5   during that time?
6        A.   Facility wide at Decatur?
7        Q.   Yes.
8        A.   Or -- I don't know that we -- we had a
9   facility-wide shakedown at all in that 14 years.
10       Q.   Did you, in that 14 years, participate in any
11  facility-wide shakedown, at any facility within the
12  IDOC?
13       A.   Yes.
14       Q.   Okay.  Let's just start with the prisons.  Was
15  it more than one time?
16       A.   Absolutely.  In the tenure that I was in
17  Decatur as a tactical unit member, or a Tactical
18  Response Team member, I've done several dozens.  I'm --
19  I'm sure at least a couple dozen during the time I was
20  at Decatur alone.
21       Q.   Can you tell me, based on, you know, your
22  tenure with the Department and knowledge of the Special
23  Operations Response Team, do TRT members tend to get
24  called more frequently for facility-wide shakedowns?
25  Well, that's a bad question.  Let me ask it a different

Page 32

1   way.  There are less TRT members statewide, than there
2   are Tactical Team members, right?
3        A.   That's correct.
4        Q.   And during your tenure at Decatur, can you
5   give me some estimates as to how many statewide TRT
6   members there were; if you knew?
7        A.   We've -- we've always been authorized 24 for
8   as long as I've been on a team.  That's -- it's been
9   much lower than that.  It is -- it's -- it never was
10  above that.  I would say on average 18 to 20.
11       Q.   And are there TRT members that are called to
12  be present during every facility-wide shakedown; to your
13  knowledge?
14       A.   Not -- not everyone.  I would say the vast
15  majority, there is -- is some complement of TRT members
16  at that -- at that facility-wide search.
17       Q.   Okay.  During your tenure at Decatur, can you
18  tell me which prisons you recall participating in
19  facility-wide shakedowns?
20       A.   I -- I -- I don't recall.  Numerous, but so
21  many I -- I couldn't tell you accurately, specifically,
22  what -- what facilities we were in during those years.
23       Q.   Did you, during that period of time, ever
24  participate in multiple facility-wide shakedowns at the
25  same prison?

Page 33

1        A.   I don't know that I understand what you're
2   asking.
3        Q.   So you were there for 14 years.  Let's take
4   Menard as an example.  Did you ever -- in those
5   14 years, did you participate in more than one -- well,
6   did you participate in one facility-wide shakedown at
7   Menard during that time?
8        A.   I -- I don't remember specifically, but I -- I
9   would -- I would guess yes.  Probably more than one.  I
10  mean, that -- that's a maximum security facility, so the
11  likelihood of having -- there's going to be more
12  shakedowns, more searches that take place at our maximum
13  security facilities than -- than facilities of lesser
14  security levels.
15       Q.   And when you're saying, "shakedowns," you mean
16  facility-wide shakedowns, right?
17       A.   That's -- that's correct.  And -- and let me
18  back up.  I do absolutely recall the -- going to Menard
19  at least once in Decatur, because that is the first
20  tactical search that I was ever part of as a -- as a
21  Tactical Unit member at Decatur.
22       Q.   Do you recall when that was?
23       A.   It would've been prior to 2002.  It would've
24  been prior to September 11th, shortly after September.
25  In January 2002, I left for Germany for eight months, so

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY Document 642-11 Filed 05/22/24 Page 12 of 60 Page ID #23380
The Deposition of ZACHARY SAWYER, taken on April 05, 2024
34..37

Page 34

1  it would've been early 2001 time frame.
2      Q.  And do you know during that time frame whether
3  there was a schedule for shaking down facilities, either
4  based on security level, or any other reason? In other
5  words, not, oh, it happened a couple of times because
6  there were a couple of incidents.  But whether, to your
7  knowledge, there was a schedule that every X months or
8  years we perform a facility-wide shakedown at Menard?
9          MS. BAUTISTA:  Object to form.
10  BY MS. GRADY:
11      Q.  You can answer.
12      A.  I'm -- I -- I have no idea what -- what their
13  -- if there was a schedule, or what their exact
14  reasonings were for the shakedowns.  At those times, I
15  was a -- I was a very low ranking member of the -- of
16  the Special Operations.
17      Q.  Okay.  Fair enough.  And did you gain any
18  insight against -- still focused while you were at
19  Decatur, did you gain any insight into the decision
20  making process about whether and when to conduct a
21  facility-wide shakedown when you became a member of the
22  TRT team?
23      A.  Working on TRT as a -- as you work more
24  closely with the regional commanders.  So you do have a
25  better understanding of what's going on department wide.

Page 35

1  We would know more so than we would working in the
2  facilities as a regular correctional officer, or a
3  correctional lieutenant, about the issues that were
4  plaguing, if you will, certain prisons.  So -- so yes,
5  we -- we did know as TRT members when, say Pontiac
6  Correctional Center was having a particular issue with
7  drugs, or weapons, or staff assaults, or -- or, you
8  know, those types of issues that would warrant a
9  tactical search.  So as a TRT member, yes, we had a
10  little better insight.
11      Q.  Okay.  Let's back up for a minute and just
12  talk about, based on your experience within the Tactical
13  Team, what is the purpose of the Tact Team?
14      A.  The tactical unit at the facilities, and --
15  and I -- I -- I tell them this all the time, you're not
16  just tactical.  You're a member of Special Operations,
17  and Special Operations is anything that is -- is not
18  within the norm.  COVID was a perfect example of -- of
19  having tactical unit members, a member of the Special
20  Operations Response Team assisting with transporting PPE
21  for -- for COVID.  So it's not just tactical, but we can
22  focus on the tactical duties there.
23          They of -- of course, would assist the
24  Tactical Response Team with hostage rescue operations,
25  mainly in perimeter work.  Also riot control, and large

Page 36

1  scale disturbances, they would be activated to -- to
2  quell those situations.  Any escape operations.  If
3  someone was to escape from a facility, they would --
4  they would man escape posts and potentially assist
5  Tactical Response Team with fugitive apprehension
6  operations.
7          The more routine operations, of course, would
8  be for cell moves, or cell extractions -- that
9  happen sometimes daily in maximum security facilities.
10  And -- and maybe years ago in a -- in a minimum security
11  prison before a Tactical Unit would have to do a cell
12  extraction in -- in, say Vandalia Correction Center.
13      Q.  Okay.  So those -- let's leave COVID to the
14  side, because at the time of our issue, COVID hadn't yet
15  made its way on the scene.  The other categories that
16  you described as being, you know, the tasks for the
17  Tactical Team, hostage situations, riots or large scale
18  disturbances, escape situations, potential assistance
19  with fugitive apprehension, and cell moves or
20  extractions, those are situations in which it is
21  expected that force may need to be used?
22      A.  No, I -- I would not say expected.  And -- and
23  I also want to clarify my answer that question, in
24  addition to the obvious of what we're talking about now,
25  which would be tactical searches at -- at facilities.

Page 37

1  So I -- I want to make sure that's included in the
2  spectrum of the operations for tactical units.  But
3  there -- there's -- there are not operations that we go
4  in expecting to use force.  I mean, that situation's
5  going to be dictated by -- by the individual in -- in
6  custody.  There are situations that we go into that we
7  know that it's more likely, or more possible than
8  others, that force would be necessary.
9      Q.  Well those categories that I just repeated
10  back to you, hostage situations, riots or large scale
11  disturbances, escape situations, fugitive apprehension,
12  and cell moves or cell extractions, those are situations
13  in which you would have a greater expectation of a need
14  to use force, right?
15          MS. BAUTISTA:  Objection.  Argumentative.
16          THE WITNESS:  I -- I would say that's true.
17  BY MS. GRADY:
18      Q.  Okay.  The TRT team, those are the individuals
19  who are authorized to wield weapons within the
20  correctional facility?  Is that right or is that wrong?
21      A.  That -- that's -- that's somewhat correct.  I
22  mean, the standard that needs to be met to carry a
23  firearm inside a facility is -- is very high.  I mean,
24  there's -- other than our towers, perimeter towers,
25  dietary towers, things of that nature, for someone to --

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 13 of 60   Page ID #23381
The Deposition of ZACHARY   SAWYER, taken on April 05, 2024
38..41

**Page 38**

1  to carry a weapon in a facility would involve something.
2  I'll give -- give you an example.  It would be a hostage
3  rescue operation.
4     **Q.   Okay.  But -- and not just anyone can wield a**
5  **firearm within a correctional institution in IDOC.  That**
6  **can only be satisfied outside of the tower situation by**
7  **a member of the TRT; is that right?**
8     A.   There's -- there's not policy that specifies
9  that exactly, but in a situation like that, I'm -- a
10  command post would most likely be open.  The incident
11  commander would make those decisions.  And it's -- it's
12  highly unlikely that they would authorize even Tactical
13  Unit members, or non-tactical unit security personnel
14  such -- such as a correctional officer, sergeant, or
15  lieutenant to conduct an operation that would require
16  the use of a firearm.
17          It would -- it would've to be under grave
18  circumstances where let's say, for instance, a hostage
19  situation where a TRT member is -- is two hours out, and
20  not yet arrived, and it's -- and -- and they felt it
21  necessary to arm say a regular tactical member in case
22  that situation called for the use of a weapon.  It would
23  be highly unlikely, but I -- there is no policy says
24  they cannot.
25  BY MS. GRADY:

**Page 39**

1     **Q.   Okay.  Well, then I am just misunderstanding.**
2  **Can you tell me what separates the TRT member from the**
3  **tactical member?**
4     A.   A very rigorous application and testing
5  process, along with weeks of training.  So tactical --
6  TRT members are selected from the roughly 800 to 900
7  Tactical Unit members.  They have an application process
8  that they go through, a written application process.
9  Then from there -- there -- there'll be a paper review
10  and then a tryout procedure, which involves a shooting
11  test, a physical agility test, and an oral interview.
12          And then members are selected to go through a
13  training course to be a TRT operator from there.  If
14  they pass that, they're on the team, and then they'll
15  have the opportunity later to go to FBI SWAT school.  And
16  once they make it through FBI SWAT school, then -- then
17  we consider them a, you know, on the -- on the team, if
18  you will.
19     **Q.   And in function, what is the difference**
20  **between a member of the Tactical Team and a member of**
21  **the TRT team?**
22     A.   Tactical Unit members handle more things
23  inside the facility, such as cell extractions.  They're
24  the -- they're, of course, the bulk of the work during
25  tactical searches at facilities.  Also, they are better

**Page 40**

1  trained, better equipped, and better prepared for things
2  like riot control, or large scale disturbances where
3  your -- your operational and training pinnacle of your -
4  - of your Tactical Response Team is hostage rescue.  Not
5  to say that -- that TRT does not do other things.  Of
6  course, hostage rescue is a very rare thing.  There's
7  been two since I've been on the Department.  But also
8  specialized in things such as fugitive apprehension, out
9  of state extradition, and high risk transports within
10  the state.
11     **Q.   Okay.  So when you became a member of the TRT**
12  **team, did you gain any understanding as to whether --**
13  **again, sorry, we're still focused on the time when**
14  **you're at Decatur.  When you became a member of the TRT**
15  **team, did you gain an understanding of whether or not**
16  **facility-wide shakedowns were ordered exclusively**
17  **because of incidents or issues that were at the**
18  **institution, or whether they also occurred because they**
19  **were on the schedule to occur at regular intervals?**
20     A.   I don't know anything of a schedule.  I --
21  I've never heard of a schedule.  There's never been a
22  schedule that I've been told about.  And -- and never in
23  my tenure as a regional commander, or currently as a
24  Special Operations commander, has there ever been a
25  schedule for tactical operations within a facility.  To

**Page 41**

1  my knowledge, they are all incident driven.
2     **Q.   Okay.  And today, do you have the ability,**
3  **unilaterally, to decide to conduct a facility-wide**
4  **shakedown on one or more facilities for any reason?**
5     A.   Absolutely not.
6     **Q.   Who -- do you have the ability to initiate a**
7  **consideration of a facility-wide shakedown?**
8     A.   I have the ability to recommend, yes.
9     **Q.   And who has the authority to order that the**
10  **facility-wide shakedown will occur?**
11     A.   The chief of operations.
12     **Q.   Who is that person today?**
13     A.   Justin Hammers.
14     **Q.   You are aware that in 2014, that person was**
15  **Joseph Yurkovich, right?**
16     A.   It wasn't until I reviewed the -- the
17  testimony in the -- in the previous depo -- or in the
18  other depositions that I remembered who the deputy
19  director -- excuse me, the chief of operations was at
20  the time.
21     **Q.   He was not the director of operations at the**
22  **time you became a regional, or then statewide commander.**
23  **Is that true or is that not true?**
24     A.   No, it was Mike Atchison whenever I became the
25  regional special operations commander.

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 14 of 60   Page ID #23382
The Deposition of ZACHARY SAWYER, taken on April 05, 2024

42..45

Page 42

1    Q.   And did you -- so as to Yurkovich, do you work
2  closely with him in any capacity?
3    A.   No.  I -- I've seen the guy around, but I
4  don't know that I ever spoke to him.
5    Q.   You did work closely with Atchison once he
6  became chief of operations?
7    A.   Yes.
8    Q.   And was he chief of operations when you became
9  the statewide commander?
10   A.   I believe that it was Sandy Funk after him.
11 And -- and there could have been a small amount of
12 overlap there.  I -- I'd have to be refreshed on the
13 dates that -- that he came and went, as well as Sandy.
14   Q.   Okay.  So there might have been some overlap
15 between your taking the position of statewide commander,
16 but shortly, if not even before you became statewide
17 commander, Sandy Funk became the chief of operations?
18   A.   That's correct.
19   Q.   Did you work closely with Mr. Atchison, or
20 Chief Atchison, in your role as central regional special
21 operations commander?
22   A.   Yes.
23   Q.   And can you tell me the nature of the work
24 that you would work together that leads you to say you
25 worked closely with him?

Page 43

1    A.   Being that the statewide commander was --
2  lived further up north, I had more direct interaction.  I
3  don't want to say -- I don't want to say I had more
4  direct interaction with him than the statewide
5  commander.  That wouldn't be true, but I did have more
6  direct interaction with him than other regional
7  commanders, simply because of the proximity to him in
8  the office.  So he liked -- he liked to have face-to-
9  face meetings.  So oftentimes it was easier for me to go
10 over there and discuss tactical operations, policies,
11 training, so on and so forth, with -- with him.
12   Q.   Was his office also in Concordia Court?
13   A.   Yes, it was.
14   Q.   And who was the statewide commander when you
15 became the central regional special operations
16 commander?
17   A.   Rob Brady.
18   Q.   Did you ever -- you -- were you aware that at
19 the time of these shakedowns, the statewide commander
20 was David White?
21   A.   Yes.
22   Q.   Did you work closely with David White in any
23 capacity, any point during his tenure?
24   A.   I was a TRT member.  We -- we worked more
25 closely with our regional commanders than the statewide

Page 44

1  commander.  But, you know, I had routine interaction.  I
2  don't want to say routine, but I mean, there wasn't
3  generally a month that would go by that we wouldn't have
4  some sort of communication with the statewide commander.
5    Q.   And what sorts of topics would generate that
6  conversation?  Like, what were you guys working together
7  about?
8    A.   Primarily hostage rescue training is the --
9  again, that's the focal point.  That's what we got
10 together and trained on -- on the most.  We're also --
11 we also run the firearms program for the Department.  So
12 everything firearms related when it comes to inventory,
13 purchasing of ammunition, training firearms instructors,
14 initially training cadets, training executive staff,
15 almost everything firearms related in the department is
16 handled by the special operations unit.  So we would
17 frequently have meetings regarding firearms training and
18 policies, or policy revisions.
19   Q.   Is Vandalia in the central region?
20   A.   Well, Vandalia is -- it used to be North,
21 Central, South.  Now it's Region 1, 2, and 3.  And I do
22 not remember if I fell at the time under the Southern
23 region as Vandalia as a TRT member or the Central.  They
24 moved these regions, and renamed them, and moved them
25 around over the years.  Currently, Vandalia is part of

Page 45

1  Region 3.
2    Q.   Which would be the Southern?
3    A.   Which would -- would be the -- it's the
4  Southeastern.  Yes.
5    Q.   And you -- were you aware that Anthony
6  McAllister was the regional tactical -- was one of the
7  regional tactical commanders during the 2014 shakedowns
8  at issue in this case?
9    A.   Yes.
10   Q.   Did you work closely with him in any capacity
11 during his tenure with the Department?
12   A.   I did.
13   Q.   And what was the nature that -- of the, you
14 know, work that you did that leads you to say that you
15 worked closely with him?
16   A.   He being the -- the regional commander, all --
17 you know, most of our direction to conduct operations or
18 training came at the direction of him.
19   Q.   Okay.  And when you moved to Vandalia in 2014,
20 were you -- did you have any leadership position on
21 either the Tact Team or the TRT?
22   A.   No.
23   Q.   Is there a leader of the TRT specifically?
24   A.   That would be myself, currently as a Special
25 Operations commander.

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY    Document 642-11    Filed 05/22/24    Page 15 of 60    Page ID #23383
The Deposition of ZACHARY SAWYER, taken on April 05, 2024
46..49

Page 46

1    Q.   Okay.  So -- right.  So you oversee all of the
2    special operations teams of any sort, but is there
3    anyone -- like with the Tactical Team at each facility,
4    there's a Tactical Team commander and an assistant
5    tactical commander, right?
6        A.   That's correct.  But --
7        Q.   Is there any -- go ahead.
8        A.   There's only the regional commander -- the
9    commander or the regional commander, and then -- then
10   not by policy or anything specified, we do have senior
11   ranking people that have been on that team for a while
12   that -- that could be named to say for instance, in
13   Region 1 right now, currently Josh Horton.  If Dan Artl,
14   who's the regional commander, was going to go on
15   vacation, Josh Horton, who has the most experience on -
16   - on that team in Region 1 would take Dan Artl's phone
17   calls and -- and conduct all the emergency -- any kind
18   of preparation or -- or conduct any operations if that
19   happened.  But there's no official title or rank
20   associated with that.
21       Q.   Do you know who was the Tactical Team
22   commander at Vandalia when you transferred over?
23       A.   I -- I don't know initially who it was to
24   begin with.  I know shortly after I got there, it was
25   Jesse Rosenberger.  And he could have been when I first

Page 47

1    got there, but I don't remember.
2        Q.   Do you know who was the -- do you know who was
3    the assistant tact commander?
4        A.   I -- I believe, and again, not 100 percent
5    sure, but Todd Whettin.
6        Q.   Okay.  And did you at any point during your
7    tenure, before you became the central regional special
8    operations commander, and you know, took that job
9    outside of the prison, did you ever hold any leadership
10   roles in the Tactical Team at Vandalia?
11       A.   No.
12       Q.   Did you ever seek to hold any leadership roles
13   on the Tactical Team at Vandalia?
14       A.   No.  And -- and to maybe help -- help better
15   understand this, to be clear, a -- a TRT member is too
16   busy and gone from -- from the facility too often to
17   hold a leadership position in the tactical unit.  So --
18   so we -- we -- we forbid a TRT member from being
19   assistant commander, squad leader, or commander on a --
20   on a tactical unit at a facility.
21       Q.   I appreciate the clarification.  So
22   when you became a TRT member in 2004, you stopped being
23   the assistant tact commander at Decatur?
24       A.   Now would you state that again, please?
25       Q.   You first joined the TRT team in 2004, right?

Page 48

1        A.   Yes.
2        Q.   And prior to that time, you had already been
3    named as assistant tact commander at Decatur, right?
4        A.   Yes.
5        Q.   Did you stop serving as the assistant tact
6    commander at Decatur when you joined the TRT team?
7        A.   That's correct.  Yes.
8        Q.   Okay.  What is your understanding of the scope
9    of the shakedowns that occurred in 2014?  And I'm sorry.
10   Let me withdraw the question and get you there a little
11   easier.  You recall that there were shakedowns, and you
12   saw documentation that there were shakedowns in --
13   facility-wide shakedowns in 2014 of Big Muddy, Illinois
14   River, Menard, and Lawrence, true?
15       A.   Yes.
16           MS. BAUTISTA:  Object to form.
17   BY MS. GRADY:
18       Q.   Were you aware of the facilities, other than
19   those four prisons, were subjected to facility-wide
20   shakedowns in 2014?
21       A.   State that again, please?
22       Q.   Do you know whether or not there were other
23   prisons that were the subject of facility-wide
24   shakedowns in 2014?
25       A.   We generally, if you will, hear it through the

Page 49

1    grapevine that there are tactical operations at another
2    facility.  I don't -- I don't recall.  I mean, that was
3    years ago.  But I -- I'm sure we found out one way or
4    another whether there was a tactical operation at a
5    facility that we weren't called out to be a part of.
6        Q.   Okay.  So for example, I'll represent to you
7    that I believe Pinckneyville Correctional Center was one
8    of the prisons that was also shaken down in 2014.  Do you
9    know whether you were aware of that fact back in
10   2014?
11       A.   I -- I very possibly could -- could have been
12   a part of that tactical search.  I -- I don't know.
13       Q.   I think you might have.  So do you -- let me
14   ask it this way.  Do you recall being made aware in 2014
15   of a plan to perform facility-wide shakedowns at every
16   prison in the state?
17       A.   No.
18       Q.   And now, not focused on 2014, did you ever, at
19   any point in time, come to learn of a plan to perform
20   facility-wide shakedowns at every prison in the state
21   back in 2014?
22       A.   I -- let me clarify what you -- you're asking
23   if now, now in my current capacity that I'm aware that
24   there was a plan to conduct tactical searches at every
25   prison in the state in 2014?  Is that what you're

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 50

```
1    asking?
2       Q.    Yes.
3       A.    No.  I -- I'm unaware of such a plan.
4       Q.    Okay.  Vandalia is a minimum security?
5       A.    Yes.
6       Q.    Did you transfer to Vandalia because of your
7    preference, or was it something that you were ordered to
8    do?
9       A.    No, my preference.
10      Q.    And what was the reason you sought to move
11   facilities?
12      A.    A better chance for promotion, ability to work
13   on day shift initially, and it's 25 miles closer to my
14   home.
15      Q.    Okay.  Do you -- strike that.  Were you
16   involved in any aspect of the planning of any of the
17   2014 shakedowns?
18      A.    No.
19      Q.    Do you recall, as you sit here today -- well,
20   strike that.  You saw in your survey that you indicated
21   that you attended a meeting in advance of the one or
22   more shakedowns you participated in, right?
23      A.    Correct.  There's a briefing prior to every
24   tactical search.
25      Q.    As you sit here today, do you recall the
```

Page 51

```
1    contents of any of those briefing that you attended in
2    2014, part of a facility-wide shakedown that year?
3       A.    I don't remember specifically what was said at
4    any given briefing, other than -- I -- I mean, I could
5    testify as to the general content of -- of every one of
6    them I ever attended, if that helps.
7       Q.    Well I appreciate the clarification, but I'd
8    like to just take this one step at a time.  I want to
9    focus on your recollection as you sit here today, not
10   based on how things typically go, but your recollection
11   as you sit here today of any of the contents of any
12   briefing you attended in 2014 as part of a facility-
13   wide shakedown.  Do you have any such recollection?
14      A.    Not specifically, no.
15      Q.    And I just need to make sure I understand.
16   When you say, "not specifically," is it your testimony
17   that you do have a recollection of attending a briefing
18   in 2014, that that recollection is only general rather
19   than specific?
20      A.    That's correct.
21      Q.    Okay.  Tell me -- and again, I'm not -- we
22   will get to what is the sort of typical briefing, and I
23   want to hear about that, but I want to make sure that
24   we're first talking about your specific recollection of
25   briefings that you attended in 2014.  Can you tell me,
```

Page 52

```
1    to the greatest specificity you are able, the content of
2    those briefings?
3             MS. BAUTISTA:  Object to form.
4             THE WITNESS:  Every tactical search that I've
5       ever been a part of, as a TRT member or a tactical
6       unit member, the person in charge of that operation
7       will brief all those participating on why we're
8       there.  And that is in every case that I can
9       remember, was incident driven due to violence,
10      drugs, and/or weapons, sometimes all three in the
11      facilities.  And there would also be a breakdown of
12      who is going to what locations. Also, where we are
13      going to bring the individuals, as far as a staging
14      area, while the -- while the -- the tactical
15      searches is being conducted.  Those are the general
16      things that would be discussed in every briefing
17      prior to an operation.
18   BY MS. GRADY:
19      Q.    Okay.  Is that the greatest degree of
20   specificity that you recall being part of the meetings,
21   or briefings, in advance of the shakedowns in 2014,
22   specifically?
23      A.    Yes.
24      Q.    Were -- have you ever heard the phrase,
25   "spring-cleaning initiative"?
```

Page 53

```
1       A.    No.
2       Q.    And have you ever participated in a shakedown
3    that you were made aware yielded no contraband?
4       A.    There is not a tactical search that I am aware
5    of that yielded zero contraband.  There are searches,
6    and I can't remember specifically, but -- but I -- I
7    know that there are searches that we have conducted that
8    yielded no major contraband.
9       Q.    Okay.  And what is the distinction that you
10   are making between major, and I assume minor contraband?
11      A.    The -- the -- the things that I will -- will
12   include for the sake of this discussion as major
13   contraband will be drugs and weapons.  And -- and let me
14   -- let me -- let me clarify that, too.  And by -- by --
15   by drugs, I mean, illicit drugs brought into the
16   facility.  I -- I'm going to include for the sake of
17   this discussion, minor contraband, including
18   prescription medication that the individuals in custody
19   would be prescribed, and maybe misused and/or traded,
20   and had in their possession that weren't marked or kept
21   according to policy.  As well as things like tattoo
22   guns, things of that nature would be on the minor side.
23   I cannot think of any tactical search that we've
24   conducted that didn't have some of that stuff.  But I
25   know there's been some that did not have major
```

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 17 of 60   Page ID #23385
The Deposition of ZACHARY SAWYER, taken on April 05, 2024

54..57

Page 54

1  contraband.
2       Q.   Do you know who led the briefings that you
3  attended at Big Muddy River Correctional Center in
4  2014?
5       A.   I -- I don't recall specifically.  The
6  regional commander at the time was -- was Anthony
7  McAllister, was most likely him, but I -- I don't recall
8  specifically.
9       Q.   Do you recall who led the briefings at Menard
10 that you likely, as you testified, attended as part of
11 those shakedowns in 2014?
12      A.   That also would've been a -- a Southern Region
13 operation, and most likely Anthony McAllister, but I --
14 I don't recall.  I believe at the time David White was
15 the Southern Region commander, and it just as likely
16 could have been David White as well.
17      Q.   Does the statewide tactical commander ever
18 lead briefings during your tenure as regional or
19 statewide commander?
20      A.   Yes.  Typically, those will be done by the
21 regional commander, but occasionally the statewide
22 commander doesn't go to all of the tactical searches. So
23 we, of course, try to make it to as many as we can. Some
24 of those we will take point on and run the operation.
25 But the majority of the time it's -- it's ran by the

Page 55

1  regional commander.
2       Q.   Have you ever participated -- prior to you
3  serving as central regional special operations
4  commander, did you ever serve as a TRT member for one or
5  more facility wide searches?
6       A.   Yes.
7       Q.   And typically based -- would you -- did you --
8  how many facility wide shakedowns did you participate in
9  in that role?
10      A.   I -- I couldn't tell you.  I mean, numerous,
11 half a dozen, dozen, 20.  I mean, I've been to -- to
12 many of them as a TRT member, but I -- I couldn't tell
13 you-all over the state and -- but I could not tell you
14 specifically which ones and what times.
15      Q.   When you became a central regional special
16 operations commander, did you remain on the TRT team, or
17 did that stop?
18      A.   So to -- to clarify all -- all the regional
19 commander and the statewide special operations commander
20 still, of course, consider them a member -- ourselves a
21 member of the TRT team.  We still keep the same training
22 standards, qualification standards, and -- and the same
23 gear to respond for two similar incidences, so yes.
24      Q.   Okay.  But you don't have the same active role
25 that a non-special operations leadership position would

Page 56

1  have, fair?
2            MS. BAUTISTA:  Object to form.
3            THE WITNESS:  Could you -- could you clarify
4       that?  I -- I don't understand what you're asking.
5  BY MS. GRADY:
6       Q.   Yeah.  You said that TRT team members can't
7  serve as leadership in the tactical teams because
8  they're so often offsite, you know, doing things like
9  hostage rescue, which is rare, or things with fugitives,
10 and then high risk transportation, and sounds like also
11 facility wide shakedowns.  I guess what I'm asking is:
12 Do you have the same -- when you're in leadership in the
13 special operations team as either a regional commander
14 or a statewide commander, do you have the same active
15 role as a TRT team member as non- regional or statewide
16 TRT positions?
17           MS. BAUTISTA:  Object to form.
18           THE WITNESS:  I -- I -- I'm still -- let me
19      try to understand this, or -- or maybe answer this.
20      A -- a -- a tactical, or excuse me, a TRT
21      commander, or a special operations commander, or
22      regional commander, can and sometimes does still do
23      the same jobs.  It's rare, but for instance, let's
24      say we have a -- an emergency transport from one
25      facility to the next of a very high risk, or high

Page 57

1  profile individual.  And everybody in that region
2  is busy doing something that they cannot be pulled
3  from.  And you have to remember that we have, you
4  know, currently right now we have 23 members, and
5  we're a very busy team.  So occasionally there is
6  an instance where the regional commander or myself
7  will say, "Don't worry about it, I got this. I'm
8  going to go with operator Joe, and we're going to
9  go -- we'll go handle this -- this transport." So
10 we don't put ourselves in a position where we feel
11 that we're above the ability to fill in the gaps
12 when necessary.  I hope that answers that.
13 BY MS. GRADY:
14      Q.   Okay.  It does.  I want to talk a little bit
15 about the facility wide shakedown since you've become
16 statewide commander.  So you've been in that role for a
17 little over five years now?
18      A.   Yes.  Like 2019, so yeah, over five years.
19      Q.   And can you tell me how many times you have
20 recommended or obtained approval to perform a facility
21 wide shakedown at Menard?
22      A.   At Menard specifically?
23      Q.   Yes.
24      A.   I -- I -- I mean, I could -- it would be -- I
25 could not tell you whether those tactical operations are

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 18 of 60   Page ID #23386
The Deposition of EXHIBIT   SAWERY, taken on 3p 19 05, 2024

58..61

Page 58

1  -- were driven by me, whether, you know, say we have a
2  reportable incident access so we're able to see all the
3  bad things, if you will, to go on in the department.  I
4  -- I can't tell you, and I don't know if there's any way
5  to -- to differentiate between the tactical operations
6  that were driven by special operations that says, "Hey,
7  chief of operations, there's a lot of drugs, and there's
8  been seven shanks found by the weapons task force in the
9  last, whatever. I think we should do a tactical
10  operation, a tactical search in Menard Correctional
11  Center," versus the chief of operations coming down to
12  me and saying, "Hey, we've had this, this, and this
13  happen, I think we need to do a tactical operation."
14          I -- I -- I don't know how I could
15  differentiate or find out an exact answer for you.  I
16  could tell you how many times that -- that -- that those
17  operations have been conducted in my tenure, but it
18  would take -- it would take a review of my records.
19          Q.    Can you give me your best estimate of that
20  number?  Understanding you don't have your records in
21  front of you.
22          A.    So as a special operations commander since
23  2019, I'm sure more than a dozen, may -- maybe two
24  dozen, maybe more.
25          Q.    Facility wide shakedowns?

Page 59

1          A.    That's correct.
2          Q.    What about at Lawrence Correctional Center?
3          A.    Less, but a -- a handful.  Three or four,
4  five, maybe.
5          Q.    What about Illinois River?
6          A.    We -- we've had -- we've had tactical searches
7  at Illinois River since I've been the statewide
8  commander.  I -- maybe a couple.
9          Q.    What about Big Muddy River?
10          A.    Yes.  I'm -- I'm not so sure that as the -- as
11  the special operations commander since 2019, that we've
12  not done a tactical search in every facility in the
13  department.  If we've missed any, I -- I think we've
14  even done one at Decatur.  If we've missed any, it's
15  been just a -- a handful of -- of -- and those will be
16  facilities with -- with very, very low security
17  populations.
18          Q.    Okay.  Can you tell me how many -- an
19  approximate number of times that you performed a
20  facility wide shakedown at Big Muddy River?
21          A.    No.  Again, I could -- I could review our
22  records and tell you.  But I mean, a few, two or three,
23  it may be more.
24          Q.    Okay.  So a facility like Southwestern
25  Illinois Correctional Center, that's a minimum security

Page 60

1  prison, right?
2          A.    That's correct.
3          Q.    You -- but you are confident that you've
4  shaken -- you've performed a facility wide shakedown at
5  Southwestern Illinois Correctional Center during your
6  tenure as statewide commander?
7          A.    We've done one that I can remember.  And --
8  but I don't remember if that was when I was a regional
9  commander, or the -- or the statewide commander.  But in
10  my -- in my tenure as -- as SOAR leadership, we've been
11  to Southwestern once that I can recall.
12          Q.    And I'm not going to go through all the
13  minimums, but the -- it's your testimony that's not
14  based on a schedule, that's exclusively incident driven?
15          A.    That's correct.
16          Q.    And has the incident that -- have the
17  incidents that drove those been primarily drugs, or
18  primarily weapons, or equal?
19          MS. BAUTISTA:  Object to form.
20          THE WITNESS:  I -- I -- I can't tell you
21  specifically, only that it would be more likely
22  that a drug, and major contraband outside of
23  weapons incident would drive a tactical search at a
24  lower level facility than say Menard.  Due to the
25  amount of movement that goes on, the amount of

Page 61

1  inmate-to-inmate interaction, the ability for those
2  to move something, say, you know, cocaine, or
3  marijuana, or -- or prescription drugs, or you
4  know, whatever is the -- the -- the going thing at
5  the time.  It's -- it's -- it's a bigger situation
6  to have that at a minimum security.  It's something
7  that's very much so out of the norm, and that would
8  drive our -- our -- the need to have that operation
9  at that facility.
10  BY MS. GRADY:
11          Q.    Okay.  So let me just make sure I'm
12  understanding you.  At minimum facilities in your
13  experience, given your role regionally and statewide,
14  the incidents that drive facility wide shakedowns tend
15  to be more contraband that's of the drug and
16  unauthorized substances variety, rather than weapons; is
17  that right?
18          A.    That is correct.  But that's not to say that
19  we've not had weapons drive a operation at a lower level
20  facility, because we have.
21          Q.    Sure, sure.  I -- right.  I understand that
22  the -- it's not zero.  Okay.  And what about at medium
23  facilities?  Does that tend -- in your experience during
24  your tenure in regional and statewide leadership, do the
25  facility wide shakedowns tend to be driven more by

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 62

1  issues with weapons or issues with drugs, or are they
2  equal?
3           MS. BAUTISTA:  Object to form.
4           THE WITNESS:  It is -- how do I say it?  It's
5      getting worse.  We see far more weapons in our
6      minimum security facilities now, and drugs, than --
7      than we used to.  So I -- it -- I think it would be
8      wrong of me to say that it's -- it's just drugs
9      that drive incidents at medium security facilities
10     now, because we see a substantial amount of
11     weapons.
12  BY MS. GRADY:
13     Q.   Okay.  And again, I'm not asking you to pledge
14  that the number is zero, or you never do a weapon driven
15  initiative to conduct a facility wide search.  I'm just
16  trying to get a sense, given your experience, whether in
17  the medium security facilities, the facility wide
18  shakedowns tend to be driven more often by issues with
19  drugs than with weapons, or vice versa?
20          MS. BAUTISTA:  Object to form.
21          THE WITNESS:  I -- I -- I will answer it this
22     way, and I hope that helps.  The lower the level of
23     facility, typically speaking, the more likely that
24     -- that a tactical operation or search is driven by
25     non- weapon-related contraband.  It -- it tends to

Page 63

1      be more likely that weapons will be included in the
2      need for the tactical search, the higher level the
3      facility is.
4  BY MS. GRADY:
5      Q.   Okay.  And this is based on your experience
6  being involved in the planning of shakedown, given your
7  role in the regional and then statewide leadership with
8  the SORT team, correct?
9      A.   Correct.  That, and including the -- the
10  reading of -- of reportable incidents throughout the
11  department.
12     Q.   Right.  Which you have access to as a regional
13  or statewide commander of the SORT team, right?
14     A.   Correct.
15     Q.   You did not have access to those prior to your
16  elevation from Vandalia to central regional special
17  operations commander, right?
18     A.   That's correct.
19     Q.   Okay.  So then finally, in maximum security
20  prisons, is it true that facility wide shakedowns are
21  more often left -- I'm sorry, more often driven by
22  incidents related to weapons than incidents related to
23  contraband that is not weapons?
24     A.   I would not say that it's driven more by
25  weapons, I -- but that weapons are more often included

Page 64

1      in the need for that tactical search.  So you may have a
2      situation at a medium security facility that there's
3      been no reportable incidents with weapons in the last
4      say 30 days.  But you've had numerous incidents of -- of
5      drugs being found, or overdoses, or whatever the case
6      may be, that -- that is -- that is pertaining to drugs
7      or narcotics, versus at a maximum security facility.  It
8      is more likely that -- that -- that weapons will be
9      included in the need, because they have either had
10     people attacked by weapons, they've been finding
11     weapons, and -- and -- and that also, I don't want to
12     say always, but that also correlates generally with --
13     with drug use.
14          So if -- if you're starting to see a lot of
15     reportable incidents on -- on drugs and/or alcohol, such
16     as hooch, that generally spikes a level of violence in
17     the facilities.  When it spikes a level of violence in
18     the facilities, people find the need to -- to arm
19     themselves, whether it's for protection against other
20     individuals or against staff.
21     Q.   And is that spike the same whether you're
22  talking about a maximum security facility, or a minimum
23  security facility, or do they differ based on the
24  security level?
25     A.   Would you repeat that, please?

Page 65

1      Q.   You talked about the spikes.  So if there's
2  more drugs or alcohol coming into the facility, then you
3  tend to see an increase in violence and a corresponding
4  increase in the prevalence of weapons. Is that the same,
5  whether you're talking about a maximum security
6  facility, like Pontiac, as compared to a minimum
7  security facility like Southwestern, or does that chain
8  of events that you just described differ a little bit,
9  depending on the security of the prison?
10     A.   I -- I would say it -- it differs based on the --
11  the security level of the -- of the prison.  You have
12  to understand that an individual in custody at
13  Taylorville Correctional Center is -- even if somebody
14  is making hooch, or getting drugs brought in, or able to
15  trade enough mental health medications to -- to get them
16  high, and you're having incidents of -- of violence in
17  somewhere like Taylorville Correctional Center, it's --
18  it's much less likely that a -- that an individual in
19  custody that's locked up for five DUIs is going to start
20  sharpening a shank to -- to -- to use against another --
21  another individual in custody or staff.
22     Q.   Do you have any information about how the
23  prevalence of drugs within any type of facility, today,
24  compares with the prevalence of drugs within those same
25  facilities in 2014?

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 20 of 60   Page ID #23388
The Deposition of ZACHARY SARVER, taken on April 05, 2024
66..69

Page 66

1    A.   There are more drugs now than in 2014.
2    Q.   And do you --
3         MS. BAUTISTA:  Sarah, would this be a good
4    time to take like a five minute break?
5         MS. GRADY:  Sure.  Yeah.
6         MS. BAUTISTA:  Great.
7         THE REPORTER:  We're off the record.  The time
8    is 12:26.
9              (OFF THE RECORD)
10        THE REPORTER:  Okay.  We are back on the
11   record for the deposition of Zachary Sarver being
12   conducted by videoconference.  My name is Sydney
13   Little.  Today is April 5, 2024.  The time is
14   12:34 p.m.
15   BY MS. GRADY:
16   Q.   Okay.  I want to turn back to your involvement
17   with the Big Muddy River shakedown in 2014.  And let me
18   just ask you this.  As a TRT member who would be
19   assigned to participate in a facility wide shakedown,
20   did you tend to have a certain type of assignment?
21   A.   No, they were -- their roles were much less
22   specified.  They were -- they're more to assist with any
23   high level transport that may result.  So if, for
24   instance, intel and investigations would do a -- a lot
25   of interviews with individuals in custody during that

Page 67

1    operation, you could have one that gave some very
2    specific information.  Putting them -- putting the
3    individual in custody at risk, and TRT would transport
4    that individual from that facility into another
5    facility.
6         Or if they, say, at a medium security facility
7    and that person they found had an escape plan, had a
8    substantial amount of drugs, had a weapon, the TAP
9    response team members would most likely be the ones to
10   do that -- that high risk transport from one facility to
11   the next.  Other than that, they were there simply as --
12   I mean, guys on a TRT unit have a -- a lot of experience
13   on -- on the tactical units.  Most of them have been on
14   a tactical unit for a -- a decent amount of time.  And -
15   - and, of course, look to by the tactical unit members
16   for advice on -- on different situations, or things that
17   they found, or how to properly do paperwork, things of
18   that nature.
19   Q.   So -- okay.  Just following up on that.  If --
20   when you go into a shakedown, you don't necessarily know
21   whether, or how many, individuals might need to be
22   transported offsite of the facility.  Would a member of
23   the TRT team then be assigned to any -- would -- was it
24   common that a member of the TRT team would at the outset
25   of the shakedown be assigned to any particular role?

Page 68

1         For example, being one of the people to
2    perform cell searches, being one of the people in the
3    common area, neither of those things, just being on
4    standby?  Was there any common assignment that would be
5    given for TRT members, as compared to a typical tact
6    team member in light of the fact that at the outset of
7    the operation you don't yet know whether or how many
8    individuals will need to be transported?
9         MS. BAUTISTA:  Object to form.
10        THE WITNESS:  So at that time, no.  The -- the
11   task force response team members are, again, very,
12   very versatile.  That's not to say that one -- let
13   me -- let me kind of give you an example.  When
14   we're coming onto a housing unit, or a wing, and
15   there were supposed to be X amount, let -- let's
16   say 40 inmates on that particular wing.  And there
17   was 41, simply because the night before someone was
18   moved from another wing to that.  And -- and so we
19   assigned 40 tactical unit members to search those
20   individuals and -- and escort them to the holding
21   area.
22        A TRT member may very well be on that wing.
23   And it's just as easy for him to say, nope, I got
24   this.  I'll jump in there, conduct a strip search,
25   restrain the individual, or individuals, in custody

Page 69

1    and -- and take them to the staging area.  And --
2    and also they're not above, I'll jump in there and
3    search that cell.  They weren't routinely assigned,
4    but they're definitely there to fill any gaps that
5    -- that may be needed.
6    BY MS. GRADY:
7    Q.   Okay.  So I appreciate the clarification, but
8    just to be honest with you, it actually leaves me a
9    little more confused.  So when you're doing a briefing
10   today, as part of that briefing, do you divvy up amongst
11   the tactical team members who's going to be doing the
12   cell searches of a particular housing unit, versus who's
13   going to be monitoring the staging area, where the
14   prisoners are being held while the searches are
15   occurring?
16   A.   Yes.
17   Q.   Okay.  And so commonly -- and then now turning
18   back to your involvement.  Commonly, would the TRT team member not
19   have an assignment unless, and until an unexpected
20   circumstance arose?  Or would they be slotted in just
21   like any other tactical team member to either do a cell
22   search, or be in the common area, or you know, any other
23   of the assignments?
24        MS. BAUTISTA:  Object to form.
25        THE WITNESS:  They would not be assigned.

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642.11   Filed 05/22/24   Page 21 of 60   Page ID #23389
The Deposition of ZACHARY SAWYER, taken on April 05, 2024
70..73

Page 70

BY MS. GRADY:

Q.  So if that situation that you described, where there's an unexpected need for an additional person to fill in did not occur, what would the TRT team member, to your experience back then, typically do during the shakedowns?

A.  They would answer any questions regarding -- say for instance, they find this particular article of clothing.  And let's say it looked like a civilian jacket.  And this is just an example.  And a -- a tactical member goes to one of TR and say, "Do you know if they're supposed to have this jacket?  It looks like a -- it looks like a blue jean jacket from the 1980s"?  And they may say, "I don't know, I'll find out."  And they will go to property control, or a -- or a lieutenant, or somebody from that facility would have the answer to the question.  And they say, "Hey, yeah -- yeah, they're allowed to have that.  That was issued, you know, we -- we -- we got those -- they bought them on commissary five years ago, since been discontinued, but we allow them to keep them."

Just simply answering questions, or have the ability to be -- to be mobile, to leave that housing unit to go find things out.  Also from time to time, they would also maybe go do a common area search.  We

Page 71

have also had instances where we would bring outside law enforcement canine into the facilities.  So they would escort and -- and stay with the outside law enforcement.  Just a -- a -- a variety of things, just to -- to fill the gaps as needed.

Q.  Okay.  And to --

A.  Literally picking up a broom and sweeping up trash.

Q.  And when those situations would occur, where there would be a question asked and the TRT team member would, you know, kind of go find out the answer, is there any kind of documentation that gets created reflecting that task as part of the shakedowns?

A.  No, there -- there's no documentation necessary for simple clarification on property.  The documentation would be if they deemed that it was not authorized property.  And -- and that officer said, you know, I'm -- I'm going to go ahead and take this.  I'm going to provide a shakedown record, or search record of this piece of property, and maybe write a -- write a ticket on it.  There would be that documentation.  But there's no documentation of -- of a question asked to a TRT member, and them going to get that clarification.

Q.  In -- again, in the -- when there's not a situation in which there's an unexpected need for an

Page 72

additional tactical team member and a TRT team member would slot in, what do TRT members, to your experience back then, typically do during the strip searching of prisoners?

A.  Providing additional security.  So all the tactical unit members will be busy conducting strip searches of the individuals in custody.  And they're -- they're so intently focused on conducting that strip search that -- that they're -- they're not necessarily super aware of what's going on.  And -- and in those cases, depends on how the facility's laid out and how the housing unit's laid out, they're not able to necessarily see to the left or -- left and right.  All they see is another tactical unit member to the left, another tactical member to the right.  So they're -- they're hyper focused on the task at hand so they can be providing additional security in the event that a tactical unit officer may get attacked by an individual in custody during the initial searching -- strip searching or handcuffing process.

Q.  Do you have any recollection where you were during the time prisoners at Big Muddy were being strip searched back in 2014, on the days you were present for the facility-wide shakedown?

MS. BAUTISTA:  Object to form.

Page 73

THE WITNESS:  I don't have any recollection.  I will tell you that the vast majority of the time that I -- that I helped assist with an operation as a TRT member, that I would be on the housing unit while the strip searches were being conducted.

BY MS. GRADY:

Q.  And the same question is true for Menard.  Do you have a recollection of where you were during any days that you were present for the 2014 shakedowns at Menard, during the strip searching of prisoners?

MS. BAUTISTA:  Object to form.

THE WITNESS:  And same answer.  I -- I don't -- I don't recall.  But if I was there as a tactical unit member, I was most likely conducting that strip search, and conducting a cell search afterwards.  If I was a TRT member, I was most likely in a housing unit providing any assistance I could to the tactical unit members.

BY MS. GRADY:

Q.  Well, you know that in 2014 you were a TRT member, right?

A.  Yes.  I believe when I was at Big Muddy, I believe the records show that I was there as a tactical unit member, because you -- you -- you are both.  You -- you have to be a tactical unit member to be a TRT

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com


CHURCHILL
REPORTING

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 22 of 60   Page ID #23390
The Deposition of AL SAMERY, taken on April 05, 2024
74..77

Page 74

1  member.  Back then, TRT was a part-time team that was
2  called out as-needed.  Today it's a full-time team, so
3  it's -- it's -- it is different.  But in 2014, yes, I
4  was a TRT member, but I also was a tactical unit member
5  that could be called out to serve with the tactical unit
6  member in a search, or any other tactical operation if I
7  was not being used as a -- as a TRT member.  I -- I
8  understand that's confusing.  But in Big Muddy, I was
9  called out and used as a tactical unit member for
10  Vandalia Correctional Center for that -- for that
11  search.  At Menard, I have no idea what I was doing.
12       Q.  Okay.  You had mentioned when we talked about
13  your recollection of being at Menard, that your answer
14  on the survey indicated to you that you must have been
15  told, or some other way received information, that
16  suggested to you the most likely reason you crossed out
17  no at Menard and then put in yes.
18       And so let me ask you this:  If you were
19  assigned to a facility-wide shakedown of a TRT member,
20  would those overtime reports include you as -- would
21  they include you on the report?
22       A.  No.
23       Q.  What documentation, if any, could I review to
24  see whether or not you were there; to your knowledge?
25       A.  I was trying to think that -- that same thing

Page 75

1  myself.  When we are called out, our facilities don't
2  know what we're going to do.  A lot of our stuff is --
3  is not -- not need-to-know for the -- for the facility
4  leadership.  And there's times I'd be gone for days or
5  weeks without, say, my warden having a clue what I was -
6  - what I was doing.
7       Some of the stuff we were doing involved just
8  training.  Some of it was operational.  But -- they
9  just weren't in the know, as far as what we were doing.
10  The only thing -- and -- and so you have to remember, I
11  answered those questions in 2018, I believe, recalling
12  events that took place in '14.  So today it's six years
13  later than -- than that.  So we're -- we're about --
14  we're about ten years.
15       I'm only surmising, speculating, but I will
16  for your better understanding of this.  It's possible
17  that I looked at maybe one of my old overtime slips.  I
18  used to keep a lot of overtime slips, and I may put down
19  -- I might, you know, the days that I work the overtime
20  and then in the comments, I'm up -- might put, "Menard
21  tactical search, TRT."
22       I could have reviewed one of those and said,
23  oh, look here.  No, I was -- I was there on that day.  I
24  don't have -- I have since thrown those away.  I don't
25  keep those records that long.  And I don't even know

Page 76

1  that I would've kept them for four years.  But I can't
2  think, other than something that I would've personally
3  kept, I can't think of anything specifically.
4       Unless I had, say, a use-of-force situation,
5  or found something in a search where I provided a
6  document such as a shakedown record, or an incident
7  report of which I'm -- I don't recall anything
8  significant happening to myself personally, or really at
9  all, for the operations that are in question.  So I
10  guess -- I guess, no, I'm unaware of anything that would
11  specifically point to me being there today.
12       Q.  And so if we were to run payroll, and it
13  showed that during the April 2014 time frame, which is
14  when the shakedowns at Menard occurred, that itself
15  wouldn't even tell us whether you were there at Menard,
16  because it would just say you worked overtime, and that
17  might be for one of a million reasons?
18       A.  That's correct.  If -- if I was gone for the
19  tactical unit, or gone for TRT, either one of them, most
20  likely say "Al, away on state business," but it wouldn't
21  say what I was doing.
22       Q.  Okay.  Is it possible you were just wrong in
23  the survey, that maybe you were unsure, or that just --
24  you just got it wrong?
25       MS. BAUTISTA:  Object to form.

Page 77

1       THE WITNESS:  It's possible.  I -- I think
2  it's -- I think it's highly unlikely.  I'm -- I'm a
3  -- I -- I don't think that I would've marked no,
4  and then marked yes without good reason.  I -- I --
5  I think that if I marked no and thought, well, no,
6  you know, I -- no, I wasn't there, or wasn't even
7  sure, I think I would've left it at no.
8       I am led to believe that there is some reason
9  that I changed that to yes.  I have no idea what
10  that was.  Again, it could be a conversation with
11  another person that says, "I remember you being
12  there very clearly."  And at the time said, "Well,
13  yeah, you was -- remember you was -- you was there,
14  you I were talking about such and such on..."
15       I mean, some people have a much better memory
16  than me.  And again, not because of the things I
17  discussed earlier, but just because they have a
18  better memory than me, or something that stuck out
19  in their head.  So I have reason to believe that I
20  marked that for a reason, but I guess if you're
21  asking for, is it possible?  I -- it's possible.
22  BY MS. GRADY:
23       Q.  Okay.  All right.  Let me ask you this.  As
24  you sit here today, do you have any recollection of
25  whether you participated in the mass line movement from

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 23 of 60   Page ID #23391
The Deposition of EDWARD SAWYER, taken on April 05, 2024
78..81

Page 78

1  the cell house to the staging area during the one or
2  more days you participated in a shakedown of Big Muddy
3  River?
4       A.  So again, I've conducted dozens of these,
5  dozens and dozens of these in my career.  Most of them,
6  I was part of the mass line movement.  It is very much
7  more likely than not that I was part of that mass line
8  movement, but I do not remember it specifically.
9       Q.  Okay.  And if you weren't a part of the last -
10  - mass line movement, you don't have any recollection of
11  the movement itself.  Is that fair to say?
12       A.  That's correct.
13       Q.  Same question with Menard.  If you were
14  present, do you have an actual recollection as to
15  whether or not you participated in the line movement?
16       A.  That's correct.
17       Q.  You do not have such a recollection, true?
18       A.  I -- I don't.  I -- that's true.
19       Q.  And do -- can you tell me whether you have any
20  recollection of where you were during the period of time
21  when the prisoners at Big Muddy were in the staging
22  area, and cells were being searched, on any days you
23  participated in the shakedown at Big Muddy in 2014?
24       A.  No, I -- I could refer to the operations plan
25  and -- and find out where they -- where the individuals

Page 79

1  were staged.  I -- I don't remember whether I was
2  assigned to the staging area, which is much less of the
3  -- if you have 100 people, 100 tactical unit members,
4  maybe just ten, or a dozen, or 15 are in the staging
5  area.  The rest are conducting cell searches.  So the
6  likelihood of being involved in the cell searches, and
7  the strip searches, and the line movement, versus being
8  involved in pulling security in the staging area, it's
9  much more likely of the first, then -- rather than the
10  staging area.
11       Q.  Okay.  And -- but that's just sort of based on
12  statistics.  You don't have a recollection, right?
13       A.  Right.
14       Q.  And same is true for Menard.  You don't have a
15  recollection about where you were during the time the
16  prisoners were in the staging area?
17       A.  That's correct.
18       Q.  Okay.  All right.  I'm going to put on the
19  screen Exhibit 2 just quickly.  Okay.  This is, for the
20  record, a document that's Bates marked Ross defendants
21  25.  Is this the document that you reviewed before
22  today's deposition that led you to the conclusion that
23  you participated in the shakedown at Big Muddy in 2014?
24           (EXHIBIT 2 MARKED FOR IDENTIFICATION)
25       A.  Yes, I believe that is, yes.

Page 80

1  BY MS. GRADY:
2       Q.  Okay.  You see your name here for overtime
3  totals, and that's a document that you reviewed within
4  the operations file; is that right?
5       A.  That's correct.
6       Q.  Okay.  I'm going to show you what we'll mark
7  as Exhibit 3 -- 13.  Sorry.  3.  Do you see this?  It's
8  "5/16/14" on your screen?
9           (EXHIBIT 3 MARKED FOR IDENTIFICATION)
10       A.  Yes.
11  BY MS. GRADY:
12       Q.  And for the record, it's Bates number 39.  So
13  you see here, that according to this document, 5-16-
14  2014 also lists you as being part of the operational
15  overtime totals for an operation at Big Muddy?
16       A.  And I only recall seeing one day in the
17  operational file.  That doesn't mean that that's --
18  that's -- that that's inaccurate.  It's just I only
19  remember seeing one day in the Big Muddy operational
20  file.  If -- if -- if that's in there, that's documents
21  that's been sent to you, I -- I can only reasonably
22  believe that I was there on both the -- what, the 15th
23  and the 16th.
24       Q.  Okay.  All right.  Let's -- I want to ask you
25  about the shakedown operations under your leadership as

Page 81

1  regional and then statewide commander.  You reviewed the
2  operations orders for the 2014 shakedowns at these four
3  prisons, right?
4       A.  Yes.
5       Q.  Do you still create operations orders in
6  advance of the shakedowns during your tenure as regional
7  and statewide commander?
8       A.  Yes, we do.
9       Q.  And are they the same format as the operations
10  orders that you reviewed?
11       A.  No, they're not.
12       Q.  Can you tell me how they differ?
13       A.  The -- the -- the current format that we use
14  is from the IEMA incident command structure.  There's --
15  it's a much more confusing form, with a -- a lot of data
16  points that -- that's not applicable to our type of
17  operations.  To be honest with you, I don't like it, but
18  it's what we use.  But in general, as far as the
19  information that gets put on that document is similar to
20  the information of the -- that -- that would've been on
21  forms earlier.
22       Q.  Are there more details about the ways that the
23  shakedowns are conducted, that weren't contained in the
24  documents you reviewed, the operations orders?
25           MS. BAUTISTA:  Objection.  Vague.


Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

CHURCHILL
REPORTING

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 24 of 60   Page ID #23392
The Deposition of ZACHARY SARVER, taken on April 05, 2024

82..85

Page 82

1           THE WITNESS:  There are -- there are things
2      that we do differently that we make sure that we do
3      put in that operations plan.  I'd have to go -- I'd
4      have to have one directly in front of me to review
5      versus one that we do now.  But I mean, sure, we --
6      we include the weather.
7           We include the nearest hospitals.  We include
8      different routes of -- of transportation, how we
9      would conduct a medical evacuation if need be,
10     numbers to facilities, chain of command.  That may
11     be a little more specific than what it was in
12     previous, as well as instructions on -- on
13     videotaping the -- the -- the operation.
14 BY MS. GRADY:
15     Q.   Okay.  Today, do tac team members -- it --
16 today, is the practice that tac team members enter a
17 cell house by hooting, and hollering, and banging their
18 batons on railings and other surfaces?
19     A.   No, that's -- that's not the process today.  I
20 -- I don't recall any hooting and hollering.  That's
21 kind of -- I don't really understand what you mean by
22 hooting and hollering, but I don't recall that now.
23     Q.   Okay.  Today, during -- under your leadership,
24 that's never been the process; is that right?
25          MS. BAUTISTA:  Object to form.

Page 83

1           THE WITNESS:  So today, when we go into --
2      into facilities, I -- I -- we don't bang our
3      batons.  We're -- we're still seeing whether we like
4      doing it the old way, versus this way, as far as
5      what the response is and -- and what kind of
6      cooperation do we get from the individual in
7      custody.
8           As far as the yelling, or anything of that
9      nature, the only thing that -- that is set from the
10     tactical members is the commands to the individuals
11     in custody of what they needed to do.
12 BY MS. GRADY:
13     Q.   What is the just -- what was the justification
14 to your -- well, strike that.  Who made the decision to
15 stop banging batons on the railings and other surfaces?
16 Was that you, or someone other than you?
17     A.   I -- honestly, I don't remember.  I -- I --
18 myself and my regional commanders have had that
19 discussion and, you know, we're -- we're now the guys
20 that we have leading this team now, myself and my three
21 regional commanders, are -- are all about best practice.
22 We want to do whatever we do to keep everybody involved,
23 ourselves, the tactical unit members, the individuals in
24 custody, other -- other security folks, or folks working
25 in the facility, want to keep everybody safe.

Page 84

1           But we're open-minded to -- to best practices
2      to accomplish that.  So there -- I don't recall anybody
3      saying, "Hey, Zach, hey Commander Sarver, we want you to
4      not bang your batons, and not -- not announce your
5      presence when you go in."  But it's just -- it's -- it's
6      a practice that we use now.
7      Q.   When you started in the position as regional
8  commander, was that still the practice to bang batons on
9  the railings and other surfaces?
10     A.   I don't know about the -- the railings, but on
11 the door, to knock on the door with the -- with the butt
12 of the baton.
13     Q.   Okay.  Well there's been testimony in this
14 case that when tac team members back in 2014 entered the
15 cell house, they did so loudly and struck their batons
16 on the railings and other surfaces.  Is it your
17 testimony that when you became central regional tactical
18 commander, that was no longer the practice?
19     A.   When I was the central region commander, when
20 I first got -- is that what you're asking?
21     Q.   Yes.
22     A.   I -- I'm unaware of any direction or common
23 practice to just randomly bang on things with batons.
24 You have to understand when you have 100 people coming
25 into a housing unit with all kinds of gear on, there's -

Page 85

1      - there's things that are -- there's tings, and dings,
2      and bangs, and it's -- it's not -- it's not quiet, just
3      because of the nature of the operation.  100 guys in
4      tactical gear running upstairs with -- with all kinds of
5      equipment on.  The practice was to knock on the door
6      loudly with the -- with the edge of the baton.
7      Q.   Okay.  Let's go back and look at your survey.
8  Okay.  This is the -- an addendum that you provided
9  after answering the questionnaire, correct?
10     A.   Yes.
11     Q.   And in it you say, "Tactical unit members
12 announced their presence by hitting batons on guardrails
13 as they enter housing units," right?
14     A.   That's correct, but I don't know that I -- I
15 really dissected that question.
16     Q.   Okay.  Well you didn't say tactical unit
17 members accidentally or inadvertently make lots of
18 noise, given the amount of materials that they are
19 donning, and then bang on the door -- on the doors to
20 the cells loudly.  You said that they announced their
21 presence by, "hitting batons on guardrails as they enter
22 housing units," right?
23     A.   I believe that's the question.  I -- I don't
24 know.  My answer may be yes.  I'd like to see
25 specifically my answer.  But when referring to the baton

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 25 of 60   Page ID #23393
The Deposition of ZACHARY SAWYER, taken on April 09, 2024

86..89

Page 86

1  question, my -- we're -- we're hitting the doors. I -- I
2  don't -- I don't know where the guardrail thing came
3  from, or that -- that allegation, or really even how
4  that's -- how the effect is different, other than we're
5  trying to get the attention of the individual in
6  custody, get them up so they can listen to our commands
7  and understand what's going on.
8       Q.  We see here one of the questions that you
9  answered yes to is whether you hit, "Your baton on one
10 or more tables doors, walls, railings, and/or other
11 surfaces while entering the wing or cell house." And
12 you answered that, "Yes," right?
13      A.  Yeah.  Yes to the doors.  I mean, that --
14 that's not a -- I don't believe that question is -- I
15 think if you only hit the doors, you should still mark
16 yes.
17      Q.  Okay.  And then when you explained your
18 answer, you said, guard -- you -- the hitting happened
19 on guardrails as they enter housing units, right?
20      A.  Is that my -- I guess that's my typed
21 response, but I can -- I can -- I can assure you the
22 practice is to knock on the door.
23      Q.  Okay.  Even though you didn't say that in your
24 response to this survey regarding the 2014 shakedowns,
25 right?

Page 87

1       A.  That -- that -- that is correct.  Now you have
2  to -- you have to understand, I don't know if my frame
3  of mind when I'm answering that question, but when
4  you're carrying a baton at port arms and running through
5  a gallery, your baton is likely at -- from time to time
6  to hit the guardrail.
7            I mean, it's almost impossible.  So I -- it
8  could have been what I was thinking of, but I'm -- the
9  practice is to knock on the door.  Yes, batons do hit
10 guardrails, but the practice is to knock on the door
11 with the baton.
12      Q.  And what is the guardrail?  That's the railing
13 across from the cell?
14      A.  That's correct.
15      Q.  Okay.  All right.  And so the practice was
16 changed during your tenure.  Was it changed during your
17 tenure as statewide commander?
18      A.  I don't remember if we stopped doing it as a
19 regional commander, or during the statewide commander,
20 but we -- we -- we've not done that for a while.  That's
21 not to say that I haven't been part of operations where
22 there's three or four guys, just out of instinct, that
23 run through and -- and are knocking on the doors, and
24 afterwards, I'll get the -- get -- find out who the
25 commander was, say, "Hey, you know, we're - we don't do

Page 88

1  that anymore."
2       Q.  Why don't you do that anymore?
3       A.  But that's a general problem.  What's that?
4       Q.  Why don't you do that anymore?
5       A.  Again, trying -- trying to find best practice.
6  What we're trying to do is -- is find the -- the best
7  way to enter a facility.  Part of it is out of -- out of
8  stealth.  You know, we don't know -- we never did enter
9  the facilities loudly.  You didn't get loud, and start
10 announcing your presence, and telling them -- and giving
11 them commands until you were coming into the facility.
12           We do some of these earlier in the morning
13 now.  Used to, we might start at 7:00 or 8:00 in the
14 morning.  Some of them now we do at 5:00 in the morning.
15 And so, you know, out of -- out of stealth, to see if
16 you get the same response from individuals and -- and
17 still get less contraband flush, things of that nature,
18 by not banging loudly on the door.  I say that works.
19 Now my opinion is still undeveloped on whether or not we
20 should do the old way or this way.  I don't know that
21 I've seen any direct pluses or minuses, one way or the
22 other.
23      Q.  Okay.  So the thinking was it might actually
24 be a more effective way to enter the cell house to
25 achieve the goal of discovering contraband before it can

Page 89

1  be, I don't know, removed?
2       A.  Yes.
3       Q.  And you haven't changed back, right?
4       A.  No, I have not changed back.
5       Q.  And how long has it been in place?
6       A.  Again, I -- I can't remember.  I mean, it --
7  it's -- we've been -- we've been not knocking on doors
8  loudly for at least a couple of years.  I could probably
9  go through and look at video footage, and -- and -- and
10 see.  And again, you might see an occasional person
11 doing that, but as -- as a -- as a whole, we're trying
12 to -- trying to get in the housing unit more quietly.
13      Q.  Now you mentioned video cameras.  The
14 facility-wide shakedowns are now recorded at all times,
15 right?
16      A.  That's correct.
17      Q.  And do you think that's a good practice or a
18 bad practice?
19      A.  It's an excellent practice.
20      Q.  Why?
21      A.  For reasons like this.  For -- to actually
22 record and show what we do, and why we do it.  I -- I'm
23 a -- I'm a big fan of cameras, as a -- as a law
24 enforcement officer, as a police officer, and as a -- a
25 tactical unit member, now commander.  I love cameras in

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 26 of 60   Page ID #23394
The Deposition of ZACHARY SAWYER, taken on April 09, 2024

90..93

Page 90

```
 1   corrections and law enforcement settings.  It -- it --
 2   it does so much to tell the truth about what actually
 3   goes on.  And I feel that it helps officers, both in
 4   corrections in law enforcement, far more times than it
 5   hurts them.
 6        Q.   Well and then it also helps the civilians or
 7   prisoners that are -- that are being dealt with as well
 8   to uncover acts of abuse, right?
 9             MS. BAUTISTA:  Objection.  Argumentative.
10             THE WITNESS:  I don't -- you're saying it
11        helps -- it helps anyone that may be abused by law
12        enforcement or corrections to be able to provide
13        proof of its existence?
14   BY MS. GRADY:
15        Q.   Yes.
16        A.   If -- if that actually took place, then yes.  I
17   mean, it -- it -- it's a -- it's a benefit to -- it's a
18   benefit to everybody.  It tells the -- it tells the
19   truth.
20        Q.   Yeah.  And that is actually a really important
21   part of being a correctional supervisor, is ensuring
22   that you can find and respond to instances of misconduct
23   or abuse within your subordinate chain of command,
24   right?
25        A.   Yes.
```

Page 91

```
 1        Q.   Do you routinely review the video footage of
 2   shakedowns, whether or not you have personally attended
 3   them?
 4        A.   I wouldn't say routinely, but I have -- I have
 5   reviewed hours and hours of -- of search operations.
 6   Some -- some because I wasn't there.  I just wanted to
 7   see how it went in my absence.  Others, because there
 8   may be an incident that -- that happened that I want to
 9   -- to -- to see exactly what happened.  I also review
10   cell extractions frequently, especially in facilities
11   that would normally -- I'll give you an example.  Just
12   like last week we had a cell extraction in an enforced
13   medication procedure on an individual in custody in
14   Taylorville Correctional Center.
15             And it's -- it's very -- it's -- it's -- those
16   happened very seldom at Taylorville.  I don't know when
17   the last one was.  It may have been six months ago.  It
18   may have been two years ago.  But I like to see how
19   those lesser experienced tactical units handle those
20   types of situations to make sure that there's not any
21   kind of training value that we need to give them to make
22   them do that better.
23             So I -- I -- I -- I review at all levels, but
24   definitely when we get one at a facility that doesn't do
25   them routinely.  I like to see how they're handling
```

Page 92

```
 1   situations.
 2        Q.   Do you have the power to issue discipline of
 3   any sort against any tactical team members?
 4        A.   That -- that's -- that's a weird -- that's not
 5   a weird question.  It's -- it's a good -- it's a good
 6   question.  And -- and I -- I hope I explain this well.  I
 7   -- yes, I -- I do have the ability to initiate that
 8   discipline.  But the -- the dichotomy of how a special
 9   operations commander, how those people work for him, I
10   have never signed discipline forms on a tac member or
11   TRT member.
12             There are situations where that -- that is
13   initiated.  So if you see misconduct, or are aware of
14   misconduct and turn that over to the facility for them,
15   they will be -- they will receive that discipline and go
16   through the processes of an investigation, and the
17   discipline processes at the facility.  But yes, they can
18   be initiated by me.
19        Q.   Okay.  And I appreciate the clarification. Can
20   you remove -- even if you don't do discipline against
21   the officer as an IDOC employee, can you order or remove
22   a tactical team member from membership in the tactical
23   team or TRT team?
24        A.   Yes.  Again, this is -- this is a -- this --
25   this is a difficult one to explain.  So let's focus on
```

Page 93

```
 1   the tactical unit members for just a minute.  That --
 2   that's a -- that is an all-volunteer organization.  So
 3   if you're a correctional officer working for -- for DOC,
 4   and you want to be a tactical unit member, you show up
 5   to tactical unit practice and will be able to train with
 6   the tactical unit team.
 7             Now there's a difference between someone who's
 8   going to go and say, "I want to go to tac practice," and
 9   go to practice, versus a certified member who the warden
10   and the tactical commander assistant commander says,
11   "Yep, you've been doing a good job in your tactical unit
12   practices, and we want to send you to the two-week
13   school to be certified."  That decision is made by the
14   tac commander, assistant commander, warden. They're not
15   just going to be able to say, "Now, I want to be a
16   certified member of the tactical unit and so I get to
17   go."
18             A lot of this is union driven, and the reason
19   is that being a volunteer organization, you can't
20   withhold overtime from a volunteer unit.  So if I say
21   "No, I don't want you to be part of the tactical unit
22   member," then I'm keeping you from overtime.  So I -- so
23   since practices are done on overtime, I can't keep you,
24   if you wanted to be a tactical unit member, from
25   attending the practices.
```

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 27 of 60   Page ID #23395
The Deposition of ZACHARY   SAWYER, taken on April 05, 2024
94..97

Page 94

1         If you don't do the right things and show
2    enough effort, and show enough skill and ability, the
3    right mindset, you'll never go and be certified.
4    Therefore, you'll never go do a tactical operation.  So
5    let's say you get certified, and all of a sudden you do
6    some boneheaded move and violate policy, get in trouble,
7    have some discipline, whatever the case may be,
8    absolutely, I have the power to say, "Hey, tac
9    commander, hey warden, John Smith just got disciplined
10   for whatever, use-of-force violation.  He is no longer a
11   certified member of the tactical command."
12         I absolutely can do that, and keep him from
13   coming on tactical operations.  I can't keep him from
14   coming to tactical unit practice, because I'm getting in
15   his overtime, and it is money, and there will be an
16   overtime -- it'll be a union issue.  With TRT,
17   absolutely.  Total different thing.  I mean, there --
18   **Q.   Well, and --**
19   A.   The other thing --
20   **Q.   I'll just cut you off, because I'm way more**
21   **focused on the tactical side.**
22   A.   Okay.
23   **Q.   So if TRT is its own animal, let's not even**
24   **worry about that.**
25   A.   Okay.

Page 95

1    **Q.   Have you ever, based on your review of video**
2    **of a facility-wide shakedown, taken action either by**
3    **referring it to the facility or attempting to initiate**
4    **disciplinary proceedings yourself?  Have you ever done**
5    **that, again, based on a review of video of a facility-**
6    **wide shakedown?**
7    A.   With actual formal discipline, the situations
8    that I've been aware of have also been aware of by --
9    by, say, a warden, or internal investigations who are
10   aware of, say, use-of-force situation during a cell
11   extraction.  And -- and oftentimes, although I support
12   what they're doing, that -- that disciplinary action is
13   already initiated.
14         So I -- I'm just -- I -- warden calls me up,
15   "Hey, we have this happen.  I think that they need to be
16   pulled off tac team and not operational until their
17   discipline is final, " and then we'll review and see
18   what the outcome of that is.  And -- and I -- I can't
19   recall the situation where I disagreed with the warden
20   and said, "No, we still want to keep that individual
21   operational."
22   **Q.   Okay.  But my question is a little bit**
23   **different.  So let me reorient you back.  What I'm**
24   **asking is whether you have been the one to initiate,**
25   **either by actually initiating or by referring to the**

Page 96

1    **facility, discipline, or a member of the tac team, based**
2    **on review of video of a facility-wide shakedown?**
3    A.   Yes.
4    **Q.   Okay.  How many times has that happened**
5    A.   As a result of a facility-wide shakedown --
6    **Q.   Yes.**
7    A.   -- or in general?
8    **Q.   As a result of a facility-wide shakedown.**
9    A.   One that I can recall specifically.
10   **Q.   Okay.  And then we talked also about, you**
11   **know, ordering that someone be de-certified, or not --**
12   **considered not certified.  Have you ever given that**
13   **order, or initiated that conversation with tac**
14   **leadership at a facility-level, based on a review of a**
15   **video of a facility-wide shakedown?**
16   A.   Not of a review of a facility-wide shakedown.
17   Only one time as a result of a facility-wide shakedown.
18   **Q.   Okay.  And -- all right.  When prisoners are**
19   **moved from -- in your current role as leadership, both**
20   **as regional leadership and now statewide leadership,**
21   **when prisoners are moved from their housing unit to a**
22   **staging area, is there any change to how they are -- how**
23   **they are moved from the administrative directive on mass**
24   **line movement?**
25   A.   I -- I'm not an expert on facility

Page 97

1    administrative directives, and institutional directives
2    on -- on non-tactical operations.  I -- I can say that
3    the way that we've moved individuals in custody in 2014,
4    versus the way we move them today from facility to the
5    staging area, is the same.
6    **Q.   Okay.  So they're ordered to be in very close**
7    **proximity, almost touching, or actually touching?**
8    A.   Definitely not touching.  I would -- they have
9    to be able to walk.  So think of it as a -- military
10   formation where they have to be able to take a -- a
11   normal step.  Most of the time they are not in leg
12   shackles.  They're able to take a full step, and so it's
13   the proximity that they would be as any other mass
14   movement, in any other situation that they would be
15   required to walk.
16   **Q.   So there's been testimony in this case that**
17   **during a non-tactical operation mass line movement**
18   **typically leaves about one arm's length between the**
19   **person in front of you in line, and a little bit less**
20   **than that between the person who might be to your side**
21   **in a -- in a two-by -- two-by-however-many line.  Is**
22   **that the same for shakedown operation movement during**
23   **facility-wide shakedowns under your leadership?**
24         MS. BAUTISTA:  Objection.  Misstates the
25         record.

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY    Document 642-11    Filed 05/22/24    Page 28 of 60    Page ID #23396
The Deposition of ZACHARY  SAWYER, taken on April 09, 2024

98..101

Page 98

1    THE WITNESS:  So in -- every facility is
2  different, and depending on what area that you have
3  to -- to stage those individuals before they
4  actually start moving -- so all of them will be
5  strip searched. Let's say housing unit has 100 --
6  100 inmates in it. They're going to be strip
7  searched.  Once everybody -- and they're clothed,
8  and they're restrained the -- the way that we would
9  restrain them, they're going to be escorted off of
10  that housing unit, off of that wing or gallery, and
11  they will go outside.  And once everybody is done
12  and accounted for, then that mass line movement
13  would begin through the staging area.  There --
14  there are places that you might have to close in
15  that formation slightly, but never anywhere close
16  to the -- the degree of touching.
17  BY MS. GRADY:
18    Q.   Okay.  Do you still prohibit prisoners from
19  putting their underwear on after a strip search?
20    A.   No.
21    Q.   They're permitted to wear their underwear?
22    A.   Yes.
23    Q.   And when did -- was that the way it was when
24  you became central regional TAC commander, or were they
25  still being prohibited from wearing underwear?

Page 99

1    A.   They were still prohibited.
2    Q.   Were you -- so it changed under -- when you
3  were part of the leadership, right?
4    A.   Yes.
5    Q.   Why did that change?
6    A.   Again, I mean, we have a lot of conversation
7  regarding best practice, and just -- just because
8  something is -- is allowable, or not a violation of
9  rules or -- or law, doesn't necessarily mean that it's
10  best practice.  I'm a -- I'm a best practice kind of
11  guy, and I -- and I want whatever we do to have
12  significant meaning, especially if it's something --
13  something of this nature.  There are definitely benefits
14  to not allowing them to wear things such as their
15  underwear, so yeah.
16    Again, it's just the -- again, these -- these
17  -- these are my words, but is -- is -- is the juice
18  worth the squeeze?  Are we getting a tactical benefit
19  and a security benefit out of that, that -- that we need
20  to continue that practice?  Yeah, I don't know the
21  answer to that.  I haven't seen any significant increase
22  or decrease in the amount of contraband that we find or
23  didn't find as a result of that practice.  But if we
24  looked at the data and said, no, that doesn't work,
25  we're getting -- these guys are bringing stuff out,

Page 100

1  we're finding stuff that makes our way in -- into a -- a
2  staging area, or we had a -- an individual or an officer
3  get stabbed because they were able to -- to conceal
4  something in that additional clothing, I would very
5  quickly and easily go back to that practice.
6    Q.   When did that change happen, approximately?
7    A.   I -- I'm going to say, I mean, approximately
8  2018, 2019, 2020.  Time -- time flies.  It's really --
9    Q.   You're telling me.  Okay.  The -- when you
10  say, "Is the juice worth the squeeze," so there's
11  something that your understanding is being traded off by
12  prohibiting prisoners from wearing their underwear,
13  right?  Is it, like, an escalation of, like,
14  adversariness between staff and prisoners, or what's the
15  what's the other side of the trade-off?
16    MS. BAUTISTA:  Object to form.
17    THE WITNESS:  I don't -- I don't know that --
18  that I ever recall hearing a gripe, if you will,
19  from an individual about not being able to wear
20  their underwear.  But at the same time, I -- I wear
21  underwear.  Some -- I know some people that spent a
22  long time in the military.  I know some people
23  that, if you will, went commando.  It's not
24  necessarily a -- it -- it's -- it's -- it's not
25  something you can't do. It's not -- so it's -- it's

Page 101

1  -- to me, it's not a human right to be able to wear
2  underwear if you have something over it.  But at
3  the same time, it is a general common practice by
4  most people.
5    And -- and if -- if I'm going to prohibit them
6  from doing it, I can point to definite, definite
7  tactical reasons to not allow them to wear
8  underwear. But I -- I need to see -- I need to see
9  a product that's beneficial to the of the facility,
10  and to them and -- and my other people that's
11  working for me by not allowing them to.  That's the
12  best way I can explain it.
13  BY MS. GRADY:
14    Q.   When you enter -- when prisoners are brought
15  to the staging area, are they still required to stand
16  with their foreheads against the wall?
17    MS. BAUTISTA:  Objection.  Misstates the
18  record.
19    THE WITNESS:  No.
20  BY MS. GRADY:
21    Q.   And when did that change?  Well, strike that.
22  When you became regional TAC commander, was that still
23  the practice?
24    MS. BAUTISTA:  Object to form.
25    THE WITNESS:  No.

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 29 of 60   Page ID #23397
The Deposition of EXAMPLE   SAMPLE, taken on April 05, 2024
102..105

Page 102

BY MS. GRADY:

2    Q.   Okay.  So that's not a change you were
3  involved in making, true?

4         MS. BAUTISTA:  Object to form.

5         THE WITNESS:  I don't -- I don't recall a time
6    where it was general standardized practice to have
7    individuals in mass formation stand against the
8    wall.  In -- in all the operations I've been a part
9    of, I -- I recall them either, A, being seated, or
10   made a -- made an effort to stand, and then we
11   allow them to sit, stand.  Now there may be a wall
12   there.  They could be lined up around a gym, but
13   it's not like that was turn around, face the wall.
14   I mean, they could -- they could stand, and if they
15   got tired of standing, our Tactical Unit members
16   actually go up and assist them into a seated
17   position.  If they got tired of being seated, we
18   would actually go up and help stand up, and into
19   the standing position.

20        A lot of -- some facilities don't have the
21   ability -- we actually tried for a few operations
22   to put them in bleachers.  That was not good.  It's
23   not safe because they could lose their balance and
24   not have the ability to catch yourself, so that's
25   like, no, that's -- that's a bad idea.  The -- but

Page 103

1    the ability to seat mass amounts of inmates in some
2    facilities isn't as -- as good as others.  As you
3    can see in Menard, now that we use the chapel, it's
4    a much better -- much better place to seat them.

5  BY MS. GRADY:

6    Q.   Yeah.  The chapel looks identical to me to the
7  auditorium at Stateville.  Have you ever -- have you
8  been in the auditorium at Stateville?

9    A.   Sure.  Yes.  It's -- it's close.  Yes.

10   Q.   It's almost like they were like built by the
11  same person.

12   A.   They very well could've been.

13   Q.   Which was my confusion.  So anyway, turning
14  back to the practice now, are prisoners still ordered to
15  stand until some event happens when they are then
16  ordered to sit, or are they brought into the staging
17  area and if chairs are available, permitted to sit right
18  away?

19        MS. BAUTISTA:  Object to form.

20        THE WITNESS:  They're brought in and permitted
21   to sit.

22  BY MS. GRADY:

23   Q.   Okay.  You require each of your Tactical Team
24  members to complete a shakedown slip for any cell that
25  they have searched whether contraband was found or not,

Page 104

1  true?

2    A.   That's correct.

3    Q.   And you prohibit your Tactical Team commanders
4  from destroying property unless they -- well, you
5  prohibit your Tactical Team members from destroying
6  property, true?

7    A.   True.

8    Q.   You require your Tactical Team commanders --
9  I'm sorry.  You require your Tactical Team members to
10  document any use of force under your leadership, true?

11   A.   True.

12   Q.   Okay.  I want to show you what we'll mark as
13  Exhibit 3.

14        MS. BAUTISTA:  There's already an Exhibit 3.

15        MS. GRADY:  Okay.  Let's try for 4.

16        (EXHIBIT 4 MARKED FOR IDENTIFICATION)

17  BY MS. GRADY:

18   Q.   Okay.  This is a document that was served on
19  Plaintiffs from Defendants titled, Defendants' First
20  Amended Rule 26(a) Disclosures."  It's, like, legalese.
21  Have you reviewed this document before your deposition
22  today?

23   A.   Yes.  We did a brief review.  Yes.

24   Q.   Okay.  So what I'm most interested in is the
25  reference to yourself, and you've seen this before

Page 105

1  today, true?

2    A.   Yes.

3    Q.   Okay.  I just want to go through a couple of
4  these.  You -- according to Defendants, you are going to
5  provide testimony at trial regarding, "The steps taken
6  within the Illinois Department of Corrections to reduce
7  the existence of dangerous contraband."  Do you see
8  that?

9    A.   Yes.

10   Q.   Okay.  I want to focus first today, you play a
11  role in overseeing efforts to remove dangerous
12  contraband within IDOC; is that true?

13   A.   That's true.

14   Q.   Are you one of the people who leads that
15  effort?

16   A.   I -- I lead the tactile operations for those
17  efforts.  Yes.

18   Q.   Okay.  Did you play any role in leading or
19  organizing efforts to remove dangerous contraband back
20  in 2014?

21   A.   No.

22        MS. GRADY:  Okay.  Let's -- actually, would it
23   be possible for us to take another break?  I don't
24   actually have that much more, but I do have a dog
25   here that needs to go out.  And I'm the only person

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 30 of 60   Page ID #23398
The Deposition of ZACHARY SARVER, taken on April 05, 2024
106..109

Page 106

1    in this house, so I don't want to have --
2         MS. BAUTISTA:  Yeah.  How much -- how long
3    will you --
4         THE REPORTER:  Okay.
5         MS. GRADY:  Yeah.  I'll be good in --
6         THE REPORTER:  I'll get us off the record real
7    quick.  Sorry.
8         MS. GRADY:  Yes.
9         THE REPORTER:  It's 1:28.
10             (OFF THE RECORD)
11        THE REPORTER:  We're back on the record for
12   the deposition of Zachary Sarver being conducted by
13   videoconference.  My name is Sydney Little.  Today
14   is April 5, 2024.  The time is 1:39 p.m. Central.
15   BY MS. GRADY:
16        Q.   Okay.  There's just a few more questions I
17   have for you, sir.  Oh, I do have one other question
18   about current practices.  Currently, when prisoners are
19   restrained as part of a facility-wide shakedown, are
20   they restrained thumbs up or thumbs down?
21        A.   Thumbs up.
22        Q.   Now you reviewed footage from the shakedown at
23   Menard in February of 2023, correct?
24        A.   Correct.
25        Q.   And you saw that as part of the -- that

Page 107

1    shakedown there was deployment of OC spray, correct?
2         A.   Correct.
3         Q.   Did you also see -- and I can -- I can play it
4    if it's helpful to refresh your recollection, just let
5    me know.  Did you also see proceeding the spray, there
6    was instances in which a number of prisoners, and then
7    several prisoners stood up out of their chairs?
8         A.   Correct.
9         Q.   Did you ever come to learn what it was that
10   got them to do that?
11        A.   So there -- I want to be careful because I
12   don't remember exactly.  I -- I did have to -- I did
13   have to ask those questions.  I was there that day.  I
14   was not in the chapel when it happened.  I was there
15   immediately following.  Of course, I did have to find --
16   find out, ask those questions about what was going on
17   that -- that caused that.  I was given an answer, and,
18   of course, that was turned over to investigation as well
19   to look at the whole situation.
20             But there was an issue with an individual in
21   custody who was needing to be escorted to segregation,
22   and who was getting the other individuals in custody
23   riled up, making more noise than they should be, having,
24   you know -- doing something that he shouldn't have been
25   doing in there.  So he was going to be escorted to

Page 108

1    restrictive housing to get him out of that environment,
2    and there was a situation of resistance between officers
3    and -- and that individual, if I remember that
4    correctly.
5         Q.   And you agree that -- and you -- did you
6    review this footage before you reviewed it to prepare
7    for today's deposition?  Did you review that footage as
8    part of your role as TACT -- SORT commander?
9         A.   Yes.  This -- this situation was -- was a big
10   deal, and -- and that -- that was reviewed, sent to
11   investigations.  I actually had a phone conference with
12   the director, with the chief of operations, with the
13   warden at Menard, investigations, all where we reviewed
14   the video together, and this -- this situation spawned a
15   lot of conversation.
16        Q.   You agree that whatever altercation, or what
17   happened that occurred that proceeded these individuals
18   in custody standing up, was off screen from the video
19   footage?
20        A.   Yes.
21        Q.   Okay.  Were one or more complaints or
22   grievances made by prisoners at Menard about what
23   happened in the staging area; to your knowledge?
24        A.   I -- I don't know -- any time that we do a
25   tactical operation, there's -- I'm sure there's

Page 109

1    grievances, but those grievances don't get shared with
2    me, unless there's specific questions or, you know -- I
3    -- I -- that goes through the facility grievance
4    processes.  It has nothing to do with special
5    operations.
6         Q.   Okay.  And I appreciate that answer, but what
7    I'm asking is whether -- you said, unless there's a
8    reason, it wouldn't be shared with me.  Do you recall
9    whether there was a reason, such that it was -- those
10   complaints or grievances were shared with you following
11   the -- or the February 2023 incident?
12        A.   They were not.
13        Q.   Did you ever come to learn of any complaints
14   being made by prisoners at Menard about what happened?
15        A.   No.
16        Q.   Did any member of the correctional staff
17   receive any discipline, to your knowledge, as a result
18   of the incident that occurred during that shakedown?
19        A.   Not that I'm aware of.
20        Q.   And did anyone get removed from the TAC Team
21   as a result of what happened during that incident, to
22   your knowledge?
23        A.   No, not that I'm aware of.
24        Q.   All right.  I do want to play one portion.
25        MS. BAUTISTA:  And just for the record, this

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Page 110

```
 1       video is attorneys' eyes only.
 2            MS. GRADY:  Yes.  So we can mark this portion
 3       of the transcript under seal.
 4            (CONFIDENTIAL PORTION II REDACTED)
 5  BY MS. GRADY:
 6       Q.   Okay.  All right.  I'm going to put back the
 7   26(a) Disclosures on the screen, Exhibit 4.
 8            MS. BAUTISTA:  We do -- I have a printed copy
 9       if you know, want to do that.
10            MS. GRADY:  Sure.  Yeah.  That -- that'd
11       probably be easier than 4.  Oh, we'll just
12       reference Exhibit 4 without having to look at the
13       screen.
14  BY MS. GRADY:
15       Q.   The next statement after -- we already talked
16   about the first sentence that runs from Page 4 to page
17   5.  The next sentence says, "Mr.  Sarver can opine
18   regarding the safety and security concerns related to
19   conducting mass shakedowns within an institution and the
20   methods taken to ensure inmate and employee safety
21   during the shakedown."  Do you see that sentence?
22       A.   Yes.
23       Q.   Now, in your current role, you have
24   responsibility to understand and take action regarding
25   safety and security concerns related to conducting mass
```

Page 111

```
 1   shakedowns within an institution, correct?
 2       A.   (No verbal response.)
 3       Q.   I didn't catch your answer.
 4       A.   Correct.
 5       Q.   Okay.  And you also have responsibility to
 6   understand and take action regarding the methods taken
 7   to ensure inmate and employee safety during the
 8   shakedowns, at -- in your current role, true?
 9       A.   True.
10       Q.   Did you have responsibility to have an
11   understanding and take action regarding those topics
12   back in 2014?
13       A.   No.
14       Q.   Okay.  The next sentence is, "Mr.  Sarver can
15   provide testimony regarding the policies and procedures
16   related to the searches conducted at correctional
17   facilities."  Do you see that?
18       A.   Yes.  And can I go back to the previous
19   question?  Would that be okay?
20       Q.   Sure.
21       A.   Okay.  And I -- and I said, no, it didn't have
22   a responsibility in a -- in a leadership role.  I want
23   to be clear that -- that every officer has a
24   responsibility to -- to properly report any type of
25   obvious misconduct, and stop any -- any obvious
```

Page 112

```
 1   violations.  I mean, that's a -- that's a -- that's a
 2   responsibility of every person in the department, but
 3   not a leadership responsibility in my particular role.  I
 4   want to be clear of that.
 5       Q.   I appreciate that.  Did you have any expertise
 6   regarding that tactic -- regarding that responsibility
 7   at that time?
 8            MS. BAUTISTA:  Object to form.
 9            THE WITNESS:  I -- I -- I'm not sure I -- so
10       expertise in -- in ensuring that things were
11       conducted properly?  Is that what you're asking?
12  BY MS. GRADY:
13       Q.   Did you have any expertise in 2014 regarding
14   the safety and security concerns related to conducting
15   mass shakedowns?
16       A.   No.
17       Q.   Did you have any expertise back in 2014
18   regarding methods that were taken to ensure inmate and
19   employee safety during shakedowns?
20       A.   No.
21       Q.   Okay.  The next sentence is, "Mr.  Sarver can
22   provide testimony regarding the policies and procedures
23   related to the searches conducted at correctional
24   facilities."  Now I want to break this down into a
25   couple different pieces.  You've already said that
```

Page 113

```
 1   you're not intimately familiar with administrative
 2   directives, and institutional directives, that do not
 3   bear on tactical operations, true?
 4       A.   I'm very good at referencing when I need to,
 5   but as far as policies that don't directly affect myself
 6   and my unit, I would've to reference them.
 7       Q.   Okay.  And so you understand that there are
 8   all sorts of non-tactical searches that happen on a
 9   regular basis.  In fact, some of them come to you
10   through -- some of the results of them come to you
11   through incident reports, right?
12       A.   Correct.
13       Q.   Okay.  Do you have any as -- today, you have
14   specialized knowledge about the policies and procedures
15   related to tactical searches conducted at correctional
16   facilities, correct?
17       A.   That -- that is correct.  You have to
18   understand, though, the -- the procedures for searching
19   an individual in custody, and the procedures for
20   searching their cells, are going to be the same top
21   procedures and practices that are used.  You know,
22   Tactical Unit members don't search property a certain
23   way different than how a normal correctional officer is
24   taught.  They don't strip search an individual, or pat
25   search an individual differently than the way a normal
```

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 32 of 60   Page ID #23400
The Deposition of ZACHARY SAWYER, taken on April 05, 2024
114..117

Page 114

1  correctional officer will be taught in the academy.
2  Practices are used every day in facilities. There's no
3  -- there's no difference in procedure.
4      Q. Okay. I guess let me put it this way. You've
5  talked today about best practices that you, as a leader
6  for the SORT Team, have sought to adhere to for the
7  Special Operations Response Teams, correct?
8      A. Correct.
9      Q. And you have opinions about how the practices
10  compare to those best practice -- how the practices
11  within IDOC compare to those best practices, based on
12  your leadership at -- within the SORT team itself,
13  right?
14      A. No. I -- I -- I think I stated I've yet to
15  develop a -- a firm opinion on which one is better.
16      Q. Okay. Fair enough. Back in 2014, before you
17  gained any leadership position, did you form any
18  opinions about the good or bad effects of the policies
19  and procedures related to searches conducted at
20  correctional facilities?
21      A. No. Everything that we did in those searches
22  seemed to be reasonable, and -- and have a -- a
23  permitted purpose.
24      Q. Okay. Let me just ask you a final set of
25  questions, so I want to turn back to those best

Page 115

1  practices. Do you consult any external source to
2  understand what practices are occurring with tactical
3  teams outside of the Illinois Department of Corrections?
4      A. I have talked to other state special
5  operations leaders. Generally, those aren't in
6  reference to, like, mass tactical searches. I've talked
7  to them about, you know, say, hostage rescue stuff,
8  firearms, ballistics, less lethal weapons than what
9  they're using, how effective they are, things of that
10  nature, but I've never had a conversation with other --
11  other state commanders regarding tactical searches.
12      Q. Okay. Do you agree that when a facility-wide
13  shakedown is conducted it can escalate tensions between
14  staff and prisoners?
15          MS. BAUTISTA: Object to form.
16          THE WITNESS: Can it?
17  BY MS. GRADY:
18      Q. Yes.
19      A. Yes.
20      Q. And all things being equal -- and I'm not
21  meaning to suggest that they are never justified, but
22  all things being equal, they do, right? They do
23  escalate some level of tension or, you know, disconnect
24  between staff and prisoners?
25          MS. BAUTISTA: Objection. Argumentative.

Page 116

1          THE WITNESS: So you are asking if they can.
2  Absolutely, they can. There are -- there are
3  situations, especially individuals in custody, who
4  are not doing the right thing. They don't like us
5  coming to the facility to conduct these operations.
6  The vast majority of individuals in custody are --
7  are trying at least to do the right thing, and many
8  of them are thankful. And I've been personally
9  told by several inmates that, "Hey, glad you're
10  here. This is getting out of control. This is
11  nuts. This is crazy. There's so much stuff, and
12  we're so glad you're here." So I've -- I've heard
13  many comments about the thankfulness of these
14  operations, both from individuals in custody, and -
15  - and staff that have to work in those environments
16  every day.
17  BY MS. GRADY:
18      Q. And did those messages of gratitude come
19  during shakedowns that you believe occurred as a result
20  of people treating the prisoners with respect?
21      A. I -- in every -- every tactical search I've
22  ever been a part of or witness, I -- the individuals in
23  custody have been treated with respect. I don't -- so
24  you're saying, are -- are you trying to -- if you're
25  trying to ask, like, is -- are they only thankful on the

Page 117

1  nice and good one ones, I -- I -- I would argue that
2  they're all as nice and good as they can be, given that
3  circumstances.
4      Q. Okay. But what I'm asking is not -- I think
5  you're -- I think you're jumping ahead. On those
6  instances, was it your understanding -- on the instances
7  where you were given messages of gratitude, was it your
8  understanding that the shakedowns were conducted out of
9  respect for -- because the tactical team members were
10  providing respect to the individuals in custody?
11          MS. BAUTISTA: Object to form.
12          THE WITNESS: So were they thankful because my
13  Tactical Unit members were respectful?
14  BY MS. GRADY:
15      Q. No, that is not what I asked. So if I asked a
16  bad question, let me rephrase. How many times have you
17  gotten messages of gratitude from one or more
18  individuals in custody following a facility-wide
19  shakedown?
20      A. Dozens upon dozens.
21      Q. And in each one of those, was it your
22  understanding that the Tactical Team -- these are
23  periods of time when you're in leadership?
24      A. I've -- I've heard him as -- as a Tac officer.
25  I've heard him as a TRT member. I've heard him as a

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 33 of 60   Page ID #23401
The Deposition of ZACHARY  SAWYER, taken on April 05, 2024
118..121

Page 118

1    commander, and as a regional commander.
2         Q.    Okay.  Do you have any recollection of
3    receiving messages of gratitude when you attended the
4    Big Muddy Shakedown in 2014?
5         A.    Not specifically.  No.
6         Q.    Do you have any recollection of receiving any
7    messages of gratitude if you -- when, if you did, attend
8    the shakedowns at Menard in 2014?
9         A.    Not specifically.  No.
10        Q.    Was it your understanding during the
11   shakedowns that you did receive these messages of
12   gratitude that during the shakedown, Tactical Team
13   members were affording the individuals in custody a
14   level of respect?
15        A.    Yes.
16        Q.    Okay.  Let me just look and see if I have
17   anything else here.  Are there any other opinions that
18   you have on the topics that are laid out in Exhibit 4,
19   which is that 26(a)(2) disclosure, that we have not
20   discussed today?
21        A.    Nothing -- nothing that stands out.
22             MS. GRADY:  Okay.  I think that I am finished.
23                  CROSS-EXAMINATION
24   BY MS. BAUTISTA:
25        Q.    Okay.  I have a few questions.  So looking at

Page 119

1    Exhibit 4, you were asked some questions about whether
2    you had expertise in your leadership role, or as a
3    leader in 2014 regarding conducting mass shakedowns
4    within an institution, and the methods taken to ensure
5    inmate and employee safety during the shakedown.  But
6    what I'm interested in is, in 2014, did you have
7    expertise as a TRT and/or Tactical Team member regarding
8    conducting mass shakedowns, and the methods taken to
9    ensure inmate and employee safety during the shakedown?
10        A.    Yeah.  So maybe we're confusing, you know, the
11   term, or definition of -- of expertise, but we
12   definitely, as a TRT member, we're -- we're there to
13   uphold a standard.  We're -- we're there to be looked
14   upon as -- as a go-to people for policy and for
15   procedures.  And -- and even if that TRT member is just
16   a correctional officer, or a correctional lieutenant,
17   and not a Tac commander or a regional commander, we have
18   a lot of experience, and are held in high esteem by the
19   -- by -- by the Tactical unit people.  So in that sense,
20   I mean, yes, we are -- we are there to provide expertise
21   and guidance.
22        Q.    And are -- and you also, as a TRT or Tac Team
23   member, have expertise regarding the steps taken in 2014
24   by IDOC to reduce the existence of dangerous contraband
25   through these facility-wide searches?

Page 120

1             MS. GRADY:  Objection.  Form.  Leading.  Go
2    ahead.
3             THE WITNESS:  So it, as far as expertise goes
4    in that, I mean, a lot of that is going to be
5    because you're a TRT member, because I was a Tac
6    commander, because I was a tactical unit member who
7    conducted many of these and -- and maybe not being
8    in leadership positions, but -- but being a part of
9    so many of them over the years.  In that case,
10   there's probably very few people in the department,
11   if any, that have that amount of expertise.  Of
12   course, that expertise isn't what it is to now, me
13   being in this position, but I don't know of anybody
14   in the department that would better understand the
15   practices then, who still work for the department.
16   BY MS. BAUTISTA:
17        Q.    You were asked questions earlier regarding
18   either allowing, or not allowing an individual in
19   custody to put their underwear back on after being strip
20   searched during part of one of these facility wide
21   searches.  And you mentioned that there can be tactical
22   reasons for not allowing the individual to wear
23   underwear after being strip searched while in the
24   holding area.  Can you explain what those tactical
25   reasons for not allowing the underwear are?

Page 121

1        A.    Absolutely.  So it's commonplace for
2    individuals to hide contraband within items, articles of
3    their clothing, the underwear being one of them.  That's
4    just -- that's an article of clothing that nobody really
5    likes to handle and properly search.  It is just -- it's
6    just, be honest, it's disgusting.  And they know that.
7    And they know if -- if an officer is going to take a
8    shortcut in a search process, it's likely going to be in
9    an article like an undergarment, like socks or
10   underwear.
11             Furthermore, there's one Tactical officer in a
12   cell with oftentimes two individuals in custody.  That
13   officer has to watch both of those individuals, make
14   sure that they're not hurting themselves, hiding
15   contraband, hurting the officer, hurting the other
16   individual in custody, while conducting that search.  So
17   searching the body of -- of the -- the individual
18   they're searching, and the articles of clothing that
19   they're -- as they're being given.
20             The least amount of articles of clothing that
21   can be given to that officer to search while still
22   looking and feeling at that garment, looking up, make
23   sure nothing's going on, searching again, looking up
24   again.  So the least amount of -- they're only going to
25   have to search what that individual is going to come out

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 34 of 60   Page ID #23402
The Deposition of ZACHARY SAWYER, taken on April 05, 2024
122..125

Page 122

1  of the facility with. The -- the fewer number, the
2  numbers of garments, the easier and safer it is for
3  those officers, and the least amount of contraband has
4  potential to, A, to -- to not be found, come out of --
5  come out of that cell, and the safer that that officer
6  is during that -- that portion of the operation.
7      Q.  For the searches that you participated in
8  2014, which we believe to be one or two at Big Muddy,
9  and maybe one at Menard, you -- did you participate in
10  briefings before the facility-wide searches began?
11     A.  Yes.
12     Q.  During those briefings, did anybody instruct
13  you to conduct a strip search so that an individual in
14  custody first manipulated their genitals and buttocks,
15  and then after that was told to manipulate their lips
16  and cheeks with their hands?
17         MS. GRADY:  Objection. Form. Foundation. You
18     can answer.
19         THE WITNESS:  So absolutely not.  I don't mean
20     -- you have to understand what -- what you're
21     asking. Imagine this.  A tactical unit commander
22     briefing 100 tactical unit officers that they don't
23     know from, say, ten different facilities for one
24     operation.  Standing in that briefing are wardens,
25     majors, investigators, intel folks.  I can't

Page 123

1  imagine any tactical unit commander or regional
2  commander saying that ever.
3         But could you imagine if they did?  There are
4  -- they would be fired the next day.  They would be
5  walked out.  They would be walked out of that
6  facility within ten minutes.  It's just -- I -- I
7  don't -- I -- I -- I'm not trying to sound
8  condescending to the question, but it's just, I
9  mean, absolutely just did not, and could not
10     happen.
11  BY MS. BAUTISTA:
12     Q.  Were you present for any strip searches in
13  which you or another officer conducted the strip search
14  so that the individuals told to first manipulate their
15  genitals, and then after that, to manipulate their lips
16  or cheeks?
17     A.  I have never seen that happen.
18         MS. GRADY:  Objection. Form. Foundation. Go
19     ahead.
20  BY MS. BAUTISTA:
21     Q.  During the briefings for the facility-wide
22  searches that we believe you were present for in 2014,
23  were you instructed to handcuff individuals in custody
24  in a particularly painful way?
25     A.  No.

Page 124

1         MS. GRADY:  Objection. Form. Foundation.
2  BY MS. BAUTISTA:
3      Q.  You mentioned earlier that the current
4  practice is to -- for facility-wide searches, is to
5  place individuals in restraints with their thumbs up. Is
6  that considered to be a particularly painful way to
7  handcuff an individual?
8      A.  Particularly painful?
9      Q.  Yes.
10     A.  No.  Handcuffing behind the back is not
11  comfortable, but painful for the average person?  No. I
12  -- I myself took and handcuff myself behind the back.
13  Had somebody handcuff me, left myself there for three
14  hours to see how that was.  It was -- it was not
15  comfortable.  I didn't like it.  It had no lasting
16  effects.  I'm unaware of any individual in custody in
17  our tactical operations that had any lasting effects
18  from being handcuffed behind her back, period.  I'm --
19  I'm unaware of -- of that.
20         But -- but no.  There's no direction to
21  handcuff anybody in any particularly painful manner. In
22  fact, there are -- there are -- there are things in
23  place for an individual in custody who has maybe an
24  excessively large build, or a medical condition where
25  they can get a permit to be restrained in a different

Page 125

1  manner from medical.  And those -- those permits are
2  always honored.
3      Q.  During the briefings for the facility-wide
4  searches in 2014 that we believe you were present for,
5  the two at Big Muddy and the one at Menard, were -- did
6  you receive instructions to have the individuals in
7  custody to -- in formation, to stand so close to each
8  other that the handcuffed hands of one individual was
9  touching the body, specifically the genital area, the
10  clothed genital area of the person behind them?
11     A.  Absolutely not.
12         MS. GRADY:  Objection. Form. Foundation. Go
13     ahead.
14  BY MS. BAUTISTA:
15     Q.  And you know, you earlier said that you don't
16  really remember these searches.  So for the things that
17  I -- we just discussed, the strip searches done genitals
18  first and mouth second, the handcuffing in a painful
19  way, or the standing so close that the hands are
20  touching the clothed genital area of the person behind
21  them, how are you so sure, sitting here, that those were
22  not instructions that were given at the time?
23     A.  So yeah.  I don't remember specifically those
24  operations.  You have to understand that in my lifetime,
25  I -- I've been a part of planning, conducting, operating

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY    Document 642-11    Filed 05/22/24    Page 35 of 60    Page ID #23403
The Deposition of ZACHARY SARVER, taken on April 05, 2024
126..129

Page 126

1  hundreds of those operations. But I can assure you if --
2  if I witnessed somebody doing something like some of the
3  allegations we've just discussed, you would have my name
4  on an incident report. There is no way in God's green
5  Earth that I would witness somebody doing in this, say,
6  a reverse strip search on an individual in custody, and
7  you wouldn't see Zach Sarver's name on an incident
8  report. I -- I would remember that. That's -- that's --
9  that's out of the ordinary. It's gross. That would've
10  gotten my or the vast, vast majority of Tactical members
11  in this department's attention.
12      Q.   Big Muddy River Correctional Center in 2014,
13  what was the security level for that facility?
14      A.   I believe that was still -- I don't know for
15  sure, but I believe that was still primarily a sex
16  offender unit, and a medium security facility.
17           MS. BAUTISTA:  Okay.  Can I have just one
18  minute, Sarah?  I'm not going to discuss anything
19  with the witness.
20           MS. GRADY:  Sure.
21           THE REPORTER:  Okay to go off the record?
22           MS. BAUTISTA:  Yeah.
23           THE REPORTER:  Okay.  We're off the record.
24  The time is 2:12.
25           (OFF THE RECORD)

Page 127

1           THE REPORTER:  Okay.  We're back on the record
2      for the deposition of Zachary Sarver being
3      conducted by videoconference.  My name is Sydney
4      Little.  Today is April 5, 2024.  And the time is
5      2:13 p.m.
6           MS. BAUTISTA:  I have no further questions.
7           MS. GRADY:  Sorry, Laura.
8              REDIRECT EXAMINATION
9  BY MS. GRADY:
10      Q.   Okay.  I have some follow up for you, sir.  We
11  talked a little bit about legitimate penological
12  justifications for various things.  In 2014, were you
13  part of the team that identified legitimate penological
14  purposes for various aspects of a facility-wide
15  shakedown?
16           MS. BAUTISTA:  Outside the scope of cross.
17  BY MS. GRADY:
18      Q.   You can answer.
19      A.   No.  I -- I wasn't part of any formal team
20  identifying that.
21      Q.   And did you have any role in making decisions
22  about whether to allow prisoners to wear their
23  underwear, or whether to prohibit them from wearing
24  their underwear back during that time frame, 2014?
25      A.   No.  I did not.

Page 128

1      Q.   Okay.  You said -- you talked a little bit
2  about writing an incident report.  Can you tell me how
3  many incident reports that you've written reporting
4  misconduct by Tactical Team members?
5      A.   I -- I don't know that I've ever written an
6  incident report regarding misconduct by a Tactical Team
7  member.
8      Q.   And you mentioned that you would remember
9  something like that.  Can you tell me the last time that
10  a prisoner was reversed strip searched; to your
11  recollection?
12      A.   I have no idea.  I have no recollection that
13  that ever even happened.
14      Q.   Okay.  You said that -- you mentioned people
15  who had -- who were present during the briefing.  Can
16  you tell me the name of the investigator who attended
17  the briefing in Big Muddy, that you were present for?
18      A.   No.  I -- I -- that was years ago.  Those
19  investigators have changed hands many times.
20      Q.   Were there two investigators present?  One?
21  Three?
22      A.   I -- I don't remember.  In almost every
23  briefing that I can remember, it's facility leadership,
24  intel, IA, Tac leadership, and of course, all the
25  members.

Page 129

1      Q.   And was it Anthony McAllister who led the
2  briefing, or David White who led the briefing, in the
3  ones that you attended?
4           MS. BAUTISTA:  Object to form.
5           THE WITNESS:  Again, I -- I don't remember,
6      but it's -- it's most likely one of those two.
7  BY MS. GRADY:
8      Q.   But you don't have a recollection as to which
9  one for any of the briefings you attended?
10      A.   Correct.
11      Q.   You mentioned that the wardens would be
12  present.  Can you tell me which of the wardens were
13  present for the briefings you attended?
14      A.   I don't even know who the wardens were at that
15  time.
16      Q.   Okay.  You mentioned that if an instruction
17  like the ones Ms. Bautista gave to you were given,
18  they'd be walked out of the facility.  Can you tell me
19  the last time that a supervisor was walked out of a
20  facility for an instruction he gave to subordinate
21  staff?
22      A.   A supervisor walked out of a facility for
23  instruction that they -- instruction that they gave or
24  just something they did to subordinate staff?
25      Q.   An instruction they gave to subordinate staff.

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 36 of 60   Page ID #23404
The Deposition of ZACHARY SAWYER, taken on April 05, 2024

130..133

Page 130

1    A.   I -- I -- I'm -- I'm -- I'm aware of a
2  circumstance recently that happened in Western, but I --
3  I don't know if I'm privy to opine on -- I don't even
4  know if this situation is still under investigation, or
5  that inmate -- or that individual, that office -- excuse
6  me -- that major is still working for the department.  I
7  have no idea the disposition of that situation.  I'd be
8  happy for some guidance on this.
9          (CONFIDENTIAL PORTION III REDACTED)
10   Q.   Now, you said that permits are always honored.
11 Can you tell me what review you've done of the 2014
12 shakedowns to compare the number of permits that were --
13 had been given to prisoners at the facility, and the
14 number of instances in which a prisoner was restrained
15 in consistent with that permit?
16   A.   A -- a review of those permits?
17   Q.   Yes.  A review of the underlying facts that
18 would give you any foundation to testify that medical
19 permits are always honored, as of 2014?
20   A.   Okay.  I'll -- I'll clarify my response.  I --
21 I have personally never been presented with a permit for
22 an alternate form of handcuffing or restraining, and not
23 honored it.  I have also never witnessed any tactical
24 unit member staff or staff, any staff, being presented a
25 permit for alternate forms of restraint and not be

Page 131

1  honored.  And I've witnessed it happen, countless,
2  hundreds of times in my career.
3    Q.   And how many times did you witness it in 2014?
4    A.   I -- I couldn't put a specific number on it.
5  It happens frequently.  I would say, just throwing a
6  number, but it's going to be close.  I'd say three to
7  five percent of the population has a -- has an alternate
8  form of cuffing, some facilities more than others based
9  on the demographic of the population.  Some facilities
10 have a -- a -- a larger elderly population, because they
11 might provide additional medical services at that
12 facility.  So that -- that percentage could go up or
13 down, but it's not like it's a person or two every
14 operation.  It's -- it's you're going to find ten, a
15 dozen, 20 who have alternate cuffing permits.
16   Q.   Okay.  But what I'm asking is how many
17 instances in which you personally witnessed a prisoner
18 having their cuffing permit honored in 2014,
19 specifically?
20   A.   Okay.  I -- I don't -- I don't specifically
21 remember any specific instances.
22   Q.   Okay.
23   A.   My -- my -- my -- my testimony is that it
24 happens.  It happens frequently.  I can't -- I -- it --
25 it happens frequently.  That's my testimony.

Page 132

1    Q.   As a Tactical Team commander -- or a sort team
2  commander rather, sorry, when you write an instruction
3  down in an operation order, you expect that even through
4  the verbal transmission that will be transmitted; is
5  that right?
6          MS. BAUTISTA:  Object to the form.
7          THE WITNESS:  If you're asking if -- if my
8     operations plan, and the orders written in the
9     operations plan, if there's an expectation for them
10    to be followed, if that's the question, that's yes.
11 BY MS. GRADY:
12   Q.   Right.  And line level tac staff are not given
13 the ability to receive those operations orders, true?
14          MS. BAUTISTA:  Object to form.
15          THE WITNESS:  So the operations plan is not
16    disseminated directly to every -- every tactical
17    unit member doesn't get a copy of the operations
18    plan.  The operations plan is -- is written by
19    myself, or one of the special operations
20    commanders, sent to the chief of operations for
21    approval.  Once it's approved, it comes back to us,
22    and we will implement that plan.  The portion then
23    -- and that plan is -- is briefed and implemented
24    verbally through -- through briefing processes
25    prior to, and during the operation.

Page 133

1  BY MS. GRADY:
2    Q.   And it's your expectation that the verbal
3  transmission -- is follows the operations order, true?
4    A.   Correct.
5    Q.   You said that you have not become aware of
6  anybody who's had a lasting effect from handcuffing.  Can
7  you tell me how many medical records you've reviewed to
8  make that determination?
9    A.   None.
10   Q.   How many grievances have you reviewed of
11 individuals who have complaints about the effects from
12 handcuffing in that manner, for an extended period of
13 time?  How many of those have you reviewed?
14   A.   None.  Neither one of those are in my duties.
15   Q.   And you don't have any medical training,
16 right?
17   A.   That's correct.  Well, that -- that is -- is no.
18 I -- I do have medical training.  I -- I -- I am a
19 combat lifesaver in -- in the military.  Also combat --
20 various -- various combat and tactical medical courses,
21 but all mostly dealing with penetrating trauma and
22 emergency lifesaving.
23   Q.   Okay.  Not any specialty in orthopedics, apart
24 from penetrative trauma?
25   A.   That's correct.

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 37 of 60   Page ID #23405
The Deposition of ZACHARY SAWYER, taken on April 05, 2024
134..137

Page 134

1    Q.    And there are other methods of handcuffing
2  that are permitted within the Department of Corrections,
3  correct?
4    A.    With specialized permits.  Yes.
5    Q.    Well, you're aware that prisoners who are
6  moved within a facility outside of a tactical operation
7  are frequently handcuffed with, even without a permit,
8  with their thumbs down, true?
9    A.    So I mean, I think we're confusing the terms
10  handcuffing.  When I -- when I talk about handcuffing in
11  -- in particular, I'm talking about the way that
12  corrections personnel are taught to be handcuffed from -
13  - from the facility.  And that is hands behind the back,
14  the back of the -- the palms facing each other with the
15  thumbs up.  There are other situations where, say, for
16  instance, on a court writ where somebody would be placed
17  in a back -- black box restraint, that does involve a
18  handcuff as part of that restraint.  That's completely
19  different than the manner we just described, as well as
20  waist chains that have a one half of a handcuff hanging
21  off each side.  And those are used for many lower risk
22  court writ, and medical furloughs, and things of that
23  nature.
24        I -- and I have seen situations where
25  individuals have been moved, and have been handcuffed in

Page 135

1  the front.  My personal and tactical opinion on that is
2  that's a very, very bad practice.  I would rather see
3  individuals not handcuffed versus handcuffed in the
4  front.  It's extremely dangerous.
5    Q.    All right.  Okay.  But what I'm talking about
6  is restrained behind the back with thumbs down.  Have
7  you ever seen that?
8    A.    Oh.  No.  The -- the only time that I've ever
9  seen somebody restrained behind their back with thumbs
10  down is someone who has been restrained in the proper
11  way, but maybe the handcuffs are not tight enough and
12  that individual has rotated their hands to get their
13  hands to where they're together so they're more
14  comfortable for them.  In that case, the -- those
15  handcuffs need to be removed and reapplied in the proper
16  manner.  But I -- I've seen it happen.
17    Q.    Okay.  But you've never become aware of anyone
18  purposely restraining anyone in that method, at any
19  point during your career with the Department of
20  Corrections.  Is that your testimony?
21    A.    No.  That's -- that's the improper way to
22  handcuff.
23    Q.    Okay.  So my statement is correct.  You've
24  never come to learn of anyone intentionally permitting
25  restraints to be applied while the prisoner is has their

Page 136

1  hands behind their back, the thumbs down; is that true?
2    A.    That -- that's correct.  Look, I want to be
3  careful on the -- on the orientation of the thumbs.
4  You're talking about -- what you talking about is
5  I've seen them with their palms together, handcuff
6  behind her back with her palms together?
7    Q.    Yes.  And thumbs down.
8    A.    Okay.  That -- yeah.  That -- that is -- that
9  is -- I have seen that before, and that situations where
10  I've seen that, it has been a situation where they were,
11  A, potentially improperly applied, or applied the
12  correct way and the individual was able to manipulate --
13  manipulate their hands and turn them around in -- in the
14  wrong way.
15    Q.    Okay.  And I want to leave that second
16  category out.  You have seen individuals intentionally
17  apply -- you have seen people intentionally apply
18  restraints to prisoners who have their palms together
19  with thumbs down, within the Department of Corrections,
20  right?
21        MS. BAUTISTA:  Objection.  Misstates
22  testimony.
23        MS. GRADY:  Oh, okay.
24        THE WITNESS:  I --
25  BY MS. GRADY:

Page 137

1    Q.    Then I just misunderstood.  You've never, in
2  your career, ever seen anyone be intentionally
3  restrained that way?
4    A.    Okay.  Yes.  I -- I have -- I have never seen
5  someone apply handcuffs in that manner.  If they did, I
6  would have said, "No, that is the wrong way."  I have
7  seen individuals in custody who had them on that way.
8  They were either, A, yes, implied -- applied
9  incorrectly, which is a possibility, or in most cases,
10  and I've actually watched numerous times -- individuals
11  manipulate their hands and turn them around.  In that
12  case, you need to make contact with the individual in
13  custody and say, "Hey, bud, no, that's -- that's
14  incorrect.  Make sure you have enough security.  Take
15  the handcuffs off.  Get their hands the right way, and
16  reapply the restraints in the proper way."  And -- and I
17  would say, in most cases, it's probably happening
18  because the individual in custody is manipulating those
19  handcuffs.  I have never watched somebody put them on
20  incorrectly to begin with, not to say that hasn't
21  happened.
22    Q.    Okay.  I just have one last question for you.
23  Tac Team officers now wear black?
24    A.    It's navy blue.
25    Q.    When did that change; to your knowledge?


Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 38 of 60   Page ID #23406
the Deposition of ZACHARY SAWYER, taken on April 30, 2024
138..141

Page 138

1    MS. BAUTISTA:  Objection.  Outside of the
2  scope.
3    THE WITNESS:  Gosh.  Rob Brady was still
4  around.  I believe I was a regional commander.  I'm
5  going to say 2018.
6  BY MS. GRADY:
7    Q.   Were you part of the decision to make that
8  change?
9    MS. BAUTISTA:  Objection.  Outside the scope.
10    THE WITNESS:  I was not part of the decision
11  to make that change.  I believe that came from Mike
12  Atchison.  I don't know.  I was not privy to those
13  conversations.  I was part of -- of the group that
14  -- that put their heads together to try to figure
15  out what would -- what would -- what colors, what
16  style, what, you know, what fit our operations in
17  the best manner.  So I -- I did have a say in what
18  we wound up with, but not the fact that we were
19  going to change from the previous uniform.
20  BY MS. GRADY:
21    Q.   And are they still anonymized so that they
22  don't bear any identifying information?
23    MS. BAUTISTA:  Objection.  Outside of scope.
24    THE WITNESS:  No.  They've got -- they've got
25  a badge and a name on them.

Page 139

1  BY MS. GRADY:
2    Q.   And were you part of the decision to make that
3  change?
4    MS. BAUTISTA:  Objection.  Outside of scope.
5    THE WITNESS:  No.  I -- I -- I was not part of
6  the -- I was not part of the decision-making on
7  that they would be -- have their names on their
8  uniform, but we did have conversation about, you
9  know, should they be Velcro?  Should they be sewed?
10  Should it be a pin on?  We had those kind of
11  conversations, but it was always with the
12  assumption that the names would be put on it.
13    MS. GRADY:  Okay.  That's all I got.  Thank
14  you, sir.
15    THE WITNESS:  Thank you.
16    MS. BAUTISTA:  I have nothing further.
17    THE REPORTER:  Okay.  How would we like to
18  handle signature?
19    MS. BAUTISTA:  You can send it to me.
20    THE REPORTER:  Okay.  Sounds good.
21    MS. BAUTISTA:  We'll review.
22    THE REPORTER:  And then, Sarah, would you like
23  a copy of the transcript today?
24    MS. GRADY:  I don't think at this time.  No.
25    THE REPORTER:  Okay.  And Laura, would you

Page 140

1  like a copy?
2    MS. BAUTISTA:  Not at this time.
3    THE REPORTER:  All right.  Let me take us off
4  the record.
5    (DEPOSITION CONCLUDED AT 2:30 P.M. CT)

Page 141

1    CERTIFICATE OF DIGITAL REPORTER
2    STATE OF ILLINOIS
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Stipulation page hereof, by me
7  after first being duly sworn to testify the truth, the
8  whole truth, and nothing but the truth; and that the
9  said matter was recorded digitally by me and then
10  reduced to typewritten form under my direction, and
11  constitutes a true record of the transcript as taken,
12  all to the best of my skill and ability. I certify that
13  I am not a relative or employee of either counsel and
14  that I am in no way interested financially, directly or
15  indirectly, in this action.
16
17
18
19
20
21
22  SYDNEY LITTLE,
23  DIGITAL REPORTER/NOTARY
24  MY COMMISSION EXPIRES: 03/18/2026
25  SUBMITTED ON:  04/22/2024

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

**Exhibits**

**Exhibit 1_
Sarver** 24:5,6,
8,11

**Exhibit 2_
Sarver** 79:19,
24

**Exhibit 3_
Sarver** 80:7,9
104:13,14

**Exhibit 4_
Sarver** 104:16
110:7,12
118:18 119:1

**0**

**0309** 6:15

**1**

**1** 24:5,6,8,11
44:21 46:13,16

**100** 47:4 79:3
84:24 85:3
98:5,6 122:22

**110** 6:6

**11:00** 6:8

**11:14** 16:9

**11:15** 16:14

**11th** 33:24

**12:26** 66:8

**12:34** 66:14

**13** 80:7

**14** 21:11 31:1,9,
10 33:3,5 75:12

**15** 6:15 24:23
79:4

**15th** 80:22

**16th** 25:2 80:23

**18** 32:10

**1980s** 70:13

**1993** 26:18
28:25

**1997** 29:1

**1:28** 106:9

**1:39** 106:14

**2**

**2** 44:21 79:19,
24

**20** 32:10 55:11
131:15

**2000** 19:3
20:18,22 25:23

**2000s** 19:3

**2001** 20:24
34:1

**2002** 20:24
33:23,25

**2004** 19:3 21:5
30:22 47:22,25

**2005** 19:4

**2013** 27:7

**2014** 9:1 10:16,
24 21:10 22:12
23:20,25 24:23
30:3 41:14
45:7,19 48:9,
13,20,24 49:8,
10,14,18,21,25
50:17 51:2,12,
18,25 52:21
54:4,11 65:25
66:1,17 69:18
72:23 73:9,20
74:3 76:13
78:23 79:23
80:14 81:2
84:14 86:24
97:3 105:20
111:12 112:13,
17 114:16
118:4,8 119:3,
6,23 122:8
123:22 125:4
126:12 127:12,
24 130:11,19
131:3,18

**2015** 21:15,19
22:9

**2018** 75:11
100:8 138:5

**2019** 21:25
57:18 58:23
59:11 100:8

**2020** 100:8

**2023** 15:18,20,
24 16:4,18,22
106:23 109:11

**2024** 6:8 16:13
66:13 106:14
127:4

**23** 57:4

**24** 32:7

**25** 50:13 79:21

**26(a)** 104:20
110:7

**26(a)(2)** 118:19

**2:12** 126:24

**2:13** 127:5

**2:30** 140:5

**3**

**3** 44:21 45:1
80:7,9 104:13,
14

**30** 64:4

**39** 80:12

**4**

**4** 12:12 104:15,
16 110:7,11,12,
16 118:18
119:1

**40** 68:16,19

**41** 68:17

**5**

**5** 16:13 66:13
106:14 110:17

127:4

**5-16-** 80:13

**5/16/14** 80:8

**5:00** 88:14

**5th** 6:7

**6**

**60606** 6:7

**7**

**7:00** 88:13

**8**

**800** 39:6

**86** 28:17

**8:00** 88:13

**9**

**9** 15:20 16:4

**900** 39:6

**A**

**A-R** 8:7

**a.m.** 6:8 16:14

**A1** 76:20

**ability** 20:4
41:2,6,8 50:12
57:11 61:1
70:23 92:7 94:2
102:21,24
103:1 132:13

**abroad** 28:4

**absence** 91:7

**absolutely**
31:16 33:18
41:5 94:8,12,17
116:2 121:1
122:19 123:9
125:11

**abuse** 90:8,23

**abused** 90:11

**academy**
25:22 114:1

**access** 58:2
63:12,15

**accidentally**
85:17

**accomplish**
84:2

**accounted**
98:12

**accurate** 9:21

**accurately**
32:21

**achieve** 88:25

**achieved**
29:23

**action** 9:1
95:2,12 110:24
111:6,11

**activated** 36:1

**active** 55:24
56:14

**acts** 90:8

**actual** 17:12
27:22 78:14
95:7

**addendum**
85:8

**addition** 36:24

**additional**
70:3 72:1,5,17
100:4 131:11

**addressed**
8:15

**adhere** 114:6

**administrative**
96:23 97:1
113:1

**advance** 15:11
50:21 52:21
81:6



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 40 of 60   Page ID #23408
The Deposition of ZACHARY SARVER, taken on April 08, 2022

143

advanced 29:13

adversariness 100:14

advice 67:16

affect 113:5

affirm 7:21

affording 118:13

Afghanistan 27:5

agencies 29:4

agent 30:19

agility 39:11

agree 108:5,16 115:12

ahead 26:20,22 46:7 71:18 117:5 120:2 123:19 125:13

airfield 29:15

alcohol 64:15 65:2

all-volunteer 93:2

allegation 86:3

allegations 126:3

allowable 99:8

allowed 22:4 70:18

allowing 99:14 101:11 120:18, 22,25

altercation 108:16

alternate 130:22,25 131:7,15

Amended 104:20

ammunition 44:13

amount 42:11 60:25 62:10 67:8,14 68:15 85:18 99:22 120:11 121:20, 24 122:3

amounts 103:1

and/or 52:10 53:19 64:15 86:10 119:7

animal 94:23

announce 84:4

announced 85:12,20

announcing 88:10

anonymized 138:21

answering 70:22 85:9 87:3

answers 14:10 57:12

Anthony 45:5 54:6,13 129:1

anymore 88:1, 2,4

appearance 6:17

applicable 81:16

application 30:18 39:4,7,8

applied 29:4 30:15,18 135:25 136:11 137:8

apply 26:10 136:17 137:5

appointed 21:1

apprehension 36:5,19 37:11 40:8

approval 57:20 132:21

approved 132:21

approximate 59:19

approximately 20:23 100:6,7

April 6:8 16:13 66:13 76:13 106:14 127:4

area 7:6 52:14 68:3,21 69:1, 13,22 70:25 78:1,22 79:2,5, 8,10,16 96:22 97:5 98:2,13 100:2 101:15 103:17 108:23 120:24 125:9, 10,20

argue 117:1

Argumentative 37:15 90:9 115:25

arm 38:21 64:18

arm's 97:18

armor 27:25

armored 27:22 28:2,3

arms 87:4

Army 26:18 28:5 29:11

Army's 29:12

arose 21:9 69:20

arrived 38:20

article 70:8 121:4,9

articles 121:2, 18,20

ArtI 46:13

ArtI's 46:16

as-needed 74:2

aspect 50:16

aspects 127:14

assaults 35:7

assets 28:3

assigned 10:21 11:17 21:22 66:19 67:23,25 68:19 69:3,25 74:19 79:2

assignment 66:20 68:4 69:19

assignments 69:23

assist 35:23 36:4 66:22 73:3 102:16

assistance 36:18 73:17

assistant 7:8 20:24 25:9,13 46:4 47:3,19,23 48:3,5 93:10,14

assisting 35:20

associate's 28:19 29:1,22

assume 53:10

assuming 23:9

assumption 139:12

assure 86:21 126:1

Atchison 41:24 42:5,19, 20 138:12

attacked 64:10 72:18

attempt 19:25

attempting 95:3

attend 118:7

attended 50:21 51:1,6,12,25 54:3,10 91:2 118:3 128:16 129:3,9,13

attending 6:17,18,21,25 30:4 51:17 93:25

attention 86:5 126:11

Attorney 7:8

attorneys' 110:1

auditorium 103:7,8

August 21:19

authority 41:9

authorize 38:12

authorized 32:7 37:19 71:17

average 32:10 124:11

aware 41:14 43:18 45:5 48:18 49:9,14, 23 53:3,4 72:10 92:13 95:8,10 109:19,23 130:1 133:5 134:5 135:17

B

bachelor's 28:17 29:2,22 30:1,8

back 16:11 19:25 22:2 23:5 25:7 28:12,15 29:24 33:18 35:11 37:10 49:9,21 66:10, 16 69:18 70:5 72:3,23 74:1 84:14 85:7 89:3,4 95:23

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 41 of 60   Page ID #23409
The Deposition of ZACHARY SARVER, taken on April 06, 2022

144

100:5 103:14
105:19 106:11
110:6 111:12,
18 112:17
114:16,25
120:19 124:10,
12,18 127:1,24
132:21 134:13,
14,17 135:6,9
136:1,6

**background**
14:4,7 26:2,15,
17 28:20

**bad** 31:25 58:3
89:18 102:25
114:18 117:16
135:2

**badge** 138:25

**badly** 26:13

**balance**
102:23

**ballistics**
115:8

**bang** 83:2 84:4,
8,23 85:19

**banging** 82:17
83:15 88:18

**bangs** 85:2

**based** 31:21
34:4 35:12
51:10 55:7
60:14 63:5
64:23 65:10
79:11 95:1,5
96:1,14 114:11
131:8

**basically**
28:16,18 29:3

**basis** 113:9

**Bates** 79:20
80:12

**baton** 84:12
85:6,25 86:9
87:4,5,11

**batons** 82:18
83:3,15 84:4,8,
15,23 85:12,21
87:9

**Bautista** 7:1,
18 16:2 34:9
37:15 48:16
52:3 56:2,17
60:19 62:3,20
66:3,6 68:9
69:24 72:25
73:11 76:25
81:25 82:25
90:9 97:24
100:16 101:17,
24 102:4
103:19 104:14
106:2 109:25
110:8 112:8
115:15,25
117:11 118:24
120:16 123:11,
20 124:2
125:14 126:17,
22 127:6,16
129:4,17 132:6,
14 136:21
138:1,9,23
139:4,16,19,21
140:2

**bear** 113:3
138:22

**began** 20:17
25:8,15 29:20
30:11 122:10

**begin** 7:25
46:24 98:13
137:20

**beginning**
14:19

**behalf** 6:11

**beneficial**
101:9

**benefit** 90:17,
18 99:18,19

**benefits** 99:13

**big** 9:2 10:25
22:23 23:2
24:15 25:3
48:13 54:3
59:9,20 66:17
72:22 73:22
74:8 78:2,21,23
79:23 80:15,19
89:23 108:9

118:4 122:8
125:5 126:12
128:17

**bigger** 61:5

**bit** 20:15 26:15
57:14 65:8
95:22 97:19
127:11 128:1

**black** 134:17
137:23

**bleachers**
102:22

**blue** 70:13
137:24

**Board** 30:19

**body** 121:17
125:9

**boneheaded**
94:6

**boost** 26:8

**BOP** 30:15

**bought** 70:19

**box** 134:17

**Brady** 10:12
13:3,8 43:17
138:3

**Brady's** 13:11

**brand** 25:17

**break** 16:16
66:4 105:23
112:24

**breakdown**
52:11

**briefed** 132:23

**briefing** 50:23
51:1,4,12,17,22
52:16 69:9,10
122:22,24
128:15,17,23
129:2 132:24

**briefings**
51:25 52:2,21
54:2,9,18
122:10,12
123:21 125:3

129:9,13

**bring** 52:13
71:1

**bringing** 99:25

**broom** 71:7

**brought** 53:15
65:14 101:14
103:16,20

**bud** 137:13

**build** 124:24

**built** 103:10

**Bulgaria** 27:4

**bulk** 39:24

**business**
76:20

**busy** 47:16
57:2,5 72:6

**butt** 84:11

**buttocks**
122:14

———

**C**

**cadets** 44:14

**call** 8:22 29:13

**called** 12:12
21:10 31:24
32:11 38:22
49:5 74:2,5,9
75:1

**calls** 46:17
95:14

**cameras**
89:13,23,25

**canine** 71:2

**capacity** 21:23
42:2 43:23
45:10 49:23

**care** 11:21

**career** 14:9
20:20 78:5
131:2 135:19
137:2

**careful** 107:11
136:3

**carry** 37:22
38:1

**carrying** 87:4

**case** 6:15 7:2,9
9:6 10:6 13:5
17:25 18:9,20
22:13,19 38:21
45:8 52:8 64:5
84:14 94:7
97:16 120:9
135:14 137:12

**cases** 17:11
18:10,12 19:6,7
20:2,3 72:11
137:9,17

**cashed** 28:16,
18

**catch** 102:24
111:3

**categories**
36:15 37:9

**category**
136:16

**caused** 107:17

**cell** 36:8,11,19
37:12 39:23
68:2 69:3,12,21
73:15 78:1
79:5,6 82:17
84:15 86:11
87:13 88:24
91:10,12 95:10
103:24 121:12
122:5

**cells** 78:22
85:20 113:20

**Center** 6:23
15:19,24 20:22,
25 21:12,16
22:8 30:22 31:4
35:6 36:12 49:7
54:3 58:11
59:2,25 60:5
65:13,17 74:10
91:14 126:12

**Centers** 9:3



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

CHURCHILL
REPORTING

Case 3:15-cv-00309-SMY  Document 642-11  Filed 05/22/24  Page 42 of 60  Page ID #23410
The Deposition of ZACHARY SARVER, taken on April 05, 2019
145

**central** 6:8 16:14 21:19 42:20 43:15 44:19,21,23 47:7 55:3,15 63:16 84:17,19 98:24 106:14

**certainty** 24:17

**certified** 9:10 93:9,13,16 94:3,5,11 96:12

**chain** 65:7 82:10 90:23

**chains** 134:20

**chairs** 103:17 107:7

**challenges** 26:4

**chance** 28:22 50:12

**change** 96:22 99:5 100:6 101:21 102:2 137:25 138:8,11,19 139:3

**changed** 23:18 29:1 77:9 87:16 89:3,4 99:2 128:19

**chapel** 103:3,6 107:14

**charge** 52:6

**cheeks** 122:16 123:16

**Chicago** 6:7, 21,25 7:11

**chief** 18:2,6,16 19:12 41:11,19 42:6,8,17,20 58:7,11 108:12 132:20

**Churchill** 6:5

**circumstance** 69:20 130:2

**circumstances** 38:18 117:3

**civil** 17:11,15, 24 18:20 19:20 20:2,9

**civilian** 70:9

**civilians** 90:6

**clarification** 15:7 47:21 51:7 69:7 71:15,23 92:19

**clarify** 36:23 49:22 53:14 55:18 56:3 130:20

**class** 9:1,8

**clear** 16:2 47:15 111:23 112:4

**clearer** 11:15

**close** 25:25 97:6 98:14,15 103:9 125:7,19 131:6

**closely** 34:24 42:2,5,19,25 43:22,25 45:10, 15

**closer** 50:13

**clothed** 98:7 125:10,20

**clothing** 70:9 100:4 121:3,4, 18,20

**clue** 75:5

**cocaine** 61:2

**Cold** 28:2

**college** 26:25

**colors** 138:15

**combat** 29:19 133:19,20

**comfortable** 124:11,15 135:14

**command** 38:10 81:14 82:10 90:23 94:11

**commander** 8:12,15,17 13:8,11 20:25 21:2,20,24 22:1 25:10,13 38:11 40:23,24 41:22, 25 42:9,15,17, 21 43:1,5,14, 16,19 44:1,4 45:16,25 46:4, 5,8,9,14,22 47:3,8,19,23 48:3,6 54:6,15, 17,19,21,22 55:1,4,16,19 56:13,14,21,22 57:6,16 58:22 59:8,11 60:6,9 63:13,17 81:1,7 84:3,8,18,19 87:17,19,25 89:25 92:9 93:10,14 94:9 98:24 101:22 108:8 118:1 119:17 120:6 122:21 123:1,2 132:1,2 138:4

**commanders** 34:24 43:7,25 45:7 83:18,21 104:3,8 115:11 132:20

**commando** 100:23

**commands** 83:10 86:6 88:11

**comments** 75:20 116:13

**commissary** 70:20

**Commission** 17:16 19:21 20:2,9

**commissions** 17:11

**common** 67:24 68:3,4 69:22 70:25 84:22 101:3

**commonly** 69:17,18

**commonplace** 121:1

**communication** 44:4

**Company** 27:6

**compare** 114:10,11 130:12

**compared** 65:6 68:5

**compares** 65:24

**competitive** 29:3

**complaints** 108:21 109:10, 13 133:11

**complement** 32:15

**complete** 103:24

**completely** 134:18

**conceal** 100:3

**concerned** 13:15

**concerns** 110:18,25 112:14

**CONCLUDED** 140:5

**conclusion** 79:22

**Concordia** 11:12 43:12

**condescending** 123:8

**condition** 9:20 124:24

**common** ...

**conduct** 34:20 38:15 41:3 45:17 46:17,18 49:24 62:15 68:24 82:9 116:5 122:13

**conducted** 16:12 52:15 53:7,24 58:17 66:12 73:5 78:4 81:23 106:12 111:16 112:11, 23 113:15 114:19 115:13 117:8 120:7 123:13 127:3

**conducting** 72:6,8 73:14,15 79:5 110:19,25 112:14 119:3,8 121:16 125:25

**conference** 108:11

**confident** 60:3

**CONFIDENTIAL** 9:24 110:4 130:9

**confirmed** 16:16

**confused** 69:9

**confusing** 74:8 81:15 119:10 134:9

**confusion** 16:6 103:13

**connected** 18:16

**connection** 17:17,21 18:2,6 19:9,10

**consideration** 41:7

**considered** 96:12 124:6

**consistent** 130:15

**consult** 115:1



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 43 of 60   Page ID #23411
The Deposition of ZACHARY SARVER, taken on April 06, 2022

146

contact 137:12

contained 10:14 81:23

content 51:5 52:1

contents 51:1, 11

continue 99:20

continued 21:7

contraband 53:3,5,8,10,13, 17 54:1 60:22 61:15 62:25 63:23 88:17,25 99:22 103:25 105:7,12,19 119:24 121:2, 15 122:3

control 35:25 40:2 70:15 116:10

convened 6:9

conversation 14:24 44:6 77:10 96:13 99:6 108:15 115:10 139:8

conversations 138:13 139:11

cooperation 83:6

coordinate 14:21

coordinated 14:20

coordinators 12:10

copy 110:8 132:17 139:23 140:1

correct 9:4 10:17 11:5 12:17,21 16:19 18:4 20:14 23:22 24:2,20, 25 27:14 29:8

30:6 32:3 33:17 37:21 42:18 46:6 48:7 50:23 51:20 59:1 60:2,15 61:18 63:8,9,14,18 76:18 78:12,16 79:17 80:5 85:9,14 87:1,14 89:16 104:2 106:23,24 107:1,2,8 111:1,4 113:12, 16,17 114:7,8 129:10 133:4, 17,25 134:3 135:23 136:2, 12

Correction 36:12

correctional 9:3 15:19,24 20:21,22,23,25 21:8,12,13,16 22:8,13 24:7 25:15 30:22 31:4 35:2,3,6 37:20 38:5,14 49:7 54:3 58:10 59:2,25 60:5 65:13,17 74:10 90:21 91:14 93:3 109:16 111:16 112:23 113:15,23 114:1,20 119:16 126:12

corrections 8:9 14:5 17:18 19:24 20:16 26:11 29:5 30:5,12 90:1,4, 12 105:6 115:3 134:2,12 135:20 136:19

correctly 108:4

correlates 64:12

Coughs 26:23

could've 103:12

counsel 6:19 7:25 12:24 15:8 17:2

count 12:4

countless 131:1

couple 19:17 25:20 31:19 34:5,6 59:8 89:8 105:3 112:25

courses 133:20

court 6:5,13 11:12 17:15 19:7,15 43:12 134:16,22

COVID 35:18, 21 36:13,14

Cowden 17:24 18:7

crazy 116:11

create 81:5

created 71:12

criminal 17:11 19:5,15

cross 127:16

CROSS-EXAMINATIO
N 118:23

crossed 74:16

CT 140:5

cuffing 131:8, 15,18

current 8:11 49:23 81:13 96:19 106:18 110:23 111:8 124:3

custody 37:6 53:18 65:12,19, 21 66:25 67:3 68:25 72:7,19 83:7,11,24 86:6 91:13 97:3 107:21,22

108:18 113:19 116:3,6,14,23 117:10,18 118:13 120:19 121:12,16 122:14 123:23 124:16,23 125:7 126:6 137:7,13,18

cut 94:20

_____
D
_____

daily 36:9

Dan 46:13,16

dangerous 105:7,11,19 119:24 135:4

data 81:15 99:24

date 12:24 22:8 29:23

dates 42:13

David 43:20,22 54:14,16 129:2

day 6:7 50:13 75:23 80:16,19 107:13 114:2 116:16 123:4

days 23:2 64:4 72:23 73:9 75:4,19 78:2,22

de-certified 96:11

deal 108:10

dealing 133:21

dealt 90:7

Decatur 20:21, 23,25 21:8 22:11 25:15,22 30:21 31:1,4,6, 17,20 32:4,17 33:19,21 34:19 40:14 47:23 48:3,6 59:14

December 30:3

decent 67:14

decide 41:3

decision 34:19 83:14 93:13 138:7,10 139:2

decision-making 139:6

decisions 38:11 127:21

declined 30:17

decrease 99:22

deemed 71:16

defendant 9:6 18:12 19:6

defendants 7:2,4,9 9:14 24:7 79:20 104:19 105:4

Defendants' 104:19

definite 101:6

definition 119:11

degree 28:17 29:1,2,22 30:2 52:19 98:16

degrees 30:7

Demetrius 6:11

demographic 131:9

department 8:9 14:4 15:14 17:18 18:3,7,17 19:10,24 20:16, 17 22:1 26:6,11 28:8 29:4,21 30:5,12 31:22 34:25 40:7 44:11,15 45:11 58:3 59:13 63:11 105:6 112:2 115:3 120:10,14,15 130:6 134:2 135:19 136:19

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY Document 642-11 Filed 05/22/24 Page 44 of 60 Page ID #23412
The Deposition of ZACHARY SARVER, taken on April 05, 2024

147

**department's**
20:6 126:11

**depending**
65:9 98:2

**depends** 72:11

**deployment**
107:1

**deployments**
27:3

**depo** 41:17

**deponent** 7:3

**deposed** 17:8,
10

**deposition**
6:10 10:3,5
12:15,25 13:4
14:16 15:3,10,
12 16:12,22,25
17:3,5,12
18:10,13,19
66:11 79:22
104:21 106:12
108:7 127:2
140:5

**depositions**
17:17,19 18:6,
16 19:1 41:18

**deps** 17:16

**depth** 14:14

**deputy** 41:18

**describing**
11:16

**designated**
24:21,22 25:1

**designed**
29:14

**destroying**
104:4,5

**detailed** 21:21,
23 22:5

**details** 81:22

**determination**
133:8

**develop**
114:15

**dichotomy**
92:8

**dictated** 37:5

**dietary** 37:25

**differ** 64:23
65:8 81:12

**difference**
39:19 93:7
114:3

**differentiate**
58:5,15

**differently**
82:2 113:25

**differs** 65:10

**difficult** 92:25

**dings** 85:1

**direct** 8:1
22:24 43:2,4,6
88:21

**direction**
45:17,18 84:22
124:20

**directive** 96:23

**directives**
97:1 113:2

**directly** 82:4
113:5 132:16

**director** 13:8,
10 14:16 41:19,
21 108:12

**disagreed**
95:19

**discharge**
27:16,19

**disciplinary**
95:4,12

**discipline**
92:2,8,10,15,
17,20 94:7
95:7,17 96:1
109:17

**disciplined**
94:9

**disclosure**
118:19

**Disclosures**
104:20 110:7

**disconnect**
115:23

**discontinued**
70:20

**discovering**
88:25

**discuss** 43:10
126:18

**discussed**
52:16 77:17
118:20 125:17
126:3

**discussion**
53:12,17 83:19

**disgusting**
121:6

**disposition**
130:7

**dissected**
85:15

**disseminated**
132:16

**distinction**
53:9

**District** 6:13,
14

**disturbances**
36:1,18 37:11
40:2

**Division** 6:15

**divvy** 69:10

**DOC** 93:3

**document**
11:23 12:10
24:9 76:6
79:20,21 80:3,
13 81:19
104:10,18,21

**documentatio
n** 48:12 71:12,
14,16,21,22
74:23

**documents**
10:1,3,4 12:18

15:2,5,7 23:11
80:20 81:24

**dog** 105:24

**donning** 85:19

**door** 84:11
85:5,19 86:22
87:9,10 88:18

**doors** 85:19
86:1,10,13,15
87:23 89:7

**dozen** 19:17
31:19 55:11
58:23,24 79:4
131:15

**dozens** 31:18
78:4,5 117:20

**drive** 6:6 60:23
61:8,14,19 62:9

**driven** 41:1
52:9 58:1,6
60:14 61:25
62:14,18,24
63:21,24 93:18

**drove** 60:17

**drug** 60:22
61:15 64:13

**drugs** 35:7
52:10 53:13,15
58:7 60:17 61:3
62:1,6,8,19
64:5,6,15 65:2,
14,23,24 66:1
67:8

**due** 52:9 60:24

**DUIS** 65:19

**dust** 29:24

**duties** 35:22
133:14

---

**E**

**E-R** 8:7

**earlier** 26:16
77:17 81:21
88:12 120:17
124:3 125:15

**early** 19:3
20:22,24 34:1

**earn** 29:21

**Earth** 126:5

**easier** 43:9
48:11 110:11
122:2

**easily** 100:5

**East** 6:14

**Eastern** 29:25
30:8

**easy** 11:21
68:23

**edge** 85:6

**education**
14:7

**effect** 86:4
133:6

**effective** 88:24
115:9

**effects** 114:18
124:16,17
133:11

**effort** 94:2
102:10 105:15

**efforts** 105:11,
17,19

**elderly** 131:10

**elevation**
63:16

**elite** 29:12

**else's** 13:4

**emergency**
46:17 56:24
133:22

**Emma** 7:7

**employed** 8:8

**employee**
92:21 110:20
111:7 112:19
119:5,9

**employment**
17:18 28:9
30:12

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY Document 642-11 Filed 05/22/24 Page 45 of 60 Page ID #23413
The Deposition of ZACHARY SARVER, taken on April 08, 2021

148

enemy 28:3

enforced 91:12

enforcement 26:7 28:9,12 29:3 30:13 71:2,3 89:24 90:1,4,12

enlisted 27:12

enlistment 26:24

ensure 110:20 111:7 112:18 119:4,9

ensuring 90:21 112:10

enter 82:16 85:13,21 86:19 88:7,8,24 101:14

entered 84:14

entering 86:11

entirety 13:9 14:12

environment 108:1

environments 29:19 116:15

equal 60:18 62:2 115:20,22

equipment 85:5

equipped 40:1

era 28:2

escalate 115:13,23

escalation 100:13

escape 36:2,3, 4,18 37:11 67:7

escort 68:20 71:3

escorted 98:9 107:21,25

esteem 119:18

estimate 19:14 20:8 58:19

estimates 32:5

et al 6:11

evacuation 82:9

event 72:17 103:15

events 65:8 75:12

exact 34:13 58:15

EXAMINATION 8:1 127:8

excellent 89:19

excessively 124:24

exciting 26:3

exclusively 40:16 60:14

excuse 26:23 41:19 56:20 130:5

executive 44:14

exhibit 24:5,6, 8,11 79:19,24 80:7,9 104:13, 14,16 110:7,12 118:18 119:1

existence 90:13 105:7 119:24

expect 132:3

expectation 37:13 132:9 133:2

expected 13:19 36:21,22

expecting 37:4

experience 35:12 46:15 61:13,23 62:16

63:5 67:12 70:5 72:2 119:18

experienced 91:19

expert 9:14 96:25

expertise 112:5,10,13,17 119:2,7,11,20, 23 120:3,11,12

explain 19:21 92:6,25 101:12 120:24

explained 86:17

extended 133:12

external 115:1

extraction 36:12 91:12 95:11

extractions 36:8,20 37:12 39:23 91:10

extradition 40:9

extremely 135:4

eyes 110:1

———————

**F**

face 43:9 102:13

face-to- 43:8

facilities 10:10 32:22 33:13 34:3 35:2,14 36:9,25 39:25 41:4 48:18 50:11 52:11 59:16 61:12,23 62:6,9,17 64:17,18 65:25 71:2 75:1 82:10 83:2 88:9 91:10 102:20 103:2 111:17 112:24

113:16 114:2, 20 122:23 131:8,9

facility 21:22 25:17,19 31:6, 11 33:10 36:3 37:20,23 38:1 39:23 40:25 46:3 47:16,20 49:2,5 53:16 55:5,8 56:11,25 57:15,20 58:25 59:12,20,24 60:4,24 61:9, 14,20,25 62:15, 17,23 63:3,20 64:2,7,22,23 65:2,6,7,23 66:19 67:4,5,6, 10,22 70:16 75:3 83:25 88:7,11 91:24 92:14,17 95:3 96:1,25 97:4 98:1 101:9 109:3 116:5 120:20 122:1 123:6 126:13, 16 128:23 129:18,20,22 130:13 131:12 134:6,13

facility's 72:11

facility- 51:12 95:5

facility-level 96:14

facility-wide 31:3,9,11,24 32:12,16,19,24 33:6,16 34:8,21 40:16 41:3,7,10 48:13,19,23 49:15,20 51:2 72:24 74:19 89:14 95:2 96:2,5,8,15,16, 17 97:23 106:19 115:12 117:18 119:25 122:10 123:21 124:4 125:3 127:14

facing 134:14

fact 7:16 49:9 68:6 113:9 124:22 138:18

facts 130:17

fair 23:19 34:17 56:1 78:11 114:16

fairly 25:25

fall 15:17,24

familiar 29:9 113:1

fan 89:23

FBI 39:15,16

February 15:20 16:4,18, 22 106:23 109:11

federal 26:6 28:9,12 30:13

feel 57:10 90:3

feeling 121:22

fell 44:22

felt 38:20

fewer 122:1

figure 138:14

file 10:6,7,14, 15,22 11:25 24:18 80:4,17, 20

files 11:2,17,25 12:8,14,18,20 16:20 23:25

fill 57:11 69:4 70:4 71:4

filled 12:5 21:3

final 95:17 114:24

finally 63:19

find 58:15 64:18 70:8,14, 24 71:11 78:25 87:24 88:5,6 90:22 99:22,23

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

107:15,16
131:14

**finding** 64:10
100:1

**fine** 8:16,23

**finished**
118:22

**fire** 20:12

**firearm** 20:5,13
37:23 38:5,16

**firearms**
44:11,12,13,15,
17 115:8

**fired** 123:4

**firm** 114:15

**fit** 138:16

**flies** 100:8

**flush** 88:17

**focal** 44:9

**focus** 17:16
35:22 51:9
92:25 105:10

**focused** 34:18
40:13 49:18
72:8,16 94:21

**focuses** 29:18

**folder** 10:18

**folks** 10:9
83:24 122:25

**follow** 127:10

**footage** 89:9
91:1 106:22
108:6,7,19

**forbid** 47:18

**force** 36:21
37:4,8,14 58:8
68:11 104:10

**foreheads**
101:16

**form** 23:18
34:9 48:16 52:3
56:2,17 60:19
62:3,20 68:9
69:24 72:25

73:11 76:25
81:15 82:25
100:16 101:24
102:4 103:19
112:8 114:17
115:15 117:11
120:1 122:17
123:18 124:1
125:12 129:4
130:22 131:8
132:6,14

**formal** 95:7
127:19

**format** 81:9,13

**formation**
97:10 98:15
102:7 125:7

**forms** 81:21
92:10 130:25

**found** 49:3
58:8 64:5 67:7,
17 76:5 103:25
122:4

**foundation**
122:17 123:18
124:1 125:12
130:18

**four-year**
26:23,24 28:4

**frame** 19:4
34:1,2 76:13
87:2 127:24

**frequently**
31:24 44:17
91:10 131:5,24,
25 134:7

**friendly** 27:24

**front** 58:21
82:4 97:19
135:1,4

**fugitive** 36:5,
19 37:11 40:8

**fugitives** 56:9

**full** 27:22 97:12

**full-time** 21:21
74:2

**fun** 26:3

**function** 39:19

**Funk** 42:10,17

**furloughs**
134:22

**future** 15:14

---

**G**

**gain** 34:17,19
40:12,15

**gained** 114:17

**gallery** 87:5
98:10

**gaming** 30:19

**gaps** 57:11
69:4 71:5

**garment**
121:22

**garments**
122:2

**gave** 12:23
13:24 19:7 67:1
129:17,20,23,
25

**gear** 55:23
84:25 85:4

**general** 7:8
28:18 30:1,8
51:5,18 52:15
81:18 88:3 96:7
101:3 102:6

**generally** 44:3
48:25 64:12,16
115:5

**generate** 44:5

**genital** 125:9,
10,20

**genitals**
122:14 123:15
125:17

**Germany** 27:4
33:25

**give** 7:22 13:25
19:14 20:8,19
32:5 38:2 58:19
68:13 91:11,21

130:18

**giving** 88:10

**glad** 116:9,12

**go-to** 119:14

**goal** 88:25

**God's** 126:4

**Godinez** 10:12
13:3,8

**Godinez'**
14:16

**Godinez's**
13:11

**good** 8:3 23:9
28:22 66:3 77:4
89:17 92:5
93:11 102:22
103:2 106:5
113:4 114:18
117:1,2 139:20

**Gosh** 138:3

**Gossett** 6:12

**graduate**
28:21 29:6

**Grady** 6:20
7:17 8:2 9:25
16:5,15 24:13
34:10 37:17
38:25 48:17
52:18 56:5
57:13 61:10
62:12 63:4
66:5,15 69:6
70:1 73:6,19
77:22 80:1,11
82:14 83:12
90:14 98:17
101:13,20
102:1 103:5,22
104:15,17
105:22 106:5,8,
15 110:2,5,10,
14 112:12
115:17 116:17
117:14 118:22
120:1 122:17
123:18 124:1
125:12 126:20
127:7,9,17
129:7 132:11

133:1 136:23,
25 138:6,20
139:1,13,24

**grapevine**
49:1

**gratitude**
116:18 117:7,
17 118:3,7,12

**grave** 38:17

**Great** 66:6

**greater** 37:13

**greatest** 52:1,
19

**green** 126:4

**Greg** 6:12

**grievance**
109:3

**grievances**
108:22 109:1,
10 133:10

**gripe** 100:18

**gross** 126:9

**group** 138:13

**guard** 26:25
27:2,3,13 86:18

**guardrail** 86:2
87:6,12

**guardrails**
85:12,21 86:19
87:10

**guess** 25:25
33:9 56:11
76:10 77:20
86:20 114:4

**guidance**
119:21 130:8

**guns** 53:22

**guy** 42:3 99:11

**guys** 44:6
67:12 83:19
85:3 87:22
99:25

**gym** 102:12



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 47 of 60   Page ID #23415
The Deposition of ZACHARY SARVER, taken on April 06, 2020

150

**H**

**half** 55:11
134:20

**Hammers**
41:13

**hand** 7:20
72:16

**handcuff**
123:23 124:7,
12,13,21
134:18,20
135:22 136:5

**handcuffed**
124:18 125:8
134:7,12,25
135:3

**handcuffing**
72:20 124:10
125:18 130:22
133:6,12 134:1,
10

**handcuffs**
135:11,15
137:5,15,19

**handful** 17:13
59:3,15

**handle** 39:22
57:9 91:19
121:5 139:18

**handled** 44:16

**handling** 91:25

**hands** 122:16
125:8,19
128:19 134:13
135:12,13
136:1,13
137:11,15

**handwriting**
24:9

**handwritten**
24:8

**hanging**
134:20

**happen** 36:9
58:13 95:15
100:6 113:8

123:10,17
131:1 135:16

**happened**
34:5 46:19
86:18 91:8,9,16
96:4 107:14
108:17,23
109:14,21
128:13 130:2
137:21

**happening**
76:8 137:17

**happy** 130:8

**head** 77:19

**headquarters**
11:10

**heads** 138:14

**health** 9:20
25:19 65:15

**hear** 48:25
51:23

**heard** 40:21
52:24 116:12
117:24,25

**hearing** 100:18

**held** 20:20
69:14 119:18

**helped** 73:3

**helpful** 107:4

**helps** 51:6
62:22 90:3,6,11

**hey** 58:6,12
70:17 84:3
87:25 94:8,9
95:15 116:9
137:13

**hide** 121:2

**hiding** 121:14

**high** 37:23 40:9
56:10,25 65:16
66:23 67:10
119:18

**higher** 63:2

**highest** 29:22

**highly** 38:12,
23 77:2

**hired** 30:17,20

**hiring** 29:4

**history** 20:16

**hit** 86:9,15
87:6,9

**hitting** 85:12,
21 86:1,18

**hold** 47:9,12,17

**holding** 68:20
120:24

**hollering**
82:17,20,22

**home** 28:12,
15,19 29:24
50:14

**honest** 69:8
81:17 121:6

**honestly** 83:17

**honorable**
27:16,19

**honored** 125:2
130:10,19,23
131:1,18

**hooch** 64:16
65:14

**hooting** 82:17,
20,22

**hope** 57:12
62:22 92:6

**hopes** 28:12

**Horton** 46:13,
15

**hospitals** 82:7

**hostage** 35:24
36:17 37:10
38:2,18 40:4,6
44:8 56:9 115:7

**hours** 12:4,11
28:17 38:19
91:5 124:14

**house** 78:1
82:17 84:15

86:11 88:24
106:1

**housing** 68:14
69:12 70:23
72:12 73:4,17
84:25 85:13,22
86:19 89:12
96:21 98:5,10
108:1

**human** 101:1

**hundreds**
126:1 131:2

**hurting**
121:14,15

**hurts** 90:5

**hyper** 72:16

**I**

**IA** 128:24

**idea** 23:8 34:12
74:11 77:9
102:25 128:12
130:7

**identical** 103:6

**IDENTIFICATI
ON** 24:11 79:24
80:9 104:16

**identified** 9:14
127:13

**identify** 10:9
28:1,2

**identifying**
127:20 138:22

**IDOC** 11:10
19:11 31:12
38:5 92:21
105:12 114:11
119:24

**IEMA** 81:14

**II** 110:4

**III** 130:9

**illicit** 53:15

**Illinois** 6:7,14,
21,25 7:3 8:9

9:2 10:25 11:10
17:18,24 19:23
27:1,2,7,8,9,11,
13 28:13,15,23,
24 29:25 30:5,
8,12,19 48:13
59:5,7,25 60:5
105:6 115:3

**imagine**
122:21 123:1,3

**immediately**
107:15

**implement**
132:22

**implemented**
132:23

**implied** 137:8

**important**
90:20

**impossible**
87:7

**improper**
135:21

**improperly**
136:11

**inaccurate**
80:18

**inadvertently**
85:17

**incarcerated**
9:9

**incidences**
55:23

**incident** 38:10
41:1 52:9 58:2
60:14,16,23
76:6 81:14 91:8
109:11,18,21
113:11 126:4,7
128:2,3,6

**incidents** 34:6
40:17 60:17
61:14 62:9
63:10,22 64:3,
4,15 65:16

**include** 53:12,
16 74:20,21

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 48 of 60   Page ID #23416
The Deposition of ZACHARY SARVER, taken on April 06, 2021

151

82:6,7

**included** 24:18
37:1 63:1,25
64:9

**includes** 10:7

**including**
53:17 63:9

**incorrect**
137:14

**incorrectly**
137:9,20

**increase** 65:3,
4 99:21

**individual** 37:5
57:1 65:12,18,
21 67:3,4 68:25
72:18 83:6 86:5
91:13 95:20
100:2,19
107:20 108:3
113:19,24,25
120:18,22
121:16,17,25
122:13 124:7,
16,23 125:8
126:6 130:5
135:12 136:12
137:12,18

**individuals**
9:8 37:18 52:13
53:18 64:20
66:25 67:21
68:8,20,25 72:7
78:25 83:10,23
88:16 97:3 98:3
102:7 107:22
108:17 116:3,6,
14,22 117:10,
18 118:13
121:2,12,13
123:14,23
124:5 125:6
133:11 134:25
135:3 136:16
137:7,10

**infantry** 27:6,
25

**informal** 8:21

**information**
65:22 67:2

74:15 81:19,20
138:22

**initial** 72:19

**initialed** 23:7

**initially** 23:7
44:14 46:23
50:13

**initiate** 41:6
92:7 95:3,24

**initiated** 92:13,
18 95:13 96:13

**initiating** 95:25

**initiative** 52:25
62:15

**inmate** 110:20
111:7 112:18
119:5,9 130:5

**inmate-to-
inmate** 61:1

**inmates** 68:16
98:6 103:1
116:9

**inside** 37:23
39:23

**insight** 34:18,
19 35:10

**instance** 38:18
46:12 56:23
57:6 66:24 70:8
134:16

**instances** 71:1
90:22 107:6
117:6 130:14
131:17,21

**instinct** 87:22

**institution**
38:5 40:18
110:19 111:1
119:4

**institutional**
97:1 113:2

**instruct** 122:12

**instructed**
123:23

**instruction**

129:16,20,23,
25 132:2

**instructions**
82:12 125:6,22

**instructors**
44:13

**intel** 66:24
122:25 128:24

**intelligence**
14:2

**intentionally**
135:24 136:16,
17 137:2

**intently** 72:8

**interaction**
43:2,4,6 44:1
61:1

**interested**
104:24 119:6

**internal** 95:9

**interrogatorie
s** 24:3

**interrogatory**
23:4,6

**intervals** 40:19

**interview**
39:11

**interviews**
14:3 66:25

**intimately**
113:1

**inventory**
44:12

**investigation**
92:16 107:18
130:4

**investigations**
66:24 95:9
108:11,13

**investigator**
128:16

**investigators**
122:25 128:19,
20

**involve** 38:1
134:17

**involved** 50:16
63:6 75:7 79:6,
8 83:22 102:3

**involvement**
66:16

**involves** 39:10

**involving** 9:1
20:4

**Iraq** 27:4

**issue** 10:24
22:13,19 35:6
36:14 45:8 92:2
94:16 107:20

**issued** 70:18

**issues** 35:3,8
40:17 62:1,18

**items** 121:2

_____

**J**

**jacket** 70:10,
12,13

**January** 20:18
21:10,25 22:9
33:25

**jean** 70:13

**Jesse** 46:25

**job** 19:25 26:13
47:8 93:11

**jobs** 56:23

**Joe** 7:3 57:8

**jogs** 26:9

**John** 94:9

**join** 25:14 26:1

**joined** 25:11
26:18,24 30:22
47:25 48:6

**joining** 6:23
7:5

**Joseph** 41:15

**Josh** 46:13,15

**juice** 99:17
100:10

**jump** 68:24
69:2

**jumping** 117:5

**justification**
83:13

**justifications**
127:12

**justified**
115:21

**Justin** 41:13

_____

**K**

**keeping** 93:22

**kind** 46:17
68:13 71:11,12
82:21 83:5
91:21 99:10
139:10

**kinds** 84:25
85:4

**knew** 32:6

**knock** 84:11
85:5 86:22
87:9,10

**knocking**
87:23 89:7

**knowledge**
14:20 31:22
32:13 34:7 41:1
74:24 108:23
109:17,22
113:14 137:25

**Korea** 28:6

_____

**L**

**lack** 14:24 20:4

**laid** 72:11,12
118:18

**large** 35:25
36:17 37:10
40:2 124:24

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

**larger** 131:10

**lasting** 124:15, 17 133:6

**late** 25:23 28:2

**Laura** 7:1 127:7 139:25

**law** 6:23 26:6 28:9,12 29:3 30:13 71:1,3 89:23 90:1,4,11 99:9

**Lawrence** 9:2 11:1 48:14 59:2

**lawsuit** 10:25

**lead** 54:18 105:16

**leader** 45:23 47:19 114:5 119:3

**leaders** 115:5

**leadership** 29:13,18 45:20 47:9,12,17 55:25 56:7,12 60:10 61:24 63:7 75:4 80:25 82:23 96:14,19, 20 97:23 99:3 104:10 111:22 112:3 114:12, 17 117:23 119:2 120:8 128:23,24

**leading** 83:20 105:18 120:1

**leads** 42:24 45:14 105:14

**learn** 49:19 107:9 109:13 135:24

**leave** 36:13 70:23 136:15

**leaves** 69:8 97:18

**led** 54:2,9 77:8 79:22 129:1,2

**left** 33:25 63:21 72:13,14 77:7 124:13

**leg** 97:11

**legalese** 104:20

**legitimate** 127:11,13

**length** 97:18

**lesser** 33:13 91:19

**lethal** 115:8

**level** 34:4 60:24 61:19 62:22 63:2 64:16,17,24 65:11 66:23 115:23 118:14 126:13 132:12

**levels** 33:14 91:23

**lieutenant** 21:15 22:6,7 35:3 38:15 70:16 119:16

**lifesaver** 133:19

**lifesaving** 133:22

**lifetime** 125:24

**light** 24:1 68:6

**likelihood** 33:11 79:6

**likes** 121:5

**lined** 102:12

**lips** 122:15 123:15

**list** 10:20 24:19

**listen** 86:6

**lists** 80:14

**Litchfield** 27:7

**Literally** 71:7

**lived** 43:2

**LOA** 21:3

**local** 29:3

**located** 6:6 11:9

**location** 6:17

**locations** 52:12

**locked** 65:19

**long** 19:2,3 32:8 75:25 89:5 100:22 106:2

**longer** 84:18 94:10

**looked** 23:11 70:9 75:17 99:24 119:13

**lose** 102:23

**lot** 13:16 14:18 58:7 64:14 66:24 67:12 75:2,18 81:15 93:18 99:6 102:20 108:15 119:18 120:4

**lots** 85:17

**loud** 88:9

**loudly** 84:15 85:6,20 88:9,18 89:8

**Louis** 6:15 7:6

**Louisiana** 26:24 27:1,9,11 28:11

**love** 26:4 89:25

**low** 34:15 59:16

**lower** 32:9 60:24 61:19 62:22 134:21

---

**M**

**made** 21:6 36:15 49:14 53:3 83:14 93:13 102:10

108:22 109:14

**major** 8:15 22:4 28:11 53:8,10,12,25 60:22 130:6

**majority** 32:15 54:25 73:2 116:6 126:10

**majors** 122:25

**make** 37:1 38:11 39:16 51:15,23 54:23 61:11 82:2 85:17 91:20,21 121:13,22 133:8 137:12, 14 138:7,11 139:2

**makes** 100:1

**making** 34:20 53:10 65:14 102:3 107:23 127:21

**malpractice** 17:25 18:20

**man** 36:4

**manipulate** 122:15 123:14, 15 136:12,13 137:11

**manipulated** 122:14

**manipulating** 137:18

**manner** 124:21 125:1 133:12 134:19 135:16 137:5 138:17

**marijuana** 61:3

**mark** 24:5 80:6 86:15 104:12 110:2

**marked** 23:7,8, 16 24:11 53:20 77:3,4,5,20 79:20,24 80:9 104:16

**marking** 12:24

**mass** 77:25 78:6,7,10 96:23 97:13,17 98:12 102:7 103:1 110:19,25 112:15 115:6 119:3,8

**materials** 10:2 15:2,8 16:24 85:18

**matter** 6:10 25:12

**matters** 14:16 19:16

**maximum** 33:10,12 36:9 63:19 64:7,22 65:5

**Mcallister** 45:6 54:7,13 129:1

**meaning** 99:12 115:21

**medical** 17:24 18:20 21:3 82:9 124:24 125:1 130:18 131:11 133:7,15,18,20 134:22

**medication** 9:19 53:18 91:13

**medications** 65:15

**medium** 61:22 62:9,17 64:2 67:6 126:16

**meeting** 50:21

**meetings** 43:9 44:17 52:20

**member** 21:9, 14,18 22:14 23:1,13,14 31:17,18 33:21 34:15,21 35:9, 16,19 38:7,19, 21 39:2,3,20 40:11,14 43:24

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY Document 642-11 Filed 05/22/24 Page 50 of 60 Page ID #23418
The Deposition of ZACHARY SARVER, taken on April 05, 2019
153

44:23 47:15,18,
22 52:5,6 55:4,
12,20,21 56:15
66:18 67:22,24
68:6,22 69:18,
21 70:4,11
71:10,23 72:1,
14,15 73:4,14,
16,21,24,25
74:1,4,6,7,9,19
89:25 92:10,11,
22 93:4,9,16,
22,24 94:11
96:1 109:16
117:25 119:7,
12,15,23 120:5,
6 128:7 130:24
132:17

**members**
31:23 32:1,2,6,
11,15 35:5,19
38:13 39:6,7,
12,22 56:6 57:4
67:9,15 68:5,
11,19 69:11
72:2,6 73:18
79:3 82:15,16
83:10,23 84:14
85:11,17 92:3
93:1 102:15
103:24 104:5,9
113:22 117:9,
13 118:13
126:10 128:4,
25

**membership**
92:22

**memory** 77:15,
18

**Menard** 9:1
10:25 15:19
16:4,18,21
23:7,20,21,25
33:4,7,18 34:8
48:14 54:9
57:21,22 58:10
60:24 73:7,10
74:11,13,17
75:20 76:14,15
78:13 79:14
103:3 106:23
108:13,22
109:14 118:8
122:9 125:5

**mental** 9:20
25:19 65:15

**mentioned**
10:14 13:3
26:14 27:15
74:12 89:13
120:21 124:3
128:8,14
129:11,16

**messages**
116:18 117:7,
17 118:3,7,11

**met** 37:22

**method** 135:18

**methods**
110:20 111:6
112:18 119:4,8
134:1

**Meyer** 25:18

**Middle** 8:6

**Mike** 41:24
138:11

**miles** 50:13

**military** 26:2,
14,16 28:15,20
29:18 97:9
100:22 133:19

**million** 76:17

**mind** 26:10
87:3

**mindset** 94:3

**minimum**
36:10 50:4
59:25 61:6,12
62:6 64:22 65:6

**minimums**
60:13

**minor** 53:10,
17,22

**minuses** 88:21

**minute** 35:11
66:4 93:1
126:18

**minutes** 123:6

**misconduct**

90:22 92:13,14
111:25 128:4,6

**missed** 22:8
59:13,14

**mission** 29:15

**Missouri** 7:6

**Misstates**
97:24 101:17
136:21

**misunderstan
ding** 39:1

**misundertoo
d** 137:1

**misused** 53:19

**mobile** 70:23

**money** 94:15

**monitoring**
69:13

**month** 44:3

**months** 21:11
25:12,16,20,21
27:4,5 33:25
34:7 91:17

**morning** 8:3
88:12,14

**mouth** 125:18

**move** 27:8
50:10 61:2 94:6
97:4

**moved** 27:8,11
28:15 44:24
45:19 68:18
96:19,21,23
97:3 134:6,25

**movement**
60:25 77:25
78:6,8,10,11,15
79:7 96:24
97:14,17,22
98:12

**moves** 36:8,19
37:12

**moving** 15:7
98:4

**Muddy** 9:2

11:1 22:23 23:3
24:15 25:3
48:13 54:3
59:9,20 66:17
72:22 73:22
74:8 78:2,21,23
79:23 80:15,19
118:4 122:8
125:5 126:12
128:17

**multiple** 32:24

---

**N**

**named** 9:5
46:12 48:3

**names** 11:24
24:19 139:7,12

**narcotics** 64:7

**National** 26:25
27:2,12

**nature** 14:9
37:25 42:23
45:13 53:22
67:18 83:9 85:3
88:17 99:13
115:10 134:23

**navy** 137:24

**nearest** 82:7

**necessarily**
11:20 67:20
72:9,13 99:9
100:24

**need-to-know**
75:3

**needed** 26:13
69:5 71:5 83:11

**needing**
107:21

**nice** 117:1,2

**night** 68:17

**Nikki** 6:22

**noise** 85:18
107:23

**non-** 56:15
62:25

**non-special**
55:25

**non-tactical**
38:13 97:2,17
113:8

**norm** 35:18
61:7

**normal** 97:11
113:23,25

**north** 6:6 43:2
44:20

**nothing's**
121:23

**noticed** 23:6
25:6

**NSU** 28:11

**number** 6:15
58:20 59:19
62:14 80:12
107:6 122:1
130:12,14
131:4,6

**numbers**
82:10 122:2

**numerous**
27:3 32:20
55:10 64:4
137:10

**nuts** 116:11

---

**O**

**Object** 34:9
48:16 52:3
56:2,17 60:19
62:3,20 68:9
69:24 72:25
73:11 76:25
82:25 100:16
101:24 102:4
103:19 112:8
115:15 117:11
129:4 132:6,14

**Objection**
37:15 81:25
90:9 97:24
101:17 115:25
120:1 122:17
123:18 124:1



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 51 of 60   Page ID #23419
The Deposition of ZACHARY SARVER, taken on April 05, 2024
154

125:12 136:21 138:1,9,23 139:4

**obtain** 30:2

**obtained** 30:7 57:20

**obvious** 36:24 111:25

**OC** 107:1

**occasional** 89:10

**occasionally** 54:21 57:5

**occur** 40:19 41:10 70:4 71:9

**occurred** 10:23 15:16 31:4 40:18 48:9 76:14 108:17 109:18 116:19

**occurring** 69:15 115:2

**offender** 126:16

**office** 10:18 11:6,7,9 43:8, 12 130:5

**officer** 17:23 19:12 20:21,23 21:8,13 22:14 24:7 25:15 35:2 38:14 71:17 72:18 89:24 92:21 93:3 100:2 111:23 113:23 114:1 117:24 119:16 121:7,11,13,15, 21 122:5 123:13

**officers** 90:3 108:2 122:3,22 137:23

**official** 46:19

**offsite** 56:8 67:22

**oftentimes**

43:9 95:11 121:12

**online** 6:4

**open** 38:10

**open-minded** 84:1

**opened** 25:20

**operating** 125:25

**operation** 10:10,21 12:17, 19 15:15 38:3, 15 49:4 52:6,17 54:13,24 58:10, 13 61:8,19 62:24 67:1 68:7 73:3 74:6 80:15 82:13 85:3 94:4 97:17,22 108:25 122:6, 24 131:14 132:3,25 134:6

**operational** 12:3 14:11 40:3 75:8 80:14,17, 19 95:16,21

**operations** 8:12 10:7,8,14, 15,19 11:3,13, 16,25 12:8,19 14:20,21 21:20, 24 22:1 23:24 24:18 29:14,16, 17 31:23 34:16 35:16,17,20,24 36:2,6,7 37:2,3 40:24,25 41:11, 19,21,25 42:6, 8,17,21 43:10, 15 44:16 45:17, 25 46:2,18 47:8 49:1 55:3,16, 19,25 56:13,21 57:25 58:5,6,7, 11,17,22 59:11 63:17 76:9 78:24 80:4,25 81:2,5,9,17,24 82:3 87:21 91:5 92:9 94:13 97:2 102:8,21 105:16 108:12

109:5 113:3 114:7 115:5 116:5,14 124:17 125:24 126:1 132:8,9, 13,15,17,18,19, 20 133:3 138:16

**operator** 39:13 57:8

**opine** 110:17 130:3

**opinion** 88:19 114:15 135:1

**opinions** 114:9,18 118:17

**opportunity** 39:15

**oral** 39:11

**order** 10:8,19 12:19 41:9 92:21 96:13 132:3 133:3

**ordered** 40:16 50:7 97:6 103:14,16

**ordering** 96:11

**orders** 11:13 81:2,5,10,24 132:8,13

**ordinary** 126:9

**organization** 93:2,19

**organizing** 105:19

**orientation** 136:3

**orthopedics** 133:23

**outcome** 95:18

**outset** 67:24 68:6

**overdoses** 64:5

**overlap** 42:12, 14

**oversee** 46:1

**overseeing** 105:11

**overtime** 10:8 11:18,19,21,25 12:20 24:19,21, 23 25:2 74:20 75:17,18,19 76:16 80:2,15 93:20,22,23 94:15,16

**overview** 20:19

**P**

**p.m.** 66:14 106:14 127:5 140:5

**painful** 123:24 124:6,8,11,21 125:18

**palms** 134:14 136:5,6,18

**paper** 39:9

**paperwork** 67:17

**part** 8:25 13:24 14:22,23 33:20 44:25 49:5,12 51:2,12 52:5,20 54:10 69:10 71:13 78:6,7,9 80:14 87:21 88:7 90:21 93:21 99:3 102:8 106:19, 25 108:8 116:22 120:8, 20 125:25 127:13,19 134:18 138:7, 10,13 139:2,5,6

**part-time** 21:7 30:4 74:1

**participate** 22:21 31:10

32:24 33:5,6 55:8 66:19 122:9

**participated** 22:18,23 24:15, 17 50:22 53:2 55:2 77:25 78:2,15,23 79:23 122:7

**participating** 22:25 24:16 25:2 32:18 52:7

**participation** 25:7

**parties** 7:15

**party** 18:21

**pass** 39:14

**pat** 113:24

**Path** 12:12

**payroll** 8:13 76:12

**pending** 6:13

**penetrating** 133:21

**penetrative** 133:24

**penological** 127:11,13

**people** 46:11 64:10,18 68:1,2 77:15 79:3 84:24 92:9 100:21,22 101:4,10 105:14 116:20 119:14,19 120:10 128:14 136:17

**People's** 6:23

**percent** 47:4 131:7

**percentage** 131:12

**perfect** 35:18

**perform** 34:8 49:15,19 57:20

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 52 of 60   Page ID #23420
The Deposition of ZACHARY SARVER, taken on April 06, 2021
155

68:2

**performed**
59:19 60:4

**perimeter**
35:25 37:24

**period** 12:1,2,3
28:5 32:23
78:20 124:18
133:12

**periods** 117:23

**permit** 124:25
130:15,21,25
131:18 134:7

**permits** 125:1
130:10,12,16,
19 131:15
134:4

**permitted**
98:21 103:17,
20 114:23
134:2

**permitting**
135:24

**person** 41:12,
14 52:6 67:7
70:3 77:11
89:10 97:19,20
103:11 105:25
112:2 124:11
125:10,20
131:13

**personal** 14:9
135:1

**personally**
76:2,8 91:2
116:8 130:21
131:17

**personnel**
10:20 38:13
134:12

**pertained**
14:19

**pertaining**
64:6

**phone** 46:16
108:11

**phonetic** 12:12

**phrase** 27:17
52:24

**physical** 9:20
39:11

**picking** 71:7

**piece** 71:20

**pieces** 112:25

**pin** 139:10

**Pinckneyville**
49:7

**pinnacle** 40:3

**place** 26:11
33:12 75:12
89:5 90:16
103:4 124:5,23

**places** 98:14

**plaguing** 35:4

**plaintiff** 18:23,
24

**plaintiff's** 6:18

**Plaintiffs**
104:19

**plan** 49:15,19,
24 50:3 67:7
78:24 82:3
132:8,9,15,18,
22,23

**planning** 50:16
63:6 125:25

**play** 105:10,18
107:3 109:24

**pledge** 62:13

**pluses** 88:21

**point** 7:5 27:13
29:21 30:13
43:23 44:9 47:6
49:19 54:24
76:11 101:6
135:19

**points** 81:16

**police** 17:23
18:2,3,7,17
19:10,12,13
28:13,23,25
89:24

**policies** 43:10
44:18 111:15
112:22 113:5,
14 114:18

**policy** 38:8,23
44:18 46:10
53:21 94:6
119:14

**Pontiac** 35:5
65:6

**population**
131:7,9,10

**populations**
59:17

**port** 87:4

**portion** 9:24
14:1,6 109:24
110:2,4 122:6
130:9 132:22

**portions** 13:9,
10

**position** 21:21,
22 22:5 30:15
42:15 45:20
47:17 55:25
57:10 84:7
102:17,19
114:17 120:13

**positions**
20:19 56:16
120:8

**possession**
53:20

**possibility**
137:9

**possibly** 49:11

**post** 38:10

**posts** 36:4

**potential** 36:18
122:4

**potentially**
15:10 26:8 36:4
136:11

**power** 92:2
94:8

**PPE** 35:20

**practice** 82:16
83:21 84:6,8,
18,23 85:5
86:22 87:9,10,
15 88:5 89:17,
18,19 93:5,8,9
94:14 99:7,10,
20,23 100:5
101:3,23 102:6
103:14 114:10
124:4 135:2

**practices** 84:1
93:12,23,25
106:18 113:21
114:2,5,9,10,11
115:1,2 120:15

**prefer** 8:14

**preference**
50:7,9

**pregnant**
28:14

**preparation**
10:2 15:10
46:18

**prepare** 10:5
12:15 15:2
16:22,25 108:6

**prepared** 40:1

**prescribed**
53:19

**prescription**
53:18 61:3

**presence** 24:1
84:5 85:12,21
88:10

**present** 23:20
30:14 32:12
72:23 73:9
78:14 123:12,
22 125:4
128:15,17,20
129:12,13

**presented**
130:21,24

**prevalence**
65:4,23,24

**prevent** 9:21

**previous**
41:17 82:12
111:18 138:19

**primarily** 44:8
60:17,18
126:15

**primary** 29:15

**printed** 110:8

**prior** 22:3
33:23,24 48:2
50:23 52:17
55:2 63:15
132:25

**prison** 32:25
36:11 47:9
49:16,20,25
60:1 65:9,11

**prisoner**
128:10 130:14
131:17 135:25

**prisoners**
69:14 72:4,22
73:10 78:21
79:16 90:7
96:18,21 98:18
100:12,14
101:14 103:14
106:18 107:6,7
108:22 109:14
115:14,24
116:20 127:22
130:13 134:5
136:18

**prisons** 9:9
10:23 11:4
22:21 31:14
32:18 35:4
48:19,23 49:8
63:20 81:3

**privy** 130:3
138:12

**problem** 88:3

**procedure**
21:3 39:10
91:13 114:3

**procedures**
14:11 111:15
112:22 113:14,
18,19,21

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

Case 3:15-cv-00309-SMY Document 642-11 Filed 05/22/24 Page 53 of 60 Page ID #23421
The Deposition of ZACHARY SARVER, taken on April 08, 2021
156

114:19 119:15

**proceeded**
108:17

**proceeding**
107:5

**proceedings**
6:1 95:4

**process** 30:18
34:20 39:5,7,8
72:20 82:19,24
121:8

**processes**
92:16,17 109:4
132:24

**produced** 15:8
16:17

**product** 101:9

**professional**
17:21

**profile** 57:1

**program** 44:11

**prohibit** 98:18
101:5 104:3,5
127:23

**prohibited**
98:25 99:1

**prohibiting**
100:12

**promote** 22:7

**promoted**
21:15 22:3

**promotion**
50:12

**proof** 90:13

**proper** 135:10,
15 137:16

**properly** 67:17
111:24 112:11
121:5

**property** 70:15
71:15,17,20
104:4,6 113:22

**protection**
64:19

**provide** 71:19
90:12 105:5
111:15 112:22
119:20 131:11

**provided**
15:14 76:5 85:8

**providing** 9:21
72:5,17 73:17
117:10

**proximity** 43:7
97:7,13

**psych** 28:11

**psychology**
28:18

**pulled** 57:2
95:16

**pulling** 79:8

**purchasing**
44:13

**purpose** 11:20
35:13 114:23

**purposely**
135:18

**purposes**
127:14

**pursue** 30:16

**put** 23:16 24:4
57:10 74:17
75:18,20 79:18
81:19 82:3
102:22 110:6
114:4 120:19
131:4 137:19
138:14 139:12

**putting** 24:6
67:2 98:19

━━━━━━━
**Q**
━━━━━━━

**qualification**
20:12 55:22

**qualify** 20:4

**quell** 36:2

**question** 11:3,
15 13:20 26:10
31:25 36:23

48:10 70:17
71:10,22 73:7
76:9 78:13
85:15,23 86:1,
14 87:3 92:5,6
95:22 106:17
111:19 117:16
123:8 132:10
137:22

**questioning**
13:16

**questionnaire**
85:9

**questions**
14:8,10 70:7,22
75:11 86:8
106:16 107:13,
16 109:2
114:25 118:25
119:1 120:17
127:6

**quick** 106:7

**quickly** 79:19
100:5

**quiet** 85:2

**quietly** 89:12

━━━━━━━
**R**
━━━━━━━

**railing** 87:12

**railings** 82:18
83:15 84:9,10,
16 86:10

**raise** 7:20

**ran** 54:25

**randomly**
84:23

**Ranger** 28:21
29:6,10,11

**ranger's** 29:14

**rank** 8:11 46:19

**ranking** 34:15
46:11

**rare** 40:6 56:9,
23

**read** 14:11,12

**reading** 14:23
63:10

**real** 106:6

**reapplied**
135:15

**reapply** 137:16

**reason** 9:19
23:9,17 34:4
41:4 50:10
74:16 77:4,8,
19,20 93:18
109:8,9

**reasonable**
114:22

**reasonings**
34:14

**reasons** 76:17
89:21 101:7
120:22,25

**recall** 13:13,14
14:15 15:11,25
17:1 23:17
24:16 32:18,20
33:18,22 48:11
49:2,14 50:19,
25 52:20 54:5,
7,9,14 60:11
73:13 76:7
80:16 82:20,22
84:2 95:19 96:9
100:18 102:5,9
109:8

**recalling** 75:11

**receive** 92:15
109:17 118:11
125:6 132:13

**received** 20:7
74:15

**receiving**
118:3,6

**recently** 130:2

**recollection**
22:25 23:19
51:9,10,13,17,
18,24 72:21
73:1,8 74:13
77:24 78:10,14,
17,20 79:12,15

107:4 118:2,6
128:11,12
129:8

**recommend**
41:8

**recommended**
57:20

**reconnaissan
ce** 26:19 27:20,
23,24

**record** 6:3 7:13
8:4 16:7,8,10,
11 66:7,9,11
71:19 76:6
79:20 80:12
89:22 97:25
101:18 106:6,
10,11 109:25
126:21,23,25
127:1 140:4

**recorded**
89:14

**records** 11:18
23:23 58:18,20
59:22 73:23
75:25 133:7

**REDACTED**
9:24 110:4
130:9

**REDIRECT**
127:8

**reduce** 105:6
119:24

**redundant**
12:9

**refer** 78:24

**reference**
104:25 110:12
113:6 115:6

**referenced**
17:15

**referencing**
10:15 113:4

**referring** 85:25
95:3,25

**reflecting**
71:13



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

CHURCHILL
REPORTING

Case 3:15-cv-00309-SMY   Document 642-11   Filed 05/22/24   Page 54 of 60   Page ID #23422
The Deposition of ZACHARY SARVER, taken on April 05, 2018
157

refresh 107:4

refreshed 42:12

region 21:19 44:19,21,23 45:1 46:13,16 54:12,15 57:1 84:19

regional 21:24 34:24 40:23 41:22,25 42:20 43:6,15,25 45:6,7,16 46:8, 9,14 47:7 54:6, 18,21 55:1,3, 15,18 56:13,15, 22 57:6 60:8 61:24 63:7,12, 16 81:1,6 83:18,21 84:7, 17 87:19 96:20 98:24 101:22 118:1 119:17 123:1 138:4

regionally 61:13

regions 44:24

regular 35:2 38:21 40:19 113:9

related 44:12, 15 63:22 110:18,25 111:16 112:14, 23 113:15 114:19

remain 55:16

remained 21:13 27:12

remaining 21:16,18

remember 12:2 14:22,23 18:9 23:10 33:8 44:22 47:1 51:3 52:9 53:6 57:3 60:7,8 75:10 77:11,13 78:8 79:1 80:19 83:17 87:18

89:6 107:12 108:3 125:16, 23 126:8 128:8, 22,23 129:5 131:21

remembered 41:18

remodeled 25:18,20

remotely 6:21, 25

remove 92:20, 21 105:11,19

removed 89:1 109:20 135:15

renamed 44:24

reopened 25:17

reorient 95:23

repeat 64:25

repeated 37:9

rephrase 117:16

replicated 29:19

report 11:19,20 74:21 76:7 111:24 126:4,8 128:2,6

reportable 58:2 63:10 64:3,15

reported 24:23

reporter 6:3,5 7:10,12,15,19, 25 16:8,11 66:7,10 106:4, 6,9,11 126:21, 23 127:1 139:17,20,22, 25 140:3

reporting 6:6 128:3

reports 24:19, 22 25:4 74:20

113:11 128:3

represent 7:2, 8 49:6

representing 6:5

represents 7:4

require 38:15 103:23 104:8,9

required 97:15 101:15

requirements 29:1

rescue 35:24 38:3 40:4,6 44:8 56:9 115:7

resistance 108:2

respect 116:20,23 117:9,10 118:14

respectful 117:13

respond 55:23 90:22

response 21:5,9,14,17 22:16 23:13 30:23 31:18,23 35:20,24 36:5 40:4 67:9 68:11 83:5 86:21,24 88:16 111:2 114:7 130:20

responsibility 110:24 111:5, 10,22,24 112:2, 3,6

rest 79:5

restrain 68:25 98:9

restrained 98:8 106:19,20 124:25 130:14 135:6,9,10 137:3

restraining 130:22 135:18

restraint 130:25 134:17, 18

restraints 124:5 135:25 136:18 137:16

restrictive 108:1

result 66:23 96:5,8,17 99:23 109:17,21 116:19

results 113:10

resume 26:8

retired 27:5

retirement 27:15,16,18,19

reverse 126:6

reversed 128:10

review 10:11 13:3,7,9,13 14:6 15:2,13,23 16:20 23:1,23, 24 39:9 58:18 59:21 74:23 82:4 91:1,9,23 95:1,5,17 96:2, 14,16 104:23 108:6,7 130:11, 16,17 139:21

reviewed 10:2, 4,6 11:2 12:8, 14,18,22 13:2, 24,25 14:3,17, 19,22 15:5,9,21 16:24 23:5 24:3,10 41:16 75:22 79:21 80:3 81:1,10,24 91:5 104:21 106:22 108:6, 10,13 133:7,10, 13

reviewing 13:14 14:15 15:11

revisions 44:18

rigorous 39:4

riled 107:23

riot 35:25 40:2

riots 36:17 37:10

risk 40:9 56:10, 25 67:3,10 134:21

River 9:2 10:25 11:1 24:15 48:14 54:3 59:5,7,9,20 66:17 78:3 126:12

Rob 43:17 138:3

role 17:21 18:6 21:4 25:9 42:20 55:9,24 56:15 57:16 61:13 63:7 67:25 96:19 105:11, 18 108:8 110:23 111:8, 22 112:3 119:2 127:21

roles 47:10,12 66:21

Rosenberger 46:25

Ross 6:11 79:20

roster 12:5

rosters 10:8 12:7 22:25

rotated 135:12

roughly 39:6

routes 82:8

routine 36:7 44:1,2

routinely 69:3 91:1,4,25

Rule 104:20

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

**rules** 99:9

**run** 44:11 54:24
76:12 87:23

**running** 85:4
87:4

**runs** 110:16

**Rupcich** 7:4

**S**

**safe** 83:25
102:23

**safer** 122:2,5

**safety** 110:18,
20,25 111:7
112:14,19
119:5,9

**sake** 53:12,16

**Sam** 8:7

**Sandy** 42:10,
13,17

**Sarah** 6:20
16:2 66:3
126:18 139:22

**Sarver** 6:10
7:10,12,14,16,
19 8:6,15,22
16:12 24:9
66:11 84:3
106:12 110:17
111:14 112:21
127:2

**Sarver's** 126:7

**sat** 17:5 18:13

**satisfied** 38:6

**scale** 36:1,17
37:10 40:2

**scene** 36:15

**schedule** 34:3,
7,13 40:19,20,
21,22,25 60:14

**school** 28:10,
21 29:6,10,11,
25 39:15,16
93:13

**Schultz** 6:22

**scope** 48:8
127:16 138:2,9,
23 139:4

**screen** 24:4,6
79:19 80:8
108:18 110:7,
13

**seal** 110:3

**search** 32:16
33:20 35:9
49:12 50:24
52:4 53:4,23
58:10 59:12
60:23 62:15,24
63:2 64:1
68:19,24 69:3,
22 70:25 71:19
72:9 73:15
74:6,11 75:21
76:5 91:5 98:19
113:22,24,25
116:21 121:5,8,
16,21,25
122:13 123:13
126:6

**searched**
72:23 78:22
98:5,7 103:25
120:20,23
128:10

**searches**
33:12 36:25
39:25 49:24
52:15 53:5,7
54:22 55:5 59:6
68:2 69:12,14
72:7 73:5 79:5,
6,7 111:16
112:23 113:8,
15 114:19,21
115:6,11
119:25 120:21
122:7,10
123:12,22
124:4 125:4,16,
17

**searching**
72:3,19,20
73:10 113:18,
20 121:17,18,
23

**seat** 103:1,4

**seated** 102:9,
16,17

**security** 33:10,
13,14 34:4
36:9,10 38:13
50:4 59:16,25
61:6 62:6,9,17
63:19 64:2,7,
22,23,24 65:5,
7,9,11 67:6
72:5,17 79:8
83:24 99:19
110:18,25
112:14 126:13,
16 137:14

**seek** 28:8
30:12 47:12

**segregation**
107:21

**seizure** 29:16

**seldom** 91:16

**selected** 39:6,
12

**send** 16:3
93:12 139:19

**senior** 46:10

**sense** 62:16
119:19

**sentence**
110:16,17,21
111:14 112:21

**separate** 11:23

**separates**
39:2

**September**
33:24

**sergeant** 27:6
38:14

**serve** 21:23
28:4 55:4 56:7
74:5

**served** 12:23
21:24 26:18
104:18

**service** 17:11,

16 19:21 20:2,9

**services**
131:11

**serving** 48:5
55:3

**set** 83:9 114:24

**settings** 90:1

**settled** 29:24

**sewed** 139:9

**sex** 126:15

**shackles**
97:12

**shakedown**
14:2 15:16
16:21 23:20,25
25:2 31:9,11
32:12 33:6
34:8,21 41:4,7,
10 51:2,13 53:2
57:15,21 59:20
60:4 63:6
66:17,19 67:20,
25 71:19 72:24
74:19 76:6
78:2,23 79:23
80:25 95:2,6
96:2,5,8,15,16,
17 97:22
103:24 106:19,
22 107:1
109:18 110:21
115:13 117:19
118:4,12 119:5,
9 127:15

**shakedowns**
9:1,10 10:16,23
22:12,19,22
24:15 25:8
31:4,24 32:19,
24 33:12,15,16
34:14 40:16
43:19 45:7
48:9,11,12,13,
20,24 49:15,20
50:17,22 52:21
54:11 55:8
56:11 58:25
61:14,25 62:18
63:20 70:6
71:13 73:9

**Schultz** 6:22

76:14 81:2,6,23
86:24 89:14
91:2 97:23
110:19 111:1,8
112:15,19
116:19 117:8
118:8,11 119:3,
8 130:12

**shaken** 49:8
60:4

**shaking** 34:3

**shank** 65:20

**shanks** 58:8

**shared** 109:1,
8,10

**sharpening**
65:20

**shift** 8:13 22:3,
5 50:13

**shooting**
39:10

**shortcut** 121:8

**shortly** 25:12,
14 33:24 42:16
46:24

**show** 73:23
80:6 89:22 93:4
94:1,2 104:12

**showed** 76:13

**side** 36:14
53:22 94:21
97:20 100:15
134:21

**signature**
139:18

**signed** 92:10

**significant**
76:8 99:12,21

**similar** 55:23
81:19

**similarly** 6:12

**simple** 71:15

**simply** 43:7
67:11 68:17
70:22

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

**sir** 8:21 9:18
106:17 127:10
139:14

**sit** 50:19,25
51:9,11 77:24
102:11 103:16,
17,21

**sitting** 125:21

**situated** 6:12

**situation** 38:6,
9,19,22 61:5
64:2 70:2 71:25
76:4 95:10,19
97:14 107:19
108:2,9,14
130:4,7 136:10

**situation's**
37:4

**situations**
21:9 36:2,17,
18,20 37:6,10,
11,12 67:16
71:9 91:20
92:1,12 95:7
116:3 134:15,
24 136:9

**skill** 94:2

**skim** 14:13

**skimmed**
14:13

**slightly** 98:15

**slip** 103:24

**slips** 75:17,18

**slot** 72:2

**slotted** 69:20

**small** 17:23
42:11

**Smith** 94:9

**SOAR** 60:10

**socks** 121:9

**solemnly** 7:21

**someplace**
27:9

**son** 26:12

**sort** 11:7 44:4
46:2 51:22
63:8,13 79:11
92:3 108:8
114:6,12 132:1

**sorts** 44:5
113:8

**sought** 50:10
114:6

**sound** 123:7

**sounds** 56:10
139:20

**source** 115:1

**South** 44:21

**Southeastern**
45:4

**Southern** 6:14
44:22 45:2
54:12,15

**Southwestern**
59:24 60:5,11
65:7

**spawned**
108:14

**speaking**
62:23

**special** 8:12
21:20,24 22:1
29:14,16,17
30:19 31:22
34:16 35:16,17,
19 40:24 41:25
42:20 43:15
44:16 45:24
46:2 47:7 55:3,
15,19 56:13,21
58:6,22 59:11
63:16 92:8
109:4 114:7
115:4 132:19

**specialist**
26:19 27:21

**specialists**
27:23

**specialized**
40:8 113:14
134:4

**specialty**
133:23

**specific** 51:19,
24 67:2 82:11
109:2 131:4,21

**specifically**
32:21 33:8
45:23 51:3,14,
16 52:22 53:6
54:5,8 55:14
57:22 60:21
76:3,11 78:8
85:25 96:9
118:5,9 125:9,
23 131:19,20

**specificity**
52:1,20

**specifics**
14:23 20:1

**specifies** 38:8

**spectrum** 37:2

**speculating**
75:15

**spell** 8:3

**spent** 100:21

**spike** 64:21

**spikes** 64:16,
17 65:1

**spoke** 42:4

**spoken** 17:2

**spray** 107:1,5

**spring-
cleaning** 52:25

**Springfield**
7:3 11:9,12
21:23

**squad** 47:19

**squeeze** 99:18
100:10

**St** 6:14 7:6

**stabbed** 100:3

**staff** 35:7 44:14
64:20 65:21
100:14 109:16
115:14,24

**116:15** 129:21,
24,25 130:24
132:12

**stage** 98:3

**staged** 79:1

**staging** 52:13
69:1,13 78:1,21
79:2,4,8,10,16
96:22 97:5
98:13 100:2
101:15 103:16
108:23

**stand** 28:22
101:15 102:7,
10,11,14,18
103:15 125:7

**standard**
37:22 119:13

**standardized**
102:6

**standards**
20:6,12 55:22

**standby** 68:4

**standing**
102:15,19
108:18 122:24
125:19

**stands** 118:21

**start** 9:18 10:3
31:14 65:19
88:9,13 98:4

**started** 25:23
84:7

**starting** 6:18
20:22 64:14

**state** 6:16 7:13
8:3 26:6 28:9,
13,23,25 30:13
40:9,10 47:24
48:21 49:16,20,
25 55:13 76:20
115:4,11

**stated** 114:14

**statement**
110:15 135:23

**States** 6:13
29:12

**Stateville**
15:16,23,25
16:3 103:7,8

**statewide**
32:1,5 41:22
42:9,15,16
43:1,4,14,19,25
44:4 54:17,19,
21 55:19 56:14,
15 57:16 59:7
60:6,9 61:13,24
63:7,13 81:1,7
87:17,19 96:20

**statistics**
79:12

**stay** 22:4 26:5
28:8 71:3

**stayed** 20:22

**stealth** 88:8,15

**Steimel** 7:7,11

**step** 23:5 51:8
97:11,12

**steps** 105:5
119:23

**stipulate** 7:15

**stood** 13:17
107:7

**stop** 48:5 55:17
83:15 111:25

**stopped** 47:22
87:18

**strenuous**
29:19

**strike** 11:14
13:23 50:15,20
83:14 101:21

**strip** 68:24
72:3,6,8,19,22
73:5,10,15 79:7
98:5,6,19
113:24 120:19,
23 122:13
123:12,13
125:17 126:6
128:10

**struck** 84:15

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606


CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

structure 81:14

stuck 77:18

studies 28:19 30:1,8

stuff 53:24 75:2,7 99:25 100:1 115:7 116:11

style 138:16

subject 13:12 14:16 48:23

subjected 48:19

subordinate 90:23 129:20, 24,25

subpoena 10:11 12:22,23

substances 61:16

substantial 62:10 67:8

sudden 94:5

suggest 115:21

suggested 74:16

super 72:10

supervisor 8:13 22:4,5 90:21 129:19, 22

support 95:11

supposed 68:15 70:12

surfaces 82:18 83:15 84:9,16 86:11

surmising 75:15

surprising 13:21

survey 24:7 50:20 74:14

76:23 85:7 86:24

SWAT 39:15, 16

swear 7:21

sweeping 71:7

Sydney 6:4 66:12 106:13 127:3

system 12:11

___

T
___

tables 86:10

tac 25:9,10 26:1 82:15,16 84:14 92:10 93:8,14 94:8 95:16 96:1,13 98:24 101:22 109:20 117:24 119:17,22 120:5 128:24 132:12 137:23

tact 35:13 45:21 47:3,23 48:3,5 68:5 108:8

tactic 112:6

tactical 10:10, 20 20:24 21:1, 2,5,9,13,14,16, 17 22:15 23:2, 13,14 25:23 29:17 30:22 31:17 32:2 33:20,21 35:9, 12,14,16,19,21, 22,24 36:5,11, 17,25 37:2 38:12,21 39:3, 5,7,20,22,25 40:4,25 43:10 45:6,7 46:3,4,5, 21 47:10,13,17, 20 49:1,4,12,24 50:24 52:4,5,14 53:4,23 54:17, 22 56:7,20 57:25 58:5,9,

10,13 59:6,12 60:23 62:24 63:2 64:1 67:13,14,15 68:19 69:11,21 70:17 72:1,6, 14,15,18 73:13, 18,23,25 74:4, 5,6,9 75:21 76:19 79:3 83:10,23 84:17 85:4,11,16 89:25 91:19 92:3,22 93:1,4, 5,6,10,11,16, 21,24 94:4,11, 13,14,21 99:18 101:7 102:15 103:23 104:3,5, 8,9 108:25 113:3,15,22 115:2,6,11 116:21 117:9, 13,22 118:12 119:7,19 120:6, 21,24 121:11 122:21,22 123:1 124:17 126:10 128:4,6 130:23 132:1, 16 133:20 134:6 135:1

tactile 105:16

taking 9:19 42:15

talk 10:1 20:15 35:12 57:14 134:10

talked 26:15 65:1 74:12 96:10 110:15 114:5 115:4,6 127:11 128:1

talking 36:24 51:24 64:22 65:5 77:14 134:11 135:5 136:4

TAP 67:8

task 58:8 68:11 71:13 72:16

tasks 36:16

tattoo 53:21

taught 113:24 114:1 134:12

Taylorville 65:13,17 91:14, 16

team 11:7 21:6, 7,9,14,17,18 22:15,16 23:13 25:9,11,14 26:1 30:23 31:18,23 32:2,8 34:22 35:13,20,24 36:5,17 37:18 39:14,17,20,21 40:4,12,15 45:21 46:3,4, 11,16,21 47:10, 13,25 48:6 55:16,21 56:6, 13,15 57:5 63:8,13 67:9, 23,24 68:6,11 69:11,18,21 70:4 71:10 72:1 74:1,2 82:15,16 83:20 84:14 92:3,22,23 93:6 95:16 96:1 103:23 104:3,5, 8,9 109:20 114:6,12 117:9, 22 118:12 119:7,22 127:13,19 128:4,6 132:1 137:23

teams 46:2 56:7 114:7 115:3

technician 6:4

telling 88:10 100:9

tells 90:18

tempo 13:16

ten 75:14 79:4 122:23 123:6 131:14

tend 31:23 61:14,23,25 62:18 65:3 66:20

tension 115:23

tensions 115:13

tenure 30:21 31:16,22 32:4, 17 40:23 43:23 45:11 47:7 54:18 58:17 60:6,10 61:24 81:6 87:16,17

term 27:22 119:11

terminated 19:23

terms 134:9

test 39:11

testified 14:1 17:10 18:19 19:5,15,20 20:5,9 24:14 54:10

testify 20:3,5 51:5 130:18

testifying 14:17 20:11

testimony 7:21 9:22 13:4, 13,18,19,23,24 14:1,4 17:14 19:7 41:17 51:16 60:13 84:13,17 97:16 105:5 111:15 112:22 131:23, 25 135:20 136:22

testing 39:4

thankful 116:8, 25 117:12

thankfulness 116:13

that'd 110:10

there'll 39:9

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

thereof 14:24

thing 26:3 40:6
61:4 74:25
75:10 83:9 86:2
94:17,19 116:4,
7

things 9:18
11:16 37:25
39:22 40:1,5,8
51:10 52:16
53:11,21,22
56:8,9 58:3
67:16,17 68:3
70:24 71:4
77:16 82:1
84:23 85:1
88:17 94:1
99:14 112:10
115:9,20,22
124:22 125:16
127:12 134:22

thinking 87:8
88:23

thought 26:6,7
28:19,21 77:5

throwing
131:5

thrown 75:24

thumbs
106:20,21
124:5 134:8,15
135:6,9 136:1,
3,7,19

ticket 71:21

tight 135:11

time 6:8 12:1,2,
3,24 16:14
17:22 19:4 21:6
28:1,14,25
30:14 31:5,15,
19 32:23 33:7
34:1,2 35:15
36:14 40:13
41:20,22 43:19
44:22 48:2
49:19 51:8
54:6,14,25 61:5
66:4,7,13 67:14
68:10 70:24
72:22 73:2

76:13 77:12
78:20 79:15
87:5 96:17
97:11 100:8,20,
22 101:3 102:5
106:14 108:24
112:7 117:23
125:22 126:24
127:4,24 128:9
129:15,19
133:13 135:8
139:24 140:2

time's 16:9

times 17:8,9,
10,12,13 19:15,
19 20:8 34:5,14
55:14 57:19
58:16 59:19
75:4 89:14 90:4
96:4 117:16
128:19 131:2,3
137:10

tings 85:1

tired 102:15,17

title 8:11,13
46:19

titled 24:6
104:19

today 6:5,7
8:25 9:22 10:3
15:3 16:13
17:3,6 41:2,12
50:19,25 51:9,
11 65:23 66:13
69:10 74:2
75:12 76:11
77:24 82:15,16,
19,23 83:1 97:4
104:22 105:1,
10 106:13
113:13 114:5
118:20 127:4
139:23

today's 10:5
12:15 15:10
16:22,25 79:22
108:7

Todd 47:5

told 40:22
74:15 116:9

122:15 123:14

top 24:8 113:20

topics 9:15
44:5 111:11
118:18

Total 94:17

totals 80:3,15

touch 9:17

touching 97:7,
8 98:16 125:9,
20

tour 28:6

tower 38:6

towers 37:24,
25

town 17:23

TR 70:11

track 11:21

trade 65:15

trade-off
100:15

traded 53:19
100:11

train 26:4 93:5

trained 40:1
44:10

training 12:4,5,
7,10 20:6 39:5,
13 40:3 43:11
44:8,13,14,17
45:18 55:21
75:8 91:21
133:15,18

transcript
14:12 110:3
139:23

transcripts
10:12 13:2,4,8

transfer 50:6

transferred
21:12 22:10
27:1 46:22

transmission
132:4 133:3

transmitted
132:4

transport
56:24 57:9
66:23 67:3,10

transportation
56:10 82:8

transported
67:22 68:8

transporting
35:20

transports
40:9

trash 71:8

trauma 133:21,
24

treated 116:23

treating 116:20

trial 105:5

trips 27:4

trouble 94:6

TRT 22:16
31:23 32:1,5,
11,15 34:22,23
35:5,9 37:18
38:7,19 39:2,6,
13,21 40:5,11,
14 43:24 44:23
45:21,23 47:15,
18,22,25 48:6
52:5 55:4,12,
16,21 56:6,15,
16,20 66:18
67:3,12,23,24
68:5,22 69:18
70:4 71:10,23
72:1,2 73:4,16,
20,25 74:1,4,7,
19 75:21 76:19
92:11,23 94:16,
23 117:25
119:7,12,15,22
120:5

true 22:19
37:16 41:23
43:5 48:14
63:20 73:7
78:17,18 79:14

102:3 104:1,6,
7,10,11 105:1,
12,13 111:8,9
113:3 132:13
133:3 134:8
136:1

truth 7:22,23
90:2,19

truthful 9:21

tryout 39:10

turn 10:13
66:16 92:14
102:13 114:25
136:13 137:11

turned 107:18

turning 69:17
103:13

two-by 97:21

two-by-
however-
many 97:21

two-week
93:12

type 65:23
66:20 81:16
111:24

typed 86:20

types 12:18
13:16 35:8
91:20

typical 51:22
68:5

typically 51:10
54:20 55:7
62:23 70:5 72:3
97:18

———— U ————

Ukraine 27:4

unauthorized
61:16

unaware 50:3
76:10 84:22
124:16,19



Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606

CHURCHILL
REPORTING

(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com

uncover 90:8

undergarment 121:9

underlying 130:17

understand 8:24 9:5,11,13 12:13 13:20,22, 23 14:5 20:1 33:1 47:15 51:15 56:4,19 61:21 65:12 74:8 82:21 84:24 86:7 87:2 110:24 111:6 113:7,18 115:2 120:14 122:20 125:24

understanding 15:9 34:25 40:12,15 48:8 58:20 61:12 75:16 100:11 111:11 117:6,8, 22 118:10

underway 6:24

underwear 98:19,21,25 99:15 100:12, 20,21 101:2,8 120:19,23,25 121:3,10 127:23,24

undeveloped 88:19

unexpected 69:19 70:3 71:25

uniform 138:19 139:8

unilaterally 41:3

union 93:18 94:16

unit 20:25 21:1, 2,14,17 23:2,14 25:23 31:17 33:21 35:14,19 36:11 38:13

39:7,22 44:16 47:17,20 52:6 67:12,14,15 68:14,19 69:12 70:24 72:6,14, 18 73:4,14,17, 18,24,25 74:4, 5,9 76:19 79:3 83:23 84:25 85:11,16 89:12, 25 93:1,4,5,6, 11,16,20,21,24 94:14 96:21 98:5,10 102:15 113:6,22 117:13 119:19 120:6 122:21, 22 123:1 126:16 130:24 132:17

unit's 72:12

United 6:13 29:12

units 27:24,25 29:16 37:2 67:13 85:13,22 86:19 91:19

University 29:25 30:9

unsure 76:23

uphold 119:13

upstairs 85:4

Uptown 6:22

use-of-force 76:4 94:10 95:10

_____

V

vacation 46:15

Vague 81:25

Vandalia 21:12,13,15 22:7,11,14 23:2,14 36:12 44:19,20,23,25 45:19 46:22 47:10,13 50:4,6 63:16 74:10

variety 9:14 61:16 71:4

vast 32:14 73:2 116:6 126:10

Velcro 139:9

verbal 111:2 132:4 133:2

verbally 132:24

versa 62:19

versatile 68:12

versus 58:11 64:7 69:12 79:7 82:5 83:4 93:9 97:4 135:3

vice 62:19

Victor 8:7

video 6:4 15:9, 11,13,21,23,25 16:3,4,17,18, 20,21 89:9,13 91:1 95:1,5 96:2,15 108:14, 18 110:1

videoconferen ce 6:9 16:13 66:12 106:13 127:3

violate 94:6

violation 94:10 99:8

violations 112:1

violence 52:9 64:16,17 65:3, 16

volunteer 93:19,20

_____

W

W-Y-A-T-T 8:6

Wacker 6:6

waist 134:20

walk 97:9,15

walked 123:5 129:18,19,22

wall 101:16 102:8,11,13

walls 86:10

wanted 28:8 91:6 93:24

War 28:2

warden 75:5 93:9,14 94:9 95:9,14,19 108:13

wardens 122:24 129:11, 12,14

warrant 35:8

watch 121:13

watched 137:10,19

watching 15:25

ways 81:22

weapon 38:1, 22 62:14 67:8

weapon-related 62:25

weapons 35:7 37:19 52:10 53:13 58:8 60:18,23 61:16, 19 62:1,5,11,19 63:1,22,23,25 64:3,8,10,11 65:4 115:8

wear 98:21 99:14 100:19, 20 101:1,7 120:22 127:22 137:23

wearing 98:25 100:12 127:23

weather 82:6

week 91:12

weeks 39:5

75:5

weird 92:4,5

Western 130:2

Whettin 47:5

White 43:20,22 54:14,16 129:2

wide 31:6 34:25 51:13 55:5,8 56:11 57:15,21 58:25 59:20 60:4 61:14,25 62:15, 17 63:20 66:19 95:6 120:20

wield 37:19 38:4

wife 28:13

wing 68:14,16, 18,22 86:11 98:10

winter 15:18

withdraw 48:10

withhold 93:20

witnessed 126:2 130:23 131:1,17

words 34:5 99:17

work 18:16 19:9,11 21:1,7 28:20 34:23 35:25 39:24 42:1,5,19,23,24 43:22 45:10,14 50:12 75:19 92:9 99:24 116:15 120:15

worked 42:25 43:24 45:15 76:16

working 20:17 21:8,17 25:15 29:20 30:5,11 34:23 35:1 44:6 83:24 93:3 101:11 130:6

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com



**works** 88:18

**worry** 57:7
94:24

**worse** 62:5

**worth** 99:18
100:10

**would've**
10:21 11:14,17
12:11 15:19
23:16 33:23
34:1 38:17
54:12 76:1,2
77:3,7 81:20
113:6 126:9

**wound** 138:18

**writ** 134:16,22

**write** 71:20
132:2

**writing** 128:2

**written** 23:6
39:8 128:3,5
132:8,18

**wrong** 37:20
62:8 76:22,24
136:14 137:6

**Wyatt** 7:14 8:6

———————

**Y**

———————

**year** 22:2,10
27:5 28:6 51:2

**years** 18:25
26:19 30:15
31:1,9,10 32:22
33:3,5 34:8
36:10 44:25
49:3 57:17,18
70:20 75:12,14
76:1 89:8 91:18
120:9 128:18

**yelling** 83:8

**yield** 23:25

**yielded** 53:3,5,
8

**you-all** 55:13

**Yurkovich**

14:25 41:15
42:1

———————

**Z**

———————

**Z-A-C-H-A-R-Y**
8:5

**Zach** 8:16,18,
19 84:3 126:7

**Zachary** 6:10
7:14,16 8:5
16:12 66:11
106:12 127:2

Churchill Reporting
30 South Wacker Drive
Floor 22
Chicago, IL 60606



(877)808-5056
schedule@churchillreporting.com
www.churchillreporting.com