*Ross v. Gossett*, No. 15-cv-309 (S.D. Ill.)
Defendants' Motion for Summary Judgment

**Defendants' Exhibit RR**
Zack Roeckeman Deposition Transcript



**Planet Depos**
We Make It *Happen*™

# Transcript of Zack Roeckeman

**Date:** August 8, 2018
**Case:** Ross, et al. -v- Gossett, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE
          SOUTHERN DISTRICT OF ILLINOIS, EAST ST. LOUIS DIVISION
 2
     DEMETRIUS ROSS, et al., )
 3                           )
          Plaintiff,         )
 4                           )
     vs.                     )Case No. 15 C 0309
 5                           )
     GREG GOSSETT, et al.,   )
 6                           )
          Defendants.  )
 7

 8

 9

10                  DEPOSITION OF ZACH ROECKEMAN

11               TAKEN ON BEHALF OF THE PLAINTIFF

12                      AUGUST 8, 2018

13              VALERIE A. LEHR, CCR, CSR, RPR

14

15

16

17

18

19

20

21

22

23

24
```

Transcript of Zack Roeckeman
Conducted on August 8, 2018                    2

```
1                         I N D E X

2                        WITNESSES

3   ALL WITNESSES:                               PAGE:

4   For Plaintiffs:

5     Zach Roeckeman:
          Examination by Ms. Crosley            5:13
6         Examination by Mr. Weigand           84:16

7                        EXHIBITS

8   NO.:    DESCRIPTION:                         PAGE:

9   For Plaintiffs:

10  1       Big Muddy operations order 5/12/14:
            For Identification                 33:20
11
    2       Email chain:
12          For Identification                 79:15

13  3       Email between G. Troyer and Z.
            Roeckeman:
14          For Identification                  83:9
    Original exhibits were retained by the reporter to be
15  copied and attached to the Original and copies.

16

17

18

19

20

21

22

23

24
```

```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
         SOUTHERN DISTRICT OF ILLINOIS, EAST ST. LOUIS DIVISION
 2
    DEMETRIUS ROSS, et al.,  )
 3                           )
            Plaintiff,       )
 4                           )
    vs.                      )Case No. 15 C 0309
 5                           )
    GREG GOSSETT, et al.,    )
 6                           )
            Defendants.  )
 7

 8

 9          DEPOSITION OF ZACH ROECKEMAN, produced, sworn,

10  and examined on August 8, 2018, between the hours of

11  eight o'clock in the forenoon and six o'clock in the

12  afternoon of that day, at Best Western Plus Centralia

13  Hotel & Suites, 8145 Jolliff Bridge Road, Centralia,

14  Illinois 62801, before Valerie A. Lehr, a Certified

15  Shorthand Reporter, within and for the State of

16  Illinois, in a certain cause now pending in the United

17  States District Court for the Southern District of

18  Illinois, East St. Louis Division, in re:  DEMETRIUS

19  ROSS, et al. vs. GREG GOSSETT, et al.; on behalf of the

20  PLAINTIFF.

21

22

23

24
```

```
 1                       APPEARANCES

 2


 3
    For the Plaintiffs:
 4
           Ms. Adair Crosley, Esq.
 5         LOEVY & LOEVY
           311 N. Aberdeen Street, 3rd Floor
 6         Chicago, Illinois 60607
           312/243-5900
 7         Adair@loevy.com

 8

 9  For the Defendants:

10         Mr. Jason Weigand, Esq.
           OFFICE OF THE ATTORNEY GENERAL
11         STATE OF ILLINOIS
           500 S. Second Street
12         Springfield, Illinois 62706
           217/785-4555
13         jweigand@atg.state.il.us

14

15  Reported By:

16         Ms. Valerie A. Lehr, CCR(MO), CSR(IL), RPR

17

18

19

20

21

22

23

24
```

```
 1              IT IS HEREBY STIPULATED AND AGREED by and

 2    between counsel for the Plaintiff and counsel for the

 3    Defendants that this deposition may be taken in

 4    shorthand by Valerie A. Lehr, CCR, CSR and Illinois

 5    notary public, and afterwards transcribed into printing,

 6    and signature by the witness is expressly waived.

 7                        *  *  *  *  *

 8         (Wherein the deposition began at 12:51 p.m.)

 9                   ZACH ROECKEMAN,

10    of lawful age, produced, sworn, and examined on behalf

11    of Plaintiff, deposes and says:

12                   EXAMINATION

13    QUESTIONS BY MS. CROSLEY:

14         Q.    Can you please state and spell your name

15    for the record?

16         A.    Zach Roeckeman.  Z-A-C-H.  Last name is

17    R-O-E-C-K-E-M-A-N.

18         Q.    Thank you.  My name is Adair Crosley.  I

19    am an attorney for a gentleman named Demetrius Ross and

20    others who have brought a lawsuit, and you are one of

21    the named defendants.

22              Have you ever been deposed before?

23         A.    Yes.

24         Q.    About how many times have you been
```

Case 3:15-cv-00309-SMY-MAB  Document 642-4548  Filed 05/23/24/20/22  Page 8 Page 8 of 122  Page ID #8553 #8553

```
1   deposed?

2           A.      Three.

3           Q.      When was the most recent?

4           A.      Several years ago.

5           Q.      Were all of those depositions in

6   connection with your employment with the Illinois

7   Department of Corrections?

8           A.      No.

9           Q.      Were any of them in connection with your

10  employment with the Illinois Department of Corrections?

11          A.      Not that I recall.

12          Q.      I'm going to go over the rules, since it's

13  been a while for you.  So the first rule is that, you

14  know, you've taken an oath, so this is like court.  You

15  took an oath to tell the truth.  Like court, there is

16  also a court reporter, which means she is here to take

17  down everything we say, which means we have to try to

18  keep our answers verbal.  So no uh-huh, huh-uh because

19  those don't copy down onto paper well.  There is a

20  natural tendency in human conversation to cut each other

21  off; right?  You'll know what my question is before I

22  finish asking it and want to answer.  We both have to

23  try not to do that because it makes it very hard for her

24  to write down if we start talking over each other.  If,
```

1   at any point, you want to take a break, just let me

2   know, it's no problem.  However, if there is a question

3   pending, I'm going to ask that you finish the answer and

4   then we take a break.  At various times, the attorney,

5   your attorney, may object.  Unless he specifically

6   instructs you not to answer, you are still expected to

7   answer, even though he has raised an objection.  I'm

8   going to assume that you understand all the questions

9   that I've asked as I've asked them.  If, for any reason,

10  you do not understand the question, please ask me to

11  clarify; otherwise, I will assume that you understood

12  it.  Are there any questions about that?

13          A.      Nope.

14          Q.      Okay.  I assume that you're aware that

15  you've been named in a lawsuit?

16          A.      Yes.

17          Q.      Do you know what the lawsuit is about?

18          A.      In general, yes.

19          Q.      What is your general understanding of what

20  the lawsuit is about?

21          A.      It's in relation to tactical operations,

22  facility shakedowns that IDOC conducted in 2014, I

23  believe.

24          Q.      And when did you first learn that you had

```
 1    been named as a defendant in this lawsuit?

 2           A.      I don't recall.

 3           Q.      Do you recall how you found out that you

 4    had been named as a defendant in this lawsuit?

 5           A.      Not specifically, no.

 6           Q.      Other than talking to your lawyers, have

 7    you talked to anyone about this lawsuit?

 8           A.      Not that I can recall, no.

 9           Q.      In preparation for today's deposition, did

10    you review any documents?

11           A.      Yes.

12           Q.      What documents did you review?

13           A.      Answers to Interrogatories.

14           Q.      Okay.  And were those provided to you by

15    your attorney?

16           A.      Yes.

17           Q.      Did you review any other documents?

18           A.      No.

19           Q.      In preparation for your deposition today,

20    did you speak to anyone other than your attorneys?

21           A.      No.

22           Q.      Have you ever been named as a defendant in

23    a lawsuit before?

24           A.      Yes.
```

Case 3:15-cv-00309-SMY-MAB Document 642-5 Filed 05/22/18 Page 11 of 122 Page ID #2956

1          Q.      Okay.  How many times?

2          A.      Multiple.  I don't know the exact number.

3          Q.      Have any of those lawsuits ended up in a

4   finding against you?

5          A.      No, not to my knowledge.

6          Q.      Have you -- were any of those lawsuits in

7   connection with your employment at the Illinois

8   Department of Corrections?

9          A.      Yes.

10          Q.      Were all of those lawsuits in connection

11   with your employment with the Illinois Department of

12   Corrections?

13          A.      No.

14          Q.      What were the other ones?

15          A.      Related to an employment as the jail

16   administrator of Marion County Jail.

17          Q.      Anything else?

18          A.      Not to my knowledge.

19          Q.      It would be fair to say that the only

20   times that you have been named a defendant in a lawsuit

21   has been in connection with your employment in the

22   corrections field, shall we say, either at the Marion

23   County Jail or the Illinois Department of Corrections?

24          A.      Yes.

Transcript of Zack Roeckeman
Conducted on August 8, 2018                          10

```
1          Q.      And to the best of your knowledge, none of

2    those lawsuits has resulted in a finding against you?

3          A.      Correct.

4          Q.      Okay.  When you mentioned before that you

5    had been deposed about three times, were those then all

6    in connection with lawsuits related to the Marion County

7    Jail?

8          A.      Yes.

9          Q.      Who is your current employer?

10         A.      State of Illinois.

11         Q.      What do you do for the State of Illinois?

12         A.      I work for the Department of Human

13   Services.

14         Q.      What do you do there?

15         A.      I work for the SODC Division for the

16   Department of Human Services as a human resources

17   specialist at Murray Center in Centralia.

18         Q.      What is the Murray Center?

19         A.      It's a state-operated development center

20   for individuals with developmental disabilities.

21         Q.      How long have you held this position?

22         A.      Since September of 2017.

23         Q.      What did you do prior to that?

24         A.      I was employed with the International
```

1    Brotherhood of Teamsters, Local Union 50.

2          Q.      And who does Local Union 50 -- what

3    employees are in Local 50?

4          A.      It's a general union.  I represented

5    public sector employees.

6          Q.      Right.  But the local, I would assume, was

7    a specific subset of public sector employees, which

8    public sector employees did Local 50 represent?

9          A.      Illinois Department of Transportation.  We

10   represented various school districts, as well as

11   municipal and county employees for various counties and

12   municipalities in southern Illinois.

13         Q.      All in Local 15?

14         A.      Fifty.

15         Q.      I'm sorry, 50.

16         A.      Yes.

17         Q.      How long did you hold that job?

18         A.      Approximately one year.

19         Q.      I'm sorry.  What was your title?

20         A.      Business representative.

21         Q.      Business representative.  What were some

22   of your duties as a business representative?

23         A.      I represented bargaining unit employees in

24   grievance resolutions, any sort of labor dispute between

1    management and employees and also negotiated contracts

2    on behalf of Local Union 50 employees.

3           Q.     And who made the decision to leave the

4    that job and pursue the job at the Department of Human

5    Services?  Did you make the decision to leave the job?

6           A.     I did.

7           Q.     Why did you leave the job?

8           A.     This opportunity arose closer to home.

9           Q.     Prior to working for the Teamsters, where

10   did you work?

11          A.     I worked for the Illinois Department of

12   Corrections.

13          Q.     Was that when you were warden of Big

14   Muddy?

15          A.     I served as of warden of Big Muddy from

16   September 2012 until December 2015.

17          Q.     Okay.  What other positions did you hold?

18          A.     From January of 2012 till September of

19   2012 I was assistant warden of program of Centralia

20   Correctional Center.

21          Q.     Any other positions within IDOC?

22          A.     No.

23          Q.     Prior to starting at the Illinois

24   Department of Corrections in January 2012, what did you

Case 1:15-cv-00309-SM-MAB Document 42-15 Filed 05/22/19 Page 15 of 122 PageID #: 3965

1   do?

2          A.     I was the jail administrator for Marion

3   County Jail.

4          Q.     How long did you hold that position?

5          A.     Approximately three years, from December

6   2008 to December 2011.

7          Q.     What were your duties as the jail

8   administrator?

9          A.     I was responsible for the safety and

10  security of the Marion County Jail facility as well as

11  supervision of all correctional officers.

12         Q.     And before the Marion County Jail, what

13  did you do?

14         A.     I worked for Community Resource Center.

15         Q.     What's that?

16         A.     It is a community service organization.  I

17  was a case management coordinator for adults with mental

18  illness.

19         Q.     I'm sorry.  Case management?

20         A.     Case management coordinator.

21         Q.     I'm sorry.  Did you say with mental health

22  issues or mental --

23         A.     Adults with mental illness.

24         Q.     Mental illness.  Okay.  How long did you

Case 3:15-cv-00309-SMY-MAB Document 64-5 Filed 05/22/18 Page 16 of 122 Page ID #2596

```
1    have that job?

2              A.        Approximately three years.

3              Q.        Where is the Community Resource Center

4    located?

5              A.        Centralia, Illinois.

6              Q.        Before that?

7              A.        Before that, I worked for the Thresholds

8    in Chicago, Illinois.

9              Q.        That's adults with mental health issues;

10   correct?

11             A.        Yes.

12             Q.        How long did you have that job?

13             A.        Approximately five years.

14             Q.        Before that?

15             A.        Before that, I did not have any regular

16   full-time employment.  Before that, I was a student.

17             Q.        Where did you go to school?

18             A.        I went to Greenville College in

19   Greenville, Illinois.

20             Q.        Did you obtain a Bachelor's degree?

21             A.        Not from Greenville College.

22             Q.        What did -- did you obtain any degree from

23   Greenville?

24             A.        No.
```

Transcript of Zack Roeckeman
Conducted on August 8, 2018                                    15

```
1          Q.      Where did you obtain a degree from?

2          A.      Eastern Illinois University.

3          Q.      What did you obtain a degree in?

4          A.      It was a Bachelor's of arts.

5          Q.      Uh-huh.  In what subject?

6          A.      General subjects.  I believe it was a

7    governor's degree is what they referred to it as.

8          Q.      Did you go to Greenville and transfer to

9    Eastern or --

10         A.      Huh-uh.

11         Q.      -- other way around?

12         A.      I went to Greenville.  I no longer

13   matriculated to Greenville.  Then later I went to

14   Eastern.

15         Q.      So there was some time off in between?

16         A.      Yes.

17         Q.      Was that time off also in school or was

18   that time off working or neither?

19         A.      It was during the same time as the

20   employment with Community Resource Center.

21         Q.      Okay.  Before Greenville, was that just

22   high school then or was there time off between high

23   school and Greenville?

24         A.      Oh, yes.  Augustana College for one year
```

Case 3:15-cv-00309-SMY-RJD Document 64-26 Filed 05/22/18 Page 18 of 122 Page ID #2596

1    in Rock Island, Illinois.

2         Q.     Augustana for one year.  And then before

3    that, was it high school?

4         A.     Before that, it was Centralia High School

5    in Centralia, Illinois.

6         Q.     We have Centralia High School, graduated

7    from there.  What year was that?

8         A.     1993.

9         Q.     '93.  You went Augustana for a year, then

10   you went to Greenville, then you worked for a while at

11   Community Resource Center.

12        A.     No.

13        Q.     Finished your degree -- where did I screw

14   up?

15        A.     I went to Greenville.  I worked -- then I

16   went to work for Thresholds.

17        Q.     Okay.

18        A.     And then I went to work for Community

19   Resource Center while at the same time getting my degree

20   from Eastern.

21        Q.     Okay.  I get it.  Finished degree at

22   Eastern during this time.  Okay.

23               Were you involuntarily terminated from any

24   of the positions that we have just discussed?

Transcript of Zack Roeckeman
Conducted on August 8, 2018                    17

```
 1            A.      Yes.

 2            Q.      Which one?

 3            A.      From the Illinois Department of

 4   Corrections as a warden.

 5            Q.      Okay.  What were the circumstances of your

 6   departure?

 7            A.      I was informed that my services were no

 8   longer required.

 9            Q.      Had you been subject to any kind of

10   discipline before that?

11            A.      No, ma'am.

12            Q.      To the best of your knowledge, was it

13   based on any kind of specific incident or just one day

14   you got a call?

15            A.      No.  One day I got a call.  It was a

16   position served at the pleasure of the director of the

17   department and the governor.

18            Q.      And who did you get that call from?

19            A.      Chief of Staff Bob Bowen.

20            Q.      Was the director at that time Godinez?

21            A.      No, ma'am.

22            Q.      Who was it?

23            A.      He is the current director.

24            Q.      It's on the tip of my tongue too.
```

```
1              A.    Baldwin.

2              Q.    Baldwin?

3              A.    Baldwin.

4              Q.    When you were initially hired, was Baldwin

5    the head?

6              A.    No.  I was hired by Director Godinez.

7              Q.    Was any reason given?  I mean, you were an

8    at will employee, I assume?

9              A.    Correct.

10             Q.    So no reason was given?

11             A.    No.

12             Q.    Were you involuntarily terminated from any

13   of the other jobs that we've talked about?

14             A.    No, ma'am.

15             Q.    It sounds like you do not have any law

16   enforcement experience; is that correct?

17             A.    Correct.

18             Q.    Separating corrections from law

19   enforcement, you don't have law enforcement?

20             A.    Correct.

21             Q.    Prior to IDOC, you had some -- I mean, if

22   you want to call the jail corrections, we can get into

23   semantics, but you had the jail experience prior to

24   IDOC?
```

```
 1              A.      Yes.

 2              Q.      But those are the only two --

 3              A.      Correct.

 4              Q.      -- of that category?  Do you have any

 5    military background?

 6              A.      No, ma'am.

 7              Q.      While you were at the Marion County Jail,

 8    were you ever disciplined as an employee?

 9              A.      No.

10              Q.      Were you the subject of any grievances?

11              A.      Could you clarify that?

12              Q.      You can correct me if I'm wrong, my

13    understanding is that most facilities like the jail have

14    a grievance procedure wherein detainees at the jail can,

15    you know, formally complain about things that have

16    happened to them, including naming individuals that they

17    believe are responsible for those things.  And my

18    question is:  Via whatever means is available at the

19    Marion County Jail, did any inmate or a detainee ever

20    formally complain about you?

21              A.      I don't recall specifically.

22              Q.      It sounds like there's a "but."

23              A.      However, I am sure that -- I was the jail

24    administrator.  So, yes, I was named in multiple
```

1    grievances, I'm sure.

2            Q.     You believe that there were some lawsuits

3    in which you were named as a defendant coming from the

4    Marion County Jail.  Do you recall if any of those were

5    about kind of specific things you were alleged to have

6    done as opposed to I'm just naming the jail

7    administrator because I'm mad at the jail, if that makes

8    sense?

9            A.     My recollection is that they were -- I was

10   involved because of my position as jail administrator,

11   not any direct actions I took.

12           Q.     Okay.  During your employment with the

13   Illinois Department of Corrections, were you ever

14   subject to any discipline?

15           A.     No.

16           Q.     During your employment with the Illinois

17   Department of Corrections, one of your duties as warden

18   would have been to review grievances filed by inmates at

19   the facility; is that correct?

20           A.     Yes.

21           Q.     Okay.  Were you the subject of any of

22   those grievances as a result of an individual action

23   that you took as opposed to a complaint about the prison

24   policy that they assumed you were responsible for?

Case 3:15-cv-00309-SMY-MAB Document 424-26 Filed 05/22/18 Page 23 of 122 Page ID #4563

1         A.        I don't recall being the subject of --

2    directly the subject but rather because of my position.

3         Q.        Okay.  So you've -- have you ever worked

4    as a corrections officer?

5         A.        No.

6         Q.        Okay.  So before you started working at

7    the Illinois Department of Corrections or, rather,

8    either before you were formally hired or immediately

9    after you were formally hired with the Illinois

10   Department of Corrections, did you have to go to any

11   special training?

12        A.        Repeat that, please.

13        Q.        Yes.  I apologize.  I'm having trouble

14   phrasing this.  I understand when you get a job with the

15   Illinois Department of Corrections, as a corrections

16   officer, you have to go to cadet training in

17   Springfield.  When you join the Illinois Department of

18   Corrections coming in as an assistant warden, do you

19   have to go to cadet training?

20        A.        No.

21        Q.        Okay.  Do you go to any kind of formal

22   training like that where it's, you know, several days or

23   several weeks of training before you even really start?

24        A.        Are you referring as the capacity of the

Case 3:15-cv-00309-SMY-MAB Document 442-15 Filed 05/22/18 Page 24 of 122 Page ID #5554

1    warden or assistant warden at IDOC?

2           Q.      Yeah.  Since you were never a corrections

3    officer, I assume that you have no -- you never were a

4    member of the tactical team?

5           A.      Correct.

6           Q.      Did you ever participate in or attend or

7    observe any tactical team training or practices,

8    however?

9           A.      I have a vague recollection of attending a

10   tactical team practice at Big Muddy River, but I don't

11   recall any specifics about it.

12          Q.      What is your understanding of the tact

13   team and why it exists and what they do and how one

14   becomes a member of it?

15          A.      My understanding is that they exist to

16   provide special operations, that the tactical unit

17   performs separate from that of a correctional officer,

18   you generally are -- from what I recall of the process,

19   there is -- if someone wishes to become a tactical unit

20   member, their work history and other factors are

21   reviewed, and there is a sort of tryout process from

22   what I recall, but I don't recall with any specificity

23   any of that.

24          Q.      Fast forward to 2014.  By that time, were

Case 3:15-cv-00309-SMY-MAB Document 442-26 Filed 05/22/18 Page 25 of 122 Page ID #2595

```
 1    you warden of Big Muddy?

 2         A.      Yes.

 3         Q.      Did you have any other duties outside of

 4    being warden, either in an acting capacity, temporary

 5    capacity or in a full official capacity?

 6         A.      For a time period in 2014, I believe it

 7    was May and June of 2014, I served in a temporary

 8    capacity as the deputy director of the southern region.

 9         Q.      How did that come to pass; do you recall?

10         A.      I don't recall specifically, although I --

11    I know that Chief of Operations Yurkovic told me that

12    that's what I was going to be doing.

13         Q.      Okay.  And prior to that point -- I guess

14    as warden of Big Muddy, who did you answer to?

15         A.      I reported directly to the deputy director

16    of the southern region.

17         Q.      When you started as warden of Big Muddy,

18    do you recall who that deputy director was?

19         A.      I believe it was Ty Bates.

20         Q.      And at some point Ty Bates no longer held

21    that position, it sounds like?

22         A.      Yes.  I believe Shannis Stock took his

23    position.

24         Q.      Shana?
```

Case 1:15-cv-00309-SM-WAD Document 64-5 Filed 05/22/18 Page 26 of 122 PageID #: 9756

```
 1          A.      Shannis.

 2          Q.      Shannis.  Do you know how that's spelled?

 3          A.      S-H-A-N-N-I-S, I believe.  Stock, common

 4   spelling.

 5          Q.      Okay.  And then at some point Shannis

 6   Stock was no longer deputy director.  Was there anybody

 7   else when Shannis Stock and when you were told/asked

 8   that you would be temporary deputy director?

 9          A.      You know, I don't recall.  Yes.  Yes,

10   there was.  Donny Gaetz.   Donald Gaetz.  I apologize.

11          Q.      Anyone else after Donald Gaetz then?

12          A.      No.

13          Q.      When you became temporary deputy director,

14   do you recall if that was more of a request, if you were

15   interested, or, by the way, you're the new acting deputy

16   director?

17          A.      It was a request by Chief Yurkovic and

18   Deputy Chief Atchison was probably involved as well.

19          Q.      Okay.  Did they do anything to, like,

20   interview you before it or it literally was one day,

21   hey, by the way, we have this hole, can you fill it?

22          A.      I don't recall a formal interview.  I

23   believe it was based on my job performance over the past

24   several years.
```

Case 3:15-cv-00309-SMY Document 424-26 Filed 05/22/18 Page 27 of 122 Page ID #2557

```
1          Q.      But you think that Yurkovic and Atchison
2    were involved in that decision?
3          A.      Yes.
4          Q.      Okay.  And you seem to recall that it was
5    Yurkovic specifically was the one that made the phone
6    call or reached out to you?
7          A.      I don't recall specifically, but I know
8    that Yurkovic was the chief of operations, and yes, he
9    would have done that.
10         Q.      Okay.  And you think it was around May or
11   June but you're not --
12         A.      I don't know exactly.  I believe it was in
13   between the tenure of Donald Gaetz, who believe retired
14   at the end of April, and Randy Davis, who I believe
15   began in July.
16         Q.      So between Gaetz and Davis.  Let's back up
17   a little bit and talk about what were your duties as
18   warden of Big Muddy.
19         A.      I was responsible for the overall
20   supervision of the facility, including all safety and
21   security as well as over operational aspects as well as
22   programs and healthcare and supervision of staff.
23         Q.      Was Big Muddy -- what was the security
24   designation?
```

Case 3:15-cv-00309-SMY-MAB Document 424-5 Filed 05/22/18 Page 28 of 122 Page ID #5575

```
 1            A.      Medium.

 2            Q       Does Big Muddy have any, like, special

 3    correctional industries or anything at it?

 4            A.      No.

 5            Q.      Does it offer any special programming?

 6            A.      Yes.

 7            Q.      Tell me about the special programming at

 8    Big Muddy.

 9            A.      Big Muddy River has special programming

10    related to sex offenders as well as offenders who are

11    referred to as SDP, sexually dangerous persons.  Big

12    Muddy is primarily known for those programs and for that

13    population.

14            Q.      What percentage of the Big Muddy prisoner

15    population is made up of sex offenders and SDP?

16            A.      I don't recall specifically.  The SDPs

17    separately were on two wings.  I believe there were

18    approximately -- I don't know -- approximately 100 to

19    150 SDPs.

20            Q.      Okay.

21            A.      Our population was generally around 1800

22    to 2,000.

23            Q.      Okay.

24            A.      The sex offenders or persons who had a sex
```

1   crime, I'm not sure, but I recollect, with no

2   specificity, that it was approximately 30 percent of our

3   population had a sex offender crime or sex crime.

4           Q.    So not the majority, for sure?

5           A.    No.

6           Q.    But definitely a noticeable fraction?

7           A.    Yes.

8           Q.    Who was your assistant warden of

9   operations while you were warden at Big Muddy?

10          A.    When I came to Big Muddy in September of

11  2012, I believe, from what I recollect, that Angela

12  Windsor was serving in a temporary capacity as both

13  assistant warden of operations and assistant warden of

14  programs.  Then Robert Craig was hired, I believe, as

15  assistant warden of programs.  Ms. Windsor then returned

16  to her normal position or incumbent position of clinical

17  services supervisor.  I also believe at some point

18  therein, Tom Austin was appointed as assistant warden of

19  operations at Big Muddy River.  Sometime Assistant

20  Warden Austin left and then Assistant Warden Craig

21  became assistant warden of operations.

22          Q.    Do you have any recollection -- does it

23  seem likely to you that Craig was assistant warden of

24  operations as of May 2014?

1      A.    Yes.

2      Q.    Do you know that for sure or you're just

3  agreeing that sounds reasonable?

4      A.    I know that for sure.

5      Q.    Sounds good.  And then would Tom Austin

6  have been assistant warden of operations at that time --

7  I'm sorry -- of programming?

8      A.    No.  I believe at that time Assistant

9  Warden Austin was an assistant warden at Centralia

10 Correctional Center.

11     Q.    Do you think you had an assistant warden

12 of programs at that time?

13     A.    At that time, no.  Assistant Warden Craig

14 was serving in both capacities.

15     Q.    Okay.  So I want to direct your attention

16 to the week of May 12, 2014, during which there was a

17 facility-wide shakedown at Big Muddy.  Do you remember

18 that week?

19     A.    I remember, in general, that week.

20     Q.    Okay.  Do you remember that there was a

21 facility-wide shakedown at Big Muddy around that time in

22 May of 2014?

23     A.    Yes.  Yes.

24     Q.    When do you recall first learning that

```
1    there would be a shakedown at Big Muddy that week?
2         A.    Honestly, I do not.
3         Q.    You don't remember when you would have
4    learned?
5         A.    I don't.
6         Q.    Do you know if -- go ahead.
7         A.    It would have been -- obviously, it would
8    have been prior to that, but I don't know specifically
9    when.
10        Q.    Do you recall if kind of you were part of
11   the decision -- of the decision-making that decided to
12   have a facility-wide shakedown at Big Muddy around that
13   time?
14        A.    Would you --
15        Q.    Sure.  Obviously, someone made a decision
16   that there would be a --
17        A.    Yes.
18        Q.    -- facility-wide shakedown.  And my
19   question is:  Do you recall what role, if any, you had
20   in making that decision or conversations that took place
21   about that decision?
22        A.    I don't recall specifically that we --
23   that I was involved with the scheduling of that
24   shakedown.  From my recollection, it was a direction
```

Case 3:15-cv-00309-SMY-MAB   Document 442-26   Filed 05/22/18   Page 32 of 122   Page ID #25962

1    given from the Deputy Chief of Operations Mike Atchison.

2            Q.     So I apologize.   This is kind of

3    repetitive.   To your recollection, did you request a

4    facility-wide shakedown at Big Muddy?

5            A.     No.

6            Q.     So it sounds like it would be fair to say

7    that at some point you were informed that a shakedown

8    was going to happen.   You may have been part of

9    conversations deciding when it exactly it was happening,

10   but it wasn't really your decision to have the

11   shakedown?

12           A.     I would agree with that.   Yes.

13           Q.     Do you have any recollection of why a

14   decision was made to have a facility-wide shakedown at

15   Big Muddy?

16           A.     My recollection was that it was something

17   that was being performed statewide at all adult

18   correctional facilities.

19           Q.     Do you recall if, prior to the shakedown

20   at Big Muddy, you had heard anything about how -- back

21   up.   To the best of your knowledge, was Big Muddy the

22   first of the facilities to get shaken down as part of

23   this statewide operation to shake down all the

24   facilities?

```
 1            A.       No.

 2            Q.       No, it was not part of the -- it was not

 3     the first one?

 4            A.       It was not the first to my recollection.

 5            Q.       In fact, was Menard one of the ones that

 6     had gone before Big Muddy?

 7            A.       I don't recall specifically, but my

 8     recollection is yes, they were.

 9            Q.       Okay.  Do you recall going into the

10     facility-wide shakedown at Big Muddy if there had been

11     any conversations about kind of things that had happened

12     at some of the shakedowns before?

13            A.       I don't recall specifically.  I do recall

14     that the operations order -- the Department of

15     Corrections operations division did want an operations

16     plan in place that covered all issues or concerns that

17     may arise and wanted to ensure that those operations

18     were conducted efficiently.

19            Q.       Do you remember being part of

20     conversations in April of 2014 involving Kim Butler and

21     others regarding some complaints and grievances that

22     were coming to Kim Butler's attention after a shakedown

23     at Menard?

24            A.       In general.  Nothing specifically.
```

Transcript of Zack Roeckeman
Conducted on August 8, 2018                              32

1          Q.     Okay.  Do you remember conversations or
2    being part of conversations or aware of conversations
3    about a planned staff assault in response to a shakedown
4    that had happened at Menard either in March or April of
5    that year?
6          A.     I do not.
7          Q.     Okay.  So the shakedown at Big Muddy
8    started on May 12, 2014.  Do you recall if you were
9    there that day?
10         A.     It is my recollection that I was present
11   the first day.  Yes.
12         Q.     And my understanding is that, you know, it
13   started out with the relevant, you know, members of the
14   tact team, both from Big Muddy and the other facilities
15   that were helping out kind of meeting, gathering in a
16   location to get their directions --
17         A.     Yes.
18         Q.     -- for what they were doing.  Were you at
19   that meeting?
20         A.     I remember being there when they were all
21   together.  Yes.
22         Q.     Do you remember speaking to the assembled
23   group of tact team members?
24         A.     I recall addressing them.  Yes.

1          Q.      Do you recall what you told them?

2          A.      Not exactly, no.

3          Q.      How about generally?

4          A.      Generally, it would be that we appreciated

5    the time that they would come and help us make the

6    facility safer, we reiterated -- we would have

7    reiterated the operations plan and any relevant orders.

8    I do recall speaking about the sex offender population

9    specifically in four house, which is where they were

10   housed, the SDPs, and how that was a unique population.

11   I don't recall on what day or where that conversation

12   happened specifically about four house.  In general,

13   that would be -- it would be a welcome to Big Muddy and

14   thank you and follow the plan.

15         Q.      Okay.  Was Chief of Operations Yurkovic

16   present on that day or any day, to your recollection?

17         A.      I don't recall.

18         Q.      How about Deputy Chief Atchison?

19         A.      I don't recall.

20         Q.      How about Southern Regional Tact Commander

21   Anthony McAllister, also known as Bull?

22         A.      I do recall Lieutenant McAllister being

23   there.

24         Q.      No, that's fine.  There was another

Case 3:15-cv-00309-SMY-MAB Document 242-5 Filed 05/22/18 Page 36 of 122 Page ID #2586

1    Lieutenant McAllister who was just deposed right before

2    you but is not Anthony McAllister.

3          A.    How would you prefer me to refer -- Bull

4    was there.

5          Q.    Bull was there.  All right.  Is there

6    anybody else outside of tact team members and, you know,

7    kind of leadership from Big Muddy that you recall being

8    there on any of those days?

9          A.    I know that I recall Assistant Warden

10   Craig being present with me, and I believe that

11   Lieutenant Hunter -- there was a lieutenant who was, I

12   think, the statewide, and I -- that may not be the

13   correct last name.

14         Q.    Statewide what?  Like statewide tact?

15         A.    Yes, that he would be involved in some way

16   with the -- like Bull McAllister's chain of command.

17         Q.    Was he someone that you had met before

18   this incident or before these shakedowns and would have

19   known him before?

20         A.    I recall knowing of him and knowing him

21   before, yes.

22         Q.    I'm going to hand you what I'm going to

23   have the court reporter mark as exhibit 1.

24               (Plaintiff's Exhibit 1 was marked for

Case 3:15-cv-00309-SMY-MAB   Document 442-5   Filed 05/22/18   Page 37 of 122   Page ID #2567

```
1                      identification.)

2           Q.      (BY MS. CROSLEY)  I have handed you -- or

3    the court reporter has handed you a document labeled

4    Exhibit 1.  I'm going to ask you to go ahead and turn to

5    the second page of that.

6           A.      Okay.

7           Q.      Can you tell me what this is starting on

8    the second page?

9           A.      It looks like this is the operations order

10   for the facility shakedown for Big Muddy which was May

11   12, 2014 through May 19, 2014.

12          Q.      Have you seen this document before?

13          A.      Yes, I have.

14          Q.      Did you have a hand in drafting this

15   document or was this --

16          A.      Yes, I did.

17          Q.      Did you draft it entirely yourself or was

18   it someone else's input?

19          A.      With the input of others.

20          Q.      Who else had input in the drafting of this

21   document?

22          A.      Assistant Warden Robert Craig, Shift

23   Commander Major Eric Plot and Shift Commander Major

24   Daniel Monty.
```

1        Q.        Now, on the top, it says limited

2   distribution.  Do you know to whom this operation order

3   was distributed?

4        A.        I do not.

5        Q.        On the day that the -- or each day that

6   the shakedown occurred, was this something that would

7   have been distributed to the various tactical team

8   members that were gathered for the shakedown?

9        A.        I don't recall, but I would say no.

10       Q.        Okay.  This would be something that would

11  stay kind of in leadership?

12       A.        This would be command staff, potentially

13  Mr. McAllister -- potentially Mr. McAllister, but I do

14  not believe the tactical unit members would see this,

15  no.

16       Q.        This would be something -- however, it's

17  the contents of this is kind of what would have been

18  gone over with the tactical team every morning when they

19  met up before they started?

20       A.        I'm sorry.  I'm on something else.  Would

21  you repeat that question?

22       Q.        Sure.  This document -- the contents of

23  this document is what would have been conveyed to the

24  tactical officers every morning that they were at Big

1    Muddy for the shakedown?

2          A.     Correct.  I would like to state one thing.

3    I mentioned in couple of answers that I mentioned

4    Hunter.

5          Q.     Uh-huh.

6          A.     After looking at this document, it is

7    potential that I am meaning this David White.

8          Q.     Okay.

9          A.     I'm not entirely sure that I can say that

10   it was Hunter, but it was -- it was somebody else who

11   was in the special operations.

12         Q.     Okay.  So David White may have been the

13   person from special operations --

14         A.     May have.

15         Q.     -- one or more days of the shakedown?

16         A.     Correct.  Correct.

17         Q.     Okay.  All right.  So I'm noticing on this

18   first page of the operations order towards the bottom,

19   and it list command staff being Chief of Operations

20   Yurkovic and Deputy Chief Atchison; do you see that?

21         A.     Yes.

22         Q.     But I believe you said that you do not

23   recall if they were there for the shakedown?

24         A.     I do not recall.  I do not think they

1    were, but I don't recall specifically.

2           Q.      So the next line is the operations chain

3    of command; do you see that?

4           A.      Yes.

5           Q.      You're at the top of the chain of command;

6    is that correct?

7           A.      That's correct.

8           Q.      What does mean?  What does that mean to be

9    at the top of the chain of command?

10          A.      That means as far as Big Muddy River is

11   concerned, that everything is reported through me.

12          Q.      Okay.

13          A.      And then I would report things up through

14   my chain of command.

15          Q.      Okay.  In terms of for this operation, on

16   the ground level that you were the decision -- the

17   ultimate decision-maker of the people that were present;

18   would that be fair to say?

19          A.      No.

20          Q.      What part of that do you disagree with?

21          A.      I disagree that I would be the ultimate

22   decision-maker on a tactical operation on the activities

23   and direction of the tactical unit.

24          Q.      Okay.  That would fall to McAllister?

1        A.      That would fall to McAllister.  Yes, that

2    would be his responsibility.

3        Q.      In other words, are you suggesting that

4    when it came to directing members of the tact team in

5    their duties that day that the ultimate responsibility

6    was with McAllister and not you?

7        A.      I'm saying that as far as directing the

8    tactical team, the ultimate responsibility was

9    McAllister.

10       Q.      Okay.

11       A.      I would further clarify that by saying

12   that if there was any disagreement between McAllister

13   and myself over the operations, the determination would

14   be made by either the deputy chief of staff or chief of

15   -- I'm sorry -- the Deputy Chief of Operations Atchison

16   or Chief of Operations Yurkovic, as they were

17   McAllister's chain.

18       Q.      Okay.  So whereas, it was your institution

19   and McAllister was a guest at your institution, he was a

20   guest that, in your mind, had as much authority as you

21   did for the purpose of this operation?

22       A.      For the purpose of that operation?

23       Q.      Yes.

24       A.      Repeat that, please.

Transcript of Zack Roeckeman
Conducted on August 8, 2018                                    40

```
1          Q.     Though this was your facility, right, and

2   he was a guest at your facility, for the purposes of

3   this operation, in your mind, he had as much authority

4   as you did in terms of directing the operation?

5          A.     Yes.

6          Q.     Okay.  Such that if there was any point of

7   disagreement, it would have had to have been resolved by

8   someone higher than both of you?

9          A.     Yes.

10         Q.     Okay.  However, that's not to say that you

11  didn't have responsibility?

12         A.     Correct.

13         Q.     And as warden, if things went wrong,

14  right, in some ways the buck stopped with you as

15  warden --

16         A.     Yes.

17         Q.     -- no matter what the operation was while

18  it was at your facility?

19         A.     Yes.

20         Q.     After the initial meeting where all the

21  tact officers were gathered and you kind of gave them

22  the welcome message, at that point, did McAllister give

23  them more specific directions of this is how the day is

24  going to go?
```

1          A.        I don't recall.

2          Q.        After everybody was assembled and whoever

3     was going to talk talked, what happened next?

4          A.        I recall us walking through -- they

5     assembled at the facility garage.  It's a building that

6     is immediately outside the security fence.

7          Q.        Okay.

8          A.        And I recall everybody walking through the

9     security fence, the sally port and entering the

10    facility.

11         Q.        You went from outside the wall to inside

12    the wall, in other words, as the parlance goes?

13         A.        As the parlance goes, yes.

14         Q.        Did you go with everybody?

15         A.        I can -- I recall walking through the

16    sally port with them and then returning to my office.

17         Q.        Okay.  So according to this, on the first

18    day, the schedule was for them to go to R2.  So it is

19    your recollection that you would not have gone -- that

20    you did not go with them to R2 at that point but instead

21    went back to your office?

22         A.        I do not recall being in the housing -- in

23    that housing unit with them.

24         Q.        What about on the second day, did you go

Case 3:15-cv-00309-SMY-MAB Document 424-26 Filed 05/22/18 Page 44 of 122 Page ID #5594

1    to -- it looks like they were in R2 and R1.  Did you go

2    with them to those housing units?

3         A.    I don't recall with any specificity.  I

4    recall being in the housing units while the shakedowns

5    were commencing or while they were -- while they were

6    being completed.  I don't recall any specific housing

7    unit --

8         Q.    Okay.  And so --

9         A.    -- except for the SDP unit.

10         Q.    Which is R4; correct?

11         A.    It was housing unit four.  At the time, I

12    believe it was C and D unit.

13         Q.    So would that maybe have been -- looking

14    on the first page -- what they did on Monday the 19th or

15    would they have gotten some of it on the 16th, too?

16         A.    Honestly, my recollection is that things

17    went quicker than this schedule.

18         Q.    Okay.  Fair enough.  So other than for the

19    SDP wing, you do not believe that at any time during

20    this week, you, you know, stayed in the cellhouse for

21    the entirety of the operation?

22         A.    Not for any entirety.  I can recall

23    checking in.

24         Q.    Okay.

Transcript of Zack Roeckeman
Conducted on August 8, 2018                                                43

1          A.      And I had -- I can recall we had

2     maintenance staff who were there as well who were

3     performing repairs in the cell, along with the tactical

4     units and others, and I can recall checking in on them

5     but nothing to where I was supervising or observing for

6     long periods of time the tactical operations.

7          Q.      Do you recall if you were in the housing

8     units anytime during the portion of the shakedown where

9     the men were being strip searched?

10         A.      Yes.

11         Q.      Okay.  Do you remember if there were any

12    female tact team members that were present during those

13    times that you were present when the men were being

14    strip searched?

15         A.      I don't recall specifically.

16         Q.      Do you recall being in a place where you

17    could actually see the strip searches -- any strip

18    search while it was happening?

19         A.      No.

20         Q.      So as you sit here today, you don't have

21    any, you know, kind of independent recollection of

22    watching a strip search or a portion of a strip search

23    during that week?

24         A.      It is my recollection that the strip

Case 3:15-cv-00309-SMY-MAB Document 424-26 Filed 05/22/18 Page 46 of 122 Page ID #2397

1    searches were conducted in the cell.

2         Q.    Okay.

3         A.    I have a vague recollection of seeing an

4    officer in a doorway but not necessarily knowing what

5    was going on in there until afterwards that it was the

6    strip search.

7         Q.    Okay.  And so when you would go to check

8    in, you mostly kind of stayed on the main floor and,

9    like, checked in with McAllister who whoever else was

10   kind of down there?

11        A.    Yes.

12        Q.    After the men were strip searched, they

13   would have been lined up outside and escorted to --

14   well, do you know where they were escorted to?

15        A.    I believe they were escorted to the main

16   dietary.

17        Q.    Thanks.  At any point, did you watch the

18   -- on any of these days at any time during that week

19   watch as the inmates were escorted from their housing

20   unit to dietary?

21        A.    I can vaguely recall mass line movement

22   during that time.  Nothing specifically.

23        Q.    Do you remember hearing -- do you remember

24   hearing anything that any corrections officer said

Transcript of Zack Roeckeman
Conducted on August 8, 2018                                    45

1   during the course of the line movement?

2         A.    No.

3         Q.    Do you remember hearing tact officers use

4   obscenities or profanity?

5               MR. WEIGAND:  Objection.  He already said

6   he didn't hear them say anything.

7         A.    No.

8         Q.    (BY MS. CROSLEY)  After the strip search,

9   as we said, the inmates would be escorted to dietary.

10  Did you ever go into dietary while inmates were being

11  held there?

12        A.    I have a vague recollection of being in

13  there, but I don't recall specifically.

14        Q.    Do you recall if, when you were in there,

15  were the inmates seated or were they standing?

16        A.    My recollection is that all the offenders

17  were in a seated position around the tables.

18        Q.    Okay.  And do you recall if they were

19  handcuffed?

20        A.    My recollection is that they were

21  handcuffed.  Yes.

22        Q.    Do you recall if they had their heads

23  down?

24        A.    No.

1    Q.    Do you recall at any time while in dietary

2    hearing prisoners ask to use the bathroom?

3    A.    No.

4    Q.    Do you recall, at any time when you were

5    in dietary, hearing a prisoner or more than one prisoner

6    ask for medical attention?

7    A.    No.

8    Q.    Do you remember at a time in dietary that

9    week seeing medical staff in dietary at the same time

10   that the prisoners were in there?

11   A.    I have a vague recollection of seeing -- I

12   believe he was a physician's assistant Gary Gerst,

13   G-E-R-S-T, I believe was the was over there.  And I

14   recall seeing a -- I believe it was a nurse, but I do

15   not recall her name.

16   Q.    Okay.  So the impression I'm getting from

17   you is that, you know, you were pretty hands off during

18   this operation.  Do you think that would be a fair

19   assessment?

20   A.    Yes.

21   Q.    And that you had other duties to attend to

22   and you focused on those for the most part during that

23   week?

24   A.    Yes.

1      Q.     Okay.  Do you -- after -- so is there

2  anything at all, as you sit here today, any other

3  memories that you have of that week that we haven't

4  talked about regarding things that you personally

5  witnessed around the shakedown?

6              MR. WEIGAND:  Object to the form of the

7  question.  Form.  You can answer.

8      A.     Nothing with any specificity.

9      Q.     (BY MS. CROSLEY)  So we talked about that

10  you remember at least on the first day speaking to the

11  assembled group before they started their operation for

12  the day.

13      A.     Yes.

14      Q.     Do you think that you saw -- do you recall

15  if you were there every other morning or if it was just

16  the first morning?

17      A.     I don't recall.  I know I was there for

18  the first morning.  I don't recall the other mornings.

19      Q.     And I'm kind of getting the impression

20  that throughout the week you maybe stopped by just to

21  check how things were going from time to time but didn't

22  stay from the beginning to end of any portion of any of

23  the shakedown?

24      A.     Correct.

Case 3:15-cv-00309-SMY Document 442-5 Filed 05/22/18 Page 50 of 122 Page ID #5993

```
1           Q.      Okay.  When you would stop by, how long

2    would you stop in for?

3           A.      I don't recall.  I would say approximately

4    15 minutes.

5           Q.      Okay.  And who, if anyone, would you talk

6    to when you did that?

7           A.      As I recall, Assistant Warden Robert Craig

8    being present, I would speak to him.  I recall --

9           Q.      McAllister?

10          A.      -- Southern Region Tactical Commander

11   Anthony McAllister being present and speak to him.  I

12   recall Major Eric Plott, who was a shift commander at

13   Big Muddy River, being present and speaking to him.

14          Q.      Okay.

15          A.      I had -- there were also two lieutenants

16   who were involved in the operation, Lieutenant Harold

17   Schuler, who was our internal affairs lieutenant as well

18   as Lieutenant Larry Province.

19          Q.      Is he also internal affairs?

20          A.      He is not.

21          Q.      What is he?

22          A.      He's a zone lieutenant.

23          Q.      I want to be my own lieutenant.

24          A.      Zone.
```

Transcript of Zack Roeckeman
Conducted on August 8, 2018                                                 49

1          Q.      Oh, zone lieutenant.  I liked it better

2     when he was his own lieutenant.

3          A.      His own.

4          Q.      All right.  So was your impression that

5     Assistant Warden Craig did stay down through the

6     operation for most of it?

7          A.      My recollection is that Assistant Warden

8     Craig was more present than I was with it; however, I do

9     -- I cannot speak to how long he actually was there.  My

10    recollection is that Major Eric Plott spent the most

11    time with the shakedown.

12         Q.      Okay.  So Plott was the most involved?

13         A.      Yes.

14         Q.      Craig was more involved with you but how

15    much, you're not sure?

16         A.      He was more present.

17         Q.      Or more present.  Fair enough.

18                 What's the purpose of doing a

19    facility-wide shakedown?

20         A.      To ensure that the facility is free of

21    contraband.

22         Q.      So I understand that it's kind of a

23    regular policy that all inmates have their cells shaken

24    down about once every 30 days, the 30-day shakedowns; is

1  that your recollection?

2          A.     That sounds reasonable.  I don't recall

3  specifically but --

4          Q.     So I guess the question is:  What does a

5  facility-wide shakedown offer that is different or more

6  than what can be accomplished by just the regular

7  schedule of 30-day shakedowns?

8          A.     From my recollection, the facility-wide

9  shakedown would involve locking down the facility,

10  restricting offender movement and, in turn, that would

11  be a restriction on any programs, educational services,

12  things like that, that could interfere with a regular

13  daily schedule of the facility.  With a facility-wide

14  shakedown such as this, the facility would be placed on

15  lockdown.  Movement would be restricted.  Officers would

16  have more time to do a thorough and complete search.

17          Q.     So the advantage is that there's more time

18  to be more thorough.  Would that be --

19          A.     Yes.

20          Q.     Can you think of other advantages to doing

21  it this way?

22          A.     I'm sure there are, but I can't recall

23  offhand.

24          Q.     Okay.  What are you looking for in a

1    shakedown?  Or I mean, what would -- what is -- I mean,

2    of course you hope to find nothing.

3            A.      Yes.

4            Q.      But what are officers looking for or tact

5    team members looking for?

6            A.      Any items that could be considered

7    contraband, any items that are potentially related to

8    gang involvement or some sort of nefarious activities

9    within the facility or outside of the facility or any

10   other sort of rule violations, any concerns, regarding

11   an offender's living area or how they are doing in that

12   living area.

13           Q.      Do you recall how much contraband was --

14   I'm sorry -- major contraband was recovered as a result

15   of this tactical operation in 2014?

16                   MR. WEIGAND:  Objection.  Foundation.

17           A.      From my recollection -- I would ask you

18   what's meant by major contraband.

19           Q.      (BY MS. CROSLEY)  Sure.  Do you recall how

20   many weapons were recovered?

21           A.      I don't recall specifically that any

22   weapons were recovered.  I believe there was a pair of

23   scissors found.

24           Q.      What other options does a facility have

1    for detecting and hopefully stopping potential dangerous

2    activities by inmates?

3          A.      There are searches that can be performed

4    both on an offender's person as well as clothing as well

5    as their cells.  There are metal detecting units that

6    are used to sweep the grounds and also offenders during

7    regular line movement.  There is officer presence that

8    offenders can report any issues to, any concerns that

9    they have.

10         Q.      Are you familiar with what an intel

11   call-out is?

12         A.      I'm vaguely familiar with what that is,

13   yes.

14         Q.      Okay.  So to make sure we're on the same

15   page, my understanding is that an intel call-out is when

16   intel and IA and/or IA identifies certain prisoners who

17   they believe may have relevant information and be

18   willing to talk and kind of targets those specifically

19   as to be pulled out of their cell and brought in for

20   confidential interviews as a way to gather intelligence

21   about STG activity or other issues for the safety and

22   security of the prison officials would like to know

23   about.

24         A.      That would be my understanding, yes.

```
 1            Q.     Is there an advantage of doing a
 2     facility-wide shakedown as opposed to doing a tact
 3     call-out in terms of ensuring the safety and security of
 4     the facility?
 5            A.     I do not know.
 6            Q.     Okay.  Just give me one second.  One of
 7     your duties as warden is to -- well, let's back up.
 8                   Prisoners at Big Muddy who have complaints
 9     have a grievance process that they can use; is that
10     correct?
11            A.     Yes.
12            Q.     The first step of that grievance process
13     is they fill out a written grievance form that goes to
14     their counselor; correct?
15            A.     I don't know if that's the first step, but
16     yes, they fill out a grievance form and send it to the
17     counselor.
18            Q.     If the counselor can't resolve it, it goes
19     to the grievance officer?
20            A.     Yes.
21            Q.     If it makes its way to the grievance
22     officer, at some point it's going to pass the warden's
23     desk?
24            A.     Yes.
```

1      Q.      After the grievance officer has either

2  decided to deny it or take action or whatever, at some

3  point it passes the warden's desk to sign off on what

4  has been done; is that accurate?

5              MR. WEIGAND:  Objection.  Form.  You can

6  answer.

7      A.      From my recollection, yes, that's

8  accurate.

9      Q.      (BY MS. CROSLEY)  If an inmate wants to

10 file a grievance that they believe is an emergency, they

11 can designate an emergency and, in fact, it goes

12 straight to the warden's office to decide -- to sign off

13 whether it's an emergency or not.  Is that your

14 recollection as well?

15     A.      From what I recall, until you mentioned

16 that, I had not recalled anything about that, but, yes,

17 that seems accurate.  I believe that there is a box

18 potentially on the form that they check.

19     Q.      Do you recall if after the shakedowns in

20 May of 2014 if there was an -- if there were grievances

21 filed regarding the shakedown or things that had

22 occurred during it?

23     A.      I don't recall specifically, but yes,

24 there were grievances filed.

1      Q.      What actions did you take in response to

2   those grievances, if any?

3      A.      I don't recall specifically; however, we

4   would have followed -- my direction would have been to

5   follow the policy, the grievance procedure and ensure

6   that the offenders had all available means of that

7   procedure.

8      Q.      Okay.  Do you recall at any point, in

9   response to the grievances after the shakedown, taking

10  any steps to either investigate those -- well, we'll

11  start with to investigate those kind of grievances as a

12  category of grievances separate or in addition to the

13  regular grievance process?

14     A.      No, I don't recall that.

15     Q.      Okay.

16          MS. CROSLEY:  Can I just have like eight

17  minutes and then I will be able to resume.

18             (Wherein a recess was taken.)

19     Q.      (BY MS. CROSLEY) You mentioned before that

20  -- well, the Big Muddy houses the SDP population and

21  that they're all on one or two specific wings.

22     A.      Yes.

23     Q.      And that you had a concern -- I don't know

24  if concern is the right word.

Transcript of Zack Roeckeman
Conducted on August 8, 2018                                                    56

1          Well, you can tell me if it's the right
2     word.  Concern about how the shakedown would go when it
3     came to dealing with those gentlemen?  Would that be
4     fair to say?
5          A.     I don't know if concern is the right word
6     either, but I will go with concern.  Yes.
7          Q.     Can you tell me more about what the
8     thought process was?
9          A.     The SDP population, they are not
10    criminally convicted, they are civilly convicted.  So
11    they are held -- they have a different status.  They
12    have not been convicted of a crime.  They have been --
13    from my recollection, they were civilly detained by a
14    judge, and they were sent to the Department of
15    Corrections for oversight and housing.  That population
16    had, from my recollection, had been at Big Muddy River
17    since it opened, and a lot of that population was older.
18    A lot of that population knew that they would be there
19    for a long time, if not for the rest of their lives.
20    That housing unit, as a whole, was also a program unit,
21    and so, you know, we had -- there were staff offices on
22    those units.  There were -- it being a program unit, it
23    was a -- let's say a different level of supervision than
24    a normal housing unit.  So a concern or -- I just wanted

Case 3:15-cv-00309-SMY-MAB Document 642-26 Filed 05/22/18 Page 59 of 122 Page ID #35089

1    to ensure that that was known that that housing unit,

2    and specifically the SDP population, were somewhat

3    different than the normal IDOC population.

4          Q.     When you said that they had a different

5    level of supervision, do you mean it was slightly less

6    -- I mean --

7          A.     I mean, they were -- for example, there

8    was a substance abuse unit in that housing unit.  There

9    were, for example, inspirational posters, arts and

10   crafts, things that the offenders made that were on

11   display in the housing unit.  From my recollection, they

12   had a somewhat different schedule because of the program

13   unit, and there were groups and different services that

14   were provided to them on those units that wouldn't

15   necessarily be provided on a regular housing unit.

16         Q.     Would it perhaps be fair to say that you

17   wanted the people that were going to be involved in the

18   shakedown to understand that the rules were a little

19   different for those wings maybe then?

20         A.     Yes.

21         Q.     Okay.  And that they -- that the people

22   doing the shakedown both understood that and respected

23   that --

24         A.     Correct.

```
1         Q.      -- the rules were different?

2         A.      Yes.  Sorry to interrupt.

3         Q.      What steps did you take to ensure that

4    that understanding was there?

5         A.      Well, the command structure itself of the

6    operation was aware of all that.  Assistant Warden

7    Craig, being the former assistant warden of programs and

8    also the assistant warden of operations there at Big

9    Muddy, knew that unit, knew those housing units.  Major

10   Eric Plott was a shift commander at Big Muddy.  He was

11   aware.  Commander McAllister was familiar with the

12   facility and knew of that population.  It was also

13   something that I believe that I stated to the tactical

14   unit before they entered the facility as well.

15        Q.      So do you think that the day that they

16   were going to go to that -- those wings would have been

17   a day that you would have spoken to them when they were

18   gathered in the morning?

19        A.      Although I do not recall specifically,

20   yes, I would have spoken to them about that or

21   reiterated that.

22        Q.      Okay.  To the best of your recollection,

23   were any -- did it ever come to your attention that

24   there were any issues with how things went down on those
```

Transcript of Zack Roeckeman
Conducted on August 8, 2018                    59

1   wings?

2        A.     Specifically for the SDPs?

3        Q.     Yes.  Yes.

4        A.     My recollection was that -- I'm sorry.

5   Could you ask the question again.

6        Q.     Did it ever come to your attention after

7   the fact that there were issues with how the shakedown

8   occurred on those wings or that things didn't go as

9   perhaps you would have liked them to have gone?

10       A.     Nothing specifically.  I do seem to recall

11  that we recovered a lot of contraband, specifically, I

12  think, nuisance material from that SDP wing.  I do seem

13  to recall because some of that SDP population was older,

14  that there were, like, seats made available to them, but

15  as far as anything not happening the way it should, no,

16  I don't recall anything specifically.

17       Q.     When you were warden, how -- were you the

18  type of warden that made it part of your regular

19  schedule to kind of walk around on the living units and

20  make yourself available?

21       A.     Yes, ma'am.

22       Q.     How often did you do that?

23       A.     I would make random inspections and visits

24  to every housing unit.  My recollection is once a week,

1    if not more often.

2         Q.    Okay.  And, you know, if, as you were

3    walking through, you know, an inmate tried to get your

4    attention and say, warden, warden, was it your practice

5    to stop and talk to them or was it your --

6         A.    My practice was if it did not interfere

7    with the operation of the facility, if it didn't

8    interfere with like a line movement or something like

9    that, then I would make myself available for the

10   offenders.  If they wanted to speak with me, my

11   recollection is that I hope the offenders knew they

12   could write me or talk to me.

13        Q.    Okay.  And do you recall, after the week

14   of these shakedowns, offenders initiating conversations

15   with you with complaints about the shakedown?

16        A.    I recall vaguely there being

17   conversations.  I recall them mostly being about

18   property that was confiscated.

19        Q.    Okay.

20        A.    Nothing as far as -- I don't recall

21   anything specifically about the treatment of offenders

22   or anything regarding their welfare, let's say, during

23   the shakedown itself.

24        Q.    Property being confiscated, was it of the

1    stuff is missing and it's not reflected on a shakedown

2    slip kind of complaints or they took stuff and said it

3    was contraband and I don't think it is or both?

4         A.    I would say both of those, yes, that the

5    offenders believed that they were entitled to property

6    that was confiscated or that any property that was

7    confiscated was not necessarily contraband.

8         Q.    And did you take steps to -- did you

9    personally take steps to look into those various

10   complaints?

11        A.    I don't recall specifically, but yes, I do

12   believe that I tried to handle as many of those issues

13   as I could and questioned my grievance officer or the

14   internal affairs officer or some supervisor with

15   knowledge of the incident about those things to follow

16   up on them.

17        Q.    But you're saying right now, you don't

18   have any recollection of any complaints being of the

19   nature of how they were treated as people.  The

20   complaints that you recall getting were all about

21   property?

22        A.    I don't recall any specific grievance or

23   issue about how they were treated.

24        Q.    Okay.  Do you recall an inmate by the name

Case 3:15-cv-00309-SMY-MAB Document 242-5 Filed 05/22/18 Page 64 of 122 Page ID #2669

1    of Delvalle or Delvalle?

2            A.      In general, I recall him.

3            Q.      Do you recall that there was an incident

4    apparently where he had an injury to his wrist during

5    the shakedown?

6            A.      Yes.

7            Q.      What do you recall about that?

8            A.      From what I recall, Offender Delvalle was

9    going to be handcuffed, I believe, by a member of the

10   tactical unit who was also in the Big Muddy's internal

11   affairs officer.  And sometime during that -- either

12   when he was handcuffed, while he was escorted, at some

13   point, he complained about a pain in his wrist.  And

14   from what I recall, that was examined either by the

15   physician's assistant who was present in dietary or it

16   was in the healthcare unit.  I also recall that because

17   it involved our internal affairs officer, that it was

18   referred to the investigations unit with IDOC.

19           Q.      So I assume that it was -- a decision was

20   made to have the incident investigated in a little more

21   detail than --

22           A.      Yes.

23           Q.      Was that a decision that you made or

24   somebody else made?

Case 3:15-cv-00309-SMY-MAB Document 642-26 Filed 05/22/18 Page 65 of 122 Page ID #2695

1      A.      I don't recall if the final determination

2  would have been made -- to refer something to IDOC

3  investigations, it would have had to have the approval

4  of either the southern region district deputy or the

5  deputy chief of operations.

6      Q.      Okay.  And we talked a little before about

7  the tact team and what your understanding of the tact

8  team was.  Have you ever seen the manual that the tact

9  team uses?

10      A.      No.

11      Q.      Okay.  Have you, during your time as

12  warden of Big Muddy, do you recall other shakedowns that

13  involved tact team from other facilities coming in

14  besides that one the week in May of 2014?

15      A.      I do not.  I wouldn't make a distinction

16  between -- you asked about the tactical unit.

17      Q.      Correct.

18      A.      No.  I do not recall another tactical

19  operation involving outside officers.

20      Q.      Do you remember other kinds of shakedown

21  operations -- taking the 30-day shakedown off the table

22  -- but a shakedown operation where, you know, more than

23  one cell at a time was being shaken down, do you

24  remember other shakedown operations in general during

1  your time as warden of Big Muddy?

2       A.      I recall an incident that I believe at one

3  time the educational unit was shaken down due to a

4  report of staff and offender misconduct.  I don't recall

5  there being a facility-wide shakedown nor do I recall

6  any other facility-wide type of shakedown.

7       Q.      Since you kind of came into a leadership

8  position at IDOC from the outside as opposed to up the

9  ranks, did you have a person or a group of people that

10 kind of showed you the ropes or that you went to to kind

11 of answer some of your questions, give you advice on

12 being in this completely new setting?

13      A.      Absolutely.

14      Q.      Do you recall who some of those

15 individuals were?

16      A.      Specifically at Big Muddy?

17      Q.      Yeah.

18      A.      I recall discussing, you know, with Deputy

19 Director Bates, I relied on -- at the time, I believe

20 she was Assistant Warden Operations or Assistant Warden

21 of Programs, at the very least the Clinical Supervisor

22 Angela Windsor.  I had some very good shift commanders,

23 Major Kevin Rowsy and Major Eric Plott, Major Dan Monty

24 and multiple others.

1       Q.      Going into these facility-wide shakedowns

2   that happened in May of 2014, do you remember having

3   conversations with anyone, either of those people that

4   you mentioned or otherwise, with them kind of telling

5   you what to expect or what it was going to be like?

6       A.      I don't recall specifically, but I'm sure

7   I did.  If I had those conversations, it would have been

8   with Assistant Warden Craig, Major Plott and Major

9   Monty.

10      Q.      And was there anything about what happened

11  that week that you recall finding surprising or

12  unexpected?

13      A.      From what I recall, finding some of the

14  things they found on the housing unit number four.  I

15  believe there was, like I said, scissors and some money,

16  actual currency being found.  That was surprising.  As

17  far as how the operation was conducted, no, I was not

18  surprised.

19      Q.      And prior to that -- so my understanding,

20  obviously, is that the tact team is activated for things

21  other than shakedowns; right?  They do cell extractions,

22  for example?

23      A.      Yes.  Yes.

24      Q.      They do riots and hostage situations and

Case 3:15-cv-00309-SMY-MAB Document 424-26 Filed 05/22/18 Page 68 of 122 Page ID #5298

1  escape situations; correct?

2          A.      Yes.

3          Q.      During your time with the IDOC had you

4  ever been at a facility when there was some kind of riot

5  or disturbance that required the tact team to respond?

6          A.      I recall some drills being conducted at, I

7  believe, Centralia and Big Muddy involving tactical unit

8  members without an actual incident.  The only other

9  incident I recall being present at, there was a hostage

10 situation at Lawrence Correctional Center sometime

11 between, I believe, May and June of 2014.  And from what

12 I recall of that incident, the tactical unit was

13 activated.

14         Q.      Were you present at Lawrence when this

15 happened?

16         A.      I was serving in the capacity as temporary

17 deputy director.  I was notified.

18         Q.      Okay.

19         A.      I recall it being later on on a Sunday

20 afternoon.  I was in Centralia when I received the

21 notification, reported it up, was instructed to go to

22 Lawrence Correctional Center.  When I finally arrived at

23 Lawrence Correctional Center, the situation had been

24 resolved.

```
1          Q.      Okay.

2          A.      The immediate situation had been resolved.

3          Q.      During your time at Illinois Department of

4    Corrections, were you ever working at a facility when

5    there was an escape?

6          A.      No.

7          Q.      Okay.  During your time at Illinois

8    Department of Corrections, was there ever an escape that

9    you were notified of?

10         A.      I'm sorry.  Could you repeat the last

11   question?

12         Q.      Sure.  During your time working at the

13   Illinois Department of Corrections, were you ever

14   working at a facility when there was an escape or

15   attempted escape?

16         A.      No.

17         Q.      Okay.  During your time at Illinois

18   Department of Corrections, was there ever an escape or

19   attempted escape at another facility that you were

20   notified of kind of at the time?

21         A.      I recall an escape at Menard Correctional

22   Center.  I do not recall me being notified directly in

23   my role as deputy director.  I believe it was something

24   that we were all made aware of.  My recollection of it
```

Case 1:15-cv-03369-VMA Document 64-26 Filed 05/22/18 Page 70 of 122 Page ID #36060

1   was potentially it was an escape from an outside

2   hospital, but other than that --

3        Q.    Okay.  Did you ever, while you were at

4   Illinois Department of Corrections, witness a cell

5   extraction?

6        A.    No.

7        Q.    Okay.  So my understanding is that before

8   a cell extraction happens, there's a certain chain of

9   command that they have to follow before they go to the

10  step of bringing the tact team in due to the extraction;

11  is that your recollection?

12       A.    I believe that's part of the policy, yes.

13       Q.    Is it your understanding that before that

14  final decision is made to call the tact team that you --

15  that the warden or acting warden would have to be -- not

16  acting.  I mean the duty warden would have to be

17  notified and give the approval before the tact team

18  comes in?

19       A.    I don't recall specifically in the policy,

20  but my recollection would be that the warden would be

21  notified, and my recollection would be that the warden

22  would also notify the deputy director.

23       Q.    As a general proposition, the warden or at

24  least the duty warden should be kept apprised of kind of

Case 1:15-cv-00309-SMY Document 64-26 Filed 05/22/18 Page 71 of 122 Page ID #26606

```
 1    unusual events happening throughout the facility?

 2         A.     Yes.

 3         Q.     And preferably notified as they're

 4    happening or as soon after as practical?

 5         A.     Yes.

 6         Q.     A cell extraction would, by most

 7    definitions, qualify as an unusual incident?

 8         A.     Yes.

 9         Q.     So but I recall you said you don't think

10    you ever actually watched a cell extraction?

11         A.     I have not watched a cell extraction.

12         Q.     Would it be fair to say that prior to the

13    shakedown in May of 2014 that you had limited

14    interactions with dealing with observations of the tact

15    team in action, that is?

16         A.     Yes.

17         Q.     You said you watched a couple drills but

18    not -- that doesn't sound like much else other than

19    that?

20         A.     Correct.

21         Q.     Did what you observed of the tact team in

22    May of 2014, did that or more or less kind of consistent

23    with the impressions that you had already formed of the

24    tact team by that point?
```

```
 1              A.      I would say so, yes.

 2              Q.      What were your impressions of the tact

 3    team?

 4              A.      My impressions of the tactical team

 5    specifically at Big Muddy were that they were comprised

 6    of what I viewed as very good correctional officers,

 7    followed policy and procedure.  My recollection -- my

 8    impression of the tactical team, is that what the

 9    question is that I'm answering?

10              Q.      Yes.

11              A.      That they were good officers who followed

12    the policies.

13              Q.      So you didn't -- did you ever have

14    concerns about the tact team at Big Muddy and their

15    decisions to use force when they made decisions to use

16    force?

17              A.      No.

18              Q.      As a kind of a general matter, did you

19    ever have concerns about the tact team and, you know,

20    the fact that they had arguably more authority to use

21    force than regular corrections officers?

22              A.      No.

23              Q.      And why did those things not concern you?

24              A.      From my observation and my understanding
```

Transcript of Zack Roeckeman
Conducted on August 8, 2018                        71

1     of the tactical team, I recall the tactical commander

2     from the facility being CO David Hermitz, and I believe

3     his assistant tact commander was Officer Nick Nally.

4     Both of those individuals had experience within IDOC

5     from what I witnessed, and my perception of how they

6     conducted themselves, they were very professional,

7     policy-driven, and they had the respect of their unit,

8     and if they gave an order, their unit would follow it.

9             Q.     How often, while you were warden, did you

10    talk to Hermitz in his capacity as tact commander?

11            A.     My recollection is that it depended on

12    what his needs were at the time.  I know that we

13    discussed the composition of the tactical team, their

14    practices, any equipment that they needed, things of

15    those nature -- or things of that nature.  I don't

16    recall that we had a standing meeting or that we always

17    met once a month or something, but I tried to maintain

18    an open door policy, but even if my door was closed, CO

19    Hermitz could come in.

20            Q.     Would it be fair to say you guys met on an

21    as-needed basis?

22            A.     As-needed, yes.

23            Q.     When you communicated with Hermitz, was it

24    more likely to be in person, on the phone or in email?

Case 3:15-cv-00309-SMY-MAB Document 442-26 Filed 05/22/18 Page 74 of 122 Page ID #26609

```
 1            A.     Most likely in person.

 2            Q.     Okay.  In general, when you warden, were

 3    you an email kind of guy or in person or a phone kind of

 4    guy?

 5            A.     I would say it's a combination.  I did

 6    provide direction through email, but a lot of

 7    conversations were in person.

 8            Q.     Okay.  As warden, there's kind of monthly

 9    reports that get compiled. No, we're not going to go

10    through them.  I just wanted to make sure.

11                   Are they monthly or quarterly?

12            A.     I don't know specifically what you're

13    referring to, but I would love to take a peek.

14            Q.     They're monthly reports that include all

15    sorts of information, including things like how many

16    inmates you had.

17            A.     Okay.

18            Q.     Utilization of healthcare.

19            A.     Yes.

20            Q.     One of the things that you -- you recall

21    those kind of reports?

22            A.     Yes.

23            Q.     My impression is it was both kind of your

24    responsibility to make sure that those reports were
```

Case 3:15-cv-00309-SMY-MAB Document 442-5 Filed 05/22/18 Page 75 of 122 Page ID #2662

1    compiled as well as to familiarize yourself with what

2    was in those reports?

3         A.    Yes.

4         Q.    Was there a monthly report or was it

5    captured in a monthly report the number of grievances

6    received?

7         A.    From what I recall, that information was

8    submitted on those reports.

9         Q.    Okay.

10        A.    Or there was a report that was submitted

11   regarding the number of grievances received.

12        Q.    Then probably how many were founded and

13   unfounded and all that?

14        A.    Correct.

15        Q.    As warden, did you make it a practice to

16   kind of not only review the reports every month but, you

17   know, kind of look at trends over time?

18        A.    Yes.

19        Q.    Do you recall if there was an uptick in

20   grievances after the tactical operations of May 2014?

21        A.    I don't recall specifically; however, I

22   would assume they would be.

23        Q.    Okay.  And when you noticed -- as a

24   general matter, if you noticed an uptick in grievances,

Transcript of Zack Roeckeman
Conducted on August 8, 2018                          74

1    would it have been your practices to attempt to take

2    some steps to follow up with why there's, you know --

3        A.    From my recollection, I would have either

4    called the casework supervisor, the clinical services

5    supervisor and the grievance officer in to determine

6    what -- why there was a spike or why there was an

7    increase, yes.

8        Q.    But I believe I asked this before, but I

9    just want to ask again in case I didn't.  To the extent

10   that there was an increase in grievances after the

11   shakedown, you don't recall taking any steps to kind of

12   address them or investigate them as a group of

13   grievances?

14              MR. WEIGAND:  Objection.  Asked and

15   answered, but you can answer.

16       A.    No.  I don't recall doing that.  No.

17       Q.    (BY MS. CROSLEY)  Have you ever, in your

18   career either at Illinois Department of Corrections or

19   other portions of your career, have you ever personally

20   performed a strip search of another individual?

21       A.    Yes.

22       Q.    Was that at Illinois Department of

23   Corrections or at Marion County?

24       A.    No.  It was at a Marion County Jail.

Transcript of Zack Roeckeman
Conducted on August 8, 2018                                    75

1          Q.      When you were at Marion County Jail was

2     that something that you did more than once? dozens of

3     times? hundreds?

4          A.      I recall doing it one time.

5          Q.      One time.  Do you recall what the -- was

6     it something that prior to doing it, someone had trained

7     you on doing or was the time you did it the training

8     that you got on doing it?

9          A.      When I was hired at Marion County Jail, I

10    went through county correctional officer training, so I

11    was a certified county correctional officer.  That

12    included searches.

13         Q.      What do you recall about the proper way to

14    do a strip search or how -- strike that.

15                 How were you trained to do a strip search,

16    if you recall?

17         A.      I don't recall specifically.  From my

18    recollection, you would first perform a pat search of

19    the offender, ensuring that there was no contraband on

20    their person or clothing that could be felt.  They would

21    then be taken to an area where they could be -- their

22    clothing would be removed by themselves, and then they

23    would -- there would be a visual observation to see if

24    there was any sort of contraband on their person.

1          Q.     Okay.  Are you aware that in some strip

2     searches or have you heard of the practice in some strip

3     searches of having the person being searched actually,

4     like, put their fingers in their mouth to lift up their

5     tongue, you know, pull down their lip?

6          A.     Yes.

7          Q.     Okay.  And have you heard of or did you

8     personally do, you know, strip searches that involved,

9     if it's a male being stripped, having them lift their

10    genitals?

11               MR. WEIGAND:  Objection.  Form.  Go ahead.

12         A.     No.

13         Q.     (BY MS. CROSLEY)  Okay.  And what about as

14    part of a strip search having the person being searched

15    face the person searching them with their back and pull

16    their butt cheeks apart?

17         A.     No.

18         Q.     Have you, in your time at IDOC, did you

19    ever witness a strip search being performed?

20         A.     Not that I recall.

21         Q.     If you were to learn that a strip search

22    was performed wherein those three things that I just

23    described:  The person being stripped putting their own

24    hands in their mouth, the person being stripped using

Case 1:15-cv-00309-SMY-MAB Document 642-45 Filed 05/22/18 Page 79 of 122 Page ID #26604

1  their hands to lift their genitals, and the person being

2  stripped using their hands to spread their butt cheeks,

3  if you told you that there was a strip search in which

4  the portion involving the genitals and the butt happened

5  before sticking their hands in their mouth, would that

6  sound unusual to you?

7          A.     Yes.

8          Q.     Okay.  Would that sound problematic to

9  you?

10         A.     It would -- it would be problematic, yes.

11         Q.     If you learned that officers at your

12  facility, whether they were your own officers or they

13  were tact team members from another facility were

14  conducting strip searches that way in your facility,

15  would you have taken action?

16         A.     Yes.

17         Q.     And would that action consist of, first

18  and foremost, telling them to stop, I mean, if it was in

19  process, obviously?

20         A.     Yes.

21         Q.     Would it potentially involve discipline?

22         A.     Potentially, yes.

23         Q.     But, again, you didn't watch any of the

24  strip searches during the shakedown?

```
 1          A.     No.

 2          Q.     And to your recollection, it was not

 3   brought to your attention that anyone performed a strip

 4   search in the way that I just described?

 5          A.     Correct.

 6          Q.     Okay.  Have you ever heard the expression

 7   "nuts to butts"?

 8          A.     Yes.

 9          Q.     What does that expression mean to you?

10          A.     It is a reference to putting one person

11   standing directly behind another person so that the

12   euphemism be, I guess, that their -- one person's

13   genitals would touch the buttocks of the person in front

14   of them, that they would be that close together.

15          Q.     Have you ever heard that expression used

16   by anyone at the Illinois Department of Corrections?

17          A.     Yes.

18          Q.     Okay.  Have you ever heard that expression

19   used in the form of an order from an IDOC employee to an

20   IDOC prisoner?

21          A.     No.

22          Q.     Have you ever watched what's known as mass

23   line movement, in other words, multiple offenders being

24   moved from point A to point B as a group?
```

Transcript of Zack Roeckeman
Conducted on August 8, 2018                                    79

```
1              A.      Yes.

2              Q.      Have you ever watched that being done when

3      tact officers are the ones escorting that line?

4              A.      Yes.

5              Q.      At any time when you watched tact officers

6      escort a line or a group of inmates, did you ever hear

7      tact officers use the expression "nuts to butts"?

8              A.      No.

9              Q.      So on the week of -- that week in May 2014

10     during the shakedown, at any time did you hear the

11     express "nuts to butts"?

12             A.      No.

13             Q.      While you were at work, that is?

14             A.      Thank you.  Not that I recall.

15             Q.      If you had heard an IDOC employee ordering

16     inmates to line up "nuts to butts" or you had heard that

17     expression used in the form of an order, would that have

18     been -- would you have found that concerning?

19             A.      Yes.

20             Q.      Would that have been something that you

21     would have taken action, if you had heard it?

22             A.      Yes.

23             Q.      What action would you have taken?

24             A.      I would have -- my recollection on what I
```

1    would have done would be I would have stopped that

2    order.  I would have discussed the issue with whatever

3    person stated that and made sure that their chain of

4    command was aware that that was being given or told, and

5    we would ensure that line movements were done properly,

6    as we generally do.

7            Q.      Can you think of any reason why you would

8    want to have prisoners move in a line where they were so

9    close that they were touching, whether they were

10   touching genitals or not, I mean, even just putting

11   their head on the guy in front of them?  Can you ever

12   see why that would be necessary?

13           A.      I think it's -- there is a necessity to it

14   in that -- in order to move lines of hundreds of

15   offenders.  At any given time, there needs to be some

16   regularity and some consistency with the distance apart

17   from them, but that said, they should not be, you know

18   -- there shouldn't be gaps of four feet or so.  But as

19   far as how you're describing, no, I don't see the

20   reason.

21           Q.      So it's one thing to expect them to stand

22   -- to walk in a formation where they're close together

23   but not --

24           A.      Correct.

1          Q.        -- to actually be touching?

2          A.        Correct.

3          Q.        During the shakedown, as we talked about,

4    there was a period of time in which the prisoners were

5    kept or groups of prisoners were kept in dietary while

6    their cells were being searched?

7          A.        Yes.

8          Q.        During that time, are you aware of whether

9    or not prisoners were allowed to use the bathroom during

10   that time, if they needed to?

11         A.        I can't say specifically, but I would say

12   that the offenders were allowed to use the restroom.

13         Q.        If it had come to your attention that

14   offenders had requested to use the facilities and were

15   denied use of the facilities, would that have been a

16   problem for you?

17         A.        That would have been corrected.  Yes.

18         Q.        Likewise, if it had come to your attention

19   that there were offenders who were experiencing any kind

20   of medical symptoms, dizziness, lightheadedness,

21   shortness of breath, would your expectation have been

22   that they were seen immediately or as soon as practical

23   by a medical professional?

24         A.        Yes.  That's why we had them present.

1    Yeah.

2         Q.    But, again, -- now I can't remember.  I

3    apologize.

4              You did stop into dietary where the

5    inmates were held?

6         A.    I recall vaguely being through there, yes,

7    and seeing, yes.

8         Q.    But you don't have any recollection of

9    anything that happened while you were there?

10        A.    No.  From what I recall, we had -- like I

11   said, we had a zone lieutenant in there who was

12   responsible for that.  I don't recall anything

13   specific.

14             MR. WEIGAND:  Could we take five minutes?

15             MS. CROSLEY:  Sure.

16             (Wherein a recess was taken, and

17             Plaintiff's Exhibit 2 was marked for

18             identification.)

19        Q.    (BY MS. CROSLEY) I have another exhibit.

20   If you could kind of just take a minute to review this,

21   not necessarily in super great detail.

22        A.    Okay.

23        Q.    So Exhibit 2 is kind of a series of emails

24   back and forth.  The main -- a lot of them appear to be

Case 3:15-cv-00309-SMY-MAB Document 442-5 Filed 05/22/18 Page 85 of 122 Page ID #2665

1    drafted by Kim Butler and/or forwarded by Kim Butler.

2    You're included on some of them.  The final one is just

3    from Mike Atchison to you.  These seem to be in relation

4    to kind of an operation that had happened at Menard.  Do

5    you know why you would have been included on some of

6    these emails?

7         A.    I don't recall specifically, but if I was

8    included, it was because of the absence the deputy

9    director at the time or the vacancy in that position,

10   the deputy director.

11        Q.    So this would have been around the time

12   then that you were acting deputy director or --

13        A.    From what it -- yeah, I would assume so.

14   Yes.

15        Q.    I asked you earlier if you recalled an

16   incidence at Menard during their shakedown, including,

17   you know, a concern that there might have been a planned

18   staff assault after.  Does this -- you didn't recall.

19   Does this jog your memory at all?

20        A.    Somewhat.  The last name of the offender

21   there is triggering something, some memory, yes.

22        Q.    So then kind of focusing on the first

23   pages of this email from Mike Atchison to you, wherein

24   towards the end, he says, please tell Kim to have a high

Transcript of Zack Roeckeman
Conducted on August 8, 2018                    84

1   level supervisory present in the cellhouses that are

2   being searched by tactical staff during future

3   operations.  I'm assuming the Kim he referring to Kim

4   Butler who at the time, I think, was warden or assistant

5   warden at Menard.  But to the extent that this happened

6   a month before the shakedown at Big Muddy, do you recall

7   if this had any influence or impact on your thinking

8   about planning for that shakedown in May at Big Muddy?

9         A.    I don't recall specifically that it did.

10  I would say there's a big difference between Menard

11  Correctional Center.  It's a maximum security facility,

12  and Big Muddy River being a medium security.  I don't

13  recall anything as far as that is concerned, no.

14        Q.    Do you recall if, you know, kind of based

15  on, you know, this discussion or just in general some of

16  discussions that I think then were going on at the time,

17  if there was a -- if anyone ever raised the possibility

18  of video recording the future facility-wide shakedowns?

19        A.    From what I recall, there was video

20  recording or there was discussion of that.

21        Q.    There was discussion.  Do you recall if

22  the shakedown at Big Muddy was recorded?

23        A.    Can I refer back to Exhibit 1?

24        Q.    Sure.

1          A.    I don't recall specifically if it was.

2     Generally, I believe that tactical operations such as

3     that were recorded.  There was a -- each facility, to my

4     knowledge -- or Big Muddy River had a tactical unit

5     camera that we kept at the facility, and it would have

6     been used to record.  I don't see anything in the

7     operations order itself about recording.

8          Q.    It sounds like what you're saying is that

9     as you sit here today, you don't see why it wouldn't

10    have been, but you don't actually have any independent

11    recollection that it was recorded?

12         A.    Correct.

13         Q.    Do you have any recollection of ever

14    viewing any recordings of that shakedown?

15         A.    No.

16         Q.    Okay.  To the extent that it had not been

17    recorded, there was no plan to record it, would you have

18    been in a position to order it to be recorded or would

19    that have had to have come from someone other than you?

20         A.    I would have been in a position to

21    encourage the recording of it.  I interpret the ordering

22    of -- you saying could I have given Bull McAllister an

23    order to record it, I do not recall having that

24    authority.

```
1          Q.      But you would have had the authority to
2   bring the topic up to him and say, hey, do you think we
3   should record this, for sure?
4          A.      Yes.
5          Q.      And if you had felt strongly about it, to
6   go up the chain of command above you to say Bull and I
7   are disagreeing about this, I think we should record it?
8          A.      Yes.  Yes.
9          Q.      But as you sit here today, you don't
10  recall that ever happening?
11         A.      I don't recall that.  And honestly, as far
12  as I -- my recollection of it would have been that it
13  was recorded but --
14         Q.      I have another exhibit for you.
15                 (Plaintiffs' Exhibit 3 was marked for
16                 identification.)
17         Q.      (BY MS. CROSLEY)  The court reporter has
18  just handed you Exhibit 3.  This is an email exchange
19  between you and Gwyneth Troyer from the John Howard
20  Association and yourself.  Do you recall this email
21  exchange?
22         A.      No.
23         Q.      In this email exchange, if I can
24  summarize, Ms. Troyer writes to you -- initiates the
```

1    exchange to say that, you know, she's heard that there

2    were some concerns about the shakedown to which you

3    respond, among other things, I will address these issues

4    with our command staff.  Do you recall -- so you have no

5    recollection of this email exchange?

6           A.    I don't recall this email exchange, no.

7           Q.    So then you don't recall if you took any

8    steps at all in response to this email exchange?

9           A.    I don't know, but I would like to believe

10   that if I said I would that I did.

11          Q.    Okay.  Including, if things had been video

12   recorded, would this have been a time that you might

13   have considered reviewing those video recordings?

14          A.    Yes.

15          Q.    Okay.  But, again, as you sit here today,

16   you have no recollection of ever viewing any video

17   recordings?

18          A.    Correct.

19                MS. CROSLEY:  I think that's all I've got.

20                MR. WEIGAND:  I just have a couple real

21   quick questions.

22                          EXAMINATION

23   QUESTIONS BY MR. WEIGAND:

24          Q.    As far as video recordings, would Anthony

1   McAllister have informed you if he were videotaping the

2   shakedown?

3          A.     It's possible that he would have.  It's

4   also equally possible that that was a part of the

5   operation that I would not know about, honestly.  I

6   would expect Bull to inform me, but I don't know.

7                 MR. WEIGAND:  No further questions.

8                 MS. CROSLEY:  Nothing based on that.

9   MR. WEIGAND:  We'll waive.

10  (Wherein the deposition concluded at

11  3:16 p.m., with the signature being

12  waived.

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    CERTIFICATE OF REPORTER

 2

 3            I, VALERIE LEHR, a Certified Shorthand

 4    Reporter (IL), Registered Professional Reporter, and

 5    Notary Public within and for the State of Illinois, do

 6    hereby certify that the witness whose testimony appears

 7    in the foregoing deposition was duly sworn by me; that

 8    the testimony of said witness was taken by me to the

 9    best of my ability and thereafter reduced to typewriting

10    under my direction; that I am neither counsel for,

11    related to, nor employed by any of the parties to the

12    action in which this deposition was taken, and further

13    that I am not a relative or employee of any attorney or

14    counsel employed by the parties thereto, nor financially

15    or otherwise interested in the outcome of the action.

16

17

18

19    _____

20    VALERIE A. LEHR, CSR (IL)

21    My Notarial Commission expires March 23, 2020

22

23

24
```

Transcript of Zack Roeckeman
Conducted on August 8, 2018                                                    90

| A | | | |
|---|---|---|---|
| **aberdeen** | **accurate** | **advantages** | 25:20, 30:17, |
| 4:8 | 54:4, 54:8, | 50:20 | 30:23, 31:16, |
| **ability** | 54:17 | **advice** | 32:20, 34:5, |
| 89:9 | **acting** | 64:11 | 37:17, 40:20, |
| **able** | 23:4, 24:15, | **affairs** | 45:16, 47:2, |
| 55:17 | 68:15, 68:16, | 48:17, 48:19, | 49:4, 49:23, |
| **about** | 83:12 | 61:14, 62:11, | 55:6, 55:21, |
| 5:24, 7:12, | **action** | 62:17 | 58:6, 61:20, |
| 7:17, 7:20, 8:7, | 20:22, 54:2, | **after** | 67:24, 72:14, |
| 10:5, 18:13, | 69:15, 77:15, | 21:9, 24:11, | 73:13, 83:19, |
| 19:15, 19:20, | 77:17, 79:21, | 31:22, 37:6, | 87:8, 87:19 |
| 20:5, 20:23, | 79:23, 89:12, | 40:20, 41:2, | **alleged** |
| 22:11, 25:17, | 89:15 | 44:12, 45:8, | 20:5 |
| 26:7, 29:21, | **actions** | 47:1, 54:1, | **allowed** |
| 30:20, 31:11, | 20:11, 55:1 | 54:19, 55:9, | 81:9, 81:12 |
| 32:3, 33:3, | **activated** | 59:6, 60:13, | **along** |
| 33:8, 33:12, | 65:20, 66:13 | 69:4, 73:20, | 43:3 |
| 33:18, 33:20, | **activities** | 74:10, 83:18 | **already** |
| 41:24, 47:4, | 38:22, 51:8, | **afternoon** | 45:5, 69:23 |
| 47:9, 49:24, | 52:2 | 3:18, 66:20 | **also** |
| 52:21, 52:23, | **activity** | **afterwards** | 6:16, 12:1, |
| 54:16, 56:2, | 52:21 | 5:5, 44:5 | 15:17, 27:17, |
| 56:7, 58:20, | **actual** | **again** | 33:21, 48:15, |
| 60:15, 60:17, | 65:16, 66:8 | 59:5, 74:9, | 48:19, 52:6, |
| 60:21, 61:15, | **actually** | 77:23, 82:2, | 56:20, 58:8, |
| 61:20, 61:23, | 43:17, 49:9, | 87:15 | 58:12, 62:10, |
| 62:7, 62:13, | 69:10, 76:3, | **against** | 62:16, 68:22, |
| 63:6, 63:16, | 81:1, 85:10 | 9:4, 10:2 | 88:4 |
| 65:10, 70:14, | **adair** | **age** | **although** |
| 70:19, 75:13, | 4:6, 5:18 | 5:10 | 23:10, 58:19 |
| 76:13, 81:3, | **adair@loevy** | **ago** | **always** |
| 84:8, 85:7, | 4:11 | 6:4 | 71:16 |
| 86:5, 86:7, | **addition** | **agree** | **among** |
| 87:2, 88:5 | 55:12 | 30:12 | 87:3 |
| **above** | **address** | **agreed** | **angela** |
| 86:6 | 74:12, 87:3 | 5:1 | 27:11, 64:22 |
| **absence** | **addressing** | **agreeing** | **another** |
| 83:8 | 32:24 | 28:3 | 33:24, 63:18, |
| **absolutely** | **administrator** | **ahead** | 67:19, 74:20, |
| 64:13 | 9:16, 13:2, | 29:6, 35:4, | 77:13, 78:11, |
| **abuse** | 13:8, 19:24, | 76:11 | 82:19, 86:14 |
| 57:8 | 20:7, 20:10 | **al** | **answer** |
| **accomplished** | **adult** | 1:4, 1:10, 3:4, | 6:22, 7:3, 7:6, |
| 50:6 | 30:17 | 3:10, 3:25 | 7:7, 23:14, |
| **according** | **adults** | **all** | 47:7, 54:6, |
| 41:17 | 13:17, 13:23, | 2:3, 6:5, 7:8, | 64:11, 74:15 |
| | 14:9 | 9:10, 10:5, | **answered** |
| | **advantage** | 11:13, 13:11, | 74:15 |
| | 50:17, 53:1 | | |

Transcript of Zack Roeckeman
Conducted on August 8, 2018                                                91

**answering**
70:9
**answers**
6:18, 8:13,
37:3
**anthony**
33:21, 34:2,
48:11, 87:24
**any**
6:9, 7:1, 7:9,
7:12, 8:10,
8:17, 9:3, 9:6,
11:24, 12:21,
14:15, 14:22,
16:23, 17:9,
17:13, 18:7,
18:12, 18:15,
19:4, 19:10,
19:19, 20:4,
20:11, 20:14,
20:21, 21:10,
21:21, 22:7,
22:11, 22:22,
22:23, 23:3,
26:2, 26:5,
27:22, 29:19,
30:13, 31:11,
33:7, 33:16,
34:8, 39:12,
40:6, 42:3,
42:6, 42:19,
42:22, 43:11,
43:17, 43:21,
44:17, 44:18,
44:24, 46:1,
46:4, 47:2,
47:8, 47:22,
50:11, 51:6,
51:7, 51:9,
51:10, 51:21,
52:8, 55:2,
55:8, 55:10,
58:23, 58:24,
61:6, 61:18,
61:22, 64:6,
71:14, 74:11,
75:24, 77:23,
79:5, 79:10,

80:7, 80:15,
81:19, 82:8,
84:7, 85:10,
85:13, 85:14,
87:7, 87:16,
89:11, 89:13
**anybody**
24:6, 34:6
**anyone**
8:7, 8:20,
24:11, 48:5,
65:3, 78:3,
78:16, 84:17
**anything**
9:17, 24:19,
26:3, 30:20,
44:24, 45:6,
47:2, 54:16,
59:15, 59:16,
60:21, 60:22,
65:10, 82:9,
82:12, 84:13,
85:6
**anytime**
43:8
**apart**
76:16, 80:16
**apologize**
21:13, 24:10,
30:2, 82:3
**apparently**
62:4
**appear**
82:24
**appearances**
4:1
**appears**
89:6
**appointed**
27:18
**appreciated**
33:4
**apprised**
68:24
**approval**
63:3, 68:17
**approximately**
11:18, 13:5,

14:2, 14:13,
26:18, 27:2,
48:3
**april**
25:14, 31:20,
32:4
**area**
51:11, 51:12,
75:21
**arguably**
70:20
**arise**
31:17
**arose**
12:8
**around**
15:11, 25:10,
26:21, 28:21,
29:12, 45:17,
47:5, 59:19,
83:11
**arrived**
66:22
**arts**
15:4, 57:9
**as-needed**
71:21, 71:22
**ask**
7:3, 7:10,
35:4, 46:2,
46:6, 51:17,
59:5, 74:9
**asked**
7:9, 24:7,
63:16, 74:8,
74:14, 83:15
**asking**
6:22
**aspects**
25:21
**assault**
32:3, 83:18
**assembled**
32:22, 41:2,
41:5, 47:11
**assessment**
46:19
**assistant**
12:19, 21:18,

22:1, 27:8,
27:13, 27:15,
27:18, 27:19,
27:20, 27:21,
27:23, 28:6,
28:8, 28:9,
28:11, 28:13,
34:9, 35:22,
46:12, 48:7,
49:5, 49:7,
58:6, 58:7,
58:8, 62:15,
64:20, 65:8,
71:3, 84:4
**association**
86:20
**assume**
7:8, 7:11,
7:14, 11:6,
18:8, 22:3,
62:19, 73:22,
83:13
**assumed**
20:24
**assuming**
84:3
**atchison**
24:18, 25:1,
30:1, 33:18,
37:20, 39:15,
83:3, 83:23
**attached**
2:20
**attempt**
74:1
**attempted**
67:15, 67:19
**attend**
22:6, 46:21
**attending**
22:9
**attention**
28:15, 31:22,
46:6, 58:23,
59:6, 60:4,
78:3, 81:13,
81:18
**attorney**
4:15, 5:19,

7:4, 7:5, 8:15,
89:13
**attorneys**
8:20
**august**
1:18, 3:16
**augustana**
15:24, 16:2,
16:9
**austin**
27:18, 27:20,
28:5, 28:9
**authority**
39:20, 40:3,
70:20, 85:24,
86:1
**available**
19:18, 55:6,
59:14, 59:20,
60:9
**aware**
7:14, 32:2,
58:6, 58:11,
67:24, 76:1,
80:4, 81:8

**B**

**bachelor's**
14:20, 15:4
**back**
25:16, 30:20,
41:21, 53:7,
76:15, 82:24,
84:23
**background**
19:5
**baldwin**
18:1, 18:2,
18:3, 18:4
**bargaining**
11:23
**based**
17:13, 24:23,
84:14, 88:8
**basis**
71:21
**bates**
23:19, 23:20,

64:19
**bathroom**
46:2, 81:9
**became**
24:13, 27:21
**because**
6:18, 6:23,
20:7, 20:10,
21:2, 57:12,
59:13, 62:16,
83:8
**become**
22:19
**becomes**
22:14
**been**
5:22, 5:24,
6:13, 7:15, 8:1,
8:4, 8:22, 9:20,
9:21, 10:5,
17:9, 20:18,
28:6, 29:7,
29:8, 30:8,
31:10, 36:7,
36:17, 36:23,
37:12, 40:7,
42:13, 44:13,
54:4, 55:4,
56:12, 56:16,
58:16, 63:2,
65:7, 66:4,
66:23, 67:2,
74:1, 79:18,
79:20, 81:15,
81:17, 81:21,
83:5, 83:11,
83:17, 85:6,
85:10, 85:16,
85:18, 85:20,
86:12, 87:11,
87:12
**before**
3:20, 5:22,
6:21, 8:23,
10:4, 13:12,
14:6, 14:7,
14:14, 14:15,
14:16, 15:21,

16:2, 16:4,
17:10, 21:6,
21:8, 21:23,
24:20, 31:6,
31:12, 34:1,
34:17, 34:18,
34:19, 34:21,
35:12, 36:19,
47:11, 55:19,
58:14, 63:6,
68:7, 68:9,
68:13, 68:17,
74:8, 77:5, 84:6
**began**
5:8, 25:15
**beginning**
47:22
**behalf**
1:17, 3:25,
5:10, 12:2
**behind**
78:11
**being**
21:1, 23:4,
30:17, 31:19,
32:2, 32:20,
33:22, 34:7,
34:10, 37:19,
41:22, 42:4,
42:6, 43:9,
43:13, 43:16,
45:10, 45:12,
48:8, 48:11,
48:13, 56:22,
58:7, 60:16,
60:17, 60:24,
61:18, 63:23,
64:5, 64:12,
65:16, 66:6,
66:9, 66:19,
67:22, 71:2,
76:3, 76:9,
76:14, 76:19,
76:23, 76:24,
77:1, 78:23,
79:2, 80:4,
81:6, 82:6,
84:2, 84:12,

88:11
**believe**
7:23, 15:6,
19:17, 20:2,
23:6, 23:19,
23:22, 24:3,
24:23, 25:12,
25:13, 25:14,
26:17, 27:11,
27:14, 27:17,
28:8, 34:10,
36:14, 37:22,
42:12, 42:19,
44:15, 46:12,
46:13, 46:14,
51:22, 52:17,
54:10, 54:17,
58:13, 61:12,
62:9, 64:2,
64:19, 65:15,
66:7, 66:11,
67:23, 68:12,
71:2, 74:8,
85:2, 87:9
**believed**
61:5
**besides**
63:14
**best**
3:18, 10:1,
17:12, 30:21,
58:22, 89:9
**better**
49:1
**between**
2:16, 3:16,
5:2, 11:24,
15:15, 15:22,
25:13, 25:16,
39:12, 63:16,
66:11, 84:10,
86:19
**big**
2:11, 12:13,
12:15, 22:10,
23:1, 23:14,
23:17, 25:18,
25:23, 26:2,

Case 3:15-cv-00309-SMY-MAB Document 642-26 Filed 05/22/18 Page 95 of 122 Page ID #266045

26:8, 26:9,
26:11, 26:14,
27:9, 27:10,
27:19, 28:17,
28:21, 29:1,
29:12, 30:4,
30:15, 30:20,
30:21, 31:6,
31:10, 32:7,
32:14, 33:13,
34:7, 35:10,
36:24, 38:10,
48:13, 53:8,
55:20, 56:16,
58:8, 58:10,
62:10, 63:12,
64:1, 64:16,
66:7, 70:5,
70:14, 84:6,
84:8, 84:10,
84:12, 84:22,
85:4
**bit**
25:17
**bob**
17:19
**both**
6:22, 27:12,
28:14, 32:14,
40:8, 52:4,
57:22, 61:3,
61:4, 71:4,
72:23
**bottom**
37:18
**bowen**
17:19
**box**
54:17
**break**
7:1, 7:4
**breath**
81:21
**bridge**
3:19
**bring**
86:2
**bringing**
68:10

**brotherhood**
11:1
**brought**
5:20, 52:19,
78:3
**buck**
40:14
**building**
41:5
**bull**
33:21, 34:3,
34:5, 34:16,
85:22, 86:6,
88:6
**business**
11:20, 11:21,
11:22
**butler**
31:20, 83:1,
84:4
**butler's**
31:22
**butt**
76:16, 77:2,
77:4
**buttocks**
78:13
**butts**
78:7, 79:7,
79:11, 79:16

**C**

**cadet**
21:16, 21:19
**call**
17:14, 17:15,
17:18, 18:22,
25:6, 68:14
**call-out**
52:11, 52:15,
53:3
**called**
74:4
**came**
27:10, 39:4,
56:3, 64:7
**camera**
85:5

**can**
5:14, 8:8,
18:22, 19:12,
19:14, 24:21,
35:7, 37:9,
41:15, 42:22,
43:1, 43:4,
44:21, 47:7,
50:6, 50:20,
52:3, 52:8,
53:9, 54:5,
54:11, 55:16,
56:1, 56:7,
74:15, 80:7,
80:11, 84:23,
86:23
**can't**
50:22, 53:18,
81:11, 82:2
**cannot**
49:9
**capacities**
28:14
**capacity**
21:24, 23:4,
23:5, 23:8,
27:12, 66:16,
71:10
**captured**
73:5
**career**
74:18, 74:19
**case**
1:8, 3:8,
13:17, 13:19,
13:20, 74:9
**casework**
74:4
**category**
19:4, 55:12
**cause**
3:22
**ccr**
1:19, 5:4
**ccr(mo**
4:23
**cell**
43:3, 44:1,

52:19, 63:23,
65:21, 68:4,
68:8, 69:6,
69:10, 69:11
**cellhouse**
42:20
**cellhouses**
84:1
**cells**
49:23, 52:5,
81:6
**center**
10:17, 10:18,
10:19, 12:20,
13:14, 14:3,
15:20, 16:11,
16:19, 28:10,
66:10, 66:22,
66:23, 67:22,
84:11
**centralia**
3:18, 3:19,
10:17, 12:19,
14:5, 16:4,
16:5, 16:6,
28:9, 66:7,
66:20
**certain**
3:22, 52:16,
68:8
**certificate**
89:1
**certified**
3:20, 75:11,
89:3
**certify**
89:6
**chain**
2:14, 34:16,
38:2, 38:5,
38:9, 38:14,
39:17, 68:8,
80:3, 86:6
**check**
44:7, 47:21,
54:18
**checked**
44:9

Transcript of Zack Roeckeman
Conducted on August 8, 2018

94

| | | | |
|---|---|---|---|
| **checking** 42:23, 43:4 | **coming** 20:3, 21:18, 31:22, 63:13 | **composition** 71:13 | 75:19, 75:24 |
| **cheeks** 76:16, 77:2 | **command** 34:16, 36:12, | **comprised** 70:5 | **contracts** 12:1 |
| **chicago** 4:9, 14:8 | 37:19, 38:3, 38:5, 38:9, | **concern** 55:23, 55:24, | **conversation** 6:20, 33:11 |
| **chief** 17:19, 23:11, | 38:14, 58:5, 68:9, 80:4, | 56:2, 56:5, 56:6, 56:24, | **conversations** 29:20, 30:9, |
| 24:17, 24:18, 25:8, 30:1, | 86:6, 87:4 | 70:23, 83:17 | 31:11, 31:20, 32:1, 32:2, |
| 33:15, 33:18, 37:19, 37:20, | **commander** 33:20, 35:23, | **concerned** 38:11, 84:13 | 60:14, 60:17, 65:3, 65:7, 72:7 |
| 39:14, 39:15, 39:16, 63:5 | 48:10, 48:12, 58:10, 58:11, | **concerning** 79:18 | **conveyed** 36:23 |
| **circumstances** 17:5 | 71:1, 71:3, 71:10 | **concerns** 31:16, 51:10, | **convicted** 56:10, 56:12 |
| **civilly** 56:10, 56:13 | **commanders** 64:22 | 52:8, 70:14, 70:19, 87:2 | **coordinator** 13:17, 13:20 |
| **clarify** 7:11, 19:11, | **commencing** 42:5 | **concluded** 88:10 | **copied** 2:20 |
| 39:11 | **commission** 89:21 | **conducted** 7:22, 31:18, | **copies** 2:20 |
| **clinical** 27:16, 64:21, | **common** 24:3 | 44:1, 65:17, 66:6, 71:6 | **copy** 6:19 |
| 74:4 | **communicated** 71:23 | **conducting** 77:14 | **correct** 10:3, 14:10, |
| **close** 78:14, 80:9, | **community** 13:14, 13:16, | **confidential** 52:20 | 18:9, 18:16, 18:17, 18:20, |
| 80:22 | 14:3, 15:20, 16:11, 16:18 | **confiscated** 60:18, 60:24, | 19:3, 19:12, 20:19, 22:5, |
| **closed** 71:18 | **compiled** 72:9, 73:1 | 61:6, 61:7 | 34:13, 37:2, 37:16, 38:6, |
| **closer** 12:8 | **complain** 19:15, 19:20 | **connection** 6:6, 6:9, 9:7, | 38:7, 40:12, 42:10, 47:24, |
| **clothing** 52:4, 75:20, | **complained** 62:13 | 9:10, 9:21, 10:6 | 53:10, 53:14, 57:24, 63:17, |
| 75:22 | **complaint** 20:23 | **considered** 51:6, 87:13 | 66:1, 69:20, 73:14, 78:5, |
| **college** 14:18, 14:21, | **complaints** 31:21, 53:8, | **consist** 77:17 | 80:24, 81:2, 85:12, 87:18 |
| 15:24 | 60:15, 61:2, 61:10, 61:18, | **consistency** 80:16 | **corrected** 81:17 |
| **com** 4:11 | 61:20 | **consistent** 69:22 | **correctional** 12:20, 13:11, |
| **combination** 72:5 | **complete** 50:16 | **contents** 36:17, 36:22 | 22:17, 26:3, 28:10, 30:18, |
| **come** 23:9, 33:5, | **completed** 42:6 | **contraband** 49:21, 51:7, | 66:10, 66:22, 66:23, 67:21, |
| 58:23, 59:6, 71:19, 81:13, | **completely** 64:12 | 51:13, 51:14, 51:18, 59:11, | 70:6, 75:10, |
| 81:18, 85:19 | | 61:3, 61:7, | |
| **comes** 68:18 | | | |

Transcript of Zack Roeckeman
Conducted on August 8, 2018                                      95

75:11, 84:11
**corrections**
6:7, 6:10, 9:8,
9:12, 9:22,
9:23, 12:12,
12:24, 17:4,
18:18, 18:22,
20:13, 20:17,
21:4, 21:7,
21:10, 21:15,
21:18, 22:2,
31:15, 44:24,
56:15, 67:4,
67:8, 67:13,
67:18, 68:4,
70:21, 74:18,
74:23, 78:16
**could**
19:11, 43:17,
50:12, 51:6,
59:5, 60:12,
61:13, 67:10,
71:19, 75:20,
75:21, 82:14,
82:20, 85:22
**counsel**
5:2, 89:10,
89:14
**counselor**
53:14, 53:17,
53:18
**counties**
11:11
**county**
9:16, 9:23,
10:6, 11:11,
13:3, 13:10,
13:12, 19:7,
19:19, 20:4,
74:23, 74:24,
75:1, 75:9,
75:10, 75:11
**couple**
37:3, 69:17,
87:20
**course**
45:1, 51:2
**court**
1:1, 3:1, 3:23,

6:14, 6:15,
6:16, 34:23,
35:3, 86:17
**covered**
31:16
**crafts**
57:10
**craig**
27:14, 27:20,
27:23, 28:13,
34:10, 35:22,
48:7, 49:5,
49:8, 49:14,
58:7, 65:8
**crime**
27:1, 27:3,
56:12
**criminally**
56:10
**crosley**
2:6, 4:6, 5:13,
5:18, 35:2,
45:8, 47:9,
51:19, 54:9,
55:16, 55:19,
74:17, 76:13,
82:15, 82:19,
86:17, 87:19,
88:2
**csr**
1:19, 5:4,
89:20
**csr(il**
4:23
**currency**
65:16
**current**
10:9, 17:23
**cut**
6:20

---
**D**
---

**daily**
50:13
**dan**
64:23
**dangerous**
26:11, 52:1

**daniel**
35:24
**david**
37:7, 37:12,
71:2
**davis**
25:14, 25:16
**day**
3:18, 17:13,
17:15, 24:20,
32:9, 32:11,
33:11, 33:16,
36:5, 39:5,
40:23, 41:18,
41:24, 47:10,
47:12, 49:24,
50:7, 58:15,
58:17, 63:21
**days**
21:22, 34:8,
37:15, 44:18,
49:24
**dealing**
56:3, 69:14
**december**
12:16, 13:5,
13:6
**decide**
54:12
**decided**
29:11, 54:2
**deciding**
30:9
**decision**
12:3, 12:5,
25:2, 29:11,
29:15, 29:20,
29:21, 30:10,
30:14, 38:16,
62:19, 62:23,
68:14
**decision-maker**
38:17, 38:22
**decision-making**
29:11
**decisions**
70:15
**defendant**
8:1, 8:4, 8:22,

9:20, 20:3
**defendants**
1:12, 3:12,
4:13, 5:3, 5:21
**definitely**
27:6
**definitions**
69:7
**degree**
14:20, 14:22,
15:1, 15:3,
15:7, 16:13,
16:19, 16:21
**delvalle**
62:1, 62:8
**demetrius**
1:4, 3:4, 3:24,
5:19
**denied**
81:15
**deny**
54:2
**department**
6:7, 6:10, 9:8,
9:11, 9:23,
10:12, 10:16,
11:9, 12:4,
12:11, 12:24,
17:3, 17:17,
20:13, 20:17,
21:7, 21:10,
21:15, 21:17,
31:14, 56:14,
67:3, 67:8,
67:13, 67:18,
68:4, 74:18,
74:22, 78:16
**departure**
17:6
**depended**
71:11
**deposed**
5:22, 6:1,
10:5, 34:1
**deposes**
5:11
**deposition**
1:16, 3:15,

5:3, 5:8, 8:9,
8:19, 88:10,
89:7, 89:12
**depositions**
6:5
**deputy**
23:8, 23:15,
23:18, 24:6,
24:8, 24:13,
24:15, 24:18,
30:1, 33:18,
37:20, 39:14,
39:15, 63:4,
63:5, 64:18,
66:17, 67:23,
68:22, 83:8,
83:10, 83:12
**described**
76:23, 78:4
**describing**
80:19
**description**
2:9
**designate**
54:11
**designation**
25:24
**desk**
53:23, 54:3
**detail**
62:21, 82:21
**detained**
56:13
**detainee**
19:19
**detainees**
19:14
**detecting**
52:1, 52:5
**determination**
39:13, 63:1
**determine**
74:5
**development**
10:19
**developmental**
10:20
**did**
7:24, 8:9,

8:12, 8:17,
8:20, 10:23,
11:8, 11:17,
12:5, 12:6,
12:7, 12:10,
12:17, 12:24,
13:4, 13:13,
13:21, 13:24,
14:12, 14:15,
14:17, 14:20,
14:22, 15:1,
15:3, 15:8,
16:13, 17:18,
19:19, 21:10,
22:6, 23:3,
23:9, 23:14,
24:19, 30:3,
31:15, 35:14,
35:16, 35:17,
39:21, 40:4,
40:22, 41:14,
41:20, 41:24,
42:1, 42:14,
44:17, 45:10,
48:6, 49:5,
55:1, 58:3,
58:23, 59:6,
59:22, 60:6,
61:8, 64:9,
65:7, 68:3,
69:21, 69:22,
70:13, 70:18,
70:23, 71:9,
72:5, 73:15,
75:2, 75:7,
76:7, 76:18,
79:6, 79:10,
82:4, 84:9,
87:10
**didn't**
40:11, 45:6,
47:21, 59:8,
60:7, 70:13,
74:9, 77:23,
83:18
**dietary**
44:16, 44:20,
45:9, 45:10,

46:1, 46:5,
46:8, 46:9,
62:15, 81:5,
82:4
**difference**
84:10
**different**
50:5, 56:11,
56:23, 57:3,
57:4, 57:12,
57:13, 57:19,
58:1
**direct**
20:11, 28:15
**directing**
39:4, 39:7,
40:4
**direction**
29:24, 38:23,
55:4, 72:6,
89:10
**directions**
32:16, 40:23
**directly**
21:2, 23:15,
67:22, 78:11
**director**
17:16, 17:20,
17:23, 18:6,
23:8, 23:15,
23:18, 24:6,
24:8, 24:13,
24:16, 64:19,
66:17, 67:23,
68:22, 83:9,
83:10, 83:12
**disabilities**
10:20
**disagree**
38:20, 38:21
**disagreeing**
86:7
**disagreement**
39:12, 40:7
**discipline**
17:10, 20:14,
77:21
**disciplined**
19:8

**discussed**
16:24, 71:13,
80:2
**discussing**
64:18
**discussion**
84:15, 84:20,
84:21
**discussions**
84:16
**display**
57:11
**dispute**
11:24
**distance**
80:16
**distinction**
63:15
**distributed**
36:3, 36:7
**distribution**
36:2
**district**
1:1, 1:2, 3:1,
3:2, 3:23, 63:4
**districts**
11:10
**disturbance**
66:5
**division**
1:2, 3:2, 3:24,
10:15, 31:15
**dizziness**
81:20
**document**
35:3, 35:12,
35:15, 35:21,
36:22, 36:23,
37:6
**documents**
8:10, 8:12,
8:17
**does**
11:2, 26:2,
26:5, 27:22,
38:8, 50:4,
51:24, 78:9,
83:18, 83:19

**doesn't**
69:18
**doing**
23:12, 32:18,
49:18, 50:20,
51:11, 53:1,
53:2, 57:22,
74:16, 75:4,
75:6, 75:7, 75:8
**don't**
6:19, 8:2, 9:2,
18:19, 19:21,
21:1, 22:10,
22:22, 23:10,
24:9, 24:22,
25:7, 25:12,
26:16, 26:18,
29:3, 29:5,
29:8, 29:22,
31:7, 31:13,
33:11, 33:17,
33:19, 36:9,
38:1, 41:1,
42:3, 42:6,
43:15, 43:20,
45:13, 47:17,
47:18, 48:3,
50:2, 51:21,
53:15, 54:23,
55:3, 55:14,
55:23, 56:5,
59:16, 60:20,
61:3, 61:11,
61:17, 61:22,
63:1, 64:4,
65:6, 68:19,
69:9, 71:15,
72:12, 73:21,
74:11, 74:16,
75:17, 80:19,
82:8, 82:12,
83:7, 84:9,
84:12, 85:1,
85:6, 85:9,
85:10, 86:9,
86:11, 87:6,
87:7, 87:9, 88:6
**donald**
24:10, 24:11,

25:13
**done**
20:6, 25:9,
54:4, 79:2,
80:1, 80:5
**donny**
24:10
**door**
71:18
**doorway**
44:4
**down**
6:17, 6:19,
6:24, 30:22,
30:23, 44:10,
45:23, 49:5,
49:24, 50:9,
58:24, 63:23,
64:3, 76:5
**dozens**
75:2
**draft**
35:17
**drafted**
83:1
**drafting**
35:14, 35:20
**drills**
66:6, 69:17
**due**
64:3, 68:10
**duly**
89:7
**during**
15:19, 16:22,
20:12, 20:16,
28:16, 42:19,
43:8, 43:12,
43:23, 44:18,
44:22, 45:1,
46:17, 46:22,
52:6, 54:22,
60:22, 62:4,
62:11, 63:11,
63:24, 66:3,
67:3, 67:7,
67:12, 67:17,
77:24, 79:10,

81:3, 81:8,
81:9, 83:16,
84:2
**duties**
11:22, 13:7,
20:17, 23:3,
25:17, 39:5,
46:21, 53:7
**duty**
68:16, 68:24

**E**

**each**
6:20, 6:24,
36:5, 85:3
**earlier**
83:15
**east**
1:2, 3:2, 3:24
**eastern**
15:2, 15:9,
15:14, 16:20,
16:22
**educational**
50:11, 64:3
**efficiently**
31:18
**eight**
3:17, 55:16
**either**
9:22, 21:8,
23:4, 32:4,
39:14, 54:1,
55:10, 56:6,
62:11, 62:14,
63:4, 65:3,
74:3, 74:18
**else**
9:17, 24:7,
24:11, 34:6,
35:20, 36:20,
37:10, 44:9,
62:24, 69:18
**else's**
35:18
**email**
2:14, 2:16,
71:24, 72:3,

72:6, 83:23,
86:18, 86:20,
86:23, 87:5,
87:6, 87:8
**emails**
82:23, 83:6
**emergency**
54:10, 54:11,
54:13
**employed**
10:24, 89:11,
89:14
**employee**
18:8, 19:8,
78:19, 79:15,
89:13
**employees**
11:3, 11:5,
11:7, 11:8,
11:11, 11:23,
12:1, 12:2
**employer**
10:9
**employment**
6:6, 6:10, 9:7,
9:11, 9:15,
9:21, 14:16,
15:20, 20:12,
20:16
**encourage**
85:21
**end**
25:14, 47:22,
83:24
**ended**
9:3
**enforcement**
18:16, 18:19
**enough**
42:18, 49:17
**ensure**
31:17, 49:20,
55:5, 57:1,
58:3, 80:5
**ensuring**
53:3, 75:19
**entered**
58:14

Transcript of Zack Roeckeman
Conducted on August 8, 2018

| | | | |
|---|---|---|---|
| **entering** | 63:8, 66:4, | **exist** | 40:1, 40:2, |
| 41:9 | 67:4, 67:8, | 22:15 | 40:18, 41:5, |
| **entirely** | 67:13, 67:18, | **exists** | 41:10, 49:20, |
| 35:17, 37:9 | 68:3, 69:10, | 22:13 | 50:9, 50:13, |
| **entirety** | 70:13, 70:19, | **expect** | 50:14, 51:9, |
| 42:21, 42:22 | 74:17, 74:19, | 65:5, 80:21, | 51:24, 53:4, |
| **entitled** | 76:19, 78:6, | 88:6 | 58:12, 58:14, |
| 61:5 | 78:15, 78:18, | **expectation** | 60:7, 66:4, |
| **equally** | 78:22, 79:2, | 81:21 | 67:4, 67:14, |
| 88:4 | 79:6, 80:11, | **expected** | 67:19, 69:1, |
| **equipment** | 84:17, 85:13, | 7:6 | 71:2, 77:12, |
| 71:14 | 86:10, 87:16 | **experience** | 77:13, 77:14, |
| **eric** | **every** | 18:16, 18:23, | 84:11, 85:3, |
| 35:23, 48:12, | 36:18, 36:24, | 71:4 | 85:5 |
| 49:10, 58:10, | 47:15, 49:24, | **experiencing** | **facility-wide** |
| 64:23 | 59:24, 73:16 | 81:19 | 28:17, 28:21, |
| **escape** | **everybody** | **expires** | 29:12, 29:18, |
| 66:1, 67:5, | 41:2, 41:8, | 89:21 | 30:4, 30:14, |
| 67:8, 67:14, | 41:14 | **express** | 31:10, 49:19, |
| 67:15, 67:18, | **everything** | 79:11 | 50:5, 50:8, |
| 67:19, 67:21, | 6:17, 38:11 | **expression** | 50:13, 53:2, |
| 68:1 | **exact** | 78:6, 78:9, | 64:5, 64:6, |
| **escort** | 9:2 | 78:15, 78:18, | 65:1, 84:18 |
| 79:6 | **exactly** | 79:7, 79:17 | **fact** |
| **escorted** | 25:12, 30:9, | **expressly** | 31:5, 54:11, |
| 44:13, 44:14, | 33:2 | 5:6 | 59:7, 70:20 |
| 44:15, 44:19, | **examination** | **extent** | **factors** |
| 45:9, 62:12 | 2:6, 2:7, 5:12, | 74:9, 84:5, | 22:20 |
| **escorting** | 87:22 | 85:16 | **fair** |
| 79:3 | **examined** | **extraction** | 9:19, 30:6, |
| **esq** | 3:16, 5:10, | 68:5, 68:8, | 38:18, 42:18, |
| 4:6, 4:14 | 62:14 | 68:10, 69:6, | 46:18, 49:17, |
| **et** | **example** | 69:10, 69:11 | 56:4, 57:16, |
| 1:4, 1:10, 3:4, | 57:7, 57:9, | **extractions** | 69:12, 71:20 |
| 3:10, 3:25 | 65:22 | 65:21 | **fall** |
| **euphemism** | **except** | | 38:24, 39:1 |
| 78:12 | 42:9 | **F** | **familiar** |
| **even** | **exchange** | **face** | 52:10, 52:12, |
| 7:7, 21:23, | 86:18, 86:21, | 76:15 | 58:11 |
| 71:18, 80:10 | 86:23, 87:1, | **facilities** | **familiarize** |
| **events** | 87:5, 87:6, 87:8 | 19:13, 30:18, | 73:1 |
| 69:1 | **exhibit** | 30:22, 30:24, | **far** |
| **ever** | 34:23, 34:24, | 32:14, 63:13, | 38:10, 39:7, |
| 5:22, 8:22, | 35:4, 82:17, | 81:14, 81:15 | 59:15, 60:20, |
| 19:8, 19:19, | 82:19, 82:23, | **facility** | 65:17, 80:19, |
| 20:13, 21:3, | 84:23, 86:14, | 7:22, 13:10, | 84:13, 86:11, |
| 22:6, 45:10, | 86:15, 86:18 | 20:19, 25:20, | 87:24 |
| 58:23, 59:6, | **exhibits** | 33:6, 35:10, | **fast** |
| | 2:8, 2:19 | | 22:24 |

Transcript of Zack Roeckeman
Conducted on August 8, 2018                                    99

| | | | |
|---|---|---|---|
| **feet**<br>80:18 | 53:15, 75:18,<br>77:17, 83:22 | **found**<br>8:3, 51:23, | **full**<br>23:5 |
| **felt**<br>75:20, 86:5 | **five**<br>14:13, 82:14 | 65:14, 65:16,<br>79:18 | **full-time**<br>14:16 |
| **female**<br>43:12 | **floor**<br>4:8, 44:8 | **foundation**<br>51:16 | **further**<br>39:11, 88:7, |
| **fence**<br>41:6, 41:9 | **focused**<br>46:22 | **founded**<br>73:12 | 89:12 |
| **field**<br>9:22 | **focusing**<br>83:22 | **four**<br>33:9, 33:12, | **future**<br>84:2, 84:18 |
| **fifty**<br>11:14 | **follow**<br>33:14, 55:5, | 42:11, 65:14,<br>80:18 | **G** |
| **file**<br>54:10 | 61:15, 68:9,<br>71:8, 74:2 | **fraction**<br>27:6 | **g-e-r-s-t**<br>46:13 |
| **filed**<br>20:18, 54:21, | **followed**<br>55:4, 70:7, | **free**<br>49:20 | **gaetz**<br>24:10, 24:11, |
| 54:24 | 70:11 | **from**<br>12:15, 12:18, | 25:13, 25:16 |
| **fill**<br>24:21, 53:13, | **force**<br>70:15, 70:16, | 13:5, 14:21,<br>14:22, 15:1, | **gang**<br>51:8 |
| 53:16 | 70:21 | 16:7, 16:20, | **gaps**<br>80:18 |
| **final**<br>63:1, 68:14, | **foregoing**<br>89:7 | 16:23, 17:3,<br>17:18, 18:12, | **garage**<br>41:5 |
| 83:2 | **foremost**<br>77:18 | 18:18, 20:3,<br>22:17, 22:18, | **gary**<br>46:12 |
| **finally**<br>66:22 | **forenoon**<br>3:17 | 22:21, 27:11,<br>29:24, 30:1, | **gather**<br>52:20 |
| **financially**<br>89:14 | **form**<br>47:6, 47:7, | 32:14, 34:7,<br>37:13, 41:11, | **gathered**<br>36:8, 40:21, |
| **find**<br>51:2 | 53:13, 53:16,<br>54:5, 54:18, | 44:19, 46:16,<br>47:21, 47:22, | 58:18 |
| **finding**<br>9:4, 10:2, | 76:11, 78:19,<br>79:17 | 50:8, 51:17,<br>54:7, 54:15, | **gathering**<br>32:15 |
| 65:11, 65:13 | **formal**<br>21:21, 24:22 | 56:13, 56:16,<br>57:11, 59:12, | **gave**<br>40:21, 71:8 |
| **fine**<br>33:24 | **formally**<br>19:15, 19:20, | 62:8, 62:14,<br>63:13, 64:8, | **general**<br>4:15, 7:18, |
| **fingers**<br>76:4 | 21:8, 21:9 | 65:13, 66:11,<br>68:1, 70:24, | 7:19, 11:4,<br>15:6, 28:19, |
| **finish**<br>6:22, 7:3 | **formation**<br>80:22 | 71:2, 71:5,<br>73:7, 74:3, | 31:24, 33:12,<br>62:2, 63:24, |
| **finished**<br>16:13, 16:21 | **formed**<br>69:23 | 75:17, 77:13,<br>78:19, 78:24, | 68:23, 70:18,<br>72:2, 73:24, |
| **first**<br>6:13, 7:24, | **former**<br>58:7 | 80:17, 82:10,<br>83:3, 83:13, | 84:15 |
| 28:24, 30:22,<br>31:3, 31:4, | **forth**<br>82:24 | 83:23, 84:19,<br>85:19, 86:19 | **generally**<br>22:18, 26:21, |
| 32:11, 37:18,<br>41:17, 42:14, | **forward**<br>22:24 | **front**<br>78:13, 80:11 | 33:3, 33:4,<br>80:6, 85:2 |
| 47:10, 47:16,<br>47:18, 53:12, | **forwarded**<br>83:1 | | **genitals**<br>76:10, 77:1, |

Case 1:15-cv-00309-SM-AD Document 64-25 Filed 05/22/18 Page 102 of 122 Page ID #26042

| | | | |
|---|---|---|---|
| 77:4, 78:13, 80:10 | 41:3, 44:5, 47:21, 53:22, 57:17, 58:16, 62:9, 65:1, 65:5, 72:9, 84:16 | 20:18, 20:22, 31:21, 54:20, 54:24, 55:2, 55:9, 55:11, 55:12, 73:5, 73:11, 73:20, 73:24, 74:10, 74:13 | 56:16, 56:21, 57:4, 57:12, 62:4, 63:3, 64:22, 65:7, 66:3, 66:23, 67:2, 69:13, 69:23, 70:20, 71:4, 71:7, 71:16, 72:16, 75:6, 79:15, 79:16, 79:21, 81:13, 81:14, 81:18, 81:24, 82:10, 82:11, 83:4, 84:7, 85:4, 85:16, 85:19, 86:1, 86:5, 87:11 |
| **gentleman** 5:19 | | | |
| **gentlemen** 56:3 | **gone** 31:6, 36:18, 41:19, 59:9 | **ground** 38:16 | |
| **gerst** 46:12 | **good** 28:5, 64:22, 70:6, 70:11 | **grounds** 52:6 | |
| **get** 16:21, 17:18, 18:22, 21:14, 30:22, 32:16, 60:3, 72:9 | **gossett** 1:10, 3:10, 3:25 | **group** 32:23, 47:11, 64:9, 74:12, 78:24, 79:6 | |
| **getting** 16:19, 46:16, 47:19, 61:20 | **got** 17:14, 17:15, 75:8, 87:19 | **groups** 57:13, 81:5 | |
| **give** 40:22, 53:6, 64:11, 68:17 | **gotten** 42:15 | **guess** 23:13, 50:4, 78:12 | **hand** 34:22, 35:14 |
| **given** 18:7, 18:10, 30:1, 80:4, 80:15, 85:22 | **governor** 17:17 | **guest** 39:19, 39:20, 40:2 | **handcuffed** 45:19, 45:21, 62:9, 62:12 |
| **go** 6:12, 14:17, 15:8, 21:10, 21:16, 21:19, 21:21, 29:6, 35:4, 40:24, 41:14, 41:18, 41:20, 41:24, 42:1, 44:7, 45:10, 56:2, 56:6, 58:16, 59:8, 66:21, 68:9, 72:9, 76:11, 86:6 | **governor's** 15:7 | **guy** 72:3, 72:4, 80:11 | **handed** 35:2, 35:3, 86:18 |
| | **graduated** 16:6 | **guys** 71:20 | **handle** 61:12 |
| | **great** 82:21 | **gwyneth** 86:19 | **hands** 46:17, 76:24, 77:1, 77:2, 77:5 |
| | **greenville** 14:18, 14:19, 14:21, 14:23, 15:8, 15:12, 15:13, 15:21, 15:23, 16:10, 16:15 | | **happen** 30:8 |
| | | **H** | **happened** 19:16, 31:11, 32:4, 33:12, 41:3, 65:2, 65:10, 66:15, 77:4, 82:9, 83:4, 84:5 |
| **godinez** 17:20, 18:6 | **greg** 1:10, 3:10, 3:25 | **had** 7:24, 8:4, 10:5, 17:9, 18:21, 18:23, 26:24, 27:3, 28:11, 29:19, 30:20, 31:6, 31:10, 31:11, 32:4, 34:17, 35:20, 39:20, 40:3, 40:7, 43:1, 45:22, 46:21, 48:15, 54:16, 54:21, 55:6, 55:23, | |
| **goes** 41:12, 41:13, 53:13, 53:18, 54:11 | **grievance** 11:24, 19:14, 53:9, 53:12, 53:13, 53:16, 53:19, 53:21, 54:1, 54:10, 55:5, 55:13, 61:13, 61:22, 74:5 | | **happening** 30:9, 43:18, 59:15, 69:1, 69:4, 86:10 |
| **going** 6:12, 7:3, 7:8, 23:12, 30:8, 31:9, 34:22, 35:4, 40:24, | | | **happens** 68:8 |
| | **grievances** 19:10, 20:1, | | **hard** 6:23 |

harold
48:16
has
7:7, 9:21,
10:2, 26:9,
35:3, 54:1,
54:4, 86:17
haven't
47:3
having
21:13, 65:2,
76:3, 76:9,
76:14, 85:23
he's
48:22
head
18:5, 80:11
heads
45:22
health
13:21, 14:9
healthcare
25:22, 62:16,
72:18
hear
45:6, 79:6,
79:10
heard
30:20, 76:2,
76:7, 78:6,
78:15, 78:18,
79:15, 79:16,
79:21, 87:1
hearing
44:23, 44:24,
45:3, 46:2, 46:5
held
10:21, 23:20,
45:11, 56:11,
82:5
help
33:5
helping
32:15
her
6:23, 27:16,
46:15
here
6:16, 43:20,

47:2, 85:9,
86:9, 87:15
hereby
5:1, 89:6
hermitz
71:2, 71:10,
71:19, 71:23
hey
24:21, 86:2
high
15:22, 16:3,
16:4, 16:6,
83:24
higher
40:8
him
34:19, 34:20,
48:8, 48:11,
48:13, 62:2,
86:2
hired
18:4, 18:6,
21:8, 21:9,
27:14, 75:9
his
23:22, 39:2,
49:2, 49:3,
62:4, 62:13,
71:3, 71:10,
71:12
history
22:20
hold
11:17, 12:17,
13:4
hole
24:21
home
12:8
honestly
29:2, 42:16,
86:11, 88:5
hope
51:2, 60:11
hopefully
52:1
hospital
68:2

hostage
65:24, 66:9
hotel
3:19
hours
3:16
house
33:9, 33:12
housed
33:10
houses
55:20
housing
41:22, 41:23,
42:2, 42:4,
42:6, 42:11,
43:7, 44:19,
56:15, 56:20,
56:24, 57:1,
57:8, 57:11,
57:15, 58:9,
59:24, 65:14
how
5:24, 8:3, 9:1,
10:21, 11:17,
13:4, 13:24,
14:12, 22:13,
23:9, 24:2,
30:20, 33:3,
33:10, 33:18,
33:20, 34:3,
40:23, 47:21,
48:1, 49:9,
49:14, 51:11,
51:13, 51:19,
56:2, 58:24,
59:7, 59:17,
59:22, 61:19,
61:23, 65:17,
71:5, 71:9,
72:15, 73:12,
75:14, 75:15,
80:19
howard
86:19
however
7:2, 19:23,
22:8, 36:16,

40:10, 49:8,
55:3, 73:21
huh-uh
6:18, 15:10
human
6:20, 10:12,
10:16, 12:4
hundreds
75:3, 80:14
hunter
34:11, 37:4,
37:10

**I**

i've
7:9, 87:19
ia
52:16
identification
2:12, 2:15,
2:18, 35:1,
82:18, 86:16
identifies
52:16
idoc
7:22, 12:21,
18:21, 18:24,
22:1, 57:3,
62:18, 63:2,
64:8, 66:3,
71:4, 76:18,
78:19, 78:20,
79:15
il
4:20, 89:4,
89:20
illinois
1:2, 3:2, 3:20,
3:22, 3:24, 4:9,
4:16, 4:18, 5:4,
6:6, 6:10, 9:7,
9:11, 9:23,
10:10, 10:11,
11:9, 11:12,
12:11, 12:23,
14:5, 14:8,
14:19, 15:2,
16:1, 16:5,

17:3, 20:13,
20:16, 21:7,
21:9, 21:15,
21:17, 67:3,
67:7, 67:13,
67:17, 68:4,
74:18, 74:22,
78:16, 89:5
**illness**
13:18, 13:23,
13:24
**immediate**
67:2
**immediately**
21:8, 41:6,
81:22
**impact**
84:7
**impression**
46:16, 47:19,
49:4, 70:8,
72:23
**impressions**
69:23, 70:2,
70:4
**incidence**
83:16
**incident**
17:13, 34:18,
61:15, 62:3,
62:20, 64:2,
66:8, 66:9,
66:12, 69:7
**include**
72:14
**included**
75:12, 83:2,
83:5, 83:8
**including**
19:16, 25:20,
72:15, 83:16,
87:11
**increase**
74:7, 74:10
**incumbent**
27:16
**independent**
43:21, 85:10

**individual**
20:22, 74:20
**individuals**
10:20, 19:16,
64:15, 71:4
**industries**
26:3
**influence**
84:7
**inform**
88:6
**information**
52:17, 72:15,
73:7
**informed**
17:7, 30:7,
88:1
**initial**
40:20
**initially**
18:4
**initiates**
86:24
**initiating**
60:14
**injury**
62:4
**inmate**
19:19, 54:9,
60:3, 61:24
**inmates**
20:18, 44:19,
45:9, 45:10,
45:15, 49:23,
52:2, 72:16,
79:6, 79:16,
82:5
**input**
35:18, 35:19,
35:20
**inside**
41:11
**inspections**
59:23
**inspirational**
57:9
**instead**
41:20

**institution**
39:18, 39:19
**instructed**
66:21
**instructs**
7:6
**intel**
52:10, 52:15,
52:16
**intelligence**
52:20
**interactions**
69:14
**interested**
24:15, 89:15
**interfere**
50:12, 60:6,
60:8
**internal**
48:17, 48:19,
61:14, 62:10,
62:17
**international**
10:24
**interpret**
85:21
**interrogatories**
8:13
**interrupt**
58:2
**interview**
24:20, 24:22
**interviews**
52:20
**into**
5:5, 18:22,
31:9, 45:10,
61:9, 64:7,
65:1, 82:4
**investigate**
55:10, 55:11,
74:12
**investigated**
62:20
**investigations**
62:18, 63:3
**involuntarily**
16:23, 18:12

**involve**
50:9, 77:21
**involved**
20:10, 24:18,
25:2, 29:23,
34:15, 48:16,
49:12, 49:14,
57:17, 62:17,
63:13, 76:8
**involvement**
51:8
**involving**
31:20, 63:19,
66:7, 77:4
**island**
16:1
**issue**
61:23, 80:2
**issues**
13:22, 14:9,
31:16, 52:8,
52:21, 58:24,
59:7, 61:12,
87:3
**it's**
6:12, 7:2,
7:21, 10:19,
11:4, 17:24,
21:22, 36:16,
41:5, 49:22,
53:22, 54:13,
56:1, 61:1,
72:5, 76:9,
80:13, 80:21,
84:11, 88:3
**items**
51:6, 51:7
**its**
53:21
**itself**
58:5, 60:23,
85:7

| J |
| --- |

**jail**
9:15, 9:16,
9:23, 10:7,
13:2, 13:3,

Transcript of Zack Roeckeman
Conducted on August 8, 2018                                    103

| | | | |
|---|---|---|---|
| 13:7, 13:10, | jweigand@atg | 25:12, 26:18, | **lawful** |
| 13:12, 18:22, | 4:20 | 28:2, 28:4, | 5:10 |
| 18:23, 19:7, | **K** | 29:6, 29:8, | **lawrence** |
| 19:13, 19:14, | | 32:12, 32:13, | 66:10, 66:14, |
| 19:19, 19:23, | **keep** | 34:6, 34:9, | 66:22, 66:23 |
| 20:4, 20:6, | 6:18 | 36:2, 42:20, | **lawsuit** |
| 20:7, 20:10, | **kept** | 43:21, 44:14, | 5:20, 7:15, |
| 74:24, 75:1, | 68:24, 81:5, | 46:17, 47:17, | 7:17, 7:20, 8:1, |
| 75:9 | 85:5 | 52:22, 53:5, | 8:4, 8:7, 8:23, |
| **january** | **kevin** | 53:15, 55:23, | 9:20 |
| 12:18, 12:24 | 64:23 | 56:5, 56:21, | **lawsuits** |
| **jason** | **kim** | 60:2, 60:3, | 9:3, 9:6, 9:10, |
| 4:14 | 31:20, 31:22, | 63:22, 64:18, | 10:2, 10:6, 20:2 |
| **job** | 83:1, 83:24, | 70:19, 71:12, | **lawyers** |
| 11:17, 12:4, | 84:3 | 72:12, 73:17, | 8:6 |
| 12:5, 12:7, | **kind** | 74:2, 76:5, | **leadership** |
| 14:1, 14:12, | 17:9, 17:13, | 76:8, 80:17, | 34:7, 36:11, |
| 21:14, 24:23 | 20:5, 21:21, | 83:5, 83:17, | 64:7 |
| **jobs** | 29:10, 30:2, | 84:14, 84:15, | **learn** |
| 18:13 | 31:11, 32:15, | 87:1, 87:9, | 7:24, 76:21 |
| **jog** | 34:7, 36:11, | 88:5, 88:6 | **learned** |
| 83:19 | 36:17, 40:21, | **knowing** | 29:4, 77:11 |
| **john** | 43:21, 44:8, | 34:20, 44:4 | **learning** |
| 86:19 | 44:10, 47:19, | **knowledge** | 28:24 |
| **join** | 49:22, 52:18, | 9:5, 9:18, | **least** |
| 21:17 | 55:11, 59:19, | 10:1, 17:12, | 47:10, 64:21, |
| **jolliff** | 61:2, 64:7, | 30:21, 61:15, | 68:24 |
| 3:19 | 64:10, 65:4, | 85:4 | **leave** |
| **judge** | 66:4, 67:20, | **known** | 12:3, 12:5, |
| 56:14 | 68:24, 69:22, | 26:12, 33:21, | 12:7 |
| **july** | 70:18, 72:3, | 34:19, 57:1, | **left** |
| 25:15 | 72:8, 72:21, | 78:22 | 27:20 |
| **june** | 72:23, 73:16, | **L** | **lehr** |
| 23:7, 25:11, | 73:17, 74:11, | | 1:19, 3:20, |
| 66:11 | 81:19, 82:20, | **labeled** | 4:23, 5:4, 89:3, |
| **just** | 82:23, 83:4, | 35:3 | 89:20 |
| 7:1, 15:21, | 83:22, 84:14 | **labor** | **less** |
| 16:24, 17:13, | **kinds** | 11:24 | 57:5, 69:22 |
| 20:6, 28:2, | 63:20 | **larry** | **let** |
| 34:1, 47:15, | **knew** | 48:18 | 7:1 |
| 47:20, 50:6, | 56:18, 58:9, | **last** | **let's** |
| 53:6, 55:16, | 58:12, 60:11 | 5:16, 34:13, | 25:16, 53:7, |
| 56:24, 72:10, | **know** | 67:10, 83:20 | 56:23, 60:22 |
| 74:9, 76:22, | 6:14, 6:21, | **later** | **level** |
| 78:4, 80:10, | 7:2, 7:17, 9:2, | 15:13, 66:19 | 38:16, 56:23, |
| 82:20, 83:2, | 19:15, 21:22, | **law** | 57:5, 84:1 |
| 84:15, 86:18, | 23:11, 24:2, | 18:15, 18:18, | **lieutenant** |
| 87:20 | 24:9, 25:7, | 18:19 | 33:22, 34:1, |

34:11, 48:16,
48:17, 48:18,
48:22, 48:23,
49:1, 49:2,
82:11
**lieutenants**
48:15
**lift**
76:4, 76:9,
77:1
**lightheadedness**
81:20
**like**
6:14, 6:15,
18:15, 19:13,
19:22, 21:22,
23:21, 24:19,
26:2, 30:6,
34:14, 34:16,
35:9, 37:2,
42:1, 44:9,
50:12, 52:22,
55:16, 59:14,
60:8, 65:5,
65:15, 69:18,
72:15, 76:4,
82:10, 85:8,
87:9
**liked**
49:1, 59:9
**likely**
27:23, 71:24,
72:1
**likewise**
81:18
**limited**
36:1, 69:13
**line**
38:2, 44:21,
45:1, 52:7,
60:8, 78:23,
79:3, 79:6,
79:16, 80:5,
80:8
**lined**
44:13
**lines**
80:14

**lip**
76:5
**list**
37:19
**literally**
24:20
**little**
25:17, 57:18,
62:20, 63:6
**lives**
56:19
**living**
51:11, 51:12,
59:19
**local**
11:1, 11:2,
11:3, 11:6,
11:8, 11:13,
12:2
**located**
14:4
**location**
32:16
**lockdown**
50:15
**locking**
50:9
**loevy**
4:7
**long**
10:21, 11:17,
13:4, 13:24,
14:12, 43:6,
48:1, 49:9,
56:19
**longer**
15:12, 17:8,
23:20, 24:6
**look**
61:9, 73:17
**looking**
37:6, 42:13,
50:24, 51:4,
51:5
**looks**
35:9, 42:1
**lot**
56:17, 56:18,

59:11, 72:6,
82:24
**louis**
1:2, 3:2, 3:24
**love**
72:13

**M**

**ma'am**
17:11, 17:21,
18:14, 19:6,
59:21
**mad**
20:7
**made**
12:3, 25:5,
26:15, 29:15,
30:14, 39:14,
57:10, 59:14,
59:18, 62:20,
62:23, 62:24,
63:2, 67:24,
68:14, 70:15,
80:3
**main**
44:8, 44:15,
82:24
**maintain**
71:17
**maintenance**
43:2
**major**
35:23, 48:12,
49:10, 51:14,
51:18, 58:9,
64:23, 65:8
**majority**
27:4
**make**
12:5, 33:5,
52:14, 59:20,
59:23, 60:9,
63:15, 72:10,
72:24, 73:15
**makes**
6:23, 20:7,
53:21
**making**
29:20

**male**
76:9
**management**
12:1, 13:17,
13:19, 13:20
**manual**
63:8
**many**
5:24, 9:1,
51:20, 61:12,
72:15, 73:12
**march**
32:4, 89:21
**marion**
9:16, 9:22,
10:6, 13:2,
13:10, 13:12,
19:7, 19:19,
20:4, 74:23,
74:24, 75:1,
75:9
**mark**
34:23
**marked**
34:24, 82:17,
86:15
**mass**
44:21, 78:22
**material**
59:12
**matriculated**
15:13
**matter**
40:17, 70:18,
73:24
**maximum**
84:11
**may**
5:3, 7:5, 23:7,
25:10, 27:24,
28:16, 28:22,
30:8, 31:17,
32:8, 34:12,
35:10, 35:11,
37:12, 37:14,
52:17, 54:20,
63:14, 65:2,
66:11, 69:13,

Case 3:15-cv-00309-SMY-MAB Document 425-26 Filed 05/22/18 Page 106 of 122 Page ID #26636

Transcript of Zack Roeckeman
Conducted on August 8, 2018

105

69:22, 73:20,
79:9, 84:8
**maybe**
42:13, 47:20,
57:19
**mcallister**
33:21, 33:22,
34:1, 34:2,
36:13, 38:24,
39:1, 39:6,
39:9, 39:12,
39:19, 40:22,
44:9, 48:9,
48:11, 58:11,
85:22, 88:1
**mcallister's**
34:16, 39:17
**mean**
18:7, 18:21,
38:8, 51:1,
57:5, 57:6,
57:7, 68:16,
77:18, 78:9,
80:10
**meaning**
37:7
**means**
6:16, 6:17,
19:18, 38:10,
55:6
**meant**
51:18
**medical**
46:6, 46:9,
81:20, 81:23
**medium**
26:1, 84:12
**meeting**
32:15, 32:19,
40:20, 71:16
**member**
22:4, 22:14,
22:20, 62:9
**members**
32:13, 32:23,
34:6, 36:8,
36:14, 39:4,
43:12, 51:5,

66:8, 77:13
**memories**
47:3
**memory**
83:19, 83:21
**men**
43:9, 43:13,
44:12
**menard**
31:5, 31:23,
32:4, 67:21,
83:4, 83:16,
84:5, 84:10
**mental**
13:17, 13:21,
13:22, 13:23,
13:24, 14:9
**mentioned**
10:4, 37:3,
54:15, 55:19,
65:4
**message**
40:22
**met**
34:17, 36:19,
71:17, 71:20
**metal**
52:5
**might**
83:17, 87:12
**mike**
30:1, 83:3,
83:23
**military**
19:5
**mind**
39:20, 40:3
**minute**
82:20
**minutes**
48:4, 55:17,
82:14
**misconduct**
64:4
**missing**
61:1
**monday**
42:14

**money**
65:15
**month**
71:17, 73:16,
84:6
**monthly**
72:8, 72:11,
72:14, 73:4,
73:5
**monty**
35:24, 64:23,
65:9
**more**
24:14, 37:15,
40:23, 46:5,
49:8, 49:14,
49:16, 49:17,
50:5, 50:16,
50:17, 50:18,
56:7, 60:1,
62:20, 63:22,
69:22, 70:20,
71:24, 75:2
**morning**
36:18, 36:24,
47:15, 47:16,
47:18, 58:18
**mornings**
47:18
**most**
6:3, 19:13,
46:22, 49:6,
49:10, 49:12,
69:6, 72:1
**mostly**
44:8, 60:17
**mouth**
76:4, 76:24,
77:5
**move**
80:8, 80:14
**moved**
78:24
**movement**
44:21, 45:1,
50:10, 50:15,
52:7, 60:8,
78:23

**movements**
80:5
**much**
39:20, 40:3,
49:15, 51:13,
69:18
**muddy**
2:11, 12:14,
12:15, 22:10,
23:1, 23:14,
23:17, 25:18,
25:23, 26:2,
26:8, 26:9,
26:12, 26:14,
27:9, 27:10,
27:19, 28:17,
28:21, 29:1,
29:12, 30:4,
30:15, 30:20,
30:21, 31:6,
31:10, 32:7,
32:14, 33:13,
34:7, 35:10,
37:1, 38:10,
48:13, 53:8,
55:20, 56:16,
58:9, 58:10,
63:12, 64:1,
64:16, 66:7,
70:5, 70:14,
84:6, 84:8,
84:12, 84:22,
85:4
**muddy's**
62:10
**multiple**
9:2, 19:24,
64:24, 78:23
**municipal**
11:11
**municipalities**
11:12
**murray**
10:17, 10:18
**myself**
39:13, 60:9

**N**

**nally**
71:3

Transcript of Zack Roeckeman
Conducted on August 8, 2018

106

| | | | |
|---|---|---|---|
| **name** | **normal** | **noticeable** | **observed** |
| 5:14, 5:16, | 27:16, 56:24, | 27:6 | 69:21 |
| 5:18, 34:13, | 57:3 | **noticed** | **observing** |
| 46:15, 61:24, | **not** | 73:23, 73:24 | 43:5 |
| 83:20 | 6:11, 6:23, | **noticing** | **obtain** |
| **named** | 7:6, 7:10, 8:5, | 37:17 | 14:20, 14:22, |
| 5:19, 5:21, | 8:8, 9:5, 9:18, | **notification** | 15:1, 15:3 |
| 7:15, 8:1, 8:4, | 14:15, 14:21, | 66:21 | **obviously** |
| 8:22, 9:20, | 18:15, 20:11, | **notified** | 29:7, 29:15, |
| 19:24, 20:3 | 25:11, 27:1, | 66:17, 67:9, | 65:20, 77:19 |
| **naming** | 27:4, 29:2, | 67:20, 67:22, | **occurred** |
| 19:16, 20:6 | 31:2, 31:4, | 68:17, 68:21, | 36:6, 54:22, |
| **natural** | 32:6, 33:2, | 69:3 | 59:8 |
| 6:20 | 34:2, 34:12, | **notify** | **off** |
| **nature** | 36:4, 36:14, | 68:22 | 6:21, 15:15, |
| 61:19, 71:15 | 37:9, 37:22, | **now** | 15:17, 15:18, |
| **necessarily** | 37:24, 39:6, | 3:22, 36:1, | 15:22, 46:17, |
| 44:4, 57:15, | 40:10, 41:19, | 61:17, 82:2 | 54:3, 54:12, |
| 61:7, 82:21 | 41:20, 41:22, | **nuisance** | 63:21 |
| **necessary** | 42:19, 42:22, | 59:12 | **offender** |
| 80:12 | 44:4, 46:15, | **number** | 27:3, 33:8, |
| **necessity** | 48:20, 49:15, | 9:2, 65:14, | 50:10, 62:8, |
| 80:13 | 53:5, 54:13, | 73:5, 73:11 | 64:4, 75:19, |
| **needed** | 54:16, 56:9, | **nurse** | 83:20 |
| 71:14, 81:10 | 56:12, 56:19, | 46:14 | **offender's** |
| **needs** | 58:19, 59:15, | **nuts** | 51:11, 52:4 |
| 71:12, 80:15 | 60:1, 60:6, | 78:7, 79:7, | **offenders** |
| **nefarious** | 61:1, 61:7, | 79:11, 79:16 | 26:10, 26:15, |
| 51:8 | 63:15, 63:18, | ——————— | 26:24, 45:16, |
| **negotiated** | 65:17, 67:22, | **O** | 52:6, 52:8, |
| 12:1 | 68:15, 69:11, | **o'clock** | 55:6, 57:10, |
| **neither** | 69:18, 70:23, | 3:17 | 60:10, 60:11, |
| 15:18, 89:10 | 72:9, 73:16, | **oath** | 60:14, 60:21, |
| **never** | 76:20, 78:2, | 6:14, 6:15 | 61:5, 78:23, |
| 22:2, 22:3 | 79:14, 80:10, | **object** | 80:15, 81:12, |
| **new** | 80:17, 80:23, | 7:5, 47:6 | 81:14, 81:19 |
| 24:15, 64:12 | 81:9, 82:21, | **objection** | **offer** |
| **next** | 85:16, 85:23, | 7:7, 45:5, | 26:5, 50:5 |
| 38:2, 41:3 | 88:5, 89:13 | 51:16, 54:5, | **offhand** |
| **nick** | **notarial** | 74:14, 76:11 | 50:23 |
| 71:3 | 89:21 | **obscenities** | **office** |
| **none** | **notary** | 45:4 | 4:15, 41:16, |
| 10:1 | 5:5, 89:5 | **observation** | 41:21, 54:12 |
| **nope** | **nothing** | 70:24, 75:23 | **officer** |
| 7:13 | 31:24, 43:5, | **observations** | 21:4, 21:16, |
| **nor** | 44:22, 47:8, | 69:14 | 22:3, 22:17, |
| 64:5, 89:11, | 51:2, 59:10, | **observe** | 44:4, 44:24, |
| 89:14 | 60:20, 88:8 | 22:7 | 52:7, 53:19, |

Transcript of Zack Roeckeman
Conducted on August 8, 2018

107

53:22, 54:1,
61:13, 61:14,
62:11, 62:17,
71:3, 74:5,
75:10, 75:11
**officers**
13:11, 36:24,
40:21, 45:3,
50:15, 51:4,
63:19, 70:6,
70:11, 70:21,
77:11, 77:12,
79:3, 79:5, 79:7
**offices**
56:21
**official**
23:5
**officials**
52:22
**often**
59:22, 60:1,
71:9
**oh**
15:24, 49:1
**okay**
7:14, 8:14,
9:1, 10:4,
12:17, 13:24,
15:21, 16:17,
16:21, 16:22,
17:5, 20:12,
20:21, 21:3,
21:6, 21:21,
23:13, 24:5,
24:19, 25:4,
25:10, 26:20,
26:23, 28:15,
28:20, 31:9,
32:1, 32:7,
33:15, 35:6,
36:10, 37:8,
37:12, 37:17,
38:12, 38:15,
38:24, 39:10,
39:18, 40:6,
40:10, 41:7,
41:17, 42:8,
42:18, 42:24,

43:11, 44:2,
44:7, 45:18,
46:16, 47:1,
48:1, 48:5,
48:14, 49:12,
50:24, 52:14,
53:6, 55:8,
55:15, 57:21,
58:22, 60:2,
60:13, 60:19,
61:24, 63:6,
63:11, 66:18,
67:1, 67:7,
67:17, 68:3,
68:7, 72:2,
72:8, 72:17,
73:9, 73:23,
76:1, 76:7,
76:13, 77:8,
78:6, 78:18,
82:22, 85:16,
87:11, 87:15
**older**
56:17, 59:13
**once**
49:24, 59:24,
71:17, 75:2
**one**
5:20, 11:18,
15:24, 16:2,
17:2, 17:13,
17:15, 20:17,
22:13, 24:20,
25:5, 31:3,
31:5, 37:2,
37:15, 46:5,
53:6, 55:21,
63:14, 63:23,
64:2, 72:20,
75:4, 75:5,
78:10, 78:12,
80:21, 83:2
**ones**
9:14, 31:5,
79:3
**only**
9:19, 19:2,
66:8, 73:16

**onto**
6:19
**open**
71:18
**opened**
56:17
**operation**
30:23, 36:2,
38:15, 38:22,
39:21, 39:22,
40:3, 40:4,
40:17, 42:21,
46:18, 47:11,
48:16, 49:6,
51:15, 58:6,
60:7, 63:19,
63:22, 65:17,
83:4, 88:5
**operational**
25:21
**operations**
2:11, 7:21,
22:16, 23:11,
25:8, 27:9,
27:13, 27:19,
27:21, 27:24,
28:6, 30:1,
31:14, 31:15,
31:17, 33:7,
33:15, 35:9,
37:11, 37:13,
37:18, 37:19,
38:2, 39:13,
39:15, 39:16,
43:6, 58:8,
63:5, 63:21,
63:24, 64:20,
73:20, 84:3,
85:2, 85:7
**opportunity**
12:8
**opposed**
20:6, 20:23,
53:2, 64:8
**options**
51:24
**order**
2:11, 31:14,

35:9, 36:2,
37:18, 71:8,
78:19, 79:17,
80:2, 80:14,
85:7, 85:18,
85:23
**ordering**
79:15, 85:21
**orders**
33:7
**organization**
13:16
**original**
2:19, 2:20
**other**
6:20, 6:24,
8:6, 8:17, 8:20,
9:14, 12:17,
12:21, 15:11,
18:13, 22:20,
23:3, 32:14,
39:3, 41:12,
42:18, 46:21,
47:2, 47:15,
47:18, 50:20,
51:10, 51:24,
52:21, 63:12,
63:13, 63:20,
63:24, 64:6,
65:21, 66:8,
68:2, 69:18,
74:19, 78:23,
85:19, 87:3
**others**
5:20, 31:21,
35:19, 43:4,
64:24
**otherwise**
7:11, 65:4,
89:15
**our**
6:18, 26:21,
27:2, 48:17,
62:17, 87:4
**out**
8:3, 25:6,
32:13, 32:15,
52:19, 53:13,

53:16
**outcome**
89:15
**outside**
23:3, 34:6,
41:6, 41:11,
44:13, 51:9,
63:19, 64:8,
68:1
**over**
6:12, 6:24,
24:23, 25:21,
36:18, 39:13,
46:13, 73:17
**overall**
25:19
**oversight**
56:15
**own**
48:23, 49:2,
49:3, 76:23,
77:12

**P**

**page**
2:3, 2:9, 35:5,
35:8, 37:18,
42:14, 52:15
**pages**
83:23
**pain**
62:13
**pair**
51:22
**paper**
6:19
**parlance**
41:12, 41:13
**part**
29:10, 30:8,
30:22, 31:2,
31:19, 32:2,
38:20, 46:22,
59:18, 68:12,
76:14, 88:4
**participate**
22:6
**parties**
89:11, 89:14

**pass**
23:9, 53:22
**passes**
54:3
**past**
24:23
**pat**
75:18
**peek**
72:13
**pending**
3:22, 7:3
**people**
38:17, 57:17,
57:21, 61:19,
64:9, 65:3
**percent**
27:2
**percentage**
26:14
**perception**
71:5
**perform**
75:18
**performance**
24:23
**performed**
30:17, 52:3,
74:20, 76:19,
76:22, 78:3
**performing**
43:3
**performs**
22:17
**perhaps**
57:16, 59:9
**period**
23:6, 81:4
**periods**
43:6
**person**
37:13, 52:4,
64:9, 71:24,
72:1, 72:3,
72:7, 75:20,
75:24, 76:3,
76:14, 76:15,
76:23, 76:24,

77:1, 78:10,
78:11, 78:13,
80:3
**person's**
78:12
**personally**
47:4, 61:9,
74:19, 76:8
**persons**
26:11, 26:24
**phone**
25:5, 71:24,
72:3
**phrasing**
21:14
**physician's**
46:12, 62:15
**place**
29:20, 31:16,
43:16
**placed**
50:14
**plaintiff**
1:6, 1:17, 3:6,
3:26, 5:2, 5:11
**plaintiff's**
34:24, 82:17
**plaintiffs**
2:4, 2:10, 4:4,
86:15
**plan**
31:16, 33:7,
33:14, 85:17
**planned**
32:3, 83:17
**planning**
84:8
**please**
5:14, 7:10,
21:12, 39:24,
83:24
**pleasure**
17:16
**plot**
35:23
**plott**
48:12, 49:10,
49:12, 58:10,

64:23, 65:8
**plus**
3:18
**point**
7:1, 23:13,
23:20, 24:5,
27:17, 30:7,
40:6, 40:22,
41:20, 44:17,
53:22, 54:3,
55:8, 62:13,
69:24, 78:24
**policies**
70:12
**policy**
20:24, 49:23,
55:5, 68:12,
68:19, 70:7,
71:18
**policy-driven**
71:7
**population**
26:13, 26:15,
26:21, 27:3,
33:8, 33:10,
55:20, 56:9,
56:15, 56:17,
56:18, 57:2,
57:3, 58:12,
59:13
**port**
41:9, 41:16
**portion**
43:8, 43:22,
47:22, 77:4
**portions**
74:19
**position**
10:21, 13:4,
17:16, 20:10,
21:2, 23:21,
23:23, 27:16,
45:17, 64:8,
83:9, 85:18,
85:20
**positions**
12:17, 12:21,
16:24

Case 3:15-cv-00309-SMY-MAB Document 242-25 Filed 05/22/18 Page 111 of 122 Page ID #2661

Transcript of Zack Roeckeman
Conducted on August 8, 2018

| | | | |
|---|---|---|---|
| **possibility** 84:17 | 12:23, 18:21, 18:23, 23:13, 29:8, 30:19, 65:19, 69:12, 75:6 | **properly** 80:5 | **questions** 5:13, 7:8, 7:12, 64:11, 87:21, 87:23, 88:7 |
| **possible** 88:3, 88:4 | | **property** 60:18, 60:24, 61:5, 61:6, 61:21 | |
| **posters** 57:9 | **prison** 20:23, 52:22 | | **quick** 87:21 |
| **potential** 37:7, 52:1 | **prisoner** 26:14, 46:5, 78:20 | **proposition** 68:23 | **quicker** 42:17 |
| **potentially** 36:12, 36:13, 51:7, 54:18, 68:1, 77:21, 77:22 | **prisoners** 46:2, 46:10, 52:16, 53:8, 80:8, 81:4, 81:5, 81:9 | **provide** 22:16, 72:6 | **R** |
| | | **provided** 8:14, 57:14, 57:15 | **r-o-e-c-k-e-m-a-n** 5:17 |
| **practical** 69:4, 81:22 | **probably** 24:18, 73:12 | **province** 48:18 | **r1** 42:1 |
| **practice** 22:10, 60:4, 60:6, 73:15, 76:2 | **problem** 7:2, 81:16 | **public** 5:5, 11:5, 11:7, 11:8, 89:5 | **r2** 41:18, 41:20, 42:1 |
| **practices** 22:7, 71:14, 74:1 | **problematic** 77:8, 77:10 | **pull** 76:5, 76:15 | **r4** 42:10 |
| **prefer** 34:3 | **procedure** 19:14, 55:5, 55:7, 70:7 | **pulled** 52:19 | **raised** 7:7, 84:17 |
| **preferably** 69:3 | **process** 22:18, 22:21, 53:9, 53:12, 55:13, 56:8, 77:19 | **purpose** 39:21, 39:22, 49:18 | **random** 59:23 |
| **preparation** 8:9, 8:19 | | **purposes** 40:2 | **randy** 25:14 |
| **presence** 52:7 | | **pursue** 12:4 | **ranks** 64:9 |
| **present** 32:10, 33:16, 34:10, 38:17, 43:12, 43:13, 48:8, 48:11, 48:13, 49:8, 49:16, 49:17, 62:15, 66:9, 66:14, 81:24, 84:1 | **produced** 3:15, 5:10 | **put** 76:4 | **rather** 21:2, 21:7 |
| | **profanity** 45:4 | **putting** 76:23, 78:10, 80:10 | **reached** 25:6 |
| | **professional** 71:6, 81:23, 89:4 | **Q** | **real** 87:20 |
| | **program** 12:19, 56:20, 56:22, 57:12 | **qualify** 69:7 | **really** 21:23, 30:10 |
| | | **quarterly** 72:11 | **reason** 7:9, 18:7, 18:10, 80:7, 80:20 |
| | **programming** 26:5, 26:7, 26:9, 28:7 | **question** 6:21, 7:2, 7:10, 19:18, 29:19, 36:21, 47:7, 50:4, 59:5, 67:11, 70:9 | **reasonable** 28:3, 50:2 |
| **pretty** 46:17 | | | **recalled** 54:16, 83:15 |
| **primarily** 26:12 | **programs** 25:22, 26:12, 27:14, 27:15, 28:12, 50:11, 58:7, 64:21 | | **received** 66:20, 73:6, 73:11 |
| **printing** 5:5 | | **questioned** 61:13 | **recent** 6:3 |
| **prior** 10:23, 12:9, | **proper** 75:13 | | |

Transcript of Zack Roeckeman
Conducted on August 8, 2018                                              110

| | | | |
|---|---|---|---|
| **recess** | 51:22, 59:11 | 52:17 | 30:3 |
| 55:18, 82:16 | **reduced** | **relied** | **requested** |
| **recollect** | 89:9 | 64:19 | 81:14 |
| 27:1, 27:11 | **refer** | **remember** | **required** |
| **recollection** | 34:3, 63:2, | 28:17, 28:19, | 17:8, 66:5 |
| 20:9, 22:9, | 84:23 | 28:20, 29:3, | **resolutions** |
| 27:22, 29:24, | **reference** | 31:19, 32:1, | 11:24 |
| 30:3, 30:13, | 78:10 | 32:20, 32:22, | **resolve** |
| 30:16, 31:4, | **referred** | 43:11, 44:23, | 53:18 |
| 31:8, 32:10, | 15:7, 26:11, | 45:3, 46:8, | **resolved** |
| 33:16, 41:19, | 62:18 | 47:10, 63:20, | 40:7, 66:24, |
| 42:16, 43:21, | **referring** | 63:24, 65:2, | 67:2 |
| 43:24, 44:3, | 21:24, 72:13, | 82:2 | **resource** |
| 45:12, 45:16, | 84:3 | **removed** | 13:14, 14:3, |
| 45:20, 46:11, | **reflected** | 75:22 | 15:20, 16:11, |
| 49:7, 49:10, | 61:1 | **repairs** | 16:19 |
| 50:1, 50:8, | **regarding** | 43:3 | **resources** |
| 51:17, 54:7, | 31:21, 47:4, | **repeat** | 10:16 |
| 54:14, 56:13, | 51:10, 54:21, | 21:12, 36:21, | **respect** |
| 56:16, 57:11, | 60:22, 73:11 | 39:24, 67:10 | 71:7 |
| 58:22, 59:4, | **region** | **repetitive** | **respected** |
| 59:24, 60:11, | 23:8, 23:16, | 30:3 | 57:22 |
| 61:18, 67:24, | 48:10, 63:4 | **report** | **respond** |
| 68:11, 68:20, | **regional** | 38:13, 52:8, | 66:5, 87:3 |
| 68:21, 70:7, | 33:20 | 64:4, 73:4, | **response** |
| 71:11, 74:3, | **registered** | 73:5, 73:10 | 32:3, 55:1, |
| 75:18, 78:2, | 89:4 | **reported** | 55:9, 87:8 |
| 79:24, 82:8, | **regular** | 4:22, 23:15, | **responsibility** |
| 85:11, 85:13, | 14:15, 49:23, | 38:11, 66:21 | 39:2, 39:5, |
| 86:12, 87:5, | 50:6, 50:12, | **reporter** | 39:8, 40:11, |
| 87:16 | 52:7, 55:13, | 2:19, 3:21, | 72:24 |
| **record** | 57:15, 59:18, | 6:16, 34:23, | **responsible** |
| 5:15, 85:6, | 70:21 | 35:3, 86:17, | 13:9, 19:17, |
| 85:17, 85:23, | **regularity** | 89:1, 89:4 | 20:24, 25:19, |
| 86:3, 86:7 | 80:16 | **reports** | 82:12 |
| **recorded** | **reiterated** | 72:9, 72:14, | **rest** |
| 84:22, 85:3, | 33:6, 33:7, | 72:21, 72:24, | 56:19 |
| 85:11, 85:17, | 58:21 | 73:2, 73:8, | **restricted** |
| 85:18, 86:13, | **related** | 73:16 | 50:15 |
| 87:12 | 9:15, 10:6, | **represent** | **restricting** |
| **recording** | 26:10, 51:7, | 11:8 | 50:10 |
| 84:18, 84:20, | 89:11 | **representative** | **restriction** |
| 85:7, 85:21 | **relation** | 11:20, 11:21, | 50:11 |
| **recordings** | 7:21, 83:3 | 11:22 | **restroom** |
| 85:14, 87:13, | **relative** | **represented** | 81:12 |
| 87:17, 87:24 | 89:13 | 11:4, 11:10, | **result** |
| **recovered** | **relevant** | 11:23 | 20:22, 51:14 |
| 51:14, 51:20, | 32:13, 33:7, | **request** | **resulted** |
| | | 24:14, 24:17, | 10:2 |

| | | | |
|---|---|---|---|
| **resume** | **ropes** | 70:1, 71:20, | 76:14, 81:6, |
| 55:17 | 64:10 | 72:5, 81:11, | 84:2 |
| **retained** | **ross** | 84:10, 86:2, | **searches** |
| 2:19 | 1:4, 3:4, 3:25, | 86:6, 87:1 | 43:17, 44:1, |
| **retired** | 5:19 | **saying** | 52:3, 75:12, |
| 25:13 | **rowsy** | 39:7, 39:11, | 76:2, 76:3, |
| **returned** | 64:23 | 61:17, 85:8, | 76:8, 77:14, |
| 27:15 | **rpr** | 85:22 | 77:24 |
| **returning** | 1:19, 4:23 | **says** | **searching** |
| 41:16 | **rule** | 5:11, 36:1, | 76:15 |
| **review** | 6:13, 51:10 | 83:24 | **seated** |
| 8:10, 8:12, | **rules** | **schedule** | 45:15, 45:17 |
| 8:17, 20:18, | 6:12, 57:18, | 41:18, 42:17, | **seats** |
| 73:16, 82:20 | 58:1 | 50:7, 50:13, | 59:14 |
| **reviewed** | | 57:12, 59:19 | **second** |
| 22:21 | **S** | **scheduling** | 4:17, 35:5, |
| **reviewing** | s-h-a-n-n-i-s | 29:23 | 35:8, 41:24, |
| 87:13 | 24:3 | **school** | 53:6 |
| **right** | **safer** | 11:10, 14:17, | **sector** |
| 6:21, 11:6, | 33:6 | 15:17, 15:22, | 11:5, 11:7, |
| 34:1, 34:5, | **safety** | 15:23, 16:3, | 11:8 |
| 37:17, 40:1, | 13:9, 25:20, | 16:4, 16:6 | **security** |
| 40:14, 49:4, | 52:21, 53:3 | **schuler** | 13:10, 25:21, |
| 55:24, 56:1, | **said** | 48:17 | 25:23, 41:6, |
| 56:5, 61:17, | 37:22, 44:24, | **scissors** | 41:9, 52:22, |
| 65:21 | 45:5, 45:9, | 51:23, 65:15 | 53:3, 84:11, |
| **riot** | 57:4, 61:2, | **screw** | 84:12 |
| 66:4 | 65:15, 69:9, | 16:13 | **see** |
| **riots** | 69:17, 80:17, | **sdp** | 36:14, 37:20, |
| 65:24 | 82:11, 87:10, | 26:11, 26:15, | 38:3, 43:17, |
| **river** | 89:8 | 42:9, 42:19, | 75:23, 80:12, |
| 22:10, 26:9, | **sally** | 55:20, 56:9, | 80:19, 85:6, |
| 27:19, 38:10, | 41:9, 41:16 | 57:2, 59:12, | 85:9 |
| 48:13, 56:16, | **same** | 59:13 | **seeing** |
| 84:12, 85:4 | 15:19, 16:19, | **sdps** | 44:3, 46:9, |
| **road** | 46:9, 52:14 | 26:16, 26:19, | 46:11, 46:14, |
| 3:19 | **saw** | 33:10, 59:2 | 82:7 |
| **robert** | 47:14 | **search** | **seem** |
| 27:14, 35:22, | **say** | 43:18, 43:22, | 25:4, 27:23, |
| 48:7 | 6:17, 9:19, | 44:6, 45:8, | 59:10, 59:12, |
| **rock** | 9:22, 13:21, | 50:16, 74:20, | 83:3 |
| 16:1 | 30:6, 36:9, | 75:14, 75:15, | **seems** |
| **roeckeman** | 37:9, 38:18, | 75:18, 76:14, | 54:17 |
| 1:16, 2:5, | 40:10, 45:6, | 76:19, 76:21, | **seen** |
| 2:17, 3:15, 5:9, | 48:3, 56:4, | 77:3, 78:4 | 35:12, 63:8, |
| 5:16 | 56:23, 57:16, | **searched** | 81:22 |
| **role** | 60:4, 60:22, | 43:9, 43:14, | **semantics** |
| 29:19, 67:23 | 61:4, 69:12, | 44:12, 76:3, | 18:23 |

Case 3:15-cv-00309-SMY-MAB   Document 424-5   Filed 05/22/18   Page 113 of 122   Page ID #26653

Transcript of Zack Roeckeman
Conducted on August 8, 2018                                    112

| | | | |
|---|---|---|---|
| **send** 53:16 | 30:11, 30:14, 30:19, 31:10, | 48:12, 58:10, 64:22 | 42:15, 51:8, 53:22, 54:2, |
| **sense** 20:8 | 31:22, 32:3, 32:7, 35:10, | **shorthand** 3:21, 5:4, 89:3 | 59:13, 61:14, 62:12, 64:11, |
| **sent** 56:14 | 36:6, 36:8, 37:1, 37:15, | **shortness** 81:21 | 64:14, 64:22, 65:13, 65:15, |
| **separate** 22:17, 55:12 | 37:23, 43:8, 47:5, 47:23, | **should** 59:15, 68:24, | 66:4, 66:6, 74:2, 76:1, |
| **separately** 26:17 | 49:11, 49:19, 50:5, 50:9, | 80:17, 86:3, 86:7 | 76:2, 80:15, 80:16, 83:2, |
| **separating** 18:18 | 50:14, 51:1, 53:2, 54:21, | **shouldn't** 80:18 | 83:5, 83:21, 84:15, 87:2 |
| **september** 10:22, 12:16, | 55:9, 56:2, 57:18, 57:22, | **showed** 64:10 | **somebody** 37:10, 62:24 |
| 12:18, 27:10 | 59:7, 60:15, 60:23, 61:1, | **sign** 54:3, 54:12 | **someone** 22:19, 29:15, |
| **series** 82:23 | 62:5, 63:20, 63:21, 63:22, | **signature** 5:6, 88:11 | 34:17, 35:18, 40:8, 75:6, |
| **served** 12:15, 17:16, | 63:24, 64:5, 64:6, 69:13, | **signature-ghi1v** 89:16 | 85:19 |
| 23:7 | 74:11, 77:24, 79:10, 81:3, | **since** 6:12, 10:22, | **something** 30:16, 36:6, |
| **service** 13:16 | 83:16, 84:6, 84:8, 84:22, | 22:2, 56:17, 64:7 | 36:10, 36:16, 36:20, 58:13, |
| **services** 10:13, 10:16, | 85:14, 87:2, 88:2 | **sit** 43:20, 47:2, | 60:8, 63:2, 67:23, 71:17, |
| 12:5, 17:7, 27:17, 50:11, | **shakedowns** 7:22, 31:12, | 85:9, 86:9, 87:15 | 75:2, 75:6, 79:20, 83:21 |
| 57:13, 74:4 | 34:18, 42:4, 49:24, 50:7, | **situation** 66:10, 66:23, | **sometime** 27:19, 62:11, |
| **serving** 27:12, 28:14, | 54:19, 60:14, 63:12, 65:1, | 67:2 | 66:10 |
| 66:16 | 65:21, 84:18 | **situations** 65:24, 66:1 | **somewhat** 57:2, 57:12, |
| **setting** 64:12 | **shaken** 30:22, 49:23, | **six** 3:17 | 83:20 |
| **several** 6:4, 21:22, | 63:23, 64:3 | **slightly** 57:5 | **soon** 69:4, 81:22 |
| 21:23, 24:24 | **shall** 9:22 | **slip** 61:2 | **sorry** 11:15, 11:19, |
| **sex** 26:10, 26:15, | **shana** 23:24 | **sodc** 10:15 | 13:19, 13:21, 28:7, 36:20, |
| 26:24, 27:3, 33:8 | **shannis** 23:22, 24:1, | **some** 11:21, 15:15, | 39:15, 51:14, 58:2, 59:4, |
| **sexually** 26:11 | 24:2, 24:5, 24:7 | 18:21, 20:2, 23:20, 24:5, | 67:10 |
| **shake** 30:23 | **she** 6:16, 64:20 | 27:17, 30:7, 31:12, 31:21, | **sort** 11:24, 22:21, |
| **shakedown** 28:17, 28:21, | **she's** 87:1 | 34:15, 40:14, | 51:8, 51:10, 75:24 |
| 29:1, 29:12, 29:18, 29:24, | **shift** 35:22, 35:23, | | **sorts** 72:15 |
| 30:4, 30:7, | | | |

Transcript of Zack Roeckeman
Conducted on August 8, 2018                                          113

| | | | |
|---|---|---|---|
| **sound** 69:18, 77:6, 77:8 | 61:11, 64:16, 65:6, 68:19, 70:5, 72:12, 73:21, 75:17, 81:11, 83:7, 84:9, 85:1 | 36:19, 47:11 | 80:1 |
| **sounds** 18:15, 19:22, 23:21, 28:3, 28:5, 30:6, 50:2, 85:8 | | **starting** 12:23, 35:7 | **stopping** 52:1 |
| | | **state** 3:21, 4:16, 4:20, 5:14, 10:10, 10:11, 37:2, 89:5 | **straight** 54:12 |
| | **specificity** 22:22, 27:2, 42:3, 47:8 | | **street** 4:8, 4:17 |
| **southern** 1:2, 3:2, 3:23, 11:12, 23:8, 23:16, 33:20, 48:10, 63:4 | | **state-operated** 10:19 | **strike** 75:14 |
| | **specifics** 22:11 | **stated** 58:13, 80:3 | **strip** 43:9, 43:14, 43:17, 43:22, 43:24, 44:6, 44:12, 45:8, 74:20, 75:14, 75:15, 76:1, 76:2, 76:8, 76:14, 76:19, 76:21, 77:3, 77:14, 77:24, 78:3 |
| **speak** 8:20, 48:8, 48:11, 49:9, 60:10 | **spell** 5:14 | | |
| | **spelled** 24:2 | **states** 1:1, 3:1, 3:23 | |
| **speaking** 32:22, 33:8, 47:10, 48:13 | **spelling** 24:4 | **statewide** 30:17, 30:23, 34:12, 34:14 | |
| | **spent** 49:10 | | |
| **special** 21:11, 22:16, 26:2, 26:5, 26:7, 26:9, 37:11, 37:13 | **spike** 74:6 | **status** 56:11 | |
| | **spoken** 58:17, 58:20 | **stay** 36:11, 47:22, 49:5 | |
| **specialist** 10:17 | **spread** 77:2 | **stayed** 42:20, 44:8 | **stripped** 76:9, 76:23, 76:24, 77:2 |
| **specific** 11:7, 17:13, 20:5, 40:23, 42:6, 55:21, 61:22, 82:13 | **springfield** 4:18, 21:17 | **step** 53:12, 53:15, 68:10 | **strongly** 86:5 |
| | **st** 1:2, 3:2, 3:24 | **steps** 55:10, 58:3, 61:8, 61:9, 74:2, 74:11, 87:8 | **structure** 58:5 |
| | **staff** 17:19, 25:22, 32:3, 36:12, 37:19, 39:14, 43:2, 46:9, 56:21, 64:4, 83:18, 84:2, 87:4 | | **student** 14:16 |
| **specifically** 7:5, 8:5, 19:21, 23:10, 25:5, 25:7, 26:16, 29:8, 29:22, 31:7, 31:13, 31:24, 33:9, 33:12, 38:1, 43:15, 44:22, 45:13, 50:3, 51:21, 52:18, 54:23, 55:3, 57:2, 58:19, 59:2, 59:10, 59:11, 59:16, 60:21, | | **stg** 52:21 | **stuff** 61:1, 61:2 |
| | | **sticking** 77:5 | **subject** 15:5, 17:9, 19:10, 20:14, 20:21, 21:1, 21:2 |
| | **stand** 80:21 | **still** 7:6 | **subjects** 15:6 |
| | **standing** 45:15, 71:16, 78:11 | **stipulated** 5:1 | **submitted** 73:8, 73:10 |
| | **start** 6:24, 21:23, 55:11 | **stock** 23:22, 24:3, 24:6, 24:7 | **subset** 11:7 |
| | **started** 21:6, 23:17, 32:8, 32:13, | **stop** 48:1, 48:2, 60:5, 77:18, 82:4 | **substance** 57:8 |
| | | **stopped** 40:14, 47:20, | **such** 40:6, 50:14, 85:2 |

Transcript of Zack Roeckeman
Conducted on August 8, 2018                                        114

| | | | |
|---|---|---|---|
| **suggesting** 39:3 | **tables** 45:17 | 89:12 | **tenure** 25:13 |
| **suites** 3:19 | **tact** 22:12, 32:14, | **taking** 55:9, 63:21, | **terminated** 16:23, 18:12 |
| **summarize** 86:24 | 32:23, 33:20, 34:6, 34:14, | 74:11 | **terms** 38:15, 40:4, |
| **sunday** 66:19 | 39:4, 40:21, 43:12, 45:3, | **talk** 25:17, 41:3, 48:5, 52:18, | 53:3 |
| **super** 82:21 | 51:4, 53:2, 63:7, 63:8, | 60:5, 60:12, 71:10 | **testimony** 89:6, 89:8 |
| **supervising** 43:5 | 63:13, 65:20, 66:5, 68:10, | **talked** 8:7, 18:13, | **th** 42:14, 42:15 |
| **supervision** 13:11, 25:20, | 68:14, 68:17, 69:14, 69:21, | 41:3, 47:4, 47:9, 63:6, 81:3 | **than** 8:6, 8:20, |
| 25:22, 56:23, 57:5 | 69:24, 70:2, 70:14, 70:19, | **talking** 6:24, 8:6 | 40:8, 42:17, 42:18, 46:5, |
| **supervisor** 27:17, 61:14, | 71:3, 71:10, 77:13, 79:3, | **targets** 52:18 | 49:8, 50:6, 56:23, 57:3, |
| 64:21, 74:4, 74:5 | 79:5, 79:7 | **team** 22:4, 22:7, | 62:21, 63:22, 65:21, 68:2, |
| **supervisory** 84:1 | **tactical** 7:21, 22:4, | 22:10, 22:13, 32:14, 32:23, | 69:18, 70:21, 75:2, 85:19 |
| **sure** 19:23, 20:1, | 22:7, 22:10, 22:16, 22:19, | 34:6, 36:7, 36:18, 39:4, | **thank** 5:18, 33:14, |
| 27:1, 27:4, 28:2, 28:4, | 36:7, 36:14, 36:18, 36:24, | 39:8, 43:12, 51:5, 63:7, | 79:14 |
| 29:15, 36:22, 37:9, 49:15, | 38:22, 38:23, 39:8, 43:3, | 63:8, 63:9, 63:13, 65:20, | **thanks** 44:17 |
| 50:22, 51:19, 52:14, 65:6, | 43:6, 48:10, 51:15, 58:13, | 66:5, 68:10, 68:14, 68:17, | **that's** 14:9, 23:12, |
| 67:12, 72:10, 72:24, 80:3, | 62:10, 63:16, 63:18, 66:7, | 69:15, 69:21, 69:24, 70:3, | 24:2, 33:24, 38:7, 40:10, |
| 82:15, 84:24, 86:3 | 66:12, 70:4, 70:8, 71:1, | 70:4, 70:8, 70:14, 70:19, | 53:15, 54:7, 68:12, 81:24, |
| **surprised** 65:18 | 71:13, 73:20, 84:2, 85:2, 85:4 | 71:1, 71:13, 77:13 | 87:19 |
| **surprising** 65:11, 65:16 | **take** 6:16, 7:1, 7:4, | **teamsters** 11:1, 12:9 | **their** 22:20, 32:16, |
| **sweep** 52:6 | 54:2, 55:1, 58:3, 61:8, | **tell** 6:15, 26:7, | 39:5, 44:19, 45:22, 47:11, |
| **sworn** 3:15, 5:10, | 61:9, 72:13, 74:1, 82:14, | 35:7, 56:1, 56:7, 83:24 | 49:23, 52:5, 52:19, 53:14, |
| 89:7 | 82:20 | **telling** 65:4, 77:18 | 56:19, 60:22, 70:14, 71:7, |
| **symptoms** 81:20 | **taken** 1:17, 5:3, | **temporary** 23:4, 23:7, | 71:8, 71:13, 75:20, 75:21, |
| **T** | 6:14, 55:18, 75:21, 77:15, | 24:8, 24:13, 27:12, 66:16 | 75:24, 76:4, 76:5, 76:9, |
| **table** 63:21 | 79:21, 79:23, 82:16, 89:8, | **tendency** 6:20 | 76:15, 76:16, 76:23, 76:24, 77:1, 77:2, |

77:5, 78:12,
80:3, 80:11,
81:6, 83:16
**them**
6:9, 7:9,
19:16, 32:24,
33:1, 40:21,
40:23, 41:16,
41:18, 41:20,
41:23, 42:2,
43:4, 45:6,
57:14, 58:17,
58:20, 59:9,
59:14, 60:5,
60:17, 61:16,
65:4, 72:10,
74:12, 76:9,
76:15, 77:18,
78:14, 80:11,
80:17, 80:21,
81:24, 82:24,
83:2
**themselves**
71:6, 75:22
**then**
7:4, 10:5,
15:13, 15:22,
16:2, 16:9,
16:10, 16:15,
16:18, 24:5,
24:11, 27:14,
27:15, 27:20,
28:5, 38:13,
41:16, 55:17,
57:19, 60:9,
73:12, 75:21,
75:22, 83:12,
83:22, 84:16,
87:7
**there's**
19:22, 50:17,
68:8, 72:8,
74:2, 84:10
**thereafter**
89:9
**therein**
27:18
**thereto**
89:14

**these**
34:18, 44:18,
60:14, 65:1,
83:3, 83:6, 87:3
**they**
15:7, 19:16,
20:9, 20:24,
22:13, 22:15,
24:19, 31:8,
32:18, 32:20,
33:5, 33:9,
36:18, 36:19,
36:24, 37:23,
37:24, 39:16,
41:4, 42:1,
42:5, 42:14,
42:15, 44:12,
44:14, 44:15,
45:15, 45:18,
45:20, 45:22,
47:11, 51:11,
52:9, 52:17,
53:9, 53:13,
53:16, 54:10,
54:18, 56:9,
56:10, 56:11,
56:12, 56:13,
56:14, 56:18,
57:4, 57:7,
57:11, 57:21,
58:14, 58:15,
58:17, 60:10,
60:11, 61:2,
61:5, 61:19,
61:23, 65:14,
65:21, 65:24,
68:9, 70:5,
70:11, 70:15,
70:20, 71:5,
71:6, 71:7,
71:8, 71:14,
72:11, 73:22,
75:20, 75:21,
75:22, 77:12,
78:14, 80:8,
80:9, 80:17,
81:10, 81:22
**they're**
55:21, 69:3,

72:14, 80:22
**thing**
37:2, 80:21
**things**
19:15, 19:17,
20:5, 31:11,
38:13, 40:13,
42:16, 47:4,
47:21, 50:12,
54:21, 57:10,
58:24, 59:8,
61:15, 65:14,
65:20, 70:23,
71:14, 71:15,
72:15, 72:20,
76:22, 87:3,
87:11
**think**
25:1, 25:10,
28:11, 34:12,
37:24, 46:18,
47:14, 50:20,
58:15, 59:12,
61:3, 69:9,
80:7, 80:13,
84:4, 84:16,
86:2, 86:7,
87:19
**thinking**
84:7
**this**
5:3, 6:14, 8:1,
8:4, 8:7, 10:21,
12:8, 16:22,
21:14, 24:21,
30:2, 30:23,
34:18, 35:7,
35:9, 35:12,
35:14, 35:15,
35:20, 36:2,
36:6, 36:10,
36:12, 36:14,
36:16, 36:17,
36:22, 36:23,
37:6, 37:7,
37:17, 38:15,
39:21, 40:1,
40:3, 40:23,

41:17, 42:17,
42:20, 46:18,
50:14, 50:21,
51:15, 64:12,
66:14, 74:8,
82:20, 83:11,
83:18, 83:19,
83:23, 84:5,
84:7, 84:15,
86:3, 86:7,
86:18, 86:20,
86:23, 87:5,
87:6, 87:8,
87:12, 89:12
**thorough**
50:16, 50:18
**those**
6:5, 6:19,
8:14, 9:3, 9:6,
9:10, 10:2,
10:5, 19:2,
19:17, 20:4,
20:22, 26:12,
31:17, 34:8,
42:2, 43:12,
46:22, 52:18,
55:2, 55:10,
55:11, 56:3,
56:22, 57:14,
57:19, 58:9,
58:16, 58:24,
59:8, 61:4,
61:9, 61:12,
61:15, 64:14,
65:3, 65:7,
70:23, 71:4,
71:15, 72:21,
72:24, 73:2,
73:8, 76:22,
87:13
**though**
7:7, 40:1
**thought**
56:8
**three**
6:2, 10:5,
13:5, 14:2,
76:22

Transcript of Zack Roeckeman
Conducted on August 8, 2018

| | | | |
|---|---|---|---|
| **thresholds** | **tip** | **transfer** | 21:14, 49:22, |
| 14:7, 16:16 | 17:24 | 15:8 | 57:18 |
| **through** | **title** | **transportation** | **understanding** |
| 35:11, 38:11, | 11:19 | 11:9 | 7:19, 19:13, |
| 38:13, 41:4, | **today** | **treated** | 22:12, 22:15, |
| 41:8, 41:15, | 8:19, 43:20, | 61:19, 61:23 | 32:12, 52:15, |
| 49:5, 60:3, | 47:2, 85:9, | **treatment** | 52:24, 58:4, |
| 72:6, 72:10, | 86:9, 87:15 | 60:21 | 63:7, 65:19, |
| 75:10, 82:6 | **today's** | **trends** | 68:7, 68:13, |
| **throughout** | 8:9 | 73:17 | 70:24 |
| 47:20, 69:1 | **together** | **tried** | **understood** |
| **till** | 32:21, 78:14, | 60:3, 61:12, | 7:11, 57:22 |
| 12:18 | 80:22 | 71:17 | **unexpected** |
| **time** | **told** | **triggering** | 65:12 |
| 15:15, 15:17, | 23:11, 24:7, | 83:21 | **unfounded** |
| 15:18, 15:19, | 33:1, 77:3, 80:4 | **trouble** | 73:13 |
| 15:22, 16:19, | **tom** | 21:13 | **union** |
| 16:22, 17:20, | 27:18, 28:5 | **troyer** | 11:1, 11:2, |
| 22:24, 23:6, | **tongue** | 2:16, 86:19, | 11:4, 12:2 |
| 28:6, 28:8, | 17:24, 76:5 | 86:24 | **unique** |
| 28:12, 28:13, | **too** | **truth** | 33:10 |
| 28:21, 29:13, | 17:24, 42:15 | 6:15 | **unit** |
| 33:5, 42:11, | **took** | **try** | 11:23, 22:16, |
| 42:19, 43:6, | 6:15, 20:11, | 6:17, 6:23 | 22:19, 36:14, |
| 44:18, 44:22, | 20:23, 23:22, | **tryout** | 38:23, 41:23, |
| 46:1, 46:4, | 29:20, 61:2, | 22:21 | 42:7, 42:9, |
| 46:8, 46:9, | 87:7 | **turn** | 42:11, 42:12, |
| 47:21, 49:11, | **top** | 35:4, 50:10 | 44:20, 56:20, |
| 50:16, 50:17, | 36:1, 38:5, | **two** | 56:22, 56:24, |
| 56:19, 63:11, | 38:9 | 19:2, 26:17, | 57:1, 57:8, |
| 63:23, 64:1, | **topic** | 48:15, 55:21 | 57:11, 57:13, |
| 64:3, 64:19, | 86:2 | **ty** | 57:15, 58:9, |
| 66:3, 67:3, | **touch** | 23:19, 23:20 | 58:14, 59:24, |
| 67:7, 67:12, | 78:13 | **type** | 62:10, 62:16, |
| 67:17, 67:20, | **touching** | 59:18, 64:6 | 62:18, 63:16, |
| 71:12, 73:17, | 80:9, 80:10, | **typewriting** | 64:3, 65:14, |
| 75:4, 75:5, | 81:1 | 89:9 | 66:7, 66:12, |
| 75:7, 76:18, | **towards** | | 71:7, 71:8, 85:4 |
| 79:5, 79:10, | 37:18, 83:24 | **U** | **united** |
| 80:15, 81:4, | **trained** | **uh-huh** | 1:1, 3:1, 3:22 |
| 81:8, 81:10, | 75:6, 75:15 | 6:18, 15:5, | **units** |
| 83:9, 83:11, | **training** | 37:5 | 42:2, 42:4, |
| 84:4, 84:16, | 21:11, 21:16, | **ultimate** | 43:4, 43:8, |
| 87:12 | 21:19, 21:22, | 38:17, 38:21, | 52:5, 56:22, |
| **times** | 21:23, 22:7, | 39:5, 39:8 | 57:14, 58:9, |
| 5:24, 7:4, 9:1, | 75:7, 75:10 | **under** | 59:19 |
| 9:20, 10:5, | **transcribed** | 89:10 | **university** |
| 43:13, 75:3 | 5:5 | **understand** | 15:2 |
| | | 7:8, 7:10, | |

Transcript of Zack Roeckeman
Conducted on August 8, 2018

117

| | | | |
|---|---|---|---|
| **unless** | 64:22, 70:6, | 12:19, 17:4, | **we'll** |
| 7:5 | 71:6 | 20:17, 21:18, | 55:10, 88:9 |
| **until** | **via** | 22:1, 23:1, | **we're** |
| 12:16, 44:5, | 19:18 | 23:4, 23:14, | 52:14, 72:9 |
| 54:15 | **video** | 23:17, 25:18, | **we've** |
| **unusual** | 84:18, 84:19, | 27:8, 27:9, | 18:13 |
| 69:1, 69:7, | 87:11, 87:13, | 27:13, 27:15, | **weapons** |
| 77:6 | 87:16, 87:24 | 27:18, 27:20, | 51:20, 51:22 |
| **uptick** | **videotaping** | 27:21, 27:23, | **week** |
| 73:19, 73:24 | 88:1 | 28:6, 28:9, | 28:16, 28:18, |
| **use** | **viewed** | 28:11, 28:13, | 28:19, 29:1, |
| 45:3, 46:2, | 70:6 | 34:9, 35:22, | 42:20, 43:23, |
| 53:9, 70:15, | **viewing** | 40:13, 40:15, | 44:18, 46:9, |
| 70:20, 79:7, | 85:14, 87:16 | 48:7, 49:5, | 46:23, 47:3, |
| 81:9, 81:12, | **violations** | 49:7, 53:7, | 47:20, 59:24, |
| 81:14, 81:15 | 51:10 | 58:6, 58:7, | 60:13, 63:14, |
| **used** | **visits** | 58:8, 59:17, | 65:11, 79:9 |
| 52:6, 78:15, | 59:23 | 59:18, 60:4, | **weeks** |
| 78:19, 79:17, | **visual** | 63:12, 64:1, | 21:23 |
| 85:6 | 75:23 | 64:20, 65:8, | **weigand** |
| **uses** | **vs** | 68:15, 68:16, | 2:7, 4:14, |
| 63:9 | 1:8, 3:8, 3:25 | 68:20, 68:21, | 45:5, 47:6, |
| **using** | W | 68:23, 68:24, | 51:16, 54:5, |
| 76:24, 77:2 | | 71:9, 72:2, | 74:14, 76:11, |
| **utilization** | **waive** | 72:8, 73:15, | 82:14, 87:20, |
| 72:18 | 88:9 | 84:4, 84:5 | 87:23, 88:7, |
| V | **waived** | **warden's** | 88:9 |
| | 5:6, 88:12 | 53:22, 54:3, | **welcome** |
| **vacancy** | **walk** | 54:12 | 33:13, 40:22 |
| 83:9 | 59:19, 80:22 | **wasn't** | **welfare** |
| **vague** | **walking** | 30:10 | 60:22 |
| 22:9, 44:3, | 41:4, 41:8, | **watch** | **well** |
| 45:12, 46:11 | 41:15, 60:3 | 44:17, 44:19, | 6:19, 11:10, |
| **vaguely** | **wall** | 77:23 | 13:10, 24:18, |
| 44:21, 52:12, | 41:11, 41:12 | **watched** | 25:21, 26:10, |
| 60:16, 82:6 | **want** | 69:10, 69:11, | 43:2, 44:14, |
| **valerie** | 6:22, 7:1, | 69:17, 78:22, | 48:17, 52:4, |
| 1:19, 3:20, | 18:22, 28:15, | 79:2, 79:5 | 53:7, 54:14, |
| 4:23, 5:4, 89:3, | 31:15, 48:23, | **watching** | 55:10, 55:20, |
| 89:20 | 74:9, 80:8 | 43:22 | 56:1, 58:5, |
| **various** | **wanted** | **way** | 58:14, 73:1 |
| 7:4, 11:10, | 31:17, 56:24, | 15:11, 24:15, | **went** |
| 11:11, 36:7, | 57:17, 60:10, | 24:21, 34:15, | 14:18, 15:12, |
| 61:9 | 72:10 | 50:21, 52:20, | 15:13, 16:9, |
| **verbal** | **wants** | 53:21, 59:15, | 16:10, 16:15, |
| 6:18 | 54:9 | 75:13, 77:14, | 16:16, 16:18, |
| **very** | **warden** | 78:4 | 40:13, 41:11, |
| 6:23, 64:21, | 12:13, 12:15, | **ways** | 41:21, 42:17, |
| | | 40:14 | |

| | | | |
|---|---|---|---|
| 58:24, 64:10, 75:10 | 83:13, 84:19, 85:8 | 88:10 | **why** 12:7, 22:13, |
| **western** 3:18 | **what's** 13:15, 49:18, | **whether** 54:13, 77:12, | 30:13, 70:23, 74:2, 74:6, |
| **what** 6:21, 7:17, | 51:18, 78:22 | 80:9, 81:8 | 80:7, 80:12, 81:24, 83:5, |
| 7:19, 8:12, | **whatever** 19:18, 54:2, | **which** 6:16, 6:17, | 85:9 |
| 9:14, 10:11, | 80:2 | 11:7, 17:2, | **will** 7:11, 18:8, |
| 10:14, 10:18, | **when** | 20:3, 28:16, | 55:17, 56:6, |
| 10:23, 11:2, | 6:3, 7:24, | 33:9, 35:10, | 87:3 |
| 11:19, 11:21, | 10:4, 12:13, | 42:10, 77:3, | **willing** |
| 12:17, 12:24, | 18:4, 21:14, | 81:4, 87:2, | 52:18 |
| 13:7, 13:12, | 21:17, 23:17, | 89:12 | **windsor** |
| 14:22, 15:3, | 24:7, 24:13, | **while** | 27:12, 27:15, |
| 15:5, 15:7, | 27:10, 28:24, | 6:13, 16:10, | 64:22 |
| 16:7, 17:5, | 29:3, 29:9, | 16:19, 19:7, | **wing** |
| 22:12, 22:13, | 30:9, 32:20, | 27:9, 40:17, | 42:19, 59:12 |
| 22:18, 22:22, | 36:18, 39:4, | 42:4, 42:5, | **wings** |
| 23:12, 25:17, | 43:13, 44:7, | 43:18, 45:10, | 26:17, 55:21, |
| 25:23, 26:14, | 45:14, 46:4, | 46:1, 62:12, | 57:19, 58:16, |
| 27:11, 29:19, | 48:1, 48:6, | 68:3, 71:9, | 59:1, 59:8 |
| 32:18, 33:1, | 49:2, 52:15, | 79:13, 81:5, | **wishes** |
| 33:11, 34:14, | 56:2, 57:4, | 82:9 | 22:19 |
| 34:22, 35:7, | 58:17, 59:17, | **white** | **with** |
| 36:17, 36:23, | 62:12, 66:4, | 37:7, 37:12 | 6:6, 6:9, 6:10, |
| 38:8, 38:20, | 66:14, 66:20, | **who** | 9:7, 9:11, 9:21, |
| 40:17, 41:3, | 66:22, 67:4, | 5:20, 10:9, | 10:6, 10:20, |
| 41:24, 42:14, | 67:14, 70:15, | 11:2, 12:3, | 10:24, 13:17, |
| 44:4, 48:21, | 71:23, 72:2, | 17:18, 17:22, | 13:21, 13:23, |
| 50:4, 50:6, | 73:23, 75:1, | 23:14, 23:18, | 14:9, 15:20, |
| 50:24, 51:1, | 75:9, 79:2, 79:5 | 25:13, 25:14, | 20:12, 20:16, |
| 51:4, 51:24, | **where** | 26:10, 26:24, | 21:9, 21:14, |
| 52:10, 52:12, | 12:9, 14:3, | 27:8, 34:1, | 22:22, 27:1, |
| 54:3, 54:15, | 14:17, 15:1, | 34:11, 35:20, | 29:23, 30:12, |
| 55:1, 56:7, | 16:13, 21:22, | 37:10, 43:2, | 32:13, 34:10, |
| 58:3, 62:7, | 33:9, 33:11, | 44:9, 48:5, | 34:16, 35:19, |
| 62:8, 62:14, | 40:20, 43:5, | 48:12, 48:16, | 36:18, 38:20, |
| 63:7, 65:5, | 43:8, 43:16, | 48:17, 52:16, | 39:6, 40:14, |
| 65:10, 65:13, | 44:14, 62:4, | 53:8, 62:10, | 41:14, 41:16, |
| 66:11, 69:21, | 63:22, 75:21, | 62:15, 64:14, | 41:20, 41:23, |
| 70:2, 70:6, | 80:8, 80:22, | 70:11, 81:19, | 42:2, 42:3, |
| 70:8, 71:5, | 82:4 | 82:11, 84:4 | 43:3, 44:9, |
| 71:12, 72:12, | **whereas** | **whoever** | 47:8, 49:8, |
| 73:1, 73:7, | 39:18 | 41:2, 44:9 | 49:11, 49:14, |
| 74:6, 75:5, | **wherein** | **whole** | 50:12, 50:13, |
| 75:13, 76:13, | 5:8, 19:14, | 56:20 | 52:10, 52:12, |
| 78:9, 79:23, | 55:18, 76:22, | **whom** | 55:11, 56:3, |
| 79:24, 82:10, | 82:16, 83:23, | 36:2 | |
| | | **whose** 89:6 | |

Transcript of Zack Roeckeman
Conducted on August 8, 2018

119

| | | | |
|---|---|---|---|
| 56:6, 58:11,<br>58:24, 59:7,<br>60:7, 60:8,<br>60:10, 60:15,<br>61:14, 62:18,<br>64:18, 65:3,<br>65:4, 65:8,<br>66:3, 69:14,<br>69:23, 71:23,<br>73:1, 74:2,<br>76:15, 80:2,<br>80:16, 87:4,<br>88:11<br>**within**<br>3:21, 12:21,<br>51:9, 71:4, 89:5<br>**without**<br>66:8<br>**witness**<br>5:6, 68:4,<br>76:19, 89:6,<br>89:8<br>**witnessed**<br>47:5, 71:5<br>**witnesses**<br>2:2, 2:3<br>**word**<br>55:24, 56:2,<br>56:5<br>**words**<br>39:3, 41:12,<br>78:23<br>**work**<br>10:12, 10:15,<br>12:10, 16:16,<br>16:18, 22:20,<br>79:13<br>**worked**<br>12:11, 13:14,<br>14:7, 16:10,<br>16:15, 21:3<br>**working**<br>12:9, 15:18,<br>21:6, 67:4,<br>67:12, 67:14<br>**wouldn't**<br>57:14, 63:15,<br>85:9 | **wrist**<br>62:4, 62:13<br>**write**<br>6:24, 60:12<br>**writes**<br>86:24<br>**written**<br>53:13<br>**wrong**<br>19:12, 40:13<br>**Y**<br>**yeah**<br>22:2, 64:17,<br>82:1, 83:13<br>**year**<br>11:18, 15:24,<br>16:2, 16:7,<br>16:9, 32:5<br>**years**<br>6:4, 13:5,<br>14:2, 14:13,<br>24:24<br>**you'll**<br>6:21<br>**you're**<br>7:14, 24:15,<br>25:11, 28:2,<br>38:5, 49:15,<br>61:17, 72:12,<br>80:19, 83:2,<br>85:8<br>**you've**<br>6:14, 7:15,<br>21:3<br>**your**<br>5:14, 6:6, 6:9,<br>7:5, 7:19, 8:6,<br>8:15, 8:19,<br>8:20, 9:7, 9:11,<br>9:21, 10:1,<br>10:9, 11:19,<br>11:22, 13:7,<br>16:13, 17:5,<br>17:12, 20:12,<br>20:16, 20:17,<br>22:12, 25:17,<br>27:8, 28:15, | 30:3, 30:10,<br>30:21, 33:16,<br>39:18, 39:19,<br>39:20, 40:1,<br>40:2, 40:3,<br>40:18, 41:19,<br>41:21, 49:4,<br>50:1, 53:7,<br>54:13, 58:22,<br>58:23, 59:6,<br>59:18, 60:3,<br>60:4, 60:5,<br>63:7, 63:11,<br>64:1, 64:11,<br>66:3, 67:3,<br>67:7, 67:12,<br>67:17, 68:11,<br>68:13, 70:2,<br>72:23, 74:1,<br>74:17, 74:19,<br>76:18, 77:11,<br>77:12, 77:14,<br>78:2, 78:3,<br>81:13, 81:18,<br>81:21, 83:19,<br>84:7<br>**yourself**<br>35:17, 59:20,<br>73:1, 86:20<br>**yurkovic**<br>23:11, 24:17,<br>25:1, 25:5,<br>25:8, 33:15,<br>37:20, 39:16<br>**Z**<br>**z-a-c-h**<br>5:16<br>**zach**<br>1:16, 2:5,<br>3:15, 5:9, 5:16<br>**zone**<br>48:22, 48:24,<br>49:1, 82:11<br>**0**<br>**0309**<br>1:8, 3:8 | **1**<br>**100**<br>26:18<br>**12**<br>2:11, 5:8,<br>28:16, 32:8,<br>35:11<br>**13**<br>2:6<br>**14**<br>2:11<br>**15**<br>1:8, 2:15, 3:8,<br>11:13, 48:4<br>**150**<br>26:19<br>**16**<br>2:7, 42:15,<br>88:11<br>**1800**<br>26:21<br>**19**<br>35:11, 42:14<br>**1993**<br>16:8<br>**2**<br>**2,000**<br>26:22<br>**20**<br>2:12<br>**2008**<br>13:6<br>**2011**<br>13:6<br>**2012**<br>12:16, 12:18,<br>12:19, 12:24,<br>27:11<br>**2014**<br>7:22, 22:24,<br>23:6, 23:7,<br>27:24, 28:16,<br>28:22, 31:20,<br>32:8, 35:11,<br>51:15, 54:20,<br>63:14, 65:2, |

Transcript of Zack Roeckeman
Conducted on August 8, 2018

120

| | | |
|---|---|---|
| 66:11, 69:13, 69:22, 73:20, 79:9 | **5900** 4:10 | |
| **2015** 12:16 | **6** | |
| **2017** 10:22 | **60607** 4:9 | |
| **2018** 1:18, 3:16 | **62706** 4:18 | |
| **2020** 89:21 | **62801** 3:20 | |
| **217** 4:19 | **7** | |
| **23** 89:21 | **785** 4:19 | |
| **243** 4:10 | **79** 2:15 | |
| **3** | **8** | |
| **3** 88:11 | **8145** 3:19 | |
| **30** 27:2, 49:24, 50:7, 63:21 | **83** 2:18 | |
| **311** 4:8 | **84** 2:7 | |
| **312** 4:10 | **9** | |
| **33** 2:12 | **9** 2:18 | |
| **3rd** 4:8 | **93** 16:9 | |
| **4** | | |
| **4555** 4:19 | | |
| **5** | | |
| **5** 2:6 | | |
| **50** 11:1, 11:2, 11:3, 11:8, 11:15, 12:2 | | |
| **500** 4:17 | | |
| **51** 5:8 | | |