IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

| | | |
|---|---|---|
| DEMETRIUS ROSS, et al., on behalf of themselves and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 15 C 0309 |
| GREG GOSSETT, et al., | ) ) ) | |
| Defendants. | ) | Hon. Staci M. Yandle |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION TO BAR EXPERT TESTIMONY**

Plaintiffs respectfully submit this response to Defendants' Motion to Bar Expert Testimony (ECF. 643), stating as follows:

**INTRODUCTION**

Between April and July 2014, the Illinois Department of Corrections ("IDOC") performed facility-wide shakedowns at four Illinois prisons: Menard, Illinois River, Big Muddy River, and Lawrence. This Court has certified a class of prisoners in those four prisons with claims against 22 Defendants who were responsible for creating the plan for these shakedowns and overseeing their execution to ensure uniformity and compliance with the plan. As set out in more detail in their response to Defendants' motion for summary judgment (being filed contemporaneously with this response), Plaintiffs have adduced substantial evidence that both the decision to conduct the shakedowns and the plan that governed the execution of the shakedowns were governed by Defendants' intention to harass and intimidate, rather than a legitimate penological purpose.

Plaintiffs have retained two correctional expert witnesses, Dan Pacholke and Pat Hurley, who have each authored a report assessing the conduct of the Defendants during the shakedowns. Ex. 1 (Pacholke Rep.); Ex. 2 (Hurley Rep.). After carefully applying their extensive correctional

training and experience to the record in this case, the experts opined that multiple aspects of the shakedowns were contrary to widely accepted correctional standards and had no legitimate penological purpose, and that Defendants failed in their duties to ensure that the shakedowns were conducted for a legitimate purpose and using methods that adhered to legitimate penological purposes, rather than intimidation and harassment.

Defendants seek to exclude certain opinions of Mr. Hurley, and to entirely bar the testimony of Mr. Pacholke. Their motion is largely comprised of baseless accusations of "biased advocacy." ECF 643 at 1. Stridency aside, however, Defendants do not challenge much. They do not challenge Mr. Hurley's or Mr. Pacholke's eminent qualifications to opine on matters of correctional administration and security, including facility-wide shakedowns, appropriate uses of force, and Defendants' conduct and responsibilities. *See* Fed. R. Evid. 702(a). They do not argue that Mr. Hurley or Mr. Pacholke reviewed insufficient materials. *See* Fed. R. Evid. 702(b). Nor do they meaningfully challenge the experts' methods or their application of those methods to the facts. *See* Fed. R. Evid. 702(c), (d). Mr. Hurley's and Mr. Pacholke's opinions satisfy all requirements under Rule 702 and *Daubert*, and the Court should accordingly deny Defendants' motion.

## LEGAL STANDARD

"A district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert*." *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993)). The Supreme Court in *Daubert* made clear that an expert by "knowledge, skill, experience, training, or education" may offer opinions if the expert's "scientific, technical, or other specialized knowledge" would "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert,* 509 U.S. at 588 (citing Fed. R. Evid. 702).

The Court also emphasized the "liberal thrust" of the Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony." *Id*. (citation omitted).

Rule 702 similarly provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. Under Rule 702, "the rejection of expert testimony is the exception rather than the rule." *Id.* (Advisory Note, 2000 amends.).

Although courts should serve as gatekeepers to ensure experts' opinions are reliable and relevant, "the district court's role as gatekeeper does not render the district court the trier of all facts relating to expert testimony." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013); *see also Lapsley v. Xtec, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) ("A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy."). In other words, the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact," and the focus of the *Daubert* inquiry should remain on the principles and methodology used by the expert, not on the ultimate opinions reached. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). If an opposing party intends to challenge the factual basis of the expert's opinion, the appropriate method is through cross-examination, not exclusion. *See Daubert*, 509 U.S. at 596; *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 586-87 (7th Cir. 2000).

And even if a district court determines that some of an expert's opinions are inadmissible, the court should not completely bar him or her from testifying to other, admissible opinions. *See, e.g., Vandervelden v. Saint Louis Univ.*, 589 F. Supp. 3d 944, 950-51 (S.D. Ill. 2022) (finding certain opinions admissible and excluding others); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1082-83 (N.D. Ill. 2022) (same).

## ARGUMENT

Defendants argue that Mr. Pacholke and Mr. Hurley are simply a "mouthpiece" for Plaintiffs' counsel. In reality, they seek to exclude the experts' testimony because the experts are critical of the Defendants' conduct and supportive of Plaintiffs' position in this case. But the fact that the experts have a perspective that the opposing party dislikes is not grounds for exclusion. Both Mr. Pacholke and Mr. Hurley tie their decades of relevant experience and expertise in correctional administration to the record of this case, which they have thoroughly reviewed, and explain in detail why the Defendants' conduct ran afoul of widely accepted practices within the field of corrections. Those opinions, which Defendants are free to challenge on cross-examination, easily satisfy Rule 702 and *Daubert*, and will assist the jury in determining whether Defendants' shakedown plan violated Plaintiffs' constitutional rights.

**I.     Mr. Hurley and Mr. Pacholke are undisputedly qualified to opine about accepted correctional practices.**

**A.     Dan Pacholke**

Dan Pacholke has 35 years of experience in correctional practices, where he held positions as a Director of Prisons, Correctional Officer, Lieutenant, Captain, Deputy Superintendent, Superintendent, Chief of Emergency Operations, Deputy Secretary, and Secretary in the Washington State Department of Corrections. His responsibilities included managing and reforming segregation units, overseeing violence reduction efforts, and conducting cell searches

in maximum security facilities. Ex. 1 at 4-5; Ex. 3 (Pacholke Dep.) at 21, 35. Mr. Pacholke has co-authored multiple publications regarding correctional practices, including peer-reviewed publications for the U.S. Department of Justice, and has been a consultant for the Department of Justice and the National Institute of Corrections. Ex. 1 at 6. As an Associate Director at the Institute of Urban Management at New York University, he collaborated with researchers on correctional management. Ex. 4 (Pacholke CV). He has also presented at the White House, the Mexican Consulate, and to national leadership in the United Kingdom. *Id.* at 4-5. During his career, Mr. Pacholke conducted trainings on strip searches and searches for contraband. Ex. 3 at 15-17, 34-38, 54-55, 120-121. He has served as a consultant and expert on correctional practices in 20 states. Relying on his extensive experience, Mr. Pacholke submitted a thorough, 73-page report in this case. *See generally* Ex. 1.

Pat Hurley is equally qualified, himself having 36 years of experience in corrections. As an expert he has reviewed over 12,000 use of force incidents. Ex. 2 at 1. He has worked in five prisons as Institutional Inspector, Commander of the Special Tactics and response team, Deputy Warden for operations and security, and Warden. *Id.* at 1-2. As a Commander of the Special Tactics and Response ("STAR") team, Mr. Hurley developed and implemented plans for facility searches of contraband, including for maximum security Ohio prisons. *Id.* Mr. Hurley has been a court-appointed monitor in three federal cases regarding use of force. *Id.* at 1, 3. During his career he served as a representative for the Bureau Chief for the Ohio Governor's Task Force for eliminating prone restraints. *Id.* at 1. He submitted a 37-page report in this case, with an additional ten-page appendix listing the materials relied upon in forming the opinions in his report. *See generally id.*

Defendants do not dispute that Mr. Hurley and Mr. Pacholke are qualified as experts in correctional practices and "can testify to the customs, practices, rules, and regulations that govern

5

activities in a correctional setting, as this is specialized knowledge that a jury would not have." ECF 643 at 20. And Defendants concede that Mr. Hurley can opine on "appropriate planning and execution of a facility-wide search." *Id.* at 8. There can be no question that under Rule 702, Mr. Hurley and Mr. Pacholke are each "qualified as an expert by knowledge, skill, experience, training, or education," and that they may assist a jury in understanding the appropriateness of Defendants' conduct at issue in this case. *See* Fed. R. Evid. 702; *Holliman v. Thompson*, 2019 WL 13156933, at *3 (N.D. Ill. Mar. 25, 2019) (holding that an expert can testify about a broad range of correctional practices due to his 32 years of correctional experience).

II. **Defendants' accusations of "biased advocacy" are baseless and, in any event, do not provide grounds for exclusion.**

Unable to attack Mr. Pacholke's and Mr. Hurley's qualifications to testify to correctional matters, Defendants argue that Plaintiffs' experts act as a "mouthpiece for the lawyer" and "weapons" who "propose to present Plaintiffs' closing argument, narrating Plaintiffs' facts, drawing Plaintiffs' factual and legal conclusions, and directing the jury precisely what to find." ECF 643 at 2, 16. First, they are wrong. Second, and more to the point, "it is well-established that an expert's bias is not a proper basis to bar testimony under *Daubert*." *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 827 (N.D. Ill. 2013). If Defendants wish to attack Mr. Pacholke's and Mr. Hurley's integrity and professionalism, they may seek to do so at trial through cross-examination.

With no persuasive basis for their accusations, Defendants rely on blatant misrepresentations of the records. For example, Defendants accuse Mr. Pacholke of starting his report by "listing" Defendants to "preview who is in his crosshairs." ECF 643 at 7. They say that he "distilled down" his review "to a factual narrative that ties up Plaintiffs' case against each of the [22] supervisory Defendants by name, personal involvement, and liability basis." *Id.* Defendants then include in their motion a bulleted list that condenses multiple statements made

throughout Mr. Pacholke's report into single bullet points, *see id.* at 7-8, making it seem as though this is Pacholke's own so-called "crosshairs" list. But that list is one *Defendants* created, collected by picking statements Pacholke made throughout his report along with a detailed analysis of the evidence reflecting Defendants' conduct and how it compares to accepted correctional practices. The list that Mr. Pacholke included in his report merely provides a description of each Defendant's position and background, as sourced from the Defendants' *own* deposition testimony. Ex. 1 at 10-12. Those descriptions are strictly factual, and there is nothing incorrect, spun, or slanted about them.

Defendants next criticize the fact that Mr. Pacholke referenced a letter written by Plaintiffs' counsel (sent prior to the lawsuit) that was addressed to Defendant Godinez and informed him about the reports of abuse during the shakedowns. ECF 643 at 16. Mr. Pacholke cited the letter as further support that Godinez had received notice about abusive conduct. Ex. 1 at 52. Mr. Pacholke's opinion that the letter provided additional notice to Godinez about the abusive conduct obviously rests on a belief that the letter had been received by Godinez—a belief that courts have relied upon to justify a presumption of "timely delivery of properly addressed mail." *Hayes v. Potter*, 310 F.3d 979, 982 (7th Cir. 2002). At his deposition, Mr. Pacholke acknowledged that he was aware that Godinez had denied receiving the letter and answered questions from defense counsel about what, if any impact, it would have on his opinions if, in fact, Godinez had never received the letter (a fact that is disputed between the parties). Ex. 3 at 247. Of course, the fact that one of Mr. Pacholke's opinions rests on a view of the evidence that hews closer to Plaintiffs' version of the facts than Defendants' is no basis for exclusion. *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000). Instead, as the Seventh Circuit in *Cooper* held, the proper method of contesting such an opinion is "to cross-examine vigorously, to present contrary

7

evidence, and to give careful instructions on the burden of proof." *Id.*; *see also Sommerfield v. City of Chicago*, 254 F.R.D. 317, 321 (N.D. Ill. 2008) ("The curative in cases involving conflicting testimony is not exclusion of opinions that assume the truthfulness of a particular version of facts, but cross-examination and jury instructions (that make clear that the expert is not deciding credibility), as the Court stressed in *Daubert*."). And the mere fact that Mr. Pacholke reviewed and commented on a disputed piece of evidence is no basis to jump to the conclusion that Mr. Pacholke is nothing more than a mouthpiece for Plaintiffs' counsel. Were it otherwise, the Seventh Circuit's holding in *Cooper* would be a nullity. Regardless, none of Defendants' accusations provide a proper basis for excluding expert testimony. The credibility of a witness, including an expert witness, goes to the weight of the testimony—not its admissibility. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017). And as this Court knows, credibility determinations about the weight of any witness's testimony (including expert witnesses) are reserved for the jury—not the Court. *Lapsley*, 689 F.3d at 805. If Defendants wish to sow doubt about the experts' "bias" despite their thorough review of the record and well-supported opinions, they can do that on cross-examination. *See Cage*, 979 F. Supp. 2d at 827.

**III.    Plaintiffs' experts' factual descriptions are appropriate and required by Rule 702.**

Defendants relatedly argue that Mr. Pacholke's and Mr. Hurley's reports provide "a narrative recounting of the facts in the light most favorable to Plaintiff[s]" that do not assist the trier of fact. ECF 643 at 7-9. But experts *must* provide the factual basis for their opinions in their reports to show how they arrived at their conclusion, and experts are frequently excluded for not doing so. *See, e.g.*, *Crawford Supply Grp., Inc. v. Bank of Am., N.A.*, 2011 WL 4840965, at *3 (N.D. Ill. Oct. 12, 2011) (excluding expert's opinions based on his prior experience because "he never draws explicit connections between specific incidences or lessons from his professional

8

history and the [facts of the case]."); *see also* Fed. R. Evid. 702, Advisory Comm. Notes ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience . . . is reliably applied to the facts.").

Mr. Pacholke and Mr. Hurley do exactly what is required by *Daubert* and Rule 702 by "show[ing] their work," and providing a thorough report that explains the link between the record and their conclusions. *Wilda v. JLG Indus., Inc.*, 2021 WL 392705, at *4 (N.D. Ill. Feb. 3, 2021). In *Kraft Foods Global, Inc. v. United Egg Producers*, a case Defendants heavily rely on, the district court recognized that experts are expected "to summarize the facts to lay the foundation for the opinions that follow." 2023 WL 6248473, at *4 (N.D. Ill. Sept. 19, 2023). The problem in *Kraft Foods* was that the expert occasionally simply provided a factual summary followed by a "raw conclusion" that was not dependent on his "specialized knowledge." *Id.* Notably, the district court noted that while a select few of the expert's opinions were mere narration, the expert's opinion was "chock-full of economic analysis that might help the jury" and was therefore admissible. *Id.* at *3; *see also id.* at *4 ("The issue is about trimming the fat, not throwing the whole thing out. Any meat on the bone can stay.").

In this case, Defendants argue in conclusory fashion that *all* of the opinions in Mr. Pacholke's report and at least most of the opinions in Mr. Hurley's report (the motion is not specific) are simply raw conclusions. ECF 643 at 2, 4, 9, 20. But both Mr. Pacholke's and Mr. Hurley's reports make clear that their opinions are anything but. To the contrary, their reports span a combined 114 pages that fastidiously connect the facts and their experience to their opinions, which rely upon their expertise in correctional administration and will help the jury to understand what is and is not widely accepted within the field of corrections, and how conduct by prisoner

9

administrators and supervisors is or is not connected to accepted legitimate penological interests.[1] And Mr. Pacholke and Mr. Hurley do not cherry-pick facts most favorable to the Plaintiffs, either. Both experts reviewed abundant evidence and cited the evidence relevant to their opinions. To the extent Defendants argue that the experts should have reviewed or cited different facts, the materials they reviewed and used to support their opinions are quintessentially "fodder for cross-examination, not grounds for exclusion." *Artis v. Santos*, 95 F.4th 518, 527 (7th Cir. 2024); *see Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 809 (7th Cir. 2013) ("Whether [the expert] selected the best data set to use . . . is a question for the jury, not the judge[;] it does not go to admissibility."); *Sioux Steel Co. v. Prairie Land Mill Wright Servs.*, 2022 WL 17184469, at *9 (N.D. Ill. Nov. 23, 2022) ("[D]isagreements with the facts [expert] used in coming to her opinions . . . go to the weight of [her] testimony and do not warrant its exclusion.").[2]

The jury will see and hear much of the evidence discussed by Mr. Pacholke and Mr. Hurley in their reports, and Plaintiffs do not intend to have Mr. Pacholke and Mr. Hurley merely rehash

---

[1] Though not nearly as thorough as Plaintiffs' experts, Defendants' expert Larry Reid summarizes the facts of the case in his report as well. For example, Reid created a chart of class members' grievances about the abuses that occurred during the shakedowns. *See* Ex. 5 (Reid Rep.) at 24. Plaintiffs rightly did not seek to exclude Reid's opinions on the ground that he included too much factual information, or that those facts are described in Defendants' favor. *See e.g., id.* at 30 (stating that "IDC supervisory staff took allegations of deviation from policy very seriously"). Of course, if the opinions of Mr. Pacholke or Mr. Hurley are excluded on those grounds, then the opinions of Mr. Reid should be as well.

[2] Defendants specifically suggest that Plaintiffs' experts improperly cite the testimony and grievances of prisoners. For example, Defendants excerpted Mr. Hurley's statement that "[i]nmates were denied basic needs during the shakedowns," which he based on the deposition testimony of five separate class members who were not permitted to use the bathroom during the shakedown. Ex. 2 at 10. Mr. Hurley's assumption is permissible. Courts agree that experts may "assume the truthfulness of the evidence on which their opinions were based," so long as such assumptions are actually supported by some evidence in the record. *Sommerfield*, 254 F.R.D. at 321; *see also Holliman*, 2019 WL 13156933, at *2 (Experts may make "certain assumptions about the record evidence—as all experts do—crediting some items of evidence and discrediting others."). As noted above, the proper response is not exclusion, but rather vigorous cross-examination and jury instructions that make the jury's role clear. *See supra* pg. 7-8. If Defendants contend that the class members were *not* denied basic needs, or that their testimony was not a reliable foundation for his opinion, then they can question Mr. Hurley about that opinion at trial.

the evidence that the jury already will have heard over the course of several days. Of course, the experts will have to testify about how the evidence they reviewed ties to their opinions—a practice that the district court in *Kraft Foods* recognized was appropriate. 2023 WL 6248473, at *4. Defendants are free to object at trial if they believe that either Mr. Pacholke's or Mr. Hurley's testimony is veering from proper expert testimony to merely Plaintiffs' mouthpiece, just as Plaintiffs will if Defendants' expert appears to be merely reciting their version of facts without more. It is perhaps for this reason that the district court in *Kraft Foods* ultimately held that "[p]inning down the particulars" of which statements in the expert's report would be admissible and which would not was "best left for trial." *Id.* This Court should act similarly and deny Defendants' *Daubert* motion with leave to object at trial if appropriate.

**IV.    Plaintiffs' experts will not testify to the Defendants' mental states.**

Defendants select a list of statements from Mr. Pacholke's and Mr. Hurley's reports, devoid of context, to argue that the experts improperly opine as to Defendants' mental states. Plaintiffs agree that experts cannot opine about a defendant's mental state. A definitive statement about another person's mental state would be purely speculative, and pure speculation is not admissible expert testimony because it is not the result of a reliable methodology. *Lurry v. City of Joliet*, 2023 WL 2138763, at *16 (N.D. Ill. Feb. 21, 2023). If there are rare instances where Mr. Pacholke and Mr. Hurley's phrasing implies their knowledge of a Defendants' mental state, Plaintiffs agree that it is inadmissible at trial and will not elicit it. *See* ECF. 645 at 15 (moving to exclude certain opinions of Defendants' expert Larry Reid that impermissibly speculate about the Defendants' states of mind.).

But experts *are* permitted to form opinions that suggest a person's knowledge or intent, based on their experience tied to the facts of the case. These opinions assist the trier of fact, and

11

are not speculative, because they are based on an expert's experience and expertise. For example, Mr. Hurley stated in his report that reverse strip searches indicate either improper practices that violated policy *or* purposeful actions. Ex. 2 at 16. Defendants take issue with the conclusion that Defendants' actions may have been purposeful. But Mr. Hurley properly came to this opinion after reviewing the evidence, including IDOC strip search policies and multiple complaints by class members, and applying his knowledge about how strip searches should be performed. *See id.* at 15-16; Ex. 6 (Hurley Dep.) at 15-16. Mr. Hurley did not conclude that the Defendants' actions were definitively purposeful, though a jury may conclude that they were. Similarly, Mr. Hurley can properly conclude based on his experience that class members' grievances "are remarkable for their volume and their consistency," Ex. 2 at 10, and should be taken "extremely seriously and [acted on] quickly and with decisiveness." *Id.* at 30. This could (or could not) lead a juror to conclude that grievances are truthful, but it properly leaves the role of making credibility determinations to the jury.

Defendants mischaracterize Mr. Pacholke and Mr. Hurley's reports, making it seem like they are simply telling the jury what conclusions to draw about Defendants motives, when they really provide their opinions that could allow a juror to draw that inference. For instance, Defendants argue that Mr. Pacholke opined "Yurkovich was motivated to do facility searches by fear of union reprisal." ECF. 643 at 11. But Mr. Pacholke did not offer any opinion as to motivations. Instead, he opined that, based on his experience as a former prison administrator and his "thorough understanding of the type of departmental actions for which it would be appropriate to provide prior notice to the union," Yurkovich's conversations with the president of the correctional officers' union were inappropriate. Ex. 1 at 14-15. The jury may conclude that Yurkovich was motivated by fear of the unions, or they may not, but Mr. Pacholke's report does

12

not improperly opine on Yurkovich's mental state, and for avoidance of doubt, Plaintiffs will be certain not to elicit any testimony from either Mr. Pacholke or Mr. Hurley that merely asks them to opine on Defendants' mental states.

### V.     Mr. Pacholke does not offer legal opinions.

Defendants accuse Mr. Pacholke of offering improper "outcome-determinative" legal conclusions, simply because he uses certain phrases in his report. Specifically, Defendants fault Mr. Pacholke for stating that, based on his review of the record, Defendants "failed to intervene," "failed to adequately supervise," and "caused harm to Plaintiffs." ECF 643 at 15-16.

There are no magic words that transform opinions into legal conclusion. "[W]hen legal standards are intertwined with everyday language, an expert's testimony will not necessarily be inadmissible solely because he uses such terms in his opinion." *Lurry*, 2023 WL 2138763, at *15. "It is the substance of the expert's opinion that matters; the expert must describe the officer's actions in terms of their consistency with or departure from sound [correctional] practices." *Id*. Here, Mr. Pacholke did not recite the elements of Plaintiffs' claims or otherwise tie the facts to the legal standard. Rather, Mr. Pacholke described that greater supervision or intervention would be required to conform with accepted correctional standards, and that Defendants did not meet these standards. For instance, Pacholke opined that "Plaintiffs reported that tactical personnel used profanity or demeaning language when addressing them verbally, another indicator of a lack of professionalism and lax training and supervision." Ex. 1 at 63. The words he used to describe these failures and the harm Plaintiffs experienced are used in the "commonly understood context," "thus [they are] permissible." *Sommerfield*, 254 F.R.D. at 336.

By contrast, Defendants' expert Larry Reid offers obvious bottom-line legal conclusions. For example, he states that the Defendants' destruction of property "do[es] not rise to the level of

cruel and unusual punishment." Ex. 5 at 40. And he opines that no jurisdiction would consider it a violation of rights for a tactical team to enter a cellhouse by yelling and banging batons on various surfaces. *Id*. at 39. These are precisely the types of legal conclusions that the jury is tasked with deciding. *Roundy's Inc. v. NLRB*, 674 F.3d 638, 648 (7th Cir. 2012) (The Federal Rules "prohibit experts from offering opinions about legal issues that will determine the outcome of a case") (citation omitted).

Mr. Pacholke's opinions do not suffer from this bottom-line opinion that simply purports to instruct the jury as to which box to check on the verdict form. Although his opinions sometimes use words that also have meaning in the legal context, they are appropriately used in the correctional context—the context in which Mr. Pacholke has expertise and experience. They are therefore appropriate and Defendants' motion to bar them should be denied.

### VI. Mr. Pacholke's and Mr. Hurley's opinions about the Defendants' failures to stop misconduct are relevant to the trier of fact.

Defendants argue that the Plaintiffs' experts should not be permitted to opine regarding the Defendants' failures to intervene in the actions of other IDOC staff because the class was certified based on a "top-down" conspiracy theory by which Defendants "designed and implemented the four facility-wide shakedowns as part of a common scheme to punish the persons in custody at the four facilities." ECF 643 at 18. As their argument goes, any opinion about how Defendants responded to misconduct is irrelevant because Plaintiffs' theory is not that "the tactical team had gone rogue," but that the shakedown was implemented as planned. *Id.* at 19.

To be sure, Plaintiffs do assert that the Defendants designed and carried out a uniform plan that had the effect of violating the Eighth Amendment rights of class members. But the class was also certified on the question of "whether the Defendants knew of, approved, facilitated and/or turned a blind eye to the alleged unconstitutional shakedowns." *Ross v. Gossett*, 33 F.4th 433, 437

14

(7th Cir. 2022) (citing and affirming the district court's class certification order). Each of the opinions that Defendants argue are "irrelevant" because they do not relate to Defendants' conspiracy in planning the shakedowns but are directly relevant to Plaintiffs' failure-to-intervene claims.

To the extent that Defendants contend Plaintiffs' claims are inconsistent, that argument is not only contrary to the Seventh Circuit's decision to affirm the district court's class certification on the failure-to-intervene claims, but also conflicts with their own summary judgment motion. In Defendants' summary judgment brief, they choose not to address Plaintiffs' failure-to-intervene claims at all because "all three claims are premised on the same underlying Eighth Amendment theory," and the failure-to-intervene claims merely require Plaintiffs to establish additional facts. ECF 642 at 31-32 n.5. Mr. Pacholke and Mr. Hurley offer clearly relevant opinions on that score. Such opinions, based on Mr. Pacholke's and Mr. Hurley's extensive experience in correctional administration, are clearly helpful to the jury and Defendants' motion to bar them should accordingly be denied.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motion to Bar the expert testimony of Pat Hurley and Dan Pacholke.

Dated: August 12, 2024 					Respectfully Submitted,

/s/ Nabihah Maqbool
Nabihah Maqbool


Sarah Grady
Nabihah Maqbool
Terah Tollner
KAPLAN & GRADY LLC
2071 N. Southport Avenue Ste. 205
Chicago, Illinois 60614
(312) 852-2184
nabihah@kaplangrady.com

Michael Kanovitz
Stephen H. Weil
Megan Porter
LOEVY & LOEVY
311 North Aberdeen St.
Chicago, Illinois 60607
(312) 243-5900

Alan Mills
Nicole Schult
UPTOWN PEOPLE'S LAW CENTER
4413 North Sheridan Rd.
Chicago, IL 60640
(773) 769-1410

## CERTIFICATE OF SERVICE

I, Nabihah Maqbool, an attorney, certify that on August 12, 2024, I caused the foregoing document to be filed using the Court's CM/ECF system, effecting service on all counsel of record.

/s/ Nabihah Maqbool
Nabihah Maqbool
Attorney for Plaintiffs