IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

| | | |
|---|---|---|
| DEMETRIUS ROSS, et al., on behalf of themselves and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 15 C 0309 |
| v. | ) ) | Hon. Judge Staci M. Yandle |
| GREG GOSSETT, et al., | ) ) | Hon. Magistrate Judge Mark A. Beatty |
| Defendants | ) ) ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Dated:        August 12, 2024

Michael Kanovitz
Stephen H. Weil
Megan Porter
LOEVY & LOEVY
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900

Sarah Grady
Nabihah Maqbool
Terah Tollner
KAPLAN & GRADY LLC
2071 N. Southport Ave., Ste 205
Chicago, IL 60614
(312) 852-2184

Alan Mills
Nicole Schult
UPTOWN PEOPLE'S LAW CENTER
4413 N. Sheridan Rd.
Chicago, IL 60640
(773) 769-1410

i

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION .....................................................................................................1

RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS...............................1

PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS ..................................12

PROCEDURAL HISTORY...........................................................................................42

LEGAL STANDARD..................................................................................................43

ARGUMENT ...........................................................................................................44

   I.   Plaintiffs Present a Genuine Issue of Material Fact on Their Eighth Amendment Claims

       Against the Supervisory Defendants...................................................................44

          A.  Defendants Developed a Uniform Plan ...............................................45

          B.  Defendants Executed Their Uniform Plan in Uniform Fashion ...........................47

          C.  The Shakedowns Violated Class Members' Institutional Rights .........................48

          D.  Defendants' Analysis of the Facts in this Case is Defective ................................52

   II.   Summary Judgement Should Be Denied As To Plaintiffs' Conspiracy and Failure to

       Intervene Claims ..........................................................................................61

  III.  Defendants Are Not Entitled to Partial Summary Judgement ..........................................62

  IV.  Defendants Are Not Entitled to Qualified Immunity.........................................................62

   V.  Plaintiffs Present a Genuine Dispute of Material Fact on Their Eighth Amendment

       Claims Against the Non-Supervisory Defendants ..............................................65

CONCLUSION.......................................................................................................66

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ............................................................43, 44

*Arnett v. Webster,* 658 F.3d 742 (7th Cir. 2011)........................................................................64

*Beal v. Foster,* 803 F.3d 356 (7th Cir. 2015)........................................................................63, 65

*Calhoun v. DeTella*, 319 F.3d 936 (7th Cir. 2003)........................................44, 58, 60, 62, 63, 65

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) .............................................................................65

*Chatman v. Gossett*, 2018 WL 10517620, (C.D. Ill. Jan. 17, 2018).........................................59

*Gill v. City of Milwaukee*, 850 F.3d 335 (7th Cir. 2017) ..........................................................62

*Gregg v. Georgia*, 428 U.S. 153 (1976) ...............................................................................48, 63

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ...............................................................................62

*Henry v. Hulett,* 969 F.3d 769 (7th Cir. 2020)...........................................................................48

*Hope v. Pelzer*, 536 U.S. 730 (2002) .........................................................................................62

*Howell v. Smith*, 853 F.3d 892 (7th Cir. 2017)...........................................................................63

*Hudson v. Palmer*, 468 U.S. 517 (1984).............................................................................48, 58

*King v. McCarty*, 781 F.3d 889 (7th Cir. 2015).........................................................................48

*Leiser v. Kloth*, 933 F.3d 696 (7th Cir. 2019)......................................................................62, 63

*Mays v. Springborn*, 719 F.3d 631 (7th Cir. 2013)........................................44, 48, 58, 60, 64, 65

*Mitchell v. Kallas*, 895 F.3d 492 (7th Cir. 2018) .......................................................................64

*Pearson v. Callahan,* 555 U.S. 223 (2009) ...............................................................................62

*Ralston v. McGovern*, 167 F.3d 1160 (7th Cir. 1999) ...............................................................64

*Rosado v. Gonzalez*, 832 F.3d 714 (7th Cir. 2016)...............................................................45, 61

*Scherer v. Balkema*, 840 F.2d 437 (7th Cir. 1988) ...............................................................44, 61

*Stewart v. Lyles*, 66 F. App'x 18 (7th Cir. 2003) .......................................................................58

*Streeter v. Sheriff of Cook Cnty.,* 256 F.R.D. 609 ((N.D. Ill. 2009) ..........................................52

*Tolan v. Cotton,* 572 U.S. 650 (2014)........................................................................................43

*Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 (2011) ................................................................65

*Wilson v. Seiter*, 501 U.S. 294 (1991)..............................................................................................57

*Young v. County of Cook*, 2009 WL 2231782 (N.D. Ill. July 27, 2009).......................................59

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(c) ....................................................................................................................43

**INTRODUCTION**

Summary judgment's purpose is to determine what genuine disputes of material fact should be submitted to a jury at trial. There is no dispute among the parties that the 2014 shakedowns were executed according to a uniform plan. But there is an enormous dispute over what that plan actually consisted of in practice. Defendants claim that plan was routine and followed IDOC policies and written operations orders. But Plaintiffs have amassed substantial evidence that the written operations orders were incomplete and inconsistent with the instructions given to tactical team members, which was done solely through verbal instructions that contradicted those orders and IDOC policy. Plaintiffs have further adduced evidence of widespread physical and psychological abuse documented with striking similarity across all of the affected facilities, in with prisoners consistently recounting how a tactical team known for its anonymity and brutality subjected class members to humiliation and abuse without justification. Hoping to skip out on trial, Defendants ignore the wealth of evidence developed by Plaintiffs over the course of this case. But when considered in the light most favorable to Plaintiffs, as this Court must at the summary judgment stage, it is plain the factual disputes in this case are legion, and the issues must be submitted to a jury to weigh the evidence and decide which account to believe. This Court should enter an order denying summary judgment on all counts.

**RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS ("RSMF")**

Paragraphs 1, 4, 11, 13, 26-28, 35-36, 48-49, 51-52, 54-56, 57, 60-64, 66-68, 71, 73-80, 82, 84-85, 87, 89-94, 98, 100-101, 103, 105, 108-109, 112-115, 117-125, 127-131, 133-137, 139-140, 146, 148-152, 154, 156-157, 159-166, 169-170, 172-174, 177, 179-187, and 192 are undisputed. With respect to the remaining paragraphs, Plaintiffs respond as follows:

2.       Disputed in part. While prison staff across IDOC facilities regularly perform cell searches, facility-wide shakedowns are uncommon. PSMF ¶¶ 10-11.

3.       Deny. As above, facility-wide searches are uncommon across IDOC facilities. PSMF ¶ 10-11.

5.       Deny. Facility-wide searches are uncommon precisely because they are disruptive and fail to accomplish the legitimate penological purposes that they purport to achieve. PSMF ¶¶ 10-11. Less intrusive options are available that more effectively achieve these same purposes, rather than resorting to facility-wide searches as a last resort. PSMF ¶¶ 11-14.

6.       Deny. Other less intrusive options exist that accomplish the same goals that facility-wide searches purport to with better efficacy. PSMF ¶¶ 11-14.

7.       Disputed in part. While searches may be a tool for gathering gang intelligence, there are other means to gather such information without disrupting the routine operations of facilities. PSMF ¶¶ 11-14.

8.       Disputed in part. These purposes can be accomplished without placing prisoners in painful cuffing positions and requiring these individuals to stand in holding areas without breaks. PSMF ¶¶ 56-59, 71-75.

9.       Deny. It is uncommon to do these searches without prior incidents justifying the use of this technique as a last resort. PSMF ¶¶ 10-11.

10.      Disputed in part. Tactical teams are typically used for operations where use-of-force by officers is virtually guaranteed, such as forcible cell extractions, prisoner rights, and prisoner escapes. PSMF ¶¶ 15.

12.     Deny. Tact team members are selected through a process that requires no additional training and no interview to vet members. PSMF ¶¶ 18. The hiring process is informal, unprofessional, and largely kept secret in a manner that cultivates a culture for abuse.

14.     Disputed in part. While IDOC did maintain policies for conducting strip searches, these policies were not followed during the shakedowns in this case. PSMF ¶¶ 50-52.

15.     Disputed in part. While Menard has a strip-search policy, there is evidence that this written policy was not used in practice. PSMF ¶¶ 50-52.

16.     Disputed in part. While Menard has a strip-search policy, there is evidence that this written policy was not used in practice. PSMF ¶¶ 50-52.

17.     Disputed in part. While IDOC policy may prohibit female officers from being present for strip searches of male prisoners, there is evidence in the record that this policy was not followed in practice. PSMF ¶¶ 50-52.

18.     Deny. IDOC policy does not require that prisoners be moved with their heads down and in a tight formation for large line movements. It allows for large line movements of up to 90 prisoners, uncuffed, and escorted by two or more guards. PSMF ¶¶ 68.

19.     Deny. Movement in this matter imperils prisoners and increases the likelihood of unnecessary injury from close line movements. PSMF ¶¶ 70.

20.     Deny. IDOC policy and practice allows large line movements without these practices in other circumstances. PSMF ¶¶ 68.

21.     Deny. Prisoners may be moved even during large searches with their hands uncuffed. PSMF ¶¶ 68.

22.     Deny. IDOC policy allows for movement without handcuffing because there is nothing to suggest that prisoners will act more violently or erratically during large movements. PSMF ¶¶ 68-69.

23.     Deny. Cuffing during movements of the sort employed here harm prisoner safety by creating tripping and fall hazards. PSMF ¶¶ 70.

24.     Disputed in part. While prisoners can obtain a front cuffing permit from their facility, the record reveals that cuffing permits were not respected during shakedowns. PSMF ¶¶ 32.

25.     Disputed in part. Class members were needlessly cuffed for long periods of time that resulted in severe physical and emotional distress. PSMF ¶¶ 56-59. There is no indication that cuffing in this manner during mass movements is required to minimize the chance that prisoners will secure contraband. PSMF ¶¶ 59.

29.     Deny. The record demonstrates that officers did not complete shakedown slips for confiscated property or only provided incomplete or illegible shakedown slips. PSMF ¶¶ 79.

30.     Deny. Permitted property was confiscated by officers who had no familiarity with the rules of the facilities they were searching, and officers failed to provide shakedown slips indicating what good cause justified property seizure. PSMF ¶¶ 76-79.

31.     Disputed in part. The record demonstrates numerous examples of officers deviating from written IDOC policies and instead abiding by the verbal briefings given prior to the shakedowns. PSMF ¶¶ 30-32.

32.     Disputed in part. While IDOC policy provides a standard approach for a strip search, shakedown practices did not abide by the written policies for strip searches. PSMF ¶¶ 50-52.

33.     Unsupported. Defendants exhibit states that administrators and executive staff would review training but did not receive more substantive physical training. *See* ECF 642-12 at 45-46. Tact team members received very little training on the job, and there is no indication that officers were regularly trained on these matters. PSMF ¶¶ 18.

34.     Deny. Evidence indicates that Defendants did not initiate searches to eliminate contraband but because the facilities had not been recently searched. PSMF ¶¶ 4-9.

37.     Deny. In practice, the shakedowns were executed pursuant to the uniform plan outlined in pre-shakedown briefings and "cheat sheets," rather than the operations orders. PSMF ¶¶ 23-34.

38.     Disputed in part. There is no evidence that tact team members from multiple facilities were needed to execute the shakedowns quickly. Instead, facility-wide searches are not used regularly in IDOC because they require staff from multiple facilities who are unfamiliar with the prisoners, practices, and policies of the facilities, which results in problems during execution. PSMF ¶¶ 10-11. These are massive logistical undertakings, which can exacerbate existing tendons within the facilities. PSMF ¶¶ 11.

39.     Disputed in part. While tact team members report to the regional tact team commanders and statewide commanders, wardens and assistant wardens are still responsible for the conduct of tact teams at their respective facilities. PSMF ¶¶ 23.

40.     Disputed in part. While these shakedowns were executed pursuant to a uniform plan, that plan was outlined in the pre-shakedown briefings and "cheat sheets," rather than the written operations orders. PSMF ¶¶ 29-34.

41.     Disputed in part. While the shakedowns began with officers entering the living area quickly and noisily, this practice was used to intimidate prisoners, rather than to put them on notice to the search. PSMF ¶¶ 39-49.

42.     Deny. Entering a cellblock noisily would undermine any purported goal to keep prisoners from destroying contraband, as it would give prisoners notice that the search had begun and give them the opportunity to do precisely that. PSMF ¶¶ 42.

43.     Deny. The record indicates that multiple prisoners were subjected to humiliating "reverse" strip searches. PSMF ¶¶ 50-52.

44.     Disputed in part. "Cheat sheets" provided to tact team members before the shakedowns provided a uniform instruction to officers that prisoners were not allowed to put their underwear or socks back on. PSMF ¶¶ 53-55.

45.     Deny. There was no legitimate penological reason for this practice, and it was simply designed to humiliate. PSMF ¶¶ 54.

46.     Deny. This practice was designed to humiliate prisoners. PSMF ¶¶ 54.

47.     Deny. IDOC policy allows for large line movements of prisoners without requiring them to walk in painful cuffing positions, close together, with their heads down, as such movement risks injury to the prisoners. PSMF ¶¶ 68.

50.     Deny. The record demonstrates that supervisors were notified of reports of abuse throughout the execution of these shakedowns, yet they did nothing. PSMF ¶¶ 82-86.

53.     Deny. Defendants' expert distorts the numbers here. As stated in their footnote, "[s]everal inmates alleged that they told officers they had an injury that should be accommodated with no handcuffing or different handcuffing, but only two inmates actually alleged they had a permit allowing a different handcuffing procedure that was not honored." ECF 642-4 at 23 n.5. In

6

other words, Defendants' expert used their own criteria to determine who "properly" alleged that a permit was not respected.

58.     Deny. Godinez received notice of abuses occurring during the shakedowns yet did not act to correct these issues. PSMF ¶¶ 83.

59.     Deny. Final approval of the statewide shakedowns lay with Yurkovich, Atchison, and Godinez. PSMF ¶¶ 26.

65.     Deny. Yurkovich and Atchison were responsible for developing the initial shakedown plans. PSMF ¶¶ 25. Yurkovich and Atchison decided to use facility-wide shakedowns, rather than less intrusive options. PSMF ¶¶ 12-14 Yurkovich and Atchison supervised the pre-shakedown briefings held by White and McAlister, where the uniform plan was provided. PSMF ¶¶ 27-30.

69.     Disputed in part. Yurkovich and Atchison had daily conversations with on-the-ground staff, including instructing White and McAllister were advised on conducting future shakedowns in response to reports of staff misconduct. PSMF ¶¶ 26, 83.

70.     Disputed in part. Final approval of the written operations orders lay with Yurkovich, Atchison, and Godinez. PSMF ¶¶ 26.

72.     Deny. Yurkovich and Atchison were responsible for developing the initial shakedown plans. PSMF ¶¶ 25. Yurkovich and Atchison decided to use facility-wide shakedowns, rather than less intrusive options. PSMF ¶¶ 25. Yurkovich and Atchison supervised the pre-shakedown briefings held by White and McAlister, where the uniform plan was provided. PSMF ¶¶ 27-30.

81.     Deny. White, alongside McAllister, conducted the pre-shakedown briefings where the uniform plan was laid out to tact team members. PSMF ¶¶ 28-30.

83.     Disputed in part. Both McAllster and Whiter were involved in drafting written operations orders. PSMF ¶¶ 26-27.

86.     Disputed in part. McAllister and/or White was responsible for conducting initial briefings with facility tact commanders and tact teams. PSMF ¶¶ 26-27. Written operations orders were not distributed or reviewed at these briefings and, instead, verbal "cheat sheets" that omitted information or contradicted the written operations orders were what guided the shakedowns. PSMF ¶¶ 28-34.

88.     Deny. McAllister, alongside White, conducted the pre-shakedown briefings where the uniform plan was laid out to tact team members. PSMF ¶¶ 26-27.

95.     Deny. Craig was the second in command at Big Muddy, after tact team commander McAllister. Defs. ECF 642-46 at 27:14-28:2.

96.     Deny. Craig was present and spoke with McAllister during the morning briefing. Ex. SS at 29:6-23. He was present and available during the shakedowns to assist. *Id.* at 32:5-12.

97.     Deny. Craig was present and spoke with McAllister during the morning briefing. Ex. SS at 29:6-23. He was present and available during the shakedowns to assist. *Id.* at 32:5-12.

99.     Deny. Hermetz's role was to maintain the security of the operation while it was occurring. ECF 642-24 at 88:12-15.

102.    Deny. Hermetz's role was to maintain the security of the operation while it was occurring. *Id.* at 88:12-15.

104.    Deny. As a regional tact team commander, White, alongside McAllister, was responsible for overseeing the development and execution of plans across facilities. PSMF ¶¶ 35.

106.    Deny. The record states that White attended these briefings as a tact team commander, even if he has no specific memory of doing so. PSMF ¶¶ 27-29.

107.    Deny. White, alongside McAllister, conducted the pre-shakedown briefings where the uniform plan was laid out to tact team members. PSMF ¶¶ 27-29.

110.    Deny. Finney recalls participating in the shakedown at Lawrence, Menard, and Big Muddy. ECF 642-17 at 121:1-8, 122:11-21, 123:18-124:11, 124:4-16.

111.    Deny. Finney recalls participating in the shakedown at Lawrence, Menard, and Big Muddy. *Id.* at 121:1-8, 122:11-21, 123:18-124:11, 124:4-16.

116.    Deny. Gossett asserted that all officers acted consistent with the tact team plans during the 2014 shakedowns. ECF 642-6 at 264:23-265:20.

126.    Deny. Arnett was responsible for supervising team members during the shakedowns at Illinois River. Defs. ECF 642-19 at 62:8-18.

132.    Deny. Piper was responsible for giving instructions to tact team members on how to execute the uniform plan. ECF 642-47 at 120:14-121:15.

138.    Deny. Duncan was a member of the pre-operations tactical team and responsible for providing members with instructions in pre-shakedown briefings. ECF 642-20 at 51:12-22.

141.    Deny. Moore was present at operational plan briefings with tact team members and conveyed prisoners' personal property concerns to McAllister. ECF 642-38 at 66:20-68:8.

142.    Disputed in part. Moore was tasked with ensuring tact team compliance with the uniform plan in his facility, provided support to McAllister, and observed the operation for approximately an hour. *Id.* at 78:3-79:21, 81:6-82:1.

143.    Deny. Moore was present at oral briefings and collaborated with McAllister to ensure compliance. *Id.* 66:20-68:8, 78:3-79:21, 81:6-82:1.

144.    Disputed in part. Gilreath was employed at Lawrence at the time of the shakedown, which occurred before his military service orders came through. ECF 642-15 65:3-70:5. He could not recall if he was still in command at the time. *Id.* at 70:6-72:17.

145.    Disputed in part. Gilreath could not recall his role in the Lawrence shakedown. *Id.*

147.    Deny. Gilreath recalls some incidents he was present for during shakedowns, such as an incident where a prisoner's shoulder was injured. *Id.* at 129:18-130:20.

153.    Deny. As one of the two tact team commanders assigned to this operation, McAllister, alongside White, was responsible for working with Yurkovich and Atchison to develop and execute the uniform plan. PSMF ¶¶ 25-26.

155.    Deny. Butler participated in drafting and reviewing operations orders for the shakedown. ECF 642-18 at 38:8-39:12, 41:15-42:1.

158.    Deny. Butler participated in drafting and reviewing operations orders for the shakedown. *Id.*

167.    Disputed in part. Witthoft supervised the tact team's search operations and ensured that they were conducting the search according to the uniform plan. ECF 642-54 at 78:8-24.

168.    Deny. Witthoft, as the institutional tact team commander, would have been responsible for tact team members within the holding area. *Id.* at 72:19-75:18.

171.    Deny. The uniform plan developed by the Defendants in this matter deviated from IDOC policy in several respects, including strip search, cuffing, and movement policies. PSMF ¶¶ 50-52, 56-59, 66-70.

175.    Deny. IDOC policy did not require that prisoners be handcuffed for these large line movements. PSMF ¶¶ 68.

176.     Deny. Prisoners testified that they were forced to wait for extended periods of time in uncomfortable positions. PSMF ¶¶ 71-75.

178.     Deny. Prisoners testified that they were required to perform humiliating "reverse strip searches." PSMF ¶¶ 50-52.

188.     Disputed. The claimed fact is not supported by the evidence cited.   Fifteen interviews are cited.   In all but two, the attorney conducting the interview does not ask what order the search was performed in.   The only exceptions are ECF 491-7 at 62 (9:1-10) and ECF 491-7 at 91 (4:21-5:7).   In the remaining interviews, the attorney is notably careful ***not*** to ask about the order of search (head-to-toe or reverse).   In most of the cited examples, the prisoner does not state the order of search.   The following, for example, is cited by Defendants as confirmation that no reverse strip search occurred:

> 13· · · · MR. DURAND:· · And can you explain how they did the strip
> 14· ·search?
> 15· · · · MR. VARNADO:· · They strip searched us, checked our hands,
> 16· ·our nails, I mean our hands, our hair, our ears, tongue, mouth,
> 17· ·our feet, and they pat us down like we actually had clothes on.

ECF 491-7 at 212 (3:13-17).   There are 40 interviews transcribed by the Defendants in ECF 491-7.  A correct statement would be that only in two of those 40 interviews did a prisoner recall a strip search being conducted head to toe.

189.     Deny. Prisoners testified that they were touched or shoved in one another during line movements. PSMF ¶¶ 63-66.

190.     Deny. At least 18 class members reported being pushed and shoved by tact team members during line movements. PSMF ¶¶ 60.

11

191.    Deny. Plaintiffs' expert Pat Hurley testified that, had the searches been executed according to IDOC policies, they could have been acceptable, but these searches were executed according to an unwritten uniform plan. ECF 642-50 at 245:23-246:2.

193.    Deny. Plaintiffs' expert Daniel Pacholke testified that handcuffing was unnecessary under these circumstances, as IDOC policies allowed for mass line movements without the need for prolonged, painful, and unnecessary cuffing. PSMF ¶¶ 68.

**PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS ("PSMF")**

1.    Plaintiffs' claims concern the constitutionality of facility-wide shakedowns that occurred at four Illinois Department of Corrections ("IDOC") prisons: Menard Correctional Center ("Menard") in April 2014, Illinois River Correctional Center ("Illinois River") in April 2014, Big Muddy River Correctional Center ("Big Muddy") in May 2014, and Lawrence Correctional Center ("Lawrence") in July 2014.

2.    During the relevant time frame in 2014, Defendant Salvador Godinez served as the IDOC Director. ECF 481-18 at 26:19-21. Defendant Joseph Yurkovich was the Chief of Operations, and Defendant Michael Atchison was the Deputy Chief of Operations. ECF 481-16 at 65:2-10; ECF 481-6 at 45:11-13.

3.    Defendant David White was the Statewide Tact Commander, and Defendant Anthony McAllister was the Southern Regional Tact Commander. ECF 481-7 at 24:13-23, 32:6-8; ECF 481-17 at 13:7-10, 56:14-16. As Southern Regional Tact Commander, McAllister was responsible for Big Muddy, Lawrence, and Menard, among others. *Id.* at 55:22-56:5. There was no Central Regional Tact Commander. ECF 481-7 at 32:23-33:11.

**Defendants Create a Common Plan to Conduct Shakedowns**

4.     In 2014, Yurkovich and Atchison decided to perform prison-wide searches at IDOC facilities as part of a "spring cleaning" initiative to remove trash and contraband from the facilities. ECF 481-16 at 93:13-95:6; ECF 481-69 at 2 (discussing the upcoming "wave of the 'spring cleaning' whole facility shakedowns").

5.     Yurkovich and Atchison had several conversations amongst themselves to form their plan regarding these shakedowns and their intended purpose. ECF 481-6 at 42:4-21, 45:21-47:1. Yurkovich testified that he could not recall if the operation was in response to increased staff assaults, increased contraband, gang activity, or any risks to the safety and security of the facilities. ECF 481-16 at 103:23-104:15; Ex. A at 14. Instead, Yurkovich and Atchison decided to initiate these sweeps, not in response to any particular concerns within these facilities, but because the prisons "hadn't been searched on a facility-wide scale in a long time." ECF 481-6 at 46:1-10; ECF 481-16 at 103:23-104:15.

6.     Initially, Yurkovich and Atchison's plan was to conduct a facility-wide shakedown of every prison within the state, regardless or whether or not the prison had experienced any issues with contraband, assaults, or the like. ECF 481-16 at 103:17-22, 106:22-107:4. In the end, the prisons that ended up being the subject of a facility-wide searches appear to be mostly random, based on scheduling rather than any safety or similar concerns. ECF 481-71.

7.     Before they decided to plan this "spring cleaning" initiative, Yurkovich emailed Eddie Caumiant, the state union president for the majority of IDOC correctional staff, informing him that multiple facilities statewide would be locked down. Ex. B. Mr. Caumiant replied positively, as staff union members "want to see a facility wide lock and shakedown. They are

getting very worried that the place is losing control, and are starting to whisper 'no confidence' among other things." *Id.*

8.      Plaintiff expert Daniel Pacholke has offered the opinion that there was no penological purpose for Yurkovich to provide notice to the union of the upcoming shakedowns. Ex. A at 14. Yurkovich would have known, as a prison administrator with his tenure and experience, that providing notice to the union would undermine any operational justification for these shakedowns that required maintaining secrecy. *Id.* at 15. Mr. Pacholke also offers the opinion that a correctional administrator with Yurkovich's experience would have known the union staff president would relay this news to lay members throughout the targeted facilities in advance of the shakedowns, which would have undermined the purported secrecy of the plan. *Id.*

9.      Mr. Pacholke has further offered the opinion based on his experience as a former prison administrator in a state with politically influential correctional officer unions that a prison administrator would understand that "Mr. Caumiant's mention of staff discussing a vote of no confidence was a threat to Defendant Yurkovich because a union member vote of no confidence … could very likely result in Mr. Yurkovich, and others in IDOC leadership roles, losing their positions." *Id.*

### Yurkovich and Atchison Skip to Facility-wide Shakedowns Ignoring Better Options to Find Contraband

10.      Prison staff across IDOC facilities regularly perform area searches, commonly referred to as "shakedowns," of one or more cells or wings. ECF 481-8 at 51:3-52:2. By contrast, facility-wide shakedowns go beyond these routine searches, as they are "statewide" operations that require the use of tact team members from multiple prisons to execute them. These shakedowns require approval from and supervision by senior members of the IDOC administration. ECF 481-6 at 33:12-22, 46:11-15. Before 2014, facility-wide shakedowns were rare or nonexistent in IDOC.

14

ECF 481-17 at 108:19-110:24; ECF 481-6 at 46:1-10; ECF 481-26 at 63:11-64:6; ECF 481-19 at 49:18-51:10.

11.     Mr. Pacholke has offered the opinion that operations such "statewide" operations require using staff from multiple facilities who are unfamiliar with the prisoners, practices, and allowable property at each facility. Ex. A at 16. Pacholke explains that prison administrators would be expected to know that such unfamiliarity exacerbates existing tensions within facilities. *Id.* at 16-17

12.     Mr. Pacholke has additionally explained that Yurkovich and Atchison's decision to conduct statewide, facility-wide shakedowns skipped more common and more effective methods for reducing contraband, gathering gang intelligence, and mitigating security threats. *Id.* at 17. It is more common to "conduct cell searches more frequently than the usual practice in several units" and "target a limited number of cells" to narrow the search. *Id.* This approach uses staff assigned to a facility who are familiar with allowable property, electronics, permits, and commissary "to minimize wrongful confiscations." *Id.* It also does "not require a lockdown, a fully dressed out tactical team, or a large and expensive number of staff." *Id.* "It would represent a slight escalation of business as usual, but would not require lengthy lockdowns, restrictions of activities, or placing prisoners in restraints for extended periods of time in a holding area." *Id.* "Once the assessments were completed, the warden could make a determination if the contraband levels are normal or if the levels are high enough to justify conducting additional searches." *Id.*

13.     Mr. Pacholke explains that there are even less intrusive options at prison officials' disposal. For example, some prisons employ a "contraband amnesty day," where prisoners are able to deposit contraband in a designated area with no questions asked and no interaction with staff. *Id.* at 16-17. As Mr. Pacholke explains, "[t]his simple approach resulted in fairly high amounts of

lower-level contraband and some dangerous contraband being voluntarily surrendered." *Id.* at 17. "The value of the approach was that it was upfront, announced ahead of time, and staged in a way that everyone knew what was occurring and why." *Id.* Additionally, this approach gives prison officials "insight into the types of contraband [they] should be looking for during cell searches and if [they] received improvised weapons, we could track down the materials being used to make them and respond proactively." *Id.* In other words, contraband amnesty days allow prison officials to "reduce[] contraband, gain[] valuable information, and [] not disrupt operations or create tension in the process." *Id.*

14.     Even when violence occurs, Mr. Pacholke explains, a facility-wide shakedown is not the only option prison administrators have at their disposal. *Id.* at 15. Instead, the facility could be placed on lockdown pending an assessment of the disturbance. *Id.* Over the course of several days, "investigators, counselors, or other staff could . . . . be[] assembled and deployed with a standard set of questions that each inmate would be asked." *Id.* The results of those interviews would inform the transition of the facility back to normal, through "[i]ncremental steps [that] could [] [] allow[] recreation, resuming visiting, and resuming phone calls." *Id.* at 16. This approach can de-escalate conflict while achieving the goal of gathering intelligence and maintaining safety. *Id.*

### Yurkovich and Atchison Enlist Orange Crush A Team Used for Intimidation and Force

15.     Yurkovich and Atchison decided to use IDOC tactical teams to execute the shakedowns. ECF 481-6 at 47:21-49:8; ECF 481-71 at 2-3. Tact teams are utilized (or "activated") in situations where use of force against prisoners is virtually guaranteed, such as forcible cell extractions, prisoner riots, and prisoner escapes. ECF 486-1 at 6-17, 50.

16.     Tact team members are supervised by a facility tact commander and one or more assistant commanders at the prison where they work, followed by the Regional Tact Commander

(McAllister) and the Statewide Tact Commander (White). ECF 481-8 at 18:3-21; ECF 481-16 at 67:10-69:24; ECF 481-17 at 83:6-84:15. All tact command staff answer to the IDOC Deputy Chief of Operations (Atchison) and the Chief of Operations (Yurkovich), who in turn answer to the IDOC Director (Godinez). ECF 481-17 at 83:6-10; ECF 481-16 at 136:14-16.

17.    Tact team members wore an orange jumpsuit, a vest, a helmet with a face shield, gloves, a 3-foot baton, pepper mace, a flashlight, and a radio. ECF 481-7 at 38:21-39:2; ECF 486-1 at 51. These uniforms concealed team members' identities–the helmet covered their face, the gloves prevented a prisoner from being able to identify even the race of the officer, and the jumpsuits had no identifying names or numbers. ECF 481-7 at 39:5-11; ECF 486-1 at 51. Because of their uniforms, IDOC staff and prisoners referred to the tact team as "Orange Crush." ECF 481-6 at 162:16-163:17.

18.    The tact teams had no physical exam requirement and no interview process to vet new members. ECF 481-7 at 20:19-21:12. Forty hours of training are required, including training to conduct shakedowns in a "systematic fashion," but there were no written training materials and no exam. *Id.* at 17:12-18:2; ECF 481-10:9-24.

19.    Plaintiffs' experts have offered that these features of the tact teams invited abusive behavior like that seen during the shakedowns at issue in this case.

20.    Plaintiff expert Patrick Hurley offers the opinion that the colloquial use of the moniker "Orange Crush" to describe the unit is indicative of a cultural expectation that accepts and even encourages its members to engage in abusive and violent behavior outside the normal rules governing prisoner-staff interactions. Ex. C at 12-15. Mr. Hurley further opines that "[a]gencies need to be vigilant and responsive to names that staff use to label their attitudes, actions, and intentions, especially when those names are attached to agency sanctioned teams." *Id.*

at 13. Names like "Orange Crush" "undermine the efficacy of the search mission by encouraging inappropriate conduct by officers under the anonymity of these names and the aggressive attitude they connote." *Id.*

21.     Mr. Patrick Hurley offers the opinion that this lack of identifying insignia was "inconsistent with generally accepted correctional practice and sets the stage for inappropriate staff behavior because there is a lack of accountability." *Id*. It is an industry standard to have identifying insignia because it establishes officers' credibility and promotes accountability by allowing abusive officers to be identified after the fact. *Id.* Mr. Hurley offers the opinion that "[b]y design, the failure to provide identification opens the door for systemic abuse which then cannot or will not be addressed due to the inability to identify participants." *Id.* "These factors also impact disciplinary sanctions because those sanctions most likely will be nullified based upon the inability to establish the identity of the staff member." *Id.* "IDOC's practice of deploying a Tactical Team that has no identifying marks is not consistent with accepted practice and is not consistent with an intent to be transparent and any intent to have accountability." *Id.*

22.     Mr. Pacholke notes that the anonymity was relevant in the searches at issue in this case, because using "off-site tactical teams . . . to conduct strip-searches, mass movement, and cell searches to make it less likely that prisoners would know who to grieve for their conduct and missing or damaged cell property." Ex. A at 62.  Based on the offender grievances in this case, almost no one was identified for any staff misconduct cases," making anonymous abuse that much easier. *Id.*

**Execution of the Shakedowns:  Planning Between Defendants and Oral Briefings
Not Written Directives, Direct Tact Team Operations**

23.     Each prison's warden and assistant warden of operations are responsible for the tact team and their conduct at their respective prison. ECF 481-18 at 105:12-20; ECF 481-19 at 179:23-180:5; ECF 481-20 at 17:4-16; ECF 481-28 at 51:2-16.

24.     The 2014 facility tact commanders, assistant tact commanders, wardens, and assistant wardens at each facility are listed below. These officials supervised tact teams of approximately 20-40 members each. ECF 481-75; ECF 481-76; ECF 481-77. All are Defendants against whom this Court has certified the class in this action:

| Menard | Illinois River | Big Muddy | Lawrence |
|---|---|---|---|
| - Jerry Witthoft (tact commander)<br><br>- Frank Eovaldi (assistant tact commander)<br><br>- Kim Butler (Warden)<br><br>- Alex Jones (Assistant Warden of Operations) | - Robert Arnett (tact commander)<br><br>- Brian Piper (assistant tact commander)<br><br>- Greg Gossett (Warden)<br><br>- Stephanie Dorethy (Assistant Warden of Operations) | - David Hermetz (tact commander)<br><br>- Chris White (assistant tact commander)<br><br>- Ken Finney (assistant tact commander)<br><br>- Zachary Roeckeman (Warden)<br><br>- Robert Craig (Assistant Warden of Operations) | - Michael Gilreath (tact commander)<br><br>- Timothy McAllister (assistant tact commander)<br><br>- Stephen Duncan (Warden)<br><br>- Richard Moore (Assistant Warden of Operations) |

25.     After their initial conversations about the shakedowns, Yurkovich and Atchison had a series of "very in-depth conversations" between them, White, and the wardens of the facilities they planned to shake down. ECF 481-6 at 47:21-48:7, 48:23-49:8; ECF 481-69 at 2.

White, who was the Statewide Tact Commander, attended a meeting in Springfield with either Yurkovich or Atchison, where White learned about the plan to conduct the shakedowns. ECF 481-7 at 71:5-72:11. McAllister, who was the Southern Regional Tact Commander, testified that he was not involved in the decision to conduct facility-wide shakedowns, but he was involved in planning their execution once the decision was made to conduct the shakedowns. ECF 481-17 at 114:23-115:14.

26.    McAllister and White's involvement did not end there. McAllister and White were responsible for creating written "operations orders" using old IDOC templates. ECF 481-17 at 85:19-86:15; ECF 481-7 at 70:1-5; ECF 481-6 at 54:3-7, 54:20-55:16; ECF 481-17 at 123:3-124:8. These orders outlined the schedule and staffing needs for the shakedowns. ECF 481-64 at 2. These statewide operations require approval and supervision by senior members of the IDOC administration, including Yurkovich, Atchison, and Godinez. ECF 481-6 at 33:12-22, 46:11-15; ECF 481-16 at 100:5-16; ECF 481-72 at 2.

27.    These written orders were not distributed to the facility tactical team commanders, assistant commanders, or any tact team members, however. ECF 481-17 at 132:5-136:6; ECF 481-8 at 75:3-8; ECF 481-20 at 66:8-13; Ex. A at 21. Only the warden and assistant warden of each facility received a copy of the written orders. ECF 481-17 at 132:5-136:6. These written orders omitted several key details about the plan, including how the shakedowns would be performed. ECF 481-66 at 2-5. These orders list high-level, generalized "objectives" for the searches that stated what the searches would include, rather than specifics about how the searches should be conducted. *Id.* at 1, 2 ("The inmates from North Cellhouse will be strip searched, restrained behind the back, and escorted to the Chapel by Tactical Staff & then interviewed by Intel/I.A. Staff.").

28.     Instead, the details about how the shakedowns would be performed were communicated orally. *See* ECF 481-7 at 36:23-37:6 (describing how tact team would be orally informed of search duties); ECF 481-8 at 70:12-71:11 (same); ECF 481-10 at 71:3-74:11, 101:4-13 (same); ECF 481-11 at 65:14-67:8 (same); ECF 481-14 at 40:6-41:21 (same); ECF 481-15 at 73:7-169 (same). White and/or McAllister conducted the initial commanders' oral briefing. In these briefings, McAllister or White discussed the shakedown plan with facility tact commanders, including the specifics of how the shakedown operation was to be conducted. ECF 481-10 at 71:3-73:16, 75:20-23; ECF 481-7 at 37:4-6. McAllister or White laid out "how you would perform your duties of the day," "what [prisoners] could wear out of the cell," "[h]ow you [were] to cuff," and "[h]ow they were to . . . conduct their self, how to handle the inmates," among others. ECF 481-11 at 71:3-73:16. The facility's Warden and Assistant Warden of Operations also attended these briefings. ECF 481-17 at 139:23-140:8; ECF 481-7 at 36:23-37:24; ECF 481-18 at 56:8-57:9; ECF 481-19 at 131:6-132:2.

29.     Facility tact commanders and assistant commanders then met with the rest of their teams, where they would discuss the shakedown plan with each member of the tact team, relaying the instructions they had been given by White and/or McAllister. ECF 481-11 at 65:14-67:8; ECF 481-10 at 73:23-74:11, 101:4-13; ECF 481-15 at 73:1-6; ECF 481-14 at 40:6-41:10. Finally, immediately before they began marching toward the cellhouse to begin the shakedown, the entire group would convene for a mass group briefing, delivered by the prison's Warden and McAllister or White, reiterating the shakedown plan and its objectives. ECF 481-10 at 75:8-76:10; ECF 481-14 at 40:6-41:10; ECF 481-7 at 36:23-37:14. Nothing was distributed in writing during or after the oral briefings. *Id.*; *see also* ECF 481-17 at 132:5-136:6; ECF 481-8 at 75:3-8; ECF 481-20 at 66:8-13.

30.     The oral instructions contained instructions on *how* to conduct the shakedowns that are wholly absent from the written operations orders. *See* ECF 481-66; ECF 481-7 at 84:1-86:5; ECF 481-23 at 127:5-131:8. For example, the written orders provide no direction as to the procedure for entering a facility's cellhouse during the shakedowns. *See generally* ECF 481-66. Their plan (communicated orally) was for tact team members to march in, "banging and crashing" their batons on the bars of the cells. *See* ECF 481-66; ECF 481-7 at 141:4-20; ECF 481-23 at 140:19-143:9. The operations orders also do not detail how prisoners would be strip searched, or describe the line movement formation that would be used to transport prisoners from their cellhouse to the area where they would be held while their cells were searched. *See generally* ECF 481-66. These aspects of their plan were only communicated to the tact team orally. *Id.*: *see* ECF 481-66.

31.     Similarly, the written operations orders stated that prisoners could put their underwear back on after a strip search. ECF 481-66. But Defendants admitted that in the verbal briefing, they told tactical team members prisoners could not wear underwear during the shakedowns. ECF 642-1 at 162:11-168:13.

32.     Additionally, the written operations orders repeatedly stated that prisoners would be handcuffed "behind the back." ECF 481-66. There is no discussion or mention of any alternative form of cuffing in the written orders. *Id.* As detailed below, Plaintiffs have substantial evidence indicating that prisoners were restrained behind their backs, even when they had permits that specifically required alternative handcuffing (like front cuffing or waist chains). *See infra* PSOF 56-59. But during litigation, Defendants have argued that this part of the operations orders was inaccurate and alternative cuffing permits were honored during the shakedowns. ECF 481-6 at 130:12-131:7; ECF 481-7 at 82:16-87:2; ECF 481-16 at 261:3-264:1. Notably, several of the

Defendants, including Yurkovich, Gossett, Finney, and Arnett could not recount a single instance where a prisoner was handcuffed in front.  ECF 482-14 at 26.

33.     Existing Administrative Directives also provided that prisoners in line movement were to travel "at a uniform pace at an arm's length distance between each other."  Ex. D.  As Plaintiff expert Patrick Hurley notes and as documented in photographs *infra*, the line movement during the shakedowns did not comply with this directive, and instead prisoners were pressed up against one another.  Ex. C at 20.

34.     As Mr. Pacholke and Pat Hurley (who is also an expert in correctional administration and operations) have opined, "[w]ritten and approved operation orders are worthless if they are not shared with those who are executing them and if verbal directives differ from those in the operations orders." *Id* at 25; Ex. A at 20-22.

## Yurkovich, Atchison, White, and McAllister
## Execute Their Common Plan in Uniform Fashion

35.     In addition to their roles forming the plan and communicating it to tact team members, McAllister and White also supervised the 2014 shakedowns while they were underway to ensure that they were conducted in uniform fashion. McAllister and/or White were present during each day of each shakedown and were responsible for supervising the tact team members during the shakedown. ECF 481-6 at 50:6-12; ECF 481-17 at 188:4-13. White was the primary supervisor of the shakedowns at Menard and Illinois River. ECF 481-17 at 222:9-21. McAllister was the primary supervisor at Big Muddy and Lawrence. *Id.*; ECF 481-17 at 187:4-6, 258:14-261:5, 264:15-265:4. Facility tact commanders and assistant commanders reported to McAllister and/or White, who would then ensure that the uniform plan was being carried out across the facilities. ECF 481-14 at 62:1-14; ECF 481-11 at 123:18-124:10; ECF 481-10 at 107:22-109:2; ECF 481-8 at 80:15-81:22, 86:9-87:8, 89:7-22; ECF 481-75 at ¶ 4; ECF 481-7 at 79:10-19; ECF

481-11 at 116:7-120:11, 122:13-24. Each facility Warden attended the shakedowns because they understood that they were responsible for the conduct of staff at the prison. ECF 481-18 at 105:12-20; ECF 481-19 at 179:23-180:5; ECF 481-20 at 17:4-16.

36.      Yurkovich and Atchison, meanwhile, had daily conversations with on-the-ground staff. ECF 481-6 at 82:5-18; ECF 481-16 at 178:5-179:5. As White's direct supervisor, Atchison had regular in-person meetings, phone calls, and email communications with White regarding the shakedowns. ECF 481-6 at 43:10-44:7, 44:16-24; ECF 481-16 at 251:8-20.

37.      Yurkovich and Atchison's close supervision of the shakedowns ensured that there was no deviation from the uniform plan developed by Defendants. Defendants consistently testified that they saw no deviation from the uniform plan during the shakedowns. ECF 481-10 at 107:17-21; ECF 481-14 at 48:15-49:1, 61:14-62:14; ECF 481-15 at 129:4-11; ECF 481-17 at 281:18-282:10; ECF 481-19 at 184:5-185:15; ECF 481-26 at 65:10-18; ECF 481-82 at 6; ECF 481-84 at 6. Tact members similarly testified that no member acted contrary to the uniform plan communicated to them orally during the pre-shakedown briefings. ECF 481-48; ECF 481-49; ECF 481-50; *see also* ECF 481-88 at 2-17 (spreadsheet summarizing results of 300 tact team member survey responses).

**Shakedowns Uniformly Use Tactics Designed to Harass and Intimidate**

38.      Class members across Menard, Illinois River, Big Muddy, and Lawrence detailed the same complaints about the 2014 shakedowns across their grievances and throughout their depositions in this case.  Plaintiff's expert Patrick Hurley has gathered and summarized deposition and discovery responses of dozens of class members across the multiple steps of the shakedowns across the different facilities where the shakedowns occurred, Ex. C at 6-10, and offers the opinion that "the inmates recounted strikingly similar conduct by Orange Crush across facilities and

throughout their shakedowns" which "strongly indicates the truth of the class members' recounting of the conduct by Orange Crush." *Id.* at 7.

39.     **Intimidating Entry.** Numerous class members report loud, intimidating entry in which tact team members yelled and banged on cells with batons. *See* ECF 481-29 at 45:18-48:13; ECF 481-30 at 38:16-39:11; ECF 481-31 at 43:10-22; ECF 481-33 at 68:8-12, 69:9-21; ECF 481-32 at 41:4-45:7; ECF 481-34 at 66:10-68:24; ECF 481-35 at 35:23-36:1; ECF 481-36 at 30:1-10, 50:20-51:1; ECF 481-37 at 41:23-42:9; ECF 481-38 at 21:13-18; ECF 481-39 at 13:11-15; ECF 481-40 at 77:1-5, 81:17-20; ECF 481-41 at 24:10-13, 27:2-5, 28:8-10; ECF 481-42 at 32:18-37:14; ECF 481-43 at 26:2-3; ECF 481-44 at 33:12-34:19; ECF 481-45 at 42:8-20; ECF 481-46 at 34:12-14; ECF 481-47 at 55:16-56:2; ECF 481 at 10 n.4 (citing declarations submitted at ECF 481-51).

40.     As discussed above, Defendants admit that pursuant to their plan, tact team members were instructed to march in lockstep or stomp into the cellhouse and begin banging and crashing their batons on the cells. ECF 481-23 at 206:15-23; *see also* DSOF ¶ 41.

41.     Multiple Defendants made statements that the noise was a "psychological thing" designed to "get [the prisoners] ready." *See* ECF 481-8 at 138, 139; ECF 481-90 at 139; ECF 481-19 at 219, 220; ECF 491-14 at 66.

42.     Plaintiffs' experts have offered the opinion that a loud entry of this nature would serve no legitimate penological purpose and would be counterproductive to the basic goal of the shakedowns, since the loud warning of the search would give a prisoner with contraband more time to hide it. If the goal of this practice was to catch prisoners off-guard so they do not have the opportunity to dispose of contraband before a shakedown search, "then the practice of stomping, yelling, and clanging batons is not just intimidation, it's counterproductive to Defendants' alleged goal." Ex. A at 23.

43.     Plaintiffs' experts have offered the opinion that the practice is unheard of in the corrections field, even in tactical responses to large scale disturbances where a show of force is necessary." *Id.* "Allowing this ridiculous practice is condoning escalation, intimidation, and unprofessionalism." *Id.* And "It communicates to tactical team members that further belligerent and abusive staff behavior is not only acceptable but encouraged …." *Id.* at 23-24.

44.     Plaintiffs' experts have offered the opinion that the purpose of such conduct, as widely recognized in the field of correctional administration, is to intimidate and catch prisoners off-guard. Ex. A at 22.

45.     "Grievances and depositions showed that shakedowns began in the same fashion– with yelling and banging on the bars of the inmates' cells." Ex. C at 7. These techniques were meant to "inflict pain, intimidate, belittle, and humiliate" the prisoners. *Id.* at 19. "This approach escalated tension between staff and prisoners, made little sense and is simply bad security." *Id.*

46.     Tact team members claimed that the noise was to "wake everybody up and get them ready" as "some psychological thing." *Id.* But those explanations are simply "a refined way of describing intimidation." *Id.* at 23. "If their primary goal is to recover contraband and they are trying to maintain an element of surprise so that prisoners will not dispose of contraband before they are present at their cells, then the practice of stomping, yelling, and clanging batons is not just intimidation, it's counterproductive to Defendants' alleged goal." *Id.*

47.     From a supervisory standpoint, "[a]llowing this ridiculous practice is condoning escalation, intimidation, and unprofessionalism. It communicates to tactical team members that further belligerent and abusive staff behavior is not only acceptable but encouraged, especially given that these tactical operations were for 'spring cleaning' rather than a security threat or similar incident(s)." *Id.* at 23-24.

48.     "There is no need for Orange Crush's tactics [loud entry]. If the inmates are not awake, they soon will be, and a simple verbal command will accomplish that task and should be the first step in the process. For inmates who are locked in the cells presenting no threat, this tactic only serves to raise fears among the inmate population and to create tensions which are counterproductive to a search mission, which should be to conduct a search in a safe, orderly manner that does not humiliate prisoners and does not unnecessarily raise tensions in what is already a stressful setting." Ex. C at 11. In fact, the use of batons to strike cell bars was a violation of IDOC's Administrative Directive, which permits use of batons only when less serious methods of regaining control of a facility have been unsuccessful. Ex. H; Ex. C at 11-12.

49.     According to the current IDOC Statewide Tact Commander Zach Sarver, the IDOC now prohibits tact team members from entering cellhouses in this way while conducting facility-wide searches. ECF 642-11 at 82:23-83:11. Sarver testified that this decision was made because the best practice in correctional operations is to knock on the door with the baton. *Id.* at 87:1-11.

50.     **Reverse Strip Searches.** Pursuant to Defendants' plan, after entering the cellhouse, tact team members ordered prisoners to conduct reverse strip searches on themselves immediately behind the bars as tact team members watched. *See* ECF 481-44 at 36:16-23; ECF 481-47 at 64:1-6; ECF 481-42 at 41:4-8; ECF 481-41 at 31:9-18; ECF 481-34 at 72:1-4 Specifically, the tact team members ordered prisoners to strip, and then to manipulate their genitals and spread their buttocks before putting their hands in their mouths to widen it and moving their tongue. *See* ECF 481-31 at 56:19-57:5; ECF 481-33 at 73:1-74:24; ECF 481-32 at 58:8-12; ECF 481-29 at 45:18-46:3, 51:1-54:17; ECF 481-30 at 42:14-42:23; ECF 481-34 at 71:18-25; ECF 481-36 at 30:4-10, 54:14-24; 74:20-75:11; ECF 481-37 at 47:14-48:15; ECF 481-38 at 26:4-16; ECF 481-39 at 13:9-16, 14:4-11, 22:19-23:15; ECF 481-40 at 93:17-22, 96:2-5, 110:11-18; ECF 481-41 at 30:13-31:17; ECF

481-42 at 37:15-46:1; ECF 481-43 at 29:13-18, 30:10-12; ECF 481-44 at 36:14-37:3; ECF 481-45 at 49:1-50:6; ECF 481-46 at 40:23-41:15, 84:13-19; ECF 481-47 at 63:19-64:11; ECF 481 at 11 n.6 (citing declarations submitted at ECF 481-51).

51.     Officers threatened class members if they did not immediately comply with the strip search orders. ECF 481-31 at 55:4-7; ECF 481-30 at 41:13-20; ECF 481-42 at 38:18-20. For example, one class member, a paraplegic man, described being unable to remove his pants during his strip search, "so the tactical team member snatched his pants off and demanded that he get up and raise his genitals. ECF 481-35 at 22:5-16. He told the tact team member that he could not do that, and the officer grabbed him, causing him to fall. *Id.* During the search, his adult diaper was removed, and he had to later sit in the holding area in his own urine with an overflowing colostomy bag. *Id.* at 43:2-9, 61:1-4.

52.     The fact that multiple prisoners reported reverse strip searches "is significant because [conducting strip searches] is a routine task that staff are trained to do from head to toe. To perform these in reverse would have to be deliberate and there could be no plausible purpose other than to humiliate and assert dominance." Ex. A at 24. Even Defendants have admitted there is no legitimate penological purpose for conducting strip searches in this fashion. ECF 642-11 at 126:1-11.

53.     **Dressing.** Defendants have admitted that, pursuant to their plan, while the strip searches were occurring, tact team members ordered prisoners to hand them their clothing (including their underwear) for a close, manual inspection and search. ECF 642-11 at 121:16-25, 122:1-5. After the search, and pursuant to Defendants' plan communicated at the oral briefing, prisoners were told that they must wear their "prison blues" but could not wear underwear. *See* ECF 481-31 at 56:19-57:5; ECF 481-30 at 44:15-45:3; ECF 481-36 at 72:8-73:6; ECF 481-37 at

47:14-48:15; ECF 481-38 at 27:3-13; ECF 481-39 at 14:24-15:1, 25:7-8; ECF 481-40 at 111:18-20; ECF 481-41 at 37:4-7; ECF 481-42 at 37:15-46:1; ECF 481-43 at 61:2-9; ECF 481-44 at 36:14-37:3; ECF 481-45 at 52:15-19; ECF 481-46 at 42:4-22, 83:17-19; ECF 481-47 at 133:14-21; ECF 481 at 11 n.7 (citing declarations submitted at ECF 481-51); ECF 642-11 at 98:18-25, 99:1-15. This was another practice "designed to humiliate." Ex. A at 25.

54.     As discussed above, the written operations orders directed that prisoners could wear underwear, and this aspect of the plan was thus admittedly only part of the oral briefing. ECF 481-66 at 4, 8, 12, 17, 20, 24, 28, 32, 36, 40, 44, 48, 52, 56. Some of the Defendants have testified that this order was put into place to avoid contraband being placed in the underwear, but a reasonable jury could conclude that, given the fact that a prisoner's underwear (along with his "prison blues") were closely searched by each tact team member, this aspect of the plan was designed to humiliate. Ex. A at 25.

55.     Statewide Tact Commander Sarver testified that the IDOC now allows prisoners to wear underwear, even during facility-wide searches. ECF 642-11 at 98:18-22. Sarver further testified that the IDOC is able to conduct effective facility-wide searches, even despite the fact that prisoners are now allowed to wear underwear during these searches. ECF 642-11 at 99:21-23.

56.     **Handcuffing.** As part of the plan, class members were handcuffed in a needlessly painful and uncomfortable manner with their hands behind their backs and palms facing out. *See* ECF 481-31 at 60:20-61:6; ECF 481-33 at 80:7-21; ECF 481-32 at 63:23-64:01; ECF 481-29 at 55:11-64:10; ECF 481-30 at 46:15-19; ECF 481-34 at 77:1-2, 77:10-11; ECF 481-35 at 21:21-23:13, 45:1-53:24; ECF 481-36 at 77:4-78:1; ECF 481-37 at 51:3-8, 51:22-52:18; ECF 481-38 at 28:3-9; ECF 481-39 at 15:9-13; ECF 481-40 at 115:17-20, 116:5-117:6; ECF 481-41 at 32:11-13, 38:17-20; ECF 481-42 at 45:5-50:19; ECF 481-43 at 33:9-12; ECF 481-44 at 36:14-37:3; ECF

481-45 at 53:24-54:16, 101:15-103:2; ECF 481-46 at 43:2-44:21, 43:11-44:9; ECF 481-47 at 66:6-19; ECF 481 at 12 n.8 (citing declarations submitted at ECF 481-51). Multiple Defendants testified to this same fact, stating that this was a cuffing position typically only used to escort a prisoner to segregation. Ex. C at 20 (describing standard practice in corrections field).

57.     As Plaintiff's expert, Mr. Pacholke, explained: "Cuffing people behind their back, palms out, thumbs up is a maximum-security cuffing technique which is commonly only used for movement at that security level." Ex. A at 27. Notably, three of the four prisons at issue in this case (Illinois River, Big Muddy, and Lawrence) were not maximum security at the time of the 2014 shakedowns. ECF 481-19 at 150:7-19; ECF 481-20 at 12:13-15; ECF 481-26 at 25:23-26:1. Mr. Pacholke further explained that this cuffing technique "can be highly discomforting and painful, especially if kept in this position for prolonged periods of time, and especially for people in wheelchairs, people with injuries to their shoulders, elbows, or wrists, and larger people." Ex. A at 27.

58.     The IDOC's policies provide that medical staff may issue "cuffing permits," which require correctional staff to handcuff prisoners in a certain fashion–i.e., through "front cuffs" or "waist chains"–if their medical needs require it. ECF 642-11 at 124:20-25, 125:1-2. But the 2014 shakedown plan was to ignore these handcuffing permits, requiring all tact team staff to handcuff class members in the same fashion, regardless of any cuffing permits. ECF 481-66 at 3 *et seq.*; ECF 481-33 at 78:16-81:18; ECF 481-34 at 77:10-11; ECF 481-42 at 45:5-50:19.

59.     Mr. Pacholke opined that this aspect of the plan–to handcuff prisoners behind their back, with palms out, regardless of cuffing status–"was . . . completely unnecessary." Ex. A at 27. Yet, this painful position was employed for extended periods of time–*i.e.*, for hours–during these shakedowns. Ex. C at 20.

60.    **Movement.** In accordance with the plan, once prisoners were cuffed, they were told to line up "nuts to butts," or words to that effect. *See* ECF 481-36 at 44:22-46:15, 62:19-21, 85:9-23, 127:18-128:8, 130:11-15; ECF 481-38 at 62:17-63:4; ECF 481-34 at 62:25-64:25; ECF 481-32 at 34:21-36:7, 65:12-67:14, 71:17-72:7, 83:3-9; ECF 481-40 at 71:12-21, 209:11-21; ECF 481-41 at 42:3-10, 49:7-51:4, 61:23-62:9, 73:14-23, 76:3-12, 81:24-82:7; ECF 481-42 at 30:24-31:17, 63:3-7, 66:6-14, 72:6-9, 82:12-17; ECF 481-44 at 32:5-17, 43:11-13, 44:14-21, 46:20-22, 48:13-22, 65:14-66:1; ECF 481-45 at 67:13-68:10, 83:21-84:8; ECF 481-31 at 39:8-40:6, 74:10-75:11; ECF 481-30 at 50:14-51:9, 52:18-22, 55:24-56:5, 73:5-22; ECF 481-37 at 61:22-24, 64:13-22, 66:12-67:6, 71:16-21; ECF 481-33 at 62:1-63:21; ECF 481-35 at 37:11-23, 40:16-24; ECF 481-51 at 138. Class members were marched in a formation so close with prisoners in front and behind that their genitals were forced to make physical contact with the prisoner in front of them and the genitals of the prisoner behind them. *See* ECF 481-31 at 74:10-18, 147:2-16; ECF 481-33 at 62:1-67:9, 92:1-97:15; ECF 481-29 at 68:7-79:14; ECF 481-30 at 50:14-51:13, 55:19-56:5; ECF 481-36 at 44:22-45:23; 88:18-89:21, 93:3-94:24; ECF 481-37 at 61:18-62:2; 64:13-22, 69:23-70:24; ECF 481-38 at 33:2-12, 62:17-63:12; ECF 481-40 at 130:6-131:7, 138:1-4, 144:4-16; ECF 481-41 at 42:4-7, 44:5-23, 45:21-46:3, 49:1-19, 62:4-9, 73:17-23, 76:5-77:5; ECF 481-42 at 63:3-71:18; ECF 481-43 at 35:9-13, 38:10-13, 39:9-20, 40:2-7; ECF 481-44 at 46:20-50:1, 77:24-78:10; ECF 481-45 at 67:13-68:14, 70:2-71:6; ECF 481-46 at 56:2-59:5; ECF 481-47 at 115:7-120:3; ECF 481 at 12 n.9 (citing declarations submitted at ECF 481-51). While "nuts to butts" may be a colloquial term in the military, a more apt description for the shakedown mass movements was "nuts to hands," which is what class members described. ECF 481-19 at 222:3-225:21; ECF 481-27 at 37:4-23.

61.     "Here again, there is no security or any other justification for this practice. It is meant to humiliate and abuse prisoners and considering the potential for people to trip and fall while being forced to move in this position." Ex. A at 29.

62.     They were marched single file outside in two columns with tact team members in full gear flanking them on all sides. ECF 481-19 at 222:3-225:21; ECF 481-27 at 37:4-23.

63.     Class members were aware that noncompliance would be met with violence. Several class members testified that during line movement (which other class members could hear and/or see), tact team members pushed and shoved them so they were in contact with other prisoners. ECF 481-31 at 74:10-18, 86:20-89:1, 90:2-94:11, 110:14-112:15; ECF 481-33 at 92:1-97:15, 104:14-109:1, 110:22-112:16; ECF 481-29 at 69:2-9; ECF 481-30 at 51:23-52:11, 55:19-56:5; ECF 481-34 at 83:15-85:6; ECF 481-35 at 21:21-23:13, 25:4-26:13; ECF 481-36 at 85:13-86:3; ECF 481-37 at 34:8-17; 60:18-23, 68:24-69:22; ECF 481-38 at 33:13-35:3, 42:14-48:14; ECF 481-40 at 113:2-22, 115:17-20, 120:9-10, 129:16-17, 157:2-158:10; ECF 481-41 at 39:24-40:8, 46:21-47:5, 49:1-19, 51:1-11, 54:10-20, 54:4-57:3, 57:6-59:1, 59:2-24, 60:1-61:12, 71:22-72:1, 73:17-23, 74:9-76:2, 76:5-77:5; ECF 481-42 at 51:15-61:10, 71:19-81:22; ECF 481-43 at 35:21-24, 35:9-13, 41:20-42:12; ECF 481-44 at 46:20-50:1, 50:7-56:11; ECF 481-45 at 65:21-66:1; 69:4-70:1, 75:4-19; ECF 481-46 at 55:19-56:8, 56:12-24; ECF 481-47 at 73:5-24, 75:21-76:17, 82:21-83:4; ECF 481 at 13 n.11 (citing declarations submitted at ECF 481-51).

64.     Numerous class members reported being pushed, punched, kneed, poked with batons, and subjected to verbal abuse by tact team members Ex. A at 58 (collecting accounts of abuse). Other class members could hear and/or see this abuse taking place. *Id.* For example, Plaintiff James Dunmore was forced to keep his head down with his face "literally in [the other prisoner's] ass." ECF 481-34 at 84.  For example, Plaintiff Jeffrey Miller testified that an officer

32

came up behind him and pushed his head forcefully into the prisoner in front of him. ECF 481-45 at 72. Plaintiff Sergio Cortes described being pushed and manhandled by officers to get inmates in line and out of the cell house." ECF 481-38 at 30, 42. Plaintiff Zarchary Watts, who is disabled, testified, "I got a spinal injury, and I keep looking up, and they said the same thing, like 'Put your fucking head down! We didn't tell you to put your head up.'" "Multiple inmates described how their genitals were touched by the hands and/or butt of the inmate in front of them, and vice versa., because of the 'nuts to butts' arrangement." *See generally* Ex. C at 9 (collecting testimony).

65.     Plaintiff expert Patrick Hurley offers that forcing prisoners to keep their heads down and walk for extended periods of time with their hands cuffed behind their backs had no valid penological purpose beyond acting as a form of corporal punishment. Ex. A at 20. Mr. Hurley notes that these instructions increases the likelihood of falls and of prisoners bumping into each other, and significantly reduces their ability to follow instructions because prisoners cannot see where they are going. Ex. C at 17.

66.     Prisoners "described the consequences they faced for stepping out of line." *Id.* at 9 (gathering prisoner testimony). *See* ECF 481-40 at 131 ("[M]y head was shoved back down, hit in the back of the neck, and my head slammed back down."); *id*. at 138 ("I fell out of formation once because I was struck on the back of my neck and my head was shoved into my chest. When I filed into formation I'm shoved back in formation with a stick in my side."); ECF 481-37 at 60 ("[O]nce we left the cell house, I looked up. They slammed my head in front of the person in front."). Officers told him to "keep [his] fucking head down." ECF 481-40 at 119. James Dunmore, who is wheelchair bound, was hit with a baton for "refusing to deliberately put [his] face in [another inmate's] ass." ECF 481-34 at 84. Glenn Verser described an incident where an officer "snatched" the inmate in front of him and "flipped him, wrestled him to the ground, and told him, if I tell you

to put your head down again, you're not going to like it." ECF 481-34 33 at 119; ECF 481-45 at 72 ("[T]his officer . . . came from behind me and pushed my head very hard into this guy's back."); ECF 481-38 at 30 ("They were pushing us so we would walk quickly out of the cell house."), 42 ("Q. Were you touched by any officer . . . ? A. Struck? Yes. . . ."), *id.* At 76-78 ("Q. How close to the inmate in front of you was your pelvic region or genital region? A. Less than an inch probably. . . . Q. Is it possible that your genital region came into contact with . . . the inmate in front of you in line during those stops and starts [in the line movement]? . . . A. I would say yeah, when I was pushed probably.").

    67.   There is photographic evidence of this abusive line movement as well. This photographs is drawn from Mr. Pacholke's report, showing close line movement:



Ex. A at 19; Ex. E. Mr. Hurley has annotated this photograph, highlighting that the line movement was not used simply to escort but as an opportunity to harass:



Ex. C at 21; Ex. F.

68.     One of the IDOC's Rule 30(b)(6) designees testified that there was no justification
for such a practice, as, pursuant to IDOC policy, large groups of prisoners (as many as 90) are
routinely escorted by just two correctional officers, and they are typically uncuffed and allowed to
look around. Ex. G at 57:13-58:3. This practice was similarly against IDOC's own directives,
which required prisoners be moved at an arm's distance in a uniform pace. Ex. D; *see also* Ex. C
at 20.

69.     Nothing about the shakedowns required the tact teams' approach. "[N]othing
magical or extreme happens to inmates when a facility search occurs. They do not suddenly
become delusional and think that they can orchestrate some significant incident when additional
resources are at the facility and those resources are tactical teams. Inmates understand that facility
searches are necessary. …. They understand that being cuffed makes them more vulnerable, so it

is clear they would be more, not less, reluctant to challenge these tactical team members. … These realities make [the state's] claim that inmates need to look down to avoid inmates attempting to escape or assault is completely unreasonable and outside of accepted correctional practices." Ex. A at 18.

70.     Mr. Pacholke opined that there was no legitimate penological justification recognized within the field of corrections to conduct line movement in this way, and thus it could only have been "meant to humiliate and abuse prisoners and considering the potential for people to trip and fall while being forced to move in this position, it is also just plain stupid." *Id.* at 29. Prisoners were forced to walk with "blind faith" that they would not stumble, Ex. C at 21, which Mr. Hurley opined was irresponsible given that class members were also restrained behind the back." *Id.*  Like Mr. Pacholke, Mr. Hurley opined that there was no legitimate penological reason to march prisoners in this manner. *Id.* at 22.

71.     **Holding.** Nearly all class members were made to remain handcuffed in painful positions for unnecessarily long periods of time, from one to four hours. *See* ECF 481-31 at 102:16-104:11; ECF 481-29 at 83:8-94:3; ECF 481-34 at 89:13-99:22; ECF 481-35 at 61:22-63:17; ECF 481-36 at 121:20-23; ECF 481-37 at 78:13-21; ECF 481-38 at 35:13-22; ECF 481-40 at 165:13-18; ECF 481-41 at 70:18-21; ECF 481-42 at 71:19-81:22; ECF 481-43 at 46:14-18; ECF 481-44 at 56:18-65:2; ECF 481-45 at 79:6-9; ECF 481-46 61:21-23; ECF 481-47 at 92:7-10; ECF 481 at 14 n.12 (citing declarations submitted at ECF 481-51).

72.     Defendants offered differing accounts of the conditions under which prisoners were held, but those accounts were consistent in that they reported that prisoners remained cuffed, standing for hours at a time, facing walls, and unable to speak.  *See* ECF 481-7 at 82-83, 92; ECF

481-17 at 241; ECF 481-6 at 75; ECF 481-9 at 86-90. *See also* Ex. C at 23 (gathering defense testimony).

73.     Many prisoners were made to stand for the duration of their time in the holding area. The practice was to keep prisoners standing in holding areas but, in some facilities, tact team members had to start seating class members because their legs were giving out and/or they were losing consciousness. ECF 481-12 at 101:4-102:14, 112:9-113:23.

74.     Prisoners at Menard were ordered to stand with their knees bent to avoid losing consciousness. At Illinois River, prisoners reported that they were losing feeling in their hands while waiting due to the extremely tight handcuffs. ECF 481-10 at 113:1-19. Guards there checked that prisoners' arms "weren't turning blue" and put prisoners on their knees if they could no longer stand. *Id.* At Lawrence, prisoners were held for approximately 1.5 hours and not permitted to use the bathroom while waiting in the holding area.  ECF 481-23 at 166:6-8; ECF 481-22 at 99:4-9. At Big Muddy, prisoners were allowed to sit if they had physical issues, and nurses were stationed in the holding areas because it was anticipated prisoners would begin "passing out or getting sick." ECF 481-22 at 90:8-16, 161:4-162:4There were multiple reports that prisoners could only use the bathroom if they provided medical documentation. ECF 481-12 at 186:9- 187:9.

75.     The stress positions that Defendants placed prisoners in – kneeling, standing, heads down, hands cuffed behind their backs, without water or bathroom breaks – "is well outside accepted correctional practice" and "just plain cruel." Ex. A at 33. "These holding areas were managed in a way that was intended to be painful, embarrassing, and a test of prisoners' endurance without any legitimate penological purpose." *Id.*

76.     **Cell Searches.** The cell searches were wrought with similar problems. As Mr. Pacholke has explained, "[i]t is a well-accepted correctional practice throughout the country that

when a cell is searched, two staff members are present" to proactively avoid misconduct or allegations of misconduct, *id.* at 34, but Defendants did not ensure that two staff members participated in the search of each cell, instead leaving cells to be searched by a single tact team member. ECF 481-16 at 206:6-207:22 And worse still, the single tact team member conducting the search was often someone without the familiarity of local practices and policies regarding personal property, commissary limits, or the prisoners within those cells. Ex. A at 34-35.

77.    As Mr. Pacholke has described, such a practice was contrary to the commonly accepted practice to pair outside staff with one from the facility to minimize the chance that authorized items were confiscated. *Id.* at 35. "This approach resulted in complaints of broken property, items being taken that shouldn't have been and left the incarcerated population almost no way to contest what had occurred." *Id.* Officers took sentimental items, such as family photos, hygiene items, and food from the commissary. *Id.* at 64 (summarizing grievances).

78.    "[I]nmates nearly universally described how Orange Crush destroyed or damaged their property during their shakedown." Ex. C at 10. Plaintiff's expert Patrick Hurley tabulated 138 grievances that referenced or complained of lost or destroyed property across the various facilities." *Id.* For Hurley, "[t]he complaints were remarkable for their volume and consistency" when made by "a host of prisoners at different, far flung facilities." *Id.* "Inmates in the same facility often have difficulty communicating with one another about an event or phenomenon." *Id.* "For inmates at different facilities, such communication is substantially difficult, especially in the absence of any evidence of collusion." *Id.* "In this light, the volume and consistency of complaints across different facilities strongly suggests that the inmates in the different facilities were accurately reporting what had occurred in the shakedowns." *Id.*

79.     Even if prisoners grieved their property loss, Plaintiffs' expert Pacholke opined that they did not know who had conducted the search of their cell because cell slips were "illegible or nonexistent." Ex. A at 35. Shakedown slips would not state what was confiscated, so grievances would be denied because the grievance officer could not verify what items were taken or substantiate that prisoners had those items in the first place. *Id.* at 64. This left prisoners with no recourse when their property was wantonly damaged, taken, or broken, which is further evidence that these operations were meant to demean, dominate, and dehumanize prisoners and undermine their changes for resolution after the fact. Id. (summarizing takeaways from reviewing grievances).

80.     These tactics were unwarranted. "The vast majority of units or facilities that were searched were not involved in a violent incident or any other activity that would warrant this type of abusive staff behavior." *Id.* at 19. "Brutal searches designed to display control and threaten have been widely recognized as bad, unsafe correctional practice since at least the 1970's-1980's." *Id.* at 20.

81.     After their cell searches were complete, the prisoners were marched back to their cells in the same "nuts to butts" formation. *See* ECF 481-31 at 110:14-112:15; ECF 481-33 at 117:22-119:17; ECF 481-36 at 127:12-128:8; ECF 481-37 at 89:22-91:17; 93:4-94:20; ECF 481-40 at 177:4-7; ECF 481-41 at 73:17-23; ECF 481-42 at 81:23-85:12; ECF 481-43 at 48:14-17; ECF 481-44 at 65:3-67:19; ECF 481-45 at 83:24-85:19; ECF 481-46 at 68:9-13; ECF 481 at 15 n.13 (citing declarations submitted at ECF 481-51).

**Yurkovich, Atchison, White, and McAllister Ignore Obvious Problems**

82.     As the 2014 shakedowns were ongoing, prisoners submitted grievances. Plaintiffs' expert Patrick Hurley noted that grievances across different facilities "recounted strikingly similar conduct by Orange Crush across facilities and throughout their shakedowns. . . . [T]he similarity

39

of these accounts strongly indicates the truth of the class members' recounting of the conduct by

Orange Crush." Ex. C at 7, 28.

83.     These grievances, alongside the daily briefings received from tact team members

on the ground, gave Defendants notice of abuses during the shakedowns. Godinez was aware of

many reports of abuse by tact team members during the facility operations, yet he failed to stop

them, even after receiving a letter from Uptown Peoples' Law Center on May 14, 2014 regarding

the abuses that had occurred at Menard and Shawnee. ECF 481-16 at 100:5-7, 107:17-19, 109:10-

20.

84.     As deputy chief, Atchison received status updates at the end of the day with

highlights of what was found or use of force, segregation, transfer, or assault incidents. ECF 481-

6 at 79:12-23. Yurkovich received these daily reports as well. ECF 481-16 at 100:5-7, 107:17-19,

109:10-20. When incidents of abuse were reported in these updates, neither Yurkovich nor

Atchison took steps to investigate, respond to, or correct the unprofessional behavior of on-site

personnel. ECF 481-16 at 235:7-12; ECF 481-6 at 104:3-11.

85.     Similarly, neither White nor McAllister investigated allegations of abuse or

misconduct reported in the facilities they supervised. ECF 481-7 at 150:21-24.. They likewise

failed to supervise the tact team commanders and assistant commanders in the field to ensure that

allegations of excessive force, physical and verbal abuse, unprofessionalism, and misconduct were

property investigated. ECF 481-7 at 151:23-152:2.

86.     Multiple emails were exchanged among tact team officers and commanders as early

as April 2014 that highlighted prisoners' experiences with abusive and unprofessional staff during

the shakedowns. Ex. I. In these exchanges, they discussed the "overwhelming amount of

allegations of staff misconduct" from prisoners in different facilities, including accounts of tact

team members eating their food and leaving empty candy wrappers, missing property not documented on shakedown slips, broken damaged property, property receipts missing, urine on bed sheets and in property boxes, allegations of physical abuse such as slapping the backs of their heads, forcefully placing their heads against walls ….” Ex. A at 41-42 (summarizing emails) In one instance, Atchison and Yurkovich were made aware of a prisoner who suffered a broken wrist during a May 15 shakedown, yet these supervisors dismissed the complaint. As Plaintiffs' expert Pacholke opined, “[h]ow this prisoner's broken wrist could be dismissed by the Defendants without any investigation is a dereliction of their duty to protect the prisoners in their care.” *Id.*

**There Was No Legitimate Penological Justification for These Shakedowns**

87.     Plaintiff's experts offer the opinion that there was no legitimate justification for the extent of these operations. First, the shakedowns failed to accomplish their alleged goal of identifying contraband. Very little contraband was confiscated to justify what was an extremely costly operation for the state in overtime pay, travel and lodging, staff resources, and subsequent legal defense. Ex. A at 17. Instead, the evidence demonstrates that Orange Crush tact team members indiscriminately abuse prisoners' property. Class members wrote grievances complaining about the abuse they suffered at the hands of the tact team members. ECF 481-92. Prisoners reported missing property, paperwork, commissary, and electronics. Ex. A at 20. Atchison testified that he believed these complaints to be true. ECF 481-6 at 139:22-140:4. In fact, he testified that several policy changes were the result of the 2014 shakedowns to ensure they did not happen again. ECF 481-6 at 58:10-59:3.

88.     Second, the shakedowns failed to accomplish their alleged goal of gaining gang intelligence. Instead, these searches were designed to inflict pain and humiliation. Ex. A at 20. Their approach was designed to “escalate fear and dominance within the inmate population while

signaling that brute force would be utilized." *Id.* at 18. Using the tact team "throughout the state in full tactical gear e.g., anonymized coveralls, body armor, helmets, batons, padded gloves, pepper spray with large numbers of staff marching in formation was intentional and intended to intimidate." *Id.* at 18-19. "So was the banging of their batons against railings and cell doors while yelling as they entered the units." *Id.*

89.     Third, the execution of the shakedowns demonstrates that their purported justifications were a farce. Defendants conducted just two investigations into allegations of abuse. ECF 481-95; ECF 481-96.

90.     These investigations were hamstrung by IDOC's failure to document the shakedowns. Defendants failed to preserve nearly all of the video taken of the shakedowns. ECF 481-6 at 65:6-68:6; 143:12-24; ECF 481-17 at 265:21-266:2, 270:12-271:15; ECF 481-17 at 270:12-271:15; ECF 481-7 at 129:8-11; ECF 481-83 at 8 (No. 11). "Recording tactical operations has been standard practice for a long time." Ex. A at 60. But none of the Defendants ordered tactical staff to videotape their operations, despite daily reports of abuse and misconduct. *Id.*

## PROCEDURAL HISTORY

The complaint in this case was filed in March 2015, on behalf of a putative class of prisoners at Menard, Illinois River, Big Muddy River, and Lawrence who had been subjected to the 2014 shakedowns. Through amendments, Plaintiffs named as defendants the tact team members who conducted the shakedowns, as well as the 22 individuals responsible for overseeing and supervising the shakedowns to ensure they were conducted according to plan.

In 2018, Plaintiffs moved to certify the class under Rule 23(b)(3).  ECF 481.  The Court granted Plaintiffs' motion, explaining that while "the class members' particular experiences [during the shakedowns] may vary to some degree," any such variance went to the existence and

quantum of damages, ECF 519 at 11-12, whereas liability issues relied on "common questions inherent in Plaintiffs' Eighth Amendment claims . . . ." Id.  The Defendants appealed the Court's decision pursuant to Rule 23(f), but the Seventh Circuit affirmed class certification.

Plaintiffs subsequently disclosed the opinions of its two experts, Daniel Pacholke and Patrick Hurley.  *See* Exs. A & C.  Mr. Pacholke and Mr. Hurley both examined evidence about the planning and execution of the shakedowns.  Both experts offered opinions that the evidence they had reviewed regarding the planning and execution of the shakedowns indicated that the shakedowns were not planned to effectuate a legitimate penological purpose and instead appeared designed to harass, humiliate, and intimidate the people confined in each of the affected prisons. Defendants have issued their own expert report, and now move for summary judgment, ECF 642.

## LEGAL STANDARD

At the summary judgment stage, the Court's task is to determine whether Plaintiffs can present enough evidence supporting Plaintiffs' claims against the Defendants "to require submission [of those claims] to a jury . . . ."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).  The Court cannot weigh the evidence or decide whose version of admissible evidence should be believed. *Id* at 249. That is because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," and thus require a jury trial to decide. *Id.* at 255. At summary judgment, the Court must view the evidence in the light most favorable to Plaintiffs, and must draw all reasonable inferences in their favor. *Tolan v. Cotton*, 572 U.S. 650, 660 (2014).  Summary judgment is only proper if the record "show[s] that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). So long as "the evidence is such

that a reasonable jury could return a verdict for" Plaintiffs on their claims, summary judgment must be denied. *Anderson*, 477 U.S. at 248.[1]

**ARGUMENT**

### I. Plaintiffs Present a Genuine Issue of Material Fact on Their Eighth Amendment Claims Against the Supervisory Defendants

Plaintiffs assert class claims against the Defendants charging that they (1) designed and implemented a plan to conduct abusive and humiliating shakedowns that did not further any legitimate penological purpose, in violation of class members' Eighth Amendment rights; (2) reached an agreement to violate class members' constitutional rights; and (3) knew their plan would violate class members' Eighth Amendment rights, and did nothing to intervene to prevent these constitutional violations.

At the heart of each of these claims is the contention that the Defendants crafted a plan to conduct shakedowns that were intended to inflict unnecessary pain and humiliation without any legitimate penological justification, in violation of the Eighth Amendment. *Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009) (searches violate the Eighth Amendment when they are "conducted in a harassing manner intended to humiliate and cause psychological pain"); *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) (searches conducted in a manner that has no legitimate penological justification violate the Eighth Amendment). The conspiracy claims further require the class to establish that the Defendants reached an agreement to violate class members' Eighth Amendment rights and each took action in furtherance of that agreement. *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988). Finally, the failure-to-intervene claims require proof

---

[1] Plaintiffs do not oppose summary judgment as to their injunctive relief claims, ECF 642 at 50-52, or on their IIED claim, *id.* at 52-56.

that the Defendants had the opportunity to intervene to prevent the violation of class members' Eighth Amendment rights. *Rosado v. Gonzalez*, 832 F.3d 714, 718 (7th Cir. 2016).

In affirming class certification in this case, the Seventh Circuit provided guidance about how these claims were to be tried and adjudicated. The ultimate class issues in dispute in this case, the Seventh Circuit explained, were narrow:  "[t]he [supervisor defendants] concede," wrote the Court, "that the shakedowns were conducted according to a uniform plan created and implemented by the [supervisor defendants], and that the plan was executed in a uniform manner under their supervision."  *Ross v. Gossett*, 33 F.4th 433, 438 (7th Cir. 2022).  Because the Defendants had "conceded" "the existence of a uniform policy," the Court of Appeals went on, "[t]he only dispute is . . . whether that uniform policy reflected the version alleged by the plaintiffs or the one alleged by the defendants." *Id.*

As such, the Seventh Circuit observed, the relevant questions on the merits are two: ***first***, whether the Defendants had developed a plan to conduct the shakedowns in an unconstitutional manner, and ***second***, whether the shakedowns were conducted pursuant to that plan. *Id.* at 442. Those will be the principal questions at the class trial in this case. At the summary judgment phase, the task for the Court is to determine whether, viewing the evidence and drawing all inferences from the evidence in Plaintiff's favor, there is enough evidence for a reasonable jury to conclude it is more likely than not that the Defendants planned for the shakedowns to occur in a humiliating manner and that the shakedowns were carried out pursuant to that plan.

Plaintiffs have gathered that evidence in droves.

## A.   Defendants Developed A Uniform Plan

The evidence demonstrates that these shakedowns were executed consistent with a uniform plan developed by the Defendants. Defendants Yurkovich and Atchison decided between

45

themselves to perform facility-wide searches across the state. PSMF ¶ 4. In doing so, they ignored other, more effective, less invasive options that could reduce contraband or gather gang intelligence and instead opted for costly, intrusive facility-wide searches. PSMF ¶¶ 9-13. Indeed, they testified that they did not decide to perform the shakedowns because of any real need in any one facility, but because the prisons "hadn't been searched on a facility-wide scale in a long time." PSMF ¶¶ 4-6. At the time, notably, Yurkovich had received correspondence from the president of the correctional officers' union, who told Yurkovich that union members wanted to see shakedowns or else they would institute a vote of "no confidence." PSMF ¶¶ 6-8. As a long-time prison administrator, Yurkovich would have understood that the union president's "no confidence" remark was an implicit threat from the union, because a no-confidence vote could cost Yurkovich and other Defendants their jobs. PSMF ¶¶ 7-8.

Yurkovich and Atchison enlisted the "Orange Crush" tactical team to execute their vision. PSMF ¶¶ 14. The tact team was comprised of officers selected through an informal selection process, cloaked with anonymity to evade any accountability for abuse, and known for their violence and aggression among staff and prisoners alike. PSMF ¶¶ 15-20. The anonymity afforded by their uniforms, by design, opened the door for members to abuse prisoners, because there was no risk that they would be identified in the aftermath of their brutality. PSMF ¶ 19. Defendants in this case would have been well aware of these issues among Orange Crush, as the name itself was indicative of a violent culture that ignored normal rules governing prisoner-staff interactions. PSMF ¶ 20.

After their initial conversations, Yurkovich and Atchison had a series of conversations with White, McAllister, and the wardens of each facility to plan the shakedowns. PSMF ¶ 23. While McAllister and White created written "operations orders" that outlined how the shakedowns were

supposed to be performed, these orders did not accurately reflect the actual plan. PSMF ¶ 24. Wardens received copies of these written orders, but no other tact team supervisors did. PSMF ¶ 25. First, the written orders omitted key details such as how to enter cell houses, how strip searches would be conducted, how front cuffing permits should be handled, or how prisoners would be marched from their cells to holding. PSMF ¶¶ 29, 31. Second, the written orders contradicted the verbal instructions that the Defendants *actually* gave to tact team members at pre-shakedown briefings. For example, while the written orders said that prisoners could put their underwear back on after being strip searched, the verbal instructions did not. PSMF ¶ 30.

## B. Defendants Executed Their Uniform Plan in Uniform Fashion

The evidence demonstrates that these shakedowns were planned and overseen by each Defendant across one or more facilities.

Yurkovich, Atchison, White, and McAllister supervised the 2014 shakedowns to ensure that the uniform plan was executed in the same manner with little variation across facilities. Each shakedown began with a 10 to 15 minute briefing where White and/or McAllister would communicate the plan to tact team members. PSMF ¶ 28. These briefings laid out "how you would perform your duties of the day," "what [prisoners] could wear out of the cell," "[h]ow you was to cuff," and "[h]ow they were to . . . conduct their self, how to handle the inmates," among others." PSMF ¶ 26. These briefings ensured that the plan was executed in the same fashion each day of the shakedown. During the shakedowns, Yurkovich and Atchison had daily conversations with the on-the-ground staff, White, and McAllister to ensure that the uniform plan was being followed accordingly. PSMF ¶ 32-33. Each prison's warden, assistant warden, tact commander, and assistant tact commander was responsible for overseeing on-the-ground operations. PSMF ¶¶ 21-22. Then, before entering the cell house, the entire tactical team would convene for one last mass briefing delivered by McAllister, White, or the facility warden. PSMF ¶ 27.

Both officers and class members consistently testified that the shakedowns followed the same uniform plan. Officers testified that they saw no deviation from the plan outlined in their briefings. PSMF ¶ 34. Many class members submitted grievances in the aftermath of the shakedowns at their facilities, and the grievances across facilities are strikingly similar. PSMF ¶ 35, 65. As Plaintiffs' expert Pat Hurley notes, the complaints were remarkable for their volume and consistency across multiple facilities, where class members would have no ability to communicate or collude on their accounts. PSMF ¶ 61. That consistency supports the inference that the Defendants acted according to a consistent plan through the shakedowns. *Id.*

White and/or McAllister were present for each shakedown and received briefings throughout from tactical team commanders to ensure compliance with the plan. PSMF ¶ 32.

### C.   The Shakedowns Violated Class Members' Constitutional Rights

The evidence further demonstrates that these shakedowns violated Plaintiffs' Eighth Amendment rights. The Eighth Amendment prohibits searches of prisoners that are "so totally without penological justification that [they] result in the gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hudson v. Palmer*, 468 U.S. 517, 530 (1984) (Eighth Amendment protects against "calculated harassment unrelated to prison needs"). But even where there is a valid penological justification to conduct *a* search, the Seventh Circuit has held that "the manner in which the searches were conducted must itself pass constitutional muster." *Mays v. Springborn*, 719 F.3d 631, 633-34 (7th Cir. 2013); *King v. McCarty*, 781 F.3d 889, 897 (7th Cir. 2015) ("Even where prison authorities are able to identify a valid correctional justification for the search, it may still violate the Eighth Amendment if conducted in a harassing manner intended to humiliate and cause psychological pain." (citing *Mays*, 575 F.3d at 649)), *overruled on other grounds by Henry v. Hulett*, 969 F.3d 769, 783 (7th Cir. 2020). Certainly, some searches do not rise to the level of a constitutional violation because they are motivated by a legitimate

penological justification and conducted in a manner that adheres to the legitimate penological justification. But, the evidence shows, that was not this case here.

Yurkovich and Atchison enlisted a tactical team known for its anonymity and brutality. PSMF ¶¶ 14-20. Across the grievances, class members recounted virtually identical experiences. As the shakedown began, the tact team members entered the living area while yelling and banging their batons on the bars. PSMF ¶¶ 36-37. There was no need to do this to prisoners in their cells and presenting no threat. PSMF ¶ 40. If the goal was to "surprise" prisoners so they did not hide contraband, any hopes of maintaining the element of surprise would be dashed by announcing that the tact team had arrived. PSMF ¶ 38. Instead, the apparent goal was to "inflict pain, intimidate, belittle, and humiliate" prisoners through abusive staff behavior that could only succeed in escalated tensions between staff and prisoners. PSMF ¶¶ 37-40.

Then, in violation of IDOC policy, tact team members approached each prisoner and ordered them to strip. PSMF ¶ 41. Multiple class members reported being subjected to demeaning and unsanitary "reverse" strip searches under the threat of physical violence from staff. PSMF ¶¶ 41-42. Strip searches are a routine task that staff are trained to perform head to toe, so instructing prisoners to perform these in reverse would be a deliberate choice by correctional staff intended to humiliate the prisoners. PSMF ¶ 43.

After that, prisoners reported that officers would not allow them to put on underpants after their search. PSMF ¶ 44. While the written orders told tact team members that prisoners could put their undergarments back on, the briefings told officers otherwise, without justification. *Id.*

Next, tact team members cuffed prisoners with their hands behind their backs, palms-out, and their thumps facing up, a maximum-security technique typically only used for moving prisoners into segregation. PSMF ¶¶ 45-46. Even when the palms-out technique is used, prisoners

are only kept in this position for short periods, given that it is so painful. *Id.* That is not what happened during the shakedowns in this case.  Instead, the tact team members employed this painful cuffing technique on the class members for an extended period. *Id. See also infra.*

Once they were cuffed, prisoners were marched in two single-file lines "nuts to butts" in close formation such that their genitals were forced to make physical contact with the prisoner in front of them, and vice versa. PSMF ¶ 47-48, 51. Walking in this close formation subjected prisoners to the risk of tripping and falling, while tact team members pushed, punched, shoved, poked with batons, and subjected them to verbal abuse. PSMF ¶¶ 47, 49. Prisoners were not permitted to look around, and tact team members told them to look at the ground under threat of violence. PSMF ¶ 50. Plaintiffs' experts have explained that this line movement had no legitimate penological justification, and that instead these practices were designed to humiliate.  PMSF ¶¶ 65-70. Prisoners repeatedly risked tripping and falling while having their hands and faces deliberately pushed into the genitals and back of the prisoner in front of them. PSMF ¶¶ 47, 50. This lack of justification is further demonstrated by IDOC's own policies. IDOC routinely allows two corrections officers to escort up to 90 prisoners uncuffed while allowing prisoners the freedom to look around, PSMF ¶ 52, and IDOC's written Administrative Directive provides that prisoners in line movement should travel at "arm's length." PSMF ¶ 33. There was nothing "magical or extreme" likely to occur during a facility search that would justify deviating from that standard approach. PSMF ¶ 53-54.

Then, class members were made to wait in holding areas during the searches, often for hours at a time while cuffed and often standing, without justification. PSMF ¶ 55. Class members reported their legs giving out from exhaustion, needing to have their cuffs checked and adjusted for loss of circulation, and being unable to use the bathroom or sit despite clear medical needs.

PSMF ¶¶ 56-57. These types of restrictive holding practices are typically used for fights that risk escalating between prisoners, not entire facility searches. PSMF ¶ 58. Employing these practices here without justification is just "painful, embarrassing, and a test of prisoners' endurance without any legitimate penological purpose." *Id.*

Finally, prisoners were marched back to their cells in the same "nuts to butts" manner. PSMF ¶ 64. When they returned, they found that tact team members in many cases had gotten rid of personal or accepted property in their facility, but Orange Crush's anonymity made grieving against any one officer impossible. PSMF ¶¶ 59-63.

Finally, though numerous prisoners filed grievances and made complaints about the manner in which the shakedowns at the facilities were conducted, the defendants made little effort to investigate them, and never paused the shakedowns in light of the complaints of serious violations.  PSMF ¶¶ 82-86.

The evidence outlined above is set out in dozens of depositions and thousands of pages of records.  Plaintiffs have gathered ample evidence sufficient to answer both questions set out by the Court of Appeals when it affirmed class certification: *first* Plaintiffs have gathered evidence from which a reasonable jury could conclude that Yurkovich, Atchison, and the other Defendants planned for the shakedowns to be conducted in a violent, harassing manner designed to humiliate the prisoners at the various facilities.  *Second*, Plaintiffs have gathered evidence showing that the shakedowns, through their various steps, were carried out pursuant to this plan, all while being overseen by the Defendants themselves. Defendants disagree with these claims, and offer evidence of their own, largely in the form of their own self-serving denials.  That sets up conflicting, material evidence that a jury must weigh and decide.  This case should proceed to trial.

51

### D.     Defendants' Analysis of the Facts in the Case is Defective.

The Defendants' summary judgment submission, by contrast, avoids answering either of the questions framed by the Court of Appeals.  First, the Defendants presume that the shakedowns were planned for a legitimate purpose, never engaging with the substantial evidence Plaintiffs have gathered showing otherwise.  Second, the Defendants examine each of the abusive components of the shakedowns in isolation, adopting different rationalizations to justify or brush away each one– but again, failing to grapple with ample evidence permitting the inference that from start to finish, the shakedowns were conducted in a manner that did not further a penological purpose but instead were intended to humiliate and harass the class members. Third, the Defendants argue that each component of the shakedowns *must* be considered in isolation rather than as part of a plan. In fact, the opposite is true

***Defendants assume shakedowns were planned for a legitimate purpose.*** The Defendants begin by summarizing the shakedowns in the most anodyne means possible:  officers entered the living areas, strip searched the prisoners, escorted them to holding areas, searched their cells, and then brought them back.  *See* ECF 642 at 14. In doing so, the Defendants assume a legitimate impetus for the planning of the shakedowns, ECF 642 at 33, simply ignoring the wealth of evidence that Plaintiffs have presented to the contrary, indicating that the shakedowns were motivated to appease a union that expressed a desire to show prisoners who was in charge in the IDOC, *supra* ¶¶ 4-9.  In failing even to engage with this evidence, the Defendants fail to examine or even consider "'the validity of [the shakedown plan],'" which, as this Court explained in its class certification decision, "'tends to be the predominant issue in the litigation'" about such plans.  ECF 519 at 11 (quoting *Streeter v. Sheriff of Cook Cnty.*, 256 F.R.D. 609, 614 (N.D. Ill. 2009)).

***Defendants offer shifting rationalizations for each abusive step in the shakedowns.*** From their initial presumption that the shakedowns were conducted pursuant to a legitimate penological plan, the Defendants purport to examine the *manner* in which the shakedowns were conducted. But the Defendants examine each allegedly abusive part of the shakedowns in isolation, offering shifting rationalizations for each shakedown component, and never reaching the relevant question: whether it can be inferred that the abuses at each step of the shakedowns–which were reported by numerous prisoners across the different prisons where the shakedowns occurred–were "conducted in a harassing manner intended to humiliate and cause psychological pain." *Mays*, 575 F.3d at 649.

Entering the cellhouse in a loud and intimidating manner?  Defendants claim that their loud, intimidating entrance "can surprise the inmate population and prevent inmates from destroying or hiding contraband."  ECF 642 at 44.  Both experts offered by Plaintiffs explain what any layperson would immediately recognize: a noisy warning that a shakedown was coming would give a prisoner with contraband *more* time to hide it, undermining the purported purpose of the shakedowns at their inception.  PSMF ¶¶ 42; *supra* at 49.  A reasonable jury could conclude that the tact team's unprofessional entry was designed not as a method to surprise, but instead to intimidate and demean, and to set the tone for the abusive conduct that would follow. *Id.* And the IDOC has since forbidden this entry during facility searches, which a reasonable jury could consider in determining that such a method of entry was not necessary to achieve any legitimate penological interest. PSMF ¶ 55.

Forcing prisoners to perform a reverse strip search, in which they were forced to touch their own genitals and then put their fingers in their mouths?  Defendants acknowledge that such a search would be a wholesale departure from policy, ECF 642 at 40, but brush away widespread reports of the technique, ECF 642 at 41, claiming that "40%" of the interviews Defendants'

attorneys conducted of putative class members confirmed that a head-to-toe search was done instead. ECF 642 at 41 (citing DSMF ¶ 188). As Plaintiffs explain *supra* in their response to DSMF ¶ 188, however, in the cited interviews, which were done *ex parte*, defense attorneys were careful *not* to ask the class members whether they were subject to reverse strip-search, such that in almost all cases prisoners were never asked, and never said, whether or not a reverse strip search was conducted. *See* Plaintiff response to DSMF ¶ 188, *supra*. In reality, only 2 of the 40 prisoners interviewed by defense counsel actually stated that they did not receive a reverse strip search. *Id.* That is a vanishingly small number of the 111 prisoners whose testimony was presented by the two sides in this case. *See* Plaintiff response to DSMF ¶¶ 186-88, *supra*. Defendants simply have amplified omissions in the record, primarily of their own making, while failing to offer any compelling showing of actual meaningful inconsistency.[2]

Forcing prisoners to dress without underwear after their strip search, which violated IDOC policy? Defendants say that as a general matter prisoners may hide contraband in their underwear, ECF 642 at 10, a proposition that may be true when a prisoner puts on underwear in seclusion, but is hard to explain where the prisoner is dressing in front of guards who have just searched him. And indeed, the experts proffered by Plaintiffs explain that such a practice lacked a legitimate purpose and was demeaning. PSMF ¶¶ 53-54, *supra* at 50. Again, the IDOC no longer prohibits prisoners from wearing underwear during facility searches, showing that such a method was not necessary to achieve a legitimate penological purpose. PSMF ¶ 55.

---

[2] As this Court explained in its class certification decision, such minor variations in the experience of a minority of class members would not defeat the utility of a class trial. *See* ECF 519 at 11 ("while the class members' particular experiences may vary to some degree, any such variation would primarily impact the type and amount of recoverable damages, assuming Defendants' liability is proven.").

Deploying a needlessly painful palms-out handcuffing technique for thousands of prisoners?  Defendants say that "routine discomfort" is an ordinary part of prison life, ECF 642 at 42, and they justify this with their *own* testimony that cuffing was done by the book.  ECF 642 at 36-37.  And once again, Defendants ignore the glaring factual dispute created by this cuffing technique:  the experts proffered by Plaintiffs explain that the painful, palms-out cuffing technique for extended periods of time is widely recognized within the field of corrections as being appropriate only in situations requiring extraordinary security, not the "spring cleaning" shakedowns that were conducted in this case.  PSMF ¶¶ 57, 59; *supra* at 50.

Forcing prisoners to dress without underwear after their strip search, which violated written IDOC policy?  Defendants say that as a general matter prisoners may hide contraband in their underwear, ECF 642 at 10, a proposition that may be true when a prisoner puts on underwear in seclusion, but is hard to explain where the prisoner is dressing in front of guards who have just searched him.  And indeed, the experts proffered by Plaintiffs explain that such a practice lacked a legitimate purpose and was demeaning. PSMF ¶ 54. Again, the IDOC no longer prohibits prisoners from wearing underwear during facility searches, showing that such a method was not necessary to achieve a legitimate penological purpose. PSMF ¶ 55.

Deploying a needlessly painful palms-out handcuffing technique for thousands of prisoners?  Defendants say that "routine discomfort" is an ordinary part of prison life, ECF 642 at 42, and they justify this with their *own* testimony that cuffing was done by the book.  ECF 642 at 36-37.  Once again, this ignores the glaring factual dispute created by this cuffing technique:  the experts proffered by Plaintiffs explain that the painful, palms-out cuffing technique is widely recognized within the field of corrections as being appropriate only in situations requiring extraordinary security, and even then for short periods of time—not the "spring cleaning"

shakedowns that were conducted in this case, in which many class members were cuffed palms-out for hours.  PSMF ¶¶ 56-59; *supra* at 50.

Forcing prisoners to march in formation so close that their genitals touched?  Defendants simply deny there is evidence this occurred (with potentially inadvertent exceptions), despite reports from dozens upon dozens of prisoners that it had, PSMF ¶¶ 60, 64, and despite photographic evidence, analyzed by expert Patrick Hurley and Daniel Pacholke, setting forth plain evidence that the tact teams used line movement as an occasion to harass prisoners and put them much closer together than necessary.  *See* PSMF ¶¶ 61, 65-70, and *supra* at 50-51.

Forcing prisoners to remain handcuffed and in painful positions, sometimes for hours, for as long as it took to search their cells?  The Defendants do not contest that this was the uniform practice during the shakedowns, and respond only that *some* prisoners were not held in these positions for multiple hours, because some searches happened to be completed faster than others.  ECF 642 at 38.  Such variations, however, merely indicate that some cell searches happened to take less time than others.  They do not suggest that the defendants deviated from the plan of holding the class members in unnecessarily harsh and painful conditions while the cell searches were conducted.

Cell shakedowns that did not observe facility rules, left cells in disarray, resulted in frequent reports of eaten food and destruction of legitimate and important property like family photos?  The Defendants do not address this abusive aspect of the shakedowns at all, even though they produced an extraordinary number of grievances and even though Plaintiff's experts point to the troubling nature in which they were conducted, and a reasonable jury could consider that evidence in determining whether the shakedowns and their executions were done to intimidate and harass, and not to further legitimate penological interests.  *See* PSMF ¶¶ 76-81.

Lax or nonexistent follow-up by supervisors regarding complaints by prisoners regarding the manner in which the shakedowns were conducted?  This feature of the shakedowns is also ignored by Defendants, even though Plaintiffs' experts explain that it is indicative of a shakedown plan that was indifferent to the widespread abuses perpetrated during the shakedowns. PSMF ¶¶ 82-86.

The Defendants' various rationalizations, in short, do not withstand scrutiny.  More important for the Court's summary judgment analysis, each different rationalization fails to engage with the evidence Plaintiffs have amassed showing that each step of the shakedowns was conducted in an unnecessarily abusive manner divorced from a legitimate penological interest, but was instead done in a way designed to intimidate and humiliate the class.  Defendants have done nothing, in short, to negate Plaintiffs' class-wide evidence supporting their allegations that the shakedowns violated the Eighth Amendment rights of the class.

***The Defendants insist on an incorrect legal frame for analyzing the shakedowns***.  Rather than try to answer whether each abusive step in the shakedowns was part of a plan to humiliate the class members, the Defendants insist that question is off limits–the Court, the Defendants say, *must* consider each part of the shakedowns in isolation and analyze each one separately–none can be "aggregated together" to determine whether they were part of a plan.  ECF 642 at 39.

This argument badly mixes apples and oranges in Eighth Amendment case law.  The Defendants primarily rely on *Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991), a case involving a prisoner who complained generally that various and unrelated conditions of his confinement should be considered altogether to determine whether his Eighth Amendment rights were violated generally. The Supreme Court rejected that analysis, finding instead that an Eighth Amendment claim must identify an "single, identifiable human need" and not merely a patchwork of unrelated

conditions that comprise a general constitutional violation. *Id.* In this case, Plaintiffs have identified a single, identifiable human need that was violated by Defendants' misconduct, and one that the Supreme Court has expressly recognized: the right to be free from "calculated harassment" unrelated to legitimate penological needs as part of a prison search. *Hudson*, 468 U.S. at 530. As such, a search may violate the Eighth Amendment "when [it is] conducted *as part of a course of* '*calculated harassment* unrelated to prison needs.'" *Stewart v. Lyles*, 66 F. App'x 18, 20–21 (7th Cir. 2003)(quoting *Hudson*, 468 U.S. at 530) (other citations omitted; emphasis added).

Indeed the Seventh Circuit has recognized that, when considering whether a search was motivated by or executed with an intent to harass and intimidate, all of the circumstances of that search should be considered as a whole. *Mays*, 575 F.3d at 649-50. In *Mays*, the Seventh Circuit reversed summary judgment against a prisoner who had been searched, noting that the plaintiff's allegations about multiple aspects of the searches, *considered together*, permitted a reasonable jury to conclude that they were conducted for intimidation and harassment: [1] the fact that other prisoners often were in view *and* [2] the fact that the searches were done in a cold room *and* [3] that guards did not regularly change their gloves *and* [4] that guards sometimes made demeaning comments *and* [5] that the searches violated written policies. *Id.* at 649; *see also Calhoun*, 319 F.3d at 939-40 (illegitimate purpose of search can be inferred by considering "behavior unrelated to legitimate prison needs" including [1] guards' ribald comments during search; [2] sexually explicit gestures; *and* [3] female guards were invited spectators of the search). If Defendants' position were correct, the Seventh Circuit would have had to examine each of these aspects of the searches in isolation. Instead, as the Seventh Circuit in *Mays* and district courts through this Circuit have recognized, each aspect of one or more searches must be considered in combination to determine whether or not a reasonable jury could determine that in their purpose or execution they

were designed to harass or intimidate, in violation of the Eighth Amendment. *E.g., Young v. County of Cook*, 2009 WL 2231782, at *1 (N.D. Ill. July 27, 2009) (in the context of strip searches, "[i]t is inappropriate to compartmentalize each bit of plaintiffs' evidence and view it in isolation"); *see also Chatman v. Gossett*, 2018 WL 10517620, at *5 (C.D. Ill. Jan. 17, 2018) (considering all aspects of the challenged searches in combination but determining summary judgment was still required);

Defendants' suggestion that the Court should put on blinders and consider each step of the search in isolation would prevent the Court from considering whether the supervisor Defendants planned to conduct *the shakedowns*, from start to finish, in a manner that was designed to harass and humiliate the class members. Consider the affidavit of class member Kenji Haley, a prisoner at Big Muddy correctional center, which is quoted in Mr. Hurley's report at length:

> On May 13, 2014, around nine a.m. I as well as other men who were housed with me was violently awoke by men in orange jumpsuits (known as "Orange Crush") ran on the wing, using their batons to slam on the doors repeatedly and scream "wake the fuck up!!!" Once they screamed their expletives, all of the orange crush was on each and every door on the wing. Once they opened the door, they made each of us go to the wall. They had me strip naked, then lift my genitals, turn around and spread my cheeks, turn around again and use those same hands to open my mouth and reveal my gums (to make sure that I was not concealing anything) and then I was told to put only my blues on (no underwear or shirt) and step outside. once I was outside, I was screamed at to not look up or "we will beat your ass, boy!" They applied special "orange" handcuffs to me and they were put on so tight, that I had "black" rings around my wrist for weeks to come. Once I was cuffed up, they told me to keep your head down and "if you don't keep it down, we will make you pay!" Any inmate who dared to look at them were beat up, pepper-sprayed and carried off to segregation. They then mad us make this long and painful walk to the dietary where we were held for over 2 hours, cuffed with our hands behind our backs, seated with our heads facing down onto the table. One inmate, an older male (now deceased) was in so much pain from the cuffs and being held down that he started to sweat profusely, panic and become sick, he then asked to use the bathroom and was rejected. Shortly after, he defecated on himself and was then carried off to the bathroom in the technique they call the "chicken-wing." Once they were finished "tossing" the rooms, we were sent back to the housing unit by having our heads slammed on the next inmates back in the same "Nuts to Butt" position as we did being sent out.

59

> The room was so disarrayed that my items were in my cellmates' boxes and his things were in mine. I also noticed that they took all of my laundry soap was dumped into my toilet where it dissolved there and that food that I DID NOT open was opened and halfeaten.  I was then issued a shakedown slip, that was hard to read and the name was no noticed. I then saw that it stated "clear" and no ticket was being issued. Later that evening, I received a ticket from the officer stating that I had received a D.R. for destruction of state property, because my coat had a slight tear in it. How could I get a ticket when they stated that I did not have a ticket on my shakedown slip? I ran into Warden Zachary Roeckeman and asked him why did they take my state-issued toothbrush and could I get another. He told me that I should "grieve it, like you always do."

Ex. C at 30-31.  These same basic events are recounted over and over again by the members of the class.  PSMF ¶¶ 39, 50, 53, 56, 60, 63, 71, 81.  Each step of the shakedown was a component of the same search; in this regard it is notable that the tact teams were trained to conduct shakedowns in a "systematic fashion," PSMF ¶ 18.  Those shakedown steps can and must be considered in combination when assessing whether the shakedowns were designed or executed with an intent to harass and humiliate. *Mays*, 575 F.3d at 649-50.

Defendants offer no argument whatsoever about how summary judgment could possibly be proper when the evidence is viewed together, as it must be. That is a telling omission, particularly because the evidence that Plaintiffs have adduced goes far beyond the evidence that the Seventh Circuit found sufficient in *Mays* and *Calhoun*. Simply put, if credited (as the Court must at this stage), Plaintiffs' evidence should easily permit a reasonable jury to conclude that *both* the decision to conduct the shakedowns at its inception, and the plan that governed the execution of the shakedowns, were motivated by harassment and intimidation, rather than any legitimate penological purpose. Either one is sufficient and summary judgment must accordingly be denied.

**II.     Summary Judgment Should Be Denied as to Plaintiffs' Conspiracy and Failure to Intervene Claims.**

In addition to alleging that each of the 22 supervisor defendants violated Plaintiffs' Eighth Amendment rights, Plaintiffs in this case additionally charged, on the same facts, that these defendants conspired to violate their Eighth Amendment rights, and failed to intervene to protect those rights. *See* ECF 76 Counts II and III.  Defendants address these theories only in a footnote, and state that if the underlying claim fails against the defendants, the conspiracy and failure-to-intervene claims must fail as well. *See* ECF 642 at 31 n.5.  No further argument is made as to whether there is a genuine issue of material fact regarding the elements of these two theories, and as such the Defendants' motion fails to satisfy Rule 56(c)(1)(B)(for "each claim or defense," the party moving for summary judgment must "show[] that the materials cited do not establish the absence or presence of a genuine dispute").

In all events, Plaintiffs have adduced substantial evidence supporting both claims. Plaintiffs have adduced evidence of multiple meetings among all the supervisor defendants about the planned shakedowns and that then communicated with each other during the shakedowns to ensure they were going according to plan, *see* PMSF ¶¶ 4-5, 23-32, permitting the inference that the Defendants reached an agreement to violate class members' Eighth Amendment rights and each took action in furtherance of that agreement. *See Scherer*, 840 F.2d at 442.  This evidence, and the evidence that the Defendants were aware of but effectively ignored prisoner complaints about the shakedowns and how they were conducted, *see* PSMF ¶¶ 82-86, are evidence from which it can be inferred that the Defendants had the opportunity to intervene to prevent the violation of class members' Eighth Amendment rights, but failed to do so. *See Rosado v. Gonzalez*, 832 F.3d at 718.  Plaintiffs thus have adduced material evidence to satisfy Counts II and III.

### III.    Defendants Are Not Entitled to Partial Summary Judgment

As a stopgap measure, Defendants argue that the Court should grant partial summary judgment as to any subpart of Plaintiffs' claims—*i.e.*, they should receive summary judgment as to different steps of the shakedowns. ECF 642 at 56. This, however, is just another way of packaging the Defendants' wrong-headed argument that each step in the shakedowns should be considered in isolation from all the others.  Rule 56(a), of course, does permit parties to seek partial summary judgment on subclaims. But there must be a basis to do so.  And as Plaintiffs have explained at length*,* the Courts are emphatic that it is inappropriate to compartmentalize evidence in the way Defendants have asked—rather, the point of *Mays*, *Calhoun*, and the raft of decisions reviewed by Plaintiffs *supra* is that the question of whether prisoner searches are illegitimate, "calculated harassment" must be assessed, and thus adjudicated, as a whole.  *Supra* at 57-60.

### IV.    Defendants Are Not Entitled to Qualified Immunity

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Put differently, "qualified immunity does not shield a government official if the alleged conduct violates a right that was clearly established at the time." *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019). To defeat a qualified immunity defense at summary judgment, Plaintiffs must demonstrate that the facts of the case (viewed in the light most favorable to them) show "a violation of a constitutional right" and that the "constitutional right was clearly established at the time of the alleged violation." *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017). Notably, Plaintiffs do not need to find a case "on all fours" with the facts at issue. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Instead, Plaintiffs need

only show "a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017).

"The Eighth Amendment prohibits unnecessary and wanton infliction of pain, thus forbidding punishment that is 'so totally without penological justification that it results in the gratuitous infliction of suffering.'" *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). This protection includes both physical and psychological harm. *See Beal v. Foster*, 803 F.3d 356, 357-58 (7th Cir. 2015). "Inmates have long had a clearly established right to be free from intentionally inflicted psychological torment and humiliation unrelated to penological interests." *Leiser*, 933 F.3d at 703 (collecting cases).

Here, Plaintiffs allege that the Defendants executed a uniform plan designed to humiliate and inflict psychological harm. PSMF ¶¶ 4-8, 32-34. Defendants used multiple methods to carry out this intent–psychological intimidation upon entering the units, degrading reverse strip searches, painful cuffing and humiliating mass movements, and physical and psychological violence if class members failed to comply with the tact team's orders. PSMF ¶¶ 35-64. Throughout the grievances and depositions, class members provide strikingly similar accounts of each of these tactics. PSMF ¶ 61. And, Plaintiffs' experts demonstrate in their analyses how these tactics violated both industry standard correctional practices and IDOC's own policies without justification. PSMF ¶¶ 70-73.

At summary judgment, all this court needs to decide is whether the evidence presented when viewed in the light most favorable to Plaintiffs supports their allegations such that a jury should decide which account to believe. The defendants note that other facility-wide searches have been upheld, ECF 642 at 50, but that focuses on the wrong issue. A variety of prisoner searches

are routinely upheld by courts as a matter of course, as flowing from legitimate penological imperatives.  But for years courts have been equally clear that searches—of whatever sort—that are intended to harass and humiliate prisoners violate the Eighth Amendment.  Case law clearly establishes that a shakedown plan designed to humiliate violated Plaintiffs' Eighth Amendment rights. The tact team, under the direction of Defendants, who concocted the plan and supervised its execution, subjected class members to humiliating reverse strip searches in violation of the prison's regulations. PSMF ¶¶ 41-43; *see Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009) (reversing grant of summary judgment on strip search claim where evidence showed that plaintiff was "subjected to daily strip searches in view of other inmates, that the searches were sometimes done in a cold room, that guards did not regularly change their latex gloves, that guards sometimes made demeaning comments as they searched the naked prisoners, and that the searches were done in knowing violation of the prison's regulations" as a jury "could have [] found that the searches were intended to harass . . . ."). Orange Crush members ignored clear medical needs of class members during the shakedowns–brutalizing and humiliating a wheelchair-bound class member, ignoring front cuffing permits, and denying class members medical care and basic needs while in holding. PSMF ¶¶ 42, 46; *see, e.g.*, *Mitchell v. Kallas*, 895 F.3d 492, 499 (7th Cir. 2018) ("An absence of treatment is equally actionable whether the inmate's suffering is physical or psychological."); *Arnett v. Webster*, 658 F.3d 742, 752–53 (7th Cir. 2011) (refusal to provide inmate with prescribed medication or to follow advice of specialists can violate the Eighth Amendment); *Ralston v. McGovern*, 167 F.3d 1160, 1161–62 (7th Cir. 1999) (reversing summary judgment because non-medical prison guard's refusal to comply with physician's therapy decision could be cruel and unusual). And, throughout all these events, Orange Crush members verbally and physically assaulted class members without reason. PSMF ¶¶ 38, 42, 44, 47-54, 56-58; *see*

*Beal*, 803 F.3d at 359 (finding that the jury could find that a correctional officer's verbal and nonverbal harassment of a prisoner was cruel and unusual because it "inflicted significant psychological harm"). Both *Mays* and *Calhoun* provided ample notice that the conduct at issue in this case was illegal, and both cases were decided years before these shakedowns took place.

If a jury could plausibly find that Defendants developed and executed their uniform plan with the intent to inflict psychological harm, qualified immunity must be denied.

## V.     Plaintiffs Present a Genuine Dispute of Material Fact on Their Eighth Amendment Claims Against the Non-Supervisory Defendants

Defendants improperly move the goal post as to the non-supervisory Defendants in this case.[3] This is not the time to resolve any claims against the non-supervisory Defendants against whom the class has not been certified. Summary judgment is meant to determine what genuine issues of material fact exist that should be submitted to the jury at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no trial pending against the non-supervisory defendants, and thus no need to resolve any claims against the non-supervisory Defendants at this time.

At this juncture, all that is at issue at the upcoming trial, as dictated by the Seventh Circuit's opinion in this case, is whether the uniform plan developed by the supervisory Defendants and executed at Menard, Illinois River, Big Muddy, and Lawrence was constitutional–as the supervisory Defendants claim–or unconstitutional–as Plaintiffs assert. *Ross*, 33 F.4th at 441. This is a class action, so the constitutionality of the plan will "drive the resolution of the litigation" for the entire class, including any finding of liability against the defendants. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). And, it will drive the resolution of the claims against the non-

---

[3] Defendants have not moved for summary judgment on behalf of Defendants Bradley Clark, Steven Conrad, Justin Eckelberry, Jason Furlow, James Gray, Marcus Jenkins, Brian Livingston, John Maragni, and Carson Winters. ECF 642 at 47.

supervisory Defendants, who will have ability to seek summary judgment on their claims based on their alleged lack of personal involvement in executing the plan before their eventual trial.

But a timetable for adjudicating claims against the non-supervisory defendants has not yet been set and as such it is not the time to resolve any claims against the non-supervisory Defendants via summary judgment. Right now, the Court need only decide what issues against the *supervisory* Defendants present a genuine issue of material fact for trial.

## CONCLUSION

For the reasons set forth in this memorandum, Plaintiffs respectfully request that this Court deny Defendants' motion for summary judgment.

Dated:         August 12, 2024                    Respectfully submitted,

                                                  /s/ Megan Porter
                                                  *One of Plaintiffs' Attorneys*

                                                  Michael Kanovitz
                                                  Stephen H. Weil
                                                  Megan Porter
                                                  LOEVY & LOEVY
                                                  311 N. Aberdeen St.
                                                  Chicago, IL 60607
                                                  (312) 243-5900

                                                  Sarah Grady
                                                  Nabihah Maqbool
                                                  Terah Tollner
                                                  KAPLAN & GRADY LLC
                                                  2071 N. Southport Ave., Ste 205
                                                  Chicago, IL 60614
                                                  (312) 852-2184

                                                  Alan Mills
                                                  Nicole Schult
                                                  UPTOWN PEOPLE'S LAW CENTER
                                                  4413 N. Sheridan Rd.
                                                  Chicago, IL 60640
                                                  (773) 769-1410

**CERTIFICATE OF COMPLIANCE**

I, Megan Porter, an attorney, certify that this response complies with the page limit set out in Local Rules 7.1(a)(3) and 56.1(e), as modified by this court on [X], because this response, exclusive of those items set out in Local Rules 7.1(a)(3) and 56.1(d), is approximately [X] pages in length.


Dated:        August 12, 2024                    /s/ Megan Porter
                                                 *One of Plaintiffs' Attorneys*

                                                 Megan Porter
                                                 Loevy & Loevy
                                                 311 N. Aberdeen St.
                                                 Chicago, IL 60640
                                                 (312) 243-5900
                                                 porter@loevy.com