## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DEMETRIUS ROSS, et al., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GREG GOSSETT, et al.,<br><br>Defendants. | Case No. 15-cv-0309<br><br>Hon. Staci M. Yandle |

## DEFENDANTS' REPLY IN SUPPORT
## OF THEIR MOTION FOR SUMMARY JUDGMENT

Dated: September 9, 2024

KWAME RAOUL
Attorney General of Illinois

Laura K. Bautista
Assistant Chief Deputy Attorney General
500 South Second Street
Springfield, IL 62701
(217) 782-5819
laura.bautista@ilag.gov

*Counsel for Defendants*

Joseph N. Rupcich
Joy C. Syrcle
Special Assistant Attorneys General
Cassiday Schade LLP
2040 W. Iles, Suite B
Springfield, IL 62704
(217) 572-1714
jrupcich@cassiday.com
jsyrcle@cassiday.com

*Counsel for Supervisory Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ...................................................................................................1

RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS..........2

ARGUMENT .........................................................................................................30

I.      Summary Judgment Is Proper As To All Defendants.........................................30

        A.      The Evidence Shows That Defendants Acted Pursuant To Policy. .......................31

        B.      Plaintiffs' Contrary Account Is Unsupported By The Evidence. ..........................35

II.     Summary Judgment Is Proper As To Specific Defendants................................38

        A.      Plaintiffs Fail To Connect Any Aspect Of The Uniform Plan To Any Specific
                Supervisory Defendants. ........................................................................39

        B.      Plaintiffs' Efforts To Evade Their Summary-Judgment Obligations As To The
                Non-Supervisory Defendants Fail...........................................................41

III.    Qualified Immunity Bars Relief........................................................................42

CONCLUSION ......................................................................................................45

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ames v. Stigler*,
   2009 WL 9097015 (N.D. Ill. Sept. 3, 2009) ...................................................43

*Beal v. Foster*,
   803 F.3d 356, 358 (7th Cir. 2015) .................................................................22

*Calhoun v. Detella*,
   319 F.3d 936 (7th Cir. 2003) ....................................................................43, 44

*Chairs v. Ill. Dep't of Corr's*,
   2022 WL 3716170 (S.D. Ill. Aug. 29, 2022) ................................................ 43

*Chatman v. Gossett*,
   766 F. App'x 362 (7th Cir. 2019) ..................................................................32

*Curiel v. Stigler*,
   2009 WL 904894 (N.D. Ill. Mar. 31, 2008)..............................................34, 43

*De v. City of Chicago*,
   912 F. Supp. 2d 709 (N.D. Ill. 2012) ...............................................................9

*Farmer v. Brennan*,
   511 U.S. 825 (1994)........................................................................................33

*Flowers v. Kia Motors Fin.*,
   105 F.4th 939 (7th Cir. 2024) ....................................................................36, 38

*Gross v. Town of Cicero*,
   619 F.3d 697 (7th Cir. 2010) ..........................................................................41

*Hernandez v. Battaglia*,
   673 F. Supp. 2d 673 (N.D. Ill. 2009) ..............................................................43

*Hope v. Pelzer*,
   536 U.S. 730 (2002).........................................................................................19

*Haywood v. Hathaway*,
   842 F.3d 1026 (7th Cir. 2016) (per curiam)....................................................39

*Hudson v. McMillan*,
   503 U.S. 1 (1992)............................................................................................33

*Jones v. DeGrave*,
    2024 WL 1988835 (7th Cir. May 6, 2024) ...................................................................32

*Leiser v. Kloth*,
    933 F.3d 696 (7th Cir. 2019) ...........................................................................43, 44, 45

*Lewis v. Stephen*,
    2016 WL 6638029 (W.D. Wis. Nov. 9, 2016) .............................................................32

*Mays v. Springborn*,
    575 F.3d 643 (7th Cir. 2009) .......................................................................34, 35, 43, 44

*Modrowski v. Pigatto*,
    712 F.3d 1166 (7th Cir. 2013) .....................................................................................39

*Mullenix v. Luna*,
    577 U.S. 7 (2015) .........................................................................................................43

*Peckham v. Wisconsin Dep't of Corr.*,
    141 F.3d 694 (7th Cir. 1998) .......................................................................................32

*Perkins v. Pfister*,
    711 F. App'x 335 (7th Cir. 2017) ...............................................................................33

*Renee v. Neal*,
    483 F. Supp. 3d 606 (N.D. Ind. 2020) ........................................................................40

*Stockton v. Milwaukee Cnty.*,
    44 F.4th 605 (7th Cir. 2022) .............................................................................38, 39, 41

*United States v. Shea*,
    989 F.3d 271 (4th Cir. 2021) .............................................................................. *passim*

*Whitman v. Nesic*,
    368 F.3d 931 (7th Cir. 2004) .......................................................................................31

*Wilson v. Seiter*,
    501 U.S. 294 (1991) ...............................................................................................34, 35

**Statutes, Rules, and Other Authorities**

Federal Rule of Civil Procedure 56 ...................................................................41, 42

Federal Rule of Evidence 407 ...................................................................................33

## INTRODUCTION

Plaintiffs' response to defendants' motion for summary judgment is startling for what it does not say. Plaintiffs must show a genuine dispute of material fact over whether the supervisory defendants intentionally designed and implemented a uniform policy to inflict pain and humiliation on them (and a genuine dispute of material fact over whether each individual defendant executed such a plan). Plaintiffs deposed every supervisory defendant and obtained thousands of pages of documents seeking evidence of such a plan—but they point to no statement made by any defendant and no piece of paper produced by defendants that suggests one was ever made. Plaintiffs rely, as they did at the certification stage, only on their own statements that the facility-wide searches were conducted in ways that they viewed as consistent, and on defendants' agreement that the searches were conducted pursuant to Department policy and operations orders (orders that contain no hint of the clandestine plan that plaintiffs imagine). That cannot be enough to send plaintiffs' Eighth Amendment claims to a jury.

Meanwhile, their claims falter on other grounds. Plaintiffs concede they cannot hold the Department liable on an official-capacity theory for its current practices, and they agree that their state-law claim (Count V) fails as a matter of law. And despite being called on to produce specific evidence connecting specific defendants to the hypothetical plan to deviate from Department rules and humiliate inmates, plaintiffs punt, identifying no evidence any *specific* supervisory defendant planned or oversaw the execution of such a plan. Instead, they wholly disclaim any need to produce such evidence with respect to the individual officer defendants, not even attempting to shoulder their summary judgment burden. Nor do plaintiffs explain why qualified immunity does not apply, especially given courts' uniform rejection of liability on similar facts. The Court should grant all defendants summary judgment across the board.

**RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS**

1.    Unsupported by any record citation.

2.    Admitted.

3.    Unsupported by the record citation.  The cited transcript supports only that Big Muddy, Lawrence, and Menard, among other facilities, are in the Southern Region; not that as Southern Regional Tact Commander, McAllister was "responsible" for Big Muddy, Lawrence, and Menard.

4.    Unsupported by the record citation.  To the extent this fact asserts that the *only* purpose of the "spring cleaning" was to remove trash and contraband from the facilities, that is not supported because the transcript states that the purposes for the search included removing trash, searching for weapons and drugs, *and* gathering intelligence.  And the cited transcript and email do not support the statement that it was Yurkovich's and Atchison's decision to perform the prison-wide searches in 2014.

5.    Unsupported by the record citation.  The cited transcript for the first sentence supports only that several conversations were had involving Atchison, Yurkovich, *and others* regarding a need to shakedown medium security facilities and the reasons those shakedowns were needed (reports of cell phones and weapons in the facilities), not that Yurkovich and Atchison had several conversations "to form their plan regarding these shakedowns."  The cited transcript for the second sentence supports only that Yurkovich could not recall in 2018 (when his deposition was taken) whether the search was in response to increased staff assaults, increased contraband, increased gang activity, or increased risk to the safety and security of any institution.  The second sentence is also supported by a citation to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion." *United States v. Shea*, 989 F.3d 271, 278 (4th Cir. 2021).  The cited transcript for the third sentence does not support the assertion that the

only reason for the searches was because there had not been facility-wide searches in a long time; rather, it states that the facility-wide searches were initiated because there hadn't been facility-wide searches in a long time *and* there had been reports in medium-security facilities of cell phones and weapons. Finally, the referenced testimony from Atchison and Yurkovich also does not state that "Yurkovich and Atchison decided to initiate these sweeps."

6.    Unsupported by the record citation. The cited transcript supports only that the initial plan was to conduct a facility-wide shakedown of every prison in the state for the purpose of finding weapons and drugs, and gathering intelligence. It does not support the assertion that the plan was devised by Yurkovich and Atchison, nor that the plan was for a facility-wide shakedown "regardless of whether or not the prison had experienced issues with contraband, assaults, or the like." The email cited for the third sentence (Doc. 481-71) in no way supports the statement that the prisons that ended up being selected for the search "appear to be mostly random" and based on scheduling rather than safety or security concerns.

7.    Unsupported by the record citation. The cited email does not support the statement that Yurkovich (or "they") planned the spring-cleaning initiative. To the extent this fact asserts that these are only statements made in this email, it is also unsupported because Eddie Caumiant stated that three assaults took place at Menard the previous week which included three shots being fired because they got the latest assault stopped, so "[s]taff there want to see a facility wide lock and shakedown. They are getting very worried that the place is losing control, and are starting to whisper 'no confidence' among other things."

8.    Immaterial. The record citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false. It is opinion." *Shea*, 989 F.3d at 278. The claimed fact is also immaterial because, as discussed below, *infra* p. 32, the email on which the

expert opinion is based, Pl. Ex. B, expressly states that the searches were initiated in reaction to assaults by inmates on Department staff (three in one week at Menard alone), which is a penological justification for the searches.

9.      Immaterial.  The record citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion." *Shea*, 989 F.3d at 278. Additionally, Mr. Pacholke cannot express an "opinion" about what a prison administrator would have understood based on Mr. Caumiant's email.  *See* Defs.' Mtn. to Bar Expert Testimony, Doc. 643 at 9-14.

10.     Unsupported by the record citations.  The cited transcripts support only that: (1) Department facilities regularly perform area searches commonly referred to as "shakedowns" of one or more cells or wings; (2) verbal approval of the deputy director is needed for a facility-wide shakedown and the operation plan needs approval from a deputy chief of operations or chief of operations; (3) and facility-wide searches slowed down at a certain point, or occurred only a certain number of times at specific facilities.  (For example, Roeckeman's testimony states that he doesn't remember another facility-wide shakedown at Big Muddy while he was the warden at Big Muddy, which was from September 2012 to December 2015.  *See* Roeckeman Dep. Tr. 12:11-16 (Def. Ex. RR) (Doc. 642-45).)  The second sentence has no citation in support.  There is no support for the statement that facility-wide shakedowns require approval from "senior members" of Department administration, or that supervision is required by "senior members" of Department administration. And the cited transcripts do not support the statement that before 2014, facility-wide shakedowns were "rare or non-existent." In fact, Atchison testified that "it's more than the norm to shake down your maximum security facilities at least once a year."  Atchison Dep. Tr. 47:13-15 (Def. Ex. U) (Doc. 642-22).

11.    Immaterial.  The record citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion."  *Shea*, 989 F.3d at 278.  Additionally, Mr. Pacholke cannot express an "opinion" that a prison administrator would have known using staff unfamiliar with a facility would have increased tensions within facilities.  *See* Defs.' Mtn. to Bar Expert Testimony, Doc. 643 at 9-14.

12.    Immaterial.  The record citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion." *Shea*, 989 F.3d at 278.  Additionally, it is legally irrelevant whether there were more common or more effective methods for reducing contraband, gathering gang intelligence, or mitigating security threats.  *See infra* p. 32.

13.    Immaterial.  The record citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion." *Shea*, 989 F.3d at 278.  Additionally, it is legally irrelevant whether there were less intrusive options for reducing contraband.  *See infra* p. 32.

14.    Immaterial.  The record citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion." *Shea*, 989 F.3d at 278.  Additionally, it is legally irrelevant whether prison administrators had options other than a facility-wide shakedown at their disposal.  *See infra* p. 32.

15.    Unsupported by the record citations.  To the extent the claim is that other facility-wide shakedowns did not use IDOC tactical teams to execute shakedowns, but Atchison and Yurkovich decided that the ones at issue in this case would, that is not supported by the record citations.  The cited material supports only that tactical teams are utilized (or activated) for forcible cell extractions, prisoner riots, and prisoner escapes.  It does not support a conclusion that tactical

teams are only utilized in situations where use of force is "virtually guaranteed," or even that use of force is virtually guaranteed in forcible cell extractions, prisoner rights, and prisoner escapes. For example, the cited material also states that the tactical unit is "often" involved in escorting compliant inmates, Doc. 486-1 at 11, and even in situations where force might be necessary, the procedure requires attempts to first obtain voluntary compliance, *id.* at 6, 9, 13.

16.    Admitted. *See* SMF 39.

17.    Unsupported by the record citations.  The record citations only support that tact team members "typically" wore the items described in this fact, that they did not wear name tags, and that inmates gave the tact team the nickname "Orange Crush" because of the color of the uniforms, and staff have used that name as well.  The record citations do not support that the uniforms concealed team members' identities, that the helmets covered their faces, or that the gloves prevented prisoners from being able to tell the race of the officer.

18.    Unsupported by the record citations.  The record citations do not support the statement that there were no written training materials for the tact team.  Indeed, Plaintiffs previously submitted the tact manual as evidence, and relied on it in their statement of material facts.  *See* Doc. 486-1; PSMF 15.

19.    Unsupported by the record, as there is no material cited for this fact.  Additionally, this is immaterial because the "fact" is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion." *Shea*, 989 F.3d at 278.  Finally, it is not expert testimony to offer an "opinion" that the features of the tact team invited abusive behavior like that Plaintiffs allege occurred in this case.  *See* Defs.' Mtn. to Bar Expert Testimony, Doc. 643 at 9-14.

20.     Immaterial.  The record citation is to an opinion of plaintiffs' expert, "[b]ut expert

opinion is not fact that can be proved true or false. It is opinion." *Shea*, 989 F.3d at 278. Additionally, Mr. Hurley cannot express an "opinion" that the nickname "Orange Crush" indicates a cultural expectation that accepts and encourages members to engage in abusive and violent behavior, nor can he express an "opinion" that the name "Orange Crush" undermines the efficacy of the search mission by encouraging inappropriate conduct. *See* Defs.' Mtn. to Bar Expert Testimony, Doc. 643 at 9-14. These "opinions" are argumentative and conclusory, and Mr. Hurley discloses no specialized knowledge that vests him with expertise in making this kind of determination.

21.    Immaterial. The record citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false. It is opinion." *Shea*, 989 F.3d at 278. Additionally, it is not expert testimony to offer an "opinion" that not having nametags allowed systematic abuse, or that it is not consistent with an intent to be transparent and have accountability. *See* Defs.' Mtn. to Bar Expert Testimony, Doc. 643 at 9-14.

22.    Immaterial. The record citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false. It is opinion." *Shea*, 989 F.3d at 278. Additionally, it is not expert testimony to offer an "opinion" that the Department used the tact team in order to make it less likely for prisoners to know who to include in a grievance. *See* Defs.' Mtn. to Bar Expert Testimony, Doc. 643 at 9-14.

23.    Unsupported by the record citations. PSMF 16 correctly explains that "[t]act team members are supervised by a facility tact commander and one or more assistant commanders at the prison where they work, followed by the Regional Tact Commander (McAllister) and the Statewide Tact Commander (White)." And the record citations in PSMF 23 include then-Warden Dorethy's testimony, which explains that, once a tact team operation begins, "tactical reports to

the commander." Dorethy Dep. Tr. 51:20-52:2 (Def. Ex. X) (Doc. 642-25); *see also id.* (explaining that, when "an individual tact member ha[s] a question or concern," the tact team member goes "to their . . . tactical commander or assistant"). None of the record citations support the statement that the warden and assistant warden were responsible for the tact team's conduct at their respective prisons.

24.    Unsupported by the record citations. There is no citation for the first sentence. The record citations for the second sentence provide no support. One document (Doc. 481-75) is an email discussing investigations of inmates that Menard staff took following the shakedown. And while the remaining two documents (Docs. 481-76, 481-77) appear to list tactical team members, those records still do not support that the individuals in that chart each supervised tact teams of 20-40 members each.

25.    Admitted.

26.    The first sentence is unsupported by any citation. It is unsupported by the record citations that the operations orders were created using "old IDOC templates." Rather, the record citations only support that the operations orders were created using a form, including areas where one could click to add text, a feature designed to ensure uniformity.

27.    Unsupported by the record citations. In the first sentence, the cited testimony for Anthony McAllister states that sometimes operations orders were forwarded to the tact team commander; the cited testimony for Kenneth Finney states that there was nothing in writing in connection with the briefing between the tact commanders and regional commanders, but does not discuss the operations orders; and the cited testimony for Stephen Duncan states that during the briefing he read from the operations order to the tact team members. In the second sentence, the cited testimony for Anthony McAllister states that sometimes operations orders were forwarded

to the tact team commander.  The fourth and fifth sentences are unsupported by the record citations

and are improper argument, not facts.  *See De v. City of Chicago*, 912 F. Supp. 2d 709, 713 (N.D.

Ill. 2012) (in responding to a summary judgment motion, a non-moving party's statement of

additional facts must include only material facts, and not argumentative or conclusory allegations).

     28.     The first sentence is admitted.  The second sentence is unsupported by a record

citation.  The record citations for the third sentence do not support the assertion that McAllister

gave some of the briefings; the cited testimony of Brian Piper states that Brady or White gave the

briefings, and the cited testimony of David White describes what he (White) would talk about

(presumably in the briefings), suggesting that White gave the briefings and not stating anything

about McAllister.   For the fourth sentence, the record citation supports only what was

communicated during the briefing, but not that the briefing was given by McAllister or White.

The fifth sentence is not supported by the record citations:  The cited testimony of Anthony

McAllister states that sometimes the warden or a member of the warden's staff would "be there"

(presumably, at the briefing before an operation); the cited testimony of David White states that

"typically" the warden or "other administrators of the facility" were present for the briefing; the

cited testimony of Kimberly Butler states that she would have been present at the briefing; and

Greg Gossett testified that he was present at the briefing (as warden) and he believes Stephanie

Dorethy, the assistant warden, was there as well.  Additionally, this fact is immaterial to the extent

it suggests that the briefings were the only way the Department communicated expectations

regarding shakedowns; the Department has issued policies to guide searches (including facility-

wide searches), including how strip searches were to be conducted from head to toe, that female

officers were not to be present for searches of male prisoners, the method of searching a cell, and

more.  *See* SMF 13, 26-28 (undisputed by plaintiffs); SMF 14-17, 31-32 (disputed by plaintiffs as

to whether the policies were followed).

29.     Unsupported by the record citations.  For the first sentence, the record citations only support the statement that the tact commanders and assistant tact commanders would describe the briefing to the facility-level tact team members, but not that initial briefing was given by McAllister and/or White.   For the second sentence, the record citations only support that, immediately before beginning the shakedown, the group would again meet as a whole; the cited testimony of David White states that he would give this final briefing, and the remaining record citations do not state who gave the final briefing.  Additionally, it is immaterial that nothing was distributed in writing during or after the oral briefings; the Department has issued policies to guide searches (including facility-wide searches), including how strip searches were to be conducted from head to toe, that female officers were not to be present for searches of male prisoners, the method of searching a cell, and more.  *See* SMF 13, 26-28 (undisputed by plaintiffs); SMF 14-17, 31-32 (disputed by plaintiffs as to whether the policies were followed).

30.     Unsupported by the record citations. The record citations in no way support the statement that the orally communicated briefing included instructions to march in, "banging and crashing" their batons on the bars of the cells.  The record citations also do not support the statement that the orally communicated plan included how prisoners were strip searched or a description of the line movement formation that would be used to transport prisoners from their cellhouse to the area where they would be held while their cells were searched. Additionally, this fact is immaterial to the extent it suggests that the oral briefings were the only way IDOC communicated expectations regarding shakedowns; the Department has issued policies to guide searches (including facility-wide searches), including how strip searches were to be conducted from head to toe, that female officers were not to be present for searches of male prisoners, the

10

method of searching a cell, and more. *See* SMF 13, 26-28 (undisputed by plaintiffs); SMF 14-17,

31-32 (disputed by plaintiffs as to whether the policies were followed).

    31.    The record citation does not support the second sentence.  The citation is to the

exhibit list in support of defendants' motion for summary judgment, which does not support any

factual proposition.  To the extent plaintiffs intended to cite Yurkovich's deposition transcript

(Doc. 642-2), the cited page range has nothing to do with underwear.  This fact also is immaterial

because there is a penological justification for not allowing inmates to wear underwear during the

shakedowns, SMF 45-46, and because, as discussed in defendants' motion, Mem. 38-39, courts

have consistently held that the temporary deprivation of underwear does not constitute an Eighth

Amendment violation.

    32.    Unsupported by the record citations.  The record citations only support the

statement that the written operations orders state that inmates would be handcuffed "behind the

back," and that several defendants testified that alternative cuffing permits were honored during

the shakedowns.  The record citations do not support the statement that inmates presented permits

for alternative handcuffing and were denied.  The last sentence is unsupported by the record

citation, as the cited document (Doc. 482-14) does not exist.

    33.    Unsupported by the record citation.  The photographs do not show line movement

in violation of Department policy, and the expert has no special expertise allowing him to make

this conclusion.  Instead, the photographs depict inmates in formation prior to the line moving,

which is made clear because at the front of the line (where there is movement), the inmates are

more widely spaced, and at the back of the line, where there is no movement, the inmates have not

begun to move.  Additionally, the second sentence is immaterial; the record citation is to an opinion

of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion."

*Shea*, 989 F.3d at 278.  Finally, this fact is immaterial because, as discussed in defendants' motion, Mem. 42-43, the evidence on this issue cannot support an inference that the supervisory defendants devised and executed a secret "plan" to depart from Department line movement policy in the uniform manner plaintiffs describe.

34.    Unsupported by the record and immaterial.  The record citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion." *Shea*, 989 F.3d at 278.  Additionally, the record does not support the inference that the operations orders were not shared with those executing them, *see supra* p. 8 (defendants' response to PSMF 27) (Stephen Duncan read the operations orders to the tact team).

35.    Unsupported by the record citation.  There is no citation for the first sentence.  The second sentence is not supported by the record citations; the cited testimony of Yurkovich states that it was his expectation that Brady or White would be present for every shakedown; and the cited testimony of McAllister states that he was on vacation so White took over for him.  There is no support for the statement that White or McAllister were present each day of the shakedowns, or that they were responsible for supervising the tact team members during the shakedown.  The third sentence is not support by the record citation, which only states that McAllister was in charge of the first day of the shakedown at Menard and then was on vacation.  For the fourth sentence, the record citation only supports that McAllister was present at all but half of one day at the Big Muddy search, and was present during the Lawrence search.  The fifth sentence is immaterial as there is no record evidence that the "uniform plan" communicated during the oral briefings including any instructions to act in a manner that violated policy, the Constitution, or for the purpose of harassing and humiliating inmates.  *See supra* p. 10 (defendants' response to PSMF 30).  For the sixth sentence, the cited testimony of Butler states only that she was responsible for

overseeing the tactical team staff during facility-wide shakedowns, the cited testimony of Gossett only states that he went to the areas being shaken down to make sure staff wasn't tearing anything up; and the cited testimony of Duncan states only that he was responsible for overseeing the facility, not that they attended the shakedown "because they understood that they responsible for the conduct of the staff at the prison."  Additionally, this statement is immaterial because, as explained in defendants' motion, Mem. 45-47, plaintiffs must show (and have not) that each supervisory defendant was personally responsible for the deprivation of a constitutional right, which required plaintiffs to show that each defendant designed and implemented a uniform plan to cause pain or humiliation with no penological justification.

36.    Unsupported by the record citations.  For the first sentence, the cited testimony of Atchison states that he does not recall speaking to Yurkovich specifically about the progress of the shakedowns, and the cited testimony of Yurkovich is regarding an email that suggests there was a phone call with Atchison; neither record citation supports the statement that Yurkovich and Atchison had daily conversations with on-the-ground staff.  For the second sentence, the cited testimony of Atchison states only that he generally had regular in-person meetings, phone calls, and email communications with White, but not specifically in regard to the shakedowns at issue in this case.  And the cited testimony of Yurkovich states only that one operations meeting was called that included White and possibly included Atchison.

37.    Unsupported by the record citations.  There is no record citation for the first sentence.  For the second and third sentences, to the extent they suggest that the "uniform plan" included aspects intended to violate plaintiffs' rights, that is unsupported by the record citations. *See* Mem. 39-45.

38.    Unsupported by the record citations.  There is no record citation for the first

sentence. The second sentence is immaterial because the record citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false. It is opinion." *Shea*, 989 F.3d at 278. Additionally, it is not expert testimony to offer an "opinion" that is actually factual testimony simply summarizing documents, nor is it proper to offer an "opinion" on credibility issues. *See* Defs.' Mtn. to Bar Expert Testimony, Doc. 643 at 8-9, 12-14. Furthermore, this expert "opinion" is based on vague statements made by plaintiffs' expert. *See infra* p. 38 & n.5.

39.     Unsupported by the record citations and immaterial. The cited transcripts support only that select inmates testified that the tact team entered the cell house by yelling and banging batons, but did not describe the entry as "intimidating." Plaintiffs also cite their class certification brief ("ECF 481 at 10 n.4 (citing declarations submitted at ECF 481-51)"), but they fail to cite to specific pages of the record, making it impossible to both determine which declarations they are relying on in this paragraph and verify the cited declarations purportedly supporting this statement. The cited exhibit, *see* Doc. 481-51, is 190 pages long and consists of dozens of declarations that are not ordered or indexed. It is unreasonable to require the Court and defendants to search through this document for declarations that could plausibly support this fact, and the Court should disregard the citation. Finally, the claimed fact is immaterial because, as discussed in defendants' motion, Mem. 38-39, this method of entry had a penological purpose, and courts have consistently held that noise does not constitute an Eighth Amendment violation.

40.     Unsupported by the record citation and immaterial. Plaintiffs cite a specific page of Tim McAllister's deposition transcript, *see* T. McAllister Dep. Tr. 206:15-23 (Def. Ex. MM) (Doc. 642-40), but that page of the transcript is the index, not testimony. And the claimed fact is immaterial because, as discussed in defendants' motion, Mem. 38-39, this method of entry had a

penological purpose, and courts have consistently held that noise does not constitute an Eighth Amendment violation.

41.    Unsupported by the record citations.  The cited testimony of Kenneth Finney, *see* Finney Dep. Tr. 138, 139 (Def. Ex. P) (Doc. 642-17), and Greg Gossett, *see* Gossett Dep. Tr. 219, 220 (Def. Ex. E) (Doc. 642-7), does not state that the noise was "psychological" designed to "get prisoners ready."  Plaintiffs also cite Doc. 481-90 at 139, but that document is a four-page resume for plaintiffs' counsel, and there is no page 139.  Plaintiffs finally cite Doc. 491-14 at 66, but that document does not exist.

42.    Immaterial. The record citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion."  *Shea*, 989 F.3d at 278. Additionally, it is legally irrelevant whether there are better, or more effective, options for entering cellhouses prior to a search. *See infra* p. 32.  Finally, this "opinion" is a conclusory statement that should be barred. *See* Defs.' Mtn. to Bar Expert Testimony, Doc. 643 at 9-11.

43.    Immaterial.  The record citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion."  *Shea*, 989 F.3d at 278. Additionally, it is legally irrelevant whether there are better, or more effective, options for entering cellhouses prior to a search. *See infra* p. 32.  Finally, this "opinion" is a conclusory statement that should be barred. *See* Defs.' Mtn. to Bar Expert Testimony, Doc. 643 at 9-11.

44.    Immaterial.  The record citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion."  *Shea*, 989 F.3d at 278. Additionally, it is legally irrelevant whether there are better, or more effective, options for entering cellhouses prior to a search. *See infra* p. 32.  Finally, this "opinion" is a conclusory statement regarding defendants' intentions that should be barred. *See* Defs.' Mtn. to Bar Expert Testimony,

Doc. 643 at 9-11.

45.     Immaterial.  The record citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion."  *Shea*, 989 F.3d at 278.  This "opinion" is also a conclusory statement about defendants' intentions that should be barred.  *See* Defs.' Mtn. to Bar Expert Testimony, Doc. 643 at 9-11.  Finally, the asserted fact is immaterial because, as explained in defendants' motion, Mem. 38-39, courts have consistently held that noise does not constitute an Eighth Amendment violation.

46.     Immaterial.  While this fact states the tact team members' penological goal for making noise upon entering the cellhouse, the expert "opinion" about the real goal, or effectiveness of this method of achieving the goal, in immaterial.  It is legally irrelevant whether there are better, or more effective, options for entering cellhouses prior to a search.  *See infra* p. 32.  The record citation is also to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion."  *Shea*, 989 F.3d at 278.  Finally, this "opinion" is a conclusory statement about defendants' intent that should be barred.  *See* Defs.' Mtn. to Bar Expert Testimony, Doc. 643 at 9-11.

47.     Immaterial.  The record citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion."  *Shea*, 989 F.3d at 278.  This "opinion" is also a conclusory statement that allowing noise also secretly encouraged other abuses to occur, which should be barred.  *See* Defs.' Mtn. to Bar Expert Testimony, Doc. 643 at 9-11.

48.     Immaterial.  The record citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion."  *Shea*, 989 F.3d at 278.  Additionally, it is legally irrelevant whether there are better, or more effective, options for entering cellhouses prior to a search.  *See infra* p. 32.  This "opinion" is also a conclusory statement that

should be barred.  *See* Defs.' Mtn. to Bar Expert Testimony, Doc. 643 at 9-11.

49.    Unsupported by the record citations.  For the first sentence, the cited testimony
reflects that the Department is still considering whether it is preferable to make noise or not when
conducting facility-wide searches, but that tact teams' current practice is not to.  For the second
sentence, the cited testimony has nothing to do with "best practices"; Commander Sarver was
describing the general practice in 2014 (not today) and was explaining that the "practice [was] to
knock on the door with the baton" rather than on the guardrails.  Sarver Dep. Tr. 86:23-87-11 (Def.
Ex. J) (Doc. 642-11).

50.    Unsupported by the record citations.  The cited transcripts support only that a small
number of inmates claim that reverse strip searches occurred, but not that such searches were done
uniformly or "pursuant to Defendants' plan."  And, as explained in defendants' motion, the inmate
testimony on this issue is fractured, not uniform, and contradicted by other contemporaneous
evidence, at most possibly supporting that some tact team members in some facilities deviated
from Department policy, but not that the supervisory defendants devised and executed a secret
"plan" to depart from that policy in the uniform manner plaintiffs describe.  Mem. 41-42.

51.    Unsupported by the record citations and immaterial.  The cited transcripts do not
support that the conduct described here was uniform or pursuant to plan.  That a small number of
inmates testified how a single claimed reverse strip search occurred is irrelevant in this case unless
such searches were done pursuant to a uniform plan designed and implemented by the supervisory
defendants.

52.    Unsupported by the record citations and immaterial.  The record citation is to an
opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is
opinion."  *Shea*, 989 F.3d at 278.  The facts in the second and third sentences are also immaterial

to summary judgment issues unless the asserted reverse strip searches were performed pursuant to a uniform plan designed and implemented by the supervisory defendants. Plaintiffs offer no record evidence to support such a conclusion, because none exists.

53. Unsupported by the record citations and immaterial. The only citation for the first sentence is Commander Sarver's testimony, which reflects the reasons that some officers may have instructed inmates to dress only in their uniforms (without socks or underwear), not that all inmates were ordered to do so by all officers "pursuant to [the Department's] plan." *See* Sarver Dep. Tr. 121:16-25, 122:1-5 (Def. Ex. J) (Doc. 642-11) (describing "tactical reasons" why some officers might choose to do this). The citations for the second sentence are to a handful of inmate depositions, but scattered testimony of this sort does not establish that this practice was uniform or "pursuant to . . . plan." That certain inmates were told to dress in this manner is immaterial, regardless, because (a) courts have consistently held that the temporary deprivation of underwear does not constitute an Eighth Amendment violation, Mem. 38-39, and (b) any instructions given to this effect were grounded in penological goals, as Sarver's testimony reflects. *See* SMF 44-46. Finally, the final sentence is not a fact and so is not supported by the record citation. The citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false. It is opinion." *Shea*, 989 F.3d at 278.

54. Unsupported by the record citations and immaterial. The written operations orders simply list "underwear" as a "clothing/grooming requirement"; they do not state when underwear was to be searched. No record citation supports that there was a "plan," communicated only at the "oral briefing," to uniformly require inmates to dress in only their uniforms (without socks or underwear); rather, the evidence suggests that the practice on this question was not uniform, with some officers providing one instruction and some another. *See* SMF 44. There is thus no evidence

of any uniform plan that was not set out in the operations orders.  The final sentence is not a fact and is therefore also not supported by the record citation.  The record citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion." *Shea*, 989 F.3d at 278.  The claimed fact is also immaterial because (a) courts have consistently held that the temporary deprivation of underwear does not constitute an Eighth Amendment violation, Mem. 38-39, and (b) any instructions given to dress in prison uniforms only (not socks or underwear) were grounded in penological goals, *see* SMF 44-46.

55.    Unsupported by the record citations and immaterial.  The referenced testimony from Sarver makes no mention of "facility-wide searches."  The claimed facts are also immaterial because (a) courts have consistently held that the temporary deprivation of underwear does not constitute an Eighth Amendment violation, Mem. 38-39, and (b) any instructions given to dress in prison uniforms only (not socks or underwear) were grounded in penological goals, *see* SMF 44-46.

56.    Unsupported by the record citations.  The first sentence is unsupported because the cited transcripts support only that a small number of inmates claim that they were handcuffed "in a needlessly painful and uncomfortable manner," not that any such practice was uniform or "part of the plan."  Plaintiffs provide no evidence that the supervisory defendants intentionally designed a plan to go beyond Department handcuffing policy to "gratuitous[ly] inflict[] . . . 'wanton and unnecessary' pain" on inmates, *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (quoting *Trop v. Dulles*, 356 U.S. 86, 100 (1958)).  The cited testimony at most supports that some tact team members in some facilities deviated from Department policy, but not that the supervisory defendants devised and executed a secret "plan" to do so in the uniform manner plaintiffs describe.  *See* Mem. 35-37. The second sentence is unsupported for two reasons.  First, the citation does not support the "fact"

set forth; there is no mention of that fact on the cited page.  Second, the record citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion."  *Shea*, 989 F.3d at 278.

57.    Unsupported by the record citations and immaterial.  The citations supporting the first and third sentences are to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion."  *Shea*, 989 F.3d at 278.  The second sentence is immaterial to the issues before the Court (that is, the lack of evidence showing a uniform plan, the lack of evidence showing the supervisory defendants' personal involvement in the claimed conduct, and the lack of evidence showing the non-supervisory defendants' personal involvement in the claimed conduct).  That some of the facilities were not maximum security at the time of the incidents alleged is irrelevant to these issues.

58.    Partially unsupported by the record citations.  The first sentence is admitted.  The second sentence is unsupported by the record citations.  The cited materials support only that *two* members of the 10,000-person certified class had cuffing permits that they assert were not honored during the 2014 facility-wide searches.  *See* Doc. 481-34 at 76:7-20 (Dunmore); Doc. 481-42 at 46:2-47:24 (Knox).  The remaining materials do not support the stated fact:  "ECF 481-66 at 3 *et seq.*" appears to be a reference to 55 pages of operations orders, which do not show the existence of a "plan to ignore . . . handcuffing permits," and "ECF 481-33 at 78:16-81:18" is a reference to three pages of a deposition transcript that do not discuss cuffing permits at all.  These citations do not support the statement that there was a "2014 shakedown plan to ignore" cuffing permits.

59.    Unsupported by the record citations.  Both citations are to opinions of plaintiffs' experts, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion."  *Shea*, 989 F.3d at 278.

60.    Unsupported by the record citations.  The cited transcripts support only that a small number of inmates claim that they were told to line up "nuts to butts" or to have marched "so close with prisoners in front and behind that their genitals were forced" to contact the inmate in front and behind of them, but not that any such practice was uniform or "[i]n accordance with the plan." And, as discussed in defendants' motion, Mem. 42-43, the evidence on this issue cannot support an inference that the supervisory defendants devised and executed a secret "plan" to depart from Department line movement policy in the uniform manner plaintiffs describe.

61.    Unsupported by the record citation.  The citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion." *Shea*, 989 F.3d at 278.

62.    Immaterial.  Line movements "flanked" by tact team members do not violate the Eighth Amendment, and plaintiffs do not argue otherwise.

63.    Unsupported by the record citations and immaterial.  The first sentence is not supported with a record citation.  The second sentence is immaterial to the to the issues before the Court (that is, the lack of evidence showing a uniform plan, the lack of evidence showing the supervisory defendants' personal involvement in the claimed conduct, and the lack of evidence showing the non-supervisory defendants' personal involvement in the claimed conduct).  It does not matter that certain inmates claim to have been pushed and shoved while in the line movement unless such conduct was undertaken pursuant to a uniform plan designed and implemented by the supervisory defendants.  Plaintiffs do not assert in this statement that such a plan existed, and offer no record evidence to support any such conclusion, because none exists.  *See* Mem. 44.

64.    Immaterial.  The asserted facts are immaterial to the issues before the Court (that is, the lack of evidence showing a uniform plan, the lack of evidence showing the supervisory

defendants' personal involvement in the claimed conduct, and the lack of evidence showing the non-supervisory defendants' personal involvement in the claimed conduct).  It does not matter that certain inmates claim to have been pushed, shoved, or subjected to verbal abuse while in the line movement unless such conduct was undertaken pursuant to a uniform plan designed and implemented by the supervisory defendants.  Plaintiffs do not assert in this statement that such a plan existed, and offer no record evidence to support any such conclusion, because none exists. *See* Mem. 44.  The testimony of "verbal abuse" is also immaterial because "most verbal harassment by jail or prison guards does not rise to the level of cruel and unusual punishment." *Beal v. Foster*, 803 F.3d 356, 358 (7th Cir. 2015).

65.     Unsupported by the record citation.  The record citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion." *Shea*, 989 F.3d at 278.

66.     Immaterial.  The asserted facts are immaterial to the issues before the Court (that is, the lack of evidence showing a uniform plan, the lack of evidence showing the supervisory defendants' personal involvement in the claimed conduct, and the lack of evidence showing the non-supervisory defendants' personal involvement in the claimed conduct).  It does not matter that certain inmates claim to have been pushed, shoved, or subjected to verbal abuse while in the line movement unless such conduct was undertaken pursuant to a uniform plan designed and implemented by the supervisory defendants.  Plaintiffs do not assert in this statement that such a plan existed, and offer no record evidence to support any such conclusion, because none exists. *See* Mem. 44.

67.     Unsupported by the record citations.  The first photograph is not "evidence of [an] abusive line movement," because it depicts inmates in formation *prior* to the line movement.  The

22

second photograph proves the point:  That photograph depicts a line that is beginning to move, with inmates widely spaced at the front of the line (where there is movement) and less widely spaced at the back of the line (where there is no movement).  The commentary to the second photograph provided by plaintiffs' expert is not fact, but opinion, and as such does not support any facts.  *See Shea*, 989 F.3d at 278 ("expert opinion is not fact that can be proved true or false").

68.    Unsupported by the record citation and immaterial.  The testimony that purportedly supports the first sentence does not state or imply that "there was no justification for" the line movements used during the 2014 shakedowns; instead, Assistant Warden Jennings testified that Department policy provided for a "minimum of two" officers for a group of 90 inmates during a movement, but that the number of officers actually assigned to such a movement varied depending on security and staffing needs.  Jennings Dep. Tr. 57:13-58:18.  The policies cited to support the second sentence do not support the existence of a "practice" of requiring inmates to move in an uncomfortably close manner.  And the reference to plaintiffs' expert's opinion provides no support for any fact relating to the line movement.  *See Shea*, 989 F.3d at 278 ("expert opinion is not fact that can be proved true or false").

69.    Unsupported by the record citation.  The record citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion." *Shea*, 989 F.3d at 278.

70.    Unsupported by the record citation.  The record citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion." *Shea*, 989 F.3d at 278.

71.    Immaterial.  That a small number of inmates testified that they were handcuffed in "painful positions for unnecessarily long periods of time" during the shakedowns is irrelevant

unless such handcuffing occurred pursuant to a uniform plan designed and implemented by the supervisory defendants.  Plaintiffs do not even suggest here that such a plan existed and, regardless, offer no record evidence to support such a conclusion.

72.    Unsupported by the record citations.  The citations are to four of the supervisory defendants' deposition testimony (and one expert report that "gather[s]" the same four citations). None of these defendants testified to a "consistent" practice of leaving inmates "standing for hours at a time, facing walls, and unable to speak."  (Defendants admit that inmates generally "remained cuffed" during this time.)   At the cited page, Atchison, for instance, described a practice of "allow[ing] prisoners to sit when they were held for extended periods in the holding area," Atchison Dep. Tr. 75:3-6 (Def. Ex. U) (Doc. 642-22), not of "standing for hours at a time."  David White likewise agreed on the cited page that prisoners were given "a seat."  D. White Dep. Tr. 92:23 (Def. Ex. D) (Doc. 642-5).  And the cited page of Anthony McAllister's deposition describes only his practice of ensuring that no inmate was ever "in cuffs" for "over two hours."   A. McAllister Dep. Tr. 241:23-24 (Def. Ex. H) (Doc. 642-9).  This testimony does not support a "consistent" practice of leaving defendants "standing for hours at a time, facing walls, and unable to speak."

73.    Unsupported by the record citation.  The first sentence is not supported by any record citation.  The citation for the second sentence is a single deposition transcript, which describes only a single officer (Jerry Withhoft)'s personal "prefer[ences]" regarding when inmates should sit and when they should stand.  Witthoft Dep. Tr. 102:5 (Def. Ex. AAA) (Doc. 642-54). This transcript in no way supports what "[m]any prisoners" were "made" to do or what any "practice" was during the shakedowns.

74.    Unsupported by the record citations.  The first sentence is not supported by any

record citation.  The citation for the second and third sentences is a single page of deposition testimony from Brian Piper; these sentences grossly mischaracterize Piper's testimony.  Piper did not, for instance, state that "prisoners reported that they were losing feeling in their hands while waiting due to the extremely tight handcuffs"; he stated that officers would "systematically look at the cuffs on each inmate" to ensure "there was enough room."  Piper Dep. Tr. 113:6-13 (Def. Ex. TT) (Doc. 642-47).  Nor did Piper say that inmates were "put . . . on their knees if they could no longer stand"; he said that inmates would be "allow[ed] . . . to go to their knees" if they "didn't want to stand anymore."  *Id.* at 113:20-23.  The fourth sentence likewise is not supported by the cited deposition transcripts.  Hermetz was not at Lawrence for the searches at that facility, and so his testimony is not relevant to a statement about conditions at Lawrence.  Regardless, neither officer stated that inmates were not allowed to use the bathroom:  Hermetz stated that that inmates *were* permitted to use the bathroom, Hermetz Dep. Tr. 99:1-3 (Def. Ex. W) (Doc. 642-24) ("Q: Were inmates permitted to use the bathroom if they needed to during the shakedown?  A: Yes."), and Tim McAllister simply stated that he had not personally *seen* any inmates use the bathroom, T. McAllister Dep. Tr. 166:6-8 (Def. Ex. MM) (Doc. 642-40).  Neither excerpt says anything about the duration of the searches at Lawrence.  The fifth sentence is not supported by the cited deposition excerpts.  Hermetz does not state at either of the cited page ranges that, at Big Muddy "prisoners were allowed to sit if they had physical issues" or that "nurses were stationed in the holding areas because it was anticipated prisoners would" become sick.  The first cited excerpt (Dep. Tr. 90:8-16) describes Menard, not Big Muddy, and states only that some inmates sat and some stood, depending on which part of the facility they had come from.  The second excerpt (Dep. Tr. 161:4-162:4) consists almost entirely of plaintiffs' attorney *asking* Hermetz whether he saw inmates becoming sick at Big Muddy—a question Hermetz answered by explaining that he

25

generally "was notified of [such] incidents more than [he] observed them."  Finally, the sixth sentence is also not supported by the cited deposition transcript.  The only citation is to Witthoft's deposition, which does not describe "multiple reports" about anything.  In fact, Witthoft was asked whether "prisoners could only use the bathroom if they provided medical documentation," and answered no.  *See* Witthoft Dep. Tr. 187:10-24 (Def. Ex. AAA) (Doc. 642-54) (if an inmate didn't have medical documentation, officers might not "encourage" him to use the bathroom, but would not prohibit it).

75.  Unsupported by the record citation.  The citation is to an opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion." *Shea*, 989 F.3d at 278.

76.  Unsupported by the record citations.  The first sentence is not supported by a record citation.  The first clause of the second sentence and the entire third sentence are supported only by expert opinions, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion." *Shea*, 989 F.3d at 278.  The record citation provided for the second clause of the second sentence does not support the assertion that cells were uniformly (or frequently) "searched by a single tact team member."

77.  Unsupported by the record citation and immaterial.  The citations are to the opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion." *Shea*, 989 F.3d at 278.  It also does not matter that certain inmates claimed to have had property broken or taken during cell searches unless such conduct was undertaken pursuant to a uniform plan designed and implemented by the supervisory defendants.  But plaintiffs do not even suggest here that the record evidence supports such a conclusion, because none exists.

78.  Unsupported by the record citation and immaterial.  The citations are to the opinion

of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion."
*Shea*, 989 F.3d at 278.  It also does not matter that certain inmates claimed to have had property
broken or taken during cell searches unless such conduct was undertaken pursuant to a uniform
plan designed and implemented by the supervisory defendants.  But plaintiffs do not even suggest
here that the record evidence supports such a conclusion, because none exists.

79.    Unsupported by the record citation and immaterial.  The citations are to the opinion
of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion."
*Shea*, 989 F.3d at 278.  It also does not matter that certain inmates claimed to have had property
broken or taken during cell searches unless such conduct was undertaken pursuant to a uniform
plan designed and implemented by the supervisory defendants.  But plaintiffs do not even suggest
here that the record evidence supports such a conclusion, because none exists.

80.    Unsupported by the record citation and immaterial.  The citations are to the opinion
of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion."
*Shea*, 989 F.3d at 278.  It also does not matter that certain inmates claimed to have had property
broken or taken during cell searches unless such conduct was undertaken pursuant to a uniform
plan designed and implemented by the supervisory defendants.  But plaintiffs do not even suggest
here that the record evidence supports such a conclusion, because none exists.

81.    Unsupported by the record citations.  The cited transcripts support only that a small
number of inmates claim that they were told to line up "nuts to butts," but not that any such practice
was uniform or in accordance with a plan.  And, as discussed in defendants' motion, Mem. 42-43,
the evidence on this issue cannot support an inference that the supervisory defendants devised and
executed a secret "plan" to depart from Department line movement policy in the uniform manner
plaintiffs describe.

82.    Unsupported by the record citation.  The citation is to the opinion of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion." *Shea*, 989 F.3d at 278.

83.    Unsupported by the record citation. The first sentence is not supported by a record citation.  The record citations purportedly supporting the second sentence bear no relationship to Godinez's asserted awareness "of many reports of abuse."

84.    Partially unsupported by the record citations.  The first sentence is admitted.  The record citations for the second sentence all describe the initial planning efforts for the facility-wide searches; they have nothing to do with whether Yurkovich received daily reports.  *See* Yurkovich Dep. Tr. 100:5-7 (Def. Ex. A) (Doc. 642-2) (describing "general conversations" about searches); *id.* at 107:17-19 (similar); *id.* at 109:10-20 (similar).  The record citations for the third sentence do not support the statement that Yurkovich or Atchison generally or uniformly did not take steps to investigate allegations about misconduct.

85.    Unsupported by the record citations.  The only evidence cited for the first sentence is an excerpt from White's deposition explaining that he has never been "interviewed" by internal affairs as part of an investigation into the tact team, D. White Dep. Tr. 150:21 (Def. Ex. D) (Doc. 642-5); it says nothing about whether White ever personally "investigated allegations of abuse or misconduct," and it says nothing at all about Anthony McAllister.  The excerpt from White's deposition cited for the second sentence has no bearing at all on whether White "failed to supervise the tact team commanders and assistant commanders in the field to ensure that allegations of excessive force, physical and verbal abuse, unprofessionalism, and misconduct were property investigated"; it is a short discussion of whether White was ever "made aware of complaints by prisoners in east cell house at Menard about abuse by" tact team members.  *Id.* at 151:23-152:2

28

(he did not).  Again, it has nothing to do with Anthony McAllister.

86.    Immaterial and unsupported by the record citation.  Given the issues before the Court (that is, the lack of evidence showing a uniform plan, the lack of evidence showing the supervisory defendants' personal involvement in the claimed conduct, and the lack of evidence showing the non-supervisory defendants' personal involvement in the claimed conduct), it does not matter that emails discussing complaints by certain inmates regarding the 2014 shakedowns were exchanged among tact team members unless those emails are evidence that the complained-of-conduct was undertaken pursuant to a uniform plan designed and implemented by the supervisory defendants.  But plaintiffs do not even suggest here that the record evidence supports such a conclusion, because it does not.  And second and third record citations are to opinions of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion." *Shea*, 989 F.3d at 278.

87.    Unsupported by the record citations.  The first, second, and fourth sentences are not supported by record citations.  The third and sixth sentences are supported only by expert opinion, which is "not fact that can be proved true or false.  It is opinion."  *Shea*, 989 F.3d at 278.  The fifth sentence is supported only by a citation to a single *pro se* inmate's complaint filed in this Court, and does not support any statement about multiple grievances.  *See* Doc. 481-92.  The seventh and eighth sentences are not supported by the record citations:  Atchison said only that "some" of the inmates' complaints were likely true, Atchison Dep. Tr. 139:23 (Def. Ex. U) (Doc. 642-22), and did not describe any changes in policy that "were the result of the 2014 shakedowns."

88.    Unsupported by the record citations.  Each sentence is supported either only by expert opinion, which is "not fact that can be proved true or false," *Shea*, 989 F.3d at 278, or by no record citation at all.

89.    Unsupported by the record citations.  The first sentence is not supported by a record citation.  The record citations for the second sentence support only that two investigations were undertaken, not that these were the only investigations undertaken.

90.    Unsupported by the record citations.  The first sentence is not supported by a record citation.  The second sentence is not supported by the record citations, which do not establish that defendants "failed to preserve" any video recordings.  The third and fourth sentences are supported only by opinions of plaintiffs' expert, "[b]ut expert opinion is not fact that can be proved true or false.  It is opinion." *Shea*, 989 F.3d at 278.

## ARGUMENT

Defendants explained in their motion why summary judgment is required on multiple independent grounds.  In response, plaintiffs identified no evidence of a uniform and clandestine plan to violate their Eighth Amendment rights, nor did they identify evidence connecting each of the supervisory and individual defendants to any such plan.  And even if there were any question on the merits, qualified immunity would shield defendants from liability, since the evidence shows only that defendants executed facility-wide searches in 2014 that were consistent with Department policy and practice.[1]

## I.    Summary Judgment Is Proper As To All Defendants.

Plaintiffs' Eighth Amendment claims fail as a matter of law.  As defendants explained in their motion, Mem. 33-45, there is no evidence of a clandestine plan to violate plaintiffs' rights:  The record establishes that the 2014 facility-wide searches were conducted pursuant to Department

---

[1]  Plaintiffs conceded that summary judgment is appropriate as to their official-capacity claim against the Acting Director of the Department and their state-law claim (Count V), Opp. 44 n.1, and that the Court should grant defendants summary judgment on those claims.  With the exception of these claims, references to "defendants" in this reply exclude the individual defendants identified as non-movants in the motion for summary judgment.  *See* Mem. 47 n.6.

policies and operational plans designed not "to humiliate and inflict psychological pain," *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004), but to further the Department's penological objectives. Plaintiffs' arguments to the contrary are flawed on multiple levels.[2]

### A.    The Evidence Shows That Defendants Acted Pursuant To Policy.

Defendants established that the 2014 facility-wide searches were conducted pursuant to Department policies, and that those policies further the Department's penological goals. Mem. 33-39. Plaintiffs' contrary arguments lack merit.

Plaintiffs largely ignore the Department's evidence. Plaintiffs halfheartedly chastise the Department for failing to show that the searches furthered "a legitimate purpose," Opp. 52-53, but that misstates the record. In fact, plaintiffs themselves concede that the facility-wide searches were conducted (among other reasons) "to remove . . . contraband," PSMF 4—*i.e.*, to ensure that the Department's facilities were free of security threats, including drugs and weapons, *see* SMF 4 (contraband includes drugs and weapons); Opp. 1 (not disputing SMF 4). Plaintiffs' own expert likewise testified that "periodic facility-wide searches" are an "important" method of controlling contraband that "most agencies have adopted." Hurley Dep. Tr. 66:7-12, 67:1-3 (Def's MSJ Ex. WW).[3] For that reason, courts have repeatedly acknowledged that strip-search based methods of

---

[2] Plaintiffs briefly criticize defendants for failing to advance additional, independent arguments regarding their conspiracy and failure-to-intervene claims (Counts II and III). *See* Opp. 61. But plaintiffs appear to agree that these claims are derivative of their underlying Eighth Amendment claim, *id.* at 44-45 (Counts II and III require "further" proof on plaintiffs' part), and so there is no dispute that, if summary judgment is proper on Count I, it is also proper on Counts II and III.

[3] Plaintiffs purport to "deny" this quotation, asserting that it is "uncommon" to do facility-wide searches "without prior incidents justifying the use of this technique as a last resort." Opp. 2 (citing PSMF 10-11). But, as defendants explain, *supra* p. 4 (responding to PSMF 10), nothing in the record, including the deposition transcripts plaintiffs cite at PSMF 10, supports this claim. And even if some States do conduct facility-wide searches only "as a last resort," Opp. 2, the law does not require prison officials to use the least intrusive possible means for a search. *See infra* p. 32.

.

controlling contraband "are penologically justified," *Chatman v. Gossett*, 766 F. App'x 362, 364 (7th Cir. 2019); *accord Peckham v. Wisconsin Dep't of Corr.*, 141 F.3d 694, 697 (7th Cir. 1998) (affirming constitutionality of strip search premised on "legitimate, identifiable purposes"); *Jones v. DeGrave*, 2024 WL 1988835, at *2 (7th Cir. May 6, 2024) (similar). Given plaintiffs' agreement that the searches were initiated to search for contraband, PSMF 4, there is no question of fact as to whether they were justified at the outset.

Plaintiffs' other arguments about the purpose of the searches lack merit. Plaintiffs appear to contend that the searches were not required because there were "better" (that is, less intrusive) alternatives for identifying contraband other than facility-wide shakedowns, PSMF 10-14; Opp. 46, but the Constitution does not require prison administrators to use the least intrusive alternatives in overseeing facilities. *See Peckham*, 141 F.3d at 697 (describing the "deference [courts] accord prison authorities to run their institutions"); *see also, e.g.*, *Lewis v. Stephen*, 2016 WL 6638029, at *5 (W.D. Wis. Nov. 9, 2016) (the Fourth Amendment "does not require prison officials to have used the least intrusive alternative" in conducting searches). Plaintiffs also assert there is a "wealth of evidence" suggesting that the Department initiated the searches "to appease a union that expressed a desire to show prisoners who was in charge," Opp. 52; *see id.* 46; PSMF 4-8, but that is absurd: Plaintiffs rely on *one email* for that proposition, *see* Ps.' Ex. B, and that email expressly justifies the searches not by reference to a desire for labor peace but in "assaults" by inmates on Department staff (three in one week at Menard alone), *id.* Far from undercutting the Department's penological objectives, this email underscores the genuine concerns the Department had in the summer of 2014 for the safety of its facilities and staff. And plaintiffs identify no other basis on which to question the validity of the Department's policies or its goals in initiating the searches.

Plaintiffs advance various objections to the Department's policies and the way they were

32

implemented during the searches, but those objections are meritless.  Plaintiffs admit, for instance,

that the Department's behind-the-back handcuffing policy can be "appropriate" at times, Opp. 55,

but maintain that it was inappropriate in this instance given the length of the facility-wide searches.

But an Eighth Amendment claim in federal court is not an opportunity to cherrypick a prison's use

of otherwise constitutional policies; it is a protection from truly extreme conduct, not the "routine

discomfort" that attends prison life.  *Hudson v. McMillan*, 503 U.S. 1, 9 (1992); *see Perkins v.

Pfister*, 711 F. App'x 335, 337 (7th Cir. 2017) ("[T]he Eighth Amendment would [not] be violated

by a policy requiring inmates during periods of heightened security to navigate stairs while

handcuffed behind the back.").  Plaintiffs likewise observe that the Department's policies and

practices regarding noise and clothing during facility-wide searches have changed since 2014,

Opp. 53-54, but the Department regularly reevaluates all of its policies, a fact that hardly indicates

constitutional infirmity.  *Cf.* Fed. R. Evid. 407 ("evidence of subsequent measures is not admissible

to prove . . . culpable conduct").  In any event, defendants explained why neither of these ancillary

aspects of the searches, to the extent they occurred, resulted in "the denial of the minimal civilized

measure of life's necessities," *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see* Mem. 38-39, and

plaintiffs mount no serious argument to the contrary.[4]

---

[4] Plaintiffs also misstate the record on this score.  As defendants explained, some officers directed
inmates to dress only in their blue Department uniforms, without donning socks or underwear—
clothing items in which inmates are more likely to hide contraband.  SMF 44-46.  The purpose of
doing so, as defendants testified, is to permit officers to search those items *after* inmates have left
their cells rather than while inmates are standing in their cells.  *Id.*  Plaintiffs assert that defendants
"admitted" that officers "ordered prisoners to hand them their clothing (including their underwear)
for a close, manual inspection and search" while inmates remained in the cells, PSMF 53, thus
suggesting that any instruction to dress only in blue Department uniforms could not have been for
a legitimate penological purpose.  But the transcript plaintiffs cite in fact establishes the opposite:
Statewide Tact Commander Sarver testified that some officers instructed inmates to leave their
underwear in their cells because those officers viewed it as "easier," "safer," and more effective to
search underwear *after inmates leave*, rather than while they are present.  Sarver Dep. Tr. 121:1-

At bottom, plaintiffs' primary argument appears to be that the Court cannot distinguish in resolving defendants' motion between various facets of the searches—that it cannot, as defendants argued, Mem. 55-56, grant partial summary judgment on the aspects of the searches that complied with Department policy and the Eighth Amendment if there is *any* material question of fact about *any* aspect of plaintiffs' allegations. Opp. 57-60. That is incorrect. As defendants explained, the Supreme Court has specifically stated that otherwise *de minimis* constitutional conditions can be aggregated for purposes of a single Eighth Amendment violation only where they have a "mutually reinforcing effect that produces the deprivation of a single, identifiable human need" cognizable under the Eighth Amendment, *Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991), and courts have relied on that reasoning to consider distinct facets of a single facility-wide search "in turn," *Curiel v. Stigler*, 2009 WL 904894, at *4 (N.D. Ill. Mar. 31, 2008), rather than as part of one consolidated course of conduct. Plaintiffs contend that they have satisfied *Wilson*'s test by identifying a "single, identifiable human need," namely, "the right to be free from 'calculated harassment' unrelated to legitimate penological needs." Opp. 58 (quoting *Hudson v. Palmer*, 468 U.S. 517, 530 (1984)). But that argument simply restates the Eighth Amendment test, and so proves too much: Essentially *all* Eighth Amendment claims could be recharacterized as implicating "the right to be free from 'calculated harassment,'" *id.*, including *Wilson* itself, which used analogous language in describing the constitutional standard, *see* 501 U.S. at 298 (describing the Eighth Amendment as prohibiting "the unnecessary and wanton infliction of pain").

*Mays v. Springborn*, 575 F.3d 643 (7th Cir. 2009), which plaintiffs cite for the proposition that the Court cannot grant partial summary judgment as to discrete facets of the search, Opp. 58-

---

122:6 (Def. Ex. J) (Doc. 642-11). It is not clear how plaintiffs could read Sarver's testimony in any other manner.

59, in fact illustrates the opposite:  The Seventh Circuit did not there, as plaintiffs suggest, consider every allegation made by the plaintiff (including that he had been deprived of an adequate diet, clothing, and more) as part of one aggregated Eighth Amendment claim premised on "the right to be free from 'calculated harassment,'" Opp. 58; *see Mays*, 575 F.3d at 647-50.  Rather, the Seventh Circuit considered these allegations *individually*, asking whether each violated the Constitution. *Id.* at 648-49 (evidence of lack of clothing did not "rise to the level of the objectively serious harm necessary to show an Eighth Amendment violation").  To be sure, in discussing the plaintiff's strip search claim, the court indicated that the full factual context of the strip searches (including guards' comments, the temperature of the room, and the like) would be "relevant evidence" for the jury. *Id.* at 650.  But here, plaintiffs' claims arise from discrete factual allegations—strip searches, the use of handcuffs, the line movement, and more—and so must be analyzed individually.  At the least, the Court should grant partial summary judgment if it concludes—as the evidence shows— that the searches were constitutional to the extent they complied with the Department's policies. At bottom, to accept plaintiffs' view—under which no part of their constitutional claims can be considered in isolation, simply because they all implicate the right to be free from unlawful harassment—would be to prohibit courts from disaggregating Eighth Amendment claims in all cases, on the view that "all prison conditions are a seamless web for Eighth Amendment purposes." *Wilson*, 501 U.S. at 305.  That position was roundly rejected by *Wilson*, and is incorrect.

### B.    Plaintiffs' Contrary Account Is Unsupported By The Evidence.

Plaintiffs offer a contrary account of the 2014 facility-wide searches, one in which senior Department leaders decided to deviate from Department policies on a massive scale for the express purpose of humiliating inmates—and did so without leaving any hint of such a plan in the record. Opp. 45-51.  Plaintiffs' wholly speculative account of a clandestine statewide plan to deviate from Department policy in such a way does not create a genuine issue of material fact requiring a jury

trial.  *See Flowers v. Kia Motors Fin.*, 105 F.4th 939, 945-46 (7th Cir. 2024) ("Speculation cannot create a genuine issue of fact that defeats summary judgment.").

Plaintiffs' account rests entirely on speculation.  Plaintiffs describe a chain of events in which (1) Atchison and Yurkovich decided to conduct facility-wide searches using the tact team, and formed a "plan" for the searches with McAllister, White, and unnamed facility wardens; (2) White and McAllister communicated the "plan" to tact team members before the searches, giving Atchison and Yurkovich daily updates to ensure the "plan" was followed; and (3) various members of the class experienced treatment from tact team members that they say violated their rights.  Opp. 45-51.  The class members' accounts, plaintiffs insist, establish that all 22 supervisory defendants (or at least the four principal defendants) developed a "plan" not to conduct facility-wide searches pursuant to the Department's policies, but instead a secret plan to do so in a way that intentionally deviated from those policies in a manner designed to humiliate and harm inmates.

The evidence roundly refutes that speculative account.  Plaintiffs repeatedly use the word "plan" in describing defendants' conduct, and suggest that defendants have described the searches as "uniform."  *E.g.*, PSMF 35, 37; Opp. 45, 47, 48.  But that is misleading:  Defendants agree that the searches were carried out pursuant to a uniform plan, but that is because they were carried out in a manner consistent with the Department's policies and procedures, as reflected in the thousands of pages produced during discovery and defendants' deposition testimony.  And plaintiffs produce *no* evidence—at all—that the "plans" described by Atchison, Yurkovich, White, or McAllister (not to mention the 18 other supervisory defendants) were anything other than the operational plans produced during discovery, as supplemented by the Department's policies and procedures.  There is no evidence—and plaintiffs identify none—that any "plan" ever developed by any defendant included the conduct about which plaintiffs primarily complain (namely, "reverse" strip searches

and "nuts to butts" line movements).  *See, e.g.*, PSMF 28 (asserting only that McAllister or White provided oral instruction on how to perform the duties for the day, what prisoners could wear out of the cell, how to handcuff prisoners, and general officer behavior); PSMF 36 (declining to assert that any "daily conversations" included any objectionable content).  At bottom, plaintiffs' account of defendants' actual behavior consists of nothing more than speculation.

Nor can the inmate accounts, on which plaintiffs rely heavily, Opp. 48-51, justify sending plaintiffs' claims to a jury. As defendants explained in the motion, the contemporaneous evidence refutes plaintiffs' allegations:  Only a small handful of inmates (18 out of almost 10,000) filed grievances claiming that they experienced a "reverse" strip search, and an even smaller group (16) filed grievances claiming that they had been forced to walk "nuts to butts" while their cells were searched.  Plaintiffs' post hoc evidence is no more helpful to them:  As defendants explained, the class-certification evidence (which consisted of inmate declarations, interviews, and depositions) represented only 1% of the certified class, and only a bare majority of those inmates testified that they experienced a reverse strip search—roughly 0.5% of the class.  More than 30% of plaintiffs' *own* declarations are silent as to the way in which strip searches were conducted, SMF 186-87— figures plaintiffs do not dispute, *see* Opp. 1 (not disputing SMF 186-87).  Plaintiffs protest that some of the inmates that defendants interviewed did not *expressly* state that strip searches were conducted in the ordinary way, i.e., head to toe, Opp. 53-54, but each inmate's account of the strip searches (including the account plaintiffs cite, which describes a strip search that began with the "hands" and ended at the "feet") is transparently inconsistent with the contention that inmates were strip searched in the profoundly anomalous way that plaintiffs describe.

There is no other evidence that could justify sending plaintiffs' account of the searches to a jury.  Plaintiffs assert, for instance, that "[m]any class members submitted grievances" after the

searches, and that those grievances are "strikingly similar," Opp. 58, but that assertion is based on a vague statement made by plaintiffs' expert[5] and is flatly inconsistent with the record evidence. As Larry Reid explains, fewer than 50 out of almost 10,000 class members submitted a grievance alleging that any of plaintiffs' primary complaints ("reverse" strip searches, "nuts to butts" line movement, and the like) occurred; instead, the overwhelming majority of the grievances (70%) concerned allegations of missing property. SMF 52; Reid Rep. 23-24 (¶¶ 31-34); *see* Mem. 41-42. That is less than 0.5% of the class—hardly "many." Indeed, as Reid explains, what is striking about the grievances is how *few* there are—a gap in the record that further confirms that any deviations from Department policy were isolated, not uniform, and not the product of some sort of clandestine policy by defendants to intentionally circumvent the law and humiliate inmates.

At bottom, plaintiffs ask the Court to infer from the post hoc accounts of a small portion of the certified class—accounts contradicted by the grievances and defendants' own testimony—the existence of a clandestine plan to deviate from Department policy for the specific purpose of humiliating Illinois inmates, a plan reflected in no document and no deposition. But "[s]peculation cannot create a genuine issue of fact that defeats summary judgment," *Flowers*, 105 F.4th at 945-46, and here plaintiffs have offered little more than speculation to support their extraordinary account. Summary judgment should be granted across the board.

## II.     Summary Judgment Is Proper As To Specific Defendants.

Summary judgment is also required for a second reason: Plaintiffs have identified no evidence linking any *specific* defendant with the hypothetical uniform plan they describe. That deficiency is fatal, given that individuals are liable under § 1983 only for their *own* conduct, not

---

[5] Plaintiffs' expert states that there were consistencies among grievances, but does not specify what those consistencies were, or how many grievances complained of which conduct. *See* Hurley Rep. 32-33 (Def. Ex. XX) (Doc. 642-51).

the conduct of others.  *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 619 (7th Cir. 2022); *Haywood v. Hathaway*, 842 F.3d 1026, 1030 (7th Cir. 2016) (per curiam).  Defendants met their "initial burden" under Rule 56 of showing that there is an "absence of evidence" linking the defendants—supervisory and non-—with plaintiffs' alleged uniform plan, *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013); *see* Mem. 45-48, but plaintiffs fail to shoulder their own burden in response: They identify no evidence linking any of the supervisory defendants to any alleged uniform plan, and flatly disavow any obligation at all to identify evidence that could support a jury verdict as to any non-supervisory defendant.  Summary judgment is thus warranted for the separate reason that plaintiffs have failed to shoulder their burden under Rule 56.

A.    **Plaintiffs Fail To Connect Any Aspect Of The Uniform Plan To Any Specific Supervisory Defendants.**

Plaintiffs must identify evidence that each of the 22 supervisory defendants "personally," *Stockton*, 44 F.4th at 619, developed or oversaw the execution of a uniform plan to intentionally harm or humiliate plaintiffs.  *See* Mem. 45-47.  They failed to make any such showing.  Instead, throughout their response, plaintiffs consistently describe the supervisory defendants as a unit, collectively responsible for the deprivations plaintiffs allege they experienced.  That approach cannot be squared with the basic requirements of § 1983 or Rule 56.

Plaintiffs' account of the clandestine plan does little to connect it to any specific defendant or establish that any specific defendant intended to harm or humiliate them.  Plaintiffs assert that "the Defendants" developed a uniform plan to conduct facility-wide searches, Opp. 45, that "the Defendants" gave orders to individual tact team members, Opp. 46-47, and that "each Defendant" "planned and overs[aw]" the shakedown "across one or more facilities," Opp. 47.  That falls short of meeting plaintiffs' burden to establish that *each* supervisory defendant "personally," *Stockton*, 44 F.4th at 619, developed or oversaw the execution of a uniform plan to violate plaintiffs' rights.

Whose specific idea was it to initiate a set of facility-wide searches that (unlike other facility-wide searches) would deviate dramatically from Department policy in order to humiliate inmates?  Who specifically developed the operating plan for such an extraordinary operation, and how and when did he or she memorialize it (given the lack of documentation of such a plan in the record)?  Who specifically communicated the plan to the tact team officers, and when?  Plaintiffs' hazy account leaves these questions unanswered, and so fails to meet their burden under Rule 56 to identify evidence that could support a verdict as to each one of the supervisory defendants.  *See, e.g.*, *Renee v. Neal*, 483 F. Supp. 3d 606, 613 (N.D. Ind. 2020) (even if a plaintiff describes improper conduct by "individual officers conducting . . . searches," a "high-ranking prison official . . . cannot be held liable for their misdeeds simply because he oversees operations within" the Department).

Even if there were evidence of a uniform plan, however, plaintiffs have failed to make any serious effort to explain how the record could support a jury verdict as to most of the supervisory defendants.  As defendants explained (Mem. 46), defendant Godinez did not plan the searches and was not present for their execution, SMF 57, and many of the facility-specific defendants (wardens, assistant wardens, facility tact commanders and assistant tact commanders) did not participate in either planning or executing the searches, SMF 89-171.  Indeed, plaintiffs' account of the searches, Opp. 45-51, does not mention *any* single defendant outside the four statewide supervisors who had (in plaintiffs' view) the principal role in planning the facility-wide searches: Yurkovich, Atchison, White, and McAllister.  To be sure, plaintiffs assert casually that "[e]ach prison's warden, assistant warden, tact commander, and assistant tact commander was responsible for overseeing on-the-ground operations," Opp. 47, but the cited statements of material fact do not support that assertion, *see* PSMF 21-22 (summarizing various aspects of the expert testimony), and to the extent plaintiffs intended to cite other statements, no other statements appear to support the notion that the facility-

40

level defendants were responsible for overseeing the operation of the facility-wide searches. *Cf. Gross v. Town of Cicero*, 619 F.3d 697, 702 (7th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in the record." (cleaned up)).[6]  The Court should grant summary judgment to *all* the supervisory defendants—or, at minimum, all defendants except Yurkovich, Atchison, White, and McAllister—on the ground that plaintiffs have failed to shoulder their burden under Rule 56 to identify record evidence from which a jury could find these defendants individually liable.

### B.    Plaintiffs' Efforts To Evade Their Summary-Judgment Obligations As To The Non-Supervisory Defendants Fail.

Plaintiffs must also identify evidence that each of the over 400 non-supervisory defendants "personally," *Stockton*, 44 F.4th at 619, violated an individual plaintiff's constitutional rights. *See* Mem. 47-48.  Remarkably, plaintiffs make no attempt *at all* to do so, instead simply asserting that "[t]his is not the time" to resolve the non-supervisory defendants' liability.  Opp. 65.  But plaintiffs cannot evade their obligations under Rule 56 simply by stating that they should be allowed to do so later.  The Court should reject that argument as gamesmanship and grant summary judgment to all of the non-supervisory defendants who have sought it (*see* Mem. 47 n.6).

Plaintiffs' argument appears to rest on the premise that "[t]here is no trial pending against the non-supervisory defendants," and those defendants' motion is thus premature.  Opp. 65.  That is wrong on multiple levels.  Most basically, Rule 56(b) does not presuppose a trial date:  Absent a contrary order, "a party may file a motion for summary judgment at any time until 30 days after the close of all discovery."  Fed. R. Civ. P. 56(b).  So no matter what the current scheduling order

---

[6]  Indeed, plaintiffs' brief consistently cites statements of material fact that have no relationship at all to the proposition for which they are cited. *Compare, e.g.*, Opp. 48 (citing PSMF 61 for the proposition that the inmate grievances were "remarkable for their volume and consistency") *with* PSMF 61 (alleging a lack of penological justification for defendants' line movement policy).  The Court should decline to credit any factual assertion made in plaintiff's brief that is not supported by a correct citation. *See Gross*, 619 F.3d at 702.

provides, absent a court order prohibiting the non-supervisory defendants from seeking summary judgment, their motion is not premature, and plaintiffs are required to respond to it.[7]

Regardless, plaintiffs are also wrong about the Court's orders. *None* of the scheduling orders entered by the Court has distinguished between the supervisory defendants and the non-supervisory defendants. Fact discovery closed as to *all* defendants on December 15, 2020, *see* Doc. 569 at 19-20 (Beatty, M.J.) (denying plaintiffs' request to extend fact discovery, including for the purpose of deposing certain non-supervisory defendants), and the Court subsequently entered multiple scheduling orders setting deadlines for dispositive motions, pretrial filings, and trial without distinguishing between the supervisory and the non-supervisory defendants, *see* Docs. 525, 622, 662. Indeed, only a month ago, the Court explained that its resolution of this motion for summary judgment would determine whether the trial would proceed against the non-supervisory defendants as well as the supervisory defendants, Doc. 665, thus foreclosing plaintiffs' suggestion that the existing scheduling orders apply only to the latter group. Plaintiffs had a burden under Rule 56 to respond to the non-supervisory defendants' motion by identifying facts linking each individual defendant to an alleged constitutional violation. Because plaintiffs consciously and expressly declined to do so, summary judgment is required.

## III.    Qualified Immunity Bars Relief.

Finally, as defendants explained in the motion, Mem. 49-50, qualified immunity applies to plaintiffs' Eighth Amendment damages claims (the only claims now at issue). To defeat qualified immunity, plaintiffs must establish not only a violation of a constitutional right, but also precedent

---

[7] To be sure, a nonmovant may seek to defer responding to such a motion under Rule 56(d) if he or she "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). But plaintiffs made no such attempt, and realistically could not do so, given that fact discovery has been closed for years. *Supra* p. 42.

showing that the "constitutional right was clearly established at the time of the alleged violation."
*Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019).  Although plaintiffs can do so either by pointing
to a "reasonably analogous case" involving similar "factual circumstance[s]" or by showing that
"the violation was so obvious" that "every reasonable official would have understood" that what
he or she was doing was unconstitutional, *id.* at 701-02, they did neither.

 First, plaintiffs identify no cases imposing liability on similar "factual circumstances."  *Id.*
That makes sense, given that, as defendants explained, Mem. 35, Illinois federal courts considering
the constitutionality of facility-wide searches undertaken by the Department in the mid-2000s
uniformly rejected Eighth Amendment challenges to those searches on the merits, *see Hernandez
v. Battaglia*, 673 F. Supp. 2d 673, 674-75 (N.D. Ill. 2009); *Ames v. Stigler*, 2009 WL 9097015, at
*3 (N.D. Ill. Sept. 3, 2009); *Curiel*, 2009 WL 904894, at *8—a conclusion echoed by this Court
in 2022 in rejecting constitutional challenges to facility-wide searches conducted only *months* after
those at issue here, *see Chairs v. Ill. Dep't of Corr's*, 2022 WL 3716170, at *2-3  (S.D. Ill. Aug.
29, 2022).  Plaintiffs protest that "[a] variety of prisoner searches are routinely upheld by courts as
a matter of course," Opp. 63-64, but that misses the point:  These cases uphold facility-wide
searches conducted by the *same* Department pursuant to the *same* policies—and, in *Chairs*'s case,
at the behest of the same named defendants within months of the searches at issue here.
Regardless, it is plaintiffs' burden to point to cases establishing that specific conduct was unlawful
rather than defendants' burden to identify cases upholding that conduct, and they have not.

 Plaintiffs halfheartedly suggest that the Seventh Circuit's decisions in *Mays*, 575 F.3d 643,
and *Calhoun v. Detella*, 319 F.3d 936 (7th Cir. 2003), "provided ample notice that the conduct in
this case was illegal," Opp. 65, but that is incorrect.  The Supreme Court has "repeatedly" warned
courts and litigants "not to define clearly established law at a high level of generality."  *Mullenix*

*v. Luna*, 577 U.S. 7, 12 (2015) (per curiam).  "The dispositive question" in a qualified-immunity case "is whether the violative nature of *particular* conduct is clearly established," an inquiry that "must be undertaken in light of the specific conduct of the case, not as a broad general proposition." *Id.* (cleaned up; emphasis in original).  Here, neither *Mays* nor *Calhoun* looks at all like this case. Although each case applies the *rule* relevant here—i.e., that a search may be unconstitutional if it is conducted "in a harassing manner intended to humiliate and cause psychological pain," *Mays*, 575 F.3d at 649; *Calhoun*, 319 F.3d at 939—the *facts* of the cases bear no resemblance to this one: Both cases concern strip searches in which inmates were searched "in view of other prisoners," *Mays*, 575 F.3d at 645; "in front of several female guards," *Calhoun*, 319 F.3d at 938, while guards engaged in other malicious behavior, including making demeaning and sexual comments, forcing the inmates to "perform 'provocative acts,'" brandishing weapons at inmates' private parts, *id.*, and the like.  Here, by contrast, plaintiffs largely attack the Department's established practice of conducting facility-wide searches—a practice that courts have consistently upheld as lawful and grounded in penological objectives, *supra* p. 43.  Defendants could not have understood *Mays* and *Calhoun* to prohibit them from conducting such searches.

Plaintiffs' remaining arguments are meritless.  They do not appear to contend that any alleged constitutional violations were "so obvious" that "every reasonable official" would have known to not commit them, *Leiser*, 933 F.3d at 702, or at least they do not expressly embrace that standard.  Instead, they largely just reprise their factual allegations and argue that *Mays*, *Calhoun*, and other cases applying the general Eighth Amendment rule were sufficient to warn defendants of the unconstitutionality of their conduct.  *See* Opp. 64 ("Case law clearly establishes that a shakedown plan designed to humiliate violated Plaintiffs' Eighth Amendment rights.").  Plaintiffs also attempt to wave away the qualified-immunity issue by suggesting that "all this [C]ourt needs

to decide is whether the evidence presented when viewed in the light most favorable to Plaintiffs

supports their allegations such that a jury should decide which account to believe."  Opp. 63.  But

that argument goes to the existence of a constitutional violation, not to whether any such violation

was "clearly established," *Leiser*, 933 F.3d at 701, and plaintiffs must make both showings in order

to overcome the qualified immunity defense.  Because they have failed to show that any asserted

constitutional violation implicates a clearly established right, the Court should grant summary

judgment, holding that qualified immunity bars plaintiffs' damages claims.

## CONCLUSION

For these reasons, and those stated in defendants' motion for summary judgment, the Court

should grant the motion.

Respectfully submitted,

KWAME RAOUL
Attorney General of Illinois

/s/ Laura K. Bautista
Laura K. Bautista
Assistant Chief Deputy Attorney General
500 South Second Street
Springfield, IL 62701
(217) 782-5819
laura.bautista@ilag.gov

*Counsel for Defendants*

Joseph N. Rupcich
Joy C. Syrcle
Special Assistant Attorneys General
Cassiday Schade LLP
2040 W. Iles, Suite B
Springfield, IL 62704
(217) 572-1714
jrupcich@cassiday.com
jsyrcle@cassiday.com

*Counsel for Supervisory Defendants*

## CERTIFICATE OF COMPLIANCE

I, Laura K. Bautista, an attorney, certify that this motion complies with the page limit set out in Local Rules 7.1(a)(3) and 56.1(d), as modified by this Court's order of September 6, 2024, because the motion, exclusive of those items set out in Local Rules 7.1(a)(3) and 56.1(d), is approximately 16 pages in length.

/s/ Laura K. Bautista
Laura K. Bautista
Assistant Chief Deputy Attorney General
500 South Second Street
Springfield, IL 62701
(217) 782-5819
laura.bautista@ilag.gov

Dated: September 9, 2024

**CERTIFICATE OF SERVICE**

I, Laura K. Bautista, an attorney, certify that on September 9, 2024, I caused the foregoing

Reply to be filed using the Court's CM/ECF system, which effected service on all counsel of

record.


/s/ Laura K. Bautista
Laura K. Bautista
Assistant Chief Deputy Attorney General
500 South Second Street
Springfield, IL 62701
(217) 782-5819
laura.bautista@ilag.gov