IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DEMETRIUS ROSS, et al., on behalf of themselves and all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) Case No. 15-cv-309-SMY ) |
| vs. | ) ) |
| GREG GOSSETT, et al., | ) ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiffs Demetrius Ross, Kevin L. Hamilton, Ronald Smith, Jonathan Tolliver, and Glenn Verser, current and former inmates of the Illinois Department of Corrections ("IDOC"), bring this class action on behalf of themselves and all others similarly situated for violations of their constitutional rights as alleged in the Second Amended Complaint. Plaintiffs' claims concern the constitutionality of facility-wide shakedowns that occurred at Illinois River, Big Muddy River, Lawrence, and Menard correctional centers during the period April 2014 through July 2014.

Now pending before the Court are Defendants' Motion to Bar Expert Testimony (Doc. 643) and Plaintiffs' Motion to Exclude Certain Opinions of Larry Reid (Doc. 645). The parties have filed responses (Docs. 667, 670). For the following reasons, the motions are **GRANTED in part and DENIED in part**.

## Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Under these standards, the court is the "gatekeeper" of expert testimony. In that vein, the Seventh Circuit

has articulated a three-part analysis for considering whether to admit expert testimony under Rule 702 and *Daubert* – the trial court must consider (1) the expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010).

## Discussion

As an initial matter, Plaintiffs and Defendants move generally to prohibit the expert correctional witnesses from offering expert opinions on an individual's mental state. Speculation regarding Defendants' motives is impermissible. *See DePaepe v. GMC,* 141 F.3d 715, 720 (7th Cir. 1998) (finding that an engineering expert could testify that a certain type of padding could save money, or that the company's explanation for using that padding was not sound, but he could not testify that the company's motive was to save money). Therefore, any instances where the experts' phrasing implies their knowledge of a defendant's mental state is inadmissible and cannot be elicited at trial. The parties' respective motions seeking to bar expert opinion on mental state are therefore **GRANTED**.

### Defendants' Motion to Bar Expert Testimony (Doc. 643)

Defendants move to bar Dan Pacholke's testimony entirely and portions of Pat Hurley's testimony.

### *Pacholke*

Pacholke has 35 years of experience in correctional practices, where he held positions as a Director of Prisons, Correctional Officer, Lieutenant, Captain, Deputy Superintendent, Superintendent, Chief of Emergency Operations, Deputy Secretary, and Secretary in the Washington State Department of Corrections. His responsibilities included managing and reforming segregation units, overseeing violence reduction efforts, and conducting cell searches

in maximum security facilities. He has co-authored numerous publications regarding correctional practices and has been a consultant for the Department of Justice and the National Institute of Corrections. Pacholke conducted trainings on strip searches and searches for contraband during his career. He has served as a consultant and expert on correctional practices in 20 states. Defendants do not raise any substantive challenges to Pacholke's qualifications, and the Court is satisfied that he is qualified to testify as an expert on correctional practices.

Pacholke authored a 77-page written report in which he details why, in his opinion, Defendants' conduct ran afoul of widely accepted practices within the field of corrections. Pacholke summarized his opinions at the beginning of his report and then provided a detailed analysis as to how he reached his conclusions. Specifically, Pacholke opines:

> (1) Defendants had no legitimate rationale for conducting statewide facility searches; (2) Defendants failed to develop adequate operations orders and communicate staff expectations, creating circumstances that allowed staff to commit misconduct against prisoners regarding their property; (3) Defendants knew throughout the 2014 statewide tactical facility search AKA "spring cleaning[1]" operations, that staff were using intimidation and excessive force on prisoners and committing other misconduct and policy violations and failed to intervene, in effect condoning this behavior; (4) Defendants failed to adequately supervise tactical team members and other staff, allowing staff to commit misconduct against prisoners and regarding their property; (5) Defendants failed to take reasonable steps to stop the use of excessive force and other staff misconduct; (6) Defendants failed to investigate allegations and evidence of staff misconduct and hold staff accountable; and (7) Defendants' actions served no correctional purpose and were not in keeping with common correctional practices, causing harm to the Plaintiffs and making the prisons less safe.

Under *Daubert,* testimony is relevant if it "assist[s] the trier of fact to understand the evidence or to determine a fact in issue." *Daubert,* 509 U.S. at 591 (citing Fed.R.Evid. 702). Defendants argue that Pacholke is merely a mouthpiece for the Plaintiffs – that his report includes a lengthy and slanted factual narrative, argumentative conclusions about Defendants' knowledge and intent, and legal conclusions on the elements of Plaintiffs' burden of proof.

---

[1] Pacholke's use of the phrase "spring cleaning" references the phrase utilized by Defendants in reference to the 2014 facility-wide searches.

Experts need to summarize the facts they relied on to lay the foundation for the opinions that follow. It is essential that there be a link between the facts or data the expert relied on and the conclusion the expert's testimony is intended to support. *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). When that link is missing, a court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).

Here, Pacholke does not merely provide a skewed factual narrative and argumentative conclusions about Defendants' knowledge and intent as Defendants contend. In reaching his opinions, Pacholke reviewed case-specific materials, including: the five named Plaintiffs' depositions; depositions from fourteen other Plaintiff class members who were at the facilities in 2014; audio transcriptions from the Illinois Attorney General Office's interviews of 33 Plaintiff class members who had been at the facilities; numerous administrative records, grievances, and ARB documents; and the pleadings in this case. He explains the factual basis for his opinions as to whether Defendants' actions comported with generally accepted correctional standards and shows how he arrived at his conclusions by tying his opinions to the facts.

While Defendants disagree with Pacholke's recitation of the facts, "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at [his] opinion." *Schultz v. Akzo Nobel Paints, LLC,* 721 F.3d 426, 431 (7th Cir. 2013). The Court finds Pacholke's methodology to be reliable. To the extent Defendants argue that Pacholke should have reviewed or cited different facts, the materials he reviewed and used to support his opinions are quintessentially "fodder for cross-examination, not grounds for exclusion." *Artis v. Santos*, 95 F.4th 518, 527 (7th Cir. 2024).

Next Defendants complain that Pacholke offers legal conclusions that mirror the elements of Plaintiffs' claims. Specifically, Defendants take issue with Pacholke's usage of the phrases "failed to intervene", "failed to adequately supervise" and "caused harm to Plaintiffs." Expert testimony as to legal conclusions that will determine the outcome of the case are inadmissible. *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). That said, when the application of expertise necessarily overlaps with the applicable legal standard, it can be difficult to disentangle the two. Still, "[t]here is a difference between stating a legal conclusion and providing concrete information against which to measure abstract legal concepts." *United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007). In the context of constitutional tort claims, "[w]hen an expert offers an opinion relevant to applying a legal standard ..., the expert's role is limited to describing sound professional standards and identifying departures from them." *West v. Waymire*, 114 F.3d 646, 652 (7th Cir. 1997).

Pacholke utilizes the phrases "failed to intervene" "failed to adequately supervise" and "caused harm" in explaining that greater supervision or intervention would be required to conform with accepted correctional standards and that Defendants did not meet these standards. He does not recite the elements of Plaintiffs' claims or otherwise tie the facts to the legal standard.

Finally, Defendants contend that the class was certified based on a "top-down" conspiracy theory by which Defendants designed and carried out a uniform plan that violated the rights of class members, and any opinions suggesting that Defendants failed to intervene to stop misconduct that originated at the tactical level should be excluded under *Daubert* as irrelevant and not helpful to the jury. This argument completely ignores the fact that the class was also certified on the question of "whether the Defendants knew of, approved, facilitated and/or turned a blind eye to

the alleged unconstitutional shakedowns." As such, Pacholke's opinions regarding this issue are relevant and will be helpful to the jury.

For these reasons, Defendants' motion to bar Pacholke's expert testimony is **DENIED**.

### *Hurley*

Defendants also do not challenge Hurley's qualifications. Hurley has 36 years of experience in corrections. He has worked in five prisons as Institutional Inspector, Commander of the Special Tactics and response team, Deputy Warden for operations and security, and Warden. As a Commander of the Special Tactics and Response ("STAR") team, Hurley developed and implemented plans for facility searches of contraband, including for maximum security Ohio prisons. Hurley served as a representative for the Bureau Chief for the Ohio Governor's Task Force for eliminating prone restraints. He has also been a court appointed monitor in three federal cases regarding use of force. As an expert, Hurley has reviewed over 12,000 use of force incidents. The Court finds that based on his extensive experience in corrections, knowledge, skill and training, Hurley is qualified to testify as a correctional expert and that his testimony will assist a jury in understanding the correctional practices at issue in this case.

Hurley's report totals 33-pages. In reaching his opinions, he reviewed case-specific documents, including depositions, interviews, video footage, emails, grievance and ARB records, and the pleadings. Relying on his education, training, and experience, Hurley evaluated the material and developed conclusions based upon a reasonable degree of certainty about accepted correctional practices.

The first portion in his report discusses best practices and accepted correctional standards regarding the use of force and facility searches in prisons. He then details the evidence in this case

gleaned from the materials he reviewed, and opines that the manner in which Defendants conducted the facility searches was not consistent with generally accepted practices.

Defendants argue that like Pacholke's report, Hurley's report includes a lengthy narrative recounting of the facts and argumentative conclusions. Again, in determining whether Hurley's opinions are reliable, the focus is on his methodology, "not the factual underpinnings or the substance of his conclusions." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718, 719 (7th Cir. 2000). The Court finds no significant problems with Hurley's methodology. Accordingly, Defendants' motion as to Hurley is **DENIED**.

### Plaintiffs' Motion to Bar Expert Testimony (Doc. 645)

Plaintiffs move to exclude portions of the opinions offered by Defendants' expert Larry Reid. Reid is the President of Correctional Consulting Services, LLC, a criminal justice consulting service that provides direction and services to clients on established standards and emerging correctional subjects. He holds a master's degree in criminal justice management from Columbus University. Reid spent 15 years with the Colorado Department of Corrections in various roles. He served as warden from 2001 to 2010 at two high security prisons and a mental health facility. Reid worked for 27 years as a parttime trainer and consultant with the National Institute of Corrections. The Court finds that Reid is qualified to opine about correctional standards.

Reid was retained to evaluate the facility-wide searches, including the policies and practices related to searches of inmate living areas and inmates themselves. He generally opines that Defendants' conduct was appropriate and concludes that based on his review of the documents, the searches were conducted for a legitimate penological reasons and were not conducted in a harassing manner intended to humiliate and inflict psychological pain. He also believes that the 22 supervisory defendants did not direct that the searches be conducted in a

harassing manner, nor did they have knowledge or consent to the searches being conducted in a harassing manner. Plaintiffs move to exclude portions of Reid's report, including: (1) Reid's legal opinions on constitutional law; (2) Reid's opinions about Illinois's criminal law and the characteristics of people convicted of certain categories of crimes; and (3) Reid's opinions that are speculative or ipse dixit.

Reid articulates several opinions about constitutional law and whether Defendants' conduct violated the constitutional rights of class members. For example, he concludes that the searches were conducted for a legitimate penological reason and were not conducted in a harassing manner intended to humiliate and inflict psychological pain. But experts may not offer legal conclusions. *Jimenez*, 732 F.3d at 721. Whether the shakedowns at issue were conducted in a legitimate manner or instead conducted in a harassing manner intended to humiliate class members is a question for the jury. Accordingly, Plaintiffs' motion is granted on this point; Reid will be prohibited from offering legal opinions about the ultimate issue in this case.

Plaintiffs also seek to exclude Reid's discussion about the impact of convictions for Class X felonies, his resulting opinions about the characteristics of individuals convicted of Class X crimes, and the justifications that flow from those characteristics. Specifically, Reid states that Class X is the most serious felony offense on the books and that Class X felonies are high-level violent offenses that call for high security management and housing. He notes the percentage of Class X felons at each facility, opining that all individuals convicted of Class X felonies are violent and dangerous and that the facility-wide shakedowns were justified because of the prison population. According to Defendants, Reid's point is that these prisons housed a large population of inmates convicted of serious felonies and in his experience, inmates convicted of serious felonies in high security prisons pose a significant risk of possessing contraband.

The problem with Reid's discussion of Class X felonies it that it is unreliable and unsupported by any facts or data. To satisfy the requirements of Rule 702 and *Daubert*, the expert needs to show that his conclusions were the fruit of a rigorous, objectively verifiable approach. *Timmy v. Goodyear Dunlop Tires of North Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019). Reid testified that he learned about the Class X system in Illinois by searching on Google, but could not recall what website he looked at. Reid also testified that he had never heard of the Class X classification in his entire career. In other words, he lacks the proper foundation to make this opinion. Accordingly, Reid will be prohibited from testifying about the impact of convictions for Class X felonies and opining about the characteristics of individuals convicted of those crimes and the justifications that flow from those characteristics.

Plaintiffs also move to bar Reid's opinion that prisoners would have filed more grievances if Plaintiffs' allegations were true. Reid reviewed 258 prisoner grievances regarding the facility-wide shakedowns giving rise to this case. Considering the number of grievances filed, Reid speculates that the incidents the prisoners complained of in the grievances could not have been carried out in accordance with a written operational plan or uniform practice. Reid does not base this opinion on any methodology. "The whole point of *Daubert* is that experts can't 'speculate.' They need analytically sound bases for their opinions." *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998). Accordingly, Plaintiffs' motion is granted as to this opinion.

Plaintiffs' remaining arguments go to weight of Reid's testimony. Plaintiffs take issue with some of Reid's opinions about nationally or generally accepted correctional practices and facts he utilized in reaching other opinions. Reid is qualified to opine regarding nationally or generally accepted correctional practices. He also relies on the same methodology in reaching his

conclusions as Plaintiffs' experts, which the Court has found to be acceptable. Plaintiffs are free to present contrary evidence and to engage in "vigorous cross-examination."

## Conclusion

For the foregoing reasons, Defendants' Motion to Bar Expert Testimony (Doc. 643) is **GRANTED in part** and **DENIED in part**. Plaintiffs' Motion to Exclude Certain Opinions of Larry Reid (Doc. 645) is **GRANTED in part** and **DENIED in part.**

IT IS SO ORDERED.

DATED: January 8, 2025

**STACI M. YANDLE**
**United States District Judge**