**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **DEMETRIUS ROSS, et al., on behalf of themselves and all others similarly situated,** | ) ) ) | |
| **Plaintiffs,** | ) ) | **Case No. 15-cv-309-SMY** |
| **vs.** | ) ) | |
| **GREG GOSSETT, et al.,** | ) ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM AND ORDER</u>

**YANDLE, District Judge:**

Plaintiffs Demetrius Ross, Kevin L. Hamilton, Ronald Smith, Jonathan Tolliver, and Glenn Verser, current and former inmates of the Illinois Department of Corrections ("IDOC"), bring this class action on behalf of themselves and all others similarly situated for violations of their constitutional rights as alleged in the Second Amended Complaint. Plaintiffs' claims concern the constitutionality of facility-wide shakedowns that occurred at Illinois River, Big Muddy River, Lawrence, and Menard correctional centers during the period April 2014 through July 2014.

Plaintiffs assert the following causes of action in the Second Amended Complaint:

Count I:         Eighth Amendment cruel and unusual punishment claim under 42 U.S.C. § 1983 alleging that the Defendants designed and implemented a plan to conduct abusive and humiliating shakedowns that did not further any legitimate penological purpose;

Count II:        Eighth Amendment conspiracy claim under 42 U.S.C. § 1983 alleging Defendants reached an agreement to violate class members' constitutional rights;

Count III:       Eighth Amendment failure to intervene claim under 42 U.S.C. § 1983;

Count IV:      Prison Rape Elimination Act under 42 U.S.C. § 1983[1].; and

Count V:      State law tort claim for intentional infliction of emotional distress.

The Court previously certified a class of approximately 10,000 prisoners housed at the four prisons on three claims against 22 supervisory Defendants.[2]  The class was not certified as to the 400+ non-supervisory Defendants named in the Second Amendment Complaint.

This matter is now before the Court for consideration of Defendants' motion seeking summary judgment on Counts I, II, III and V (Doc. 642), which Plaintiffs oppose (Doc. 671). For the following reasons, the Motion is **GRANTED in part** and **DENIED and part**.

## Factual Background

Construed in the light most favorable to Plaintiffs, the evidence and reasonable inferences establish the following facts relevant to the pending summary judgment motion:

### IDOC's Search Policies

The Illinois Department of Corrections ("IDOC" or "Department") prison staff search inmates' cells at IDOC facilities regularly to ensure that inmates cannot hide contraband. Contraband includes any unlawful substance in an inmate's cell, including drugs, weapons, metal, any item that belongs to another inmate, and any item that has been altered from its original state (Doc. 642-6, p. 97).  These searches are commonly referred to as "shakedowns" (Doc. 481-8, pp. 51-52; Doc. 642-2).  Facility-wide searches go beyond these routine searches,

---

[1] The Court dismissed this Count with prejudice on January 28, 2016 (Doc. 76).
[2] The supervisory defendants are Salvador Godinez (Director); Joseph Yurkovich (Chief of Operations); Michael Atchison (Deputy Chief of Operations); David White (Statewide Tact Commander); Anthony McAllister (Southern Regional Tact Commander); Jerry Witthoft (Menard Tact Commander); Frank Eovaldi (Menard Assistant Tact Commander); Robert Arnett (Illinois River Tact Commander); Brian Piper (Illinois River Assistant Tact Commander); David Hermetz (Big Muddy Tact Commander); Chris White (Big Muddy Assistant Tact Commander); Ken Finney (Big Muddy Assistant Tact Commander); Michael Gilreath (Lawrence Tact Commander); Timothy McAllister (Lawrence Assistant Tact Commander); Kim Butler (Menard Warden);  Alex Jones (Menard Assistant Warden); Greg Gossett (Illinois River Warden); Stephanie Dorethy (Illinois River Assistant Warden); Zachary Roeckeman (Big Muddy Warden); Robert Craig (Big Muddy Assistant Warden); Stephen Duncan (Lawrence Warden); and Richard Moore (Lawrence Assistant Warden).

as they are "statewide" operations that require the use of tact team members from multiple prisons to execute them. Facility-wide searches require approval from and supervision by senior members of the IDOC administration (Doc. 481-6, pp. 33, 46). Facility-wide searches are achieved primarily by detaining inmates in a holding area while Department staff search the facilities on a cell-by-cell basis (Doc. 642-8, p. 272; Doc. 642-9, p. 231).

Facility-wide searches are generally handled by an IDOC unit known as the "tact team" (or tactical team) (Doc. 642-6, pp. 38, 45-48; Doc. 642-5, pp. 35-36; Doc. 642-2, p. 44). Tact team members are responsible for handling particularly complex situations within the Department, including riots, escapes, and forcible cell extractions (Doc. 642-6, p. 38; Doc. 642-11, pp. 35-36; Doc. 642-2, pp. 43-45).

IDOC has developed and communicated policies and procedures to guide searches at IDOC facilities, including facility-wide searches (Doc. 642-12, pp. 18-19; 27-30). The Department's policy regarding cell searches includes a visual sweep, followed by a close inspection of the cell fixtures, including plumbing, walls, ceiling, floor, windows, shelving, desks, drawers, and hot air registers, ventilation grills, and radiators (Doc. 642-7, pp. 92-94). The policy regarding cell searches also requires an in-depth search of all inmate property within the cell, including all clothing, toiletries, mattresses and bedding, books, and electronics. *Id.* Department policy requires each tactical team member to complete a "shakedown slip" for any cell he or she searches (Doc. 642-22, p. 89; Doc. 642-9, p. 169). The manual for tact teams requires tact teams to conduct strip searches from inmates' head to their legs. It also requires moving inmates in pairs and handcuffed behind the back (Doc. 642-10).

**The Administrative Defendants**

Defendant Salvador Godinez was the IDOC Director in 2014 (Doc. 642-44, pp. 17-24). Defendant Joseph Yurkovich was IDOC's chief of operations in 2014, with operational responsibilities over the entire prison system (Doc. 642-2, pp. 34-35, 58-59). Defendant Michael Atchison was IDOC's Deputy Chief of Operations in 2014 (Doc. 642-22, p. 45). Atchison supervised deputy directors of the three Department regions, each of which contained eight to ten facilities; he also supervised ancillary Department units that were operational in nature. *Id.* 38:17-22. The facility-wide searches at issue were under Atchison's supervision "at a high level." *Id.* 49:9-23. Defendant David White was IDOC's statewide tact commander (Doc. 642-5, p. 24). White assisted in overseeing IDOC's training academy and oversaw the statewide firearms and tactical operations. *Id*. 29:11-17. White supervised at least 50 facility-wide searches as the statewide tactical commander. *Id*. 35:20-36:1. Defendant Anthony McAllister was IDOC's tactical commander for the southern region in 2014, responsible for planning statewide tactical operations (Doc. 642-9, pp. 7, 37, 54).

**2014 Facility-Wide Searches**

Sometime in 2014, Yurkovich and Atchison decided to perform facility-wide searches at IDOC facilities as part of a "spring cleaning" initiative to remove trash, contraband, and to gather intelligence from facilities (Doc. 481-16, pp. 93-95; Doc. 481-69, p. 2). Yurkovich and Atchison had several conversations regarding conducting facility-wide searches (Doc. 481-6, pp. 42-47). Yurkovich could not recall if the operation was in response to increased staff assaults, increased contraband, gang activity, or any risks to the safety and security of the facilities (Doc. 481-16, pp. 103-104; Doc. 671-1, p. 14). Yurkovich and Atchison initiated the searches because

the prisons "hadn't been searched on a facility-wide scale in a long time" (Doc. 481-6, p. 46;
Doc. 481-16, pp. 103-104).

In March 2014, Yurkovich emailed Eddie Caumiant, the state union president for the
majority of IDOC correctional staff, informing him that multiple facilities statewide would be
locked down (Doc. 671-3). Caumiant replied positively, as staff union members "want to see a
facility wide lock and shakedown. They are getting very worried that the place is losing control,
and are starting to whisper 'no confidence' among other things." *Id.*

Yurkovich and Atchison decided to use IDOC tactical teams to execute the shakedowns
(Doc. 481-6, pp. 47-49; Doc. 481-71, pp. 2-3). Tact team members are supervised by a facility
tact commander and one or more assistant commanders at the prison where they work, followed
by the Regional Tact Commander (McAllister) and the Statewide Tact Commander (White)
(Doc. 481-8, p. 18; Doc. 481-16, pp. 67-69; Doc. 481-17, pp. 83-84). All tact command staff
answered to the IDOC Deputy Chief of Operations (Atchison) and the Chief of Operations
(Yurkovich), who in turn answer to the IDOC Director (Godinez) (Doc. 481-17, p. 83; Doc. 481-
16, p. 136). White drafted operations orders working with regional tactical commanders (Doc.
642-5, pp. 74-75, 82, 120). IDOC statewide and regional tactical commanders worked with
facility wardens to draft operations orders for the searches (Doc. 642-2, pp. 106-107). Draft
orders for each of the four facilities were reviewed by the IDOC's operations deputy director and
deputy chief, then approved by Yurkovich. *Id*.

After their initial conversations about the searches, Yurkovich and Atchison had a series
of "very in-depth conversations" between them, White, and the wardens of the facilities they
planned to search (Doc. 481-6, pp. 47-49; Doc. 481-69, p. 2). White attended a meeting in
Springfield with either Yurkovich or Atchison, where he learned about the plan to conduct the

searches (Doc. 481-7, pp. 71-72).  McAllister testified that he was not involved in the decision to conduct facility-wide searches, but he was involved in planning their execution once the decision was made to conduct the shakedowns (Doc. 481-17, pp. 114-115).

McAllister and White were responsible for creating written operations orders (Doc. 481-17, pp. 85-86; Doc. 481-7, p. 70; Doc. 481-6, pp. 54-55; Doc. 481-17, pp. 123-124).  The orders outlined the schedule and staffing needs for the shakedowns (Doc. 481-64, p. 2).  The statewide operations require approval and supervision by senior members of the IDOC administration, including Yurkovich, Atchison, and Godinez (Doc. 481-6, p. 33, 46; Doc. 481-16, p. 100; Doc. 481-72, p. 2).  The written orders were not distributed to the facility tactical team commanders, assistant commanders, or any tact team members (Doc. 481-17, pp. 132-136; Doc. 481-8, p. 75; Doc. 481-20, p. 66; Doc. 671-1, p. 21).  Only the warden and assistant warden of each facility received a copy of the written orders (Doc. 481-17, pp. 132-136).

The written orders omitted several key details about the plan, including how the shakedowns would be performed (Doc. 481-66, pp. 2-5).   The orders listed high-level, generalized "objectives" for the searches that stated what the searches would include.  *Id.* at 1, 2. Instead, the details about how the shakedowns would be performed were communicated orally (Doc. 481-7, pp. 36-37; Doc. 481-8, pp. 70-71; Doc. 481-10, pp. 71-74, 101; Doc. 481-11, pp. 65-67; Doc. 481-14, pp. 40-41).  In briefings, McAllister or White discussed the shakedown plan with facility tact commanders, including the specifics of how the shakedown operation was to be conducted (Doc. 481-10, pp. 71-73, 75; Doc. 481-7, p. 37).  McAllister or White laid out "how you would perform your duties of the day," "what [prisoners] could wear out of the cell," "[h]ow you [were] to cuff," and "[h]ow they were to . . . conduct their self, how to handle the inmates," among others (Doc. 481-1, pp. 71-73).   The facility's Warden and Assistant Warden of

Operations also attended these briefings (Doc. 481-17, pp. 139-140; Doc. 481-7, pp. 36-37; Doc. 481-18, pp. 56-57; Doc. 481-19, pp. 131-132).

Facility tact commanders and assistant commanders then met with the rest of their teams, where they would discuss the shakedown plan with each member of the tact team, relaying the instructions they had been given by White and/or McAllister (Doc. 481-11, pp. 65-67; Doc. 481-10, pp. 73-74; Doc. 481-15, p. 73; Doc. 481-14, pp. 40-41). Immediately before they began marching toward the cellhouse to begin the shakedown, the entire group would convene for a mass group briefing, delivered by the prison's Warden and McAllister or White, reiterating the shakedown plan and its objectives (Doc. 481-10, pp. 75-76; Doc. 481-14, pp. 40-41; Doc. 481-7, pp. 36-37). Nothing was distributed in writing during or after the oral briefings. *Id.* The oral instructions contained instructions on how to conduct the shakedowns that were absent from the written operations orders (Doc. 481-66; Doc. 481-7, pp. 84-86; Doc. 481-23, pp. 127-131).

McAllister and/or White were present during the shakedowns and were responsible for supervising the tact team members during the shakedown (Doc. 481-6, p. 50; Doc. 481-17, p. 188). White was the primary supervisor of the shakedowns at Menard and Illinois River (Doc. 481-17, p. 222). McAllister was the primary supervisor at Big Muddy and Lawrence. *Id.*; Doc. 481-17, pp. 187, 258-265. Facility tact commanders and assistant commanders reported to McAllister and/or White, who would then ensure that the uniform plan was being carried out across the facilities (Doc. 481-14, p. 62; Doc. 481-11, pp. 123-124; Doc. 481-10, pp. 107-109; Doc. 481-8, pp. 80-81, 86-89; Doc. 481-75 at ¶ 4; Doc. 481-7, p. 79; Doc. 481-11, pp. 116-122). Each facility Warden attended the shakedowns because they understood that they were responsible for the conduct of staff at the prison (Doc. 481-18, p. 105; Doc. 481-19, pp. 179-180; Doc. 481-20, p. 17).

Tact team members wore an orange jumpsuit, a vest, a helmet with a face shield, gloves, a 3-foot baton, pepper mace, a flashlight, and a radio (Doc. 481-7, pp. 38-39; Doc. 486-1, p. 51). The uniforms concealed team members' identities – the helmet covered their face, the gloves prevented a prisoner from being able to identify even the race of the officer, and the jumpsuits had no identifying names or numbers (Doc. 481-7, p. 39; Doc. 486-1, p. 51). IDOC staff and prisoners referred to the tact team as "Orange Crush" (Doc. 481-6, pp. 162-163).

Officers generally began the searches by entering the inmates' living area quickly and noisily, including yelling and banging batons on railings, to alert the inmates and put them on notice that a search was going to occur (Doc. 642-5, p.141; Doc. 642-22, p. 123; Doc. 642-8, pp. 239-240). Tact team members were instructed to march in lockstep or stomp into the cellhouse and begin banging and crashing their batons on the cells (Doc. 481-23, p. 206). According to the current IDOC Statewide Tact Commander Zach Sarver, the IDOC now prohibits tact team members from entering cellhouses in this way while conducting facility-wide searches (Doc. 642-11, pp. 82-83).

After entering the cellhouse, tact team members strip searched inmates individually in their cells. Defendants testified that strip searches proceeded from head to toe according to IDOC policy (Doc. 642-14, pp. 36-38; Doc. 642-11, pp. 122-123; Doc. 642-7, pp. 54-61; Doc. 642-16, pp. 86-87; Doc. 642-39, pp. 54-56). Class members testified that they were ordered to strip and then manipulate their genitals and spread their buttocks before putting their hands in their mouths to widen it and moving their tongue (Doc. 481-31, pp. 56-57; Doc. 481-33, pp. 73-74; Doc. 481-32, p. 58; Doc. 481-29, pp. 45-46, 51-54; Doc. 481-30, p. 42; Doc. 481-34, p. 71; Doc. 481-36, pp. 30, 54, 74-75; Doc. 481-37, pp. 47-48; Doc. 481-38, p. 26; Doc. 481-39, pp. 13-14, 22-23; Doc. 481-40, pp. 93-96, 110; Doc. 481-41, pp. 30-31; Doc. 481-42, pp. 37-46;

Doc. 481-43, pp. 29-30; Doc. 481-44, pp. 36-37; Doc. 481-45 pp. 49-50; Doc. 481-46, pp. 40-41, 84; Doc. 481-47, pp. 63-64).

While the strip searches were occurring, tact team members ordered prisoners to hand them their clothing (including their underwear) for a close, manual inspection and search (Doc. 642-11, pp. 121-122). After the search, prisoners were told that they must wear their "prison blues" but could not wear underwear (Doc. 481-31, pp. 56-57; Doc. 481-30, pp. 44-45; Doc. 481-36, pp. 72-73; Doc. 481-37, pp. 47-48; Doc. 481-38, p. 27; Doc. 481-39, pp. 14-15, 25; Doc. 481-40, p. 111; Doc. 481-41, p. 37; Doc. 481-42, pp. 37-46; Doc. 481-43, p. 61; Doc. 481-44, pp. 36-37; Doc. 481-45, p. 52; Doc. 481-46, pp. 42, 83; Doc. 481-47, p. 133).

Officers then escorted inmates to waiting areas in pairs, walking in close formation, with their heads down, and handcuffed in the back with their palms facing out and thumbs up (Doc. 642-5, pp. 82-83). Class members were marched so close with prisoners in front and behind that their genitals made physical contact with the prisoner in front of them and the genitals of the prisoner behind them (Doc. 481-31, pp. 74, 147; Doc. 481-33, pp. 62-67, 92-97; Doc. 481-29, pp. 68-79; Doc. 481-30, pp. 50-51, 55-56; Doc. 481-36, 44-45; 88-89, 93-94; Doc. 481-37, pp. 61-70; Doc. 481-38, pp. 33, 62-63; Doc. 481-40, pp.130-144; Doc. 481-41, pp. 42-49, 62-77; Doc. 481-42, pp. 63-71; Doc. 481-43, pp. 35-40; Doc. 481-44, pp. 46-50, 77-78; Doc. 481-45, pp. 67-71; Doc. 481-46, pp. 56-59; Doc. 481-47, pp. 115-120; Doc. 481 at 12 n.9). Class members described the close formation mass movement as "nuts to butts" or "nuts to hands" (Doc. 481-19, pp. 222-225; Doc. 481-27, p. 37). Prisoners were marched single file outside in two columns with tact team members in full gear flanking them on all sides. *Id*. Several class members testified that during line movement, tact team members pushed and shoved them so they were in contact with other prisoners. Numerous class members reported being pushed,

punched, kneed, poked with batons, and subjected to verbal abuse by tact team members (Doc. 481-31, pp. 74, 86-94, 110-112; Doc. 481-33, pp. 92-97, 104-112; Doc. 481-29, p.69; Doc. 481-30, pp. 51-56; Doc. 481-34, 83-85; Doc. 481-35, pp. 21-26; Doc. 481-36, pp. 85-86; Doc. 481-37, p. 34, 68-69; Doc. 481-38, pp. 33-48; Doc. 481-40, pp. 113-120, 157-158; Doc. 481-41, pp. 39-40, 46-77; Doc. 481-42, pp. 51-61, 71-82; Doc. 481-43, pp. 35-42; Doc. 481-44, pp. 46-56; Doc. 481-45, pp. 65-70; Doc. 481-46, pp. 55-56; Doc. 481-47, pp. 73-83).  Other class members could hear and/or see this abuse taking place.  *Id.*

Inmates then remained in the waiting area while the tact teams searched every cell before being returned to their cells (Doc. 642-5, pp. 90-92).  Defendants offered differing accounts of the conditions under which prisoners were held, but those accounts were consistent in that they reported that prisoners remained cuffed, standing for hours at a time, facing walls, and unable to speak (Doc. 481-7, pp. 82-83, 92; Doc. 481-17, p. 241; Doc. 481-6, p. 75; Doc. 481-9, pp. 86-90).

The wardens of the respective facilities sent Yurkovich summaries of the searches after they were completed (Doc. 642-42; Doc. 642-43; Doc. 642-2, pp. 128-129).  As the shakedowns were occurring, prisoners submitted grievances complaining about the abuses they suffered and about their missing property.  Atchison received status updates at the end of the day with highlights of what was found or use of force, segregation, transfer, or assault incidents (Doc. 481-6, p. 79). Yurkovich received these daily reports as well (Doc. 481-16, pp. 100, 107-109). Neither White nor McAllister investigated allegations of abuse or misconduct reported in the facilities they supervised (Doc. 481-7, p. 150).  Multiple emails were exchanged among tact team officers and commanders as early as April 2014 that highlighted prisoners' experiences with abusive and unprofessional staff during the shakedowns (Doc. 671-10).  In these exchanges, they discussed the "overwhelming amount of allegations of staff misconduct" from prisoners in

different facilities, including accounts of tact team members eating their food and leaving empty candy wrappers, missing property not documented on shakedown slips, broken damaged property, property receipts missing, urine on bed sheets and in property boxes, allegations of physical abuse such as slapping the backs of their heads, forcefully placing their heads against walls ….” (Doc. 671-2, pp. 41-42).

### The Supervisory Defendants

The 2014 facility tact commanders, assistant tact commanders, wardens, and assistant wardens at each facility included:

| Menard | Illinois River | Big Muddy | Lawrence |
|---|---|---|---|
| - Jerry Witthoft | - Robert Arnett | - David Hermetz | - Michael Gilreath |
| - Frank Eovaldi | - Brian Piper | - Chris White | - Timothy McAllister |
| - Kim Butler | - Greg Gossett | - Ken Finney | - Stephen Duncan |
| - Alex Jones | - Stephanie Dorethy | - Zachary Roeckeman | - Richard Moore |
| | | - Robert Craig | |

Defendant Kimberly Butler was transitioning from the Menard assistant warden of programs to facility warden in April 2014, in which capacity she was responsible for the entire operation of the facility (Doc. 642-18, pp. 26-29).  Butler attended the pre-operation tactical briefings for the purpose of “welcoming all of the tact team members to the facility, giving them an idea of what they were searching for in regards to weapons.”  *Id*. at p. 56.  Butler also participated in drafting and reviewing operations orders for the shakedowns.  *Id*. at pp. 38-42, 48-54.  During the searches, Butler and her senior staff “would just walk around the galleries and talk to staff and talk to the offenders…Just to make ourselves available, you know, be seen, and if anyone had any issues, they could talk to us about them.”  *Id*. at p. 32.

Defendant Alex Jones was temporarily assigned as Menard’s assistant warden of operations during the 2014 facility-wide searches (Doc. 642-21, pp. 36-37).  Jones could not

recall the search operations at Menard. *Id*. at pp. 37, 45, 50. He also had no memory of playing a role in either planning, drafting, or receiving the operations orders. *Id*. at pp. 43-44.

Defendant Jerry Witthoft was the Menard tactical team commander in 2014, responsible for overseeing tactical team training, recruitment, and operations (Doc. 642-54, pp. 35-38, 52). Witthoft could not recall details of the 2014 searches at Menard. *Id*. at p. 57. During such operations, however, Witthoft testified that he would have been responsible as the "institutional commander" for assigning facility tactical team members to the holding areas where inmates wait while the cellhouse searches occurred, and for assigning team members to cellhouse searches. *Id*. at pp. 72-74. When participating in a facility-wide search as the tactical team commander, Witthoft supervised the team's search operations, including "assist[ing] them to do their job," and ensuring that they "adher[ed] to policy." *Id.* at 78.

Defendant Frank Eovaldi was the Menard assistant tactical team commander in 2014, responsible for tracking team members' hours, rostering team members for operations, and generally overseeing the facility tactical team (Doc. 642-39, p. 23). While he has no memory of specific operation days, Eovaldi believes he participated in the 2014 facility-wide searches at Menard, Big Muddy, and Lawrence. *Id*. at pp. 39-44.

Defendant Gregory Gossett was the Illinois River warden in 2014, responsible for daily operations (Doc. 642-6, pp. 22-26). Gossett took part in drafting the operations order for the Illinois River facility-wide search. *Id*. at pp. 103-105. On the first day of the search, Gossett addressed the tactical team with a "[w]elcome, and thank you," telling the team where they could get assistance should they have any questions about the facility or its operations. *Id*. at pp. 149-150. Once the operation began, Gossett toured the facility each day of the search, observing "all stages" of the operation. *Id*. at 144, 175.

Defendant Stephanie Dorethy was the Illinois River assistant warden of operations in 2014, overseeing "the operations of the facility, various departments like security, dietary, maintenance" (Doc. 642-25, pp. 10, 26).  Dorethy was present for some of the tactical team meetings.  *Id.* at pp. 48-49.  She testified that for the facility-wide search, the tactical teams reported to the tactical commander, who then addressed any issues or concerns to the warden or assistant warden or central regional commander.  *Id.* at p. 51.  During the operations, Dorethy would have initially gone to the location the tactical team was searching and then she would tour other units and attend to her assistant warden duties.  *Id.* at p. 53.  She did not stay with the tactical team, but was instead "intermingling throughout the facility," "basically kind of check[ing] things out, mak[ing] sure there's no issues," and then attending to her regular duties as assistant warden. *Id*. at pp. 52-54.

Defendant Robert Arnett was the Illinois River tactical commander in 2014 (Doc. 642-19, pp. 16, 26).  Arnett participated in the Illinois River facility-wide search, but not those at the other three facilities*. Id*. at pp. 27-31.  Arnett's primary role for the Illinois River search was to help instruct tactical team members during the operation.  *Id*. at pp. 34, 57.  Arnett, as "the host commander" at Illinois River, did anything that was needed to be done for the logistics of the search – getting more gloves, obtaining water for team members, making sure inmates were restrained, strip searched, lined up, and directed to the holding area, and ensuring the Illinois River tactical team was "carrying out the operation according to the procedures… discussed during the [pre-operations] commanders briefing."  *Id*. at pp. 34, 62, 68-70).

Defendant Brian Piper was the Illinois River assistant tactical commander in 2014 (Doc. 342-47, pp. 16-17).  Piper's role included ensuring that the required number of facility tactical team members were assigned to the search; he arrived at the facility early to gather supplies

needed for the tactical teams. *Id*. at p. 82. Piper participated in each day of the Illinois River search, assigned to overseeing the gymnasium or segregation yard holding areas where inmates waited while their cells were searched; he did not take part in searching housing unit cells. *Id*. at pp. 88-90, 109. After the morning briefings for the tactical teams, but prior to the inmates' arrival at the day's holding area, Piper's team swept the holding area for contraband, and did so again after the inmates left the holding area. *Id*. at pp. 93-94, 110. Piper was responsible for ensuring that operations in the holding area were conducted consistent with the morning briefing. *Id*. at pp. 108-109.

Defendant Zack Roeckeman was the Big Muddy warden in 2014, responsible for the "overall supervision of the facility, including all safety and security" and the "supervision of staff" (Doc. 642-45, pp. 12, 25). Roeckeman was not involved in deciding to conduct a facility-wide search at Big Muddy but did help draft the operations order for the search. *Id*. at 30, 35. Roeckeman was present for the first day of the operation to welcome the tactical team, thanking them in their effort to "help us make the facility safer." *Id*. at pp. 32-33. During the search week, Roeckeman "stopped by just to check how things were going from time to time." *Id*. at p. 47.

Defendant Robert Craig was the Big Muddy assistant warden of operations in 2014, responsible for the day-to-day operations and the staff of the facility (Doc. 642-46, pp. 22-23). Although Craig was second in command after tact team commander McAllister, he testified that he had no role in deciding to conduct a facility-wide search at Big Muddy and no role in deciding the logistics of the search. *Id.* at pp. 22-23, 28. Craig was present and spoke with McAllister during the morning briefings and was present and available during the shakedowns to assist. *Id.*

at p. 32.  During the searches, Craig went along with his regular daily responsibilities.  *Id.* at pp. 29-32.

Defendant David Hermetz was the Big Muddy tactical commander in 2014 and was present for the Big Muddy and Menard facility-wide searches (Doc. 642-24, pp. 26, 35). Hermetz attended the pre-operation briefings held for tactical commanders for both the Big Muddy and Menard searches, which he described as "very similar." *Id*. at p. 60.  Hernetz's role was to maintain the security of the operation while it was occurring.  *Id.* at p. 88.  After the pre-operation briefings, Hermetz's responsibilities included orally communicating to tactical team members the operations order details from those briefings and ensuring team members carried out the searches consistent with those instructions.  *Id*. at pp. 47, 50, 67.

Defendant Chris White was the Big Muddy assistant tactical commander in the spring of 2014, and was then appointed tactical commander later that summer (Doc. 642-16, pp. 170-171). He was not present during the Big Muddy facility-wide searches in 2014 because he was teaching in Springfield.  *Id.* at p. 53.  White did participate in the shakedowns at Menard and Lawrence that year.  *Id.* at p.78-83.   White testified that, generally, tactical team leadership obtained operational information regarding facility-wide searches at a commander's briefing conducted each day of facility-wide multiday searches.  *Id.*

 Defendant Kenneth Finney became the Big Muddy assistant tactical commander sometime during the summer of 2014 (Doc. 642-17, pp. 23, 142-143).  He recalled participating in the shakedowns at Lawrence, Menard, and Big Muddy but could not recall details about how the shakedowns occurred.  *Id.* at pp. 121-124.   Finney never saw an operations order for an IDOC facility-wide search.  *Id*. at pp. 144-145.

Defendant Stephan Duncan was the Lawrence warden in 2014, overseeing operations for the entire facility and responsible for the safety of inmates and staff (Doc. 642-20, pp. 6, 17). Duncan provided input on the drafting of the operations order for the Lawrence search and attended the operations, as well as several pre-operations tactical team briefings. *Id*. at pp. 40-42, 51-53. During those briefings, Duncan would address the team, focusing on the types of contraband being searched for, advising the non-Lawrence team members about the types of personal property allowed at the facility, and stressing that the team be professional and follow the chain of command. *Id*. at pp. 51, 66. Once the operations began, Duncan undertook his normal duties and "ran the facility," but would "periodically . . . check, see how things were going, watch some of the movement . . . go to the cell houses while they were conducting the strip searches." *Id*. at pp. 68-69, 72-73. Duncan "witnessed that whole operation at least two or three times that week." *Id.*

Defendant Richard Moore was the Lawrence assistant warden of operations in 2014, responsible for security-related issues and inmate movements throughout the facility (Doc. 642-38, pp. 21-22). Moore had no role in planning the facility-wide search at Lawrence or in drafting the operations order for the search. *Id*. at pp. 62-64. Moore was present at operational plan briefings with tact team members and conveyed prisoners' personal property concerns to McAllister. *Id*. at pp. 66-68. Moore was tasked with ensuring tact team compliance with the uniform plan in his facility and provided support to McAllister. *Id.* at pp.78-82.

Defendant Michael Gilreath was Lawrence's tact commander who was transitioning to active military duty in 2014 (Doc. 642-15, pp. 65-70). Gilreath could not recall his role in the Lawrence shakedown and had no memory of the pre-operation briefings, the strip searches, the cell searches, or the movement of inmates. *Id*. at pp. 129-130.

Defendant Tim McAllister was transitioning from his role as the Lawrence assistant tactical commander to the role of tactical commander in 2014, overseeing tactical members good standing, training, assignments, and communications (Doc. 642-40, at pp. 45, 69-72). McAllister had no role in preparing the search operations order and learned about the Lawrence searches the day before the operation, being told he was to arrange for 25 tactical team members for the searches. *Id*. at pp. 99, 119-120. On operation day, McAllister arrived before other team members and obtained any needed supplies for the day's work. *Id*. at p. 105. McAllister attended the pre-operations tactical commanders' briefings, in which the operations were outlined, after which commanders met with their individual teams to convey the day's operation detail; the entire tactical group then met, and the day's operation would begin. *Id*. at pp. 117-119. Through the course of the Lawrence facility operation, McAllister participated in some strip searches and searched some cells, going "back and forth" from the cellhouses to the inmate holding area*. Id.* at pp. 148-149, 164-168.

<u>Discussion</u>

Defendants move for summary judgment with respect to Counts I, II, and III, asserting that Plaintiffs have not identified evidence of a uniform plan to violate their Eighth Amendment rights and that there is also no evidence that each individual supervisory defendant was personally involved in developing or executing such a plan. Defendants also move for summary judgment on behalf of all but nine of the non-supervisory defendants on the same claims, asserting that there is no evidence connecting those individuals to any violation of Plaintiffs' rights.

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986).   The moving party is entitled to summary judgment where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."   *Celotex,* 477 U.S. at 323.   If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted.   *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986).   Any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party.   *Lawrence v. Kenosha County,* 391 F.3d 837, 841 (7th Cir. 2004).

### Supervisory Defendants Motion for Summary Judgment

### *Count I*

The Eighth Amendment prohibition on cruel and unusual punishment bars prison authorities from unnecessarily and wantonly inflicting pain on inmates. *See Hope v. Pelzer,* 536 U.S. 730, 737 (2002). This prohibition against cruel and unusual punishment of inmates includes both physical and psychological harm.  *See Beal v. Foster*, 803 F.3d 356, 357–58 (7th Cir. 2015). In the context of searches of prisoners, a prisoner states a claim under the Eighth Amendment when he plausibly alleges that the strip-search in question was motivated by a desire to harass or humiliate rather than by a legitimate justification, such as the need for order and security in prisons.  *Rivera v. Drake*, 497 F. App'x 635, 637 (7th Cir. 2012).   The infliction of pain on prisoners without any legitimate penological justification "always violates contemporary standards of decency and need not produce serious injury in order to violate the Eighth Amendment."  *Calhoun v. DeTella,* 319 F.3d 936, 939 (7th Cir. 2003) (citing *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)); *Fillmore v. Page,* 358 F.3d 496, 504 (7th Cir. 2004) ("infliction of pain that is totally without penological justification is *per se* malicious").

In affirming class certification, the Seventh Circuit noted Defendants' concession that the shakedowns were conducted according to a uniform plan created and implemented by the Defendants, and that the plan was executed in a uniform manner under their supervision. The only dispute was the content of that uniform policy – specifically, whether that uniform policy reflected the version alleged by the Plaintiffs or the one alleged by the Defendants. Defendants argue the record establishes that their version of events surrounding the planning and implementation of the shakedowns should be believed – that the shakedowns were conducted pursuant to IDOC policies, and that those policies were designed not to "cause pain or humiliation" but rather to further IDOC's penological objectives. Citing the testimony of the supervisory Defendants and the opinions of defense expert Larry Reid, Defendants maintain that no reasonable jury could conclude that the searches were unconstitutional.

Defendants' arguments are belied by the evidence in the record. Plaintiffs have adduced evidence that the written orders differed from verbal orders. The details about how the shakedowns would be performed were only communicated orally – nothing was distributed in writing during or after the oral briefings. Class members across the four facilities detailed the same complaints about the shakedowns across their grievances and throughout depositions in this case. The parties present conflicting evidence regarding many aspects of the shakedowns, including the use of batons, reverse strip searches, handcuffing, line formation, and the way cells were searched. Plaintiffs' experts Dan Pacholke and Pat Hurley opine that multiple aspects of the shakedowns were contrary to widely accepted correctional standards and had no legitimate penological purpose. Defense expert Reid comes to the opposite conclusion. The conflicting evidence and dueling expert opinions must be left to a jury to weigh and decide which version to believe.

Defendants further argue that even if there was evidence of a uniform policy to violate Plaintiffs' rights, Plaintiffs must show that each supervisory defendant personally participated in the deprivation. The personal responsibility requirement of section 1983 is satisfied if the conduct causing the constitutional deprivation occurs at the official's direction or with his or her knowledge and consent. *Williams v. Shah,* 927 F.3d 476, 482 (7th Cir. 2019). Viewing the evidence in the light most favorable to the Plaintiffs, the Court finds that there is sufficient evidence in the record to deny summary judgment to most of the supervisory Defendants:

Statewide supervisors: Godinez approved the statewide shakedowns and received notice of abuses during the shakedowns. Yurkovich and Atchison were responsible for developing the initial shakedown plans and had daily conversations with on-the-ground staff during the shakedown. White and McAllister were responsible for helping to draft operations and supervised and/or observed various stages of the searches.

Menard: Butler attended the pre-operation tactical briefings and was aware of the plans. Butler also participated in drafting and reviewing operations orders for the shakedowns. Witthoft supervised the tact team's search operations and ensured that they were conducting the search according to the uniform plan. Eovaldi participated in the searches at Menard, Big Muddy, and Lawrence.

Illinois River: Gossett took part in the drafting of the operations orders for the Illinois River search and was involved in observing all stages of the operation. Dorethy was present for some of the tactical team meetings. During the operations, Dorethy would have initially gone to the location the tactical team was searching and then she would tour other units and attend to her assistant warden duties. She periodically checked on the progress throughout the day. Arnett participated in the search at Illinois River and his primary role was to help instruct tactical team members during the operation. Piper participated in the searches and was present for morning briefings, and gave instructions to tact team members.

Lawrence: Duncan provided input on drafting the operations orders for the Lawrence searches and attend the operations and pre-operations tactical team briefings. Moore was present at operational briefings with tact team members and conveyed personal property concerns to McAllister. Tim McAllister attended pre-operations tactical team briefings and participated in some strip searches and cell searches.

<u>Big Muddy</u>: Roeckeman assisted in drafting operations for the Big Muddy search and checked on the progress of the searches throughout the week. Craig spoke with McAllister during the morning briefings and was present and available to assist during the shakedowns. Hermetz was responsible for managing the security of the operation while it was occurring at Big Muddy and Menard. he attended pre-operational tactical team meetings. Chris White attended tactical team commander briefings. Finney participated in the shakedowns at Big Muddy, Lawrence, and Menard.

However, summary judgment will be granted as Defendants Jones and Gilreath. Even viewing the evidence in the light most favorable to the Plaintiffs, Jones and Gilreath had no memory of playing a role in the operations at their facilities, did not stay with the tact team or participate in briefings, and performed their regular job duties during searches.

Accordingly, Defendants' motion is granted in part and denied in part as to Count I. [3]

### Counts II and III

In a footnote, Defendants move for judgment as a matter of law on Plaintiffs' claims that Defendants conspired to violate their Eighth Amendment rights and failed to intervene to protect those rights. They argue that because Counts II and III are premised on the same underlying Eighth Amendment theory, if Plaintiffs' core Eighth Amendment claim fails, their conspiracy and failure-to-intervene claims likewise fail. It is rarely proper to present substantive arguments in footnotes. *See Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments ... are waived."). That said, the Court finds the evidence sufficient to withstand summary judgment.

To establish a prima facie case of a civil conspiracy, a plaintiff must show (1) an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights and

---

[3] In the alternative, Defendants suggest that the Court grant partial summary judgment as to aspects of Plaintiffs' Eighth Amendment claims. For example, finding that Defendants did not violate Plaintiffs' rights by their loud entrance or by preventing them from wearing underwear. The Court declines the invitation. The conflicting evidence regarding multiple aspects of the searches considered together create genuine issues of material facts preventing the granting of summary judgment on Counts I, II, and III.

(2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement. *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988).  Here, there is evidence in the record about the planning, implementation, and communication between the Defendants regarding the shakedowns and evidence of abuses that occurred during the shakedowns.  There is also evidence that the defendants were aware of but ignored prisoner complaints about the shakedowns and how they were conducted.  This evidence sufficiently supports the failure-to-intervene claim.  Accordingly, Defendants' motion is denied on Counts II and III as to the remaining supervisory Defendants.

### *Qualified Immunity*

Determining whether a defendant state officer is entitled to qualified immunity involves two inquiries: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Williams v. City of Chicago,* 733 F.3d 749, 758 (7th Cir.2013). If *either* inquiry is answered in the negative, the defendant official is entitled to summary judgment.

Defendants assert that qualified immunity is warranted because "the policies pursuant to which these searches occurred – inmates strip searched, handcuffed, moved to secure areas, and returned to their cells after searched – are grounded in penological purposes and consistent with common practices across the United States."  This argument presumes that Defendants' factual narrative regarding the searches is believed.

Prisoner searches intended to inflict unnecessary pain and humiliation without any legitimate penological justification violate the Eighth Amendment.  The manner in which the strip search is conducted must pass constitutional muster.  *See Mays*, 575 F.3d at 649, 650

(collecting cases).  Here, factual disputes regarding the underlying motivation and the method in which these searches occurred prevents the granting of qualified immunity to the Defendants.

### *Official Capacity Claims*

In the Second Amended Complaint, Plaintiffs request injunctive relief as to Counts I and II.  Defendants move for summary judgment on official capacity claims against the Director of the Department[4].  Plaintiffs did not respond to this portion of Defendants' motion, and the Court finds Defendants' arguments to be well-taken.

The Director is amenable to suit only to remedy "an ongoing violation of federal law." *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 521 (7th Cir. 2021).  Plaintiffs have not identified an ongoing violation of federal law, nor have Plaintiffs articulated that there is any real and immediate threat that they will experience due to the conduct alleged in this case.  Accordingly, Defendants motion is granted as to the official capacity claims against the Director of IDOC.

### *Count V*

Citing *T.S. v. Cook Cnty*, 67 F.4th 884, 890 (7th Cir. 2023), Defendants move for summary judgment on Plaintiffs' state law intentional infliction of emotional distress claims on the basis these claims are barred by Illinois state-law sovereign immunity.  Plaintiffs did not respond to this portion of Defendants' motion.

In *T.S.*, the Seventh Circuit held that the Illinois Court of Claims has exclusive jurisdiction over all claims against the state founded on any law of the state.  The Court also clarified that the officer suit exception does not apply in a damages suit.  *T.S.*, 67 F.4th at 894 (reversing the district court for applying the officer suit exception to a case involving damages claims against a state agent in his personal capacity).  Thus, because Plaintiffs only seek

---

[4] Latoya Hughes is the current Acting Director of the Department.

compensatory damages against Defendants, their claims are barred.  Accordingly, Defendants are entitled to summary judgment on Count V of Plaintiffs' Second Amended Complaint.

### Non-Supervisory Defendants' Motion for Summary Judgment

Defendants move for summary judgment on Plaintiffs' claims against 432 non-supervisory defendants – individual tact team officers who Plaintiffs allege personally violated their Eighth Amendment rights by participating in the 2014 facility-wide searches.[5]  Instead of responding to the merits of Defendants' motion, Plaintiffs assert that there is no trial pending against the non-supervisory Defendants and therefore, no need to resolve any claims against those defendants at this time.

Under Rule 56(b), "a party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b).  Although Plaintiffs sought class certification as to the 22 supervisory Defendants, this case has never been bifurcated between the two groups of defendants.  The numerous amendments to the Scheduling Order applied to all defendants and did not distinguish between supervisory and non-supervisory defendants.  And pursuant to the most recent Scheduling Order, fact discovery as to all defendants closed on December 15, 2020.

That said, the Court takes this portion of the motion **UNDER ADVISEMENT**.  Plaintiffs shall file a response within 30 days of the entry of this Order.  Defendants may seek leave to file a reply pursuant to the undersigned's Case Management Procedures.

### <u>Conclusion</u>

Defendants' motion for summary judgment (Doc. 642) is **GRANTED in part** and

---

[5] Defendants do not move for summary judgment as to the following nine non-supervisory Defendants: Bradley Clark, Steven Conrad, Justin Eckelberry, Jason Furlow, James Gray, Marcus Jenkins, Brian Livingston, John Maragni, and Carson Winters.  According to Defendants, these nine individuals are the only non-supervisory Defendants who were ever named by any named or consolidated Plaintiff as having personally engaged in any specific conduct that Plaintiffs assert is unconstitutional.

**DENIED in part**.  Defendants' motion is **GRANTED** as to Defendants Alex Jones and Michael Gilreath on Plaintiffs' claims in the Second Amended Complaint; **GRANTED** as to Count V of the Second Amended Complaint as to all Defendants; and **GRANTED** as to any official capacity claims against the Director of the IDOC.  Defendants' motion is **DENIED** as to the remaining supervisory Defendants as to Count I, II, and III.  Defendants' motion is **TAKEN UNDER ADVISEMENT** as to the non-supervisory Defendants.  The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants Jones and Gilreath and against Plaintiff at the close of this case.

      **IT IS SO ORDERED.**

      **DATED:  January 8, 2025**

                                           **STACI M. YANDLE**
                                           **United States District Judge**