IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DEMETRIUS ROSS, et al., on behalf of themselves and the class, ) ) ) | |
| Plaintiffs, ) ) | Case No. 15 C 0309 |
| v. ) ) | Hon. Staci M. Yandle |
| GREG GOSSETT, et al., ) ) | |
| Defendants. ) | |

**PLAINTIFFS' MOTION FOR A NEW TRIAL AGAINST
DEFENDANTS DAVID WHITE AND ANTHONY MCALLISTER**

Pursuant to Federal Rule of Civil Procedure 59, Plaintiffs Demetrius Ross, Kevin Hamilton, Jonathan Tolliver, Ronald Smith, and Glenn Verser, on behalf of themselves and a certified class of similarly situated individuals, by and through their counsel, respectfully move this Court to grant Plaintiffs a new trial on their claims against Defendants David White and Anthony McAllister. In support of their request, Plaintiffs state as follows:

**INTRODUCTION**

This case is a class action that Plaintiffs brought on behalf of themselves and other prisoners who were subjected to abusive and humiliating facility-wide searches in four Illinois Department of Corrections ("IDOC") facilities in the spring and summer of 2014. On March 31, 2025, Plaintiffs finally had the opportunity to present their case to a jury. Over a period of two weeks, Plaintiffs introduced abundant photographic and documentary evidence supporting their claims and achieved numerous admissions from the Defendants that aspects of the shakedowns occurred exactly as Plaintiffs alleged them. All parties agreed that Defendants David White and Anthony McAllister were the architects of a uniform plan to conduct these facility-wide

shakedowns, and that one or both Defendants were on the ground each day of the shakedowns to execute that plan.

Defendants White and McAllister admitted to a surprising number of Plaintiffs' allegations of abuse. For instance, they admitted to prohibiting prisoners from putting their underwear back on after it was searched, even though numerous trial witnesses, including multiple Defendants and other IDOC employees, testified that there is no legitimate penological purpose for such orders. As another example, Defendant White and two Defendant wardens admitted that Defendants White and McAllister ordered prisoners to line up so close that they were touching one another. Multiple Defendants with decades of experience in the IDOC testified that such an order not only lacked a valid security justification, but was also dangerous for both prisoners and staff. Defendants also admitted to permitting the tactical teams to enter the housing units in an aggressive manner. Defendant White admitted that the tactical team entered the housing units yelling "oo-rah" and Defendant McAllister admitted that the reason for this noisy and scary entry was to "intimidate" Plaintiffs. Testimony from multiple Defendants repeatedly affirmed that there was no good reason for this tactic. Again and again, Defendants admitted to conduct that caused the Plaintiffs pain and humiliation, and which lacked any penological purpose.

To be sure, Defendants did not admit to everything that Plaintiffs alleged, but their nonsensical and/or contradictory denials underscored their liability. Defendants White and McAllister—the people most involved in the planning and supervision of the shakedowns—repeatedly impeached themselves and contradicted each other on critical issues. To put it plainly, a reasonable jury could not have found either of them credible.

By contrast, Plaintiffs' testimony was highly consistent. Multiple Plaintiffs from each of the four prisons at issue, many of whom had never spoken to one another, described a remarkably

similar series of events. They described how the tactical team officers entered their housing units banging batons against surfaces and yelling profanities, how they were required to get dressed without underwear and then line up so close to one another that they could feel their genitals pressed into the hands or buttocks of the person in front of them, and how they were marched in this position for long periods of time while they were beaten and prodded with batons if they fell out of formation. They also spoke of their experiences being forced to stand for hours, while handcuffed in a painful and unnecessary posture, and then suffering another humiliating march back to their cells only to find their personal property missing or wantonly destroyed.

Despite overwhelming evidence in Plaintiffs' favor that the shakedowns were conducted for the purpose of abusing and humiliating them, and not in furtherance of a legitimate penological goal, the jury returned a verdict for all Defendants, including White and McAllister. But the weight of the evidence showed that White and McAllister were the creators and enforcers of a plan to perform facility-wide shakedowns in a way that was specifically designed to harm and degrade Plaintiffs. Given the strength of the evidence for Plaintiffs against Defendants White and McAllister, as detailed below, a new trial against them is just and warranted.

## LEGAL STANDARD

A district court has discretion to grant a new trial pursuant to Rule 59 if the verdict was against the weight of the evidence. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996); *Miksis v. Howard*, 106 F.3d 754, 757 (7th Cir. 1997). In weighing the evidence, the district court can and must assess the credibility of the witnesses and the comparative strength of the facts put forth at trial. *See, e.g.*, *Byrd v. Blue Ridge Rural Elec. Co-op., Inc.*, 356 U.S. 525, 540 (1958) ("The trial judge in the federal system has powers denied the judges of many States to comment on the weight of evidence and credibility of witnesses, and discretion to grant a new trial if the

3

verdict appears to him to be against the weight of the evidence."); *United States v. Washington*, 184 F.3d 653, 658 (7th Cir. 1999) ("In considering the weight of the evidence, the court must necessarily consider the credibility of the witnesses."); *Bob Willow Motors, Inc. v. Gen. Motors Corp.*, 872 F.2d 788, 798 (7th Cir. 1989) ("In ruling on a motion for a new trial, the judge may consider the credibility of witnesses, the weight of the evidence, and anything else which justice requires."). If, after evaluating the evidence, the district court is of the opinion that the verdict is against the manifest weight of the evidence, a new trial is appropriate. *Mejia v. Cook Cnty.*, 650 F.3d 631, 633 (7th Cir. 2011); *see, e.g.*, *Ziccarelli v. Dart*, No. 17 CV 3179, 2024 WL 3740602, at *7 (N.D. Ill. Aug. 8, 2024) (granting motion for new trial, in the alternative, on grounds that the jury's verdict was against the manifest weight of the evidence); *Bedenfield v. Shultz*, 272 F. Supp. 2d 753, 754 (N.D. Ill. 2003) (granting motion for new trial on damages because plaintiff presented corroborated evidence of physical injuries).

## ARGUMENT

A new trial is warranted on Plaintiffs' three constitutional claims against David White and Anthony McAllister: (1) direct supervisory liability; (2) failure to intervene; and (3) conspiracy. At trial, Plaintiffs presented ample evidence that Defendants White and McAllister directly violated their rights under the Eighth Amendment by designing and implementing a plan to conduct prison-wide shakedowns in an abusive and humiliating manner that did not further any legitimate penological purpose. Dkt. 818, Jury Instructions, at 22. To succeed on their direct supervisory liability claims, Plaintiffs had to prove by a preponderance of the evidence that: (1) Plaintiffs were subjected to shakedowns that were executed in an abusive and humiliating manner that did not further any legitimate penological purpose; (2) White and McAllister knew that the Plaintiffs were subjected to such abusive and humiliating shakedowns; (3) White and McAllister

4

approved of, assisted with, condoned, or purposely ignored such misconduct; and, (4) Plaintiffs were harmed as a result. *Id.* at 23. The evidence presented at trial weighed heavily toward White and McAllister's liability on each of these elements, and a reasonable jury would have found against them. As explained below, the failure to intervene and conspiracy claims rely on substantially the same evidence as the supervisory liability claims. Thus, in the interests of justice and fairness, the Court should grant Plaintiffs a new trial against White and McAllister as to each of the three claims against them.

  **I.**   **The weight of the evidence presented at trial established that the shakedowns were executed in an abusive and humiliating manner that did not further any legitimate penological purpose.**

Plaintiffs presented mountains of evidence that they "were subjected to shakedowns that were executed in an abusive and humiliating manner that did not further any legitimate penological purpose." Dkt. 818 at 23; *see also King v. McCarty*, 781 F.3d 889, 897 (7th Cir. 2015) (a search that is "motivated by a desire to harass or humiliate rather than by a legitimate justification" violates the Eighth Amendment), *overruled on other grounds by Henry v. Hullett*, 969 F.3d 769 (7th Cir. 2020) (en banc); *Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009) (searches violate the Eighth Amendment when they are "conducted in a harassing manner intended to humiliate and cause psychological pain"); *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) (searches conducted in a harassing manner that has no legitimate penological justification violate the Eighth Amendment).

Though Plaintiffs presented powerful and consistent testimony about the abuses they suffered during the shakedowns, the jury did not need to take Plaintiffs' word for it because Defendants admitted to much of the alleged misconduct. Critically, Defendant White, Defendant McAllister, or sometimes both, admitted to prohibiting Plaintiffs from wearing underwear, forcing

5

them to line up touching one another, and entering the tactical units in an aggressive manner that was intended to intimidate Plaintiffs. Numerous other Defendants, witnesses testifying on behalf of the IDOC, and Plaintiffs' expert repeatedly affirmed that the admitted conduct had no penological purpose and was in fact contrary to IDOC policy. Though the jury was entitled to disbelieve Plaintiffs on the allegations that remained disputed, the admissions and photographs alone show the abusive and humiliating way the shakedowns were conducted. *See Michaelis v. Polk Bros., Inc.*, 545 F. Supp. 109, 112 (N.D. Ill. 1982) (granting motion for new trial based on what was established by the undisputed evidence). Moreover, the remarkable inconsistency of the Defendants' testimonies would lead any reasonable jury to find the Plaintiffs to be far more credible. Taken together, the weight of the evidence overwhelmingly supported a finding for Plaintiffs as to the first element of their supervisory liability claim.

### A. Defendants White and McAllister admitted that they prohibited Plaintiffs from wearing underwear.

Among the most humiliating and unjustified aspects of the shakedowns was Defendants' plan to prohibit Plaintiffs from wearing underwear before lining them up so closely against one another that they made body-to-body contact. Both Defendants White and McAllister unambiguously admitted that—after searching Plaintiffs' bodies and clothes, including their underwear—tactical team members prohibited Plaintiffs from wearing underwear for the remainder of the shakedown. 4/2/2025 White Tr. 21, 23, 25-26; 4/7/2025 McAllister Tr. 124.[1] Defendants White and McAllister both admitted that this was part of their plan and that they gave

---

[1] Plaintiff has not received a copy of the official trial transcript, so citations are to the Realtime transcripts generated contemporaneously at trial. Plaintiff has cleaned up obvious errors in the transcription but has not altered the substance of any testimony. Plaintiff has not attached the Realtime transcripts as exhibits to this motion. However, if the Court so desires, Plaintiffs can provide the Court and defense counsel with copies of the Realtime transcripts.

6

this no-underwear order to the tact teams during verbal briefings. *Id*.; *see also* 4/9/2025 Eckleberry Tr. 119. (tactical team member testifying that prohibiting underwear was part of the plan for the Menard and Lawerence shakedowns). Suspiciously, even though it was part of their plan, the jury saw evidence that the written operations orders that Defendants White and McAllister distributed to their superiors expressly *required* the prisoners to wear underwear during the shakedowns. 4/2/2025 White Tr. 21-22; 4/7/2025 McAllister Tr. 124.

Notably, Defendant White's trial testimony regarding underwear cast serious doubt on his credibility. While he testified at trial that the prisoners were not permitted to wear underwear during the shakedowns, which was consistent with the testimony of Defendant McAllister and all ten testifying Plaintiffs, Defendant White was impeached with his deposition testimony that he never saw officers order prisoners not to wear underwear following their strip searches during the 2014 shakedowns. 4/3/2025 White Tr. 104. Defendant White testified at trial that he gave that incorrect deposition testimony because he knew that the operations orders for the shakedowns said that the prisoners were required to wear underwear. 4/2/2025 White Tr. 25. Defendant White impeached himself again when he tried to defend the decision to prohibit underwear (in spite of the operations orders expressly requiring them), by claiming that prisoners sometimes hide things in a pocket sewn into their underwear. 4/3/2025 White Tr. 43. At his deposition, however, he admitted that prohibiting men from wearing underwear was *contrary* to IDOC policy—and that admission under oath was read to the jury at trial. 4/2/2025 White Tr. 27. Defendant White's post hoc explanation at trial for the abusive misconduct quickly fell apart, because he also testified that the tactical team officers were required to search the underwear to determine whether there was any pocket, and that any alteration of clothing was required to have been documented in an incident report. 4/3/2025 White Tr. 99-100. Aside from Defendant White's deposition testimony that

7

prohibiting underwear violated IDOC policy, multiple other Defendants testified that there was no legitimate penological purpose for a command not to wear underwear. *See* 4/9/2025 Gossett Tr. 45 (Warden of Illinois River Correctional Center); 4/8/2025 Duncan Tr. 128 (Warden of Lawrence Correctional Center); 4/7/2025 Yurkovich Tr. 62 (Deputy Chief of Operations); 4/4/2025 Atchison Tr. 75 (Chief of Operations). Other IDOC employees reiterated that view. 4/4/2025 Carter Tr. 107 (former Major at Menard Correctional Center); Dkt. 803, Bordner Dep. Designation, at 82-83 (IDOC's Rule 30(b)(6) designee). Finally, Plaintiffs' expert Dan Pacholke, who has more than 33 years of experience in corrections, testified that the prohibition of underwear "makes no sense." 4/8/2025 Pacholke Tr. 66-67.

As Plaintiffs explained to the jury, this prohibition from wearing underwear was humiliating. *See, e.g.*, 4/4/2025 Lyons Tr. 81. This was especially true coupled with another abusive tactic that Defendants admit—ordering prisoners to line up so that they were physically touching the person in front of and behind them.

### B. Defendants White, Gossett, and Duncan admitted that Plaintiffs were forced to line up making physical contact with one another.

Plaintiffs proved that they were ordered to line up "nuts to butts," meaning that they were forced to line up in such tight formation that their genitals came into contact with the hands or buttocks of the person in front of them. Though Defendants denied the "nuts to butts" orders and genital contact, the photographic evidence is of physical touching is indisputable. Additionally, numerous Defendants admitted that the prisoners were forced to line up with their heads on the backs of the person in front of them. 4/2/2025 White Tr. 35-38; 4/8/2025 Duncan Tr. 129; 4/9/2025 Gossett Tr. 44. In any case, whether Plaintiffs were forced to move nuts to butts, heads on backs, or both, the evidence showed that these orders had no legitimate penological purpose.

Plaintiffs presented ample evidence at trial that proved that they were forced to line up in this humiliating manner. Defendant White, the planner and leader of the shakedowns, *admitted* that he ordered the Plaintiffs to put their heads on the backs of the person in front of them, and that this was part of his plan. 4/2/2025 White Tr. 35-38. Defendant Greg Gossett, warden of Illinois River Correctional Center, and Defendant Stephen Duncan, warden of Lawrence Correctional Center, further testified that they saw Plaintiffs lined up with their heads on the backs of the person in front of them. 4/8/2025 Duncan Tr. 129; 4/9/2025 Gossett Tr. 44. The photographs admitted into evidence corroborated White, Gossett, and Duncan's testimony.

Despite this solid evidence, Defendant McAllister shockingly denied that Plaintiffs were forced to line up touching. When presented with photographs taken during the Lawrence shakedowns, clearly depicting Plaintiffs in "nuts to butts" line formation, Defendant McAllister decried that they were "optical illusions." 4/7/2025 McAllister Tr. 125; 4/8/2025 McAllister Tr. 25. Presumably, he did so to protect himself from liability because he also testified that there was no good reason to order men to line up with any sort of contact. 4/7/2025 McAllister Tr. 126. But no amount of outcry from Defendant McAllister can contradict the documentary evidence. *See Scott v. Harris*, 550 U.S. 372, 378-80 (2007) (reversing Court of Appeals for relying on the respondent's version of events even though it was "so utterly discredited" by videotape that "quite clearly contradicts the version of the story told by respondent"); *Buck v. Young*, No. 22-2052, 2024 WL 2796653, at *3 (7th Cir. May 31, 2024) (citing *Scott* regarding photographic evidence in Eighth Amendment case for the proposition that "[w]hen visual evidence accurately depicts what an observer would see (or not see), it should prevail"). Plaintiffs respectfully contend that the jury could not have reasonably credited Defendant McAllister's testimony that Plaintiffs were not required to touch one another during the line movement. Plaintiffs' Trial Exhibits 128.20 and 492.1

9

(the "optical illusions") clearly show that the prisoners were lined up touching, as Defendants White, Gossett, and Duncan acknowledged:



Pltfs' Trial Ex. 128.20 (cropped)



Pltfs' Trial Ex. 492.1 (cropped). White, Gossett, and Duncan were on the scene of the shakedowns, and in fact White, Duncan, and McAllister were all present for the particular day of the shakedowns that is captured in the above photos. 4/2/2025 White Tr. 16-17; 4/8/2025 Duncan Tr. 124; 4/7/2025 McAllister Tr. 118-119.

10

Defendant McAllister was not the only Defendant or witness with correctional experience to admit that there was no good reason to order men to line up with any sort of contact. 4/7/2025 McAllister Tr. 126. Though Gossett admits he saw heads on backs, he too testified that there is no legitimate penological purpose for it and, worse, that it could actually be dangerous. 4/9/2025 Gossett Tr. 45-46. Many other Defendants agreed that the order was inappropriate and served no legitimate penological purpose. 4/9/2025 Roeckeman Tr. 100-01; 4/7/2025 Yurkovich Tr. 64; 4/4/2025 Atchison Tr. 29-30. Tracy Bordner, who testified by deposition on behalf of the IDOC pursuant to Federal Rule of Civil Procedure 30(b)(6), further explained that it was a violation of IDOC policy to order a prisoner to make contact with the body of the prisoner ahead of him in line. Dkt. 803 at 78. To the contrary, policy required "plenty of room to be able to walk freely in line." *Id.* at 71; *see also id.* at 79. John Carter, a former IDOC major and employee of 28 years, also testified at trial that it would be inappropriate to require prisoners to line up with their foreheads on the backs of the prisoners in front of them. 4/4/2025 Carter Tr. 94-95, 103; *see also id.* at 101 (testifying that prisoners are ordinarily lined up with an arm's length between the person in front of and behind them). The magnitude of the evidence points to the conclusion that Plaintiffs were forced into a line movement that had no purpose other than to abuse and humiliate them.

### C. Defendant McAllister admitted that the tactical team entered the cellhouses in a manner that was intended to intimidate Plaintiffs.

Plaintiffs presented evidence through the testimony of ten class members that the tactical team officers entered the housing units in an intimidating and aggressive manner, by banging their batons against metal surfaces and cell bars, shouting, yelling, and chanting abusive language. *See, e.g.*, 4/3/2025 Hamilton Tr. 182-83; 4/4/2025 Lyons Tr. 81; 4/7/2025 Tolliver Tr. 2-3. Multiple witnesses, including both Defendants White and McAllister, admit that the tactical team members intentionally banged their batons on surfaces to create an exceedingly noisy entry. Defendant

11

White admitted that the tactical team yelled "oo-rah" while they entered, consistent with his plan for executing the shakedowns. 4/2/2025 White. Tr. 19. Defendant McAllister further admitted that the entry was for the express purpose of *intimidating* Plaintiffs. 4/8/2025 McAllister Tr. 3.

Defendants argued at trial that this tactic was necessary to get Plaintiffs' attention, but the great weight of the testimony supported that this tactic had no legitimate penological purpose. *See* 4/9/2025 Gossett Tr. 45; 4/6/2025 Atchison Tr. 22. In fact, such an aggressive and scary entry works against the safety of prisoners and staff. Plaintiffs' expert Dan Pacholke testified that such actions risk creating a more hostile environment, and that accepted correctional practice is to enter the housing unit for shakedowns in a normal fashion. 4/7/2025 Pacholke Tr. 65; *see* 4/6/2025 Carter Tr. 110 (testifying that banging batons on doors or rails when entering a housing unit to conduct a shakedown would violate IDOC standards of professionalism). Defendants did not call an expert witness to rebut Mr. Pacholke's testimony. *Cf. Michaelis*, 545 F. Supp. at 112 (granting motion for new trial based on "[u]ncontradicted evidence"). Further highlighting the lack of penological purpose, Defendant Yurkovich acknowledged that the prisons had other methods of getting prisoners' attention (for example, by using an announcement system), and that there were no other situations outside of tactical team operations where it was necessary for officers to enter a housing unit yelling and banging on surfaces. 4/7/2025 Yurkovich Tr. 58-59.

### D. Defendants admit that Plaintiffs were forced to hold painful positions for hours at a time.

All ten testifying Plaintiffs explained that they were restrained behind their backs, thumbs up, in an extremely painful manner for the entirety of the shakedowns, which lasted several hours. *See, e.g.*, 4/7/2025 Hemmer Tr. 111. Although Defendants quibbled about whether Plaintiffs were able to sit and the length of time they were held in the holding areas, Plaintiffs' allegations were largely admitted. Everyone agreed that Plaintiffs were cuffed with their hands behind their backs,

12

thumbs up. Plaintiffs introduced into evidence an email from Defendant White himself regarding the Menard shakedowns that stated Plaintiffs were in the holding area for over 3.5 hours. 4/2/2025 White Tr. 66. Defendant White further admitted that Plaintiffs were not offered to have their handcuffs moved to the front of their bodies to increase comfort during this long period. *Id* at 67. Defendant McAllister acknowledged that forcing prisoners to stand the whole time they were in the holding area increased the risk of prisoners losing consciousness, and that that some guys "fell out" (or became unconscious) in the holding areas. 4/8/2025 McAllister Tr. 9-10.

And there was evidence from both sides that these painful restraints and positions were unnecessary. John Carter testified that it would be a violation of department policy to require prisoners to hold the same position (whether sitting or standing) for the entire time they were in the holding area. 4/4/2025 Carter Tr. 112-13. Plaintiffs' expert testified that there was no penological justification for requiring prisoners to be cuffed while standing in the holding area and that it seemed "like just a wanton infliction of pain." 4/8/2025 Pacholke Tr. 75. The unnecessary infliction of pain is all the more evident in the context of undisputed evidence from Defendants that it is normal for prisoners to be unrestrained during typical line movements, with a much smaller officer presence, without creating any security concern. 4/3/2025 White Tr. 95-97 (testifying that normal line movements are safely conducted without restraints); 4/4/2025 Carter Tr. 99 (explaining that prisoners are typically not restrained during mass line movements, which are routine and can consist of up to 100 prisoners with only 1 officer per 25 prisoners). Again, the great weight of the evidence showed that Defendants caused Plaintiffs pain for no legitimate penological purpose.

. . .

Plaintiffs do not argue that any individual aspect of the shakedowns is dispositive. The law—which was appropriately captured in the jury instructions—is clear that all circumstances of a search should be considered as a whole. *Mays*, 575 F.3d at 649-50; *see also Young v. County of Cook*, No. 06 C 552, 2009 WL 2231782, at *1 (N.D. Ill. July 27, 2009) (in the context of strip searches, "[i]t is inappropriate to compartmentalize each bit of plaintiffs' evidence and view it in isolation"). Rather, these examples highlight how Plaintiffs' testimony regarding the specific tactics used during the shakedowns was highly corroborated by other witness testimony, and how Plaintiffs further proved that the admitted actions of the tactical team officers had no valid purpose and thus must have been intended to abuse and humiliate.

Taken together, Defendants' own admissions should have led the jury to find that Plaintiffs were subjected to abusive and humiliating shakedowns for which there was no legitimate penological purpose. Dkt. 818 at 23. As this Court knows, Plaintiffs' evidence went far beyond the details repeated above. For example, Plaintiffs repeatedly testified that they were strip searched in a humiliating reverse order, that their property was wantonly destroyed, and that they experienced or witnessed all manner of physical and emotional abuse. But Plaintiffs' motion need not rely on any disputed evidence (despite its overwhelming credibility) because it is Defendants' own admissions that tip the scales so heavily in favor of Plaintiffs' arguments. It is based on this admitted testimony about the abusive and humiliating nature of the shakedowns that Plaintiffs ask the Court to order the rare but just relief of a new trial.

II.     **The weight of the evidence presented at trial established that Defendants White and McAllister knew that the Plaintiffs were subjected to abusive and humiliating shakedowns and approved of the misconduct.**

If the Court agrees that the weight of the evidence supports Plaintiffs' allegations that the shakedowns were executed in an abusive and humiliating manner that did not further any

legitimate penological purpose, Defendants White's and McAllister's liability under the next two elements of Plaintiffs' Eighth Amendment claim flow easily from that conclusion.

Defendant White was the Statewide Tactical Commander and Defendant McAllister was the Southern Regional Tactical Commander. 4/4/2025 Atchison Tr. 14; 4/7/2025 McAllister Tr. 116. Both Defendants admitted that they were responsible for planning and communicating the plans for the facility-wide shakedowns at issue in this case. Defendant White drafted the operations orders. 4/2/2025 White Tr. 4-5, 13. Either White or McAllister communicated the plan for the shakedowns every morning through an oral briefing. *Id*. at 14-5; 4/7/2025 McAllister Tr. 120. Apart from minor differences regarding the area of the prison to be searched and the holding area, the plan communicated to the tactical team members was the same for every day of the shakedowns. 4/2/2025 White Tr. 16. Both Defendants also admitted that they were responsible for overseeing and supervising the implementation of the plans on each day of the shakedowns. 4/7/2025 McAllister Tr. 119. White and McAllister both testified that they would stand in positions that permitted them to supervise everyone and make sure the tactical team officers were uniformly following their plan. 4/2/2025 White Tr. 19-20; 4/7/2025 McAllister Tr.121.

If Plaintiffs furnished the necessary proof that the shakedowns were unconstitutional, as described in Section I, then Defendants White and McAllister necessarily "*knew* that Plaintiffs were being or about to be subjected to shakedowns that were executed in an abusive and humiliating manner that did not further any legitimate penological purpose" because they planned for them to be abusive and humiliating and supervised the shakedowns to make sure they were performed in accordance with that plan. Dkt. 818 at 23 (emphasis added).

Just as obviously, Plaintiffs established that Defendants White and McAllister "*approved of, assisted with, condoned, or purposely ignored* that Plaintiffs were being or about to be subjected

to shakedowns that were executed in an abusive and humiliating manner that did not further any legitimate penological purpose." *Id.* (emphasis added). They approved of and condoned the abusive and humiliating shakedowns by directly ordering the abusive and humiliating conduct.

### III. The weight of the evidence presented at trial established that Plaintiffs were harmed as a result.

Finally, if the weight of the evidence supported Plaintiffs as to the above elements, Plaintiffs clearly established that they were harmed "[a]s a result" of Defendants White's and McAllister's actions. Dkt. 818 at 23. As the people who planned and implemented the abusive and humiliating shakedowns, White's and McAllister's actions caused the harm that Plaintiffs suffered from those shakedowns. This harm—both physical and emotional—was described in great detail to the jury, through the testimony of James Soto, David Huffman, Kevin Hamilton, Nidrell Lyons, Jonathon Tolliver, Edward Hemmer, Demetrius Ross, Glenn Verser, Ronald Smith, and Calvin Dorris. *See* Dkt. 818 at 27 (explaining that compensatory damages include "both the physical and mental aspects of injury, even if they are not easy to measure"); *see Bedenfield*, 272 F. Supp. 2d at 754 (granting motion for new trial where jury found nominal damages despite plaintiff's corroborated evidence of physical injuries).

### IV. The evidence that established Plaintiffs supervisory liability claim also established their failure to intervene and conspiracy claims.

The evidence discussed above also shows that the manifest weight of the evidence points toward Defendants White and McAllister on Plaintiffs' failure to intervene and conspiracy claims.

To determine that a Defendant was liable for failure to intervene, the jury had to find the following: (1) Plaintiffs were subjected to shakedowns that were executed in an abusive and humiliating manner that did not further any legitimate penological purpose; (2) The Defendant knew that Plaintiffs were being subjected to, or were about to be subjected to, shakedowns that

16

were executed in an abusive and humiliating manner that did not further any legitimate penological purpose; (3) The Defendant had a realistic opportunity to do something to prevent harm from occurring; (4) The Defendant failed to take reasonable steps to prevent harm from occurring; and (5) The failure to act by the Defendant caused Plaintiffs to suffer harm. Dkt. 818 at 24. The nature of the shakedowns and Defendant White's and McAllister's knowledge are discussed in detail above. As creators, supervisors, and enforcers of their plan—with operational command over all tactical team members—both Defendants necessarily had an opportunity to prevent the shakedowns from occurring. They did not take any steps to prevent the abusive and humiliating shakedowns, and thus Plaintiffs suffered. The Court should grant a new trial against Defendants White and McAllister for failing to intervene in the violation of Plaintiffs' Eighth Amendment rights.

To succeed on their conspiracy claim, Plaintiffs had to prove three things: (1) The Defendant entered into an agreement with one or more other Defendants to subject Plaintiffs to shakedowns that were executed in an abusive and humiliating manner that did not further any legitimate penological purpose; (2) The Defendant took an overt action of any kind in furtherance of the agreement; and (3) As a result of the Defendant's conduct, Plaintiffs were subjected to shakedowns that were executed in an abusive and humiliating manner that did not further any legitimate penological purpose. Dkt. 818 at 25. The result here also flows easily from this Court's decision on the supervisory liability claims. If the manifest weight of the evidence shows that Defendants White and McAllister planned abusive and humiliating shakedowns over a period of several months, then it follows that White and McAllister entered into an agreement to subject Plaintiffs to these shakedowns. In furtherance of that agreement, White and McAllister took the

overt actions of instructing tactical team members daily on the tactics they should employ. Again, as a result of White and McAllister's misconduct, Plaintiffs were harmed.

## CONCLUSION

"[A] certain deference to the jury's conclusions is appropriate," up to and until the jury returns a verdict that is "contrary to the manifest weight of the evidence." *Mejia v. Cook Cnty.*, 650 F.3d 631, 633 n.1 (7th Cir. 2011). Here, the jury's verdict for Defendants White and McAllister was against the manifest weight of the evidence presented at trial. Whether due to bias, a misunderstanding of the instructions, or some unknown and undue influence, the jury got it wrong. It is for these circumstances that the Court retains the power and responsibility to evaluate the evidence presented as a whole and order a new trial when justice so requires. Plaintiffs respectfully ask this Court to order a new trial on Plaintiffs' claims against David White and Anthony McAllister.

Respectfully submitted,

/s/ Terah Tollner
Terah Tollner
Attorney for Plaintiffs

Sarah Grady
Vanessa del Valle
Matthew Underwood
Terah Tollner
KAPLAN & GRADY LLC
2071 N. Southport Ave., Suite 205
Chicago, IL 60614
(312) 852-2184
terah@kaplangrady.com

Lewis Kaminski
Matthew Lee-Own
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
(312) 243-5900

Nicole Schult
Shireen Jalali-Yazdi
UPTOWN PEOPLE'S LAW CENTER
4413 North Sheridan
Chicago, IL 60640
(773) 769-1411

## CERTIFICATE OF SERVICE

      I, Terah Tollner, an attorney, certify that on June 11, 2025, I caused a copy of the foregoing to be filed using the Court's CM/ECF system, which effected service on all counsel of record.

                                      /s/ Terah Tollner
                                      Terah Tollner
                                      Attorney for Plaintiffs